**UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TEXAS
BEAUMONT DIVISION**

MEDLIANT INC.,

*Plaintiff,*

v.

JEDDY ANNE M. DELGADO,

*Defendant.*

Civ. Action No.:
1:23-cv-00418-MAC

**APPENDIX TO DEFENDANT JEDDY ANNE DELGADO'S MOTION TO DISMISS
PLAINTIFF'S COMPLAINT OR, IN THE ALTERNATIVE, TO STAY**

## <u>TABLE OF CONTENTS</u>

1. Exhibit 1: Agreement For Employment ………………………………….... APP.001

2. Exhibit 2: Complaint in *Mabute, et al. v. Medliant, Inc. et al.*,
   No. A-23-881156-C (Nev. Dist. Ct. Nov. 8, 2023) ………………………. ..... APP.008

3. Exhibit 3: Motion for Removal in *Mabute, et al. v. Medliant, Inc. et al.*,
   2:23-cv-02148-APG-DJA (D. Nev.), ECF No. 1 ……………………….... APP.051

4. Exhibit 4: Motion for Remand in *Mabute,*
   2:23-cv-02148-APG-DJA (D. Nev.), ECF No. 19 ……………………..... APP.061

5. Exhibit 5: Motion to Dismiss in *Mabute,*
   2:23-cv-02148-APG-DJA (D. Nev.), ECF No. 23 ……………………..... APP.069

6. Exhibit 6: Declaration of Jeddy Anne Delgado ………………………… APP.089

7. *All Star Bonding v. State,*
   119 Nev. 47 (2003) …………………………………………….. .......... APP.091

8. *Am. First Fed. Credit Union v. Soro*
   131 Nev. 737 (2015) …………………………………………….. .... APP.096

9. *Anvui, LLC v. G.L. Dragon, LLC*
   123 Nev. 212 (2007) …………………………………………….. .... APP.101

10. *Burch v. 2d Judicial Dist. Ct.,*
    118 Nev. 438 (2002) ……………………………………………. ........... APP.106

11. *Bustos v. Dennis,*
    No. SA-17-CV-39-XR, 2017 WL 1049570 (W.D. Tex. Mar. 17, 2017) …........... APP.112

12. *Coppola v. Baron*
    No. 2:07-cv-00664-BES-RJJ, 2007 WL 4180590 (D. Nev. Nov. 20, 2007)…….. APP.117

13. *Fed. Nat'l Mortgage Assoc. v. 8th Judicial Dist. Ct. in and for Cty. Of Clark*
    528 P.3d 586 (Table), 2022 WL 19697697 (Nev. Dec. 22, 2022) ........................ APP.122

14. *Fremont Emergency Servs. (Mandavia), Ltd. v. UnitedHealth Group, Inc.,*
    No. A-19-792978-B, 2020 WL 10353883 (Nev. Dist. Ct. June 24, 2020) ……... APP.127

15. *Golden Rd. Motor Inn, Inc. v. Islam,*
    132 Nev. 476 (Nev. 2016) …………………………….......................................... APP.170

16.   *Halcyon Silver, LLC v. Evelynmoe*,
      526 P.3d 1110, 2023 WL 2661524 (Nev. Ct. App. Mar. 24, 2023)  ..................... APP.188

17.   *Huawei Techs. Co., Ltd. v. Yiren Huang*
      No. 4:17-CV-00893, 2018 WL 1964180 (E.D. Tex. Apr. 25, 2018) ...............APP.198

18.   *Huntsman Corp. v. Int'l Risk Ins. Co.*
      No. 1:08-CV-029, 2008 WL 1836384 (E.D. Tex. Apr. 22, 2008) ...........…........ APP.211

19.   *Iliescu v. Regional Trans. Comm'n of Washoe Cty.*,
      522 P.3d 453 (Nev. Ct. App. 2022) …………………………………… ..................APP.217

20.   *Magtoles v. United Staffing Registry, Inc.*,
      No. 21-CV-1850 (KAM) (PK), 2023 WL 2710178 (E.D.N.Y. Mar. 30, 2023)......APP.228

21.   *Mason v. Fakhimi*,
      865 P.2d 333 (Nev. 1993) …………………………........................................ APP.258

22.   *Meganathan v. Signal Int'l L.L.C.*
      No. 1:13-CV-497, 2015 WL 13906343 (E.D. Tex. June 17, 2015) ………….......APP.264

23.   *Mort Wallin of Lake Tahoe, Inc. v. Commercial Cabinet Co.*,
      105 Nev. 855 (1989) …………………………………………………… ............. APP.268

24.   *Paguirigan v. Prompt Nursing Employment Agency, LLC*,
      No. 17-CV-1302 (NG), 2019 WL 4647648 (E.D.N.Y. Sept. 24, 2019) ......………APP.272

25.   *Phillips v. Valley View Surgical, LLC*,
      498 P.3d 1290, 2021 WL 5370984 (Nev. Ct. App. Nov. 17, 2021) ………………APP.293

26.   *Phillipps v. Wells Fargo Bank, N.A.*,
      No. 4:16-CV-420, 2016 WL 4703067 (E.D. Tex. Sept. 8, 2016) ………........... APP.300

27.   *Prothera, Inc. v. Zhou Ye*,
      No. 3:18-cv-00410-MMD-CLB, 2020 WL 3073345 (D. Nev. June 10, 2020) …..APP.303

28.   *Reno Club, Inc. v. Young Inv. Co.*,
      64 Nev. 312 (1947) ………………………………………………………… .... APP.311

29.   *Sherman v. Smead*,
      572 P.3d 973 (Table), 2023 WL 2960621 (Nev. Ct. App. 2023) …………. ........ APP.325

30.   *Twin City Ins. Co. v. Key Energy Servs., Inc.*
      No. CIV A H-09-0352, 2009 WL 1544255 (S.D. Tex. June 2, 2009) ………....... APP.334

31. *Vorrey v. City of Brownsville*,
    No. 17-cv-222, 2018 WL 7291458 (S.D. Tex. Oct. 5, 2018) ……………………..APP.345

32. *Western Cab Co. v. Kellar*,
    90 Nev. 240 (1974) …………………………………………………………………..APP.356

33. *White v. Health Carousel, LLC*
    No. MO:19-CV-00066-DC, 2019 WL 7824787 (W.D. Tex. Oct. 18, 2019) … ….. APP.362

34. 20 C.F.R. § 656.12(b) …………………………………………………… .... APP.369

35. 20 C.F.R. § 655.731(b)(9)(ii) ……………………………………………… APP.372

36. Nev. Rev. Stat. § 200.463 ……………………………………………… ..APP.388

# EXHIBIT 1



**AGREEMENT FOR EMPLOYMENT**

This Agreement for Employment is entered into as of the latest date of the execution of the agreement by all parties (the "Effective Date"), by and between Medliant and individual indicated in the Signature block (Employee).

WHEREAS, Employer is a corporation which locates healthcare assignments in accordance with the needs of Employer's Clients and/or Employer's Clients' Customers and which may include companies providing services competitive to Employer (any and all of which are hereafter referred to as "Clients"); and

WHEREAS, Employee possesses training, skills, and the requisite qualifications to provide healthcare services in the U.S., desires employment in the U.S.'s healthcare field, and requires services of a sponsoring Employer to facilitate the employment and immigration process through the United States Citizenship and Immigration Services ("USCIS"); and

WHEREAS, Employer desires to provide such services, including sponsorship, and Employee currently desires to be employed by Employer in the capacity of healthcare professional performing work at Clients' facilities as assigned by Employer.

NOW, THEREFORE, in consideration of the mutual promises, covenants and conditions set forth herein, the parties hereto agree as follows:

1) **SCOPE OF DUTIES**.  Employer employs Employee and Employee accepts employment upon the terms and conditions set forth in this Agreement.  Employee shall perform such specialized healthcare work as he/she is directed to perform by Employer for Employer's Clients.  Employer may direct Employee to take directions from such Client, even though Employee remains employed by Employer.  Employee represents that, in the performance of his/her services for Employer's Clients, he/she will regularly and typically exercise sound discretion and independent professional judgment with respect to the significant matters entrusted to him/her.  Employee agrees to work at Clients' locations to which Employer directs him/her and at any other premises designated by Employer.  Employee agrees to adhere to applicable Employer and Clients' policies, procedures and requirements in performing his/her assigned work as well as applicable laws, rules, and regulations.  Employee further agrees to exert his/her best efforts and to conduct himself/herself in a professional manner at all times while on assignment with Employer's Clients.  Employee understands and agrees that this Agreement establishes an at-will employment relationship.  Employee further understands and agrees that while working at Clients' sites he/she works in the name of and represents Employer, but Employee has no right or authority to bind Employer to any contractual or other obligation.

2) **TERM**.

   a) Employee's employment shall commence upon the start date of services for Employer's Client and continue in effect for a minimum of five thousand two hundred (5,200) straight-time hours (hereinafter referred to as "contractual hours") or until such employment is terminated by Employer or Employee in accordance with the provisions of this Agreement or law of the state in which services are being performed, but under no circumstances in violation of any USCIS laws, rules, regulations, policies, or guidelines, as they exist from time to time.  In addition, any termination of the

**APP. 002**

DocuSign Envelope ID: E1375340-9D2B-40DF-9058-9BF10039817

employment relationship and/or this Agreement shall not release Employee from the satisfaction of the contractual hours, unless Employer agrees to waive the contractual hours' provisions.

b) The terms of this Agreement shall commence upon the Effective Date of this Agreement and continue until all services for Employer are completed or for a minimum of five thousand two hundred (5,200) straight-time hours after commencement of services, except for the terms and conditions in Sections 4, 8, 10, 14, 15, 16, 17 and 18 herein which shall continue for four (4) years after termination of the Agreement per Section 2(a) above or otherwise.

c) Employee acknowledges that Employer has paid substantial sums in order for Employee to immigrate to the U.S. to work as an employee of Employer, so Employee commits to work for a minimum of five thousand two hundred (5,200) straight-time hours.  Employee's employment shall continue in effect for a minimum of five thousand two hundred (5,200) straight-time hours and until such employment is terminated by Employer or Employee in accordance with the provisions of this Agreement.

d) In the event that Employee voluntarily leaves the employment of the Employer prior to completion of the five thousand two hundred (5,200) straight-time hours, or Employee accepts employment other than through Employer, Employee acknowledges that Employer will not have made a reasonable amount of profit in relation to Employer's investment of time, effort, and money in promoting, training, testing, and licensing and otherwise assisting Employee to become a U.S. employee.  The difficulty in ascertaining damages due to Employee's early termination is caused by Employer's profits being made only when Employee performs work for Clients.  However, Employee and Employer agree that a fair compromise for liquidated damages is the sum of $2,500 for each month (156 hours represents one month) remaining of the minimum five thousand two hundred (5,200) straight-time hours' commitment at the time of the termination.  This amount is reasonable as it is considerably less than the profit Employer would make if the Agreement was not terminated prematurely. ***This liquidated damages clause applies ONLY to the lost profits of Employer***.  The liquidated damages are separate, and are in addition to, any costs of immigration owed to Medliant pursuant to the terms of the Offer Letter.  Said liquidated damages sum shall be due in full on the date of Employee's termination.  Should it become necessary to pursue an action or proceeding to enforce the obligations set forth in this Agreement, along with the costs of immigration and liquidated damages, Medliant shall also be entitled to an award of reasonable attorneys' fees and costs incurred in attempting to enforce these terms.

e) Where Employee leaves voluntarily prior to the contract term expiring, Medliant may use Employee's breach of this Agreement as grounds to file suit for breach of contract, amongst other claims, which Medliant has done previously upon prior Employees breaching the herein Agreement.

3) **COMPENSATION, TIME RECORDS, DEDUCTIONS.**  Employer agrees to pay Employee as set forth in the Offer Letter.  For each assignment Employee will record on Employer's prescribed time record, and in accordance with any procedures established by Employer, Employee's hours worked on each day.  Prior to submitting any such time record to Employer, Employee shall obtain on each time record Client's signature confirming and approving the hours worked by Employee.  Employee agrees that such Client-approved time record shall be conclusive as to time worked each day by Employee.  Employee further agrees that he/she is responsible for ensuring that such time record (including Client's signature) for any week is received by Employer's accounting office no later than three (3) calendar days from final



date of work period.  Employee recognizes that Employer may elect to modify or supplement these procedures, orally or in writing, and, as a condition to continued employment, Employee agrees to be bound by any such future modifications or additions.  Employer shall deduct amounts from Employee's compensation only as authorized by applicable law, including amounts attributable to all applicable income tax withholding and Federal Insurance Corporation Act ("FICA") tax withholding.

4) **REIMBURSEMENT OF EXPENSES.**  Employer shall reimburse Employee for necessary or ordinary expenses incurred in the course of performing work under this Agreement provided that Employee submits to Employer for written approval in advance and Employer approves the specific expenditure in writing in advance and notifies Employee in writing in advance of its intention to provide reimbursement.  In order to receive an approved reimbursement, Employee shall present Employer with an itemized accounting of expenditures and supporting receipts and vouchers and any further information that Employer may request, and such reimbursement shall be contingent upon receipt of adequate information.

5) **BENEFITS.**  Except as specified in the Offer Letter for benefits prior to the commencement of employment or the first short term of employment, Employee shall receive no other compensation or benefits.

6) **HOURS.**  While performing work at Client's site, Employee shall work the hours typically worked by Client's employees unless directed otherwise by Employer, who shall set and enforce Employee's amount and schedule of hours. Employee shall make themselves available for all on-call and callback at the discretion of the Client. However, Employee shall work only those hours approved by Employer.

7) **PERSONAL SERVICES OF EMPLOYEE.**  Employee must personally perform the work as directed by Client or Employer and has no right to subordinate or assign Employee's work to another individual. Employee has no right to hire, supervise or pay assistants, unless as specifically directed in writing in advance by Employer to do so.

8) **CONFIDENTIALITY AND NONDISCLOSURE.**

   a) Employee acknowledges that confidential information and materials regarding Employer and its Clients have been or will be disclosed to him/her in hard copy, verbally and/or electronic methods only for the purpose of assisting him/her in performing his/her duties under this Agreement.  Such information and materials are and shall remain the property of Employer or its Client.  As used in this Agreement, the phrase "confidential information and materials" includes but is not limited to all information belonging to Employer or Employer's Clients relating to their respective services and products, customers, business methods, strategies and practices, internal operations, pricing and billing, financial data, costs, personnel information (including but not limited to names, educational background, prior experience and availability), customer and supplier contacts and needs, information designated by Employer or any of its Clients as confidential, and all other information that might reasonably be deemed confidential; and all of which is included in Section 10.  Employee acknowledges that he/she may use such confidential information and materials only during his/her term of employment and solely for the purpose of such employment, and that this right expires upon Employee's discharge, resignation or other termination of employment or this Agreement.  Employee therefore agrees not to use for his/her own benefit or for the benefit of any other person, except as

specifically authorized in writing in advance by all owners of such information and materials, or divulge to any person for any reason, any such information and materials related to the business of Employer, any of its Clients, or their customers, clients and affiliates, both at any time during the term of this Agreement and at any time after its termination. Employee agrees to take any and all reasonable actions, including those requested by Employer or Client, to prevent such disclosure and preserve the security of confidential information and materials. Employee further agrees that he/she will not directly or indirectly disclose to any person, including to the Client or to any co-workers either during or after his/her period of employment, Employee's wage rates and terms without prior written consent of Employer (disclosure to a spouse or financial institution shall be permitted so long as further disclosure by such spouse or institution is prohibited).

b) Employee understands and agrees that he/she has a very high legal duty, i.e., a fiduciary duty, to maintain all confidences referenced in this Agreement and as may be discussed or otherwise communicated to Employee during the term of this Agreement. <u>Any violation of this Section 8 shall be a serious matter and dealt with accordingly, including, but without limitation, in Employer's sole discretion a violation may be considered a material breach of this Agreement and thereupon Employer may pursue all legal and equitable remedies available through a court of law.</u>

9) **DIRECTION, SUPERVISION, AND COOPERATION.** Employee agrees to adhere to all applicable laws, policies, procedures and rules of Employer, Client, and governmental agencies. Employee will ordinarily work as required by Employer at the direction of the Client but he/she agrees that Employer has the right to direct Employee as to when and where Employee is to perform the work. Employer has the right to require Employee's attendance at meetings at Employer's or any other premises. Employee's performance is subject to the review and approval of Employer and Client and others, as may be required by law. Employee agrees to cooperate fully with any request by Employer for Employee to provide any information, orally and in writing, related to the performance of Employee's services, including but not limited to any information required by Employer to respond to any questions, claims, defenses, and the like raised by any person or governmental agency or required by Employer to prepare or file any claims, defenses or the like to be made by Employer.

10) **RETURN OF PROPERTY.**

a) Employer directs and Employee agrees that upon termination of an assignment with any Client, Employee will deliver to the Client or Employer all keys, pass cards, identification cards, policy and procedure manuals, or materials of any nature in Employee's possession or control that were given to Employee by Client or Employer that relate to Employee's services for Client.

b) Employer directs and Employee agrees that upon termination of the employment relationship between Employee and Employer, Employee will deliver to Employer all keys, pass cards, identification cards, policy and procedure manuals, or materials of any nature in Employee's possession or control that were given to Employee by Employer or a Client that relate to Employee's employment with Employer.

11) **EXCLUSIVITY/CONFLICT OF INTEREST.** Employee hereby agrees that during the term of this Agreement he/she shall provide services only for the benefit of Employer and shall refrain from performing services for others, unless approved in advance by Employer. In no case shall Employee

DocuSign Envelope ID: E127E340-8D2B-10DE-8CE3-9B51100388A7



provide services to other healthcare facilities or to others who are in direct competition to Employer's business.

12) **RESIGNATION.**  Employee may resign with or without reason as of a specified date after Employer receives written notice from Employee of his/her intention to resign as of a specified date.  See Section 2 for details.

13) **EMPLOYMENT AT-WILL.**  Consistent with the provisions set forth herein, the parties acknowledge and agree that the employment relationship created by this Agreement is at-will.  Any cause for discharge mentioned in this Agreement or in any document maintained by Employer (including but not limited to employment manuals or recruitment materials) shall not in any way limit Employer's right to discharge Employee, or in any way alter Employee's at-will status.  See Section 2 for details.

14) **SEVERABILITY.**  In the event that any provision herein is construed to be unenforceable, then the parties or a court of competent jurisdiction shall attempt to revise such provision while keeping its intent to the extent possible and having such revised provision enforceable.  In the event that any provision cannot be revised into an enforceable form, then such provision of this Agreement shall be considered severable such that if any provision or clause conflicts with existing or future applicable law, or may not be given full effect because of such law, this shall not affect any other provision of the Agreement which, consistent with such law, shall remain in full force and effect.  All surviving clauses shall be construed so as to effectuate the purpose and intent of the parties.

15) **INTEGRATION.**  Each party hereto specifically acknowledges this Agreement is the culmination of many conversations, negotiations, and communications, both written and oral, between the parties.  All such prior communication are made null and void and replaced by this Agreement.  This Agreement contains all of the agreements, understandings, representations, conditions, warranties, and covenants made between the parties hereto.  Unless set forth herein, neither party shall be liable for any representations made and all modifications and amendments hereto must be in a writing signed by both parties.

16) **GOVERNING LAW/VENUE.**  This Agreement shall be governed by the laws of Nevada.  Medliant is incorporated in Nevada and as such, chooses to utilize Nevada law for interpretation and analysis of the herein agreement as well as chooses to utilize the venue of the 8th Judicial District Court in Las Vegas, Nevada as and for any disputes that may arise from time to time.  By signing below, you agree to Medliant's choice of venue and choice of law.

17) **WAIVER.**  No waiver of any provision of this Agreement shall be valid unless it is in writing and signed by the person against whom it is sought to be enforced (in the case of Employer by an officer of Employer).  The failure of any party at any time to insist on strict performance of any condition, promise, agreement or understanding contained in this Agreement shall not be construed as a waiver or relinquishment of the right to insist on strict performance of the same condition, promise, agreement or understanding at any future time.

18) **ATTORNEY'S FEES.**  Should it become necessary to pursue an action or proceeding to enforce the obligations set forth in this Agreement, Medliant shall be entitled to an award of reasonable attorneys' fees and costs incurred in attempting to enforce these terms.

718 Thompson Lane, Suite 108-283, Nashville, TN 37204 ▪ Tel: 650 377 0990 ▪ Fax: 888 377 2460 ▪ www.medliant.com



19) **MISCELLANEOUS.**  Employee represents that he/she has read and understands the terms of this
Agreement, has had an opportunity to ask questions and to review this Agreement with legal counsel of
his/her choice, is not relying on any advice from Employer in this regard, and is voluntarily signing this
Agreement.


20) **SIGNATURES.**

This Agreement is signed to be effective as of the date on the first page hereof and is signed first by Employee
who makes this an offer to Medliant to accept it, in Clark County, Las Vegas, Nevada.


Medliant/Employer                                           Employee

DocuSigned by:                                              DocuSigned by:

*Allen B Miller JR.,*                                       *[signature]*

Allen B. Miller Jr.                                         B0F277E7D8B64E4...

President/CEO                                               Jeddy Anne M. Delgado


10/8/2019                                                   10/8/2019

Dated Signed                                                Date Signed

718 Thompson Lane, Suite 108-283, Nashville, TN 37204 • Tel: 650 377 0990 • Fax: 888 377 2460 • www.medliant.com

**APP. 007**

# EXHIBIT 2

Electronically Filed
11/8/2023 10:59 AM
Steven D. Grierson
CLERK OF THE COURT

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

COMP
Mark R. Thierman, Nev. Bar No. 8285
mark@thiermanbuck.com
Joshua D. Buck, Nev. Bar No. 12187
josh@thiermanbuck.com
Leah L. Jones, Nev. Bar No. 13161
leah@thiermanbuck.com
THIERMAN BUCK LLP
7287 Lakeside Drive
Reno, Nevada 89511
Tel. (775) 284-1500
Fax. (775) 703-5027

Juno Turner (*pro hac vice* motion forthcoming)
juno@towardsjustice.org
David H. Seligman (*pro hac vice* motion forthcoming)
david@towardsjustice.org
Rachel W. Dempsey (*pro hac vice* motion forthcoming)
rachel@towardsjustice.org
TOWARDS JUSTICE
P.O. Box 371689, PMB 44465
Denver, CO 80237-5680
Tel. (720) 441-2236

*Attorneys for Plaintiffs and the Proposed
Class and Collective*

CASE NO: A-23-881156-C
Department 29

**DISTRICT COURT
CLARK COUNTY, NEVADA**

| | |
|---|---|
| ELIAHKIM MABUTE and JEDDY ANNE DELGADO on behalf of themselves, those similarly situated, and the Proposed Rule 23 Class, <br><br> Plaintiffs, <br><br> vs. <br><br> MEDLIANT INTERNATIONAL HEALTHCARE STAFFING, <br><br> Defendant. | Case No.: <br><br> Dept. No.: <br><br> **CLASS AND COLLECTIVE ACTION COMPLAINT** <br><br> **Arbitration Exemption Claimed: Class Action** <br><br> 1) Violations of the Trafficking Victims Protection Act, 18 U.S.C. §§ 1589, 1590, and 1594; and <br><br> 2) Violations of the Fair Labor Standards Act, 29 U.S.C. §§ 201 et seq. <br><br> **JURY TRIAL DEMANDED** |

**APP. 009**

COMES NOW Plaintiffs ELIAHKIM MABUTE and JEDDY ANNE DELGADO, on behalf of themselves and all other similarly situated and typical persons and allege the following:

All allegations in the Complaint are based upon information and belief except for those allegations that pertain to the Plaintiffs named herein and their Counsel. Each allegation in the Complaint either has evidentiary support or is likely to have evidentiary support after a reasonable opportunity for further investigation and discovery.

## INTRODUCTION

1.      This case is about labor trafficking and its impact on an essential workforce, including failure to pay minimum wages, suppression of wages, and unfair competition.

2.      Medliant International Healthcare Staffing ("Medliant," "Defendant," or "the company") is a recruitment and staffing company that hires healthcare workers from other countries to work at various healthcare facilities around the United States.

3.      Plaintiffs Eliahkim Mabute and Jeddy Anne Delgado (collectively, "Plaintiffs") are two such healthcare workers.

4.      Medliant led Plaintiffs and its other foreign-recruited healthcare workers to believe that they would come to the United States to practice nursing in a safe environment with a good employer who would treat them fairly.

5.      But working for Medliant was nothing like that. Rather, Medliant's "employment" is essentially indentured servitude.

6.      Medliant requires healthcare workers to pay liquidated damages of up to approximately $80,000 if they leave Medliant within approximately three years of starting to work for the company, along with an unspecified additional amount in reimbursement for immigration expenses. And Medliant has a practice of threatening workers who try to resign with immigration consequences, even though Medliant nurses' immigration status is not tied to a specific employer.

7.      This lawsuit seeks to end Medliant's illegal practices and to compensate the

- 2 -
CLASS AND COLLECTIVE ACTION COMPLAINT

healthcare workers through two categories of claims.

8.     First, Plaintiffs assert forced labor claims under federal law. Employers cannot use or attempt to use the threat of substantial harm, including financial harm or immigration consequences, to keep people trapped in their jobs. Medliant's threats of extraordinary financial penalties and immigration consequences if employees try to leave their jobs violate federal forced labor laws and contravene the spirit of a competitive labor market to the detriment of Medliant's healthcare workers and its competitors who play by the rules.

9.     Second, Plaintiffs assert a claim under the Fair Labor Standards Act for failure to pay wages "free and clear" because Medliant's policy of charging workers so-called "liquidated damages" and other damages if they try to leave their jobs prevented their earned wages from being "paid finally and unconditionally."  And when Medliant recovers so-called "damages" in its lawsuits or through payment of those sums, it receives a "kick-back" of wages that is impermissible under the FLSA. The kickbacks reduce workers' wages in their final workweek of employment to substantially less than the federal minimum wage—indeed, well into the negative numbers.

## JURISDICTION AND VENUE

10.     This Court has jurisdiction over the claims alleged herein because it is a court of general jurisdiction, in accordance with the Agreement for Employment with Plaintiffs and members of the proposed Class and Collective that contains a Nevada choice of law and venue provision, and because the amount in controversy exceeds $15,000.

11.     This Court has personal jurisdiction over Defendant, and venue is proper in this Court, because Defendant is incorporated in Nevada and because its Agreement for Employment with Plaintiffs and members of the proposed Class and Collective contains a Nevada choice of law and venue provision.

## PARTIES

12.     Plaintiff ELIAHKIM MABUTE is a natural person and registered nurse who was employed by Defendant until November 8, 2023. He is a citizen of the Philippines and a legal permanent resident of the United States. He lives in Beaumont, Texas.

13.     Plaintiff JEDDY ANNE DELGADO is a natural person and registered nurse who is currently employed by Defendant. She is a citizen of the Philippines and a legal permanent resident. She lives in Beaumont, Texas.

14.     Defendant MEDLIANT INTERNATIONAL HEALTHCARE STAFFING is a Domestic Corporation incorporated in Nevada and with its principal place of business in Nashville, Tennessee.

15.     Defendant is an employer under the FLSA, 29 U.S.C. § 201 *et. seq.*

### FACTUAL ALLEGATIONS

**I.      DEFENDANT'S BUSINESS**

16.     Medliant recruits trained nurses from other countries, brings them to the United States, and sells their labor to healthcare facilities. These healthcare facilities often lack sufficient staff to serve the healthcare needs of their communities, so they turn to Medliant.

17.      Medliant sells nurses the idea of the American Dream, promising on its website that it will enable nurses to "fulfill your dreams of working and living in the U.S." It tells nurses that this process comes with "[n]o risk and no upfront costs."

18.     Medliant's clients receive a different promise: That hiring a Medliant nurse will reduce costs, "increase[e] tenure[,] and decreas[e] staff turnover."

19.     Medliant profits off the labor of the healthcare workers it recruits. Specifically, Medliant profits by charging its clients (i.e., the healthcare facilities) fees for its healthcare workers' labor. Therefore, the longer Medliant can make healthcare workers continue to work for it, the more it can profit from their labor. The healthcare facilities benefit from the arrangement through, among other things, the labor of expert healthcare workers.

- 4 -
CLASS AND COLLECTIVE ACTION COMPLAINT

20.     Medliant makes the nurses it employs sign form contracts, each with substantially the same terms. A true and correct copy of one of these contracts is attached hereto as Exhibit A.

21.     These contracts provide the means by which Medliant can keep its promises to its clients, by punishing workers who attempt to leave their jobs before a specified time period is up.

## II.     DEFENDANT'S THREATENED FINANCIAL PENALTY

22.     To compel workers to keep working for Medliant, its form contract requires them to work for a "term" of a minimum of 5,200 straight-time hours (i.e., excluding overtime).

23.     The contract threatens that workers who resign before this term is up will owe Medliant "liquidated damages" for Medliant's "lost profits."

24.     Specifically, the contract provides, in relevant part:

Employee and Employer agree that a fair compromise for liquidated damages is the sum of $2,500 for each month (156 hours represents one month) remaining of the minimum five thousand two hundred (5,200) straight-time hours' commitment at the time of the termination. This amount is reasonable as it is considerably less than the profit Employer would make if the Agreement were not terminated prematurely. ***This liquidated damage clause applies ONLY to the lost profits of Employer.*** The liquidated damages are separate, and are in addition to, any costs of immigration owed to Medliant pursuant to the terms of the Offer Letter. Said liquidated damages sum shall be due in full on the date of Employee's termination. Should it become necessary to pursue an action or proceeding to enforce the obligations set forth in this Agreement, along with the costs of immigration and liquidated damages, Medliant shall also be entitled to an award of reasonable attorneys' fees and costs incurred in attempting to enforce these terms.

25.     The contract provides that "[w]here Employee leaves voluntarily prior to the contract term expiring, Medliant may use Employee's breach of this Agreement as grounds to file suit for breach of contract, amongst other claims, which Medliant has done previously upon prior Employees breaching the herein Agreement."

26.     The offer letter that Medliant provides to nurses, attached hereto as Exhibit B, states that:

- 5 -
CLASS AND COLLECTIVE ACTION COMPLAINT

[i]f, after arrival in the U.S., you fail to meet contractual obligations to Medliant, or you terminate the Agreement prior to completing five thousand two hundred (5,200) straight-time hours of service, you agree to reimburse Medliant for all costs incurred including associated administrative, licensing, and legal expenses for R.N.'s relocation and immigration.

27.     Under 20 C.F.R. § 656.12, employers may not "seek or receive payment of any kind for any activity related to obtaining permanent labor certification."

28.     The contract does not allow nurses to leave employment before the 5,200 hours have been completed even if changed circumstances or other issues make it impossible or extremely difficult for them to fulfill their contracts.

29.     Medliant routinely threatens nurses that if they resign early, Medliant will file a lawsuit against them, and tell nurses that Medliant has never lost a lawsuit against a former employee.

## III.   DEFENDANT'S IMMIGRATION THREATS

30.     Medliant's healthcare workers are in the United States on EB-3 visas. EB-3 visas are available for skilled or professional workers, including nurses, and are not tied to a specific employer. Holders of EB-3 visas receive green cards allowing them to legally live and work in the United States.

31.     The offer letter Medliant requires all nurses to sign states:

Medliant will notify USCIS of your termination as Medliant sponsored your immigration. USCIS has the power to determine that you intended to defraud the government because you did not fulfill your five thousand two hundred (5,200) straight-time hours' commitment.

32.     This is highly misleading and threatening. Medliant's 5,200-hour work requirement is specific to Medliant and is not required or enforced by USCIS.

33.     Medliant's offer letter also attaches a document called "IMPORTANT NOTICE REGARDING EMPLOYMENT-BASED GREEN CARDS." An example of this document is attached hereto as Exhibit C.

34.     This document purports to "educate [nurses] on some of the most important U.S. immigration laws regarding your employment-based Green Card." It states:

- 6 -
CLASS AND COLLECTIVE ACTION COMPLAINT

Please note that for an employment-based Green Card to be considered valid, the foreign national (employee) must work for the sponsoring employer. Not only must the foreign national work for the sponsoring employer, but he/she must also perform the job originally proposed on the I-140 petition, which is specific to the sponsoring employer. . . . If an employee leaves too soon, the United States Citizenship and Immigration Services (USCIS) may determine that the employee did not intend to take the job on a "permanent" basis. If the employee leaves his/her employment before their obligation is complete, the employer will notify USCIS that the employee has left the sponsor's employment, and USCIS may take action against the employee, including possible deportation. This could also affect the foreign national's ability to obtain citizenship or a petition for his/her relatives in the future. If the USCIS finds out that the employee was just waiting for his/her immigration to be complete before switching employers, then the USCIS may charge the employee with fraud.

Remember, Medliant has sponsored your Green Card and invested a large amount of time and money in your immigration and employment process. You have accepted and made a written commitment to Medliant that you will be employed with Medliant for a minimum of five thousand two hundred (5,200) straight-time hours. If you fail to meet your contractual obligation with Medliant or decide to terminate the Agreement prior to completing your five thousand two hundred (5,200) straight-time hours' commitment, Medliant will notify the USCIS, and USCIS may take action against you. In addition, Medliant will also have the right to recover from you all costs, fees, damages, and attorneys' fees as stated in the Offer Letter and Employment Agreement.

35.     The information contained in this notice is untrue and/or highly misleading. The USCIS does not require or enforce Medliant's 5,200-hour work requirement, and there is no requirement that nurses work for their sponsoring employer or else face deportation.

36.     When Medliant healthcare workers give notice that they intend to leave their jobs before the expiration of their commitment period, Medliant routinely tells them that Medliant will be forced to report their resignation to the United States Customs and Immigration Services and that they will get deported as a result. Medliant tells nurses who have immigrated to the United States with their families that their families will be deported as well.

37.     These threats are a powerful tool for Medliant in its efforts to prevent employees from making a free and informed decision to find new employment.

**IV.     DEFENDANT'S FAILURE TO PROVIDE SAFE AND DECENT WORK ENVIRONMENTS WITH FAIR CONDITIONS AND PAY**

CLASS AND COLLECTIVE ACTION COMPLAINT

38.     Medliant recruits nurses that already have significant experience in nursing. Medliant nurses have often worked for many years in hospitals all over the world before coming to the United States to work for Medliant.

39.     Despite this, Medliant frequently places nurses in positions that are well below their level of experience or outside their area of expertise, and provides them with hourly pay that is much lower than the pay received by American nurses with comparable levels of experience.

40.     Medliant nurses are generally ineligible for the bonuses and incentives that are paid to their colleagues at the hospitals where they work.

41.     Medliant controls where nurses are placed. If the hospital they are placed at has difficult or dangerous working conditions, such as high patient-to-nurse ratios or other limited resources, nurses may find themselves unable to leave for a better job because of Medliant's threats of financial harm and immigration consequences.

V.     **PLAINTIFF ELIAKHIM MABUTE'S FORCED LABOR EXPERIENCE WITH MEDLIANT**

42.     Plaintiff Eliakhim Mabute is a registered nurse.

43.     Mabute is from the Philippines and is a legal permanent resident of the United States.

44.     He has worked as a nurse since 2010, when he graduated from university in the Philippines with his bachelor's degree in nursing. He also received a master's of science in nursing in 2013.

45.     Mabute worked as a nurse in the Philippines until 2015.

46.     In 2015, Mabute moved to Saudi Arabia to work as a nurse there. He worked in Saudi Arabia until January 2019. From January 2019 to April 2022, he worked as a nurse in Abu Dhabi.

47.     In September 2019, while working as a nurse in Abu Dhabi, Mabute took and passed the National Council Licensure Examination ("NCLEX"), which is the nurse licensing exam for nurses working in the United States.

48.     Mabute wanted to work as a nurse in the United States because he believed that living and working in the United States was a great opportunity.

49.     He learned about Medliant from the processing agency in the Philippines that processed his NCLEX exam.

50.     After he submitted an application to Medliant, Mabute received a phone call from Lilian Castro, Medliant's Vice President of International Operations, who interviewed him and offered him a job with Medliant.

51.     Mabute accepted, and in October 2019 signed an offer letter and employment agreement with Medliant.

52.     In late 2021, Mabute received offers to work for Medliant from hospitals in three states. He chose the hospital in Texas because he had family there. He was not told the name of the hospital until after he had accepted the offer.

53.     He later learned that he had been placed at Baptist Hospitals of Southern Texas in Beaumont, Texas.

54.     Mabute's visa was approved in January 2022.

55.     Mabute arrived in the United States on April 10, 2022, along with several other new Medliant employees. They were greeted at the airport by Alicia Nelson, Medliant's Director of International Logistics and Client Services, who took them to a hotel where they lived for approximately four days.

56.     Nelson helped the new Medliant employees perform various administrative tasks, including getting a social security card, opening a bank account, and shopping for groceries.

57.     Medliant did not pay the nurses during this time.

58.     Mabute's first day of work at Baptist Hospitals was April 18, 2022.

- 9 -
CLASS AND COLLECTIVE ACTION COMPLAINT

APP. 017

59.     Mabute was originally hired as a registered nurse at a rate of approximately $29.50 an hour. In approximately August 2022, he was promoted to charge nurse, a supervisory position that involves coordinating patient care. The promotion to charge nurse came with a raise of approximately $1 an hour.

60.     Mabute's current hourly rate is approximately $37 an hour. This is much less than the American nurses at the hospital.

61.     Shortly after beginning work at the hospital, Mabute realized that the hospital was significantly understaffed, and the work was draining and sometimes dangerous. During the first year, there were no nurse's aides at all on the night shift, which is when Mabute generally worked. The hospital did eventually hire a single aide to assist with up to 22 patients, which still left nurses performing much of the work traditionally performed by an aide themselves.

62.     There were also no cleaning services on the night shift, and no phlebotomist, meaning that nurses had to take on all of this work themselves, including everything from drawing blood to removing trash and dirty linens from patient rooms.

63.     When Mabute was promoted to charge nurse, bedside care was no longer part of his job description. Charge nurses are in charge of the nursing unit, where they coordinate the care provided to the patients and serve as the primary resource for bedside nurses.

64.      However, due to understaffing, he still had to perform significant amounts of direct patient care. This made his work physically and mentally challenging, requiring him to for example push heavy patients between units, lift patients, and act as a runner between the unit and other departments.

65.     In fall 2022, a Medliant nurse quit his job at Baptist Hospitals before the expiration of his contract. In response to the nurse's departure, Baptist Hospitals and Medliant staff called a joint meeting to discuss issues that Medliant employees were having on the job.

66.     Approximately 30 Medliant nurses employed at Baptist Hospitals attended.

CLASS AND COLLECTIVE ACTION COMPLAINT

67.    At that meeting, Mabute raised his concerns about staffing, including the lack of nurses' aides. In response, a Baptist Hospitals employee told him to "speak up" about his concerns.

68.    Nelson and Castro also spoke separately to the Medliant nurses while the Baptist Hospitals employees were not present. In response to nurse concerns about staffing, Castro said that understaffing is normal in the United States, and that being a nurse is hard work. Nelson told nurses that there was no way to get out of their contracts, and that the nurse who had left before the expiration of his contract would face serious consequences including deportation and being banned from the United States.

69.    Mabute has psoriatic arthritis, which was exacerbated by the intense work that he was required to perform. As a result, he had a severe flare-up of pain in February 2023.

70.    Mabute's rheumatologist told him he could not lift heavy objects and needed to go on light duty.

71.    Medliant CEO Allen Miller informed Mabute that there were no light duty positions available. As a result, Mabute took unpaid leave for two weeks to recover.

72.    On March 2, 2023, Mabute received a call from Nelson, who said the purpose of her call was to address rumors that had been circulating in light of the departure of another Medliant employee. Nelson said that Mabute could not buy out his contract, and had no choice but to complete the full hours requirement. She also told him that if he did not do so, Medliant would report him to USCIS as a fraud, which would result in him being deported and banned from the United States, and that another employee who had left Medliant before their contract was up owed the company $100,000.

73.    On the call with Nelson, Mabute expressed that he was struggling with the demands of the job, including that his time off requests were frequently denied, and that he needed light duty pursuant to his doctor's orders. Nelson responded that light duty was not available but that Medliant would look into the possibility of getting Mabute assigned to a dialysis clinic. He did not receive any follow-up on this offer.

- 11 -
CLASS AND COLLECTIVE ACTION COMPLAINT

**APP. 019**

74.     The medications that Mabute was required to take as a result of his psoriatic arthritis suppressed his immune system.

75.     On March 29, 2023, Mabute sent Nelson, Castro, and Miller a note from his doctor that said he was immunosuppressed due to his medication and needed a lifting weight limit due to his back pain.

76.     He did not receive a response.

77.     Over the next several months, Mabute did his best to avoid lifting due to his back pain, and to avoid exposure to highly contagious patients due to the immunosuppression. However, Mabute grew concerned that the nurses he supervised would begin to complain to the hospital that he was not providing them with enough help.

78.     As a result, Mabute returned to his doctor and got a second note that repeated that he was immunocompromised and could lift no more than 25 pounds. He sent this note to Nelson, Castro, and Miller on September 29, 2023.

79.     On October 3, 2023, Nelson responded requesting that Mabute submit a formal request for accommodation, which he did.

80.     He did not receive a response from Medliant to this formal request for accommodation.

81.     Due to his low pay, difficulty receiving reasonable accommodations, and general working conditions, Mabute is resigning from his job with Medliant on November 8, 2023.

82.     On or around October 20, 2023, Mabute received an email from the Medliant Payroll Department that said that "a recent internal audit of employee files revealed lacking required documents," and informing Mabute that the documents would be sent shortly for his signature. The email also said that the documents were "required for both immigration services (USCIS), and employer services (OSHA/Dept. of Labor)."

83. On or around October 24, 2023, Mabute received an email from Medliant CEO Allen Miller attaching the documents and requesting a signature. The email stated that "several of the documents are required by law to be in your personnel file."

84. The attached documents included a revised employment agreement. The terms that had been changed in the employment agreement included that Medliant had added an arbitration provision and changed the choice of law and venue in the contract to Tennessee from Nevada.

85. Mabute did not sign these documents.

86. On or around October 31, 2023, Miller followed up with a second email that read:

> Not sure why you decided not to sign, as some of these documents are required by law to have in your Personnel file. These documents are normally sent to you before you start your assignment. During our audit, it appears that the documents were never sent for your review, which I take responsibility for, but we need signed copies to put in your personnel folder. Signing these documents will not change anything you are currently receiving; the documents were in effect at the time of your assignment start date.

87. Miller re-sent the documents, but Mabute still did not sign them.

88. This process of attempting to leave his employment has been very frightening for Mabute, and Medliant's threats have resulted in his working longer for the company than he otherwise would have.

## VI.   JEDDY ANNE DELGADO'S FORCED LABOR EXPERIENCE WITH MEDLIANT

89. Plaintiff Jeddy Anne Delgado is a registered nurse.

90. Delgado is from the Philippines and is a legal permanent resident of the United States.

91. She graduated from university in the Philippines with a bachelor's degree in nursing and began been working as a registered nurse there in October 2011.

- 13 -
CLASS AND COLLECTIVE ACTION COMPLAINT

APP. 021

92.     She worked in the Philippines until March 2015, at which point she moved to Abu Dhabi. She worked as a nurse in Abu Dhabi for seven years, until 2022.

93.     While Delgado was working in Abu Dhabi, a colleague at the hospital where she worked referred her to Medliant.

94.     Delgado wanted to work in the United States because of the opportunities available to nurses, including good retirement benefits, a high quality of life, and a pathway towards citizenship.

95.     Delgado applied for a job with Medliant in September 2019.

96.     In October 2019, recruiter Lilian Castro reached out to Delgado to schedule a Skype interview. Shortly afterwards, Delgado received an offer.

97.     She signed a contract with Medliant on October 8, 2019.

98.     When she applied for a job with Medliant, Delgado was told that she would have at least three interviews with different hospitals as a part of the hiring process. However, in the end she interviewed only with Baptist Hospitals of Southern Texas in Beaumont, Texas, where she currently works.

99.     Delgado's visa application process was delayed due to the COVID-19 pandemic, but she was approved for a visa in January 2022.

100.    Delgado arrived in the United States on April 10, 2022, in the same cohort as Mabute. Nelson greeted them at the airport and took them to a hotel.

101.    For the next four days, Nelson helped the new Medliant employees perform various administrative tasks, including getting a social security card, opening a bank account, setting up internet and shopping for groceries.

102.    Medliant did not pay the nurses during this time period.

103.    Delgado's first day of work at Baptist Hospitals was April 18, 2022.

104.    Delgado is employed as a registered nurse in Baptist Hospitals' telemetry department. Her primary job duties include carrying out doctors' orders, administering

CLASS AND COLLECTIVE ACTION COMPLAINT

**APP. 022**

medication, performing assessments of patients on admission and discharge, performing blood transfusions, and placing IVs.

105.    These job duties are exhausting and sometimes overwhelming due to staffing shortages. Nurse-patient ratios are high, and many patients are bed-bound, meaning that they cannot perform basic tasks for themselves. There are few aides and no regular cleaners on the night shift, which Delgado works. As a result, in addition to patient care, nurses have to perform tasks like changing bed linens and taking out trash. The demands of the job are so harsh that Delgado is concerned that she might lose her license due to the difficulty of meeting the needs of all of her patients.

106.    Relative to her American counterparts, Delgado is underpaid for her work. Medliant pays her only $33 per hour, excluding any pay differentials, which is much less than the American nurses at the hospital, who make a minimum of $55 an hour. As a result of her low salary, Delgado is being forced to live paycheck-to-paycheck and dip into her savings to cover her basic needs.

107.    Delgado also attended the October 2022 meeting with Baptist Hospitals staff, Medliant staff, and Medliant nurses. The Baptist Hospitals staff said that they knew that issues spread quickly among Filipinos, and asked nurses for their feedback on working conditions. Nurses reported that there was severe understaffing, no phlebotomists, and few aides.

108.    When the Baptist Hospitals staff were not present, Nelson told Medliant employees that the employee who had recently left Medliant before his contract term was up would be deported and banned in the United States, and had wasted the opportunity Medliant provided him.

109.    Nothing changed regarding nurse working conditions after that meeting.

110.    On or around October 20, 2023, Delgado received an email from the Medliant Payroll Department that said that "a recent internal audit of employee files revealed lacking [sic] required documents," and informing Delgado that the documents would be sent shortly for

her signature. The email also said that the documents were "required for both immigration services (USCIS), and employer services (OSHA/Dept. of Labor)."

111.    On or around October 24, 2023, Delgado received an email from Medliant CEO Allen Miller attaching the documents and requesting a signature. The email stated that "several of the documents are required by law to be in your personnel file."

112.    The attached documents included a revised employment agreement. The terms that had been changed in the employment agreement included that Medliant had added an arbitration provision and changed the choice of law and venue in the contract to Tennessee from Nevada.

113.    Delgado did not sign these documents.

114.    On or around October 31, 2023, Miller followed up with a second email that read:

> Note sure why you decided not to sign, as some of these documents are required by law to have in your Personnel file. These documents are normally sent to you before you start your assignment. During our audit, it appears that the documents were never sent for your review, which I take responsibility for, but we need signed copies to put in your personnel folder. Signing these documents will not change anything you are currently receiving; the documents were in effect at the time of your assignment start date.

115.    Miller then re-sent the documents, which Delgado still did not sign.

116.    This process of attempting to leave her employment has been very frightening for Delgado, and Medliant's threats have resulted in her working longer for the company than she otherwise would have.

## CLASS AND COLLECTIVE ACTION ALLEGATIONS

117.    Plaintiffs reallege and incorporate by this reference all the paragraphs above in this Complaint as though fully set forth herein.

118.    Plaintiffs bring this action on behalf of themselves and all other similarly situated and typical employees as both a collective action pursuant to the FLSA and a true class action under Nevada law.

119.    The **FLSA Class** is defined as follows: **All nurses who entered the United States to perform work for Defendant and Defendant's clients within the statute of limitations and are or were subject to Medliant's Employment Agreement requiring the payment of liquidated and other damages for failure to meet a specified hours commitment.**

120.    With regard to the conditional certification mechanism under the FLSA, Plaintiffs are similarly situated to those he seeks to represent and for the following reasons, among others:

A.      Defendant employed Plaintiffs as non-exempt hourly paid employees whose wages were not paid free and clear and/or whose wages were subject to an unlawful kickback.

B.      Plaintiffs' situation are similar to those they seek to represent because Defendant failed to pay Plaintiffs and all other FLSA Class Members free and clear and/or collected or attempted to collect unlawful kickbacks on their wages.

C.      Common questions of fact and/or law exist whether Defendant's failure to pay Plaintiffs and all other FLSA Class Members free and clear and/or their collections or attempts to collect unlawful kickbacks on wages violated the FLSA.

D.      Upon information and belief, Defendant employs, and has employed, in excess of 100 Class Members within the applicable statute of limitations.

E.      Plaintiffs have signed a Consent to Sue form which are attached as Exhibit D and E, hereto.  Consent to Sue forms are not required for state law claims under Rule 23 of the Nevada Rules of Civil Procedure.

F.      Defendant has known or should have known its policies alleged herein were unlawful and that they have willfully failed to pay their employees properly. Defendant's actions or omissions giving rise to this complaint were not in good faith and/or were not based upon an informed, reasonable belief that Defendant's behavior was lawful.

121.   The **NEVADA CLASS** is defined as follows: **All nurses who entered the United States to perform work for Defendant and Defendant's clients within the statute of limitations and are or were subject to Mediant's Employment Agreement requiring the payment of liquidated and other damages for failure to meet a specified hours commitment.**

122.   Pursuant to the decision of the Ninth Circuit Court of Appeals in *Busk v. Integrity Staffing Solutions, Inc*., 2013 U.S. App. LEXIS 7397 (9th Cir. Nev. Apr. 12, 2013), both opt-in collective or representative treatment of claims under the federal FLSA and Rule 23 Class treatment may be maintained in the same action.  Therefore, NRCP Rule 23(b)(3) Class treatment for all non-FLSA claims alleged in this complaint is appropriate in this case for the following reasons:

A.   The Class is Sufficiently Numerous: Upon information and belief, Defendant employs, and has employed, in excess of 100 Class Members within the applicable statute of limitations.

B.   Plaintiffs' Claims are Typical to Those of Fellow Class Members: Each Class Member is and was subject to the same practices, plans, or policies as Plaintiffs. Defendant uses a uniform contract and uniform policies and practices, resulting in common violations of law.

C.   Common Questions of Law and Fact Exist:  Common questions of law and fact exist and predominate as to Plaintiffs and the Class, including, without limitation: a) Whether Defendant obtains the labor of foreign healthcare workers by using serious harm or threats of serious harm in violation of the TVPA; b) Whether Defendant's uniform practices surrounding the commitment period, monetary penalty, immigration threats, and conditions of work constitute attempted labor trafficking in violation of the TVPA; c) Whether Defendant knowingly recruits healthcare workers and knowingly benefits by its violations of the TVPA; d) Whether Defendant's policy of charging its workers massive liquidated damages violates the FLSA's "free and clear"

requirement and/or its prohibition on kickbacks; e) The proper measure of damages; and f) The proper measure of punitive damages. These common questions arise, in part, because of the uniform circumstances under which Plaintiffs and the Class worked. These include the form contracts and workplace policies that resulted in a standard environment and set of employer-mandated conditions that employees were forced to abide by under the same threat of being sued, suffering adverse immigration consequences, and facing financial harm.

D.      Plaintiffs Are Adequate Representatives of the Class: Plaintiffs will fairly and adequately represent the interests of the Class because Plaintiffs are members of the Class, they have issues of law and fact in common with all members of the Class, and they do not have interests that are antagonistic to Class members.

E.      A Class Action is Superior/Common Claims Predominate:  A class action is superior to other available means for the fair and efficient adjudication of this controversy, since individual joinder of all members of the Class is impractical, and common claims of whether Plaintiffs and Class Members are entitled to relief predominate over individual issues. Defendant attempted to keep every healthcare worker in its employ through the threats of severe penalties and immigration consequences, as well as through conditions of employment. That attempt—regardless of whether an employee could eventually pay the severe monetary penalty or the degree to which they were misled and forced to work against their will—was the same and uniformly made as to each and every employee. Class action treatment will permit a large number of similarly situated persons to prosecute their common claims in a single forum simultaneously, efficiently, and without unnecessary duplication of effort and expense.  Furthermore, the expenses and burden of individualized litigation would make it difficult or impossible for individual members of the Class to redress the wrongs done to them, while an important public interest will be served by addressing the matter as a class action.  Individualized litigation would also present the potential for inconsistent or contradictory judgments.

123.     Plaintiffs reserve the right to amend and refine the class definitions above or add classes and/or subclasses as litigation progresses.

### FIRST CAUSE OF ACTION

**Violations of the Trafficking Victims Protection Act, 18 U.S.C. § 1589(a)**

*on behalf of* Plaintiffs and all members of the Class

124.     Plaintiffs reallege and incorporate by reference all the paragraphs above in the Complaint as though fully set forth herein.

125.     It is a violation of the TVPA to "knowingly provide[] or obtain[] the labor or services of a person . . . (2) by means of serious harm or threats of serious harm . . . ; (3) by means of the abuse or threatened abuse of law or legal process; or (4) by means of any scheme, plan, or pattern intended to cause the person to believe that, if that person did not perform such labor or services, that person or another person would suffer serious harm . . . ." 18 U.S.C. § 1589(a).

126.     The TVPA defines "serious harm" to include nonphysical harm, "including psychological, financial, or reputational harm, that is sufficiently serious . . . to compel a reasonable person of the same background and in the same circumstances to perform or to continue performing labor or services to avoid incurring that harm." *Id*. § 1589(c)(2).

127.     Defendant obtained the labor of Plaintiffs and the Class members through threats of serious harm, through a scheme to make Plaintiffs and members of the Class believe they would suffer serious harm, and through threatened abuse of legal process, including immigration processes and through the terms and administration of its contract with employees.

128.     Defendant kept Plaintiffs and the Class working for it against their will with the contract's term of indentured servitude, with contractual provisions that led employees to fear financial ruin, with threats of immigration consequences, and with other isolating and draconian employment terms, as described herein.

129.     Defendant's use of such means to obtain the labor of Plaintiffs and the Class was knowing and intentional.

- 20 -
CLASS AND COLLECTIVE ACTION COMPLAINT

**APP. 028**

130.    Plaintiffs and the Class suffered damages because of Defendant's conduct. Those damages include the penalty some members of the Class paid to Defendant, as well as emotional distress and other damages.

131.    Plaintiffs and the Class are entitled to compensatory and punitive damages and restitution in amounts to be determined at trial, together with reasonable attorneys' fees and the costs of this action.

### SECOND CAUSE OF ACTION

**Violations of the Trafficking Victims Protection Act, 18 U.S.C. § 1589(b)**

*on behalf of* Plaintiffs and all members of the Class

132.    Plaintiffs reallege and incorporate by reference all the paragraphs above in the Complaint as though fully set forth herein.

133.    It is a violation of the TVPA to "knowingly benefit" from participation in a venture which obtains labor in violation of the TVPA, while "knowing or in reckless disregard of the fact" that the venture has obtained labor through such means. 18 U.S.C. § 1589(b).

134.    Defendant has knowingly benefited from its participation in the forced labor venture described herein by earning substantial profits from the venture.

135.    Defendant knew or recklessly disregarded the fact that the venture described herein engaged in obtaining forced labor.

136.    Plaintiffs and the Class suffered damages as a result of Defendant's conduct. Those damages include the penalty some members of the Class paid to Defendant, as well as emotional distress and other damages.

137.    Plaintiffs and the Class are entitled to compensatory and punitive damages and restitution in amounts to be determined at trial, together with reasonable attorneys' fees and the costs of this action.

### THIRD CAUSE OF ACTION

**Violations of the Trafficking Victims Protection Act, 18 U.S.C. § 1590(a)**

*on behalf of* Plaintiffs and all members of the Class

138.   Plaintiffs reallege and incorporate by reference all the paragraphs above in the Complaint as though fully set forth herein.

139.   It is a violation of the TVPA to "knowingly recruit[], . . . or obtain[] by any means, any person for labor or services in violation of" the TVPA.

140.   Defendant knowingly and purposefully recruited Plaintiffs and Class members, as described herein, in violation of the TVPA.

141.   Plaintiffs and the Class suffered damages as a result of Defendant's conduct. Those damages include the penalty Plaintiffs and the Class paid to Defendant, as well as emotional distress and other damages.

142.   Plaintiffs and the Class are entitled to compensatory and punitive damages and restitution in amounts to be determined at trial, together with reasonable attorneys' fees and the costs of this action.

## FOURTH CAUSE OF ACTION

### Violations of the Trafficking Victims Protection Act, 18 U.S.C. § 1594(a)

*on behalf of* Plaintiffs and all members of the Class

143.   Plaintiffs reallege and incorporate by reference all the paragraphs above in the Complaint as though fully set forth herein.

144.   Attempts to violate the TVPA are themselves violations of the TVPA. 18 U.S.C. § 1594(a).

145.   Defendant attempted to violate 18 U.S.C. §§ 1589 and 1590, as described herein.

146.   Plaintiffs and the Class suffered damages as a result of Defendant's conduct. Those damages include any penalty Plaintiffs and the Class paid to Defendant, as well as emotional distress and other damages. The penalty amount is determinable from Defendant's records.

- 22 -

CLASS AND COLLECTIVE ACTION COMPLAINT

147.     Plaintiffs and the Class are entitled to compensatory and punitive damages and restitution in amounts to be determined at trial, together with reasonable attorneys' fees and the costs of this action.

### FIFTH CAUSE OF ACTION

**Violations of the Fair Labor Standards Act, 29 U.S.C. § 201 *et seq.* (Illegal Kickback)**

*on behalf of* Plaintiffs and all members of the Class and/or Collective

148.     Plaintiffs reallege and incorporate by reference all the paragraphs above in the Complaint as though fully set forth herein.

149.     Pursuant to 29 U.S.C. § 216(b), Plaintiffs have consented in writing to be join this Fair Labor Standards Act action as a plaintiff. Their written consents are attached to this complaint as Exhibits D and E.

150.     During the relevant period, Defendant was Plaintiffs' employer pursuant to the Fair Labor Standards Act.

151.     During the relevant period, Plaintiffs were employees pursuant to the Fair Labor Standards Act.

152.     Repayment of "damages" as defined by the contract between Defendant and Plaintiffs and other similarly situated upon termination is an illegal kickback of wages to Defendant because the purported damages are expenses incurred primarily for Defendant's benefit.

153.     Kicking back these expenses to Defendant takes employees' wages below the applicable minimum wage during the last work week employed by Defendant.

154.     Plaintiffs and others similarly situated were not paid at least minimum wage for all hours worked in their final week of work because they were required to kick back their wages to Defendant.

155.     Defendant's payment demands to Plaintiffs and others similarly situated were willful violations of the FLSA within the meaning of 29 U.S.C. § 255(a).

- 23 -

CLASS AND COLLECTIVE ACTION COMPLAINT

156.    Plaintiffs and others similarly situated are entitled to recover their unpaid wages plus an additional equal amount in liquidated damages, costs of suit, declaratory relief, and reasonable attorneys' fees pursuant to 29 U.S.C. § 216(b).

## SIXTH CAUSE OF ACTION

**Violations of the Fair Labor Standards Act, 29 U.S.C. § 201 *et seq.* (Failure to Pay Wages Free and Clear)**

*on behalf of* Plaintiffs and all members of the Class and/or Collective

157.    Plaintiffs reallege and incorporate by reference all the paragraphs above in the Complaint as though fully set forth herein..

158.    During the relevant period, Defendant was Plaintiffs' employer pursuant to the Fair Labor Standards Act.

159.    During the relevant period, Plaintiffs were employees pursuant to the Fair Labor Standards Act.

160.    Defendant violated 29 U.S.C. § 206 by unlawfully requiring Plaintiff and others similarly situated to repay so-called "damages" that amount to tens of thousands of dollars of their earned and taxed wages to Defendants once their employment with Defendants ended.

161.    Rather than paying Plaintiffs and other similarly situated employees their wages "free and clear," Defendant maintained and enforced a policy under which the wages paid to employees during every pay period were paid conditionally, subject to the requirement that they not leave their jobs. If they did leave their jobs, they would have to repay all of the wages earned during the pending pay period, plus tens of thousands of additional dollars.

162.    By requiring Plaintiffs and other similarly situated employees to return their wages to Defendant, Defendant failed to pay wages "finally and unconditionally," as required by the FLSA.

163.     Because Defendant failed to pay wages "finally and unconditionally," Defendant cannot be deemed to have met the wage requirements of the FLSA, which includes the requirement to pay no less than the federal minimum wage for each hour worked.

164.     Defendant's actions constitute willful violations of the FLSA within the meaning of 29 U.S.C. § 255(a).

165.     Plaintiffs and others similarly situated are entitled to recover all unpaid minimum wages plus an additional equal amount in liquidated damages, costs of suit, and reasonable attorneys' fees pursuant to 29 U.S.C. § 216(b).

### JURY TRIAL DEMANDED

Plaintiffs hereby demand a jury trial pursuant to Nevada Rule of Civil Procedure 38.

### PRAYER FOR RELIEF

166.     Plaintiffs on behalf of themselves and the Class and Collective respectfully request that the Court:

a. Certify the case as a class action on behalf of the proposed class;

b. Designate Plaintiffs as a class representatives;

c. Designate Plaintiffs' counsel of record as class counsel;

d. Certify the case as a collective action on behalf of the proposed collective;

e. Declare that Defendant's conduct is illegal under the various statutes cited here;

f. Preliminarily and permanently enjoin Defendant and its officers, agents, successors, employees, representatives, and any and all persons acting in concert with them from engaging in the unlawful practices set forth in this Complaint;

g. Award Plaintiffs damages, including treble damages, and equitable relief, including restitution and disgorgement, in an amount subject to proof at trial;

h. Award Plaintiffs' counsel costs incurred herein, including reasonable attorneys' fees to the extent allowable by law;

j. Order pre-judgment and post-judgment interest as provided by law; and

- 25 -
CLASS AND COLLECTIVE ACTION COMPLAINT

1      k. Provide such other and further legal and equitable relief as this Court deems

2  necessary, just, and proper.

3

4

5  Dated: November 8, 2023                    Signed: */s/ Leah L. Jones*

6                                             Mark R. Thierman, Nev. Bar No. 8285
                                              mark@thiermanbuck.com
7                                             Joshua D. Buck, Nev. Bar No. 12187
                                              josh@thiermanbuck.com
8                                             Leah L. Jones, Nev. Bar No. 13161
                                              leah@thiermanbuck.com
9
                                              THIERMAN BUCK LLP
10                                            7287 Lakeside Drive
                                              Reno, Nevada 89511
11                                            Tel. (775) 284-1500
                                              Fax. (775) 703-5027
12

13                                            Juno Turner (*pro hac vice* motion
                                              forthcoming)
14                                            David H. Seligman (*pro hac vice* motion
                                              forthcoming)
15                                            Rachel W. Dempsey (*pro hac vice* motion
                                              forthcoming)
16                                            Towards Justice
                                              P.O. Box 371689, PMB 44465
17                                            Denver, CO 80237-5680
                                              (720) 441-2236
18                                            juno@towardsjustice.org
                                              david@towardsjustice.org
19                                            rachel@towardsjustice.org
20
21                                            Attorneys for Plaintiffs and the Class and
22                                            Collective

23

24

25

26

27

28

- 26 -
CLASS AND COLLECTIVE ACTION COMPLAINT

**APP. 034**

# Exhibit A



## AGREEMENT FOR EMPLOYMENT

This Agreement for Employment is entered into as of the latest date of the execution of the agreement by all parties (the "Effective Date"), by and between Medliant and individual indicated in the Signature block (Employee).

WHEREAS, Employer is a corporation which locates healthcare assignments in accordance with the needs of Employer's Clients and/or Employer's Clients' Customers and which may include companies providing services competitive to Employer (any and all of which are hereafter referred to as "Clients"); and

WHEREAS, Employee possesses training, skills, and the requisite qualifications to provide healthcare services in the U.S., desires employment in the U.S.'s healthcare field, and requires services of a sponsoring Employer to facilitate the employment and immigration process through the United States Citizenship and Immigration Services ("USCIS"); and

WHEREAS, Employer desires to provide such services, including sponsorship, and Employee currently desires to be employed by Employer in the capacity of healthcare professional performing work at Clients' facilities as assigned by Employer.

NOW, THEREFORE, in consideration of the mutual promises, covenants and conditions set forth herein, the parties hereto agree as follows:

1) **SCOPE OF DUTIES**.  Employer employs Employee and Employee accepts employment upon the terms and conditions set forth in this Agreement.  Employee shall perform such specialized healthcare work as he/she is directed to perform by Employer for Employer's Clients.  Employer may direct Employee to take directions from such Client, even though Employee remains employed by Employer.  Employee represents that, in the performance of his/her services for Employer's Clients, he/she will regularly and typically exercise sound discretion and independent professional judgment with respect to the significant matters entrusted to him/her.  Employee agrees to work at Clients' locations to which Employer directs him/her and at any other premises designated by Employer.  Employee agrees to adhere to applicable Employer and Clients' policies, procedures and requirements in performing his/her assigned work as well as applicable laws, rules, and regulations.  Employee further agrees to exert his/her best efforts and to conduct himself/herself in a professional manner at all times while on assignment with Employer's Clients. Employee understands and agrees that this Agreement establishes an at-will employment relationship. Employee further understands and agrees that while working at Clients' sites he/she works in the name of and represents Employer, but Employee has no right or authority to bind Employer to any contractual or other obligation.

2) **TERM**.

   a) Employee's employment shall commence upon the start date of services for Employer's Client and continue in effect for a minimum of five thousand two hundred (5,200) straight-time hours (hereinafter referred to as "contractual hours") or until such employment is terminated by Employer or Employee in accordance with the provisions of this Agreement or law of the state in which services are being performed, <u>but under no circumstances in violation of any USCIS laws, rules, regulations, policies, or guidelines, as they exist from time to time</u>.  In addition, any termination of the

**APP. 036**

DocuSign Envelope ID: 5127E340-DB28-48DF-9CF3-9B5110039847



employment relationship and/or this Agreement shall not release Employee from the satisfaction of the contractual hours, unless Employer agrees to waive the contractual hours' provisions.

b) The terms of this Agreement shall commence upon the Effective Date of this Agreement and continue until all services for Employer are completed or for a minimum of five thousand two hundred (5,200) straight-time hours after commencement of services, except for the terms and conditions in Sections 4, 8, 10, 14, 15, 16, 17 and 18 herein which shall continue for four (4) years after termination of the Agreement per Section 2(a) above or otherwise.

c) Employee acknowledges that Employer has paid substantial sums in order for Employee to immigrate to the U.S. to work as an employee of Employer, so Employee commits to work for a minimum of five thousand two hundred (5,200) straight-time hours. Employee's employment shall continue in effect for a minimum of five thousand two hundred (5,200) straight-time hours and until such employment is terminated by Employer or Employee in accordance with the provisions of this Agreement.

d) In the event that Employee voluntarily leaves the employment of the Employer prior to completion of the five thousand two hundred (5,200) straight-time hours, or Employee accepts employment other than through Employer, Employee acknowledges that Employer will not have made a reasonable amount of profit in relation to Employer's investment of time, effort, and money in promoting, training, testing, and licensing and otherwise assisting Employee to become a U.S. employee. The difficulty in ascertaining damages due to Employee's early termination is caused by Employer's profits being made only when Employee performs work for Clients. However, Employee and Employer agree that a fair compromise for liquidated damages is the sum of $2,500 for each month (156 hours represents one month) remaining of the minimum five thousand two hundred (5,200) straight-time hours' commitment at the time of the termination. This amount is reasonable as it is considerably less than the profit Employer would make if the Agreement was not terminated prematurely. ***This liquidated damages clause applies ONLY to the lost profits of Employer***. The liquidated damages are separate, and are in addition to, any costs of immigration owed to Medliant pursuant to the terms of the Offer Letter. Said liquidated damages sum shall be due in full on the date of Employee's termination. Should it become necessary to pursue an action or proceeding to enforce the obligations set forth in this Agreement, along with the costs of immigration and liquidated damages, Medliant shall also be entitled to an award of reasonable attorneys' fees and costs incurred in attempting to enforce these terms.

e) Where Employee leaves voluntarily prior to the contract term expiring, Medliant may use Employee's breach of this Agreement as grounds to file suit for breach of contract, amongst other claims, which Medliant has done previously upon prior Employees breaching the herein Agreement.

3) **COMPENSATION, TIME RECORDS, DEDUCTIONS.** Employer agrees to pay Employee as set forth in the Offer Letter. For each assignment Employee will record on Employer's prescribed time record, and in accordance with any procedures established by Employer, Employee's hours worked on each day. Prior to submitting any such time record to Employer, Employee shall obtain on each time record Client's signature confirming and approving the hours worked by Employee. Employee agrees that such Client-approved time record shall be conclusive as to time worked each day by Employee. Employee further agrees that he/she is responsible for ensuring that such time record (including Client's signature) for any week is received by Employer's accounting office no later than three (3) calendar days from final

**APP. 037**

DocuSign Envelope ID: 5127E340-0228-48DF-9CF3-9B5110039947



date of work period.  Employee recognizes that Employer may elect to modify or supplement these procedures, orally or in writing, and, as a condition to continued employment, Employee agrees to be bound by any such future modifications or additions.  Employer shall deduct amounts from Employee's compensation only as authorized by applicable law, including amounts attributable to all applicable income tax withholding and Federal Insurance Corporation Act ("FICA") tax withholding.

4) **REIMBURSEMENT OF EXPENSES.**  Employer shall reimburse Employee for necessary or ordinary expenses incurred in the course of performing work under this Agreement provided that Employee submits to Employer for written approval in advance and Employer approves the specific expenditure in writing in advance and notifies Employee in writing in advance of its intention to provide reimbursement.  In order to receive an approved reimbursement, Employee shall present Employer with an itemized accounting of expenditures and supporting receipts and vouchers and any further information that Employer may request, and such reimbursement shall be contingent upon receipt of adequate information.

5) **BENEFITS.**  Except as specified in the Offer Letter for benefits prior to the commencement of employment or the first short term of employment, Employee shall receive no other compensation or benefits.

6) **HOURS.**  While performing work at Client's site, Employee shall work the hours typically worked by Client's employees unless directed otherwise by Employer, who shall set and enforce Employee's amount and schedule of hours. Employee shall make themselves available for all on-call and callback at the discretion of the Client. However, Employee shall work only those hours approved by Employer.

7) **PERSONAL SERVICES OF EMPLOYEE.**  Employee must personally perform the work as directed by Client or Employer and has no right to subordinate or assign Employee's work to another individual. Employee has no right to hire, supervise or pay assistants, unless as specifically directed in writing in advance by Employer to do so.

8) **CONFIDENTIALITY AND NONDISCLOSURE.**

   a)  Employee acknowledges that confidential information and materials regarding Employer and its Clients have been or will be disclosed to him/her in hard copy, verbally and/or electronic methods only for the purpose of assisting him/her in performing his/her duties under this Agreement.  Such information and materials are and shall remain the property of Employer or its Client.  As used in this Agreement, the phrase "confidential information and materials" includes but is not limited to all information belonging to Employer or Employer's Clients relating to their respective services and products, customers, business methods, strategies and practices, internal operations, pricing and billing, financial data, costs, personnel information (including but not limited to names, educational background, prior experience and availability), customer and supplier contacts and needs, information designated by Employer or any of its Clients as confidential, and all other information that might reasonably be deemed confidential; and all of which is included in Section 10.  Employee acknowledges that he/she may use such confidential information and materials only during his/her term of employment and solely for the purpose of such employment, and that this right expires upon Employee's discharge, resignation or other termination of employment or this Agreement.  Employee therefore agrees not to use for his/her own benefit or for the benefit of any other person, except as

DocuSign Envelope ID: E127E240-0D93-40DF-9CE3-9B5110030817

specifically authorized in writing in advance by all owners of such information and materials, or divulge to any person for any reason, any such information and materials related to the business of Employer, any of its Clients, or their customers, clients and affiliates, both at any time during the term of this Agreement and at any time after its termination.  Employee agrees to take any and all reasonable actions, including those requested by Employer or Client, to prevent such disclosure and preserve the security of confidential information and materials.  Employee further agrees that he/she will not directly or indirectly disclose to any person, including to the Client or to any co-workers either during or after his/her period of employment, Employee's wage rates and terms without prior written consent of Employer (disclosure to a spouse or financial institution shall be permitted so long as further disclosure by such spouse or institution is prohibited).

b)  Employee understands and agrees that he/she has a very high legal duty, i.e., a fiduciary duty, to maintain all confidences referenced in this Agreement and as may be discussed or otherwise communicated to Employee during the term of this Agreement.  Any violation of this Section 8 shall be a serious matter and dealt with accordingly, including, but without limitation, in Employer's sole discretion a violation may be considered a material breach of this Agreement and thereupon Employer may pursue all legal and equitable remedies available through a court of law.

9)  **DIRECTION, SUPERVISION, AND COOPERATION.**  Employee agrees to adhere to all applicable laws, policies, procedures and rules of Employer, Client, and governmental agencies.  Employee will ordinarily work as required by Employer at the direction of the Client but he/she agrees that Employer has the right to direct Employee as to when and where Employee is to perform the work.  Employer has the right to require Employee's attendance at meetings at Employer's or any other premises.  Employee's performance is subject to the review and approval of Employer and Client and others, as may be required by law.  Employee agrees to cooperate fully with any request by Employer for Employee to provide any information, orally and in writing, related to the performance of Employee's services, including but not limited to any information required by Employer to respond to any questions, claims, defenses, and the like raised by any person or governmental agency or required by Employer to prepare or file any claims, defenses or the like to be made by Employer.

10) **RETURN OF PROPERTY.**

a)  Employer directs and Employee agrees that upon termination of an assignment with any Client, Employee will deliver to the Client or Employer all keys, pass cards, identification cards, policy and procedure manuals, or materials of any nature in Employee's possession or control that were given to Employee by Client or Employer that relate to Employee's services for Client.

b)  Employer directs and Employee agrees that upon termination of the employment relationship between Employee and Employer, Employee will deliver to Employer all keys, pass cards, identification cards, policy and procedure manuals, or materials of any nature in Employee's possession or control that were given to Employee by Employer or a Client that relate to Employee's employment with Employer.

11) **EXCLUSIVITY/CONFLICT OF INTEREST.**  Employee hereby agrees that during the term of this Agreement he/she shall provide services only for the benefit of Employer and shall refrain from performing services for others, unless approved in advance by Employer.  In no case shall Employee



provide services to other healthcare facilities or to others who are in direct competition to Employer's business.

12) **RESIGNATION.** Employee may resign with or without reason as of a specified date after Employer receives written notice from Employee of his/her intention to resign as of a specified date. See Section 2 for details.

13) **EMPLOYMENT AT-WILL.** Consistent with the provisions set forth herein, the parties acknowledge and agree that the employment relationship created by this Agreement is at-will. Any cause for discharge mentioned in this Agreement or in any document maintained by Employer (including but not limited to employment manuals or recruitment materials) shall not in any way limit Employer's right to discharge Employee, or in any way alter Employee's at-will status. See Section 2 for details.

14) **SEVERABILITY.** In the event that any provision herein is construed to be unenforceable, then the parties or a court of competent jurisdiction shall attempt to revise such provision while keeping its intent to the extent possible and having such revised provision enforceable. In the event that any provision cannot be revised into an enforceable form, then such provision of this Agreement shall be considered severable such that if any provision or clause conflicts with existing or future applicable law, or may not be given full effect because of such law, this shall not affect any other provision of the Agreement which, consistent with such law, shall remain in full force and effect. All surviving clauses shall be construed so as to effectuate the purpose and intent of the parties.

15) **INTEGRATION.** Each party hereto specifically acknowledges this Agreement is the culmination of many conversations, negotiations, and communications, both written and oral, between the parties. All such prior communication are made null and void and replaced by this Agreement. This Agreement contains all of the agreements, understandings, representations, conditions, warranties, and covenants made between the parties hereto. Unless set forth herein, neither party shall be liable for any representations made and all modifications and amendments hereto must be in a writing signed by both parties.

16) **GOVERNING LAW/VENUE.** This Agreement shall be governed by the laws of Nevada. Medliant is incorporated in Nevada and as such, chooses to utilize Nevada law for interpretation and analysis of the herein agreement as well as chooses to utilize the venue of the 8th Judicial District Court in Las Vegas, Nevada as and for any disputes that may arise from time to time. By signing below, you agree to Medliant's choice of venue and choice of law.

17) **WAIVER.** No waiver of any provision of this Agreement shall be valid unless it is in writing and signed by the person against whom it is sought to be enforced (in the case of Employer by an officer of Employer). The failure of any party at any time to insist on strict performance of any condition, promise, agreement or understanding contained in this Agreement shall not be construed as a waiver or relinquishment of the right to insist on strict performance of the same condition, promise, agreement or understanding at any future time.

18) **ATTORNEY'S FEES.** Should it become necessary to pursue an action or proceeding to enforce the obligations set forth in this Agreement, Medliant shall be entitled to an award of reasonable attorneys' fees and costs incurred in attempting to enforce these terms.

718 Thompson Lane, Suite 108-283, Nashville, TN 37204 · Tel: 650 377 0990 · Fax: 888 377 2460 · www.medliant.com



19) **MISCELLANEOUS.** Employee represents that he/she has read and understands the terms of this Agreement, has had an opportunity to ask questions and to review this Agreement with legal counsel of his/her choice, is not relying on any advice from Employer in this regard, and is voluntarily signing this Agreement.

20) **SIGNATURES.**

This Agreement is signed to be effective as of the date on the first page hereof and is signed first by Employee who makes this an offer to Medliant to accept it, in Clark County, Las Vegas, Nevada.

Medliant/Employer                                    Employee

*Allen B Miller JR.,* _____          _____
16258244025548A...                          B0F277E7D8B64E4...
President/CEO                                        Jeddy Anne M. Delgado

10/8/2019                                            10/8/2019
Dated Signed                                        Date Signed

718 Thompson Lane, Suite 108-283, Nashville, TN 37204 • Tel: 650 377 0990 • Fax: 888 377 2460 • www.medliant.com

**APP. 041**

# Exhibit B

DocuSign Envelope ID: 6127F240-8D28-48DF-9CF3-9B5110939847



## OFFER LETTER

Please allow this letter to act as a formal offer of employment.  Medliant has available for you, full-time employment in our Healthcare Professional Services Division with an combine minimum pay rate of $27.00 per hour.  This is the **minimum rate** that you will receive but the hourly rate may be higher based on the prevailing wage rate of the county and state in the United States where you are assigned.

By signing this Offer Letter, you agree to act consistently with all of the terms contained in this Agreement**. In addition, you must have either completed a personal interview or schedule one within two weeks of signing, either via Skype or phone with a Medliant Recruiter to confirm your current skill set and employment.**

After you sign and return the document(s), and accepted by Medliant, the following will occur:
- Medliant will become your sponsor and pay for your Green Card processing;
- Upon approval of your Green Card, Medliant will pay for your airfare to the United States and your travel to the assigned location;
- Upon reporting to your assigned location, Medliant will provide you with one month living accommodation; and
- You will work full-time at the facility assigned to you and will be eligible for a compensation package by Medliant including Paid-Time-Off (PTO) of eighty (80) hours per year and company medical and dental insurance.
- Upon arriving in the United States and presentation of verifiable receipts, Medliant will reimburse you the following fees incurred: Board of Nursing application fee and related expenses, NCLEX-RN exam fee, IELTS exam fee, and Visa Screen application fee and related expenses.

After all document(s) has been accepted by Medliant,  Medliant will begin the process of sponsoring your Green Card.  As Green Card processing times can vary greatly, it is very important to provide us with all the requested information as quickly as possible.  Once your application is submitted for approval to the United States Citizenship and Immigration Services (USCIS), we have no control over their processing time.

When you sign and return this Offer Letter and Medliant accepts it, Medliant shall commence processing all documents and expedite all procedures to secure your Green Card at Medliant's expense.  If you decide not to work for Medliant or wish to terminate your contract with Medliant, you must give Medliant notice in order to prevent further costs to continue to be incurred.  You agree to reimburse Medliant for all costs incurred related to your Green Card processing and any fees incurred up to the date of your notice in addition to all costs related to your work assignment location.  Medliant will provide you an invoice outlining these costs within thirty (30) days of your termination of the Agreement.  Should it become necessary to pursue an action or proceeding to enforce the obligations set forth in this Agreement, Medliant shall be entitled to an award of reasonable attorneys' fees and costs incurred in attempting to enforce these terms.

Medliant will employ you as a Registered Nurse (R.N.).  You agree to perform your duties applying the highest quality of professional standards for your professional services provided to Medliant's clients; you also agree:

1. You shall perform services for at least five thousand two hundred (5,200) straight-time hours.
2. Medliant or R.N. may terminate this Agreement at any time with or without cause.



and understand these 4 terms.

DocuSign Envelope ID: 5127E249-8D28-19DF-9CE3-9B5110039847



3. Regardless of the termination right in item 2 above, if, after arrival in the U.S., you fail to meet contractual obligations to Medliant, or you terminate the Agreement prior to completing five thousand two hundred (5,200) straight-time hours of service, you agree to reimburse Medliant for all costs incurred including associated administrative, licensing, and legal expenses for R.N.'s relocation and immigration.

4. Medliant will notify USCIS of your termination as Medliant sponsored your immigration.  USCIS has the power to determine that you intended to defraud the government because you did not fulfill your five thousand two hundred (5,200) straight-time hours' commitment.

In addition to the above duties, you understand and agree that your employment is further contingent upon you meeting and abiding by the following Pre-Employment conditions and requirements:

a) Passage of the RN-NCLEX and IELTS (for non-native English language speakers) exams;
b) Submit all documents needed to process permanent residency papers in a timely manner;
c) Continue to work in an approved patient setting until departure to the United States;
d) A minimum of twelve (12) recent months' direct patient care experience in a hospital environment prior to departure to the United States;
e) Submission of employment verification certificates; and

By signing this Offer Letter, you are representing that you currently have no conflict of interest, will avoid any conflict of interest in the future, and if a possible conflict of interest arises you will immediately report it to your representative at Medliant.

Also by signing this Offer Letter, you are representing all terms and conditions of this Offer are confidential between you and Medliant.  You will not disclose any of the terms and conditions to any third party.

This documents must be returned within ten (10) business days from date of this letter.  After the ten (10) business days, this employment offer is revoked.

We at Medliant look forward to you joining our staff and to the beginning of a long and prosperous relationship.  Please show you will comply with the terms and conditions in this Offer Letter by signing below.

I hereby agree to comply/satisfy all terms and conditions in this Offer Letter.

Medliant/Employer

Allen B Miller JR., _____
16258244025548A...
President/CEO

10/8/2019
DATE

Employee

_____
B0F277E7D8B64E4...
Jeddy Anne M. Delgado

10/8/2019
DATE

# Exhibit C



## IMPORTANT NOTICE REGARDING EMPLOYMENT-BASED GREEN CARDS

The law regarding employment-based Green Cards is important for you to understand as you take steps to obtain your Green Card. Medliant provides this notice to educate you on some of the most important U.S. immigration laws regarding your employment-based Green Card. This is not a detailed summary of U.S. immigration law, so if you have additional questions after reviewing this notice, you should consult an attorney.

The two (2) most common ways a foreign national can obtain permanent resident status (Green Card) in the United States are: 1) through a family-based petition or 2) an employment-based petition. A family-based petition is one in which a relative sponsors a family member for permanent resident status. An employment-based petition is a petition submitted by an employer who sponsors a foreign national as a skilled worker for employment in the United States.

In your case, your Green Card is an employment-based petition sponsored by Medliant. Please note that for an employment-based Green Card to be considered valid, the foreign national (employee) must work for the sponsoring employer. Not only must the foreign national work for the sponsoring employer, but he/she must also perform the job originally proposed on the I-140 petition, which is specific to the sponsoring employer. U.S. immigration law states that if the employee leaves before the specified amount of time, the employee has the burden to prove that he/she accepted the job offer in good faith and did not intend to leave at the time of accepting permanent residency. The theory behind an employment-based Green Card is that an employee is accepting a job on a "permanent" basis, so the foreign national cannot legally leave the employer the day he/she gets a Green Card. "Permanent" means that at the time the employee becomes a lawful permanent resident, neither the employer nor the employee has any plans to change the employment relationship described in the I-140 petition. If an employee leaves too soon, the United States Citizenship and Immigration Services (USCIS) may determine that the employee did not intend to take the job on a "permanent" basis. If the employee leaves his/her employment before their obligation is complete, the employer will notify USCIS that the employee has left the sponsor's employment, and USCIS may take action against the employee, including possible deportation. This could also affect the foreign national's ability to obtain citizenship or a petition for his/her relatives in the future. If the USCIS finds out that the employee was just waiting for his/her immigration to be complete before switching employers, then the USCIS may charge the employee with fraud.

Remember, Medliant has sponsored your Green Card and invested a large amount of time and money in your immigration and employment process. You have accepted and made a written commitment to Medliant that you will be employed with Medliant for a minimum of five thousand two hundred (5,200) straight-time hours. If you fail to meet your contractual obligation with Medliant or decide to terminate the Agreement prior to completing your five thousand two hundred (5,200) straight-time hours' commitment, Medliant will notify the USCIS, and USCIS may take action against you. In addition, Medliant will also have the right to recover from you all costs, fees, damages, and attorneys' fees as stated in the Offer Letter and Employment Agreement.

By signing below, I am acknowledging that I have read and understand the above notice regarding employment-based Green Cards.

Medliant/Employer

_Allen B Miller JR.,_ _____
16258244025548A...
President/CEO

10/8/2019
DATE

Employee

_JD_ _____
B0F277E7D8B64E4...
Jeddy Anne M. Delgado

10/8/2019
DATE

Exhibit D

## MEDLIANT PLAINTIFF CONSENT FORM

1. I consent to make a claim under the Fair Labor Standards Act, 29 U.S.C. § 201, *et seq.* against my former employer, Medliant International Healthcare Staffing ("Defendant") and any other related individuals, entities, or subsidiaries, to recover unpaid minimum wages.

2. During my last work week employed by Defendant, I received less than the minimum wage for the hours I worked because of the large "kickback" of money to Defendant through a deduction of my wages and/or my wages were not paid "free and clear" because, if I resigned before a certain time, Defendant would seek and/or take wages from me.

3. If this case does not proceed collectively, then I also consent to join any subsequent action or matter to assert these claims against Defendant.

4. I understand that I may withdraw my consent to proceed with my claims at any time by notifying the attorneys handling this matter.

Date: _____11/7/2023_____        _____
                                      Signature

                                      ELIAHKIM MABUTE
                                      _____
                                      Print Name

# Exhibit E

## MEDLIANT PLAINTIFF CONSENT FORM

1.  I consent to make a claim under the Fair Labor Standards Act, 29 U.S.C. § 201, *et seq.* against my former employer, Medliant International Healthcare Staffing ("Defendant") and any other related individuals, entities, or subsidiaries, to recover unpaid minimum wages.

2.  During my last work week employed by Defendant, I received less than the minimum wage for the hours I worked because of the large "kickback" of money to Defendant through a deduction of my wages and/or my wages were not paid "free and clear" because, if I resigned before a certain time, Defendant would seek and/or take wages from me.

3.  If this case does not proceed collectively, then I also consent to join any subsequent action or matter to assert these claims against Defendant.

4.  I understand that I may withdraw my consent to proceed with my claims at any time by notifying the attorneys handling this matter.

Date: _____11/7/2023_____          _____ *Jeddy Anne Delgado* ___

                                        Signature

                                        Jeddy Anne Delgado

                                        Print Name

# EXHIBIT 3

1  Kristen T. Gallagher (NSBN 9561)
   McDONALD CARANO LLP
2  2300 West Sahara Avenue, Suite 1200
   Las Vegas, Nevada 89102
3  Telephone: (702) 873-4100
   kgallagher@mcdonaldcarano.com
4
   R. Brandon Bundren (will comply with LR IA 11-2 within 14 days)
5  BRADLEY ARANT BOULT CUMMINGS LLP
   1221 Broadway, Suite 2400
6  Nashville, Tennessee 37203
   Telephone: (615) 244-2582
7  bbundren@bradley.com

8  *Attorneys for Defendants Medliant and Medliant Inc.*

9              **UNITED STATES DISTRICT COURT**

                  **DISTRICT OF NEVADA**
10

11 ELIAHKIM MABUTE and JEDDY ANNE          Case No.:
   DELGADO, on behalf of themselves, those
12 similarly situated, and the Proposed Rule 23
   Class,
13                                                  **NOTICE OF REMOVAL**
                    Plaintiffs,
14
   vs.
15
   MEDLIANT INC. and MEDLIANT,
16
                    Defendants.

17         Under 28 U.S.C. §§ 1441, 1446, and 1453, the defendants, Medliant Inc. and Medliant

18 (collectively, "Medliant"), remove this action to the United States District Court for the District

19 of Nevada. Under 28 U.S.C. §§ 1331 and 1332, Medliant respectfully states the grounds for

20 removal are as follows.

21         1.      On November 8, 2023, the plaintiffs, Eliahkim Mabute and Jeddy Anne Delgado

22 (collectively, "Plaintiffs"), filed their Class and Collective Action Complaint in the action styled

23 Mabute et al. v. Medliant, Inc., et al., and assigned Case No. A-23-881156-C (the "Action") in

24 the District Court for Clark County, Nevada.

25         2.      On November 22, 2023, Plaintiffs filed their First Amended Class and Collective

26 Action Complaint.

27         3.      On November 30, 2023, Plaintiffs requested the Clerk of Court for the District

28 Court of Clark County issue summons to Medliant, which it did on December 4, 2023.

McDONALD CARANO
2300 WEST SAHARA AVENUE, SUITE 1200 • LAS VEGAS, NEVADA 89102
PHONE 702.873.4100 • FAX 702.873.9966

**APP. 052**

4.     On December 6, 2023, Plaintiffs filed their Errata to Plaintiffs' First Amended Class and Collective Action Complaint ("Amended Complaint") because the pleading filed by Plaintiffs on November 22, 2023, was filed without the required signature from counsel and supporting exhibits.

5.     On December 7, 2023, Plaintiffs served Medliant with the Amended Complaint.

6.     On its face, the Amended Complaint shows that this Court has subject matter jurisdiction over the Action under 28 U.S.C. § 1331 and 28 U.S.C. § 1332(d).

### Federal Question Jurisdiction

7.     This Court has federal question jurisdiction under 28 U.S.C. § 1331 because the Action is a civil action arising under the Constitution, laws, or treaties of the United States.

8.     Specifically, Plaintiffs allege Medliant violated the Trafficking Victims Protection Act, 18 U.S.C. §§ 1589(a) (Count I), (b) (Count II), 1590(a) (Count III), and 1594(a) (Count IV). Plaintiffs further allege Medliant violated the Fair Labor Standards Act, 29 U.S.C. §§ 255(a) (Count V) and 206 (Count VI).

### Diversity Jurisdiction under the Class Action Fairness Act

9.     This Court also has diversity jurisdiction over this Action under the Class Action Fairness Provisions of 28 U.S.C. § 1332(d).

10.     Section 1332(d) requires (1) a civil action asserting claim on behalf of a class containing at least 100 members; (2) minimum diversity between Medliant and a member of the class; and (3) at least $5 million in controversy. Kuxhausen v. BMW Financial Servs. NA LLC, 707 F.3d 1136, 1139 (9th Cir. 2013).

11.     The class proposed by Plaintiffs in the Action satisfies all three elements.

12.     **The Putative Class Contains at least 100 Members**.  The Amended Complaint asserts claims on behalf a class defined as containing "[a]ll nurses who entered the United States to perform work for Defendant and Defendant's clients within the statute of limitations and are or were subject to Medliant's Employment Agreement requiring the payment of liquidated and other damages for failure to meet a specified hours commitment." Amended Complaint at ¶ 123.

McDONALD CARANO

2300 WEST SAHARA AVENUE, SUITE 1200 • LAS VEGAS, NEVADA 89102
PHONE 702.873.4100 • FAX 702.873.9966

13.     Plaintiffs allege that there are "in excess of 100 Class Members within the applicable statute of limitations." Amended Complaint at ¶ 124(A). A claim under the Trafficking Victims Protection Act has a 10-year limitations period. 18 U.S.C. § 1595(c). Over the past 10 years, Medliant avers that it has had at least 150 employees that signed employment contracts with liquidated damages provisions.

14.     **Minimum Diversity Exists**.  Plaintiffs allege that they are citizens of the Philippines. Amended Complaint at ¶¶ 13–14.  If they were deemed citizens of the place where they reside—in both instances, Beaumont, Texas—they would be citizens of Texas. Id.

15.     Plaintiffs allege that Medliant is a citizen of Nevada and Tennessee. Amended Complaint at ¶¶ 15–16.

16.     As a result, no Plaintiff is a citizen of the same state as any Defendant.

17.     In addition to Texas, Medliant employs nurses who fall within the class definition in the states of Missouri, Arizona, and Arkansas who could supply the requisite minimal diversity.

18.     **The Amount in Controversy Exceeds $5,000,000**.  Plaintiffs seek multiple forms of relief that put more than $5,000,000 at issue. The amount in controversy is not the amount a plaintiff will recover or the minimum a plaintiff could recover; instead, it is a reasonable estimate of the maximum a plaintiff could recover—the amount "at stake" in the lawsuit.  Jauregui v. Roadrunner Trans. Servs., Inc., 28 F.3d 989, 994 (9th Cir. 2022).  If a form of relief is reasonably available, then that relief counts towards to amount in controversy, even if recovery is not likely. Id. at 993–94. Future damages are also part of this calculation. See Chavez v. JPMorgan Chase & Co., 888 F.3d 413, 417 (9th Cir. 2018).

19.     Plaintiffs demand four forms of relief: compensatory damages, punitive damages, attorneys' fees, and injunctive relief. Each adds to the amount in controversy. Each of these categories of demanded relief increases the amount in controversy.

20.     Medliant denies that Plaintiffs are entitled to any damages or relief of any of these types. The following discussion is solely for the purpose of demonstrating that Plaintiffs' allegations put certain types and amounts of damages and other relief in controversy. Medliant

McDONALD CARANO

2300 WEST SAHARA AVENUE, SUITE 1200 • LAS VEGAS, NEVADA 89102
PHONE 702.873.4100 • FAX 702.873.9966

1    reserves all rights to challenge the award of any forms of relief and the amount or terms of such

2    relief and do not concede that the types and numbers below are appropriate for this case.

3            21.    As to **compensatory damages**, Plaintiffs demand "any penalty Plaintiffs paid to

4    Defendant as emotional distress and other damages." Amended Complaint at ¶¶ 132, 138, 143,

5    148.

6            22.    Emotional distress damages under the Trafficking Victims Protection Act, 18

7    U.S.C. § 1589 *et seq*. are often awarded on a per-day basis, and damages awards can exceed

8    $150 per day. "The range for awards spans between $170 per day to $800 per day." West v.

9    Butikofer, No. 19-CV-1039-CJW-KEM, 2020 WL 5245226 at *10 (N.D. Iowa Aug. 18, 2020)

10   (collecting cases from around the country).

11           23.    Even though Plaintiffs are not entitled to any damages, Medliant proposes using

12   $150 per day as an estimate for the amount in controversy exercise. Plaintiffs' claims put three

13   years at issue for each class member. Amended Complaint at ¶ 7. If the Court were to award

14   emotional distress damages for 200 days per year (assuming 4 days of work per week with 2

15   week of vacation)[1], each class member puts 600 days at issue.[2] Awarding each of 100 class

16   members $150 per day for 600 days equals $9 million.[3]

17           24.    Though not necessary to establish the amount in controversy, Plaintiffs seek other

18   forms of compensatory damages as well, such as lost wages. Amended Complaint at ¶ 158.

19   Plaintiff Delgado claims to have been underpaid by $22 per hour. Id. at ¶ 108. Even if that

20   number were reduced by more than half to $10 per hour, it would put an additional $52,000 in

21   controversy for each class member, under the assumption that a putative class member is

22   underpaid across the entire 5,200 hour "term" Plaintiffs allege.[4] Id. at ¶ 24. Assuming a

23   minimum class size of 100, the lost wages claim puts $5.2 million at issue.[5]

---

[1] (50 weeks) X (4 days per week) = 200 days per year.

[2] (200 days per year) X (3 years) = 600 days.

[3] (600 days per class member) X ($150 per day) X (100 class members) = $9,000,000.
[4] (5,200 hour contractual term per class member) X ($10 alleged underpayment per hour) = $52,000.

[5] ($52,000 per class member) X (100 class members) = $5,200,000.

**APP. 055**

McDONALD CARANO

2300 WEST SAHARA AVENUE, SUITE 1200 • LAS VEGAS, NEVADA 89102
PHONE 702.873.4100 • FAX 702.873.9966

25.     According to Plaintiffs, any putative class member that does not work the full 5,200 term is subject to paying liquidated damages of "up to $80,000" plus additional amounts. Amended Complaint at ¶ 7. According to Plaintiffs, a putative class member who did not put an underpayment claim in controversy would put a claim to recover the liquidated damages in controversy. See, e.g., Amended Complaint at ¶ 138.

26.     The compensatory damages alone exceed the $5,000,000 threshold for the amount in controversy at least twice over.

27.     **Punitive damages** also count towards the amount in controversy. Greene v. Harley-Davidson, Inc., 965 F.3d 767, 772 (9th Cir. 2020). One way that a defendant can estimate the value of punitive damages in controversy "is to cite a case based on the same or a similar statute in which the jury or court awarded punitive damages based on the punitive-compensatory damages ratio relied upon by the defendant in its removal notice." Id.

28.     The Ninth Circuit permits the award of punitive damages under the Trafficking Victims Protection Act, 18 U.S.C. § 1589 et seq. Ditullio v. Boehm, 662 F.3d 1091, 1098 (9th Cir. 2011) ("We therefore hold that punitive damages are available under 18 U.S.C. § 1595").

29.     Even though Medliant contends that Plaintiffs will not obtain punitive damages, their request for punitive damages under a TVPA claim puts at least the amount of compensatory damages at issue. Several courts have awarded punitive damages equal to the amount of compensatory damages. See, e.g., Carazani v. Zegarra, 972 F. Supp. 2d 1, 26–27 (D.D.C. 2013) ("Following previous courts, which have found a 1:1 ratio of compensatory to punitive damages a sufficient deterrent to offenders of the TVPA, the Court awards punitive damages equal to its compensatory damages award….").

30.     Thus, the amount of punitive damages in controversy at least equals the amount of compensatory damages, which is conservatively $9 million in this case on the TVPA claim alone. Adding $9 million compensatory damages and $9 million punitive damages shows that $18 million is in controversy on that single claim.

31.     **Attorneys' fees** provided by statute (including prospective attorneys' fees) also add to the amount in controversy. Arias v. Residence Inn by Marriott, 936 F.3d 920, 922 (9th

McDONALD CARANO

2300 WEST SAHARA AVENUE, SUITE 1200 • LAS VEGAS, NEVADA 89102
PHONE 702.873.4100 • FAX 702.873.9966

Cir. 2019). Such fees can be awarded on a TVPA claim. 18 U.S.C. § 1595. Plaintiffs demand them in this case. See, e.g., Amended Complaint at ¶¶ 133, 139, 144, and 149

32.     While the Ninth Circuit has declined to adopt a per se rule that an attorneys' fee of 25% of potential damages is always appropriate, percentage-based estimates can be reasonable. Arias, 936 F.3d. at 928. Twenty-five percent is a common benchmark courts often apply. See Staton v. Boeing, 327 F.3d 938, 968 (9th Cir. 2003). Assuming a 10% fee, this would add $900,000 to the amount in controversy.

33.     Departing from a percentage-based approach would require Plaintiffs to provide discovery. The rates or hours expended or anticipated by Plaintiffs' counsel to perform a lodestar analysis are uniquely in Plaintiffs' possession. Medliant therefore requests leave to obtain discovery from Plaintiffs regarding all aspects of their attorneys' fees if Plaintiffs challenge the amount in controversy on this issue and the amount in controversy is not otherwise satisfied.

34.     The cost of **injunctive relief** also adds to the amount in controversy. Plaintiffs allege that Medliant's use of a liquidated damages provision violates Plaintiffs' rights. Amended Complaint at ¶ 8. They allege that Medliant requires payment of liquidated damages of up to $80,000 for each worker. Id. at ¶ 7. If Medliant were enjoined from enforcing these provisions and from seeking damages from employees, the cost of compliance would be the greater of its lost profits or the loss of liquidated damages—which puts $80,000 at issue for each putative class member, or a further $8,000,000 in controversy for the putative 100-member class as a whole.

**The Procedural Requirements for Removal are Satisfied**

35.     Under 28 U.S.C. § 1446(b), Medliant has timely filed this Notice of Removal within thirty (30) days of service.

36.     A copy of all process and pleadings heretofore filed in the state court action or served upon Medliant is attached as Exhibit A. While Medliant was only served with the Amended Complaint, a copy of all process and pleadings filed in the state court action are included.

37. While Medliant reserves the right to challenge venue in this Court, this Court is the appropriate venue to which the case should be removed because this District and unofficial Southern Division of this District embrace the place in which the removed action has been pending (i.e., Clark County, Nevada).

38. In removing this action, Medliant reserves all rights and all defenses including, without limitation, all defenses specified in Federal Rule of Civil Procedure 12(b).

39. Promptly upon filing this Notice, Medliant will file a copy of it with the clerk of the state court in which this action is pending and will give written notice to counsel for Plaintiffs, as required by 28 U.S.C. § 1446(d).

40. Medliant has complied with all procedural requirements for removal.

**WHEREFORE**, Medliant respectfully remove the Action from the District Court of Clark County, Nevada to proceed in the United States District Court for the District of Nevada.

DATED this 28th day of December, 2023.

McDONALD CARANO LLP

By: */s/  Kristen T. Gallagher*
　　Kristen T. Gallagher (NSBN 9561)
　　2300 West Sahara Avenue, Suite 1200
　　Las Vegas, Nevada 89102
　　kgallagher@mcdonaldcarano.com

　　R. Brandon Bundren
　　(will comply with LR IA 11-2 within 14 days)
　　Bradley Arant Boult Cummings LLP
　　1221 Broadway, Suite 2400
　　Nashville, Tennessee 37203

　　*Attorneys for Defendants Medliant and Medliant Inc.*

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that I am an employee of McDonald Carano LLP, and that on this 28th day of December, 2023, I caused a true and correct copy of the foregoing **NOTICE OF REMOVAL** to be served via this Court's CM/ECF service which will provide copies to all counsel of record registered to receive CM/ECF notification and/or via E-mail to the following:

Mark R. Thierman (mark@thiermanbuck.com)
Joshua D. Buck (josh@thiermanbuck.com)
Thierman Buck LLP
7287 Lakeside Drive
Reno, Nevada 89511

Juno Turner (juno@towardsjustice.com)
David H. Seligman
(david@towardsjustice.com)
Rachel W. Dempsey
(rachel@towardsjustice.com)
Towards Justice
P.O. Box 371689, PMB 44465
Denver, Colorado 80237-5680

*Attorneys for Plaintiffs*

/s/    *Marianne Carter*
An employee of McDonald Carano LLP

APP. 059

**INDEX OF EXHIBITS**

| Description | Exhibit |
|---|---|
| Copies of all process and pleadings heretofore filed in the state court action | A |
| Civil cover sheet | B |



McDONALD CARANO

2300 WEST SAHARA AVENUE, SUITE 1200 • LAS VEGAS, NEVADA 89102
PHONE 702.873.4100 • FAX 702.873.9966

**APP. 060**

# EXHIBIT 4

1　Mark R. Thierman, Nev. Bar No. 8285
　mark@thiermanbuck.com
2　Joshua D. Buck, Nev. Bar No. 12187
　josh@thiermanbuck.com
3　Leah L. Jones, Nev. Bar No. 13161
　leah@thiermanbuck.com
4　THIERMAN BUCK LLP
　325 W. Liberty St.
5　Reno, NV 89501
　Tel. (775) 284-1500
6　Fax. (775) 703-5027
7
8　Juno Turner (admitted pro hac vice)
　juno@towardsjustice.org
9　David H. Seligman (admitted pro hac vice)
　david@towardsjustice.org
10　Rachel W. Dempsey (admitted pro hac vice)
　rachel@towardsjustice.org
11　TOWARDS JUSTICE
　P.O. Box 371689, PMB 44465
12　Denver, CO 80237-5680
　Tel. (720) 441-2236
13
14　*Attorneys for Plaintiff and the Putative*
　*Class and Collective*
15

16

17　　　　　　**UNITED STATES DISTRICT COURT**

18　　　　　　**FOR THE DISTRICT OF NEVADA**

19　　　　　　　　　　　　　　　Case No.: 2:23-cv-02148-APG-DJA

20　ELIAHKIM MABUTE and JEDDY ANNE
　DELGADO, on behalf of themselves and all
21　others similarly situated,　　　　　　**PLAINTIFFS' MOTION TO REMAND**

22　　　　　　Plaintiffs,

23　　　　vs.

24　MEDLIANT, INC. and MEDLIANT,

25　　　　　　Defendants.

26

27

28

- 1 -

## I. INTRODUCTION

Defendants Medliant, Inc., and Medliant (hereinafter "Medliant") required Plaintiffs Eliahkim Mabute and Jeddy Anne Delgado to sign effectively identical contracts titled "Agreement for Employment." ECF No. 1-2 at 29 (Agreement). These Agreements contain a venue provision that selects the 8th Judicial District Court in Las Vegas, Nevada as the proper venue for litigation. *Id*. at 33. This provision reads as follows:

> **GOVERNING LAW/VENUE**. This Agreement shall be governed by the laws of Nevada. Medliant is incorporated in Nevada and as such, chooses to utilize Nevada law for interpretation and analysis of the herein agreement as well as chooses to utilize the venue of the 8th Judicial District Court in Las Vegas, Nevada as and for any disputes that may arise from time to time. By signing below, you agree to Medliant's choice of venue and choice of law.

*Id*.

In compliance with the venue provision, Plaintiffs filed this action in the 8th Judicial District Court in Las Vegas, Nevada, on November 8, 2023. ECF No. 1 ¶ 1 (Removal Motion). Despite having already chosen that venue for "any disputes that may arise from time to time," ECF No. 1-2 at 33, Medliant removed this dispute to federal court on December 23, 2023. ECF No. 1. By the plain terms of the Agreement between Medliant and both Plaintiffs, the case must be remanded to Medliant's chosen venue, the 8th Judicial District Court in Las Vegas, Nevada.

## II. BACKGROUND

Plaintiffs Eliahkim Mabute and Jeddy Anne Delgado are former employees of Medliant, a healthcare staffing company that recruits immigrant workers to the United States to work at healthcare facilities around the country. (ECF No. 1-2 at ¶¶ 1-2 (First Amended Complaint ("FAC")). The FAC alleges that when Medliant employees arrive in the United States, they find that the employment they were promised is essentially indentured servitude. *Id*. ¶ 5. Medliant's contracts with Plaintiffs subject them to a penalty of up to $80,000 in addition to repayment of other expenses if they leave their jobs before the end of a specified commitment period. *Id*. ¶ 24. Medliant routinely threatens nurses that if they resign early, Medliant will file a lawsuit against them. *Id*. ¶ 29. It also falsely tells nurses that if they quit, Medliant will report their resignation

1   to United States Citizenship and Immigration Services and that they will be deported along with

2   their families. *Id.* ¶ 36. For example, Medliant told Plaintiff Mabute that if he left his employment

3   early, there was no option to buy out his contract. *Id.* ¶ 72. His only choice, according to Medliant,

4   was to keep working for Medliant or be deported and banned from the United States, and to face

5   penalties of as much as $100,000. *Id.* ¶ 73.

6       Faced with difficult and dangerous working conditions, Mabute and Delgado resigned

7   from their employment with Medliant on November 8, 2023, and filed this lawsuit the same day

8   in the 8th Judicial District Court in Las Vegas, Nevada. *Id.* ¶¶ 12-13. Medliant removed the action

9   on December 28, 2023. ECF No. 1.

10  **III.   LEGAL STANDARD**

11      Courts in the Ninth Circuit apply federal law to interpret forum selection clauses.

12  *Simonoff v. Expedia, Inc.*, 643 F.3d 1202, 1205 (9th Cir. 2011); *see also Doe 1 v. AOL LLC*, 552

13  F.3d 1077, 1081 (9th Cir. 2009). "A contractual forum selection clause is 'prima facie valid and

14  should be enforced unless enforcement is shown by the resisting party to be 'unreasonable' under

15  the circumstances.'" *Docksider, Ltd. v. Sea Tech., Ltd.*, 875 F.2d 762, 763 (9th Cir. 1989)

16  (quoting *M/S Bremen v. Zapata Offshore Co.*, 407 U.S. 1, 10 (1972)).

17      Courts interpreting forum selection clauses first consider the "plain language of the

18  contract . . . with the understanding that the common or normal meaning of language will be

19  given to the words of a contract unless circumstances show that in a particular case a special

20  meaning should be attached to it." *Simonoff*, 643 F.3d 1202 (internal citations omitted). If a forum

21  selection clause is ambiguous, it is construed against the drafter. *Doe 1 v. AOL LLC*, 552 F.3d

22  1077, 1081 (9th Cir. 2009). "A contract is ambiguous 'if reasonable people could find its terms

23  susceptible to more than one interpretation." *Id.* (quoting *Klamath Water Users Protective Ass'n

24  v. Patterson*, 204 F.3d 1206, 1210 (9th Cir. 1999)).

25  **IV.   ARGUMENT**

26      **A.   The plain language of the forum selection clause compels remand.**

27      As the United States Supreme Court has recognized, a "valid forum-selection clause . . .

28  represents the parties' agreement as to the most proper forum." *Alt. Marine Const. Co., Inc. v.*

- 3 -

*U.S. Dist. Ct. for the W. Dist. Of Texas*, 571 U.S. 49, 63 (2013). Where, as here, a forum selection clause explicitly names a state court—and only a state court—as the chosen venue for disputes, that "contract term effectively waives the right to remove an action within its terms to federal court." *N2 Packaging Sys. LLC v. N2 Pack Canada Inc.*, No. CV-19-02351-PHX-NVW, 2019 WL 8326681, at *1 (D. Ariz. June 12, 2019) (citing *City of Albany v. CH2M Hill, Inc.*, 2019 WL 2285346 (9th Cir. May 29, 2019)). Federal courts "must remand if there is any doubt as to the right of removal in the first instance." *Switch, Ltd v. GEI Consultants, Inc.*, No. 219CV00371MMDDJA, 2019 WL 4803222, at *2 (D. Nev. Oct. 1, 2019).

Plaintiffs' basis for remand is simple. Medliant's contract with Plaintiffs contains a forum selection clause stating that Medliant has selected the 8th Judicial District Court in Las Vegas, Nevada for any disputes arising out of the contract. ECF No. 1-2 at 33. In accordance with that requirement, Plaintiffs filed this action in Medliant's chosen venue. ECF No. 1 ¶ 1. Medliant improperly removed the case to this court and thus remand is required.

**B.  The forum selection clause is mandatory.**

The plain language of the contract can and should be the end of the court's inquiry. See, e.g., *Simonoff*, 643 F.3d 1202. However, Medliant may argue that the forum selection clause is permissive—in effect, that when it wrote in the Agreement with Plaintiffs that it chose a single forum, the venue of the 8th Judicial District Court, "as and for any disputes that may arise from time to time," what it actually meant was that it *could* choose that forum, or could alternatively choose a different forum, if and when any disputes related to the contract arose. That, of course, is not what the Agreement says. Any argument that the forum selection clause is permissive is baseless.

"Where a contract contains a forum selection clause, courts determine whether the clause is mandatory, meaning that the specified forum is the exclusive forum agreed upon by the parties, or permissive, meaning that the parties merely consent to venue in a particular forum." *Fed. Nat'l Mortgage Assoc. v. 8th Judicial Dist. Ct. in and for Cty. Of Clark*, 528 P.3d 586 (Table), 2022 WL 19697697, at *3 (Nev. Dec. 22, 2022) (unpublished decision). Where a forum-selection clause evidences the parties' intent to limit legal actions to a specific court, that clause is

- 4 -

1    mandatory. *Id.; see also Coppola v. Baron*, No. 2:07-cv-00664-BES-RJJ, 2007 WL 4180590, at

2    *2 (D. Nev. Nov. 20, 2007) ("To be a mandatory forum selection clause, the clause must contain

3    language that clearly designates a forum as the exclusive one.").

4            Here, not only does the forum selection clause that Medliant drafted state that Medliant

5    "chooses to utilize the venue of the 8th Judicial District Court," it also requires that both parties

6    "agree to Medliant's choice of venue and choice of law." ECF No. 1-2 at 33. This "goes further

7    than signaling merely that [the specified] courts are an appropriate forum," stating not that

8    Medliant *may* choose the venue of the 8th Judicial District Court for contract disputes, but that it

9    *does*. *Fed. Nat'l Mortgage Assoc.*, 2022 WL 19697697, at *3 (finding that a forum selection

10   clause stating that "any controversy" "shall be litigated" in the District of Columbia was

11   mandatory). In other words, the parties agreed that the 8th Judicial District Court in Las Vegas,

12   Nevada is the only appropriate venue for actions arising out of the contract. Thus, the clause is

13   mandatory. *See, e.g., Docksider, Ltd. v. Sea Tech., Ltd*., 875 F.2d 762, 764 (9th Cir. 1989)

14   (holding that a venue provision stating that "[v]enue of any action brought hereunder shall be

15   deemed to be in Gloucester County, Virginia" was mandatory); *Hunt Wesson Foods, Inc. v.

16   Supreme Oil Co.*, 817 F.2d 75, 76-78 (9th Cir. 1987) (distinguishing between forum selection

17   clauses that specify that a given court has jurisdiction over an action and those that "designat[e]

18   an exclusive forum").

19           Moreover, even if the language of the venue provision were ambiguous as to whether the

20   8th Judicial District Court were the required venue for disputes arising out of the Agreement,

21   remand would be required. Plaintiffs' interpretation of the Agreement as mandatory is at

22   minimum reasonable, particularly where Medliant drafted the Agreement. Ambiguous contract

23   language is construed against the drafter. *Doe 1*, 552 F.3d at 1081 (holding that even if there was

24   ambiguity in a forum selection clause, the court "would construe the contract against . . . the

25   drafter and adopt plaintiffs' reasonable interpretation").

26           Medliant may argue that the forum selection clause is merely permissive, but the case law

27   analyzing permissive forum selection clauses highlights that this is not one of them. For example,

28   in *Coppola*, 2007 WL 4180590, the court analyzed a forum selection clause stating that "[v]enue

- 5 -

of any action brought hereon shall be Clark County, Nevada." *Id*. at *2. Neither party disputed that this provision required suit be brought in the geographical region of Clark County, but the defendants argued that it limited venue to Clark County state courts, precluding any federal court actions. *Id*. The court held that because the forum selection clause "said nothing about the Clark County state courts having exclusive jurisdiction," the federal court action would be allowed to proceed. *Id*. Here, in contrast, the forum selection clause mandates a specific state court. That is where Plaintiffs filed. Thus, the case should be returned there.

## V.    CONCLUSION

For the reasons stated above, this Court should enforce the forum selection clause as written and remand this case to the 8th Judicial District Court, Las Vegas, Nevada.

DATED: January 22, 2024                    By: /s/ *Leah L. Jones*

Mark R. Thierman, Nev. Bar No. 8285
mark@thiermanbuck.com
Joshua D. Buck, Nev. Bar No. 12187
josh@thiermanbuck.com
Leah L. Jones, Nev. Bar No. 13161
leah@thiermanbuck.com
THIERMAN BUCK LLP
325 W. Liberty St.
Reno, NV 89501
Tel. (775) 284-1500
Fax. (775) 703-5027

Rachel W. Dempsey (admitted pro hac vice)
rachel@towardsjustice.org
Juno Turner (admitted pro hac vice)
juno@towardsjustice.org
David H. Seligman (admitted pro hac vice)
david@towardsjustice.org
TOWARDS JUSTICE
P.O. Box 371689, PMB 44465
Denver, CO 80237-5680
Tel. (720) 441-2236

*Attorneys for Plaintiff and the Putative Classes*

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that I am an employee of Thierman Buck LLP, and that on this 22nd day of January, 2024, I caused a true and correct copy of the foregoing MOTION TO REMAND to be served via this Court's CM/ECF service which will provide copies to all counsel of record registered to receive CM/ECF notification and/or via e-mail to the following:

Kristen T. Gallagher
McDONALD CARANO LLP
2300 West Sahara Avenue, Suite 1200
Las Vegas, Nevada 89102
Telephone: (702) 873-4100
kgallagher@mcdonaldcarano.com

R. Brandon Bundren
BRADLEY ARANT BOULT CUMMINGS LLP
1221 Broadway, Suite 2400
Nashville, Tennessee 37203
Telephone: (615) 244-2582
bbundren@bradley.com

By:                                    /s/ Jennifer Edison-Strekal

# EXHIBIT 5

1    Kristen T. Gallagher (NSBN 9561)
     McDONALD CARANO LLP
2    2300 West Sahara Avenue, Suite 1200
     Las Vegas, Nevada 89102
3    Telephone: (702) 873-4100
     kgallagher@mcdonaldcarano.com
4
     R. Brandon Bundren (admitted *pro hac vice*)
5    BRADLEY ARANT BOULT CUMMINGS LLP
     1221 Broadway, Suite 2400
6    Nashville, Tennessee 37203
     Telephone: (615) 244-2582
7    bbundren@bradley.com

8    *Attorneys for Defendants Medliant and Medliant Inc.*

9                    **UNITED STATES DISTRICT COURT**

10                        **DISTRICT OF NEVADA**

11   ELIAHKIM MABUTE and JEDDY ANNE          Case No.: 2:23-cv-02148-APG-DJA
     DELGADO, on behalf of themselves, those
12   similarly situated, and the Proposed Rule 23
     Class,
13
                         Plaintiffs,            **DEFENDANTS' MOTION TO DISMISS**
14
     vs.                                        **ORAL ARGUMENT REQUESTED**
15
     MEDLIANT INC. and MEDLIANT,
16
                         Defendants.
17

18          Pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure, the defendants,

19   Medliant Inc. and Medliant (collectively, "Medliant"), move to dismiss Plaintiffs' First

20   Amended Class and Collective Action Complaint (the "Amended Complaint"). *See* ECF No.

21   1–2, pp. 86–127.[1] For the reasons set forth below, Medliant requests that this Court dismiss the

22   Amended Complaint with prejudice.[2]

23

24

25

     _____
26   [1] Citations to the Amended Complaint refer to the Amended Complaint served upon Medliant
     on December 7, 2023, the page number(s) of the ECF header, and the paragraph number(s) of
27   the Amended Complaint.

28   [2] Medliant is also moving to transfer this action to the Eastern District of Texas pursuant to 28
     U.S.C. § 1404(a) and the first-to-file rule.

                                                                                          **APP. 070**

**MEMORANDUM OF POINTS AND AUTHORITIES**

## I.  INTRODUCTION AND FACTUAL BACKGROUND

### A.  Medliant's Business.

Medliant recruits international nurses to fulfill staffing needs in the nursing profession in the United States.[3] *See* ECF No. 1–2, p. 87, ¶ 5. Medliant memorializes the terms of employment through an offer letter, which is followed by a written employment agreement. *See* ECF No. 1–2, pp. 113–18, 120–21. Those documents commit Medliant to sponsor and pay for all expenses associated with the employee's EB-3 Green Card, travel expenses, one month's living accommodations, and to reimburse the employee for all federal and state license-related application fees and expenses. *See id.* at p. 120. In exchange, an employee agrees to work 5,200 straight-time hours (approximately 2.5 years for a full-time employee) for Medliant upon arrival in the United States. *Id.* at pp. 113–14, § 2 and pp. 120–21. The employee also agrees that if the employee voluntarily leaves Medliant before fulfilling that obligation, the employee is obligated to pay Medliant liquidated damages in the amount of $2,500 for each month remaining on the employee's contractual term. *Id.* at p. 114, § 2(d). If the employee fails to fulfill that obligation, the employee acknowledges that Medliant may file suit for breach of contract, among other claims, and recover its attorneys' fees and costs in connection with such suit. *Id.* at p. 114, § 2(e) and p. 117, § 18.

### B.  Plaintiffs' Allegations.[4]

In the present case, Plaintiffs, Eliahkim Mabute ("Mabute") and Jeddy Anne Delgado ("Delgado"; collectively referred to as "Plaintiffs"), are former Medliant employees that

---

[3] *See, e.g.,* American Hospital Association, *Study projects nursing shortage crisis will continue without concerted action*, https://www.aha.org/news/headline/2023-04-13-study-projects-nursing-shortage-crisis-will-continue-without-concerted-action.

[4] The facts alleged in the Amended Complaint are presumed true only for purposes of this Motion and subject to recognized pleading standards.

McDONALD CARANO
2300 WEST SAHARA AVENUE, SUITE 1200 • LAS VEGAS, NEVADA 89102
PHONE 702.873.4100 • FAX 702.873.9966

**APP. 071**

executed offer letters and employment agreements. *See* ECF No. 1–2, pp. 113–21 (Delgado offer letter and employment agreement).[5]

Mabute applied to Medliant, interviewed with Medliant, and ultimately accepted employment with Medliant in October 2019. *Id*. at p. 94, ¶ 53. Medliant offered Mabute three positions in three states before he chose to work in Texas "because he had family there." *Id*. at ¶ 54. Mabute arrived in the United States on April 10, 2022, and began working for Medliant a little over one week later at Baptist Hospitals of Southeast Texas ("Baptist") in Beaumont, Texas. *Id*. at ¶¶ 57–60. When Mabute arrived in the U.S.—after Medliant fulfilled its end of the bargain by paying for his Green Card, travel expenses, one month's living accommodations, and license-related expenses—Medliant helped Mabute obtain a social security card, open a bank account, and buy groceries. *See id*. at ¶ 58. On November 8, 2023, Mabute resigned purportedly due to "low pay, difficulty receiving reasonable accommodations, and general working conditions." *See id*. at ¶ 83.

Delgado applied to Medliant, interviewed with Medliant, and ultimately accepted employment with Medliant in October 2019. ECF No. 1–2, p. 99, ¶¶ 97–99. Like Mabute, Delgado accepted an assignment at Baptist in Beaumont. *Id*. at ¶ 100. Delgado also arrived in the United States the same day as Mabute, April 10, 2022, and began working for Medliant a little over one week later. *Id*. at ¶¶ 102–05. When Delgado arrived in the U.S.—after Medliant fulfilled its end of the bargain by paying for her Green Card, travel expenses, one month's living accommodations, and license-related expenses—Medliant helped Delgado obtain a social security card, open a bank account, secure internet at her home, and buy groceries. *See id*. at ¶ 103. On November 8, 2023, Delgado resigned. *See* ECF No. 19, p. 3.

### C. Plaintiffs File Suit in Nevada.

Plaintiffs live and worked for Medliant in Beaumont, Texas, and the conduct giving rise to their claims undisputedly occurred in Beaumont. *See* ECF No. 1–2, pp. 94–98, ¶¶ 60–90 and

---

[5] While Plaintiffs did not attach Mabute's offer letter or employment agreement to the Amended Complaint, Plaintiffs allege Mabute "signed an offer letter and employment agreement with Medliant" (*id*. at p. 94, ¶ 53) and that the offer letter and employment agreement are "form contracts, each with substantially the same terms." *See* ECF No. 1–2*,* p. 90, ¶ 22.

McDONALD CARANO

2300 WEST SAHARA AVENUE, SUITE 1200 • LAS VEGAS, NEVADA 89102
PHONE 702.873.4100 • FAX 702.873.9966

pp. 99–101, ¶¶ 102–18. Yet despite these factual connections to Beaumont and before the ink was dry on their resignation emails, Plaintiffs filed this anticipatory strike suit in Nevada state court on November 8, 2023. *See* ECF No. 1–2, p. 2. On December 28, 2023, Medliant removed the Nevada state court action to this Court. ECF No. 1.

The Amended Complaint attempts to allege four claims under the Trafficking Victims Protection Act (the "TVPA") and two claims under the Fair Labor Standards Act (the "FLSA"). *See* ECF No. 1–2, pp. 105–10. For the reasons set forth below, the Amended Complaint fails to state a claim for relief and this Court should dismiss it.

## II.   LEGAL STANDARD

"To survive a motion to dismiss, a complaint must contain sufficient factual matter to state a claim for relief that is plausible on its face." *See Williams v. Sisolak*, No. 2:21-cv-01676-APG-VCF, 2022 WL 2819842, at *2 (D. Nev. July 18, 2022) (internal quotations omitted). In considering a motion to dismiss for failure to state a claim, a court takes "all well-pleaded allegations of material fact as true and construe[s] the allegations in a light most favorable to the non-moving party." *Manguin v. Becker*, No. 2:22-cv-01711-APG-EJY, 2023 WL 3251750, at *1 (D. Nev. May 3, 2023) (citing *Kwan v. SanMedica Int'l*, 854 F.3d 1088, 1096 (9th Cir. 2017)). However, a court does not "assume the truth of legal conclusions merely because they are cast in the form of factual allegations." *Id.* (citing *Navajo Nation v. Dep't of the Interior*, 876 F.3d 1144, 1163 (9th Cir. 2017)). The plaintiff "must make sufficient factual allegations to establish a plausible entitlement to relief." *Id.* (citing *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 556 (2007)). "Such allegations must amount to more than labels and conclusions, or a formulaic recitation of the elements of a cause of action." *Id.* (internal quotations omitted).

## III.   PLAINTIFFS' TVPA CLAIM SHOULD BE DISMISSED.

### A.   Plaintiffs' TVPA Allegations.

Plaintiffs allege Medliant obtained their labor through "threats of serious harm" and threats of "abuse of legal process, including immigration processes . . .". *See* ECF No. 1–2, p. 105, ¶ 129. Specifically, Plaintiffs allege Medliant is liable for two reasons: (1) through its use of contractual provisions that led employees to fear financial ruin (a liquidated damages clause

2300 WEST SAHARA AVENUE, SUITE 1200 • LAS VEGAS, NEVADA 89102
PHONE 702.873.4100 • FAX 702.873.9966

McDONALD CARANO

and immigration costs obligation) and (2) through the threatened abuse of legal process. *See* ECF No. 1–2, p. 105, ¶¶ 129–30. This alleged conduct forms the basis for liability under all four of Plaintiffs' TVPA claims. *See id.* at pp. 105–08, ¶¶ 126–149 (Count I, 18 U.S.C. § 1589(a) – "forced labor" provision; Count II, 18 U.S.C. § 1589(b) – "knowingly benefit" provision; Count III, 18 U.S.C. § 1590(a) – recruitment provision; and Count IV, 18 U.S.C. § 1594(a) – "attempt" provision).

### B. TVPA Framework.

"Congress passed the TVPA under its Thirteenth Amendment authority in order to combat trafficking in persons, a contemporary manifestation of slavery whose victims are predominately women and children, to ensure just and effective punishment of traffickers, and to protect their victims." *Carter v. Paschall Truck Lines, Inc.*, No. 5:18-cv-41-BJB, 2023 WL 359559, at *7 (W.D. Ky. Jan. 23, 2023) (internal quotations omitted). "Initially a criminal statute, in 2003 Congress amended the TVPA to include a civil cause of action to remedy violations of the statute's forced-labor provision." *Id.*

A defendant is liable for "forced labor if he intends to cause a person in his employ to believe that if she does not continue to work, she will suffer the type of serious harm—physical or nonphysical, including psychological, financial, reputation harm—that would compel someone in her circumstances to continue working to avoid that harm." *Singh v. Singh*, No. 3:21-cv-00094-HDM-WGC, 2021 WL 3549895, at *1 (D. Nev. Aug. 11, 2021) (quoting *U.S. v. Dann*, 652 F.3d 1160, 1169–70 (9th Cir. 2011)). "[T]he threat of harm must be serious – that is, the threat, considered from the vantage point of a reasonable person in the place of the victim, must be sufficiently serious *to compel that person to remain*; and . . . there must be scienter – that is, the employer intended the victim to believe that such harm would befall her if she did not continue to work. Both of these elements must be alleged in the complaint to sufficiently state a § 1589 violation." *Id.* (emphasis added) (quoting *Dann*, 652 F.3d at 1169–70) (internal quotations omitted).

"[N]ot all bad employer-employee relationships or even bad employer-immigrant . . . relationships will constitute forced labor." *Dann*, 652 F.3d at 1170. "Arduous, demeaning, or

even terrible working conditions or employment requirements alone will not suffice." *Schrader v. Wynn*, No. 2:19-cv-2159-JCM-BNW, 2021 WL 619376, at *6 (D. Nev. Feb. 17, 2021) (internal quotations omitted). "These conditions may precipitate an employee's departure from an employer . . . but unless those conditions are used to obtain and keep an employee's labor, they cannot support a claim of forced labor." *Id.*

### C. Alleged Fear of Financial Ruin.

Plaintiffs allege Medliant forced Plaintiffs' labor through the use of contractual provisions that led Plaintiffs to fear financial ruin, including a liquidated damages clause and an immigration repayment obligation. *See* ECF No. 1–2, p. 105, ¶¶ 129–30. While financial pressure, including the threat of financial harm, may constitute serious harm under the TVPA, the "threatened harm must be in some way improper or illicit." *See Estavilla v. Goodman Group, LLC*, No. CV 21-68-M-KLD, 2022 WL 539192, at *13 (D. Mont. Feb. 23, 2022) (quoting *Carmen v. Health Carousel, LLC*, No. 1:20-cv-313, 2021 WL 2476882, at *6 (S.D. Ohio June 17, 2021)). This requires distinguishing between "improper threats or coercion and permissible warnings of adverse but legitimate consequences." *See Headley v. Church of Scientology Int'l*, 687 F.3d 1173, 1180 (9th Cir. 2012).

As an initial matter, "liquidated damages provisions are presumed valid in Nevada." *Prothera, Inc. v. Zhou Ye*, No. 3:18-cv-00401-MMD-CLB, 2020 WL 3073345, at *4 (D. Nev. June 10, 2020) (citing *Khan v. Bakhsh*, 306 P.3d 411, 414 (Nev. 2013)).[6] "Their purpose is to serve as a good-faith effort to fix the amount of damages when contractual damages are uncertain or immeasurable." *Id.* (quoting *Khan*, 306 P.3d at 414).

Medliant anticipates Plaintiffs will rely upon authority from the Eastern District of New York in their response to this motion for the proposition that the liquidated damages provision

---

[6] Federal regulations also recognize that employers can "receive bona fide liquidated damages from the H-1B[, E-3, and H-1B1] nonimmigrant who ceases employment with the employer prior to an agreed date." 20 C.F.R. § 655.731(c)(10)(i)(B). While those regulations cover different visas (H-1B, E-3, and H-1B1) than Plaintiffs' EB-3 visas, the regulations acknowledge recovery of liquated damages in similar circumstances.

**APP. 075**

McDONALD CARANO

2300 WEST SAHARA AVENUE, SUITE 1200 • LAS VEGAS, NEVADA 89102
PHONE 702.873.4100 • FAX 702.873.9966

in the underlying employment agreement is unenforceable.[7] However, the liquidated damages clauses (and employment agreements) in those cases are a far cry from the agreement and liquidated damages clause at issue here. For example, in *Paguirigan v. Prompt Nursing Employ. Agency, LLC*, No. 17-CV-1302 (NG), 2019 WL 4647648, at *2 (E.D.N.Y. Sept. 24, 2019),[8] the Eastern District of New York found that an employer violated the TVPA because the contract contained a penalty provision of $25,000 and the employer filed numerous claims against former nurses seeking over $250,000 in penalties despite the fact that another court had found the penalty provision unenforceable. *Id.* at *16. Similarly, in *Magtoles v. United Staffing Registry, Inc.*, No. 21-CV-1850 (KAM) (PK), 2023 WL 2710178, at *24–25 (E.D.N.Y. Mar. 30, 2023), the court found a penalty provision in an employment contract constituted "serious harm" where the agreement also contained unenforceable non-compete clauses and the employer offered no evidence to rebut that its facilities were understaffed, the nurses were "considerably overworked," and some nurses worked hours for which they were not paid despite repeated request. Medliant's employment agreement is quite different from the contracts at issue in the Eastern District of New York cases because: (1) it has never been found to be unenforceable; (2) the liquidated damages clause is not a penalty; and (3) it does not contain any restrictive covenants.[9]

This case is more like *Panwar v. Access Therapies, Inc.*, No. 1:12-cv-00619-TWP-TAB, 2015 WL 1396599, at *3 (S.D. Ind. Mar. 25, 2015). There, the court found in favor of the employer on the plaintiffs' TVPA claim where the employees "voluntarily entered into the

---

[7] Counsel for Plaintiffs relied upon these authorities in the first-filed action pending in the Eastern District of Texas involving the same contract and same liquidated damages provision that forms the basis of Plaintiffs' forced labor claim in this case.

[8] The employment contract in *Paguirigan* also required an employee to submit a confession of judgment that the employer could file if an employee terminated his or her contract early and specifically stated that the liquidated damages provision was "to secure Employee's performance of the Employment term." *Paguirigan*, 2019 WL 4647648, at *7–8. The agreement here contains no similar provisions.

[9] Indeed, in 2016, a District Court in Clark County, Nevada found the Medliant employment contract "legal" and "enforceable as to the actual damages and liquidated damages." *See* Case No. A-15-726307-C, *Medliant v. Lim et al.*, Eighth Judicial District Court, County of Clark, State of Nevada.

McDONALD CARANO

2300 WEST SAHARA AVENUE, SUITE 1200 • LAS VEGAS, NEVADA 89102
PHONE 702.873.4100 • FAX 702.873.9966

**APP. 076**

[] contract[]," there was "no evidence" that the employees were "coerced or deceived" into signing the agreement, the contract was "plainly written, and the liquidated damages provision was made conspicuous," and "[t]here was nothing that compelled [the employees] to sign the agreement[], or even enter into the [] visa program." *Id*. The Amended Complaint acknowledges Plaintiffs voluntarily entered into their employment agreements (*see* ECF No. 1–2, p. 94, ¶¶ 52–54 and p. 99, ¶¶ 95–99), and there are zero allegations of fraud or deception. There are also no allegations that the liquidated damages provision was somehow concealed from Plaintiffs. Quite the contrary, the liquidated damages provision is referenced both in the employment agreement and the offer letter as well as the notice Plaintiffs signed regarding employment based Green Cards. *See id*. at pp. 113–14, § 2, pp. 120–21, and p. 123. Because any threatened financial harm was not in any way improper or illicit, Plaintiffs have failed to state a TVPA claim with respect to the liquidated damages clause. *See Estavilla*, 2022 WL 539192, at *13. *See also Paguirigan*, 2019 WL 4647648, at *17 ("[O]f course, there is no prohibition against defendants placing a valid liquidated damages provision in their contract.").

The alleged financial harm pertaining to the immigration repayment obligation also does not qualify as a serious threat of harm since such clauses are not per se invalid. *See Estavilla*, 2022 WL 539192, at *15 (noting that a contract provision for repayment of money advanced, in part, for immigration costs, was enforceable). Indeed, employers can recoup immigration expenses as liquidated damages so long as they do not also seek impermissible expenses like "back office administrative support fees." *See Carmen v. Health Carousel, LLC*, No. 1:20-cv-313, 2023 WL 5104066, at *14 (S.D. Ohio Aug. 9, 2023).[10] *Health Carousel* also observed that "an employer may lawfully deduct or demand reimbursement of expenses for items that primarily benefit the employee, like employee meals from a company restaurant, employee housing, and some commuter transportation." *Id*. *See also Gordon v. City of Oakland*, 627 F.3d 1092, 1095–96 (9th Cir. 2010) (concluding that former employee's payment of contractual damages was not a kickback because the damages were repayment of the

---

[10] Counsel for Plaintiffs also represents the plaintiff, Novie Dale Carmen, against Health Carousel in that case. *See Carmen v. Health Carousel, LLC*; No. 1:20-cv-00313-DRC; U.S. District Court for the Southern District of Ohio, Cincinnati Division.

**APP. 077**

McDONALD CARANO

2300 WEST SAHARA AVENUE, SUITE 1200 • LAS VEGAS, NEVADA 89102
PHONE 702.873.4100 • FAX 702.873.9966

1  employee's training expenses); *Heder v. City of Two Rivers*, 295 F.3d 777, 779 (7th Cir. 2002)

2  (same). As a result, the immigration repayment obligation cannot qualify as a serious threat of

3  harm. *See Estavilla*, 2022 WL 539192, at *15

4        Plaintiffs' TVPA claim also fails because Plaintiffs cannot plausibly claim that the

5  alleged harm was sufficiently serious to compel Plaintiffs to remain employed. *See Singh*, 2021

6  WL 3549895, at *1. It is undisputed that Plaintiffs voluntarily resigned and filed suit the same

7  day. Because Plaintiffs did not, in fact, remain employed by Medliant, they cannot, as a matter

8  of law, satisfy the first element of their forced labor claim. *See Stillwell v. Fashion Nova, LLC*,

9  No. CV-21-7040-GW-MARx, 2022 WL 2965394, at *11 (C.D. Cal. Jan. 28, 2022) (no TVPA

10  claim where "[a] reasonable person in [Plaintiffs'] circumstances would have [and did] . . .

11  walked away from the relationship . . . filed a lawsuit/defended a lawsuit/counter-sued to

12  enforce what [Plaintiffs'] believed were [their] rights . . . and/or . . . found somebody else –

13  given [Plaintiffs'] skills and education – to employ and pay [Plaintiffs] for working"), *aff'd*,

14  No. 22-55312, 2023 WL 2596823, at *1 (9th Cir. Mar. 22, 2023). *See also Carter*, 2023 WL

15  359559, at *9 (TVPA claim dismissed where employee voluntarily terminated his

16  employment).

17        The second element of a TVPA claim is scienter – "that is, the employer intended the

18  victim to believe that the threatened harm would befall her if she did not continue to work."

19  *Singh*, 2021 WL 3549895, at *1 (internal quotations omitted). Plaintiffs cannot plausibly allege

20  this element. Medliant undisputedly informs its employees that Medliant may pursue the rights

21  available to it under the agreement the employee freely entered into in order to come to live

22  and work in the United States. However, Medliant is entitled to warn its employees of adverse

23  but legitimate consequences, and these warnings cannot form the basis of a TVPA claim. *See*

24  *Headley*, 687 F.3d at 1180. *See also Stillwell*, 2022 WL 2965394, at *12 (It is not an abuse of

25  process within the meaning of the TVPA where a party seeks "to enforce what it believe[s] to

26  be its rights . . ."). As a result, Plaintiffs' TVPA claim based on a "fear of financial ruin" must

27  be dismissed.

28

    **APP. 078**

2300 WEST SAHARA AVENUE, SUITE 1200 • LAS VEGAS, NEVADA 89102
PHONE 702.873.4100 • FAX 702.873.9966
McDONALD CARANO

D. <u>Alleged Abuse of Legal Process.</u>

Plaintiffs also claim Medliant is liable under the TVPA's forced labor provision for its threatened abuse of legal process. *See* ECF No. 1–2, p. 105, ¶¶ 129–30. But, as discussed above, this alleged conduct was not serious enough to "compel [Plaintiffs] to remain employed." *See Singh*, 2021 WL 3549895, at *1. And, with respect to the second element—scienter—it is not an abuse of process within the meaning of the TVPA for a party to seek "to enforce what it believe[s] to be its rights . . .". *See Stillwell*, 2022 WL 2965394, at *12.

Medliant warns employees that it may sue an employee for breach of contract, among other claims. ECF No. 1–2, p. 114, § 2(e). Plaintiffs' allegations that such warnings constitute an "abuse of legal process" "conflate[s] the 'use' of legal process with the 'abuse' of legal process." *See Panwar*, 2015 WL 1396599, at *5. Under Nevada law, "filing a complaint does not constitute abuse of process." *See Land Baron Inv. v. Bonnie Springs Family LP*, 356 P.3d 511, 520 (Nev. 2015). And "filing lawsuits against employees who breached their employment contracts is exactly the end that the legal process at issue was designed to accomplish." *Panwar*, 2015 WL 1396599, at *5.

In sum, "[a] reasonable person in [Plaintiffs'] circumstances would have . . . walked away from the relationship . . . filed a lawsuit/defended a lawsuit/counter-sued to enforce what [Plaintiffs'] believed were [their] rights . . . and/or . . . found somebody else – given [Plaintiffs'] skills and education – to employ and pay [Plaintiffs] for working." *See Stillwell*, 2022 WL 2965394, at *11. That is precisely what the Plaintiffs did here. Accordingly, Plaintiffs cannot plausibly state a claim under the TVPA.

## IV.   **PLAINTIFFS' FLSA CLAIMS SHOULD BE DISMISSED.**

A. <u>Plaintiffs' Allegations.</u>

Plaintiffs allege their "repayment" obligation "as defined by the contract between [Medliant] and Plaintiffs . . . is an illegal kickback of wages . . . because the purported damages are expenses incurred primarily for [Medliant's] benefit." *See* ECF No. 1–2, p. 108, ¶ 154 (Fifth Cause of Action). Plaintiffs further allege Medliant violated the FLSA by failing to pay wages "free and clear" by "requiring Plaintiffs and other similarly situated employees to repay so-

called damages . . .". *Id*. at p. 109, ¶¶ 162–63 (Sixth Cause of Action). Both these claims should be dismissed for failure to state a claim.

### B. Plaintiffs Lack Standing to Assert FLSA Claims.

Plaintiffs lack standing because Medliant has caused them no injury under the FLSA that this Court could redress. Article III of the Constitution confines federal courts to adjudicate actual cases or controversies. U.S. Const. art. III § 2. Under Article III, a plaintiff must allege (1) an injury-in-fact; (2) fairly traceable to the defendant's action; that is (3) capable of being redressed by a favorable decision from the court. *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560–61 (1992). The asserted injury must be both (a) concrete and particularized and (b) actual and imminent, not conjectural and hypothetical. *Id.* at 560. A plaintiff must demonstrate standing separately for each form of relief sought. *Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.*, 528 U.S. 167, 185 (2000).

#### i. *Plaintiffs Have Not Suffered an Injury Under the FLSA.*

"The FLSA statute requires payment of minimum wages and overtime wages only…; therefore, the FLSA is unavailing where wages do not fall below the statutory minimum wage and hours do not rise above the overtime threshold." *See Nakahata v. New York-Presbyterian Healthcare Sys., Inc.*, 723 F.3d 192, 201 (2d Cir. 2013); *D'Amore v. Caesars Enterprise Servs., LLC*, No. 2:18-cv-01990-JCM-VCF, 2019 WL 8128166, at *3 (D. Nev. Dec. 16, 2019) (finding that the FLSA "requires payment of minimum wages and overtime wages only").

While Plaintiffs allege violations of the FLSA, they fail to allege that they suffered any cognizable injury under the statute. As an initial matter, Plaintiffs cannot ground their FLSA claims in a failure to pay overtime, as the Amended Complaint does not allege that Plaintiffs worked more than 40 hours in a work week or that they were not paid the required 1.5 times their regular rate of pay for any plus-40-hour week that they worked. *See* 29 U.S.C. § 207.

Likewise, Plaintiffs have failed to allege that they suffered an injury because they were not paid the minimum wage under the FLSA, which is $7.25/hour. 29 U.S.C. § 206(a)(1)(C). According to the Amended Complaint, Mabute was originally paid $29.50 per hour, which was later raised to $30.50/hour, which was subsequently raised to $37.00 per hour. ECF No. 1–2,

McDONALD CARANO

2300 WEST SAHARA AVENUE, SUITE 1200 • LAS VEGAS, NEVADA 89102
PHONE 702.873.4100 • FAX 702.873.9966

p. 95, ¶¶ 61–62. Delgado was paid $33.00 per hour. *Id.* at p. 100, ¶ 108. Because Plaintiffs were paid wages that far exceeded the $7.25/hour minimum wage, they cannot allege that they have suffered an injury that would give rise to standing.[11]

Plaintiffs clearly have no basis for seeking relief under the FLSA because they were paid wages that far exceeded the minimum wage throughout their employment with Medliant, and they have not alleged a failure to pay overtime. Despite this obvious deficiency, Plaintiffs attempt to create standing under the FLSA through the provisions of the employment agreement that they voluntarily entered into with Medliant. ECF No. 1–2, p. 88, ¶ 10, p. 89, ¶ 21, p. 108, ¶¶ 155–56, pp. 109–10, ¶¶ 162–65. As noted above, the employment agreement includes a liquidated damages clause that is triggered if the employee voluntarily leaves his/her employment before completing 5,200 straight-time hours. *Id.* at p. 90, ¶¶ 24–26. Plaintiffs claim that Medliant's inclusion of the liquidated damages clause in their employment agreements violates the FLSA in two ways. First, Plaintiffs claim that Medliant failed to "pay wages 'free and clear' because Medliant's policy of charging workers so-called 'liquidated damages' and other damages if they try to leave their jobs prevented their earned wages from being 'paid finally and unconditionally.'" *Id*. at p. 88, ¶ 10. Second, Plaintiffs allege that "when Medliant recovers so-called 'damages' in its lawsuits or through payment of those sums, it receives a 'kick-back' of wages that is impermissible under the FLSA. The kickbacks reduce workers' wages in their final workweek of employment to substantially less than the federal minimum wage—indeed, well into the negative numbers." *Id*.

Even though they do not cite it in their Amended Complaint, Plaintiffs are alleging the liquidated damages clause in their employment agreements violates 29 C.F.R. § 531.35. This regulation states as follows:

> Whether in cash or in facilities, "wages" cannot be considered to have been paid by the employer and received by the employee

---

[11] Compounding the issue for the Plaintiffs, minimum wage compliance is measured on a workweek basis, not a per hour basis. *See Douglas v. Xerox Business Servs., LLC*, 875 F.3d 884, 890 (9th Cir. 2017). Therefore, for Plaintiffs to have been injured under the FLSA, they would have to have been paid less than $7.25 per hour on average across a workweek; an allegation that they received less than $7.25 for at least one hour of work would not suffice. *Id.* In any event, this distinction is beside the point. Plaintiffs did not suffer any injury under the FLSA because they were always paid well more than the required minimum wage.

McDONALD CARANO

2300 WEST SAHARA AVENUE, SUITE 1200 • LAS VEGAS, NEVADA 89102
PHONE 702.873.4100 • FAX 702.873.9966

1  unless they are paid finally and unconditionally or "free and clear." The wage requirements of the Act will not be met where the employee "kicks-back" directly or indirectly to the employer or to another person for the employer's benefit the whole or part of the wage delivered to the employee. This is true whether the "kick-back" is made in cash or in other than cash. For example, if it is a requirement of the employer that the employee must provide tools of the trade which will be used in or are specifically required for the performance of the employer's particular work, there would be a violation of the Act in any workweek when the cost of such tools purchased by the employee cuts into the minimum or overtime wages required to be paid him under the Act.

29 C.F.R. § 531.35.

Under this regulation, "[a]n employer has not satisfied the minimum wage requirement unless the compensation is 'free and clear,' meaning the employee has not kicked back part of the compensation to the employer." *Rivera v. Peri & Sons Farms, Inc.*, 735 F.3d 892, 897 (9th Cir. 2013). "[W]hen a kickback is at issue, a plaintiff must allege an underlying minimum or overtime wage violation caused by the kickback." *Walsh v. SL One Global, Inc.*, No. 2:22-cv-00583-WBS-DB, 2022 WL 17722964, at *3 (E.D. Cal. Dec. 15, 2022). "Claims under § 531.35 are only cognizable if the effect of the condition complained of would reduce the employee's wages below the statutory minimum." *See Bland v. Edward D. Jones & Co.*, 375 F.Supp.3d 962, 972 (N.D. Ill. 2019); *see, e.g.*, *Franks v. MKM Oil, Inc.*, No. 10-C-13, 2010 WL 3613983, at *4 (N.D. Ill. Sept. 8, 2010) (granting motion to dismiss because the plaintiff failed to plead any facts that the employer's "forced repayments resulted in her earning below the minimum wage level"). This Court is already very familiar with this regulation, as it held in *Norsoph v. Riverside Resort & Casino, Inc.*, 611 F.Supp.3d 1058 (D. Nev. 2020), that "[i]f the plaintiffs can allege that the tips they were required to contribute cut into the minimum wage, they plausibly can allege a violation of the FLSA." *Id.* at 1078.

In this case, nowhere does the Amended Complaint allege any facts that they actually paid any monies back to Medliant so as to reduce their wages to below the minimum wage — during their last week of work or any other week. *See Bland*, 375 F.Supp.3d at 977 ("Moreover,

1    Defendants never reduced Plaintiffs wages below the minimum wage while they were

2    employed, so all the case law stating an employer may not do so is inapposite.").

3           No kickback of wages has occurred either. Plaintiffs allege that when Medliant recovers

4    these liquidated damages, it gets an illegal "kickback" of wages. ECF No. 1–2, p. 88, ¶ 10. But,

5    Medliant has not recovered any liquidated damages (or any type of damages) from the Plaintiffs

6    for their breaches of their employment agreement, so there has not been any illegal kickback at

7    all to reduce the Plaintiffs' wages below the minimum wage. Plaintiffs have not suffered any

8    injury under the FLSA, and this claim should be dismissed.

9                    *ii.    Any Injury Is Not Capable of Being Redressed by This Court.*

10          Plaintiffs also lack standing under the FLSA because, as their Amended Complaint

11   makes clear, they were always paid the required minimum wage, and they do not allege unpaid

12   overtime compensation. Section 216(b) of the FLSA gives this Court the ability to award

13   damages to an employee "in the amount of their unpaid minimum wages, or their unpaid

14   overtime compensation, as the case may be, and in an additional equal amount as liquidated

15   damages." 29 U.S.C. § 216(b). In fact, this Court has already held that there is no FLSA private

16   cause of action "unless there was a minimum wage or overtime violation because the damages

17   (in § 216(b)) were measured by the amount of unpaid minimum wage or overtime." *See*

18   *Norsoph*, 611 F.Supp.3d at 1076. In this case, since the Plaintiffs have always been paid the

19   minimum wage and have not alleged unpaid overtime, there is nothing for this Court to redress

20   under the FLSA. This further demonstrates that Plaintiffs lack standing.

21          C.    Plaintiffs Fail to State a Claim Under the FLSA.

22          Medliant also moves to dismiss Plaintiffs' FLSA claims because Plaintiffs have not

23   alleged any facts to plausibly state an FLSA violation. As stated above, the FLSA requires the

24   payment of minimum wage and overtime, and Plaintiffs fail to allege any facts that they did

25   not actually receive payment of at least the minimum wage or overtime. Furthermore, the mere

26   appearance of the liquidated damages clause in their employment agreements cannot serve as

27   the basis for an FLSA claim.

28

McDONALD CARANO
2300 WEST SAHARA AVENUE, SUITE 1200 • LAS VEGAS, NEVADA 89102
PHONE 702.873.4100 • FAX 702.873.9966

1    As discussed above, the liquidated damages clause at issue does not require Plaintiffs

2    to repay any of their wages. *See* ECF No. 1–2, p. 114, § 2(d). Federal courts across the country

3    have repeatedly recognized that liquidated damages provisions in employment contracts like

4    Medliant's are not unusual and do not violate the FLSA. *See, e.g., Park v. FDM Group*

5    *(Holdings) PLC*, No. 16-cv-1520-LTS, 2017 WL 946298, at *4 (S.D.N.Y. Mar. 9, 2017) ("Such

6    liquidated damages provisions in employment agreements are not unusual, and even those that

7    are explicitly tied to repayment of the costs of a training program have been upheld as akin to

8    loan repayment provisions."), *order vacated on other grounds*, 2018 WL 4100524 (S.D.N.Y.

9    Aug. 28, 2018). The Ninth Circuit reached a similar decision in *Gordon v. City of Oakland*, 627

10   F.3d 1092, 1096 (9th Cir. 2010) when it held that the plaintiff's $5,268.03 payment for training

11   costs, which the plaintiff *actually made* to the defendant, "is repayment of a voluntarily

12   accepted loan, not a kick-back."[12] *Id.* at 1096. The City of Oakland had "satisfied the FLSA's

13   requirements by paying Gordon at least minimum wage for her final week of work," and it was

14   "therefore free to seek repayment of Gordon's training debt as an ordinary creditor." *Id.* The

15   Seventh Circuit reached a similar holding in *Heder v. City of Two Rivers, Wisconsin*, 627 F.3d

16   777, 783 (7th Cir. 2002). In sum, a post-employment award of liquidated damages to remedy

17   Medliant's lost profits resulting from Plaintiffs' breach of contract does not create a FLSA

18   claim, so the mere potential of an award at some point in the future (as is the case here) certainly

19   does not create a claim either. *See Bland*, 375 F.Supp.3d at 977 ("Plaintiffs have not cited, nor

20   has this Court located, any case that suggests employers may not act to collect a debt incurred

21   for an employee's benefit at the termination of their employment on the basis that such a

22   collection is a kickback that would reduce Plaintiffs' wages below the statutory minimum. In

23   fact, courts have held just to the contrary.").

24   Medliant's liquidated damages clause is very similar to the liquidated damages

25   provision at issue in *Park*, which the Southern District of New York held did not violate the

---

[12] Medliant anticipates Plaintiffs will cite a Middle District of North Carolina, *Ketner v. Branch Banking & Trust Co.*, 143 F.Supp.3d 370 (M.D.N.C. 2015), which disagreed with *Gordon*, to support their FLSA arguments. However, Plaintiffs cannot change the fact that the *Gordon* decision is controlling authority in this District.

McDONALD CARANO

2300 WEST SAHARA AVENUE, SUITE 1200 • LAS VEGAS, NEVADA 89102
PHONE 702.873.4100 • FAX 702.873.9966

FLSA. In that case, an IT placement company's employment agreement contained a "Termination Fee" of $30,000.00 if the employee left employment within the first year, and a $20,000.00 fee if the employee left in the second year. 2017 WL 946298, at *2. The plaintiff resigned from her job shortly before the start of her second year, and she paid a termination fee of $20,000.00 after resigning. *Id.* She then brought a lawsuit against the IT placement company after paying that fee, claiming it violated the FLSA's anti-kickback regulation at issue here.

The court dismissed the plaintiff's FLSA claim for two reasons. First, the court noted that the employer did not deduct any amounts from the plaintiff's paychecks—she paid the fine on her own. *Id.* at *4. Second, the court determined that the termination fee did not constitute an illegal kickback even if it had reduced plaintiff's net wages below the aggregate minimum wage. *Id.* The termination fee was a liquidated damages provision that expressly stated that it was an approximation of the employer's damages. *Id.* It also included the employee's acknowledgment that the employer incurred significant costs to train the employee. *Id.* The termination fee was not a deduction for any tools used or costs incurred by the employee to perform her contract term; if she had completed her two years, she would owe nothing at all. *Id.*

Similar to *Park*, Medliant has not deducted any amounts from the Plaintiffs' wages. Additionally, like the termination fee in *Park*, which the court found was an approximation of the employer's damages, Medliant's employment agreements state that the liquidated damages provision is "a fair compromise" for its lost profits, which are "considerably less than the profit [Medliant] would make if the Agreement were not terminated prematurely." *See* ECF No. 1–2, p. 114, § 2(d). Finally, like in *Park*, the liquidated damages provision is not necessarily a deduction at all; if the plaintiffs complete their terms, they owe nothing at all.

These cases demonstrate that payment of liquidated damages (agreed to as fair and reasonable by Plaintiffs) to an employer for breach of an employment contract is not an illegal kickback or improper condition on wages. Plaintiffs acknowledged that Medliant "invested a large amount of time and money in [their] immigration and employment process." ECF No. 1–2, p. 123. In exchange, Plaintiffs committed to Medliant that they would complete the 5,200-

McDONALD CARANO

2300 WEST SAHARA AVENUE, SUITE 1200 • LAS VEGAS, NEVADA 89102
PHONE 702.873.4100 • FAX 702.873.9966

hour contract term. *Id*. at pp. 112–22. Had Plaintiffs performed the full 5,200 hour of their contracts, Medliant would have no lost profits and Plaintiffs would owe no liquidated damages to Medliant. The liquidated damages provision merely approximates the damages that Medliant suffered by reason of Plaintiffs' breach of the agreement prior to the completion of the 5,200-hour contracted period.

Furthermore, the liquidated damages clause does not apply to or require Plaintiffs to pay for Medliant's expenses. Under the FLSA regulation at issue, an example of an illegal kickback would be if an employee had to pay for tools that he needed to do his job, and the payment for those tools reduced his wages below the minimum wage. 29 C.F.R. § 531.35; *Edwards v. PJ Ops Idaho, LLC*, No. 1:17-cv-00283-DCN, 2023 WL 4868304, at *3 (D. Id. July 31, 2023) ("In other words, a kickback occurs when the cost to the employee of tools specifically required for the performance of the employee's work 'cuts into' his or her legally required minimum wage."). Plaintiffs' employment agreements require no such thing. By its plain terms, the liquidated damages provision does not apply to or require Plaintiffs to pay for expenses or kick back wages to Medliant. *Bland*, 375 F.Supp.3d at 977 ("[T]he Court cannot infer from the contract that Defendants seek reimbursement for the tools of the trade or costs incurred in the performance of the Plaintiffs' jobs.").

Instead of causing Plaintiffs to repay Medliant for tools of the trade, the liquidated damages provision operates to recover Medliant's lost profits caused by situations where employees, like Plaintiffs, quit prior to fulfilling their contractual duties owed to Medliant. Plaintiffs apparently seek to avoid the consequences of their breach by prophylactically asserting the provision violates the FLSA. However, as stated above, the fact that Plaintiffs *might eventually* pay a liquidated damages judgment to compensate Medliant for its lost profits does not create an illegal kickback of wages under the FLSA or cause wages not to be paid free and clear.

At bottom, Medliant is the only party that has not received the benefit of the bargain under the employment agreements at issue. Plaintiffs were paid well over the federal minimum wage and do not plead that Medliant ever failed to pay them overtime, yet now seek to avoid

1  the consequences for prematurely terminating their employment contracts with Medliant under

2  the guise that payment of the liquidated damages for such breach violates the FLSA. It does

3  not. Any speculative future payment of liquidated damages — Plaintiffs agreed were fair and

4  reasonable in the event they breached the term of their employment with Medliant — is separate

5  and distinct from the FLSA and cannot be considered an illegal kickback or failure to pay wages

6  free and clear.

7  **V.**     **CONCLUSION**

8           For these reasons, this Court should dismiss the Amended Complaint.

9           DATED this 5th day of February, 2024.

                                    McDONALD CARANO LLP

11                                  By: */s/   Kristen T. Gallagher*
                                        Kristen T. Gallagher (NSBN 9561)
12                                      2300 West Sahara Avenue, Suite 1200
                                        Las Vegas, Nevada 89102
13                                      kgallagher@mcdonaldcarano.com

14                                      R. Brandon Bundren (admitted *pro hac vice*)
                                        Bradley Arant Boult Cummings LLP
15                                      1221 Broadway, Suite 2400
                                        Nashville, Tennessee 37203
16                                      bbundren@bradley.com

17                                      *Attorneys for Defendants Medliant and Medliant Inc.*

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that I am an employee of McDonald Carano LLP, and that on this 5th day of February 2024, I caused a true and correct copy of the foregoing **DEFENDANTS' MOTION TO DISMISS** to be served via this Court's CM/ECF service which will provide copies to all counsel of record registered to receive CM/ECF notification and/or via E-mail to the following:

Mark R. Thierman (mark@thiermanbuck.com)
Joshua D. Buck (josh@thiermanbuck.com)
Thierman Buck LLP
325 West Liberty Street
Reno, Nevada 89501
Telephone: (775) 284-1500
mark@thiermanbuck.com
josh@thiermanbuck.com
leah@thiermanbuck.com

Juno Turner
David H. Seligman
Rachel W. Dempsey
Towards Justice
P.O. Box 371689, PMB 44465
Denver, Colorado 80237-5680
Telephone: (720) 441-2236
juno@towardsjustice.com
david@towardsjustice.com
rachel@towardsjustice.com

*Attorneys for Plaintiffs*

/s/  Marianne Carter
An employee of McDonald Carano LLP

**APP. 088**

# EXHIBIT 6

**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF TEXAS**
**BEAUMONT DIVISION**

| | |
|---|---|
| MEDLIANT INC., | Civ. Action No.: |
| *Plaintiff,* | 1:23-cv-00418-MAC |
| *v.* | |
| JEDDY A. DELGADO, | |
| *Defendant.* | |

**DECLARATION OF JEDDY A. DELGADO IN SUPPORT OF**
**DEFENDANT JEDDY DELGADO'S MOTION TO DISMISS PLAINTIFF'S**
**COMPLAINT OR, IN THE ALTERNATIVE, TO STAY**

I, Jeddy Anne Delgado, hereby state and declare as follows:

1. I am the Defendant in this matter. I make this declaration in support of Defendant's Motion to Dismiss or Stay.

2. I am an adult resident of Houston, Texas.

3. I have lived in Houston, Texas since November of 2023; though, due to lease obligations, I also had a mailing address in Beaumont, Texas until the end of 2023.

I declare under penalty of perjury that the foregoing is true and correct.

Dated: 02/19/2024

_____
Jeddy A. Delgado

**APP. 090**

# EXHIBIT 7

APP. 091

**1124** Nev.          **62 PACIFIC REPORTER, 3d SERIES**

**ALL STAR BONDING, Appellant,**

v.

**The STATE OF NEVADA, Respondent.**

**No. 38699.**

Supreme Court of Nevada.

Feb. 12, 2003.

Surety moved to exonerate bail bond on ground that contract was void and of no legal effect when criminal defendant failed to appear for sentencing. The Eighth Judicial District Court, Clark County, Michael L. Douglas, J., ordered bail bond forfeited. Surety appealed. The Supreme Court held that bail bond term, expressly limiting effect of agreement to one year, was enforceable, such that bond had expired and had no legal effect by time defendant failed to appear at sentencing hearing.

Reversed and remanded.

**1. Bail ☞54.1**

A bail bond is a contract between the State and the surety of the accused.

**2. Appeal and Error ☞893(1)**

Contract interpretation is a question of law and thus, the Supreme Court reviews the district court's findings with respect to such interpretation de novo.

**3. Bail ☞54.1**

Bail bonds are governed by statute.

**4. Appeal and Error ☞893(1)**

Supreme Court reviews the construction of a statute de novo.

**5. Bonds ☞48**

The language of a bond contract is strictly construed in accordance with the terms contained therein.

**6. Contracts ☞143(3)**

Neither a court of law nor a court of equity can interpolate in a contract what the contract does not contain.

**7. Bail ☞74(1)**

Bail bond term, limiting effect of agreement to one year, was not against public policy of ensuring that a defendant would return to court when released; statute requiring that bail bond terms be no shorter than one year in duration did not express public policy against limitations in bond terms, but rather allowed such limitations, and nothing in State statutes or in bond contract itself provided a requirement for delivery of the criminal defendant to custody after expiration of bond term.  West's NRSA 178.502, subd. 2.

**8. Bail ☞74(1)**

Bail bond term, limiting effect of agreement to one year, was enforceable, and thus, bond had expired and had no legal effect by time criminal defendant failed to appear at sentencing hearing after one-year period passed; bond unambiguously provided that bond would become void and of no legal effect after one year from date of bond, district court accepted bail agreement, and nothing in bond contract itself or State statutes provided a requirement for delivery of the defendant to custody after expiration of bond term.  West's NRSA 178.502, subd. 2.

**9. Courts ☞87, 89**

Court may consider legislation or judicial decisions to determine public policy considerations.

**10. Bonds ☞48**

Terms of a bond should be construed strictly in favor of the surety.

**11. Contracts ☞143(3)**

Supreme Court is not free to modify or vary the terms of an unambiguous agreement.

———————

Mayfield, Turco & Gruber, Henderson, for Appellant.

David J. Roger, District Attorney, and James Tufteland, Chief Deputy District Attorney, Clark County, for Respondent.

Before SHEARING, LEAVITT and BECKER, JJ.

ALL STAR BONDING v. STATE OF NEVADA     Nev.   **1125**
Cite as 62 P.3d 1124 (Nev. 2003)

*OPINION*

PER CURIAM:

In this appeal, we consider whether a bail bond containing an express provision that it would expire and have no legal effect after one year from the date of the bond should have been forfeited when the criminal defendant failed to appear in court after the one-year period had passed. The district court held there is an implied requirement in a bail bond that the criminal defendant be returned to custody before a bondsman can be relieved of liability. We disagree. We conclude that the terms of the bond contract are controlling. We reverse the district court's order forfeiting the bond and remand the matter to the district court to exonerate the bond.

*FACTS*

On April 1, 2000, appellant All Star Bonding posted a $3,000 bail bond with the Las Vegas Justices' Court for the release of a criminal defendant charged with attempted grand larceny. The bond provided:

This bond shall be in full force and effect until any of the following events: 1) Exoneration by court order, 2) Termination of this case by dismissal or conviction or 3) The expiration of one (1) year from the date of this bond, at which time this bond shall become void and of no legal effect.

Following the posting of the bail bond, the criminal defendant failed to appear before the court for his initial arraignment on two occasions. Finally, on February 8, 2001, the criminal defendant made an appearance, was arraigned, and entered a guilty plea to attempted grand larceny. He was ordered to appear for sentencing on May 24, 2001.

On May 24, 2001, the criminal defendant failed to appear for sentencing. As a result,

on June 4, 2001, the district court sent a notice of intent to forfeit All Star's surety bond. This notice provided that the surety bond would be declared forfeited on December 2, 2001.

On August 6, 2001, All Star filed a motion to exonerate the bond, arguing that because the bond had expired, by its terms, on April 1, 2001, the contract was void and of no legal effect on May 24, 2001, when the criminal defendant failed to appear for sentencing. The motion was heard and denied on September 7, 2001. The court concluded, "The Court's premise is very simple. If you put up collateral promising that someone's going to appear, and you don't come back and then surrender on the expiration date, you still have an obligation. You can't just walk away, and you say you had no responsibility." The district court ordered the bail bond forfeited.

All Star filed a timely appeal claiming the district court erred in ordering forfeiture of the bond after the bond had expired.

*DISCUSSION*

**[1–4]**  "A bail bond is a contract between the State and the surety of the accused." [1] Contract interpretation is a question of law and this court reviews the district court's findings de novo. [2] Bail bonds are also governed by statute. [3] "This court reviews the construction of a statute de novo." [4]

**[5, 6]**  " 'The language of the bond contract is strictly construed in accordance with the terms contained therein.' " [5] We have previously stated that the court should not revise a contract under the guise of construing it. [6] Further, "[n]either a court of law nor a court of equity can interpolate in a contract what the contract does not contain." [7]

---

**1.**  *State v. District Court,* 97 Nev. 34, 35, 623 P.2d 976, 976 (1981).

**2.**  *Grand Hotel Gift Shop v. Granite St. Ins.,* 108 Nev. 811, 815, 839 P.2d 599, 602 (1992).

**3.**  *State v. Stu's Bail Bonds,* 115 Nev. 436, 438, 991 P.2d 469, 470 (1999).

**4.**  *Id.* at 438, 991 P.2d at 471 (citing *County of Clark v. Upchurch,* 114 Nev. 749, 753, 961 P.2d 754, 757 (1998)).

**5.**  *U.S. v. Vaccaro,* 51 F.3d 189, 193 (9th Cir.1995) (quoting *United States v. Lujan,* 589 F.2d 436, 438 (9th Cir.1978)).

**6.**  *Club v. Investment Co.,* 64 Nev. 312, 324, 182 P.2d 1011, 1016 (1947).

**7.**  *Id.* at 324, 182 P.2d at 1017 (internal quotation marks and citation omitted).

In this case, the bail bond contract provided that it would expire one year from the date of the bond and become void and of no legal effect. This only guaranteed the criminal defendant's appearance in court for a period of one year, beginning April 1, 2000. When the criminal defendant failed to appear for sentencing on May 24, 2001, the bond had already expired.

[7–9]  The State argues that the bond term, limiting the effect of the agreement to one year, is unenforceable because such a limitation is against the public policy of ensuring that a defendant returns to court when he is released. The State argues that public policy requires an implied term that the surety must return the defendant to the court at the end of the bond contract period. The State accurately points out that the court may consider legislation or judicial decisions to determine public policy considerations. Neither, however, supports the State's position.

NRS 178.502(2) provides, "Any bond or undertaking for bail must provide that the bond or undertaking extends, for a period of at least 1 year." This statute requires that bail bond terms be no shorter than one year in duration. This does not express a public policy against limitations in the bail bond term; rather, it allows such limitations. There is nothing in the bond contract itself, or in Nevada's statutes, that provides a requirement for delivery of the criminal defendant to custody after the expiration of the bond term.

A New York court, on similar facts, held that the bond became void after one year based on an express term limit in the bond contract.[8] The New York court followed the general rule that liability of a surety is limited to the express contractual obligation.[9]

The court refused to impose a duty on the bondsman to notify the court that the bond was about to expire, stating that case law in other contexts clearly establishes that "a surety is not responsible for the principal's failure to appear in court after the court has erroneously permitted the principal to remain at liberty beyond the terms of the bail bond." [10]

Here, the district court accepted the bail agreement, which expressly limited its effectiveness to one year. The criminal defendant appeared for his arraignment on February 8, 2001, when the bond was still in effect. When the criminal defendant failed to appear for sentencing, the bond had already expired.

It is noteworthy that in Bronx County, New York, as well as in Nevada's Eighth Judicial District Court, the problems arising from limited-term bail bonds have been solved in the same manner.[11] By court order, entered by the criminal judges, the courts will no longer accept bonds that have a limited term.

[10, 11]  Other courts, construing bond contracts, have stated that because bondsmen make calculated risks when entering into surety agreements, they cannot be held to any greater undertaking than they have agreed to.[12] The terms of the bond should be "construed strictly in favor of the surety." [13] We agree. As we have previously stated, "We are not free to modify or vary the terms of an unambiguous agreement." [14]

### CONCLUSION

The bail bond in this case unambiguously provided that the bond would become void and of no legal effect after one year from the date of the bond. Accordingly, we conclude that the bond had expired and had no legal effect by the time the criminal defendant

---

8.  *People v. Stuyvesant Ins. Co.,* 98 Misc.2d 210, 413 N.Y.S.2d 843, 850 (Sup.Ct.1979).

9.  *Id.* at 846–47.

10.  *Id.* at 849.

11.  *See id.* at 850.

12.  *See U.S. v. Vaccaro,* 51 F.3d 189, 193 (9th Cir.1995); *Rodriquez v. People,* 554 P.2d 291,

292–93 (Colo.1976); *State v. Ericksons,* 106 N.M. 567, 746 P.2d 1099, 1100 (1987).

13.  *Ericksons,* 746 P.2d at 1100.

14.  *Kaldi v. Farmers Ins. Exch.,* 117 Nev. 273, 281, 21 P.3d 16, 21 (2001) (citing *State ex rel. List v. Courtesy Motors,* 95 Nev. 103, 107, 590 P.2d 163, 165 (1979)).

MATTER OF GUARDIANSHIP & ESTATE OF D.R.G.   Nev. **1127**
Cite as 62 P.3d 1127 (Nev. 2003)

failed to appear. We, therefore, reverse the district court's forfeiture of the bond and remand for the bond to be exonerated.



### In the Matter of the GUARDIANSHIP OF the Person and Estate of D.R.G.

### Dwight G., Appellant,

v.

### Connie E.P., Respondent.

### No. 38575.

Supreme Court of Nevada.

Feb. 12, 2003.

Unwed father appealed from decision of the Eighth Judicial District Court, Clark County, Gerald W. Hardcastle, J., appointing child's maternal aunt as general guardian of child following mother's death. The Supreme Court held that: (1) statutory parental presumption properly was rebutted, and (2) aunt, as opposed to father, properly was appointed as child's general guardian.

Affirmed.

**1. Child Custody** ⬅**7**

District Court enjoys broad discretionary powers in determining questions of child custody.

**2. Child Custody** ⬅**921(1)**

Supreme Court will not disturb the District Court's exercise of discretion in child custody matters unless the discretion is abused; however, Supreme Court must be satisfied that the District Court's decision was based upon appropriate reasons.

**3. Guardian and Ward** ⬅**10**

Statutory parental preference is a presumption that must be overcome before a court can grant guardianship to a non-parent. West's NRSA 159.061(1).

**4. Guardian and Ward** ⬅**10**

Before the statutory parental preference is applied in guardianship proceeding, the court must first determine if a parent is "qualified and suitable"; qualification and suitability are based on the parent's fitness for guardianship at the time of the hearing. West's NRSA 159.061(1).

**5. Guardian and Ward** ⬅**10**

If a parent is qualified and suitable, the parent prevails over non-parents for guardianship of the child. West's NRSA 159.061(1).

**6. Guardian and Ward** ⬅**10**

If neither parent is qualified and suitable, or if both parents are, the statute setting forth preferences in appointing guardian for child requires the court to move to the second step, namely determining who is most suitable to be child's guardian. West's NRSA 159.061(1).

**7. Guardian and Ward** ⬅**10**

Child's basic needs or welfare are superior to the claim of a parent with respect to statute providing that one of the factors in determining a parent's suitability to be child's guardian is whether the parent can provide for the basic needs of the child, including medical care. West's NRSA 159.061(1).

**8. Guardian and Ward** ⬅**10**

Statutory parental preference with respect to guardianship of child can be rebutted by showing parental unfitness or other extraordinary circumstances. West's NRSA 159.061.

**9. Guardian and Ward** ⬅**10**

Relevant factors to be considered in determining whether statutory parental preference presumption for guardianship of child has been overcome include: abandonment or persistent neglect of child by parent; likelihood of serious physical or emotional harm to child if placed in parent's custody; extended, unjustifiable absence of parental custody; continuing neglect or abdication of parental

# EXHIBIT 8

APP. 096

**AMERICA FIRST FEDERAL CREDIT
UNION, A Federally Chartered
Credit Union, Appellant,**

v.

**Franco SORO, an Individual; Myra Taig-
man–Farrell, an Individual; Isaac Far-
rell, an Individual; Kathy Arrington, an
Individual; and Audie Embestro, an In-
dividual, Respondents.**

No. 64130.

Supreme Court of Nevada.

Sept. 24, 2015.

**Background:** After lender held trustee's
sale of property that secured commercial
loan, lender brought action deficiency ac-
tion against borrowers. The Eighth Judi-
cial District Court, Clark County, Jerry A.
Wiese, J., 2013 WL 10871290, dismissed
for lack of subject matter jurisdiction.
Lender appealed.

**Holding:** On an issue of apparent first
impression, the Supreme Court, Hardesty,
C.J., held that forum selection clause was
permissive rather than mandatory.

Reversed and remanded.

1. **Appeal and Error** ⟜893(1)

    The Supreme Court reviews a district
court's decision regarding subject matter ju-
risdiction de novo.

2. **Appeal and Error** ⟜893(1)

    Contract interpretation is a question of
law and, as long as no facts are in dispute,
the Supreme Court views contract issues de
novo, looking to the language of the agree-
ment and the surrounding circumstances.

3. **Contracts** ⟜147(1)

    The objective of interpreting contracts is
to discern the intent of the contracting par-
ties.

4. **Contracts** ⟜143(1, 2)

    When interpreting a contract, the Su-
preme Court initially determines whether the
language of the contract is clear and unam-

biguous; if it is, the contract will be enforced
as written.

5. **Contracts** ⟜143(2), 155

    An ambiguous contract is susceptible to
more than one reasonable interpretation, and
any ambiguity should be construed against
the drafter.

6. **Contracts** ⟜206

    Clause in commercial loan agreement
stating that the parties were required to
"submit themselves to the jurisdiction of"
another state constituted a permissive forum
selection clause, rather than a mandatory
forum selection clause, and therefore clause
did not deprive trial court of subject matter
jurisdiction over action seeking to recover
deficiency following trustee's sale of real
property that secured loan, where no lan-
guage within clause containing words of ex-
clusivity.

————

Ballard Spahr, LLP, and Stanley W. Par-
ry, Timothy R. Mulliner, and Matthew D.
Lamb, Las Vegas, for Appellant.

Bogatz Law Group and I. Scott Bogatz and
Charles M. Vlasic III, Las Vegas, for Re-
spondents.

Before the Court En Banc.

*OPINION*

By the Court, HARDESTY, C.J.:

In this opinion, we must determine wheth-
er a contract clause stating that the parties
"submit themselves to the jurisdiction of"
another state results in a mandatory forum
selection clause requiring dismissal of the
Nevada action. We hold that such a clause
consenting to jurisdiction is permissive and
therefore reverse the district court's order
granting a motion to dismiss based on lack of
subject matter jurisdiction in Nevada.

*FACTS AND PROCEDURAL HISTORY*

In 2002, appellant America First Federal
Credit Union (the credit union) loaned $2.9
million, secured by real property in Mes-

quite, Nevada, to respondents (borrowers)[1] for the purchase of a liquor/mini-mart. The borrowers defaulted, and the credit union held a trustee's sale, resulting in a deficiency on the loan balance of approximately $2.4 million. The Utah-based credit union sued the borrowers in Clark County to recover the deficiency.

The borrowers moved to dismiss the action under NRCP 12(b)(1), arguing that the credit union could not sue to recover the deficiency in Nevada and citing several clauses in the "Commercial Promissory Note" and "Business Loan Agreement" to support their argument. An "Applicable Law" clause in the loan agreement stated that "[t]his Agreement (and all loan documents in connection with this transaction) shall be governed by and construed in accordance with the laws of the State of Utah." The loan agreement also contained the following: "Jurisdiction. The parties agree and submit themselves to the jurisdiction of the courts of the State of Utah with regard to the subject matter of this agreement." A clause in the note stated: "If there is a lawsuit, Borrower(s) agrees to submit to the jurisdiction of the court in the county in which Lender is located."

The district court agreed with the borrowers and granted the motion to dismiss. The district court found that the note and loan agreement "contain language which clearly expresses the parties' intent to submit litigation relating to the Agreement and the Note, to the jurisdiction of the State of Utah . . . . [T]he language clearly enough identifies Utah as the forum[,] which they selected for purposes of subject matter jurisdiction." This appeal followed.

### DISCUSSION

On appeal, the credit union argues that the district court erred in enforcing the clauses in question to preclude its complaint for a deficiency action.[2] More specifically, the credit union argues that the jurisdiction

clauses here were permissive, and while the complaint could have been brought in Utah, the clauses do not mandate that Utah was the exclusive forum. In response, the borrowers contend that whether a forum selection clause is mandatory or permissive is a matter of contract interpretation, and therefore, the clauses are ambiguous and must be construed against the credit union as the contract drafter. Whether forum selection clauses may be mandatory or permissive is an issue of first impression for this court.

### Standard of review

[1–5]   This court reviews a district court's decision regarding subject matter jurisdiction de novo. *Ogawa v. Ogawa*, 125 Nev. 660, 667, 221 P.3d 699, 704 (2009). Additionally, "[c]ontract interpretation is a question of law and, as long as no facts are in dispute, this court reviews contract issues de novo, looking to the language of the agreement and the surrounding circumstances." *Redrock Valley Ranch, LLC v. Washoe Cnty.*, ⸺ Nev. ⸺, ⸺, 254 P.3d 641, 647–48 (2011). The objective of interpreting contracts "is to discern the intent of the contracting parties. Traditional rules of contract interpretation are employed to accomplish that result." *Davis v. Beling*, ⸺ Nev. ⸺, ⸺, 278 P.3d 501, 515 (2012) (citation and internal quotation marks omitted). This court initially determines whether the "language of the contract is clear and unambiguous; if it is, the contract will be enforced as written." *Id.* An ambiguous contract is susceptible to more than one reasonable interpretation, and "[a]ny ambiguity, moreover, should be construed against the drafter." *Anvui, LLC v. G.L. Dragon, LLC*, 123 Nev. 212, 215–16, 163 P.3d 405, 407 (2007).

### The district court erred when it dismissed the case based on the forum selection clauses

[6]   The credit union argues that the clauses do not contain any mandatory lan-

---

1. While eight individuals signed the note and loan agreement, the only borrowers in the instant action are Franco Soro, Myra Taigman–Farrell, Isaac Farrell, Kathy Arrington, and Audie Embestro.

2. Additionally, the credit union argues that Nevada's six-month statute of limitations for recovery of deficiency judgments applies to the action, not Utah's three-month statute of limitations. However, because the district court did not decide this issue, we do not address it here.

AM. FIRST FED. CREDIT UNION v. SORO      Nev.  **107**
Cite as 359 P.3d 105 (Nev. 2015)

guage and, therefore, all of the forum selection clauses are merely permissive. We agree.

We have not yet distinguished between mandatory and permissive forum selection clauses. In *Tuxedo International, Inc. v. Rosenberg*, 127 Nev. 11, 251 P.3d 690 (2011), we reversed a district court's grant of a motion to dismiss based on the defendants' argument that any litigation must be brought in Peru. *Id.* at 14, 24–25, 251 P.3d at 692, 699. There, we remanded the case to the district court to determine which of three separate forum selection clauses potentially controlled the dispute. *Id.* at 26, 251 P.3d at 699–700. In analyzing the clauses, we noted that one of the clauses contained both a consent to jurisdiction in Peru and a Peruvian choice-of-law provision. *Id.* at 22–23, 251 P.3d at 697. We then stated:

> It can be argued, however, that there is no requirement contained in this clause that Peru is the *exclusive* forum for jurisdiction over any dispute between the parties. *See, e.g., Hunt Wesson Foods, Inc. v. Supreme Oil Co.*, 817 F.2d 75, 76–77 (9th Cir.1987) (distinguishing between exclusive and non-exclusive forum selection clauses). If it is determined that the parties did not intend for the clause to act as an *exclusive* forum selection clause, then arguably, there is no contractual bar to [plaintiff] bringing its tort claims in the Nevada district court.

*Id.* at 23–24, 251 P.3d at 698 (second emphasis added). We also noted that another clause "resemble[d] a traditional exclusive forum selection clause," containing language that "any action . . . must be brought in a court in the Country of Peru." *Id.* at 24, 251 P.3d at 698. Thus, *Tuxedo International* observed the distinctions between mandatory and permissive forum selection clauses, but the facts of the case did not provide an opportunity for us to affirmatively adopt a rule. *See id.* at 26 n. 5, 251 P.3d at 700 n. 5.

Other state courts have distinguished between mandatory and permissive forum selection clauses. *See, e.g., Garcia Granados Quinones v. Swiss Bank Corp. (Overseas), S.A.*, 509 So.2d 273, 274 (Fla.1987) (recognizing that a mandatory jurisdiction clause requires "a particular forum be the exclusive jurisdiction for litigation," while permissive jurisdiction is merely a consent to jurisdiction in a venue (internal quotation marks omitted)); *Polk Cnty. Recreational Ass'n v. Susquehanna Patriot Commercial Leasing Co.*, 273 Neb. 1026, 734 N.W.2d 750, 758–59 (2007) (distinguishing a mandatory forum selection clause based on the words "shall be brought only in" a particular jurisdiction from a permissive forum selection clause where parties only "consent and submit to the jurisdiction" of other courts); *Caperton v. A.T. Massey Coal Co.*, 225 W.Va. 128, 690 S.E.2d 322, 338–39 (2009) ("[T]o be enforced as mandatory, a forum-selection clause must do more than simply mention or list a jurisdiction; in addition, it must either specify venue in mandatory language, or contain other language demonstrating the parties' intent to make jurisdiction exclusive."). For example, the Wisconsin Court of Appeals stated:

> Clauses in which a party agrees to submit to jurisdiction are not necessarily mandatory. Such language means that the party agrees to be subject to that forum's jurisdiction *if sued there.* It does not prevent the party from bringing suit in another forum. The language of a mandatory clause shows more than that jurisdiction is *appropriate* in a designated forum; it unequivocally mandates *exclusive* jurisdiction. Absent specific language of exclusion, an agreement conferring jurisdiction in one forum will not be interpreted as excluding jurisdiction elsewhere.

*Converting/Biophile Labs., Inc. v. Ludlow Composites Corp.*, 296 Wis.2d 273, 722 N.W.2d 633, 640–41 (2006) (citations and internal quotation marks omitted).

> Similarly, federal circuit courts generally agree that where venue is specified [in a forum selection clause] with mandatory or obligatory language, the clause will be enforced; where only jurisdiction is specified [in a forum selection clause], the clause will generally not be enforced unless there is some further language indicating the parties' intent to make venue exclusive.

*Paper Express, Ltd. v. Pfankuch Maschinen GmbH*, 972 F.2d 753, 757 (7th Cir.1992); *see Excell, Inc. v. Sterling Boiler & Mech., Inc.*, 106 F.3d 318, 321 (10th Cir.1997) (describing

**108**  Nev.  **359 PACIFIC REPORTER, 3d SERIES**

the "mandatory/permissive dichotomy" and concluding that the clause, "jurisdiction shall be in the State of Colorado, and venue shall lie in the County of El Paso, Colorado," was mandatory (internal quotation marks omitted)); *John Boutari & Son, Wines & Spirits, S.A. v. Attiki Imps. & Distribs. Inc.,* 22 F.3d 51, 52–53 (2d Cir.1994) (holding the forum selection clause, "[a]ny dispute arising between the parties hereunder shall come within the jurisdiction of the competent Greek Courts, specifically of the Thessaloniki Courts," as permissive (internal quotation marks omitted)); *Hunt Wesson Foods, Inc. v. Supreme Oil Co.,* 817 F.2d 75, 76–78 (9th Cir.1987) (holding the forum selection clause, "[t]he courts of California, County of Orange, shall have jurisdiction over the parties in any action at law relating to the subject matter or the interpretation of this contract," as permissive, and noting that to be considered mandatory, a forum selection clause must clearly require that a particular court is the only one that has jurisdiction (internal quotation marks omitted)); *Keaty v. Freeport Indon., Inc.,* 503 F.2d 955, 956–57 (5th Cir. 1974) (holding the forum selection clause, "[t]his agreement shall be construed and enforceable according to the law of the State of New York and the parties submit to the jurisdiction of the courts of New York," as permissive (internal quotation marks omitted)).

We agree with the distinctions made by other state and federal courts regarding mandatory and permissive forum selection clauses described above. Here, there are two jurisdictional clauses at issue. First, the loan agreement contains a clause entitled "Jurisdiction," which provides that "[t]he parties agree and submit themselves to the jurisdiction of the courts of the State of Utah with regard to the subject matter of this agreement." We conclude that this language is permissive as there is no language within the clause containing words of exclusivity. Absent such language, we deem the clause permissive.

Second, a clause in the note stated: "If there is a lawsuit, Borrower(s) agrees to submit to the jurisdiction of the court in the county in which Lender is located." This language is also permissive as there is no language within the clause containing words

of exclusivity. *See Golden Palm Hospitality, Inc. v. Stearns Bank Nat'l Ass'n,* 874 So.2d 1231, 1233–37 (Fla.Dist.Ct.App.2004) (concluding that the language, "[i]f there is a lawsuit, Borrower agrees upon Lender's request to submit to the jurisdiction of the courts of STEARNS County, the State of Minnesota" as permissive, and thus permitted, but did not require, that the action be brought in Minnesota (internal quotation marks omitted)). Thus, the case may be heard in another appropriate venue besides the courts in Utah.

Without articulating why, the borrowers argue that the forum selection clauses are ambiguous and therefore must be construed against the credit union. We conclude that this argument is without merit as the clauses are clear and unambiguous and this court need not interpret the contract any differently from the contract's plain meaning. *See, e.g., Hunt Wesson Foods,* 817 F.2d at 77 ("A primary rule of interpretation is that '[t]he common or normal meaning of language will be given to the words of a contract unless circumstances show that in a particular case a special meaning should be attached to it.'") (quoting 4 Samuel Williston & Walter H.E. Jaeger, *A Treatise on the Law of Contracts* § 618 (3d ed.1961)). The clauses provide no words of exclusivity and to interpret the clauses as mandatory forum selection clauses would read language into the contract that is not there.

### CONCLUSION

In this case, none of the clauses contain exclusive language. Accordingly, all clauses are permissive forum selection clauses, and the district court erred when it found Utah was the sole forum for any controversy and dismissed the case for lack of subject matter jurisdiction. We therefore reverse the district court's order dismissing the case and remand this matter to the district court for further proceedings.

PARRAGUIRRE, CHERRY, GIBBONS, DOUGLAS, SAITTAA and PICKERING, JJ.



# EXHIBIT 9

123 Nev. 212

Supreme Court of Nevada.

ANVUI, LLC, A Nevada Limited Liability Company, Appellant,

v.

G.L. DRAGON, LLC, A Nevada Limited Liability Company, Respondent.

No. 48467.

|

July 26, 2007.

**Synopsis**

**Background:** Commercial tenant brought action against landlord, asserting claims for breach of contract and declaratory and injunctive relief. Landlord filed motion for order to show cause why writ of restitution and ejectment should not be issued, or in the alternative, for summary eviction. The Eighth Judicial District Court, Clark County, Jessie Elizabeth Walsh, J., granted summary eviction and writ of restitution and ejectment. Tenant appealed.

**Holdings:** The Supreme Court, Gibbons, J., held that:

as a matter of first impression, an order granting summary eviction is reviewed de novo, and

ambiguity in lease, regarding landlord's remedies, was legal defense to summary eviction.

Reversed.

**Procedural Posture(s):** On Appeal; Motion for Summary Judgment.

**Attorneys and Law Firms**

 **\*\*405**  Snell & Wilmer, LLP, and John S. Delikanakis and Elizabeth R. Brennan, Las Vegas, for Appellant.

Reade & Associates and R. Christopher Reade and Andrew H. Pastwick, Las Vegas, for Respondent.

Before GIBBONS, DOUGLAS and CHERRY, JJ.

**\*\*406   \*213** *OPINION*

By the Court, GIBBONS, J.

In this appeal, we consider whether, in an NRS 40.253(6) summary eviction proceeding, appellant raised any legal defense to allegations of its unlawful detainer of the premises at issue, precluding its summary eviction. In order to reach that issue, and since this is a matter of first impression, we must first conclude that the standard for our review of a district court's order granting summary eviction is the same as our review of a district court's order granting summary judgment. We conclude that appellant raised a legal defense, precluding its eviction. Accordingly, we reverse the district court's order granting summary eviction and a writ of restitution and ejectment.

163 P.3d 405

*FACTUAL BACKGROUND*

Appellant Anvui, LLC, leased a commercial building from respondent G.L. Dragon, LLC. The lease states that Dragon is entitled to receive basic rent "free and clear of any and all expenses, costs, impositions, taxes, assessments, liens or charges of any nature whatsoever." The lease also requires Anvui to pay all operating costs, which are defined as "all expenses and disbursements **\*214** ... that [Dragon] incurs in connection with the ownership, operation, and maintenance of the Premises." Finally, Section 14 of the lease agreement states that "[s]hould [Anvui] fail to cure any monetary default within ninety (90) days after written notice has been provided, [Anvui] and [Dragon] agree to cooperate in immediate sale of [Anvui's] operations at the highest and best price possible."

Anvui and Dragon also entered into a separate "Agreement to Purchase Real Property and Capital Improvements" (purchase agreement). That agreement recites that Dragon paid significant sums of money for two types of costs: (1) "capital improvement out-of-pocket costs directly relating to the construction" of the premises and "the common area of the real property" and (2) operational out-of-pocket costs "directly relating to the operations of [Anvui's business]." With respect to Dragon's operational out-of-pocket costs, they took the form of (1) a $746,000 loan to Anvui and its principal and (2) a $450,000 credit line to provide cash, furniture, and equipment for Anvui's business operations.

After Anvui took possession of the premises on September 1, 2005, it paid all invoiced amounts, including amounts for basic rent, taxes, insurance, common area maintenance fees, and interest on Dragon's expenses for operational out-of-pocket costs as defined in the purchase agreement, through May 2006. Beginning in June 2006, however, Anvui began to fall behind in its payments. In September 2006, Anvui initially objected to being billed for the interest. Between June and November of that year, Dragon invoiced Anvui for a total of $374,931. For that same period, Anvui made payments totaling only $126,578.76.

Anticipating that Dragon would soon seek eviction and hoping to win a declaration that it was not in breach of the lease, Anvui filed a verified complaint for declaratory relief, breach of contract, and injunctive relief. After Dragon served Anvui with a five-day notice to quit, Dragon responded to Anvui's complaint by filing a motion for an order to show cause why a writ of restitution and ejectment should not be issued, or in the alternative, for summary eviction. Dragon requested an immediate hearing, which the district court set.

At the hearing, Anvui argued, among other things, that Section 14 of the lease precluded Dragon from seeking summary eviction and restitution of the premises because that section specifies that Dragon's only remedy in the event of Anvui's breach is to cooperate in the immediate sale of the business at the highest and best possible price. The district court considered the affidavits filed by the parties and determined that Anvui was in breach of the lease and guilty of unlawful detainer. The court granted Dragon's request for summary eviction and accordingly entered an order for summary eviction and a writ of restitution and ejectment. This appeal **\*215** followed, and we granted Anvui's request for a stay of the district court's order pending appeal.

**\*\*407** *DISCUSSION*

*Standard of review*

 As a matter of first impression, we conclude that an order granting summary eviction under NRS 40.253(6) should be reviewed on appeal based upon the standard for review of an order granting summary judgment under NRCP 56 because these proceedings are analogous. This court reviews orders granting summary judgment de novo to determine whether the evidence properly before the district court "demonstrate[s] that no 'genuine issue as to any material fact [remains] and that the moving party is entitled to a judgment as a matter of law.' " [1]  Accordingly, our review of the district court's order granting summary eviction is de novo.

*Anvui raised a legal defense as to the unlawful detainer*

NRS 40.253(6) states that after a hearing "to determine the truthfulness and sufficiency of [the affidavits and notices filed, summary eviction will be granted] [i]f the court determines that there is no legal defense ... and the tenant is guilty of an unlawful detainer." On appeal, Anvui contends that the district court erred in granting summary eviction because it raised a legal defense to its alleged unlawful detainer and that Dragon is required to follow the procedures set forth in NRS 40.290 to 40.420. We agree and conclude that the district court erroneously found in Dragon's favor following the hearing on Dragon's affidavit of complaint for summary eviction.

 "Construction of a contractual term is a question of law," [2]  which we review de novo. [3]  In interpreting a contract, " 'the court shall effectuate the intent of the parties, which may be determined in light of the surrounding circumstances if not clear from the contract itself.' " [4]  A contract is ambiguous when it is subject to more than one reasonable interpretation. [5]  Any ambiguity, moreover,  **216**  should be construed against the drafter. [6]  The parties' intentions regarding a contractual provision present a question of fact. [7]

 Here, the parties' lease agreement is ambiguous as to the action that Dragon may take in the event of a default. Specifically, Section 14 of the lease agreement states that "[s]hould [Anvui] fail to cure any monetary default within ninety (90) days after written notice has been provided, [Anvui] and [Dragon] agree to cooperate in immediate sale of [Anvui's] operations at the highest and best price possible." That provision is ambiguous as to whether it precludes Dragon from initially seeking restitution of the premises. Under Anvui's interpretation, Dragon's only remedy is to sell Anvui's business. In contrast, Dragon contends that it can seek to sell Anvui's business while simultaneously seeking restitution of the premises. This ambiguity creates a genuine issue of material fact as to the parties' intent, which is a legal defense to a request for summary eviction.

### CONCLUSION

We conclude that we review a district court order granting summary eviction based on the standard for review of an order granting summary judgment. We further conclude that summary eviction was not appropriate in this case because there is a legal defense based upon unresolved issues of material fact. Dragon must attempt to pursue restitution of the premises, if at all, under NRS 40.290 to 40.420. We have carefully  **\*\*408**  analyzed the parties' other arguments and conclude that they lack merit. Accordingly, we reverse the order of the district court. [8]

We concur: DOUGLAS and CHERRY, JJ.

**All Citations**

123 Nev. 212, 163 P.3d 405

### Footnotes

| 1 | *Wood v. Safeway, Inc.,* 121 Nev. 724, 729, 121 P.3d 1026, 1029 (2005) (quoting NRCP 56(c)). |
|---|---|
| 2 | *NGA # 2 Ltd. Liab. Co. v. Rains,* 113 Nev. 1151, 1158, 946 P.2d 163, 167 (1997). |
| 3 | *May v. Anderson,* 121 Nev. 668, 672, 119 P.3d 1254, 1257 (2005). |

4    *NGA # 2,* 113 Nev. at 1158, 946 P.2d at 167 (quoting *Davis v. Nevada National Bank,* 103 Nev. 220, 223, 737 P.2d 503, 505 (1987)).

5    *Shelton v. Shelton,* 119 Nev. 492, 497, 78 P.3d 507, 510 (2003).

6    *Mullis v. Nevada National Bank,* 98 Nev. 510, 513, 654 P.2d 533, 535 (1982).

7    *See, e.g., Paradise Orchards v. Fearing,* 122 Wash.App. 507, 94 P.3d 372, 377 (2004).

8    In light of this opinion, we vacate the stay imposed by our February 7, 2007, order.

---

**End of Document**                                    © 2024 Thomson Reuters. No claim to original U.S. Government Works.

# EXHIBIT 10

BURCH v. DIST. CT.    Nev.  **647**
Cite as 49 P.3d 647 (Nev. 2002)

James BURCH and Linda
Burch, Petitioners,

v.

The SECOND JUDICIAL DISTRICT
COURT OF the STATE of Nevada, in
and for the COUNTY OF WASHOE, and
the Honorable Steven R. Kosach, Dis-
trict Judge, Respondents,

and

Double Diamond Ranch, LLC, A Nevada
Corporation; and Double Diamond
Homes, LLC, A Nevada Corporation,
Real Parties in Interest.

No. 38283.

Supreme Court of Nevada.

July 17, 2002.

Rehearing Denied Sept. 11, 2002.

Home purchasers brought action against
developer for breach of express and implied
warranties, negligence, and fraud and mis-
representation. The Second Judicial District
Court, Washoe County, Steven R. Kosach, J.,
granted developer's motion to compel arbi-
tration. Home purchasers petitioned for writ
of mandamus. The Supreme Court held that
arbitration clause in home warranty was pro-
cedurally and substantively unconscionable.

Petition granted.

**1. Arbitration** ⟐**6.2**

Home buyers warranty offered by devel-
oper was procedurally unconscionable adhe-
sion contract, and thus arbitration clause in
warranty was unenforceable, where applica-
tion and warranty were pre-printed, stan-
dardized contract forms, home buyers were
not given opportunity to negotiate warranty's
terms with developer or its insurer, home
buyers did not receive copy of warranty's
terms until after developer paid premium to
enroll home in warranty program and almost
four months after they closed escrow on their
home, developer told buyers that warranty's
issuance was automatic and it offered extra
protection for their home, when in fact war-
ranty limited their protection under Nevada
law, home buyers did not have opportunity to

read application form, 31-page warranty
booklet, or view video explaining warranty
before signing application, home buyers were
not sophisticated consumers, and warranty's
disclaimers were not conspicuous.

**2. Mandamus** ⟐**3(3), 26, 28**

When there is no plain, speedy, and
adequate remedy at law, a writ of mandamus
is available to compel the district court to
perform a required act, or to control an
arbitrary or capricious abuse of discretion.
West's NRSA 34.160, 34.170.

**3. Contracts** ⟐**1**

The Supreme Court permits the enforce-
ment of adhesion contracts where there is
plain and clear notification of the terms and
an understanding consent, and if it falls with-
in the reasonable expectations of the weaker
party.

**4. Arbitration** ⟐**6.2**
**Contracts** ⟐**1**

The Supreme Court need not enforce a
contract, or any clause of a contract, includ-
ing an arbitration clause, that is unconsciona-
ble.

**5. Arbitration** ⟐**6.2**

Although the Federal Arbitration Act
(FAA) establishes a strong public policy fa-
voring arbitration for the purpose of avoiding
the unnecessary expense and delay of litiga-
tion where parties have agreed to arbitrate,
it does not mandate the enforcement of an
unconscionable contract or arbitration clause.
9 U.S.C.A. § 1 et seq.

**6. Contracts** ⟐**1**

Both procedural and substantive uncon-
scionability generally must be present in or-
der for a court to exercise its discretion to
refuse to enforce a contract or clause as
unconscionable.

**7. Arbitration** ⟐**6.2**

Arbitration clause in home warranty was
substantively, as well as procedurally uncon-
scionable, where clause granted insurer uni-
lateral and exclusive right to decide rules
that govern arbitration and to select arbitra-
tors.

**648**  Nev.                    **49 PACIFIC REPORTER, 3d SERIES**

Robert C. Maddox & Associates and Samuel S. Crano, Reno, for Petitioners.

Walther Key Maupin Oats Cox & LeGoy and Donald A. Lattin, Reno, for Real Parties in Interest.

Vannah Costello Canepa Riedy Rubino & Lattie, Las Vegas, for Amicus Curiae Nevada Trial Lawyers Association.

Before SHEARING, ROSE and BECKER, JJ.

*OPINION*

PER CURIAM:

This petition challenges a district court order granting a motion to compel arbitration in favor of real parties in interest Double Diamond Ranch, LLC and Double Diamond Homes, LLC (Double Diamond). Petitioners James and Linda Burch purchased a new home and a homebuyer warranty from Double Diamond. When problems developed in their home, they contacted Double Diamond to fix them. After attempts at mediation failed, the Burches filed a complaint in district court for damages relating to Double Diamond's construction of their new home. The district court concluded that the Burches had entered into a valid contractual agreement, via the homebuyer warranty, to resolve any disputes concerning their home through arbitration. We disagree, and we, therefore, grant this petition for a writ of mandamus.

*FACTS*

In March 1997, the Burches purchased a new Diamond Country home developed and constructed by real parties in interest Double Diamond. In October 1997, approximately four months after closing, Double Diamond gave Linda Burch a thirty-one-page warranty booklet and asked her to sign a one-page "Application for Home Enrollment" for the 2–10 Home Buyers Warranty (HBW) offered by Double Diamond. She signed the "application" form, but she did not read the thirty-one-page booklet.

The HBW purports to be an express limited warranty. It provides one-year coverage that warrants the home will be free from materials and workmanship defects. In the second year, the coverage narrows to electrical, plumbing, and mechanical systems defects. For ten years, the HBW provides coverage that warrants the home will be free from structural defects.

The one-page "Application for Home Enrollment" states in paragraph nine that,

[b]y signing, Homebuyer acknowledges that s/he has viewed and received a video of "Warranty Teamwork: You, Your Builder & HBW", read the warranty and has received a copy of this form with the Home Buyers Warranty Booklet and CONSENTS TO THE TERMS OF THESE DOCUMENTS INCLUDING THE BINDING ARBITRATION PROVISION contained therein.

The HBW's arbitration clause provides, in pertinent part, that:

Any controversy, claim or complaint arising out of or relating to Builder's workmanship/systems limited warranty coverages provided by Builder under the terms of this agreement which Homebuyer and Builder do not resolve by mutual agreement shall be settled by *final and binding* arbitration in accordance with the Construction Arbitration Services (CAS) or other [National Home Insurance Company] NHIC/HBW approved rules applicable to the home warranty industry in effect at the time of the arbitration . . . .

Any controversy concerning a claim arising out of or relating to the Builder's ten year structural coverage (insured by NHIC) shall be settled by final and binding arbitration . . . . Arbitration of all structural warranty disputes will be conducted by arbitrators supplied by an NHIC approved arbitration service.

This arbitration clause further provides that the final and binding arbitration is governed by the Federal Arbitration Act (FAA)[1] "to the exclusion of any provisions of state arbitration law."

**1.**  9 U.S.C. §§ 1–16 (2000).

BURCH v. DIST. CT.          Nev.   **649**

Cite as 49 P.3d 647 (Nev. 2002)

In January 1999, the Burches complained to Double Diamond about "serious problems underneath [their] house"—saturated floor joists, wet insulation, muddy ground, and a wet, moldy foundation.  They requested that Double Diamond remedy the situation by removing the insulation, professionally treating the area with mildew and fungicide controls, installing upgraded insulation with proper venting, constructing a proper water barrier underneath the house, and reimbursing them for all current and future fees for professional inspections.  While contesting liability, Double Diamond offered to completely dry the crawl space underneath the house, install two additional foundation vents and a six-mill vapor barrier, treat all areas of active fungus with an approved fungicide, and reinstall insulation except at the rim joist.

The Burches were not satisfied with this offer.  After both parties stipulated to waive mediation, the Burches filed a complaint for damages with the district court, alleging breach of express and implied warranties, negligence, and fraud and misrepresentation.  Double Diamond filed a motion for a stay and a motion to compel arbitration, arguing that the HBW provided for final and binding arbitration of all disputes relating to the construction of the Burch home.  The district court found the HBW valid and granted the motion to compel arbitration.  The Burches now request that this court issue a writ of mandamus directing the district court to vacate its order compelling the Burches to arbitrate their claims against Double Diamond.

### DISCUSSION

[1, 2]  Because an order compelling arbitration is not directly appealable, the Burch-es appropriately seek writ relief from this court.[2]  When there is no plain, speedy, and adequate remedy at law, a writ of mandamus is available to compel the district court to perform a required act, or to control an arbitrary or capricious abuse of discretion.[3]  Under the circumstances of this case, the HBW is an unconscionable adhesion contract and, therefore, unenforceable.  The district court should not have compelled arbitration under the unenforceable clause.  Accordingly, we grant the petition for a writ of mandamus.

[3, 4]  This court has defined an adhesion contract as "a standardized contract form offered to consumers . . . on a 'take it or leave it' basis, without affording the consumer a realistic opportunity to bargain."[4]  "The distinctive feature of an adhesion contract is that the weaker party has no choice as to its terms."[5]  Here, the one-page "application" and the HBW were pre-printed, standardized contract forms.  The Burches, the weaker party, were not given an opportunity to negotiate the HBW's terms with Double Diamond or its insurer, National Home Insurance Company (NHIC); they were required to "take it or leave it."  Therefore, the HBW agreement between the Burches and Double Diamond is an adhesion contract.  This court permits the enforcement of adhesion contracts where there is "plain and clear notification of the terms and an understanding consent[,]"[6] and "if it falls within the reasonable expectations of the weaker . . . party."[7]  This court need not, however, enforce a contract, or any clause of a contract, including an arbitration clause,[8] that is unconsciona-

2.  *See* NRS 38.205 (no direct appeal from order *granting* motion to compel arbitration); NRS 34.170 (writ to issue when no plain, speedy, and adequate remedy in law exists); *Kindred v. Dist. Ct.,* 116 Nev. 405, 409, 996 P.2d 903, 906 (2000) (recognizing that mandamus is an appropriate method to challenge an order compelling arbitration).

3.  *See* NRS 34.160; NRS 34.170; *see also Round Hill Gen. Imp. Dist. v. Newman,* 97 Nev. 601, 603–04, 637 P.2d 534, 536 (1981).

4.  *Obstetrics and Gynecologists v. Pepper,* 101 Nev. 105, 107, 693 P.2d 1259, 1260 (1985).

5.  *Id.*

6.  *Id.* at 108, 693 P.2d at 1261.

7.  *See id.* at 107–08, 693 P.2d at 1261; *see also Bernstein v. GTE Directories Corp.,* 827 F.2d 480, 482 (9th Cir.1987) (applying Nevada law).

8.  *See* NRS 38.035 ("A written agreement to submit any existing controversy to arbitration or a provision in a written contract to submit to arbitration any controversy thereafter arising between the parties is valid, enforceable and irrevocable, *save upon such grounds as exist at law or in equity for the revocation of any contract.*" (emphasis added)).

**650** Nev.                 **49 PACIFIC REPORTER, 3d SERIES**

ble.[9]

[5] Although the FAA establishes a strong public policy favoring arbitration for the purpose of avoiding the unnecessary expense and delay of litigation where parties have agreed to arbitrate,[10] it does not mandate the enforcement of an unconscionable contract or arbitration clause.[11] The United States Supreme Court has interpreted § 2 of the FAA and held that "[s]tates may regulate contracts, including arbitration clauses, under general contract law principles and they may invalidate an arbitration clause 'upon such grounds as exist at law or in equity for the revocation of *any* contract.' " [12] Unconscionability, therefore, is a legitimate ground upon which to refuse to enforce the HBW and its arbitration clause.[13]

[6] Generally, both procedural and substantive unconscionability must be present in order for a court to exercise its discretion to refuse to enforce a contract or clause as unconscionable.[14] The circumstances present in this case significantly render the HBW procedurally unconscionable. The Burches did not receive a copy of the HBW's terms until after Double Diamond had paid the premium to enroll the Burch home in the warranty program and almost four months after they closed escrow on their home.

Double Diamond told the Burches that the HBW's issuance was "automatic" and offered extra protection for their home, when in fact the warranty limited their protection under Nevada law.[15] The Burches did not have an opportunity to read the one-page "application" form, or the thirty-one-page HBW booklet, or to view the HBW video before signing the "application." The arbitration clause was located on page six of the HBW booklet, after five pages of material only relevant to persons residing outside of Nevada. The Burches were not sophisticated consumers, they did not understand the HBW's terms, and the HBW's disclaimers were not conspicuous.[16] Under these circumstances, the Burches did not have a meaningful opportunity to decide if they wanted to agree to the HBW's terms, including its arbitration provision. As a result, the HBW was procedurally unconscionable.

[7] Because the procedural unconscionability in this case is so great, less evidence of substantive unconscionability is required to establish unconscionability.[17] The HBW's arbitration clause is also substantively unconscionable because it grants Double Diamond's insurer, NHIC, the unilateral and exclusive right to decide the rules that govern the arbitration and to select the arbitra-

---

**9.** *See* NRS 104.2302(1) (court may refuse to enforce an unconscionable contract).

**10.** *See Allied–Bruce Terminix Cos. v. Dobson*, 513 U.S. 265, 270–71, 115 S.Ct. 834, 130 L.Ed.2d 753 (1995).

**11.** *See Doctor's Associates, Inc. v. Casarotto*, 517 U.S. 681, 687, 116 S.Ct. 1652, 134 L.Ed.2d 902 (1996) (holding that generally applicable contract defenses, such as unconscionability, may be used to invalidate an arbitration clause).

**12.** *Allied–Bruce Terminix*, 513 U.S. at 281, 115 S.Ct. 834 (quoting 9 U.S.C. § 2 (emphasis added)); *see also Doctor's Associates*, 517 U.S. at 687, 116 S.Ct. 1652.

**13.** *See Doctor's Associates*, 517 U.S. at 687, 116 S.Ct. 1652.

**14.** *See, e.g., First Family Financial Services, Inc. v. Fairley*, 173 F.Supp.2d 565, 569–71 (S.D.Miss. 2001); *Data Based Systems, Intern., Inc. v. Hewlett–Packard Co.*, No. CIV. 00–CV–4425, 2001 WL 1251212, at *10 (E.D.Pa. Sept.26, 2001); *Thomas Engineering, Inc. v. Trane Co.*, No. 92 C 1251,

1994 WL 692698, at *2–3 (N.D.Ill.Dec.1, 1994); *Armendariz v. Foundation Health Psychcare*, 24 Cal.4th 83, 99 Cal.Rptr.2d 745, 6 P.3d 669, 690 (2000); *Villa Milano Homeowners Ass'n v. Il Davorge*, 84 Cal.App.4th 819, 102 Cal.Rptr.2d 1, 6–7 (2000); *Complete Interiors, Inc. v. Behan*, 558 So.2d 48, 52 (Fla.Dist.Ct.App.1990); *M.A. Mortenson Co. v. Timberline Software*, 140 Wash.2d 568, 998 P.2d 305, 314–15 (2000).

**15.** *Cf. Sierra Diesel Injection Service v. Burroughs Corp.*, 890 F.2d 108, 113 (9th Cir.1989) ("[E]xclusions of warranties are generally disfavored .... They are subject to the general obligation of good faith and of not imposing unconscionable terms upon a party.").

**16.** *See* NRS 104.1201(10) ("Whether a term or clause is 'conspicuous' or not is for decision by the court."); *see also Sierra Diesel*, 890 F.2d at 115 (explaining that even the use of capital letters in disclaimers will not be "effective in all cases").

**17.** *See Armendariz*, 99 Cal.Rptr.2d 745, 6 P.3d at 690.

ROSEQUIST v. INT'L ASS'N OF FIREFIGHTERS        Nev.  **651**
Cite as 49 P.3d 651 (Nev. 2002)

tors. These provisions are "oppressive terms," [18] and as such, are substantively unconscionable and unenforceable. We do not hold that a homebuyer warranty with an arbitration clause will always be unconscionable or unenforceable. Under the circumstances in this case, however, the HBW and its arbitration clause *are* unconscionable and, therefore, unenforceable.

We, therefore, grant the petition and direct the clerk of this court to issue a writ of mandamus directing the district court to vacate its order compelling arbitration.[19]



**Larry ROSEQUIST, Appellant,**

**v.**

**INTERNATIONAL ASSOCIATION OF FIREFIGHTERS LOCAL 1908, Respondent.**

**No. 36506.**

Supreme Court of Nevada.

July 18, 2002.

Firefighter who was denied disability benefits brought action against county and his union, claiming breach of collective bargaining agreement, breach of duty of fair representation, improper submission of grievances, breach of covenant of good faith and fair dealing, wrongful termination of his employment, and conspiracy to violate collective bargaining agreement. The Eighth Judicial District Court, Clark County, Mark R. Denton, J., granted summary judgment in favor of county and granted union's motion to dismiss without prejudice. Firefighter appealed. The Supreme Court held that: (1) firefighter's allegations against union were within exclusive jurisdiction of the Employee-

Management Relations Board (EMRB), and (2) firefighter was required to exhaust his administrative remedies before the EMRB before filing his complaint in district court.

Affirmed.

**1. Labor Relations ⟐510**

Firefighter's allegations that union breached collective bargaining agreement, breached duty of fair representation, improperly submitted grievances, breached duties of good faith and fair dealing, and conspired to violate collective bargaining agreement fell within scope of the Employee-Management Relations Act and, thus, were within the exclusive jurisdiction of the Employee-Management Relations Board (EMRB). West's NRSA 288.110, subd. 2, 288.270, subd. 2(a).

**2. Pretrial Procedure ⟐554**

A motion to dismiss is properly granted when there is a lack of subject matter jurisdiction on the face of the complaint.

**3. Administrative Law and Procedure ⟐229**

Failure to exhaust administrative remedies generally deprives a district court of subject matter jurisdiction.

**4. Appeal and Error ⟐893(1)**

The construction of a statute is a question of law subject to de novo review.

**5. Statutes ⟐190**

If the plain meaning of a statute is clear on its face, then the court will not go beyond the language of the statute to determine its meaning.

**6. Labor Relations ⟐219**

Fair representation of an employee by a union involving the implementation of the terms of a collective bargaining agreement is a right arising under the Employee-Management Relations Act and the failure of a union to fairly represent an employee interferes with that right. West's NRSA 288.270, subd. 2(a).

---

**18.** *24 Hour Fitness, Inc. v. Superior Court,* 66 Cal.App.4th 1199, 78 Cal.Rptr.2d 533, 541 (1998).

**19.** *See* NRS 34.160; *see also Round Hill,* 97 Nev. at 603–04, 637 P.2d at 536.

# EXHIBIT 11

Bustos v. Dennis, Not Reported in Fed. Supp. (2017)

2017 WL 1049570

2017 WL 1049570

Only the Westlaw citation is currently available.

United States District Court, W.D. Texas, San Antonio Division.

Ernest BUSTOS, Plaintiff,

v.

Gregg A. DENNIS, d/b/a IIS Benefit Administrators, Investment Insurance, Inc., d/b/

a IIS Benefit Administrators, Southern Nevada Benefit Administrators LLC, Defendants.

Civil Action No. SA-17-CV-39-XR

|

Signed 03/17/2017

**Attorneys and Law Firms**

Stephen J. Johnson, Attorney at Law, San Antonio, TX, for Plaintiff.

Gayla S. Corley, Roger D. Kirstein, Langley & Banack, Inc., San Antonio, TX, for Defendants.

## ORDER

XAVIER RODRIGUEZ, UNITED STATES DISTRICT JUDGE

**\*1**  On this date, the Court considered Defendant Gregg Dennis' Motion to Transfer Venue (Docket no. 5) and Plaintiff Ernest Bustos' Opposition (Docket no. 10). After careful consideration, the Court GRANTS the Motion to Transfer (Docket no. 5) and TRANSFERS the case to the United States District Court for the District of Nevada.

## BACKGROUND

Plaintiff Ernest Bustos, a citizen of Texas, filed his original petition in this breach of contract action in state court on January 14, 2016, and Defendant Dennis removed the case to federal court on January 20, 2017. [1]  Docket nos. 1, 1-2. Plaintiff has since filed an amended complaint, in which he alleges that all defendants are citizens of Nevada. Docket no. 9.

In his live complaint, Plaintiff alleges that he entered into an insurance distribution contract with Defendants in 2015. Docket no. 9 at 5. Plaintiff alleges that he "was to act as an independent contractor for marketing and selling" Defendants' "Tri-Funding" insurance products. *Id.* at 4-5. Based on Plaintiff's allegations, the contract describes a hierarchical sales model and multi-level marketing distribution scheme, which would allow Plaintiff to enlist others to sell the insurance products. *Id.* According to Plaintiff, the contract stipulated that he would receive training and on-going support throughout the contract term. *Id.* at 7-8. Plaintiff alleges that rather than helping him develop his "distribution system of agents," Defendants ignored him and instead engaged in dealings with an unlicensed third-party that recruited others who might have otherwise joined Plaintiff's distribution system. *Id.* at 8.

After removing to this Court, Defendant Dennis filed a motion to transfer venue under 28 U.S.C. § 1404(a) on January 27, 2017. Docket no. 5. Dennis bases the motion on a forum-selection clause in the contract which states: "[a]ny litigation proceeding will be governed by and in the State of Nevada." Docket no. 5 at 2. Plaintiff filed his opposition to transfer on February 13, and Defendants replied on February 24. Docket nos. 10, 13. The Court now turns to the motion to transfer.

## DISCUSSION

### I. Standard of Review

"For the convenience of parties and witnesses, in the interest of justice, a district court may transfer any civil action to any other district or division where it might have been brought." 28 U.S.C. § 1404(a). A district court has broad discretion in deciding whether to order a transfer so long as it is within the limitations of the text of the statute and the precedents of the Supreme Court and the Fifth Circuit Court of Appeals. *In re Volkswagen of Am. (Volkswagen II)*, 545 F.3d 304, 311 (5th Cir. 2008).

Where a contract contains a valid forum-selection clause, the court should ordinarily transfer the case to the specified forum. *Atlantic Marine Constr. Co., Inc. v. U.S. Dist. Ct. for the Western Dist. of Texas*, 134 S. Ct. 568, 581 (2013). "A proper application of § 1404(a) requires that a forum-selection clause be given controlling weight in all but the most exceptional cases" because a forum-selection clause represents "the parties' agreement as to the most proper forum." *Id.* at 579. Interpreting a forum-selection clause requires an inquiry into the terms of a contract, and "[c]ontract interpretation is a question of law." *Alliance Health Group, LLC v. Bridging Health Options, LLC*, 553 F.3d 397, 399 (5th Cir. 2008). In diversity and federal question cases, federal law applies in determining whether a forum-selection clause is enforceable. *Atlantic Marine*, 134 S. Ct. at 581.

**\*2** A forum-selection clause must be valid in order to be controlling. *Id.* at 581 n.5 ("Our analysis presupposes a contractually valid forum-selection clause."). Forum-selection clauses are presumptively valid and enforceable. *Haynsworth v. The Corp.*, 121 F.3d 956, 962 (5th Cir. 1997). This presumption can be overcome upon a showing that the clause is "unreasonable under the circumstances," which depends on a several factors:

> (1) the incorporation of the forum selection clause into the agreement was the product of fraud or overreaching; (2) the party seeking to escape enforcement will for all practical purposes be deprived of his day in court because of the grave inconvenience or unfairness of the selected forum; (3) the fundamental unfairness of the chosen law will deprive the plaintiff of a remedy; or (4) enforcement of the forum selection clause would contravene a strong public policy of the forum state.

*Id.* at 963 (internal quotations and citations omitted). The party challenging the clause as unreasonable bears a "heavy burden of proof." *Id.* Though not encompassed in the enforceability requirements of *Haynsworth*, the Fifth Circuit also requires a forum-selection clause to be mandatory, not permissive. *Waste Mgmt. of La., L.L.C. v. Jefferson Par. ex rel. Jefferson Par. Council*, 594 Fed.Appx. 820, 822 (5th Cir. 2014).

### II. Validity of the Forum-Selection Clause

The parties do not couch their arguments in terms of the *Haynsworth* factors listed above. Instead, they dispute whether the clause is mandatory or permissive. Plaintiff argues that the forum-selection clause is permissive, and therefore invalid, because it lacks exclusive language. Docket no. 10 at 5–7. Plaintiff also argues that the clause is permissive because it is ambiguous as to which Nevada courts—federal or state—are proper forums. *Id.* at 7. Plaintiff does not argue that the clause was unreasonable, unenforceable, or invalid in any other ways. For the following reasons, the Court disagrees with Plaintiff's arguments, and finds that the clause is valid.

To be mandatory, a forum-selection clause must contain "exclusive language"; the language must show that the parties intended the named location to serve as the forum for disputes arising out of the contract. *See Caldas & Sons v. Willingham*, 17 F.3d 123, 128 (5th Cir. 1994). In *Caldas & Sons*, the court found the following one-sentence forum-selection clause to be permissive because it lacked exclusive language: "[t]he laws and courts of Zurich are applicable." *Id.* at 127. ("[T]he forum selection clause at issue at most permitted claims arising out of the contract to be tried in the Zurich courts."). In *M/S Breman v. Zapata Off-*

*Shore Co.*, by contrast, the Supreme Court found the forum-selection clause mandatory where it specified that "[a]ny dispute arising must be treated before the London Court of Justice." 407 U.S. 1, 2 (1972). The forum-selection clause here ("[a]ny litigation proceeding will be governed by and in the State of Nevada"), like the clause in *M/S Breman*, satisfies the exclusive language requirement because of the word "any"—"any litigation" means all litigation. *Id.* at 20 ("[T]he language of the clause is clearly mandatory and all-encompassing.").

Turning next to the potential ambiguity of the clause, Plaintiff argues that the clause is permissive because it does not specify which courts may preside over controversies arising from the contract. This argument fails for two reasons: (1) the clause is clear regarding the parties and claims to which it applies, which is all that is required of the clause in this case; and (2) the phrase "by and in the State of Nevada" specifies both forum and choice of law.

**\*3** First, the clause is clear about which parties and claims it covers—the word "any" indicates that all parties and all claims are included in the forum-selection clause. Docket no. 5 at 1-2. Plaintiff does not disagree that the clause applies to all parties and all claims at issue in this suit. Docket no. 10. Thus, the clause is "unambiguous" for purposes of the transfer of venue analysis. Next, the clause clearly refers to any court—state or federal—within the State of Nevada. *Alliance Health Group*, 553 F.3d at 400 ("[T]he clause's language allows removal to a federal district court whose jurisdiction encompasses, as well as those courts actually regularly sitting in [the named location]"); *see also Simonoff v. Expedia, Inc.*, 643 F.3d 1202, 1205-06 (9th Cir. 2011) (forum-selection clause that specifies "courts in" a state includes both state and federal courts). The clause states that any litigation "will be governed by and in the State of Nevada," which includes any court located within the state, such as the lone U.S. District Court and not just the state courts. *Compare Alliance Health Group*, 553 F.3d at 400. ("Accordingly, the clause at hand, providing for venue in a specific county permits venue in either federal or state court because a federal courthouse is located [there].") *with Dixon v. TSE Int'l Inc.*, 330 F.3d 396, 397 (5th Cir. 2003) (affirming the district court's ruling that the forum-selection clause excluded federal courts where the clause stated that the "Courts of Texas" would have jurisdiction because federal courts are *in* Texas but are not *of* Texas).

For these reasons, the Court finds that the clause is valid. The Court will now analyze whether the § 1404(a) factors weigh against transfer, despite the "controlling weight" of the forum-selection clause. *Atlantic Marine*, 134 S. Ct. at 579.

### III. The *Atlantic Marine* Analysis

When a party moves to transfer based on a valid forum-selection clause, the typical § 1404(a) analysis changes. *Atlantic Marine*, 134 S. Ct. at 583. Typically, a court would consider the plaintiff's choice of venue, private interest factors, and "various public interest considerations." *Id.* at 582. Private interest factors include: "(1) the relative ease of access to sources of proof; (2) the availability of compulsory process to secure the attendance of witnesses; (3) the cost of attendance for willing witnesses; and (4) all other practical problems that make trial of a case easy, expeditious and inexpensive." *Volkswagen II*, 545 F.3d at 315 (citing *In re Volkswagen of Am. I*, 371 F.3d 201 (5th Cir. 2004)). Public interest factors include: "(1) the administrative difficulties flowing from court congestion; (2) the local interest in having localized interests decided at home; (3) the familiarity of the forum with the law that will govern the case; and (4) the avoidance of unnecessary problems of conflict of laws [or in] the application of foreign law." *Id.* A valid forum-selection clause, however, changes the usual § 1404(a) analysis in three ways:

> First, the plaintiff's choice of forum merits no weight. Rather, as the party defying the forum-selection clause, the plaintiff bears the burden of establishing that transfer to the forum for which the parties bargain is unwarranted ... Second, a court evaluating a defendant's 1404(a) motion ... should not consider arguments about the parties' private interests. When parties agree to a forum-selection clause they waive the right to challenge the preselected forum as inconvenient [although public-interest factors may be considered] ... Third ... a 1404(a) transfer of venue will not carry with it the original venue's choice-of-law rules.

*Id.* at 581-82. Because the forum-selection clause is valid, the adjusted analysis is appropriate.

Under the adjusted analysis, the § 1404(a) factors weigh in favor of transfer. First, Plaintiff agreed to the forum-selection clause in the contract; thus, Plaintiff has waived "the right to challenge the preselected forum as inconvenient." *Atlanta Marine,* 134 S. Ct. at 582. Similarly, the Court will not consider private interest factors such as the inconvenience to Plaintiff's central witnesses because "when [Plaintiff] entered into a contract to litigate all disputes in [the selected forum], [he] knew that a distant forum might hinder [his] ability to call certain witnesses and might impose other burdens on [his] litigation efforts." *Id.* at 584.

**\*4** Last, public interest factors do not support denial of the motion to transfer. If anything, the court congestion factor weighs in favor of transfer; Defendants point out that the number of cases filed in the U.S. District Court in Nevada is a little over one-third of the number of cases filed in the Western District of Texas. Docket no. 5 at 5. The local interest factor similarly does not weigh against transfer as Plaintiff pleads no facts indicating that this case is of particular local interest in Texas. Docket no. 10. Plaintiff alleges that the contract was a product of "meetings ... [that took] place in Texas," but does not otherwise allege that Texas has a strong interest in hearing the case. [2] Docket no. 10 at 2. The last two factors both deal with the transferee court's difficulty in applying unfamiliar laws; however, this is not a concern here because the forum-selection clause dictates that the transferee court apply Nevada choice-of-law rules. *Id.* Because the forum-selection clause is valid and no § 1404(a) factor weighs against transfer, the Court transfers this case to the U.S. District Court for the District of Nevada.

## CONCLUSION

For the foregoing reasons, the Court GRANTS the Motion to Transfer (Docket no. 5) and orders the case TRANSFERRED to the United States District Court for the District of Nevada.

It is so ORDERED.

## All Citations

Not Reported in Fed. Supp., 2017 WL 1049570

## Footnotes

1    Dennis was not served with process until December 27, 2016, and Plaintiff has not challenged the propriety of removal. Docket no. 1-3.

2    This is in stark contrast with *In re Volkswagen II,* in which the court found that this factor weighed in favor of transfer to Dallas where "the accident occurred on a freeway in Dallas, Texas; Dallas residents witnessed the accident; Dallas police and paramedics responded and took action; a Dallas doctor performed the autopsy; the third-party defendant lives in Dallas county, Texas; none of the plaintiffs live in the Marshall Division; no known party or non-party witness lives in the Marshall Division; no known source of proof is located in the Marshall Division; and none of the fact giving rise to this suit occurred in the Marshall Division." 545 F.3d at 317-18. Here, Plaintiff does not allege that a similarly strong local interest exists. Plaintiff alleges only that he sold insurance in Texas, that the contract was formed on the basis of meetings that occurred in Texas, and that the Defendants do business in Texas. Docket nos. 9, 10.

End of Document                                                    © 2024 Thomson Reuters. No claim to original U.S. Government Works.

# EXHIBIT 12

2007 WL 4180590
Only the Westlaw citation is currently available.
United States District Court, D. Nevada.

Anthony F. COPPOLA, as Trustee of the Anthony F. Coppola Living Trust (A), Plaintiff,

v.

Jed BARON, individually and doing business as Nevada Title
Loans; Nevada Title Loans; E & G Investments, Inc., Defendants.

No. 2:07–CV–00664–BES–RJJ.
|
Nov. 20, 2007.

**Attorneys and Law Firms**

Neil J. Beller, Neil J. Beller, Ltd., Las Vegas, NV, for Plaintiff.

Richard A. Schonfeld, Las Vegas, NV, for Defendants.

Terrence A. Mazura, Santa Ana, CA.


**ORDER**

BRIAN E. SANDOVAL, District Judge.

**\*1**  Presently before this Court is a Motion to Dismiss (# 11) filed on June 25, 2007 by Defendants Jed Baron, Nevada Title Loans and E & G Investments, Inc. ("Defendants"). Plaintiff Anthony F. Coppola, as Trustee of the Anthony F. Coppola Living Trust ("Coppola") filed an Opposition to the Motion to Dismiss (# 16) on July 12, 2007. No Reply was filed.


### I. *Background*

This dispute arises out of three promissory notes executed by Nevada Title Loans in favor of the Coppola Trust. According to the Complaint (# 1) filed on May 23, 2007, between August 2005 and April of 2006, Nevada Title Loans executed three separate promissory notes in favor of the Coppola Trust. The total amount owed to the Coppola Trust based upon the three notes was the sum of $200,000 plus interest. Coppola alleges that Defendant E & G Investments and Defendant Jed Baron ("Baron") are both guarantors of the notes. Baron signed a separate Guaranty Agreement which was attached to the Complaint. The maturity date of each note has passed. Coppola made a written demand for payment to each of the Defendants, but the Defendants have failed to pay the money due under any of the notes.

Coppola filed the Complaint in the federal district court of Nevada in Clark County. In the Complaint, Coppola seeks money damages for breach of contract for each of the three notes. Each of the notes contains a forum selection clause which states, "Venue of any action brought hereon shall be Clark County, Nevada."

Defendants seek dismissal of the Complaint for lack of venue based upon the forum selection clause. Defendants also seek dismissal of all claims against Baron on the basis that Coppola has failed to state a claim upon which relief can be granted, primarily because the Complaint does not allege that Baron received consideration for guaranteeing the debt.

WESTLAW   © 2023 Thomson Reuters. No claim to original U.S. Government Works.

Coppola v. Baron, Not Reported in F.Supp.2d (2007)

2007 WL 4180590

## II. *Analysis*

### A. Motion to Dismiss Based Upon Venue

Defendant has requested that Plaintiffs' Complaint be dismissed "pursuant to 28 U.S.C. § 1391(a) for improper venue. Such a motion is recognized by Rule 12(b)(3) as a motion to dismiss for improper venue. On a 12(b)(3) motion, the pleadings need not be accepted as true. *Murphy v. Schneider Nat'l, Inc.,* 362 F.3d 1133, 1137 (9th Cir.2004). In the context of a Rule 12(b)(3) motion based upon a forum selection clause, the trial court must draw all reasonable inferences in favor of the non-moving party and resolve all factual conflicts in favor of the non-moving party. *Murphy v. Schneider National, Inc.,* 362 F.3d 1133, 1138 (9th Cir.2004).

The Ninth Circuit has held that forum selection clauses should be enforced as written. *See, Mannetti–Farrow, Inc. v. Gucci America, Inc.,* 858 F.2d 509, 514 (9th Cir.1988). Forum selection clauses are prima facie valid and are enforceable absent a strong showing by the party opposing the clause that enforcement would be unreasonable or unjust, or that the clause is invalid for such reasons as fraud or overreaching. *Id.* (citation omitted).

*2 Here, Defendants are not arguing that the forum selection clause is invalid. Instead, Defendants are taking a position that the forum selection clause mandates that an action be filed in the state courts for Clark County. A forum selection clause will be enforced only where venue is specified with mandatory language. *Docksider, Ltd. v. Sea Technology, Ltd.,* 875 F.2d 762, 764 (9th Cir.1989). If the language of the forum selection clause is non-mandatory, the forum selection clause will not preclude suit elsewhere. *Hunt Wesson Foods, Inc. v. Supreme Oil Co.,* 817 F.2d 75, 77 (9th Cir.1987). Hence, the issue before the Court is whether the forum selection clause is mandatory or permissive.

To be a mandatory forum selection clause, the clause must contain language that clearly designates a forum as the exclusive one. *Northern California Dist. Council of Laborers v. Pittsburg–Des Moines Steel Co.,* 69 F.3d 1034, 1037 (9th Cir.1995). The prevailing rule is clear that where venue is specified with mandatory language the clause will be enforced. *Docksider, Ltd.,* 875 F.2d at 763–764. "When only jurisdiction is specified, the clause will generally not be enforced without some further language indicating the parties' intent to make jurisdiction exclusive." *Docksider,* 875 F.2d at 764. A forum selection clause needs to contain mandatory language requiring a case be litigated in only one forum. *Council of Laborers,* 69 F.3d at 1037.

A forum selection clause providing a particular court or state has jurisdiction, but says nothing about it being exclusive jurisdiction, is permissive rather than mandatory. *Hunt Wesson Foods Inc. v. Supreme Oil Co.,* 817 F.2d 75, 77 (9th Cir.1987). The effect of the language is merely that the parties consent to the jurisdiction of that particular court or state. *Kachal, Inc. v. Menzie,* 738 F.Supp. 371, 373 (D.Nev.1990). Such consent does not preclude the action from being litigated in another court. *Id; Northern California Dist. Council of Laborers,* 69 F.3d at 1036.

The forum selection clause in the parties' promissory notes provides that "Venue of any action brought hereon shall be Clark County, Nevada." This clause specifies that venue will be in Clark County, however, it does not specify whether the forum is the state court or the federal district court, both of which are located in Clark County. The language in the forum selection clause states nothing about the Clark County state courts having exclusive jurisdiction. The effect of the language is merely that the parties consent to the jurisdiction of the Clark County courts.

The language in the forum selection clause here is similar to that found in *Hunt Wesson Foods.* In *Hunt Wesson Foods,* 817 F.2d 75, the clause at issue contained the following language: "The courts of California, County of Orange, shall have jurisdiction over the parties in any action at law relating to the subject matter of the interpretation of this contract." *Id.* at 76. The Ninth Circuit held that the clause was permissive because "in cases in which forum selection clauses have been held to require litigation in a particular court, the language of the clauses clearly required exclusive jurisdiction." *Id.* at 77. Hence, the forum selection clause in this case is permissive rather than mandatory and the action is not precluded from being litigated in the federal district court.

**APP. 119**   2

Coppola v. Baron, Not Reported in F.Supp.2d (2007)

2007 WL 4180590

**\*3** Defendants rely on *Docksider Ltd. v. Sea Technology Ltd.,* 875 F.2d 762 (9th Cir.1989), which had a similar clause as the present one and which held that the matter must be pursued in state court. In *Docksider Ltd.,* the forum selection clause stated, "Venue of any action brought hereunder shall be deemed to be in Gloucester County, Virginia" and the court held that the action must be held in the county courts for Gloucester County. *Docksider Ltd.,* 875 F.2d at 763–764. However, of importance in that case is the fact that there were no federal courts in Gloucester County. Hence, the court in *Docksider Ltd.* never addressed the issue of whether the state or federal court was the more appropriate venue and instead analyzed the issue in terms of the suit being brought in Virginia as opposed to courts in other states. As such, the *Docksider Ltd.* case is distinguishable from the facts of this case.

The Court has determined that the forum selection clause in this case is permissive. A permissive forum selection clause does not divest this Court of jurisdiction. This Court's subject matter jurisdiction is properly based on diversity of citizenship. Venue is proper in the district of Nevada under 28 U.S.C. § 1391(a).

### B. Motion to Dismiss Baron

Defendant's Motion also challenges jurisdiction over Baron, asserting that the Complaint should be dismissed because it fails to state a claim upon which relief can be granted against Baron because he did not sign the promissory notes in his personal capacity and the Complaint fails to state that Baron received any consideration for signing the Guaranty Agreement.

When considering a motion to dismiss under Rule 12(b)(6), the challenged complaint is construed liberally in favor of the plaintiff, and all factual allegations set forth in the complaint are accepted as true. *McGary v. City of Portland,* 386 F.3d 1259, 1261 (9th Cir.2004). However, a complaint, or portion thereof, will be dismissed for failure to state a claim upon which relief may be granted if Plaintiff cannot establish "any set of facts consistent with the allegations in the complaint." *Bell Atlantic Corp. v. Twombly,* ⸺ U.S. ⸺, 127 S.Ct. 1955, 1968–69 (2007). Plaintiff's obligation to provide the "grounds" of her entitlement to relief requires more than labels and conclusions or a formulaic recitation of the elements of the cause of action. *Id.* at 1964–65. To state a valid claim, a complaint must contain either direct or inferential allegations respecting all the material elements to sustain recovery under some viable legal theory. *Id.* at 1969. "Factual allegations must be enough to raise a right to relief above the speculative level." *Id.* at 1965 citing 5 C. Wright & A. Miller, Federal Practice and Procedure § 1216, pp. 235–236 (3d ed.2004). In other words, "a complaint must be dismissed if it does not plead 'enough facts to state a claim to relief that is plausible on its face.' " *Id.* at 1974; *Garvais v. U.S.,* 2007 WL 1724956, \*4 (E.D.Wash.,2007).

**\*4** Defendants argue that the Guaranty Agreement violates the statute of frauds because the Guaranty Agreement fails to express that any consideration was given in return for the guaranty by Baron. However, the facts as alleged and presented in the Complaint and the accompanying documents do not support Defendants' position. The Guaranty Agreement specifically states that the guaranty was being given for good consideration. [1] Furthermore, the Guaranty Agreement was signed by Baron and indicates that the Guaranty Agreement was executed by Baron in favor of Coppola. Hence, construing the Complaint liberally in favor of Coppola and accepting all factual allegations set forth in the Complaint as true, Coppola has stated a claim for relief against Baron under the Guaranty Agreement. As such, Baron is not dismissed from this matter.

### II. *Conclusion*

Based on the foregoing, IT IS ORDERED that Defendants' Motion to Dismiss (# 11) is DENIED.

### All Citations

Not Reported in F.Supp.2d, 2007 WL 4180590

## Footnotes

1    Defendants argue that the consideration was lined out of the guaranty agreement, making the guaranty agreement invalid for failure of consideration. However, the Court finds that this crossed-out language only went to supplemental information regarding the guarantors' reasons for entering into the Guaranty Agreement.

---

**End of Document**  © 2023 Thomson Reuters. No claim to original U.S. Government Works.

# EXHIBIT 13

528 P.3d 586 (Table)
Unpublished Disposition
This is an unpublished disposition. See Nevada Rules of Appellate Procedure, Rule 36(c) before citing.
Supreme Court of Nevada.

FEDERAL NATIONAL MORTGAGE ASSOCIATION, Petitioner,

v.

The EIGHTH JUDICIAL DISTRICT COURT of the State of Nevada, IN AND FOR the
COUNTY OF CLARK; and the Honorable Mark R. Denton, District Judge, Respondents,

and

Westland Liberty Village, LLC, a Nevada Limited Liability Company; Westland Village Square, LLC, a Nevada Limited
Liability Company; Amusement Industry, Inc.; Westland Corona LLC; Westland Amber Ridge LLC; Westland Hacienda
Hills LLC; 1097 North State, LLC; Westland Tropicana Royale LLC; Vellagio Apts of Westland LLC; the Alevy Family
Protection Trust; Westland AMT, LLC; AFT Industry NV, LLC; and A&D Dynasty Trust, Real Parties in Interest.

No. 84575
|
Filed December 22, 2022

**Attorneys and Law Firms**

Snell & Wilmer, LLP/Las Vegas

Snell & Wilmer, LLP/Reno

Cooper & Kirk PLLC/Wash DC

Campbell & Williams

Law Offices of John Benedict

John W. Hofsaess

*ORDER GRANTING PETITION FOR EXTRAORDINARY WRIT RELIEF*

**\*1**  This original petition for extraordinary writ relief challenges a district court order denying petitioner's motion to dismiss.

Real parties in interest Westland Liberty Village and Westland Village Square (collectively, Westland) acquired properties secured by loan agreements for which petitioner Federal National Mortgage Association (Fannie Mae) is the successor-in-interest to the original lender. Fannie Mae commenced an action in district court, seeking the appointment of a receiver as part of the process to foreclose on the properties. Westland answered and asserted counterclaims against Fannie Mae. As part of its first amended countercomplaint, Westland joined several affiliated corporate entities as parties (collectively with Westland, RPIs) and asserted two counterclaims related to those entities and a Master Credit Facility Agreement (MCFA). The MCFA provided a credit line that RPIs allege Fannie Mae improperly restricted. The MCFA contains a forum selection clause providing that MCFA claims shall be litigated in the District of Columbia. Fannie Mae filed a motion to dismiss, arguing that the MCFA counterclaims could not be litigated in Nevada. The district court denied Fannie Mae's motion to dismiss, and Fannie Mae petitioned this court for a writ of prohibition.

 1

2022 WL 19697697

A writ of prohibition may issue when a district court acts without or in excess of its jurisdiction and the petitioner lacks a plain, speedy, and adequate remedy at law. NRS 34.320; NRS 34.330; *Smith v. Eighth Judicial Dist. Court,* 107 Nev. 674, 677, 818 P.2d 849, 851 (1991). A writ of mandamus, by contrast, is available to compel the performance of an act that the law requires as a duty resulting from an office, trust, or station or to control an arbitrary or capricious exercise of discretion. NRS 34.160; *Int'l Game Tech., Inc. v. Second Judicial Dist. Court,* 124 Nev. 193, 197, 179 P.3d 556, 558 (2008). This court may treat a petition seeking prohibition as a petition for a writ of mandamus where, although prohibition is not available, mandamus is appropriate. *City of Sparks v. Second. Judicial Dist. Court,* 112 Nev. 952, 953 n.1, 920 P.2d 1014, 1015 n.1 (1996). We grant the petition for extraordinary writ relief after concluding that the district court committed clear legal error amounting to a manifest abuse of discretion in failing to dismiss the MCFA counterclaims based on the mandatory forum selection clause to which the parties agreed.

When a contract contains a forum selection clause, courts determine whether the clause is mandatory, meaning that the specified forum is the exclusive forum agreed upon by the parties, or permissive, meaning that the parties merely consented to venue in a particular forum. *Am. First Fed. Credit Union v. Soro,* 131 Nev. 737, 740-42, 359 P.3d 105, 107-08 (2015) (noting and agreeing with other courts' explanation of the dichotomy between mandatory and permissive forum selection clauses). As with other issues of contractual interpretation, whether a forum selection clause is mandatory turns on its language, looking for "words of exclusivity." *Id.* at 742, 359 P.3d at 108; *see also id.* at 737, 739, 359 P.3d at 106 (providing that the court reviews contracts de novo and interprets clear and unambiguous provisions according to the contractual language as written). When a forum selection clause is mandatory and suit is brought in the incorrect forum, the matter should be dismissed. *See id.* at 738, 359 P.3d at 105 (reversing dismissal where forum selection clause was permissive, not mandatory).

**\*\*2**  The MCFA has a forum selection clause entitled "Choice of Law; Consent to Jurisdiction" that provides that "Borrower agrees that *any controversy* arising under or in relation to the Notes, the Security Documents (other than the Security Instruments), or any other Loan Document *shall be*, except as otherwise provided herein, *litigated in the District of Columbia."* (Emphasis added.) It further provides that D.C. courts "shall ... have jurisdiction over all controversies which may arise under or in relation to the Loan Documents ...." It continues that "Borrower irrevocably consents to service, jurisdiction, and venue of such courts for any litigation arising from [the loan instrument] and *waives any other venue* to which it might be entitled." (Emphasis added.) The clause also provides that it does not bar the Lender from bringing suit against the Borrower or the collateral in another forum and that any such action does not waive the designation of D.C. law as the controlling law.

We conclude that the forum selection clause here is mandatory. The clause states that litigation for "any controversy" arising under its loan documents "shall be litigated" in the District of Columbia. The phrase "shall be litigated," while not conclusive, strongly suggests that the forum selection clause is mandatory. *Soro,* 131 Nev. at 741-42, 359 P.3d at 107-08 (collecting and comparing forum selection clause cases). Confirming that the clause mandates Washington, D.C. as the forum for litigating MCFA claims, the agreement irrevocably consents to the jurisdiction and forum of D.C. courts and waives "any other venue." *E.g., Aguas Lenders Recovery Grp. v. Suez, S.A.,* 585 F.3d 696, 700 (2d Cir. 2009); *AAR Int'l, Inc. v. Nimelias Enters. S.A.,* 250 F.3d 510, 526 (7th Cir. 2001). Because the clause here goes further than signaling merely that D.C. courts are an appropriate forum and includes both irrevocable consent to the designated forum and a waiver of all other fora the borrower might otherwise be entitled to access, we conclude that the forum selection clause demonstrates an intent to designate the District of Columbia exclusively and is therefore mandatory.

RPIs make three additional arguments against enforcing this clause as mandatory, none of which is persuasive. First, RPIs maintain the clause cannot be mandatory because it permits Fannie Mae to bring suit outside the District of Columbia. But one-sided forum selection clauses are permissible when the parties voluntarily agree to them. *See Montoya v. Fin. Fed. Credit, Inc.,* 872 F. Supp. 2d 1251, 1276 (D.N.M. 2012) (rejecting an argument that a forum selection clause was not binding where it was permissive as to actions filed by the lender but mandatory as to those filed by the borrower); *see also Union Steel Am. Co. v. M/V Sanko Spruce,* 14 F. Supp. 2d 682, 687 (D.N.J. 1998) (concluding that a forum selection clause was mandatory despite providing the cargo carrier alone with an option to pursue arbitration). Second, RPIs characterize their counterclaims as compulsory and argue that this takes them outside a mandatory forum selection clause. Even assuming the accuracy of this characterization,

2022 WL 19697697

which is debatable, we agree with courts elsewhere that have held that this does not defeat a mandatory forum selection clause. *See, e.g., Publicis Commc'n v. True N. Commc'ns Inc.,* 132 F.3d 363, 366 (7th Cir. 1997) (enforcing forum selection clause "whether or not they would be 'compulsory' counterclaims" because the defendant had contracted not to litigate those claims in forums other than that designated in the forum selection clause); *see also Water & Sand Int'l Capital, Ltd. v. Capacitive Deionization Tech. Sys., Inc.,* 563 F. Supp. 2d 278, 284 (D.D.C. 2008) (refusing to allow parties to evade enforceable forum selection clauses by alleging what may be properly considered compulsory counterclaims). And finally, insofar as RPIs contend that fairness requires trying the counterclaims in Nevada courts, we disagree. "The parties are sophisticated corporations that freely contracted with each other, and enforcement of the forum selection clause does not offend due process." *Holland Am. Line Inc. v. Wartsila N. Am., Inc.,* 485 F.3d 450, 457 (9th Cir. 2007). [1]

**\*\*3** The dispute asserted in counterclaims three and four arises from the MCFA, so the mandatory forum selection clause applies, and requires that those claims "shall be litigated" in Washington, D.C. Nevada public policy favors enforcing freely negotiated mandatory forum selection clauses that are not unreasonable or unjust and are entered into by sophisticated parties. *See Soro,* 131 Nev. at 741, 359 P.3d at 741 (quoting with approval decisions recognizing that mandatory forum selection clauses will be enforced); *Whitemaine v. Aniskovich,* 124 Nev. 302, 312 n.31, 183 P.3d 137, 144 n.31 (2008) (recognizing that the parties were sophisticated counterparts in determining whether appellant knowingly, voluntarily, and intelligently entered into an arbitration agreement); *Tandy Comput. Leasing v. Terina's Pizza, Inc.,* 105 Nev. 841, 844, 784 P.2d 7, 8 (1989) (barring enforcement of a forum selection clause that was not "freely negotiated" and would be "unreasonable and unjust" to enforce (internal quotation marks omitted); *see also M/S Bremen v. Zapata Off-Shore Co.,* 407 U.S. 1, 15 (1972) (looking to declarations by statute or judicial decision to determine a states public policy concerning the enforcement of forum selection clauses); *Tuxedo Int'l Inc. v. Rosenberg,* 127 Nev. 11, 22, 251 P.3d 690, 697 (2011) (recognizing that parties are free to agree to binding forum selection clauses). The district court clearly erred in not applying the mandatory forum selection clause in this instance. *See Soro,* 131 Nev. at 739, 359 P.3d at 105 (providing that clear contractual provisions will be enforced as written).

The final question concerns the form, of writ relief appropriate. This court has original jurisdiction to issue a writ of prohibition to "arrest" proceedings that are "without or in excess of the jurisdiction" of the district court. NRS 34.320. The mandatory forum selection clause mandates Washington, D.C. as the venue for the MCFA counterclaims; it does not destroy jurisdiction in Nevada. *See Marra v. Papandreou,* 216 F.3d 1119, 1123 (D.C. Cir. 2000) ("[W]hile the forum-selection clause defense is a creature that has evaded precise classification, most courts and commentators have characterized it as a venue objection[.]") (footnote omitted; collecting cases). This raises a question whether prohibition is available in this setting. *See* C.P. Jhong, Annotation, *Prohibition as an Appropriate Remedy to Restrain Civil Action for Lack of Venue,* 93 A.L. R.2d 882 (1962). But it is not necessary to decide the question here, since the district judge committed clear legal error amounting to a manifest abuse of discretion in not enforcing the parties' mandatory forum selection clause as to the MCFA counterclaims. This error qualifies for mandamus relief and we therefore elect to treat the petition as one seeking mandamus relief. *See City of Sparks,* 112 Nev. at 953 n.1, 920 P.2d at 1015 n.1. Although an appeal from final judgment would generally be an adequate legal remedy, because there is no factual dispute and a clear rule warranted dismissal, we grant writ relief as to these counterclaims. *Int'l Game Tech.,* 124 Nev. at 197-98, 179 P.3d at 559.

Accordingly, we

ORDER the petition **\*587** GRANTED AND DIRECT THE CLERK OF THIS COURT TO ISSUE A WRIT OF MANDAMUS directing the district court to grant petitioner's motion to dismiss counterclaims three and four. [2]

**All Citations**

528 P.3d 586 (Table), 2022 WL 19697697

## Footnotes

1    RPIs argue that the clause is not mandatory because its inclusion of the phrase "except as otherwise provided herein" adds unspecified exceptions to its scope. Because RPIs do not explain this argument in detail or provide supporting caselaw, therefore we do not consider it. *See Edwards v. Emperor's Garden Rest.,* 122 Nev. 317, 330 n.38, 130 P.3d 1280, 1288 n.38 (2006).

2    The Honorable Patricia Lee did not participate in the decision in this matter.

---

**End of Document**                                    © 2023 Thomson Reuters. No claim to original U.S. Government Works.

# EXHIBIT 14

Electronically Filed
06/24/2020 2:45 PM

*[signature]*

CLERK OF THE COURT

1

**ODM**
Pat Lundvall (NSBN 3761)

2
Kristen T. Gallagher (NSBN 9561)
Amanda M. Perach (NSBN 12399)

3
McDONALD CARANO LLP
2300 West Sahara Avenue, Suite 1200

4
Las Vegas, Nevada 89102
Telephone: (702) 873-4100

5
plundvall@mcdonaldcarano.com
kgallagher@mcdonaldcarano.com

6
aperach@mcdonaldcarano.com

7
*Attorneys for Plaintiffs*

8

9
**DISTRICT COURT**

**CLARK COUNTY, NEVADA**

10

11
FREMONT EMERGENCY SERVICES
(MANDAVIA), LTD., a Nevada professional

12
corporation; TEAM PHYSICIANS OF
NEVADA-MANDAVIA, P.C., a Nevada
professional corporation; CRUM,

13
STEFANKO AND JONES, LTD. dba RUBY
CREST EMERGENCY MEDICINE, a

14
Nevada professional corporation,

15
                              Plaintiffs,

16
vs.

17
UNITEDHEALTH GROUP, INC., a
Delaware corporation; UNITED

18
HEALTHCARE INSURANCE COMPANY,
a Connecticut corporation; UNITED

19
HEALTH CARE SERVICES INC., dba
UNITEDHEALTHCARE, a Minnesota

20
corporation; UMR, INC., dba UNITED
MEDICAL RESOURCES, a Delaware

21
corporation; OXFORD HEALTH PLANS,
INC., a Delaware corporation; SIERRA

22
HEALTH AND LIFE INSURANCE
COMPANY, INC., a Nevada corporation;

23
SIERRA HEALTH-CARE OPTIONS, INC.,
a Nevada corporation; HEALTH PLAN OF

24
NEVADA, INC., a Nevada corporation;
DOES 1-10; ROE ENTITIES 11-20,

25
                              Defendants.

26

Case No.:   A-19-792978-B
Dept. No.:  XXVII

**ORDER DENYING DEFENDANTS' (1)
MOTION TO DISMISS FIRST
AMENDED COMPLAINT; AND (2)
SUPPLEMENTAL BRIEF IN SUPPORT
OF THEIR MOTION TO DISMISS
PLAINTIFFS' FIRST AMENDED
COMPLAINT ADDRESSING
PLAINTIFFS' EIGHTH CLAIM FOR
RELIEF**

27
        This matter came before the Court on June 5 and 9, 2020 on the (1) Motion to Dismiss

28
Plaintiffs' First Amended Complaint ("Motion"); and (2) Supplemental Brief in Support of

McDONALD CARANO

2300 WEST SAHARA AVENUE, SUITE 1200 • LAS VEGAS, NEVADA 89102
PHONE 702.873.4100 • FAX 702.873.9966

Motion To Dismiss Plaintiffs' First Amended Complaint Addressing Plaintiffs' Eighth Claim For Relief ("Supplement") filed by defendants UnitedHealth Group, Inc., UnitedHealthcare Insurance Company; United HealthCare Services, Inc.; UMR, Inc.; Oxford Health Plans, Inc. (the foregoing United entities are referred to as the "UH Parties"); Sierra Health and Life Insurance Co., Inc.; Sierra Health-Care Options, Inc.; and Health Plan of Nevada, Inc. (Sierra Health, Sierra Health-Care and Health Plan of Nevada are referred to as the "Sierra Affiliates") (UH Parties and Sierra Affiliates are collectively referred to as "United"). Pat Lundvall, Amanda M. Perach and Kristen T. Gallagher, McDonald Carano LLP, appeared on behalf of plaintiffs Fremont Emergency Services (Mandavia), Ltd. ("Fremont"); Team Physicians of Nevada-Mandavia, P.C. ("Team Physicians"); Crum, Stefanko and Jones, Ltd. dba Ruby Crest Emergency Medicine ("Ruby Crest" and collectively the "Health Care Providers"). D. Lee Roberts, Jr. and Colby L. Balkenbush, Weinberg, Wheeler, Hudgins, Gunn & Dial, LLC, appeared on behalf of United.

The Court, having considered the Motion and Supplement, the Health Care Providers' opposition to the Motion and Supplement and United's replies thereto, and the argument of counsel at the hearings on this matter, makes the following findings of fact, conclusions of law and Order:

## FINDINGS OF FACT RELEVANT TO THE COURT'S DECISION

### *Procedural History*

1.   On April 15, 2019, Fremont filed the original Complaint against UnitedHealthcare Insurance Company; United HealthCare Services, Inc.; UMR, Inc.; Oxford Health Plans, Inc.; Sierra Health and Life Insurance Co., Inc.; Sierra Health-Care Options, Inc.; and Health Plan of Nevada, Inc. (collectively, "Removing Defendants") and asserted claims for breach of implied-in-fact contract, breach of implied-in-fact contract, tortious breach of the implied covenant of good faith and fair dealing, unjust enrichment, violation of NRS 686A.020 and 686A.310, violations of Nevada Prompt Pay statutes and regulations, violations of Nevada Consumer Fraud & Deceptive Trade Practices Acts, and declaratory judgment. *See generally* Compl.

APP. 129

2.  As the Health Care Providers allege, all of these legal claims are based on United's underpayment of claims which it had determined were payable and paid, *i.e.*, a dispute over the proper rates of payment rather than the right to payment.  Compl. ¶ 27.

3.  On May 14, 2019, the Removing Defendants filed a Notice of Removal with this Court, contending that the state law claims asserted are completely preempted by Employee Retirement Income Security Act of 1974, as amended ("ERISA"), 29 U.S.C. § 1132(a)(1)(B). *See* Notice of Removal.

4.  In the removed action in the United States District Court, District of Nevada (the "Federal District Court"), Case No. 2:19-cv-00832-JCM-VCF, on May 21, 2019, the Removing Defendants filed a Motion to Dismiss arguing, *inter alia*, that each of Fremont's claims are preempted by complete preemption and conflict preemption and that even if such claims are not preempted, they fail as a matter of law.

5.  On May 24, 2019, Fremont filed a Motion to Remand (ECF No. 5) on the basis that this case, which only involves questions of the proper rate of payment, and not the right to payment, is not completely preempted by ERISA.

6.  With the Federal District Court's permission, the Health Care Providers filed their First Amended Complaint (the "FAC") on January 7, 2020. The FAC added plaintiffs Team Physicians and Ruby Crest, defendant UnitedHealth Group, Inc. and a claim for violation of NRS 207.350 *et seq.* ("NV RICO")

7.  Given the procedural posture of the action, the Federal District Court directed the Health Care Providers to file an amended motion to remand, which they did on January 18, 2020 (ECF No. 49).

8.  After completed briefing, the Federal District Court granted the Amended Motion to Remand, expressly rejecting United's argument that the Health Care Providers' claims were completely preempted by ERISA, the same arguments that United reasserts in the Motion to Dismiss pending before the Court. The Federal District Court recognized the Ninth Circuit has distinguished between claims involving the "right to payment" and claims involving the "proper "amount of payment." *Marin General Hosp. v. Modesto & Empire Traction Co.*, 581 F.3d 941,

McDONALD CARANO

2300 WEST SAHARA AVENUE, SUITE 1200 • LAS VEGAS, NEVADA 89102
PHONE 702.873.4100 • FAX 702.873.9966

948 (9th Cir. 2009); *Blue Cross of Cal. v. Anesthesia Care Assocs. Med. Grp., Inc.*, 187 F.3d 1045, 1051 (9th Cir. 1999). The Federal District Court found that the Health Care Providers' claims fall outside the scope of Section 502(a) of ERISA, failing the first prong of the test articulated by *Aetna Health Inc. v. Davila*, 542 U.S. 200 (2004) because they:

> [D]o not contend they are owed an additional amount from the patients' ERISA plans." Instead, they allege these claims arise from their alleged implied-in-fact contract with United.

> United attempts to distinguish the implied-in-fact contract from other types of contracts referenced in the case law. (ECF No. 64). However, Nevada courts have found that implied-in-fact agreements and express agreements have the same legal effects. *See Magnum Opes Constr. v. Sanpete Steel Corp.*, 2013 WL 7158997 (Nev. 2013); *Certified Fire Prot. Inc. v. Precision Constr.*, 283 P. 3d 250, 256 (Nev. 2012). Consequently, the court finds that plaintiffs' claims fall outside the scope of § 502(a) of ERISA, failing prong 1 of the Davila test.

*See* Notice of Entry of Remand Order, Remand Order at 5:4-13.

9.      After remand and pursuant to a May 15, 2020 Order, the Health Care Providers filed the FAC in this state court action.

10.      United filed the Motion and Supplement addressing the Health Care Providers' claim for violation of NRS 207.350 *et seq.* (eighth claim for relief).  The Health Care Providers filed oppositions to the Motion and Supplement.

11.      The Court heard oral argument on June 5 and 9, 2020 and issued its ruling at the conclusion of the June 9, 2020 hearing, directing the Health Care Providers' counsel to submit an order consistent with its oral ruling as well as consistent with the Health Care Providers' Oppositions to the Motion and Supplement.

### ***Relevant Allegations Concerning the Relationship Between the Parties and the Dispute***

12.      The Health Care Providers are professional emergency medicine service groups that staff the emergency departments at ten hospitals and other facilities throughout Nevada. FAC ¶¶ 3-5.

13.      Defendants ("United") are large health insurance companies and claims administrators. FAC ¶¶ 6-13. United provides healthcare benefits to its members ("United's Members"), including coverage for emergency care. FAC  ¶¶ 19, 33.

McDONALD CARANO
2300 WEST SAHARA AVENUE, SUITE 1200 • LAS VEGAS, NEVADA 89102
PHONE 702.873.4100 • FAX 702.873.9966

14.     The Health Care Providers and the hospitals whose emergency departments they staff are obligated by both federal and Nevada law and medical ethics to render emergency services and care to all patients who present in the emergency department, regardless of an individual's insurance coverage or ability to pay. FAC ¶ 18; *see also* Emergency Medical Treatment and Active Labor Act (EMTALA), 42 U.S.C. § 1395dd; NRS 439B.410.

15.     The Health Care Providers have submitted claims to United seeking reimbursement for this emergency care.  FAC ¶¶ 25-26, 40. United, in turn, has paid the Health Care Providers.  *Id*.

16.     As the Health Care Providers allege, this longstanding and historical practice establishes the basis for an implied-in-fact contract, as well as the usual and customary (or reasonable) rates of reimbursement for the emergency services. FAC ¶¶ 54, 189-206, 216-226.

17.     The Health Care Providers allege that, thereafter, United continued to pay the Health Care Providers' claims for emergency services, but arbitrarily and drastically reduced the rates of reimbursement to levels below the billed charges and usual and customary rates.  FAC ¶ 55.

18.     United is responsible for administering and/or paying for certain emergency medical services provided by Fremont which are at issue in the litigation.  FAC ¶¶ 6-13. United provides, either directly or through arrangements with providers such as hospitals and Fremont, healthcare benefits to its members.  FAC ¶ 19.

19.     The Health Care Providers allege that United arbitrarily began manipulating the rate of payment for claims submitted by the Health Care Providers. United drastically reduced the rates at which they paid the Health Care Providers for emergency services for some claims, but not others. FAC ¶ 57.

20.     For each of the healthcare claims at issue in this litigation, United has already determined that each claim is payable; however, it paid the claim at an artificially reduced rate. *Id*. at ¶ 27.

…

…

McDONALD CARANO

2300 WEST SAHARA AVENUE, SUITE 1200 • LAS VEGAS, NEVADA 89102
PHONE 702.873.4100 • FAX 702.873.9966

21. The Health Care Providers allege that there is no open question of whether the claim should be covered under a health plan or whether it is payable – United already answered those questions affirmatively when it paid the claims.

22. Rather, the Court finds that, as the Health Care Providers allege, the questions to be answered in this case are whether United paid the claim at rates that complied with applicable state law as set forth in the Health Care Providers' claims.

23. The Health Care Providers also allege a Nevada state law claim for civil racketeering ("NV RICO") against United because they have been financially harmed by an orchestrated scheme crafted and implemented by an Enterprise consisting of United and third parties including National Care Network, LLC dba Data iSight ("Data iSight") to artificially and fraudulently reduce payment rates and manipulate the related benchmark pricing data to "support" United's position.

24. In support of the NV RICO claim, the Health Care Providers allege, among other facts, as follows:

a. From late 2017 to 2018, over the course of multiple meetings in person, by phone, and by email correspondence, the Health Care Providers' representatives tried to negotiate with Defendants to become participating, in-network providers. FAC ¶ 91.

b. As part of these negotiations, the Health Care Providers' representatives met with Dan Rosenthal, President of Defendant UnitedHealth Networks, Inc., John Haben, Vice President of Defendant UnitedHealth Networks, Inc., and Greg Dosedel, Vice President of National Ancillary Contracting & Strategy at Defendant UnitedHealthCare Services, Inc. FAC ¶ 92.

c. Around December 2017, Mr. Rosenthal told the Health Care Providers' representatives that Defendants intended to implement a new benchmark pricing program specifically for their employer funded plans to decrease the rate at which such claims were to be paid. FAC ¶ 93.

d. Defendants then proposed a contractual rate for their employer funded plans that was roughly half the average reasonable rate at which Defendants have historically

McDONALD ⬥ CARANO

2300 WEST SAHARA AVENUE, SUITE 1200 • LAS VEGAS, NEVADA 89102
PHONE 702.873.4100 • FAX 702.873.9966

**APP. 133**

McDONALD CARANO

2300 WEST SAHARA AVENUE, SUITE 1200 • LAS VEGAS, NEVADA 89102
PHONE 702.873.4100 • FAX 702.873.9966

reimbursed providers - a drastic and unjustified discount from what Defendants have been paying the Health Care Providers on their non-participating claims in these plans, and an amount materially less than what Defendants were paying other contracted providers in the same market. FAC ¶ 94.

e.      Defendants' proposed rate was neither reasonable nor fair. FAC ¶ 95.

f.      In May 2018, Mr. Rosenthal escalated his threats, making clear during a meeting that, if the Health Care Providers did not agree to contract for the drastically reduced rates, Defendants would implement benchmark pricing that would reduce the Health Care Providers' non-participating reimbursement by 33%. FAC ¶ 96.

g.      Dan Schumacher, the President and Chief Operating Officer of UnitedHealthcare Inc. and part of the Office of the Chief Executive of Defendant UnitedHealth Group, Inc., said that, by April 2019, Defendants would cut the Health Care Providers' non-participating reimbursement by 50%. FAC ¶ 97.

h.      Asked why Defendants were forcing such dramatic cuts on the Health Care Providers' reimbursement, Mr. Schumacher said simply "because we can." FAC ¶ 98.

i.      Defendants made good on their threats and knowingly engaged in a fraudulent scheme to slash reimbursement rates paid to the Health Care Providers for non-participating claims submitted under their employer funded plans to levels at, or even below, what they had threatened in 2018. FAC ¶ 99.

j.      Defendants falsely claim that their new rates comply with the law because they contracted with a purportedly objective and transparent third party, Data iSight, to process the Health Care Providers' claims and to determine reasonable reimbursement rates. FAC ¶ 100.

k.      Data iSight is the trademark of an analytics service used by health plans to set payment for claims for services provided to Defendants' Members by non-participating providers.  Data iSight is owned by National Care Network, LLC, a Delaware limited liability company with its principal place of business in Irving, Texas.  Data iSight and National Care Network, LLC will be collectively referred to as "Data iSight." Data iSight is a wholly-owned subsidiary of MultiPlan, Inc., a New York corporation with its principal place of business in New

York, NY.  MultiPlan acts as a Rental Network "broker" and, in this capacity, has contracted since as early as June 1, 2016 with some of the Health Care Providers to secure reasonable rates from payors for the Health Care Providers' non-participating emergency services.  The Health Care Providers have no contract with Data iSight, and the Non-Participating Claims identified in this action are not adjudicated pursuant to the MultiPlan agreement. FAC ¶ 101.

l.      Since January 2019, Defendants have engaged in a scheme and conspired with Data iSight to impose arbitrary and unreasonable payment rates on the Health Care Providers under the guise of utilizing an independent, objective database purportedly created by Data iSight to dictate the rates imposed by Defendants. FAC ¶ 102.

m.      Defendants also continued to advance this scheme on the negotiation front. FAC ¶ 103.

n.      On July 7, 2019, Mr. Schumacher advised, in a phone call, that Defendants planned to cut the Health Care Providers' rates over three years to just 42% of the average and reasonable rate of reimbursement that the Health Care Providers had received in 2018 if the Health Care Providers did not formally contract with them at the rate dictated by Defendants. FAC ¶ 104.

o.      Mr. Schumacher additionally advised that leadership across the Defendant entities were aware and supportive of the drastic cuts and provided no objective basis for them. FAC ¶ 105.

p.      The next day, Angie Nierman, a Vice President of Networks at UnitedHealth Group, Inc., sent a written proposal reflecting Mr. Schumacher's stated cuts. FAC ¶ 106.

q.      In addition to denying the Health Care Providers what is owed to them for the Non-Participating Claims, Defendants' scheme is an attempt to use their market power to reset the rate of reimbursement to unreasonably low levels. FAC ¶ 107.

r.      As further evidence of Defendants' scheme to use their market power to the detriment of the Health Care Providers and other emergency provider groups that are part of the TeamHealth organization, in August 2019, UHG advised at least one Florida medical surgical

McDONALD CARANO

2300 WEST SAHARA AVENUE, SUITE 1200 • LAS VEGAS, NEVADA 89102
PHONE 702.873.4100 • FAX 702.873.9966

facility (the "Florida Facility") that Defendants will not continue negotiating an in-network agreement unless the Florida Facility identifies an in-network anesthesia provider.  The current out-of-network anesthesia provider is part of the TeamHealth organization.  Defendants' threats to discontinue contract negotiations prompted the Florida Facility's Chief Operating Officer to send TeamHealth a "Letter of Concern" on August 14, 2019.  Defendants' threats and leverage are aimed at intentionally interfering with existing contracts and with a goal of reducing TeamHealth's market participation. FAC ¶ 108.

s.      Additionally, Defendants first threatened, and then, on or about July 9, 2019, globally terminated all existing in-network contracts with medical providers that are part of the TeamHealth organization, including the Health Care Providers, in an effort to widen the scale of the scheme to deprive the Health Care Providers of reasonable reimbursement rates through its manipulation of reimbursement rate data. FAC ¶ 109.

25.     The Health Care Providers allege that United's and Data iSight's scheme has been in development and implementation over the last several years (FAC ¶¶ 90-109) and that United and Data iSight concealed the scheme (*id.* ¶¶ 123-131). As claims were processed and Data iSight increasingly emerged as a new entity providing supposed benchmark pricing, the Health Care Providers' representatives became aware of reductions in payments and began uncovering the scheme. *Id.* ¶¶ 132-141; ¶¶ 104-105, 109 (recounting communications from United in July 2019 regarding the plan to drastically cut payment rates with no objective basis); ¶ 108 (August 2019 threats and intended leverage aimed at intentionally interfering with existing contracts); ¶ 136 (July 2019 communications with Data iSight).

26.     The Health Care Providers allege that this scheme is not new: United was previously caught manipulating and skewing payment rates for out-of-network providers. *Id.* ¶ 70.

27.     The Health Care Providers further allege:

a.      In 2009, defendant UnitedHealth Group, Inc. was investigated by the New York Attorney General for allegedly using its wholly-owned subsidiary, Ingenix, to illegally manipulate reimbursements to non-participating providers. FAC ¶ 71.

b.      The investigation revealed that Ingenix maintained a database of health care billing information that intentionally skewed reimbursement rates downward through faulty data collection, poor pooling procedures, and lack of audits. FAC ¶ 72.

c.      Defendant UnitedHealth Group, Inc. ultimately paid a $50 million settlement to fund an independent nonprofit organization known as FAIR Health to operate a new database to serve as a transparent reimbursement benchmark. FAC ¶ 73.

d.      In a press release announcing the settlement, the New York Attorney General noted that: "For the past ten years, American patients have suffered from unfair reimbursements for critical medical services due to a conflict-ridden system that has been owned, operated, and manipulated by the health insurance industry." FAC ¶ 74.

e.      Also in 2009, for the same conduct, defendants UnitedHealth Group, Inc., United HealthCare Insurance Co., and United HealthCare Services, Inc. paid $350 million to settle class action claims alleging that they underpaid non-participating providers for services in *The American Medical Association, et al. v. United Healthcare Corp., et al.*, Civil Action No. 00-2800 (S.D.N.Y.). FAC ¶ 75.

f.      Since its inception, FAIR Health's benchmark databases have been used by state government agencies, medical societies, and other organizations to set reimbursement for non-participating providers. FAC ¶ 76.

g.      For example, the State of Connecticut uses FAIR Health's database to determine reimbursement for non-participating providers' emergency services under the state's consumer protection law. FAC ¶ 77.

h.      Defendants tout the use of FAIR Health and its benchmark databases to determine non-participating, out-of-network payment amounts on its website. FAC ¶ 78.

i.      As       stated       on       Defendants'       website (https://www.uhc.com/legal/information-on-payment-of-out-of-network-benefits)       for       non-participating provider claims, the relevant United Health Group affiliate will "in many cases" pay the lower of a provider's actual billed charge or "the reasonable and customary amount," "the

McDONALD CARANO

2300 WEST SAHARA AVENUE, SUITE 1200 • LAS VEGAS, NEVADA 89102
PHONE 702.873.4100 • FAX 702.873.9966

1  usual customary and reasonable amount," "the prevailing rate," or other similar terms that base

2  payment on what health care providers in the geographic area are charging. FAC ¶ 79.

3      28.    Based on the foregoing and a review of all of the allegations in the FAC, the Court

4  finds that each of the Health Care Providers' causes of action contain sufficient factual

5  allegations to meet the applicable pleading standard and an actionable claim exists in every

6  instance. Taking the FAC as true, which is required under a NRCP 12(b)(5) motion, the Court

7  finds that relief could be granted in favor of the Health Care Providers if, in fact, the proof and

8  determination at trial is made.

9      29.    Any of the foregoing factual statements that are more properly considered

10  conclusions of law should be deemed so.  Any of the following conclusions of law that are more

11  properly considered factual statements should be deemed so.

## CONCLUSIONS OF LAW

### ERISA Preemption

### ERISA Overview

15      30.    ERISA was passed by Congress in 1974 primarily to address "mismanagement

16  of funds accumulated to finance employee benefits and the failure to pay employees benefits

17  from accumulated funds. *Gobeille v. Liberty Mut. Ins. Co.*, 136 S. Ct. 936, 946 (2016); *Skillin v.*

18  *Rady Children's Hosp.-San Diego*, 226 Cal. Rptr. 3d 505, 509 (Ct. App. 2017).

19      31.    "The comprehensive and reticulated statute, contains elaborate provisions for the

20  regulation of employee benefit plans." *Skillin*, 226 Cal. Rptr. 3d 505, 509. It sets forth reporting

21  and disclosure obligations for plans, imposes a fiduciary standard of care for plan administrators,

22  and establishes schedules for the vesting and accrual of pension benefits." *Massachusetts v.*

23  *Morash*, 490 U.S. 107, 112–113, 109 S. Ct. 1668 (1989).

24      32.    "ERISA does not guarantee substantive benefits.  The statute, instead, seeks to

25  make the benefits promised by an employer more secure by mandating certain oversight systems

26  and other standard procedures." *Gobeille*, 136 S.Ct. at 943.

27  …

28  …

McDONALD ⟨⟨⟩⟩ CARANO

2300 WEST SAHARA AVENUE, SUITE 1200 • LAS VEGAS, NEVADA 89102
PHONE 702.873.4100 • FAX 702.873.9966

33.     ERISA is "one of only a few federal statutes under which two types of preemption may arise: conflict preemption and complete preemption." *Conn. State Dental Ass'n v. Anthem Health Plans, Inc*., 591 F.3d 1337, 1343 (11th Cir. 2009).

34.     These two forms of preemption are doctrinally distinct. *Cleghorn v. Blue Shield of Cal.*, 408 F.3d 1222, 1225 (9th Cir. 2005) (these "two strands to ERISA's powerful preemptive force, differ in their purpose and function.") (internal quotations omitted).

### *Complete Preemption*

1.     Separately, ERISA completely preempts state law only to the extent that the state law "duplicates, supplements, or supplants the ERISA civil enforcement remedy." *Davila*, 542 U.S. at 209. Section 502 (codified at 29 U.S.C. § 1132) sets forth "a comprehensive scheme of civil remedies to enforce ERISA's provisions." *Rudel v. Hawai'i Mgmt. All. Ass'n*, 937 F.3d 1262, 1269-70 (9th Cir. 2019), cert. denied sub nom. *HI Mgmt. All. Assoc. v. Rudel*, 19-752, 2020 WL 871750 (U.S. Feb. 24, 2020).

2.     Section 502's purpose is to ensure that federal courts remain the only forum and vehicle for adjudicating claims for benefits under ERISA. *Marin Gen. Hosp.*, 581 F.3d at 945.

3.     Complete preemption is a jurisdictional doctrine and cannot be used to obtain dismissal of a state law claim on a Rule 12(b)(5) motion to dismiss. *Owayawa v. Am. United Life Ins. Co.*, CV 17-5018-JLV, 2018 WL 1175106, at *3 (D.S.D. Mar. 5, 2018) ("[A]lthough complete preemption...can be used to invoke federal question jurisdiction, Defendants cannot use [the doctrine] as a ground for dismissing Plaintiffs' claims under Federal Rule of Civil Procedure 12(b)(6)."); *Summit Estate, Inc. v. Cigna Healthcare of Cal., Inc.*, Case No. 17-CV-03871, 2017 WL 4517111, at *13 (N.D. Cal. Oct. 10, 2017) (complete preemption under § 1132(a) is "really a jurisdictional rather than a preemption doctrine….[and was] created...as a basis for federal question removal jurisdiction under  28 U.S.C. § 1441(a)."); *Marin Gen. Hosp.*, 581 F.3d at 945 (complete preemption under ERISA is not a *defense* to a state law claim); *Mid-Town Surgical Ctr., L.L.P. v. Humana Health Plan of Tex., Inc.*, 16 F. Supp. 3d 767, 779 (S.D. Tex. 2014) ("complete preemption *is not grounds for dismissal*, but instead a mechanism to confer federal jurisdiction on a state-law claim that is in fact an ERISA claim."); *Autonation,*

McDONALD CARANO

2300 WEST SAHARA AVENUE, SUITE 1200 • LAS VEGAS, NEVADA 89102
PHONE 702.873.4100 • FAX 702.873.9966

*Inc. v. United Healthcare Ins. Co.*, 423 F.Supp.2d 1265, 1268 (S.D. Fla. 2006) (complete preemption is a jurisdictional doctrine which converts state law claims into federal claims for purposes of removal, but does not dismiss claims).

4.   The Court concludes that complete preemption is not a defense to a state law claim; therefore, it cannot serve as the foundation of an argument in a Rule 12(b)(5) motion to dismiss.

5.   Binding Ninth Circuit precedent makes clear that disputes concerning rates of payment do not fall within ERISA's scope and are not subject to complete preemption. *Marin Gen. Hosp.,* 581 F.3d at 948 (9th Cir. 2009); *see also California Spine & Neurosurgery Inst. v. Boston Scientific Corp.*, No. 18-CV-07610-LHK, 2019 WL 1974901, at *3 ("Under Ninth Circuit law, ERISA does not preempt claims by a third party [medical provider] who sues an ERISA plan not as an assignee of a purported ERISA beneficiary, but as an independent entity claiming damages.").

6.   The Court concludes that this dispute is one concerning rates of payment (*see, e.g.,* FAC ¶¶ 43, 265); therefore, none of the claims asserted in the FAC fall within ERISA's scope and the claims are not subject to complete preemption.

7.   The Court further considered the two-part test set forth in *Davila*, 542 U.S. at 210- 211, and concluded that neither prong is met.

8.   *Davila* provides complete preemption applies only where: (1) a plaintiff "could have brought his claim under ERISA § 502(a)(1)(B)," and (2) "no other independent legal duty . . . is implicated by a defendant's actions." *Id.* at 210. The test is conjunctive; a claim is completely preempted only if both prongs are satisfied. *McCulloch Orthopaedic Surgical Servs., PLLC v. Aetna Inc.*, 857 F.3d 141, 146 (2d Cir. 2017).

9.   Regarding the first *Davila* prong, the Court concludes that the Health Care Providers' claims challenge the ***rates*** of reimbursement paid for covered healthcare services, rather than the right to reimbursement for such services, therefore they do not fall within the scope of § 502(a)(1)(B). FAC ¶¶ 1, 26; 1 n.1 ("The Health Care Providers also do not assert any claims…with respect to the right to payment under any ERISA plan."); *Conn. State Dental*

APP. 140

1    *Ass'n.*, 591 F.3d at 1349-50; *Lone Star OB/GYN Associates v. Aetna Health Inc.*, 579 F.3d 525,

2    531 (5th Cir. 2009); *Montefiore*, 642 F.3d at 325; *CardioNet Inc. v. Cigna Health Corp.*, 751

3    F.3d 165, 177-78 (3d Cir. 2014); *Blue Cross of Cal.*, 187 F.3d at 1051 (affirming remand of

4    health care providers' state law claim for breach of contract because the dispute was "not over

5    the right to payment, which might be said to depend on the patients' assignments to the Providers,

6    but the amount, or level, of payment, which depends on the terms of the provider agreements.");

7    s*ee also Garber v. United Healthcare Corp.*, 2016 WL 1734089, at *3-5 (E.D.N.Y. May 2,

8    2016); *Long Island Thoracic Surgery, P.C. v. Building Serv. 32BJ Health Fund*, 2019 WL

9    5060495, at *2 (E.D.N.Y. Oct. 9, 2019); *Premier Inpatient Partners LLC v. Aetna Health & Life

10   Ins. Co.*, 371 F. Supp. 3d 1056, 1068-74 (M.D. Fla. 2019); *Gulf-to-Bay Anesthesiology Assocs.

11   v. UnitedHealthCare of Fla., Inc.*, 2018 WL 3640405, at *3 (M.D. Fla. July 20, 2018); *Hialeah

12   Anesthesia Specialists, LLC v. Coventry Health Care of Fla., Inc.*, 258 F. Supp. 3d 1323, 1327-

13   30 (S.D. Fla. 2017); *N. Jersey Brain & Spine Ctr. v. MultiPlan, Inc.*, 2018 WL 6592956, at *7

14   (D.N.J. Dec. 14, 2018); *E. Coast Advanced Plastic Surgery v. AmeriHealth*, 2018 WL 1226104,

15   at *3 (D.N.J. Mar. 9, 2018).

16       10.     The second *Davila* prong looks to whether an independent legal duty is implicated

17   by the defendant's actions.  542 U.S. at 210. "If there is some other independent legal duty beyond

18   that imposed by an ERISA plan, a claim based on that duty is not completely preempted . . . ."

19   *Marin*, 581 F.3d at 949. "A legal duty is independent if it is not based on an obligation under an

20   ERISA plan, or it would exist whether or not an ERISA plan existed." *N.J. Carpenters and the

21   Trs. Thereof v. Tishman Constr. Corp. of N.J.*, 760 F.3d 297, 303 (3d Cir. 2014).

22       11.     Claims predicated upon duties imposed by state common and statutory law do not

23   satisfy *Davila's* second prong. *See, e.g., McCulloch*, 857 F.3d at 150 (second *Davila* prong

24   unsatisfied because "[plaintiff's] promissory-estoppel claim against Aetna arises not from an

25   alleged violation of some right contained in the plan, but rather from a freestanding state-law duty

26   grounded in conceptions of equity and fairness."); *Wurtz v. Rawlings Co., LLC*, 761 F.3d 232, 243

27   (2d Cir. 2014) ("[W]hile defendants' reimbursement claims relate to plaintiffs' plans, this is not

28   the test for complete preemption. Plaintiffs' claims do not derive from their plans or require

McDONALD CARANO

2300 WEST SAHARA AVENUE, SUITE 1200 • LAS VEGAS, NEVADA 89102
PHONE 702.873.4100 • FAX 702.873.9966

1    investigation into the terms of their plans; rather, they derive from [a state statute]."); *Bay Area*

2    *Surgical*, 2012 WL 3235999, at \*4 (second *Davila* prong unsatisfied because plaintiff alleging

3    claim under an oral agreement "is suing on its own right pursuant to an independent obligation,

4    and its claims would exist regardless of an ERISA plan."); *Christ Hosp. v. Local 1102 Health and*

5    *Benefit Fund*, 2011 WL 5042062, at \*4 (D.N.J. Oct. 24, 2011) (second *Davila* prong unsatisfied

6    where claims "depend[ed] on the operation of a third-party contract" between plaintiff medical

7    provider and defendant ERISA plan, rather than on the terms of the ERISA plan).

8           12.     The Court concludes that the Health Care Providers' claims are founded on

9    independent legal duties beyond that imposed by an ERISA plan, therefore the claims do not

10   satisfy *Davila's* second prong.

11          13.     Further, the Court finds the Federal District Court's Order granting the Health

12   Care Providers' Amended Motion to Remand to be persuasive. There, in accord with the

13   overwhelming weight of legal authority, the Federal District Court concluded that a third-party

14   medical provider's challenge to the rate of payment afforded by an ERISA plan on indisputably

15   covered claims for reimbursement is not completely preempted.

16          14.     The Court does not find merit in United's argument that the claims asserted in the

17   FAC are preempted because an implied-in-fact agreement is different than a written, oral or quasi

18   contract. In Nevada, implied-in-fact agreements and express agreements stand on equal footing.

19   *See Certified Fire Prot. Inc. v. Precision Constr.*, 128 Nev. 371, 379, 283 P.3d 250, 256 (2012)

20   (an implied-in-fact contract "is a true contract that arises from the tacit agreement of the

21   parties."); *Smith v. Recrion Corp.*, 91 Nev. 666, 668, 541 P.2d 663, 665 (1975) ("Both express

22   and implied contracts are founded on an ascertained agreement."); *Magnum Opes Const. v.*

23   *Sanpete Steel Corp.*, 2013 WL 7158997 (Nev. Nov. 1, 2013) (quoting 1 Williston on Contracts

24   § 1:5 (4th ed. 2007) (noting that the legal effects of express and implied-in-fact contracts are

25   identical); *Cashill v. Second Judicial Dist. Court of State ex rel. Cty. of Washoe*, 128 Nev. 887,

26   381 P.3d 600 (2012) (unpublished) ("The distinction between express and implied in fact

27   contracts relates only to the manifestation of assent; both types are based upon the expressed or

28   apparent intention of the parties."). As a result, the Court concludes that implied-in-fact

McDONALD CARANO

2300 WEST SAHARA AVENUE, SUITE 1200 • LAS VEGAS, NEVADA 89102
PHONE 702.873.4100 • FAX 702.873.9966

1    agreements are treated the same as written, oral and quasi contracts in Nevada and, consequently,

2    the caselaw rejecting ERISA preemption for claims arising out of such contracts equally applies

3    to implied-in-fact agreements.

4        15.    The Court does not find *Pilot Life Ins. v. Dedeaux,* 481 U.S. 41, 57, 107 S. Ct.

5    1549, 1558 (1987), a case cited by United, to be analogous or persuasive in light of the FAC's

6    allegations.

7        16.    The Court also does not find merit in United's argument that the state law claims

8    threaten to disrupt nationally uniform plan administration by "seeking to use state law claims to

9    force the plans to pay more." Motion at 3:22-23. Other courts have similarly rejected United's

10   argument, finding that "state law claims brought by health care providers against plan insurers

11   too tenuously affect ERISA plans to be preempted." *Lordmann Enters., Inc. v. Equicor, Inc.*, 32

12   F.3d 1529, 1533 (11th Cir. 1994); *Glastein v. Aetna, Inc.*, 2018 WL 4562467, at *3 n.4 (D.N.J.

13   Sept. 24, 2018) (collecting cases); *Rocky Mountain Holdings LLC v. Blue Cross and Blue Shield*

14   *of Fla., Inc.*, 2008 WL 3833236, at *5 (M.D. Fla. Aug. 13, 2008) (collecting cases); *Med. &*

15   *Chirurgical Facility of the State of Md. v. Aetna U.S. Healthcare, Inc.*, 221 F. Supp. 2d 618, 619-

16   20 (D. Md. 2002) (collecting cases).

17       17.    Despite a heading in the Supplement that suggests the Court can dismiss the

18   Health Care Provider's NV RICO claim on complete preemption grounds, United does not cite

19   to any case that discusses or holds that ERISA's Section 502 (complete preemption) preempts a

20   state civil racketeering claim. Thus, the Court finds no merit in United's argument.

21       18.    To the extent any of United's other arguments specific to its Motion and

22   Supplement regarding complete preemption are not specifically addressed herein, the Court

23   considered all of the defenses raised in the Motion and Supplement, as well as all arguments made

24   during oral argument, and the Court does not find merit to any of them.

25   ***Conflict Preemption***

26       19.    Section 514 (codified at 29 U.S.C. § 1144) contains ERISA's conflict preemption

27   provision. It expressly preempts "any and all State laws insofar as they may now or hereafter

28   relate to any employee benefit plan[.]" 29 U.S.C. § 1144(a).

McDONALD CARANO

2300 WEST SAHARA AVENUE, SUITE 1200 • LAS VEGAS, NEVADA 89102
PHONE 702.873.4100 • FAX 702.873.9966

20. However, § 514 saves from preemption "any law of any State which regulates insurance, banking, or securities." 29 U.S.C. § 1144(b)(2)(A). The saving clause functions to preserve a state's traditional regulatory power over insurance, banking, and securities. *Rudel*, 937 F.3d at 1269-70; *Gobeille*, 136 S. Ct. at 943.

21. Section 514, however, does not confer federal jurisdiction. *Marin Gen. Hosp.*, 581 F.3d at 945.

22. In addressing conflict preemption under ERISA, the "starting presumption" is that "Congress does not intend to supplant state law," and "'that the historic police powers of the States were not to be superseded by [ERISA] unless that was the clear and manifest purpose of Congress.'" *Viad Corp v. MoneyGram Int'l, Inc.*, No. 1 CA-CV 15-0053, 2016 WL 6436827, at *2 (Ariz. Ct. App. Nov. 1, 2016), as amended (May 3, 2017) (quoting *New York State Conference of Blue Cross & Blue Shield Plans v. Travelers*, 514 U.S. 645, 654-55 (1995)).

23. The proper analysis under Section 514(a) starts with a presumption that ERISA does not supplant state law claims.

24. A common law claim "relates to" an employee benefit plan governed by ERISA "if it has a connection with or reference to such a plan." *Providence Health Plan v. McDowell*, 385 F.3d 1168, 1172 (9th Cir. 2004); *see also Blue Cross of Cal.*, 187 F.3d at 1052 (9th Cir. 1999).

25. The Supreme Court has limited the parameters of § 514(a) preemption to two categories of state laws. *Gobeille*, 136 S.Ct. at 943. Those categories are: (1) laws "with a reference to ERISA plans," which include laws which "act[ ] immediately and exclusively upon ERISA plans . . .or where the existence of ERISA plans is essential to the law's operation," and (2) laws with "an impermissible connection with ERISA plans, meaning a state law that governs a central matter of plan administration or interferes with nationally uniform plan administration." *Id.*

26. The Ninth Circuit has made it clear that § 514(a) does not apply to claims brought by third-party healthcare providers, like the Health Care Providers here. *Morris B. Silver M.D., Inc. v. Int'l Longshore & Warehouse etc.*, 2 Cal. App. 5th 793, 799, 206 Cal. Rptr. 3d 461, 466

McDONALD CARANO

2300 WEST SAHARA AVENUE, SUITE 1200 • LAS VEGAS, NEVADA 89102
PHONE 702.873.4100 • FAX 702.873.9966

(Ct. App. 2016); *Providence Health Plan*, 385 F.3d at 1172; *Abraham v. Norcal Waste Sys., Inc.*, 265 F.3d 811, 820–21 (9th Cir.2001); *Blue Cross of Cal.*, 187 F.3d at 1052–53; *see also The Meadows v. Employers Health Ins.*, 47 F.3d 1006, 1008 (9th Cir. 1995) (stating that § 1144(a) does not preempt "claims by a third-party who sues an ERISA plan not as an assignee of a purported ERISA beneficiary, but as an independent entity claiming damages").

27.    Other jurisdictions have also made it clear that § 514(a) claims by third-party providers arising out of analogous circumstances to those asserted by Health Care Providers here, are not preempted. *See, e.g., Memorial Hosp. System v. Northbrook Life Ins. Co.*, 904 F.2d 236, 243–246 (5th Cir. 1990) (holding hospital's claim for deceptive and unfair practices arising from representations regarding coverage not preempted and articulating two-factor test); *see also Access Mediquip LLC v. UnitedHealthcare Ins. Co.*, 662 F.3d 376, 385 (5th Cir. 2011) ("The state law underlying Access's misrepresentation claims does not purport to regulate what benefits United provides to the beneficiaries of its ERISA plans, but rather what representations it makes to third parties about the extent to which it will pay for their services."); *Depot, Inc. v. Caring for Montanans, Inc.*, 915 F.3d 643, 667 (9th Cir. 2019), *cert. denied*, 140 S. Ct. 223 (2019) ("State-law claims are based on other independent legal duties when they are in no way based on an obligation under an ERISA plan and would exist whether or not an ERISA plan existed.") (citing *Marin Gen. Hosp.*, 581 F.3d at 950) (internal alteration omitted).

28.    The Court agrees with the foregoing legal authority that the relationship between the parties – i.e. provider/insurer –is not a relationship that is intended to be governed by Section 514(a). As a result, the Court concludes that none of the Health Care Providers' claims set forth in the FAC are subject to conflict preemption.

29.    The Court further finds that the Health Care Providers' state-law claims do not fall within either of the *Gobeille* categories because the Health Care Providers allege that they have an implied-in-fact contract with United, which obligates United, under Nevada law, to pay the Health Care Providers reasonable compensation (FAC ¶¶ 189-206), and that, alternatively, Nevada law of unjust enrichment obligates United to pay the Health Care Providers the reasonable value for their services. *Id.* ¶¶ 216-226.

McDONALD CARANO

2300 WEST SAHARA AVENUE, SUITE 1200 • LAS VEGAS, NEVADA 89102
PHONE 702.873.4100 • FAX 702.873.9966

30.     Under controlling Supreme Court precedent, ERISA preempts only those state laws "with a reference to" or "impermissible connection with" ERISA plans. The Health Care Providers' common law and statutory claims fall into neither category.

31.     The Health Care Providers' state law claims are not subject to conflict preemption because they neither seek recovery under an ERISA plan, require examination of an ERISA plan, nor implicate any discernible goal of ERISA. Because the Health Care Providers are pursuing the instant lawsuit in their own capacity and not as assignees, the Health Care Providers' claims are not preempted. The Court or jury will not need to reference any ERISA plan to resolve the question of at what rate Nevada law requires United to reimburse the Health Care Providers for the services in question.

32.     Therefore, the Court concludes that the Health Care Providers have not pled claims for ERISA benefits. *See Blue Cross of California Inc. v. Insys Therapeutics Inc.*, 390 F. Supp. 3d 996, 1004 (D. Ariz. 2019) (holding that state-law claims for common law fraud, misrepresentation, negligent misrepresentation, unjust enrichment, civil conspiracy, tortious interference with contract, and statutory claims for unfair and deceptive competition and practices were not subject to conflict preemption); *Spinedex v. Physical Therapy, U.S.A., Inc. v. Arizona*, No. 04-CV-1576-PHX-JAT, 2005 WL 3821387, at *8 (D. Ariz. Nov. 9, 2005); *Almont Ambulatory Surgery Center, LLC v. UnitedHealth Grp., Inc.*, 121 F. Supp. 3d 950, 962-71 (C.D. Cal. 2015); *Scripps Health v. Schaller Anderson, LLC*, No. 12-CV-252-AJB(DHB), 2012 WL 2390760, at *2-*6 (S.D. Cal. Jun. 22, 2012); *Ass'n of N.J. Chiropractors v. Aetna, Inc.*, No. CIV.A. 09-3761 JAP, 2012 WL 1638166, at *5-7 (D.N.J. May 8, 2012); *United Healthcare Servs., Inc. v. Sanctuary Surgical Ctr., Inc.*, 5 F. Supp. 3d 1350, 1363 (S.D. Fla. 2014)); *Aetna Life Ins. Co. v. Huntingdon Valley Surgery Ctr.*, 2015 WL 1954287, at *10 (E.D. Pa. Apr. 30, 2015) (holding that the out-of-network provider claims for unjust enrichment and breach of contract were not preempted by ERISA because the plaintiff's state law claims were independent of the ERISA beneficiaries' rights under any ERISA plan); *Jewish Lifeline Network, Inc. v. Oxford Health Plans (NJ), Inc.*, 2015 WL 2371635, at *3 (D.N.J. May 18, 2015) (ERISA

McDONALD ⧫ CARANO
2300 WEST SAHARA AVENUE, SUITE 1200 • LAS VEGAS, NEVADA 89102
PHONE 702.873.4100 • FAX 702.873.9966

**APP. 146**

preemption "does not foreclose a plaintiff from pleading a state law claim based on a legal duty that is independent from ERISA or an ERISA-governed plan").

33.     The United States Supreme Court and more recent Ninth Circuit cases have declined to adopt a literal interpretation of the "relates to" language. In *New York State Conference of Blue Cross & Blue Shield Plans*, 514 U.S. at 654, 115 S. Ct. at 1671, the court clarified that the "starting presumption" is that Congress does not intend to supplant state law. *See also Bertoni v. Stock Bldg. Supply*, 989 So. 2d 670, 674–75 (Fla. Dist. Ct. App. 2008). It went on to describe the "relates to" language of the preemption statute as "unhelpful," and instructed that one is instead to look "to the objectives of the ERISA statute as a guide to the scope of the state law that Congress understood would survive." *Id.* at 656, 115 S.Ct. 1671. The *Travelers* court noted that in light of the objectives of ERISA and its preemption clause, Congress intended to preempt "state laws providing alternative enforcement mechanisms" for employees to obtain ERISA plan benefits. *Id.* at 658, 115 S.Ct. 1671; *see also Egelhoff v. Egelhoff ex rel. Breiner*, 121 S. Ct. 1322, 1327 (2001) ("But at the same time, we have recognized that the term "relate to" cannot be taken "to extend to the furthest stretch of its indeterminacy," or else "for all practical purposes pre-emption would never run its course).

34.     In the face of this controlling law, United relies on outdated and a now-rejected overbroad interpretations of Section 514(a). *See Evans v. Safeco Life Ins. Co.*, 916 F.2d 1437, 1439 (9th Cir. 1990). United argues that the "relates to" language in the preemption provision of Section 514 (a) is one of the "broadest preemption clauses ever enacted by Congress." However, the Court does not find merit in United's argument and therefore rejects the argument.

35.     The Court also finds that United relies on legal authority that is inapplicable to a conflict preemption analysis because it addresses complete preemption under Section 502(a) of ERISA. The cases cited by United involved claims expressly seeking ERISA benefits and/or brought directly by plan members rather than third-party medical providers. *See e.g. Aetna Life Ins. Co. v. Bayona*, 223 F.3d 1030, 1034 (9th Cir. 2000), as amended on denial of reh'g and reh'g en banc (Nov. 3, 2000) (employee plan member's counterclaims directly against plan administrator conflict preempted); *Blau v. Del Monte Corp.*, 748 F.2d 1348 (9th Cir. 1984)

McDONALD CARANO

2300 WEST SAHARA AVENUE, SUITE 1200 • LAS VEGAS, NEVADA 89102
PHONE 702.873.4100 • FAX 702.873.9966

(nonunion salaried employees brought suit against employer for benefits under employee welfare plan); *Parlanti v. MGM Mirage*, No. 2:05-CV-1259-ECR-RJJ, 2006 WL 8442532, at *1 (D. Nev. Feb. 15, 2006) (plaintiff directly sued former employer over supplemental executive retirement plan).

36.   The Court does not find merit in United's argument that the Health Care Providers' claims expressly depend on the existence of the employee welfare benefit plans and the administration of claims for benefits submitted under those plans. This argument has been rejected by other courts and the Court agrees with the Health Care Providers that this is not the test for conflict preemption. *See In re Managed Care Litig.*, 2011 WL 1595153, at *5 (S.D. Fla. Mar. 31, 2011).

37.   The Court also considered and does not find merit to United's attempt to distinguish self-funded plans from other employee-sponsored plans. Self-funded ERISA plans are only shielded from state laws (insurance or otherwise) that "*relate to*" ERISA. *See FMC Corp. v. Holliday*, 498 U.S. 52, 61 (1990) ("[S]elf-funded ERISA plans are exempt from state regulation insofar as that regulation 'relate[s] to' the plans. State laws directed toward the [self-funded] plans are pre-empted because they relate to an employee benefit plan but are not 'saved' because they do not regulate insurance.") (emphasis added). The Court therefore rejects the argument raised by United.

38.   The Court has also considered United's argument that the NV RICO claim is subject to complete preemption under *Moorman v. UnumProvident Corp.*, CIV.A. 104CV2075BBM, 2007 WL 4984162, at *1 (N.D. Ga. Oct. 30, 2007), but the Court does not find merit to United's position for the reasons set forth in the Health Care Providers' Opposition to the Supplement and at the related hearings.

39.   Instead, the Court concludes that the FAC's allegations sufficiently detail improper conduct to manipulate and deflate reimbursement payment rates so that United can then point to that same manufactured data as justification for paying the Health Care Providers a fraction of what they are owed for the emergency medicine services provided. FAC ¶¶ 90-188, ¶¶ 261-273.

McDONALD CARANO

2300 WEST SAHARA AVENUE, SUITE 1200 • LAS VEGAS, NEVADA 89102
PHONE 702.873.4100 • FAX 702.873.9966

40.     To the extent any of United's other arguments specific to its Motion and Supplement regarding conflict preemption are not specifically addressed herein, the Court considered all of the defenses raised in the Motion and Supplement, as well as all arguments made during oral argument, and the Court does not find merit to any of them.

### *NRCP 12(b)(5) Legal Standard*

41.     Rule 8(a)(2) of the Nevada Rules of Civil Procedure states that a complaint shall contain "a short and plain statement of the claim showing that the pleader is entitled to relief." NRCP 8(a)(2). Thus, Nevada is a notice-pleading state and a pleading is liberally construed to "place into issue matter which is fairly noticed to the adverse party." *Chavez v. Robberson Steel Co.*, 94 Nev. 597, 598, 584 P.2d 159, 160 (Nev. 1978); *Hay v. Hay*, 100 Nev. 196, 198, 678 P.2d 672, 674 (1984). In other words, so long as the "adverse party has adequate notice of the nature of the claim and relief sought," trial courts should allow a pleading to survive any challenge asking for dismissal.  *Hay*, 100 Nev. at 198, 678 P.2d at 674; *see also Liston v. Las Vegas Metro. Police Dept.*, 111 Nev. 1575, 1579, 908 P.2d 720, 723 (1995).

42.     When examining whether a defendant received notice of the claims against it, Nevada courts have recognized that notice is "knowledge of facts which would naturally lead a…person to make inquiry of everything which such injury pursued in good faith would disclose." *Liston*, 111 Nev. at 1579, 908 P.2d at 723. Furthermore, a plaintiff is not required to give itemized descriptions of evidence but rather "need only broadly recite the 'ultimate facts' necessary to set forth the elements of a cognizable claim that a party believes can be proven at trial." *Nutton v. Sunset Station, Inc.*, 131 Nev. 279, 290, 357 P.3d 966, 974 (Nev. App. 2015).

43.     Accordingly, in considering the dismissal of a complaint pursuant to NRCP 12(b)(5), a court must "determine whether or not the challenged pleading sets forth allegations sufficient to make out the elements of a right to relief." *Bemis v. Estate of Bemis*, 114 Nev. 1021, 1021, 967 P.2d 437, 439 (1998) (citing *Edgar v. Wagner*, 101 Nev. 226, 227, 699 P.2d 110, 111 (1985)).

44.     A district court is required to accept all factual allegations as true and to draw all inferences in favor of the non-moving party; dismissal is only proper where there is a complete

McDONALD CARANO

2300 WEST SAHARA AVENUE, SUITE 1200 • LAS VEGAS, NEVADA 89102
PHONE 702.873.4100 • FAX 702.873.9966

1    lack of a cognizable legal theory. *See Buzz Stew, LLC v. City of North Las Vegas*, 124 Nev. 224,

2    228-229, 181 P.3d 670, 672 (2008); *Garcia v. Prudential Ins. Co. of Am.*, 129 Nev. 15, 19, 293

3    P.3d 869, 871-72 (2013).

4           45.    A complaint should only be dismissed "if it appears beyond a doubt that [the

5    plaintiff] could prove no set of facts, which, if true, would entitle [the plaintiff] to relief." *Buzz*

6    *Stew, LLC*, 124 Nev. at 228, 181 P.3d at 672.

7                        ***The Health Care Providers' Claims***

8    ***Breach of Implied-in-Fact Contract***

9           46.    A plaintiff states a claim for breach of contract, whether express or implied, by

10   alleging: (1) the existence of a valid contract, (2) a breach by the defendant, and (3) damage as

11   a result of the breach. *Saini v. Int'l Game Tech.*, 434 F. Supp. 2d 913, 919-20 (D. Nev. 2006)

12   (*citing Richardson v. Jones*, 1 Nev. 405, 405 (1865)); *Recrion Corp.*, 541 P.2d at 664

13   (recognizing the elements of breach of express and implied contract claims are the same).

14          47.    In an implied contract, such intent is inferred from the conduct of the parties and

15   other relevant facts and circumstances. *Warrington v. Empey*, 95 Nev. 136, 138–139 (1979).  The

16   terms of an implied contract can also be manifested by conduct or by other customs. *Recrion*

17   *Corp.*, 541 P.2d at 668; *Nevada Ass'n Servs., Inc. v. First Am. Title Ins. Co.*, No. 2:11-cv-02015-

18   KD-VCF, 2012 WL 3096706, at *3 (D. Nev. July 30, 2012) (denying motion to dismiss on

19   breach of contract claim because the plaintiff stated "a plausible claim that, through a course of

20   dealing involving hundreds of transactions over several years, Defendants and Plaintiff

21   manifested an intent to be bound and agreed to material terms of an implied contract.").

22          48.    In *Nevada Ass'n Servs., Inc.*, the district court also noted that a motion to dismiss

23   is not the proper place for such a factual evaluation of whether parties entered into an implied

24   contract because "it necessarily requires examination of the facts and circumstance." *Id*.

25          49.    The Health Care Providers allege an implied-in-fact agreement exists between the

26   Health Care Providers and Defendants, specifically alleging that "there is no written agreement

27   between Defendants and the Health Care Providers for the healthcare claims at issue in this

28

McDONALD CARANO

2300 WEST SAHARA AVENUE, SUITE 1200 • LAS VEGAS, NEVADA 89102
PHONE 702.873.4100 • FAX 702.873.9966

1   litigation; the Health Care Providers are therefore designated as a 'non-participating' or 'out-of-

2   network' provider for all of the claims at issue." FAC ¶ 20; *see also* FAC ¶¶ 189-206.

3         50.     Thus, the FAC adequately alleges a claim for breach of implied-in-fact contract.

4         51.     To the extent any of United's other arguments specific to its Motion regarding the

5   Health Care Providers' claim for breach of implied-in-fact contract are not specifically addressed

6   herein, the Court considered all of the defenses raised in the Motion, as well as all arguments made

7   during oral argument, and the Court does not find merit to any of them.

8   ***Tortious Breach of the Implied Covenant of Good Faith and Fair Dealing***

9         52.     In Nevada, a plaintiff need only allege three elements to assert a claim for tortious

10   breach of the implied covenant of good faith and fair dealing: (1) an enforceable contract (2) "a

11   special relationship between the tortfeasor and the tort victim…a relationship of trust and special

12   reliance" and (3) the conduct of the tortfeasor must go beyond the bounds of ordinary liability

13   for breach of contract. *Martin v. Sears, Roebuck and Co.*, 111 Nev. 923, 929, 899 P.2d 551, 555

14   (1995).

15         53.     The special relationship required in *Martin* is characterized by elements of public

16   interest, adhesion, and fiduciary responsibility." *Ins. Co. of the W. v. Gibson Tile Co.,* 122 Nev.

17   455, 461, 134 P.3d 698, 702 (2006).

18         54.     Moreover, a tortious breach of the covenant requires that "the party in the superior

19   or entrusted position has engaged in grievous and perfidious misconduct." *Great Am. Ins. Co. v.*

20   *Gen. Builders, Inc.,* 113 Nev. 346, 355, 934 P.2d 257, 263 (1997) (internal quotes and citations

21   omitted).

22         55.     The Health Care Providers have satisfied its pleading requirements under NRCP

23   8(a), and at this stage in litigation, the Health Care Providers have articulated a special

24   relationship exists between United and the Health Care Providers. FAC ¶¶ 207-215.

25         56.     The Court does not find merit to United's argument that *Aluevich v. Harrah's*, 99

26   Nev. 215, 218, 660 P.2d 986, 987 (1983) stands for the proposition that this claim for relief

27   cannot apply to sophisticated parties in the commercial realm.

28

McDONALD CARANO

2300 WEST SAHARA AVENUE, SUITE 1200 • LAS VEGAS, NEVADA 89102
PHONE 702.873.4100 • FAX 702.873.9966

57.     To the extent United contends that a higher pleading standard is required for a claim of tortious breach of implied covenant of good faith and fair dealing, the Court does not find merit to that argument.

58.     To the extent any of United's other arguments specific to its Motion regarding the Health Care Providers' claim for tortious breach of the implied covenant of good faith and fair dealing are not specifically addressed herein, the Court considered all of the defenses raised in the Motion, as well as all arguments made during oral argument, and the Court does not find merit to any of them.

### *Alternative Claim for Unjust Enrichment*

59.     Nevada law permits recovery for unjust enrichment where a plaintiff provides an indirect benefit to the defendant that defendant accepts without adequate compensation, as United has done here. *Topaz Mut. Co. v. Marsh*, 108 Nev. 845, 856, 839 P.2d 606, 613 (1992) (recognizing that benefit in unjust enrichment claim can be indirect).

60.     The overwhelming majority of cases considering this issue conclude that where a state allows for an indirect benefit to provide the basis for an unjust enrichment claim, a claim of unjust enrichment against an insurer is actionable. *See Emergency Physicians LLC v. Arkansas Health & Wellness Health Plan, Inc*., No. 4:17-CV-00492-KGB, 2018 WL 3039517, at *5 (E.D. Ark. Jan. 31, 2018) (finding that because Texas law allows for an indirect benefit to sustain a claim for unjust enrichment, a claim for unjust enrichment based on indirect benefits received by insurer for services provided to insureds was actionable); *Bell v. Blue Cross of California*, 131 Cal. App. 4th 211, 221, 31 Cal. Rptr. 3d 688, 695–96 (2005) (emergency provider had standing to assert quantum meruit claim against payor because "he who has 'performed the duty of another by supplying a third person with necessaries…is entitled to restitution…"); *El Paso Healthcare System, Ltd. v. Molina Healthcare of New Mexico*, 683 F.Supp.2d 454, 461–462 (W.D. Tex. 2010) (insurer "receive[d] the benefit of having its obligations to its plan members, and to the state in the interests of plan members, discharged."); *Appalachian Reg'l Healthcare vs. Coventry Health & Life Ins*. Co., 2013 WL 1314154 at *4 (E.D. Ky. Mar. 28, 2013) (granting summary judgment to provider on unjust enrichment claim where plaintiff's services allowed

**APP. 152**

2300 WEST SAHARA AVENUE, SUITE 1200 • LAS VEGAS, NEVADA 89102
PHONE 702.873.4100 • FAX 702.873.9966
McDONALD CARANO

managed care organization to discharge its duty to provide coverage to Medicaid patients); *Fisher v. Blue Cross Blue Shield of Texas, Inc*., 2011 WL 11703781, at \*8 (N.D. Tex. June 27, 2011) (defendant insurer received the benefit of having its obligations to its plan members discharged.); *Forest Ambulatory Surgical Associates, L.P. v. United Healthcare Ins. Co*., 2013 WL 11323600, at \*10 (C.D. Cal. March 12, 2013) ("Plaintiff sufficiently stated a claim upon which relief can be granted because the allegations ... establish that Defendants received the benefit of having their obligations to the [policyholders] discharged."); *River Park Hosp., Inc. v. BlueCross BlueShield of Tennessee, Inc.*, 173 S.W.3d 43, 58-59 (Tenn. Ct. App. 2002) (MCO was unjustly enriched by hospital's emergency services provided to the insurer's enrollees); *New York City Health & Hosps. Corp. v. Wellcare of New York*, Inc., 35 Misc. 3d 250, 251, 937 N.Y.S.2d 540, 541, 546 (2011) (non-contracted hospital's unjust enrichment claim for systematic underpayment for emergency services by MCO should not be dismissed under New York law).

61.    Nevada law permits an unjust enrichment claim to lie on assertions of United's receipt of a material, indirect benefit from the Health Care Providers' services. Thus, the Court concludes that the Health Care Providers sufficiently allege an alternative claim for unjust enrichment by the contention that their provision of services to United's Members allows United to discharge its duties under its contracts with its Members to cover medically necessary emergency healthcare services, thereby creating an indirect benefit to United, giving rise to an actionable claim for unjust enrichment under Nevada law. FAC ¶¶ 216-226.

62.    To the extent any of United's other arguments specific to its Motion regarding the Health Care Providers' alternative claim for unjust enrichment are not specifically addressed herein, the Court considered all of the defenses raised in the Motion, as well as all arguments made during oral argument, and the Court does not find merit to any of them.

### *Violation of NRS 686A.020 and 686A3.10*

63.    Under NRS 686A.020, "[a] person shall not engage in this state in any practice which is defined in NRS 686A.010 to 686A.310, inclusive, as, or determined pursuant to NRS

McDONALD CARANO

2300 WEST SAHARA AVENUE, SUITE 1200 • LAS VEGAS, NEVADA 89102
PHONE 702.873.4100 • FAX 702.873.9966

686A.170 to be, an unfair method of competition or an unfair or deceptive act or practice in the business of insurance."

64.     One prohibited unfair claim settlement practice is "[f]ailing to effectuate prompt, fair and equitable settlements of claims in which liability of the insurer has become reasonably clear." NRS 686A.310(1)(e).

65.     The plain language of NRS 686A.310 does not prohibit a third party, such as the Health Care Providers, from raising claims under NRS 686A.310, but, instead, provides that claims may be asserted by the Commissioner and an insured. NRS 686A.310(2) ("In addition to any rights or remedies available to the Commissioner, an insurer is liable to its insured for any damages sustained by the insured as a result of the commission of any act set forth in subsection 1 as an unfair practice.").

66.     As the Health Care Providers allege in Paragraphs 64, 66, 230 of the FAC, United has failed to comply with NRS 686A.310(1)(e) by failing to pay the Health Care Providers' medical professionals the usual and customary rate for emergency care provided to United's members.

67.     The Health Care Providers also sufficiently allege that United has acted in bad faith regarding its obligation to pay the usual and customary fee (*see, e.g.,* FAC ¶¶ 57, 69, 233); therefore, pursuant to NRS 42.005, the Health Care Providers are entitled to maintain their claim to recover punitive damages against United associated with this claim.

68.     The Court does not find merit to United's argument that *Gunny v. Allstate Ins. Co.*, 108 Nev. 344, 346, 830 P.2d 1335, 1336 (1992) stands for the proposition that Nevada's Unfair Insurance Practices Act "does not create a private right of action against insurers in favor of third party claimants like Fremont." Motion at 23:16-17. Nor is *Gunny* analogous because the Health Care Providers allege the existence of an implied-in-fact contract with United and, consequently, a claim asserted by a medical services provider under NRS 686A.020 and 686A.310 is actionable. The absence of a contract between Gunny and the insurer makes this case distinguishable.

…

APP. 154

69.     To the extent any of United's other arguments specific to its Motion regarding the Health Care Providers' claim for Violation of NRS 686A.020 and 686A3.10 are not specifically addressed herein, the Court considered all of the defenses raised in the Motion, as well as all arguments made during oral argument, and the Court does not find merit to any of them.

### *Violations of Nevada Prompt Pay Statutes and Regulations*

70.     The Nevada Insurance Code requires an HMO, MCO or other health insurer to pay a healthcare provider's claim within 30 days of receipt of a claim. NRS 683A.0879 (third party administrator), NRS 689A.410 (Individual Health Insurance), NRS 689B.255 (Group and Blanket Health Insurance), NRS 689C.485 (Health Insurance for Small Employers), NRS 695C.185 (HMO), NAC 686A.675 (all insurers) (collectively, the "NV Prompt Pay Laws"). Thus, for all submitted claims, United was obligated to pay the Health Care Providers the usual and customary rate within 30 days of receipt of the claim.

71.     The Court concludes that the Health Care Providers adequately allege in the FAC that United has failed to reimburse the Health Care Providers at the usual and customary rate within 30 days of the submission of the claim. FAC ¶ 237. The Health Care Providers further allege that United has failed to reimburse the Health Care Providers at the usual and customary rate at all. *Id.*

72.     Additionally, the Health Care Providers adequately state a claim for violation of NV Prompt Pay Laws by alleging that United has only paid part of the subject claims that have been approved and are fully payable. *Id.* ¶ 238.

73.     As a result, the FAC adequately alleges that United has failed to reimburse the Health Care Providers at the usual and customary rate within 30 days of submission of the claims as the Nevada Insurance Code requires. If established, United is liable to the Health Care Providers for statutory penalties.

74.     Moreover, United did not challenge the Health Care Providers' claim for violation of NV Prompt Pay Laws under NRCP 12(b)(5).

75.     To the extent any of United's other arguments specific to its Motion regarding the Health Care Providers' claim for Violations of Nevada Prompt Pay statutes and regulations are

McDONALD CARANO

2300 WEST SAHARA AVENUE, SUITE 1200 • LAS VEGAS, NEVADA 89102
PHONE 702.873.4100 • FAX 702.873.9966

**APP. 155**

not specifically addressed herein, the Court considered all of the defenses raised in the Motion, as well as all arguments made during oral argument, and the Court does not find merit to any of them.

***Violations of Nevada Consumer Fraud & Deceptive Trade Practices Acts***

76.     The Nevada Deceptive Trade Practices Act (DTPA) prohibits United from engaging in "deceptive trade practices," including but not limited to (1) knowingly making a false representation in a transaction; (2) violating "a state or federal statute or regulation relating to the sale or lease of goods or services"; (3) using "coercion, duress or intimidation in a transaction"; and (4) knowingly misrepresent the "legal rights, obligations or remedies of a party to a transaction." NRS 598.0915(15), 598.0923(3), 598.0923(4), NRS 598.092(8), respectively.

77.     The Nevada Consumer Fraud Statute provides that a legal action "may be brought by any person who is a victim of consumer fraud." NRS 41.600(1). "Consumer fraud" includes a deceptive trade practice as defined by the DTPA.

78.     The Health Care Providers sufficiently allege that United has violated the DTPA and the Consumer Fraud Statute through its acts, practices, and omissions described in the FAC, including but not limited to (a) wrongfully refusing to pay the Health Care Providers for the medically necessary, covered emergency services the Health Care Providers provided to Members in order to gain unfair leverage against the Health Care Providers now that they are out-of-network and in contract negotiations to potentially become a participating provider under a new contract in an effort to force the Health Care Providers to accept lower amounts than it is entitled for its services; and (b) engaging in systematic efforts to delay adjudication and payment of the Health Care Providers' claims for its services provided to United's members in violation of their legal obligations. FAC ¶ 246.

79.     The Nevada Supreme Court has held that violations of DTPA do not need to be proven with the same level of particularity as fraud claims. *Betsinger v. D.R. Horton, Inc*., 232 P.3d 433, 436 (2010) (holding that a violation of the DTPA need not be proven under the clear and convincing standard as is required for a fraud claim).

80.     Even if this Court were to require that this claim be subject to heightened pleading standards, the Court concludes that the Health Care Providers pled the claim for violation of

McDONALD CARANO

2300 WEST SAHARA AVENUE, SUITE 1200 • LAS VEGAS, NEVADA 89102
PHONE 702.873.4100 • FAX 702.873.9966

1  DTPA with particularity. FAC ¶ 246; *see also* ¶¶ 25, 57, 65.

2    81.    The Health Care Providers sufficiently allege that United violated "a state or

3  federal statute or regulation relating to the sale or lease of goods or services" with allegations

4  that United has violated NRS 679B.152, NRS 686A.020, 686A.310, NRS 683A.0879 (third party

5  administrator), NRS 689A.410 (Individual Health Insurance), NRS 689B.255 (Group and

6  Blanket Health Insurance), NRS 689C.485 (Health Insurance for Small Employers), NRS

7  695C.185 (HMO) and NAC 686A.675 by failing to timely pay claims submitted at a usual and

8  customary rate within 30 days of receipt of the claim.  FAC ¶¶ 243-249. The Health Care

9  Providers expressly state that the UH Parties began to violate these provisions in July 2017 (FAC

10  ¶ 254) and the Sierra Affiliates in March 2019 (*id.* ¶ 255) and continue to violate such provisions

11  through the present date. Nothing further is required to establish that this claim is actionable. As

12  such, the Health Care Providers sufficiently allege this portion of the DTPA claim.

13    82.    The Health Care Providers also sufficiently allege that the DPTA has been

14  violated by United's use of "coercion, duress or intimidation in a transaction." FAC ¶ 244.

15  Specifically, the Health Care Providers allege that United is "wrongfully refusing to pay the

16  Health Care Providers for the medically necessary, covered emergency services the Health Care

17  Providers provided to Members in order to gain unfair leverage against the Health Care Providers

18  now that they are out-of-network and in contract negotiations to potentially become a

19  participating provider under a new contract in an effort to force the Health Care Providers to

20  accept lower amounts than it is entitled for its services." FAC ¶ 246.

21    83.    Further, the Health Care Providers allege:

22    Defendants paid some claims at an appropriate rate and others at a
    significantly reduced rate which is demonstrative of an arbitrary and
23    selective program and motive or intent to unjustifiably reduce the
    overall amount Defendants pay to the Health Care Providers.
24    Defendants implemented this program to coerce, influence and
    leverage business discussions with the Health Care Providers to
25    become a participating provider at significantly reduced rates, as
    well as to unfairly and illegally profit from a manipulation of
26    payment rates.

27  FAC ¶ 65.

28  …

2300 WEST SAHARA AVENUE, SUITE 1200 • LAS VEGAS, NEVADA 89102
PHONE 702.873.4100 • FAX 702.873.9966

McDONALD CARANO

84.     Based on the foregoing, the Health Care Providers sufficiently allege who engaged in these bad acts (the United entities) when such parties engaged in these acts (from 2017 to present, FAC ¶ 90) and the scope of the bad acts alleged (improperly lowering amounts paid to leverage negotiations) (FAC ¶ 65).

85.     The Health Care Providers also sufficiently allege that United has knowingly misrepresented the "legal rights, obligations or remedies of a party to a transaction." FAC ¶ 244. Specifically, the Health Care Providers assert that by paying claims at artificially reduced rates, United is representing that these claims are being paid at usual and customary and reasonable rates when such a representation is inaccurate. With respect to the UH Parties, this conduct commenced in July 2017 (FAC ¶ 254); and with respect to the Sierra Affiliates this conduct commenced in September 2019 (*id.* ¶ 255) and continues to present date and each Defendant has engaged in these bad acts. Thus, the Health Care Providers sufficiently allege this aspect of its claim for violation of DTPA.

86.     As is detailed in the FAC, the Court finds that if claims based on violation of DTPA require a heightened pleading standard, the Health Care Providers have satisfied such a standard.

87.     The Court considered United's argument that it is improper to lump all the defendant parties together in the Health Care Providers' allegations, but the Court rejects the argument. The Health Care Providers allege that United has improperly engaged in artificially reducing the rates paid to the Health Care Providers for an ulterior purpose. Thus, it is permissible for the Health Care Providers to make an allegation which encompasses all of these parties. To force the Health Care Providers to reallege this same claim using each of the Defendants' names would be inefficient and unnecessary under these circumstances.

88.     To the extent any of United's other arguments specific to its Motion regarding the Health Care Providers' claim for are not specifically addressed herein, the Court considered all of the defenses raised in the Motion, as well as all arguments made during oral argument, and the Court does not find merit to any of them.

…

McDONALD ⟨⟩ CARANO

2300 WEST SAHARA AVENUE, SUITE 1200 • LAS VEGAS, NEVADA 89102
PHONE 702.873.4100 • FAX 702.873.9966

APP. 158

89.     United argues that the Health Care Providers are not "victims" under NRS 41.600; however, the Court does not find merit to the argument based on Nevada law.

90.     NRS 41.600(1) provides that "[a]n action may be brought by any person who is a victim of consumer fraud." The statute does not define the scope of "victim," but upon review of the deceptive trade practice statutes as a whole, the legislature did not intend to limit the scope of this term.

91.     The term "victim of consumer fraud" is broad and includes "any person" who is a victim of consumer fraud, including business competitors, consumers and even businesses which do not have competing interests. *Del Webb Community, Inc. v. Partington*, 652 F.3d 1145, 1153 (9th Cir. 2011).

92.     Even under the narrow definition of "victim" adopted by *Igbinovia v. State*, 111 Nev. 699, 706, 895 P.2d 1304, 1308 (1995), limiting the term to passive victims who suffered a loss that was "unexpected and occurs without voluntary participation of the person suffering the harm or loss," the Health Care Providers qualify as victims.

93.     The Health Care Providers allege they do not voluntarily provide services to out of network patients. Rather, state law mandates that the Health Care Providers provide emergency medical services to any person presenting to an emergency room in need of emergency medical services.  NRS  439B.410(1) ("each hospital … has an obligation to provide emergency services and care, including care provided by physicians…regardless of the financial status of the patient.").

94.     The Health Care Providers allege that the provision of services to United's Members was not voluntary and the loss the Health Care Providers have suffered was unexpected given that United is refusing to pay usual and customary rates and the reasonable value of the services provided despite previously doing so. Thus, the Court concludes that, accepting all allegations of the Health Care Providers as true, the Health Care Providers are not active participants in United's fraudulent conduct and are "victims" under NRS 41.600(1) even if the definition of "victim" is limited in the way United proposes.

…

McDONALD CARANO

2300 WEST SAHARA AVENUE, SUITE 1200 • LAS VEGAS, NEVADA 89102
PHONE 702.873.4100 • FAX 702.873.9966

95.     The Court also does not find United's argument that the term "victim of consumer fraud" is to be construed narrowly such that the Health Care Providers would be excluded from the definition under NRS 41.600.

96.     To the extent any of United's other arguments specific to its Motion regarding the Health Care Providers' claim for Violations of Nevada Consumer Fraud & Deceptive Trade Practices Acts are not specifically addressed herein, the Court considered all of the defenses raised in the Motion, as well as all arguments made during oral argument, and the Court does not find merit to any of them.

### *Declaratory judgment*

97.     United did not challenge the Health Care Provider's declaratory relief claim under a NRCP 12(b)(5) standard. As a result, this claim is not subject to dismissal for failure to state a claim for relief.

### *Violation of NRS 207.350 et seq. (NV RICO)*

98.     Under Nevada law, any person who is injured in his business or property by reason of any violation of NRS 207.400 has a cause of action against a person causing such injury for three times the actual damages sustained. NRS 207.470(1).

99.     Pursuant to NRS 207.470 and NRS 207.400, to state a civil RICO cause of action requires a plaintiff to allege that defendants have:

> engag[ed] in at least two crimes related to racketeering that have the same or similar pattern, intents, results, accomplices, victims or methods of commission, or are otherwise interrelated by distinguishing characteristics and are not isolated incidents, if at least one of the incidents occurred after July 1, 1983, and the last of the incidents occurred within 5 years after a prior commission of a crime related to racketeering.

NRS 207.390. "Crimes related to racketeering" are enumerated in NRS 207.360 and include the crime of obtaining money or property valued at $650 or more, violation of 205.377 and involuntary servitude, the crimes that the Health Care Providers allege.  NRS 207.360(28), (35), (36).

100.    In order to recover, three conditions must be met: (1) the plaintiff's injury must

McDONALD � CARANO

2300 WEST SAHARA AVENUE, SUITE 1200 • LAS VEGAS, NEVADA 89102
PHONE 702.873.4100 • FAX 702.873.9966

1  flow from the defendant's violation of a predicate Nevada RICO act; (2) the injury must be

2  proximately caused by the defendant's violation of the predicate act; and (3) the plaintiff must

3  not have participated in the commission of the predicate act. *Allum v. Valley Bank of Nevada*,

4  109 Nev. 280, 283, 849 P.2d 297, 299 (1993).

5       101.    "A state RICO complaint need allege no more than that which is set forth in the

6  Nevada statute." *Siragusa v. Brown*, 114 Nev. 1384, 1399, 971 P.2d 801, 811 (1998).

7       102.    While Nevada's civil RICO statutes are patterned after the federal RICO statutes,

8  Nevada's statute differs in some respects. *Hale v. Burkhardt,* 104 Nev. 632, 634-635, 764 P.2d

9  866, 867-868 (1988).

10       103.    The Court concludes that the FAC satisfies each of these elements and United's

11  challenges must be rejected for the following reasons.

12       104.    To have standing to bring a civil RICO claim, a plaintiff must allege injury that

13  flowed from the violation of a predicate RICO act.  *Allum*, 109 Nev. at 284, 849 P.2d at 300

14  (citing *Holmes v. Securities Investor Protection Corp.*, 503 U.S. 258, 266-268 (1992)); *Brown v.*

15  *Kinross Gold, U.S.A.*, 378 F. Supp. 2d 1280, 1287 (D. Nev. 2005).

16       105.    A plaintiff satisfies this requirement by alleging "some direct relation between the

17  injury asserted and the injurious conduct alleged." *Holmes*, 503 U.S. at 266-268; *Canyon County*

18  *v. Syngenta Seeds, Inc.*, 519 F.3d 969, 980 (9th Cir. 2008) (a court evaluates proximate causation

19  under federal civil RICO by asking "whether the alleged violation led directly to the plaintiff's

20  injuries."); *Allum*, 109 Nev. at 286, 849 P.2d at 301.

21       106.    Proximate cause is a factual issue not appropriate for resolution on a Rule 12(b)(5)

22  motion. *Yamaha Motor Co., U.S.A. v. Arnoult*, 114 Nev. 233, 238, 955 P.2d 661, 664-665 (1998).

23       107.    The requirement of proximate cause seeks to "limit a person's responsibility for

24  the consequences of that person's own acts." *Painters & Allied Trades Dist. Council 82 Health*

25  *Care Fund v. Takeda Pharmaceuticals Co. Ltd.*, 943 F.3d 1243, 1248 (9th Cir. 2019) (allegations

26  sufficient to satisfy RICO's proximate cause requirement where the plaintiff alleged a third party

27  had relied on the defendants' false statements).

28       108.    The proximate causation analysis is concerned with: (1) whether plaintiff would

McDONALD CARANO
2300 WEST SAHARA AVENUE, SUITE 1200 • LAS VEGAS, NEVADA 89102
PHONE 702.873.4100 • FAX 702.873.9966

have difficulty showing its damages flowed from defendant conduct; (2) whether there is a risk of double recovery; and (3) whether others are positioned to make the same claims. *Holmes* at 503 U.S. at 269. These factors emphasize that proximate cause is "a flexible concept that does not lend itself to a black-letter rule that will dictate the result in every case." *Takeda Pharmaceuticals Co. Ltd.*, 2019 WL 6484263, at *5.

109. Similarly, the Ninth Circuit has developed three non-exhaustive factors to determine whether the proximate causation requirement has been met: (1) whether there are more direct victims of the alleged wrongful conduct who can be counted on to vindicate the law as private attorneys general; (2) whether it will be difficult to ascertain the amount of the plaintiffs damages attributable to defendant's wrongful conduct; and (3) whether the courts will have to adopt complicated rules apportioning damages to obviate the risk of multiple recoveries. *Brown v. Bettinger*, No. 2:15-cv-00331-APG, 2015 WL 4162505, at *4 (D. Nev. July 8, 2015) (citing *Mendoza v. Zirkle Fruit Co.*, 301 F.3d 1163, 1168–69 (9th Cir. 2002). Here, as they allege, the Health Care Providers are directly impacted by the scheme, they can ascertain their damages attributable to the scheme and there are no complicated rules to apportion damages to avoid multiple recoveries because the Health Care Providers only seek to recover their damages.

110. The Court concludes that the three *Holmes* (and reiterated in *Mendoza v. Amalgamated Transit Union Int'l*, No. 2:18-cv-959-JCM-NJK, 2019 WL 4221078, at *6 (D. Nev. Sept. 5, 2019)) factors are met.

111. Accepting all of the allegations in the FAC as true, the Health Care Providers are directly being defrauded by the Enterprises' scheme (*see, e.g.,* FAC ¶¶ 148, 187-188) and no one else is better suited to bring this action. FAC ¶¶ 102, 107-109, 113-115, 148.

112. The Court concludes that the foregoing allegations squarely link the scheme to manipulate and reduce rate payment data to an actual reduction in payment for emergency services to the Health Care Providers.

113. Further, the Court does not find merit to United's argument that there is a risk of double recovery because the Health Care Providers only seek recovery for emergency services they rendered and no one else is positioned to make the same Nevada civil RICO claims regarding

McDONALD ⬥ CARANO

2300 WEST SAHARA AVENUE, SUITE 1200 • LAS VEGAS, NEVADA 89102
PHONE 702.873.4100 • FAX 702.873.9966

1    the emergency services at issue in this case. *Holmes*, 503 U.S. at 266-268.

2         114.    The Court also considered, and rejects, United's argument that (1) the civil

3    racketeering allegations fail because the alleged underpayment has no causal connection to

4    alleged misrepresentations as the Health Care Providers are required to provide emergency care

5    under federal and state law; and (2) United previewed its scheme, resulting in a break in the

6    causal connection. Supplement at 5:14-6:3. Both of arguments misunderstand the proximate

7    cause inquiry.

8         115.    Instead, the Court concludes that the FAC sufficiently alleges proximate cause

9    because the facts the Health Care Providers allege – that there was a change in United's

10   reimbursement rates and the Health Care Providers' relied on the prior reimbursement – support

11   a finding of proximate cause.

12        116.    The Court concludes that the Health Care Providers sufficiently allege that they

13   are the direct victims of the predicate acts of obtaining money by false pretenses, multiple

14   transactions involving fraud or deceit and involuntary servitude.

15        117.    The Court does not find merit in United's argument that the Health Care Providers

16   failed to plead the civil RICO claim with the requisite particularity under NRCP 9(b). Supplement

17   at 6:18-25; *see* FAC ¶¶ 100-188, 261-273.

18        118.    The Court has also considered and rejected United's argument that the civil

19   racketeering claims should be dismissed because the Health Care Providers "lumped" the United

20   Defendants together (Supplement at 9:18-23). The Court concludes that the cases on which

21   United relies involve allegations that are not analogous. In *Doane v. First Franklin Financial*,

22   No. 2:11-CV-02130-MCE, 2012 WL 2129369, at *6 (E.D. Cal. June 12, 2012), the pleadings

23   referred to multiple, unrelated defendants and where the complaints at issue were otherwise

24   wholly deficient, "conclusory, convoluted, vague and generally fail to satisfy the pleading

25   standards under Rule 8(a) or 9(b)."

26        119.    The Court finds that the FAC contains substantial allegations that detail the

27   alleged scheme and United's involvement.

28   …

120. Section 205.377 provides, in part:

A person shall not, in the course of an enterprise or occupation, knowingly and with the intent to defraud, engage in an act, practice or course of business or employ a device, scheme or artifice which operates or would operate as a fraud or deceit upon a person by means of a false representation or omission of a material fact that: (a) The person knows to be false or omitted; (b) The person intends another to rely on; and (c) Results in a loss to any person who relied on the false representation or omission…

121. "False pretense is a representation of some fact or circumstance which is not true and is calculated to mislead, and may consist of any words or actions intended to deceive." *Hale*, 104 Nev. at 636–37, 764 P.2d at 869; NRS 205.380. Specifically, the Health Care Providers have provided ample allegations to support a claim for violation of NRS 205.377 and for obtaining money by false pretenses in violation of NRS 207.360(28).

122. The Court finds that the Health Care Providers sufficiently allege the elements for two fraud-based predicate acts in violation of NRS 205.377 (multiple transactions involving fraud or deceit in course of enterprise or occupation) and for obtaining possession of money or property by false pretenses.

123. Specifically, in establishing the elements of NRS 205.377, the Court concludes that Health Care Providers have sufficiently pled that in at least two transactions (*see, e.g., id.* ¶ 115), the Enterprise intended to defraud, engage in an act, practice or course of business or employ a device, scheme or artifice which operates or would operate as a fraud or deceit upon a person by means of a false representation or omission of a material fact (*see, e.g., id.* ¶¶ 177-179, 182, 183); that the Enterprise knows to be false or omitted (*see, e.g.,* ¶¶ 99, 100, 102, 107, 109, 113, 271); upon which United intends the Health Care Providers to rely (*see e.g. id.* ¶¶ 111, 183-185); and which has resulted and continues to result in losses to the Health Care Providers who relied on the false representations or omissions (*see, e.g., id.* ¶¶ 187-188).

124. The FAC also sufficiently alleges "Defendants illegally conduct the affairs of the Enterprise, and/or control the Enterprise, that includes Data iSight though a pattern of unlawful activity." FAC ¶ 112.

125. With respect to the claim under NRS 207.360(28), the Health Care Providers

McDONALD ‖ CARANO

2300 WEST SAHARA AVENUE, SUITE 1200 • LAS VEGAS, NEVADA 89102
PHONE 702.873.4100 • FAX 702.873.9966

**APP. 164**

sufficiently allege that the Enterprise intended to defraud the Health Care Providers through written false representations (*see, e.g., id.* ¶¶ 126, 177-178), causing the Health Care Providers' reliance thereon (*see, e.g. id.* ¶¶ 111, 183-185). FAC ¶¶ 123-126; *see also* ¶¶ 149-188.

126.   Under NRS 207.360(36), involuntary servitude is defined as:

> 1.   A person who knowingly subjects, or attempts to subject, another person to forced labor or services by:
>
> ***
>
> (c)  Abusing or threatening to abuse the law or legal process;
>
> ***
>
> (f)  Causing or threatening to cause financial harm to any person,
>
> ↳ is guilty of holding a person in involuntary servitude.

NRS 200.463(1).

127.   The Court concludes that the FAC sufficiently pleads such a claim premised on subsections (c) and (f) of NRS 200.463(1) by alleging that United has developed and implemented a scheme that forces the Health Care Providers to perform services at arbitrarily deflated payment rates and has threatened to abuse the law or legal process by interfering with other contracts, disclaiming it has an obligation to pay a reasonable rate for emergency services and has caused and threatened to cause financial harm to the Health Care Providers. *See* FAC ¶¶ 21, 55, 69, 108-109, ¶¶ 90-188.

128.   The Court has considered and rejected the cases United relied upon and concludes that the cases are not analogous. Supplement at 11:17-26.

129.   An "enterprise" is defined in NRS 207.380:

> "Enterprise" includes:
> 1.   Any natural person, sole proprietorship, partnership, corporation, business trust or other legal entity; and
> 2.   Any union, association or other group of persons associated in fact although not a legal entity.
>
> ↳  The term includes illicit as well as licit enterprises and governmental as well as other entities.

130.   United contends that the Health Care Providers have failed to adequately plead the existence of an "enterprise" under NRS 205.377 (multiple transactions involving fraud or deceit in the course of enterprise). Supplement at 12:12.

McDONALD CARANO

2300 WEST SAHARA AVENUE, SUITE 1200 • LAS VEGAS, NEVADA 89102
PHONE 702.873.4100 • FAX 702.873.9966

131.     The Court concludes that the existence of an enterprise is not required in connection with violations of NRS 207.400(1)(d), (1)(f) or (1)(i). *See* NRS 207.470. Therefore, this argument can only be applicable to violations of NRS 207.400(1)(a)-(c) and 1(j).

132.     The Court concludes that, for all unlawful acts that require the existence of an enterprise, the Health Care Providers adequately allege the existence of an enterprise in paragraphs 121 and 122 of the FAC. *See also* FAC ¶¶ 112, 115, 124.

133.     Further the FAC provides sufficient factual allegations, namely that United and third-party entities, including Data iSight have joined together to falsely claim to provide transparent, objective and geographically-adjusted determinations of reimbursement rates; and they illegally conduct the affairs of the Enterprise, and/or control the Enterprise through a pattern of unlawful activity.  *Id.* ¶¶ 112, 115, 124.

134.     The Court has also considered and rejects United's argument that the alleged Enterprise's conduct should be overlooked because United purports to have "an ordinary commercial contractual relationship…through MultiPlan's Data iSight tool." Supplement at 13:19-21; *see, e.g., Gomez v. Guthy-Renker*, No. EDCV 14–01425 JGB (KKx), 2015 WL 4270042 (C.D. Cal. July 13, 2015). The Court concludes that the Health Care Providers allege "something more" than a routine contract.  FAC ¶ 115.

135.     As the Health Care Providers allege, United would not be able to operate its deceptive scheme absent Data iSight's purported functioning as a third-party supplier of transparent, market-based benchmark data. Assuming all allegations in the FAC as true, Data iSight is conduit through which United seeks to color its arbitrary, deficient payments with the false appearance of good faith objectivity. The Court concludes that these allegations sufficiently detail the existence of an "enterprise" under Nevada law.

…

…

…

…

…

1

*Case No.:  A-19-792978-B*

2

*Order Denying Defendants' Motion To*
*(1) Dismiss First Amended Complaint;*

3

*And (2) Supplemental Brief In Support*
*Of Their Motion To Dismiss Plaintiffs'*

4

*First Amended Complaint  Addressing*
*Plaintiffs' Eighth Claim For Relief*

5

6

Accordingly, good cause appearing, therefor,

7

**ORDER**

8

**IT IS HEREBY ORDERED** that United's Motion is DENIED in its entirety.

9

**IT IS FURTHER ORDERED** that United's Supplement is DENIED in its entirety.

10

DATED this ___ day of June, 2020.

Dated this 24th day of June, 2020

11

*Nancy L Allf*

12

DISTRICT COURT JUDGE  JD

A7B FD7 9E00 6B2D

13

Submitted by:

14

McDONALD CARANO LLP

Nancy Allf

15

By: */s/  Kristen T. Gallagher*

16

Pat Lundvall (NSBN 3761)
Kristen T. Gallagher (NSBN 9561)

17

Amanda M. Perach (NSBN 12399)
2300 West Sahara Avenue, Suite 1200

18

Las Vegas, Nevada 89102
plundvall@mcdonaldcarano.com

19

kgallagher@mcdonaldcarano.com
aperach@mcdonaldcarano.com

20

*Attorneys for Plaintiffs*

21

22

23

24

25

26

27

28

McDONALD  CARANO

2300 WEST SAHARA AVENUE, SUITE 1200 • LAS VEGAS, NEVADA 89102
PHONE 702.873.4100 • FAX 702.873.9966

1
2
3
4
5

DISTRICT COURT
CLARK COUNTY, NEVADA

6
7
8
9
10

Fremont Emergency Services
(Mandavia) Ltd, Plaintiff(s)

vs.

United Healthcare Insurance
Company, Defendant(s)

CASE NO: A-19-792978-B

DEPT. NO.  Department 27

11
12

## AUTOMATED CERTIFICATE OF SERVICE

13
14
15

This automated certificate of service was generated by the Eighth Judicial District Court. The foregoing Order Denying Motion was served via the court's electronic eFile system to all recipients registered for e-Service on the above entitled case as listed below: Service Date: 6/24/2020

16
17
18
19
20
21
22
23
24
25
26
27

| Audra Bonney | abonney@wwhgd.com |
| Cindy Bowman | cbowman@wwhgd.com |
| D. Lee Roberts | lroberts@wwhgd.com |
| Raiza Anne Torrenueva | rtorrenueva@wwhgd.com |
| Colby Balkenbush | cbalkenbush@wwhgd.com |
| Brittany Llewellyn | bllewellyn@wwhgd.com |
| Pat Lundvall | plundvall@mcdonaldcarano.com |
| Kristen Gallagher | kgallagher@mcdonaldcarano.com |
| Amanda Perach | aperach@mcdonaldcarano.com |
| Beau Nelson | bnelson@mcdonaldcarano.com |
| Marianne Carter | mcarter@mcdonaldcarano.com |
| Karen Surowiec | ksurowiec@mcdonaldcarano.com |

28

**APP. 168**

1

Flor Gonzalez-Pacheco    FGonzalez-Pacheco@wwhgd.com

2

Kelly Gaez       kgaez@wwhgd.com

3

Kimberly Kirn      kkirn@mcdonaldcarano.com

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# EXHIBIT 15

**GOLDEN ROAD MOTOR INN, INC., a
Nevada Corporation d/b/a Atlantis Casi-
no Resort Spa, Appellant/Cross–Respon-
dent,**

**v.**

**Sumona ISLAM, an Individual,
Respondent/Cross–
Appellant,**

**and**

**MEI–GSR Holdings, LLC, a Nevada Lim-
ited Liability Company d/b/a Grand Sier-
ra Resort, which claims to be the Suc-
cessor in Interest to NAV–RENO–GS,
LLC, Respondent.**

**Sumona Islam, an Individual, Appellant,**

**v.**

**Golden Road Motor Inn, Inc., a Nevada
Corporation d/b/a Atlantis Casino
Resort Spa, Respondent.**

**MEI–GSR Holdings, LLC, d/b/a Grand
Sierra Resort, Appellant/Cross–
Respondent,**

**v.**

**Golden Road Motor Inn, Inc., a Nevada
Corporation d/b/a Atlantis Casino Re-
sort Spa, Respondent/Cross–Appellant.**

**Nos. 64349, 64452, 65497.**

Supreme Court of Nevada.

July 21, 2016.

**Background:** Casino brought action
against former employee, a casino host,
and her new employer, alleging breach of
contract, tortious interference with con-
tractual relations, conversion, and violation
of the Nevada Uniform Trade Secrets Act.
The Second Judicial District Court, Wash-
oe County, Patrick Flanagan, J., entered
judgment finding former employee liable
for breach of contract and violation of the
Uniform Trade Secrets Act, and imposed a
permanent injunction prohibiting employee
from further use of trade secrets. Parties
appealed.

**Holdings:** The Supreme Court, Douglas,
J., held that:

(1) one-year noncompete agreement pro-
hibiting employee from any employ-
ment, affiliation, or service with any
gaming business or enterprise within a
150–mile radius was unreasonable and
wholly unenforceable;

(2) unreasonable noncompete agreement
was wholly unenforceable and not sub-
ject to reformation by the court;

(3) former employee's altering and con-
cealing contact information for 87 play-
ers in employer' electronic database
did not amount to conversion;

(4) trial court could not properly award
attorney fees to employer without per-
mitting former employee to review
itemizations; and

(5) casino failed to establish that new em-
ployer knowingly misappropriated
trade secrets.

Affirmed in part, reversed in part, and re-
manded.

Hardesty, J., dissented in part and filed opin-
ion, with which Parraguirre, C.J., and Picker-
ing, J., agreed.

**1. Appeal and Error ⟳893(1)**

The Supreme Court reviews the district
court's legal conclusions de novo on appeal.

**2. Appeal and Error ⟳1008.1(5), 1010.1(6)**

The Supreme Court will not disturb a
district court's findings of fact unless they
are clearly erroneous and not based on sub-
stantial evidence.

**3. Appeal and Error ⟳893(1)**

Contract interpretation is a legal ques-
tion considered under a de novo standard of
review.

**4. Contracts ⟳116(1)**

A restraint of trade is unreasonable, in
the absence of statutory authorization or
dominant social or economic justification, if it
is greater than is required for the protection
of the person for whose benefit the restraint

**152** Nev.     **376 PACIFIC REPORTER, 3d SERIES**

is imposed or imposes undue hardship upon the person restricted.

**5. Contracts ⟺116(1), 117(2)**

Time and territory are important factors to consider when evaluating the reasonableness of a noncompete agreement; however, there is no inflexible formula for deciding the ubiquitous question of reasonableness.

**6. Contracts ⟺117(3)**

One-year noncompete agreement prohibiting former employee, a casino host, from any employment, affiliation, or service with any gaming business or enterprise within a 150–mile radius was overly broad, and presented an undue hardship for employee, and thus was unreasonable.

**7. Contracts ⟺137(4)**

**Reformation of Instruments ⟺7**

Unambiguous noncompete agreement that was overbroad and thus unreasonable was wholly unenforceable and not subject to reformation by the court.

**8. Contracts ⟺136**

An overbroad and unreasonable provision in a noncompete agreement renders the agreement wholly unenforceable.

**9. Contracts ⟺137(4), 143(3)**

A court is not free to modify or vary the terms of an unambiguous agreement, and this rule has no exception for overbroad noncompete agreements.

**10. Contracts ⟺202(2)**

The terms of a noncompete agreement must be construed in the employee's favor.

**11. Contracts ⟺137(4)**

District court did not abuse its discretion in refusing to redraft an unambiguously overbroad noncompete agreement.

**12. Contracts ⟺143(3)**

Parties are not entitled to make an agreement that they will be bound by whatever contract the courts may make for them at some time in the future; courts are not empowered to make private agreements.

**13. Labor and Employment ⟺903**

Where underlying noncompete agreement was unreasonable and wholly unenforceable, former employer had no cause of action against former employee's new employer for tortious interference with a contractual relationship.

**14. Conversion and Civil Theft ⟺117**

Former casino host's conduct in altering and concealing the contact information for 87 players in casino employer' electronic database did not amount to conversion; the information was not lost and was properly restored at relatively minimal cost.

**15. Conversion and Civil Theft ⟺108**

"Conversion" is a distinct act of dominion wrongfully exerted over another's personal property in denial of, or inconsistent with his title or rights therein or in derogation, exclusion, or defiance of such title or rights.

See publication Words and Phrases for other judicial constructions and definitions.

**16. Conversion and Civil Theft ⟺108, 205**

"Conversion" generally is limited to those severe, major, and important interferences with the right to control personal property that justify requiring the actor to pay the property's full value.

**17. Costs ⟺208**

Trial court could not properly award attorney fees to plaintiff without permitting defendant to review itemizations. Rules Civ. Proc., Rule 54.

**18. Antitrust and Trade Regulation ⟺421**

Casino, having established that former employee misappropriated trade secrets by entering certain player information she had copied from casino's electronic database into the database of her new employer, failed to establish that new employer also knowingly misappropriated trade secrets; new employer's hiring personnel advised employee before she began working to bring only herself and her relationships when she left casino, new employer's management sought and gained employee's reassurance that the player information she communicated was built on her own relationships, and casino's letter

to new employer regarding "potential trade secret violations" did not sufficiently put new employer on notice that it was using wrongfully obtained player information.  West's NRSA 600A.030(2).

West Codenotes

**Recognized as Unconstitutional**

West's Ga.Code Ann. § 13–8–2.1

———

Dotson Law and Robert A. Dotson, Reno; Lemons, Grundy & Eisenberg and Robert L. Eisenberg, Reno, for Golden Road Motor Inn, Inc., dba Atlantis Casino Resort Spa.

Law Offices of Mark Wray and Mark D. Wray, Reno, for Sumona Islam.

Cohen–Johnson, LLC, and H. Stan Johnson and Steven B. Cohen, Las Vegas, for MEI–GSR Holdings, LLC, dba Grand Sierra Resort.

Before the Court En Banc.

*OPINION*

By the Court, DOUGLAS, J.:

In this appeal, we are asked to consider (1) whether a noncompete agreement is reasonable and enforceable, (2) whether an alteration of electronic information amounts to conversion, and (3) whether one gaming establishment misappropriated another gaming establishment's trade secrets.

Casino host Sumona Islam entered into an agreement with her employer, Atlantis Casino Resort Spa, to refrain from employment, association, or service with any other gaming establishment within 150 miles of Atlantis for one year following the end of her employment.  Islam eventually grew dissatisfied with her work at Atlantis and, while searching for work elsewhere, altered and copied gaming customers' information from Atlantis'

computer management system.  Soon after, she resigned from Atlantis and began working as a casino host at Grand Sierra Resort (GSR), where she accessed the computer management system to enter the copied information.  Without knowing the information was wrongfully obtained, GSR used this and other information conveyed by Islam to market to those customers.

As to the noncompete agreement, we affirm the district court, concluding that the type of work from which Islam is prohibited is unreasonable because it extends beyond what is necessary to protect Atlantis' interests and is an undue hardship on Islam.  We further conclude that because the work exclusion term is unreasonable, the agreement is wholly unenforceable, as we do not modify or "blue pencil" contracts.  With regard to Atlantis' conversion claim based on Islam's alteration of electronic customer information, which Atlantis quickly restored, we affirm the district court's denial.  The minimal disruption and expense incurred were insufficient to require Islam to pay the full value of the information.  Finally, as to the misappropriation of trade secrets claim, we conclude that Atlantis failed to demonstrate that GSR knew or should have known the player information was obtained by improper means and therefore affirm the district court's finding of nonliability.[1]

*BACKGROUND*

While working as a casino host at Atlantis, Islam executed several agreements pertaining to her employment.  Pursuant to those agreements, Atlantis restricted Islam from sharing confidential information, disseminating intellectual property, and downloading or uploading information without authorization.  Additionally, a noncompete agreement prohibited Islam from employment, affiliation, or service with any gaming operation within 150 miles of Atlantis for one year following the end of her employment.[2]

---

**1.**  We also affirm the parties' appeals from attorney fees awards, except that we reverse the award to Atlantis against Islam because the district court erred by prohibiting Islam's review of the itemized attorney fees.

**2.**  In particular, the noncompete agreement provides as follows:

In the event that the employment relationship between Atlantis and Team Member ends for any reason, either voluntary or nonvoluntary, Team Member agrees that (s)he

**154**  Nev.          **376 PACIFIC REPORTER, 3d SERIES**

After more than three years at Atlantis, Islam became dissatisfied with her work environment. As Islam pursued employment elsewhere, she altered and concealed the contact information for 87 players in Atlantis' electronic database. She also hand-copied players' names, contact information, level of play, game preferences, credit limits, and other proprietary information from the database onto notebook paper. Soon after, she resigned, and when newly assigned casino hosts attempted to contact players formerly assigned to Islam, they discovered that the information had been altered. Despite Islam's actions, Atlantis was able to fully restore the correct contact information for its players, incurring $2,117 in repair expenses.

Meanwhile, GSR interviewed Islam for a position as a casino host. During the hiring process, GSR personnel advised Islam not to bring anything from Atlantis but herself and her established relationships. Despite GSR's request, when Islam began working at GSR, she entered certain player information she had copied from Atlantis' database into GSR's database. Evidence adduced at trial also indicated that Islam communicated copied information to GSR by email. However, Islam never presented to GSR personnel the notebooks containing the copied information and repeatedly insisted that the information she provided was from her own "book of trade." [3] Thus, GSR used the information it received from Islam to market to Atlantis players.

Thereafter, Atlantis became aware that GSR hired Islam and that GSR was marketing to its players. Atlantis sent a letter to GSR, informing GSR of Islam's noncompete agreement, that Islam may have confidential information, and that GSR was to refrain from using that information. In response, GSR sent a letter to Atlantis advising that it was not in possession of trade secret information and that the information provided by

Islam came from her book of trade. GSR additionally requested that Atlantis provide more specific information as to what Atlantis believed was protectable as a trade secret. Atlantis did not comply with GSR's request.

Subsequently, Atlantis filed a complaint against both Islam and GSR, alleging seven causes of action and requesting a restraining order. The district court issued a restraining order prohibiting Islam from employment with GSR. The parties later stipulated to a preliminary injunction pending resolution of the case, and GSR served Atlantis with an offer of judgment. However, Atlantis rejected the offer and a bench trial ensued.

As between Atlantis and Islam, the district court found Islam liable for breach of contract and violation of the Nevada Uniform Trade Secrets Act and imposed a permanent injunction prohibiting Islam from further use of Atlantis' trade secrets. The district court awarded Atlantis compensatory and punitive damages, in addition to attorney fees and costs. However, the district court also found that Islam was not liable for tortious interference with contractual relations or conversion and ruled that the noncompete agreement was unenforceable. As to Atlantis' claims against GSR, the district court found that GSR was not liable for tortious interference with contractual relations or misappropriation of trade secrets and awarded GSR attorney fees and costs based on its offer of judgment, but denied fees requested under NRS 600A.060.

All three parties appealed. Atlantis challenges the noncompete and conversion rulings in its claims against Islam, and the tortious interference and attorney fees rulings in its claims against GSR. Islam's appeal challenges the award of attorney fees to Atlantis. GSR challenges the denial of attorney fees under NRS 600A.060.

will not, without the prior written consent of Atlantis, be employed by, in any way affiliated with, or provide any services to, any gaming business or enterprise located within 150 miles of Atlantis Casino Resort for a period of one (1) year after the date that the employment relationship between Atlantis and Team Member ends.

**3.** The district court found that a casino host's "book of trade" is a collection of "names and contact information of guests with whom the host has developed relationships through [the host's] own efforts."

## DISCUSSION

**[1, 2]** "We review the district court's legal conclusions de novo." *Buzz Stew, LLC v. City of N. Las Vegas*, 124 Nev. 224, 228, 181 P.3d 670, 672 (2008). However, "this court will not disturb a district court's findings of fact unless they are clearly erroneous and not based on substantial evidence." *Int'l Fid. Ins. Co. v. State*, 122 Nev. 39, 42, 126 P.3d 1133, 1134–35 (2006).

### Atlantis v. Islam

#### Noncompete agreement

Atlantis argues that the noncompete agreement signed by Islam was reasonable and enforceable. Even if the noncompete agreement was unenforceable as written, Atlantis argues that the agreement should be preserved by judicial modification of provisions that are decidedly too broad. In contrast, Islam and GSR argue that the court properly found the noncompete agreement unreasonable and correctly determined that the proper remedy was to void the contract as a whole. Further, Islam and GSR contend that courts may not create a contract for the parties that the parties did not intend.

#### Reasonableness

**[3–5]** Contract interpretation is a legal question we consider under a de novo standard of review. *May v. Anderson*, 121 Nev. 668, 672, 119 P.3d 1254, 1257 (2005). Under Nevada law, "[a] restraint of trade is unreasonable, in the absence of statutory authorization or dominant social or economic justification, if it is greater than is required for the protection of the person for whose benefit the restraint is imposed or imposes undue hardship upon the person restricted." *Hansen v. Edwards*, 83 Nev. 189, 191–92, 426 P.2d 792, 793 (1967). Time and territory are important factors to consider when evaluating the reasonableness of a noncompete agreement. *Id.* at 192, 426 P.2d at 793. However, "[t]here is no inflexible formula for deciding the ubiquitous question of reasonableness." *Ellis v. McDaniel*, 95 Nev. 455, 458–59, 596 P.2d 222, 224 (1979). Thus, we look to our caselaw.

In *Jones v. Deeter*, an employer that performed lighting services hired an assistant, who agreed in writing not to compete within 100 miles of Reno/Sparks for five years subsequent to the end of his employment. 112 Nev. 291, 292, 913 P.2d 1272, 1273 (1996). After three months, the employer fired his assistant and, when the assistant sought work elsewhere, the employer brought suit against him to enforce the noncompete agreement. *Id.* at 293, 913 P.2d at 1273. We concluded that the five-year restriction imposed too great a hardship for the employee and was not necessary to protect the employer's interests, even in light of the employer's argument that developing a customer base in the industry was difficult. *Id.* at 296, 913 P.2d at 1275.

Also, in *Camco, Inc. v. Baker*, we held that a noncompete agreement term of two years and "within fifty miles of any area which was the 'target of a corporate plan for expansion' " was unreasonable. 113 Nev. 512, 519–20, 936 P.2d 829, 833–34 (1997). We explained "that the covenant at issue [was] overly broad as to future territory for possible expansion," and thus, operated "as a greater restraint on trade than [was] necessary to protect [the former employer's] interests." *Id.*

**[6]** In this case, similar to *Jones* and *Camco*, we conclude that the term prohibiting Islam from employment, affiliation, or service with any gaming business or enterprise is overly broad, as it extends beyond what is necessary to protect Atlantis' interests. According to the term, Islam is prohibited from being employed, for instance, as a custodian, at every casino within a 150–mile radius. Yet, in such a hypothetical, it is unlikely that Islam would be luring players from Atlantis; thus, Atlantis' interests would remain protected. Additionally, similar to *Jones*, the work exclusion term presents an undue hardship for Islam. The agreement's prohibition of *all* types of employment with gaming establishments severely restricts Islam's ability to be gainfully employed. For these reasons, we deem the term to be over-

broad and unreasonable.[4]

*Enforceability*

**[7–9]**  Under Nevada law, such an unreasonable provision renders the noncompete agreement wholly unenforceable.  *See Jones*, 112 Nev. at 296, 913 P.2d at 1275 (holding that the noncompete agreement as a whole was unenforceable after concluding that a particular provision was unreasonable). Rightfully, we have long refrained from reforming or "blue penciling"[5] private parties' contracts.  *See Reno Club, Inc. v. Young Inv. Co.*, 64 Nev. 312, 323, 182 P.2d 1011, 1016 (1947) ("This would be virtually creating a new contract for the parties, which . . . under well-settled rules of construction, the court has no power to do.").  In *All Star Bonding v. State*, we reaffirmed that "[w]e are not free to modify or vary the terms of an unambiguous agreement." 119 Nev. 47, 51, 62 P.3d 1124, 1126 (2003) (internal quotation omitted); *see Kaldi v. Farmers Ins. Exch.*, 117 Nev. 273, 278, 21 P.3d 16, 20 (2001) ("It has long been the policy in Nevada that absent some countervailing reason, contracts will be construed from the written language and enforced as written." (internal quotation omitted)).  Under Nevada law, this rule has no exception for overbroad noncompete agreements, thus Atlantis' failure to suggest that the noncompete agreement is ambiguous leaves us only to apply our clear precedent. However, our precedent appears inconsequential to the dissent's blue-penciling advocacy, as they, too, fail to charge the contract with ambiguity before picking up the pencil. But even if an argument as to the contract's ambiguity were offered, and even if it had merit, reformation may still be inappropriate, as the dissent points to no Nevada case reforming ambiguous noncompete agreements.  Thus, we act in conformance with our precedent when we refrain from rewriting the parties' contract.

Importantly, we have not overturned or abrogated our caselaw establishing our refusal to reform parties' contracts where they are unambiguous.  Nonetheless, citing to *Hansen*, 83 Nev. at 192, 426 P.2d at 793–94, and *Ellis*, 95 Nev. at 458, 596 P.2d at 224, Atlantis contends that if the noncompete agreement was overly broad and unreasonable, the district court was required to modify it.  In opposition, GSR contends that Atlantis misconstrues *Hansen* and *Ellis* because the cases do not allow for the court's modification of a noncompete agreement.  According to GSR, the cases provide for modification of a preliminary injunction rather than the original contract.  We agree with GSR.

The procedural posture of the case at bar distinguishes it from *Hansen* and *Ellis*, and likens it to *Jones*.  Both *Hansen*, 83 Nev. at 191, 426 P.2d at 793, and *Ellis*, 95 Nev. at 457, 596 P.2d at 223, were appeals from district court orders granting preliminary injunctions.  The particular thing modified after finding the terms of the employment contracts unreasonable were the injunctions, not the employment contracts.  *See, e.g.*, *Hansen*, 83 Nev. at 193, 426 P.2d at 794 ("We deem the restriction thus modified to be reasonable.").  Thus, the blue pencil was not taken up.  In contrast, in *Jones*, the appeal followed a final judgment on the merits of the noncompete agreement's reasonableness and enforceability.  112 Nev. at 293, 913 P.2d at 1274.  We held that the entire agreement was unenforceable after concluding that the five-year time restriction provision was unreasonable.  *Id.* at 296, 913 P.2d at 1275. Thus, here, as in *Jones*, the unreasonable work exclusion term renders the contract as a whole unenforceable.  *See* Harlan M. Blake, *Employee Agreements Not to Compete*, 73 Harv. L. Rev. 625, 681–82 (1960) ("[M]ost courts either issue an injunction which is regarded as reasonable, even though narrower than the terms of the restraining

---

**4.**  In accord with this conclusion, the Georgia Court of Appeals has stated that "[a] noncompete covenant is too broad and indefinite to be enforceable where it contains no limit on the work restricted and effectively prohibits an employee from working for a competitor in any capacity." *Lapolla Indus., Inc. v. Hess*, 325 Ga.App. 256, 750 S.E.2d 467, 474 (2013).

**5.**  "The 'blue-pencil test' is '[a] judicial standard for deciding whether to invalidate the whole contract or only the offending words.' " Griffin Toronjo Pivateau, *Putting the Blue Pencil Down: An Argument for Specificity in Noncompete Agreements*, 86 Neb. L. Rev. 672, 681 (2008) (quoting *Blue-pencil test*, Black's Law Dictionary (8th ed.2004)).

covenant, or refuse enforcement altogether." (footnote omitted)).

The dissent cites to caselaw from other jurisdictions to argue that Nevada should similarly indulge. Other states are divided on whether to reform parties' contracts. *Compare Federated Mut. Ins. Co. v. Whitaker*, 232 Ga. 811, 209 S.E.2d 161, 164 (1974) (holding that the entire "covenant must fall because this court has refused to apply the 'Blue-pencil theory of severability'" (internal quotations omitted)), *with Farm Bureau Serv. Co. of Maynard v. Kohls*, 203 N.W.2d 209, 212 (Iowa 1972) (upholding a lower court's finding that a noncompete agreement was unreasonable, but rejecting its conclusion that the contract as a whole was therefore void). Georgia courts explicitly considered and adamantly rejected the blue-pencil way:

> We have given careful consideration to the severance theory, and we decline to apply it. . . .

"Courts and writers have engaged in hot debate over whether severance should ever be applied to an employee restraint. The argument against doing so is persuasive. For every covenant that finds its way to court, there are thousands which exercise an in terrorem effect on employees who respect their contractual obligations and on competitors who fear legal complications if they employ a covenantor, or who are anxious to maintain gentlemanly relations with their competitors. Thus, the mobility of untold numbers of employees is restricted by the intimidation of restrictions whose severity no court would sanction. If severance is generally applied, employers can fashion truly ominous covenants with confidence that they will be pared down and enforced when the facts of

a particular case are not unreasonable. . . ."

There are some good reasons in support of the doctrine of severance. However, we conclude that those reasons are not of sufficient weight to offset those reasons for refusing to apply the doctrine. In short, we have weighed the "blue-pencil" doctrine in the balance, and found it wanting.

*Richard P. Rita Pers. Servs. Int'l, Inc. v. Kot*, 229 Ga. 314, 191 S.E.2d 79, 81 (1972) (quoting Blake, *supra*, at 682–83).[6] We are persuaded by Georgia's rationale, but there are additional reasons for abstaining.

Our exercise of judicial restraint when confronted with the urge to pick up the pencil is sound public policy. Restraint avoids the possibility of trampling the parties' contractual intent. *See* Pivateau, *supra*, at 674 ("[T]he blue pencil doctrine . . . creates an agreement that the parties did not actually agree to."); *Reno Club*, 64 Nev. at 323, 182 P.2d at 1016 (concluding that creating a contractual term operates beyond the parties' intent and the court's power). Even assuming only minimal infringement on the parties' intent, as the dissent suggests, a trespass at all is indefensible, as our use of the pencil should not lead us to the place of drafting. Our place is in interpreting. Moreover, although the transgression may be minimal here, setting a precedent that establishes the judiciary's willingness to partake in drafting would simply be inappropriate public policy as it conflicts with the impartiality that is required of the bench, irrespective of some jurisdictions' willingness to overreach.

Restraint also preserves judicial resources. Pivateau, *supra*, at 674 ("Both [types of blue penciling] essentially turn courts into attor-

---

**6.** We note that the Georgia Legislature implemented laws attempting to advance blue penciling in Georgia courts. *See* Ga. Code Ann. § 13–8–2.1 (repealed 2009); Ga. Code Ann. § 13–8–53(d) (2010). However, the Legislature's first attempt, Ga. Code Ann. § 13–8–2.1 (1990), providing that courts *must* reform unlawful contracts, was held unconstitutional by *Jackson & Coker, Inc. v. Hart*, 261 Ga. 371, 405 S.E.2d 253, 255 (1991). *See Atlanta Bread Co. Int'l, Inc. v. Lupton–Smith*, 285 Ga. 587, 679 S.E.2d 722, 724–25 (2009) ("[T]his Court has rejected a legislative attempt to usurp the application of

standards of reasonableness to noncompetition covenants in employment agreements."). Another legislative attempt, Ga. Code Ann. § 13–8–53(d) (2010), providing that courts *may* blue pencil, did not affect Georgia's precedent. The Georgia Court of Appeals reiterated that "the rule is that the court will not sever or 'blue pencil' an unenforceable noncompete covenant and enforce reasonable restrictions in other noncompete covenants, but will declare all the noncompete covenants unenforceable." *Lapolla*, 750 S.E.2d at 473.

**158**   Nev.        **376 PACIFIC REPORTER, 3d SERIES**

neys after the fact."). And restraint is consistent with basic principles of contract law that hold the drafter to a higher standard. *Williams v. Waldman*, 108 Nev. 466, 473, 836 P.2d 614, 619 (1992) ("[I]t is a well settled rule that '[i]n cases of doubt or ambiguity, a contract must be construed most strongly against the party who prepared it, and favorably to a party who had no voice in the selection of its language.' " (alteration in original) (quoting *Jacobson v. Sassower*, 66 N.Y.2d 991, 499 N.Y.S.2d 381, 489 N.E.2d 1283, 1284 (1985))).

[10]  We have been especially cognizant of the care that must be taken in drafting contracts that are in restraint of trade. *Hansen*, 83 Nev. at 191, 426 P.2d at 793 ("An agreement on the part of an employee not to compete with his employer after termination of the employment is in restraint of trade and will not be enforced in accordance with its terms unless the same are reasonable."). A strict test for reasonableness is applied to restrictive covenants in employment cases because the economic hardship imposed on employees is given considerable weight. Ferdinand S. Tinio, Annotation, *Enforceability, Insofar as Restrictions Would Be Reasonable, of Contract Containing Unreasonable Restrictions on Competition*, 61 A.L.R.3d 397, § 2b (1975). "One who has nothing but his labor to sell, and is in urgent need of selling that, cannot well afford to raise any objection to any of the terms in the contract of employment offered him, so long as the wages are acceptable." *Menter Co. v. Brock*, 147 Minn. 407, 180 N.W. 553, 555 (1920). Hence, leniency must favor the employee and the terms of the contract must be construed in the employee's favor.

Conversely, blue penciling favors the employer by presuming the employer's good faith.[7] Demonstrating compassion for the employer, one professor offered that "in most such cases, the employer does not require the promise because the employer is a hard-

earted oppressor of the poor," instead, "the employer is engaged in the struggle for prosperity and must utilize all avenues to gain and retain the good will of customers." 15 Grace McLane Giesel, *Corbin on Contracts* § 80.15, at 120 (rev. ed.2003). Further, "[t]he function of the law is to maintain a reasonable balance" because "a former employee may compete unfairly and an employer may oppress unreasonably." *Id.* This analysis sympathizes with employers at most and equivocates the employer's and employee's plight at least. However, it is plain that the scales are most imbalanced when the party who holds a superior bargaining position, and who is the contract drafter, drafts a contract that is greater than required for its protection and is thereafter rewarded with the court's legal drafting aid, as the other party faces economic impairment, restrained in his trade. In the context of an agreement that is in restraint of trade, a good-faith presumption benefiting the employer is unwarranted.

At the outset, the bargaining positions of the employer and employee are generally unequal. *Star Direct, Inc. v. Dal Pra*, 319 Wis.2d 274, 767 N.W.2d 898, 924 n. 10 (2009). When an employment contract is made, the party seeking employment must consent to almost any restrictive covenant if he or she desires employment *Id.* Hence, even an employer-drafted contract containing unenforceable provisions will likely be signed by the employee. Under a blue pencil doctrine, "[t]he employer then receives what amounts to a free ride on" the provision, perhaps knowing full well that it would never be enforced. Pivateau, *supra*, at 690. Consequently, the practice encourages employers with superior bargaining power "to insist upon unreasonable and excessive restrictions, secure in the knowledge that the promise will be upheld in part, if not in full." *Streiff v. Am. Family Mut. Ins. Co.*, 118 Wis.2d 602, 348 N.W.2d 505, 509 (1984).[8] It thereby

---

**7.** Although we acknowledge that some courts only allow blue penciling "if the party who seeks to enforce the term obtained it in good faith," *Ellis v. James V. Hurson Associates, Inc.*, 565 A.2d 615, 617 (D.C.1989) (internal quotations omitted), still other courts do not make good

faith a condition of reformation, *see, e.g., Farm Bureau*, 203 N.W.2d at 212.

**8.** A California court explains:

Many, perhaps most, employees would honor these clauses without consulting counsel or challenging the clause in court, thus di-

forces the employee to bear the burden as employers carelessly, or intentionally, overreach. Pivateau, *supra*, at 689. "In the words of one commentator, '[t]his smacks of having one's employee's cake, and eating it too.'" *Id.* at 690 (quoting Blake, *supra*, at 683).

**[11]**  The dissent argues that refusal to blue pencil is antiquated. However, it has been noted that "eliminating the blue pencil doctrine comports with recent trends as courts have indicated a greater willingness to refuse to reform agreements that are not reasonable on their face." *Id.* at 674.  Some states, such as Wisconsin, have even codified the "no modification rule."  *See* Wis. Stat. § 103.465 (2012).[9]  Based on the argument of antiquity, and the rule of law in other jurisdictions, the dissent would force the district court to change the contract to only prohibit Islam from being employed as a casino host.[10]  The dissent's overreach in such an indulgent application of the doctrine is troubling.

**[12]**  Under a strict application of the blue pencil doctrine, "only the offending words are invalidated if it would be possible to delete them simply by running a blue pencil through them, as opposed to changing, adding, or rearranging words." Pivateau, *supra*, at 681 (internal quotation omitted).  The dissent purports to reword the provision by changing the work exclusion term to limit it to employment to employment as a casino host.  Thus, the dissent embraces the most liberal form of the blue pencil doctrine, *id.* at 682, a use of judicial resources that is unwarranted and blurs the line between the bench and the bar.[11]  As explained by the Supreme Court of Arkansas, "[w]e are firmly convinced that parties are not entitled to make an agreement, as these litigants have tried to do, that they will be bound by whatever contract the courts may make for them at some time in the future."  *Rector–Phillips–Morse, Inc. v. Vroman*, 253 Ark. 750, 489 S.W.2d 1, 4 (1973).  Courts are not empowered to make private agreements.  *Id.* Such actions are simply not within the judicial province.  *Id.*

**[13]**  In light of Nevada's caselaw and stated public policy concerns, we will not reform the contract to change the type of employment from which Islam is prohibited. As written, the contract is an unenforceable restraint of trade.  *See Hansen*, 83 Nev. at 191, 426 P.2d at 793 (recognizing that contracts in restraint of trade will not be en-

---

rectly undermining the statutory policy favoring competition.  Employers would have no disincentive to use the broad, illegal clauses if permitted to retreat to a narrow, lawful construction in the event of litigation. *Kolani v. Gluska*, 64 Cal.App.4th 402, 75 Cal. Rptr.2d 257, 260 (1998).  On the other hand, the "all or nothing" approach encourages employers to carefully draft agreements devoid of "overreaching terms for fear that the entire agreement will be voided."  Kenneth R. Swift, *Void Agreements, Knocked–Out Terms, and Blue Pencils: Judicial and Legislative Handling of Unreasonable Terms in Noncompete Agreements*, 24 Hofstra Lab. & Emp. L.J. 223, 246 (2007).

9.  Wis. Stat. § 103.465 provides:

A covenant by an assistant, servant or agent not to compete with his or her employer or principal during the term of the employment or agency, or after the termination of that employment or agency, within a specified territory and during a specified time is lawful and enforceable only if the restrictions imposed are reasonably necessary for the protection of the employer or principal.  Any covenant, described in this subsection, imposing an unreasonable restraint is illegal, void and unenforceable even as to any part of the covenant or

performance that would be a reasonable restraint.

10.  Even assuming that the blue pencil doctrine is not contrary to Nevada precedent and stated public policy, reformation is certainly not a mandate placed on a district court.  Laura J. Thalacker & Hartwell Thalacker, *Non–Compete Laws: Nevada, Practical Law State Q & A* § 6 (2015) (suggesting that "[c]ourts in Nevada may, but are not required to, modify or blue pencil the terms in non-compete agreements and may enforce them as modified").  Under a review for discretion, the district court certainly did not abuse its discretion in refusing to redraft a non-compete agreement that banned the employer from "employment, affiliation, or service with any gaming operation."  *See Dowell v. Biosense Webster, Inc.*, 179 Cal.App.4th 564, 102 Cal. Rptr.3d 1, 11 (2009) (affirming a lower court's invalidation of an overbroad noncompete clause prohibiting "an employee from rendering services, directly or indirectly, to a competitor").

11.  Redrafting the contract, rather than striking the offending work exclusion term, is the dissent's only option because striking the term renders the agreement unintelligible.

**160** Nev.        **376 PACIFIC REPORTER, 3d SERIES**

forced unless the terms are reasonable). Without a contract, there was no violation.[12] Accordingly, we affirm the district court's ruling as to the noncompete agreement.

*Conversion*

**[14]** Atlantis claims the district court erred by determining that Islam was not liable for conversion. According to Atlantis, Islam converted its property when she altered the player contact information for 87 guests, taking control of its data in a form that was inconsistent with its property rights. Islam and GSR contend that conversion requires a more serious interference with property rights.

**[15, 16]** Nevada law defines conversion "as a distinct act of dominion wrongfully exerted over another's personal property in denial of, or inconsistent with his title *or* rights therein or in derogation, exclusion, or defiance of such title or rights." *M.C. Multi–Family Dev., LLC v. Crestdale Assocs., Ltd.,* 124 Nev. 901, 910, 193 P.3d 536, 542 (2008) (internal quotations omitted). Furthermore, "conversion generally is limited to those severe, major, and important interferences with the right to control personal property that justify requiring the actor to pay the property's full value." *Edwards v. Emperor's Garden Rest.,* 122 Nev. 317, 328–29, 130 P.3d 1280, 1287 (2006).

We conclude that Islam's act of altering the player contact information in Atlantis' gaming database did not amount to conversion. The information was not lost, and with relatively minimal cost, the contact information was properly restored. To be sure, the interruption in marketing caused by Islam's conduct was not severe enough to justify requiring her to pay the full value of the information, which was estimated to be much more valuable than the cost of repair.[13] Therefore, we also affirm the district court's

finding of no liability as to Atlantis' conversion claim against Islam.

*Attorney fees awarded to Atlantis against Islam*

**[17]** Islam contends that the district court violated her right to due process by awarding Atlantis $308,711 in attorney fees without allowing her to view the itemized fees. In response, Atlantis contends that NRCP 54 does not require the detailed documentation that Islam sought.

We conclude that the district court's award of attorney fees to Atlantis against Islam without permitting Islam to review the itemizations was improper. *See Love v. Love,* 114 Nev. 572, 582, 959 P.2d 523, 529 (1998) (concluding that the district court's grant of attorney fees based upon sealed billing statements unfairly precluded the opposing party from disputing the legitimacy of the award). Therefore, as to the award of attorney fees against Islam, we reverse and remand with instructions to allow Islam to review the itemized attorney fees,

*Atlantis v. GSR*

*Nevada Uniform Trade Secrets Act*

Atlantis contends that the district court's conclusions that GSR did not misappropriate its trade secrets, but that Islam did, are irreconcilable with one another. Thus, Atlantis claims that GSR is also liable for misappropriation. GSR argues that it did not misappropriate Atlantis' trade secrets because it reasonably relied on Islam's representation that she had relationships with each of the players she put in its database, and thus, GSR had no knowledge that the information was a trade secret.

We conclude that the district court's conclusion was not clearly erroneous because Atlantis failed to establish the essential elements of its misappropriation claim against

---

**12.** Based on our determination that the noncompete agreement was unenforceable, we also conclude that Atlantis' cause of action for tortious interference with a contractual relationship against GSR was properly dismissed as a matter of law. *See J.J. Indus., LLC v. Bennett,* 119 Nev. 269, 274, 71 P.3d 1264, 1267 (2003) (requiring a valid and existing contract to establish an inten-

tional interference with contractual relations claim).

**13.** We note that the district court awarded Atlantis the cost of repair as compensation in its breach of contract claim.

GSR. The following was set forth by the United States District Court for the Northern District of California in interpreting California's almost identical Uniform Trade Secrets Act:

> The elements of a claim of indirect trade secret misappropriation . . . are: (1) the plaintiff is the owner of a valid trade secret; (2) the defendant acquired the trade secret from someone other than the plaintiff and (a) knew or had reason to know before the use or disclosure that the information was a trade secret and knew or had reason to know that the disclosing party had acquired it through improper means or was breaching a duty of confidentiality by disclosing it; or (b) knew or had reason to know it was a trade secret and that the disclosure was a mistake; (3) the defendant used or disclosed the trade secret without plaintiff's authorization; and (4) the plaintiff suffered harm as a direct and proximate result of the defendant's use or disclosure of the trade secret, or the defendant benefitted from such use or disclosure.

*MedioStream, Inc. v. Microsoft Corp.*, 869 F.Supp.2d 1095, 1114 (N.D.Cal.2012). *Compare* Cal. Civ. Code § 3426.1 (2012), *with* NRS 600A.030(2).[14]

[**18**]  Atlantis failed to establish that GSR knew or should have known that the information Islam provided was a trade secret. GSR took steps to ensure that it did not receive trade secret information from Islam. GSR's hiring personnel advised Islam before she began working to bring only herself and her relationships when she left Atlantis. Additionally, GSR management sought and gained Islam's reassurance that the player information she communicated was built on her own relationships. Based on Islam's representations, there was no reason for GSR to know that it was using trade secrets that belonged to Atlantis.

Furthermore, Atlantis' letter to GSR did not sufficiently put GSR on notice that it was using wrongfully obtained player information. The letter expressed doubt as to whether GSR was in fact in possession of Atlantis' trade secrets and failed to identify the trade secrets. Atlantis' letter advised that there were "[p]otential [t]rade [s]ecret [v]iolations" and, rather elusively, communicated that "[i]f GSR has incorporated into its data base . . . confidential information that is the property of the Atlantis, we demand that GSR immediately advise us of the same." In addition to the uncertainty communicated by Atlantis' use of the terms "potential" and "if," Atlantis placed the onus on GSR to know what trade secrets GSR had in its possession that belonged to Atlantis. However, without Atlantis' player list, or Islam's candid insight, it was nearly impossible for GSR to know whether it was using Atlantis' trade secrets. Moreover, when GSR requested more specific information, Atlantis failed to provide it. Because GSR received both trade secret and nontrade secret information from Islam without knowing which, if any, information was protected, it cannot be said that GSR sufficiently knew or should have known that the information provided to it was a trade secret. *See MicroStrategy Inc. v. Bus. Objects, S.A.*, 331 F.Supp.2d 396, 431 (E.D.Va.2004) (limiting scope of protected documents to those identified as trade secrets).

---

**14.**  NRS 600A.030(2) provides that "misappropriation" means as follows:

  (a) Acquisition of the trade secret of another by a person by improper means;

  (b) Acquisition of a trade secret of another by a person who knows or has reason to know that the trade secret was acquired by improper means; or

  (c) Disclosure or use of a trade secret of another without express or implied consent by a person who:

  (1) Used improper means to acquire knowledge of the trade secret;

  (2) At the time of disclosure or use, knew or had reason to know that his or her knowledge of the trade secret was:

(I) Derived from or through a person who had used improper means to acquire it;

(II) Acquired under circumstances giving rise to a duty to maintain its secrecy or limit its use; or

(III) Derived from or through a person who owed a duty to the person seeking relief to maintain its secrecy or limit its use; or

(3) Before a material change of his or her position, knew or had reason to know that it was a trade secret and that knowledge of it had been acquired by accident or mistake.

**162**  Nev.            **376 PACIFIC REPORTER, 3d SERIES**

An alternative result, which establishes the sufficiency of GSR's knowledge based on these facts, would be harmful to the casino host trade. To protect Atlantis' potential trade secrets, GSR would need to cease marketing to all players communicated to by Islam. This result would encourage all casino hosts' former employers to send letters accusing the host's new employer of trade secret violations, knowing that with no real claim of misappropriation, they could quash competition. The consequences would suffocate a casino host's very purpose, whose trade is built on providing its employer with relationships established with customers. Hosts provide a unique advantage to casinos by expanding a casino's client base, *Choctaw Resort Development Enterprise v. Applequist*, 161 So.3d 1134, 1136 (Miss.Ct.App. 2015), and the result the dissent and Atlantis seek could stifle the trade.

Our holding considers the nature of the casino host's trade. With more specific information about which players were improperly solicited, GSR could have ceased its use of information improperly obtained while continuing its use of information rightfully obtained. We deem this to be the best outcome.

Therefore, we reject the assertion that GSR knew, or had reason to know, from Atlantis' vague accusations, that it was using information improperly obtained. We conclude that, without more, GSR appropriately relied on Islam's statements that the information she relayed was based on her own relationships and her book of trade. The district court properly held Islam responsible for her actions but distinguished Islam's conduct from that of GSR. Because the district court's determination that GSR did not misappropriate Atlantis' trade secrets was not clearly erroneous, we affirm.

*Attorney fees awarded to GSR against Atlantis*

Atlantis claims the district court's award of attorney fees in favor of GSR in the amount of $190,124.50, pursuant to GSR's NRCP 68 offer of judgment, is unsupported and should be vacated. GSR contends that it was entitled to the award of attorney fees based on the offer of judgment, but that it is additionally entitled to an award of attorney fees based on Atlantis' bad faith, pursuant to NRS 600A.060. We conclude that the district court properly awarded attorney fees pursuant to the offer of judgment. GSR made an offer that Atlantis rejected, and Atlantis failed to receive a more favorable judgment.[15] Upon a review of the record, we also conclude that the district court properly refused to award fees under NRS 600A.060 because Atlantis' claim was not brought in bad faith.[16] Thus, as to the district court's award of attorney fees between Atlantis and GSR, we affirm.

Based on the foregoing, we affirm the district court's judgment and attorney fees orders except as to the order awarding fees against Islam in favor of Atlantis. With respect to that order, we reverse and remand to the district court for further proceedings consistent with this opinion.

We concur: CHERRY, SAITTA, and GIBBONS, JJ.

HARDESTY, J., with whom PARRAGUIRRE, C.J., and PICKERING, J., agree, dissenting in part:

While I agree that the non-compete agreement was written too broadly, there is no doubt that Islam and Atlantis agreed to restrict Islam's future employment as a casino host and that such a restriction is reasonable. Absent some showing of bad faith on Atlantis' part, of which there was none, I would follow the approach taken by this court and a majority of other courts and preserve the

---

**15.** We note that Atlantis' argument that the offer of judgment was invalid because it was made by a nonparty lacks merit.

**16.** In the district court's order dated September 27, 2013, it found that Atlantis acted in bad faith in pursuing the misappropriation claim against GSR, However, the district court later denied the

fees under NRS 600A.060 because it had already awarded attorney fees based on the offer of judgment. We conclude that substantial evidence did not support the district court's bad-faith finding, but we affirm because the district court reached the right result.

GOLDEN RD. MOTOR INN, INC. v. ISLAM  Nev.  **163**
Cite as 376 P.3d 151 (Nev. 2016)

non-compete agreement by modifying or severing the overly broad provision and thereby maintain the restriction on Islam's future employment in a competing casino host position. Reformation is an equitable remedy, and here, the equities run in favor of Atlantis and against the employee who admittedly stole trade secret information from her employer to use in her new casino host job for a competitor. I therefore dissent from the majority's adoption of a minority view to invalidate the entire agreement. I also dissent from the majority's determination that GSR did not violate the Uniform Trade Secret Act. GSR had knowledge of the Islam/Atlantis non-compete and trade secret agreements soon after GSR hired Islam. As a result, GSR had reason to know that its new employee had acquired trade secrets by "improper means." NRS 600A.030(2)(a)–(c). Invalidating the non-compete agreement does not provide a defense to the use of trade secret information appropriated in violation of the enforceable trade secret agreement.

*Non-compete agreement*

A majority of courts agree that overly broad non-compete agreements should be altered, where possible, to recognize the intent of the parties and bring them within reasonable parameters. *See* Ferdinand S. Tinio, Annotation, *Enforceability, Insofar as Restrictions Would Be Reasonable, of Contract Containing Unreasonable Restrictions on Competition*, 61 A.L.R.3d 397, §§ 4–5 (1975) (outlining jurisdictions that allow some form of modification and those that do not). The modification test has been adopted by "most United States jurisdictions." *Data Mgmt., Inc. v. Greene*, 757 P.2d 62, 64 (Alaska 1988) (adopting the approach that allows a court to reasonably alter a non-compete agreement so long as the agreement was drafted in good faith). *See, e.g., Hilligoss v. Cargill, Inc.*, 649 N.W.2d 142, 147 n. 8 (Minn.2002) (explaining that "a court at its discretion [can] modify unreasonable restrictions on competition in employment agreements by enforcing them to the extent reasonable"); *Whelan Sec. Co. v. Kennebrew*, 379 S.W.3d 835, 844 (Mo.2012) ("[W]hen the provisions of a non-compete clause impose a restraint that is unreasonably broad, appellate courts still can

give effect to its purpose by refusing to give effect to the unreasonable terms or modifying the terms of the contract to be reasonable."); *Merrimack Valley Wood Prods., Inc. v. Near*, 152 N.H. 192, 876 A.2d 757, 764 (2005) ("Courts have the power to reform overly broad restrictive covenants if the employer shows that it acted in good faith in the execution of the employment contract."); *Cardiovascular Surgical Specialists, Corp. v. Mammana*, 61 P.3d 210, 213 (Okla.2002) ("To cure an overly broad and thus unreasonable restraint of trade, an Oklahoma court may impose reasonable limitations concerning the activities embraced, time, or geographical limitation but it will refuse to supply material terms of a contract." (internal quotation marks omitted)); *Durapin, Inc. v. Am. Prods., Inc.*, 559 A.2d 1051, 1058 (R.I.1989) ("We believe this is the appropriate time to choose the route that permits unreasonable restraints to be modified and enforced, whether or not their terms are divisible, unless the circumstances indicate bad faith or deliberate overreaching on the part of the promisee."); *Simpson v. C & R Supply, Inc.*, 598 N.W.2d 914, 920 (S.D.1999) (allowing modification of "noncompetition provisions to conform to the statutory mandate . . . via partial enforcement"). The policy behind this approach is that "[a]n otherwise reasonable restrictive covenant should not be held invalid because it is unreasonable solely as to [breadth] where voiding the agreement, rather than enforcing it in a reasonable way, would be contrary to legislative intent, and frustrate the intent of the parties." 17A C.J.S. *Contracts* § 381 (2011); *see also* Kenneth R. Swift, *Void Agreements, Knocked-Out Terms, and Blue Pencils: Judicial and Legislative Handling of Unreasonable Terms in Noncompete Agreements*, 24 Hofstra Lab. & Emp. L.J. 223, 249–50 (2007) (explaining that this test allows "courts [to] exercise their inherent equity powers to the extent necessary to protect the employer's legitimate business interest").

In addition to the modification test, the "blue-pencil test" also allows modification by permitting a court to delete an overly broad portion of a non-compete covenant and to enforce the remainder. *Id.; see also* 17A Am.

Jur. 2d *Contracts* § 318 (2004) ("While recognizing that illegal contracts are generally unenforceable or void, a court may, where possible, sever the illegal portion of the agreement and enforce the remainder." (footnotes omitted)). Several jurisdictions have embraced this test. *See, e.g., Ellis v. James V. Hurson Assocs., Inc.*, 565 A.2d 615, 617 (D.C.1989); *Cent. Ind. Podiatry, P.C. v. Krueger*, 882 N.E.2d 723, 730 (Ind.2008); *Hartman v. W.H. Odell & Assocs., Inc.*, 117 N.C.App. 307, 450 S.E.2d 912, 920 (1994); *Star Direct, Inc. v. Dal Pra*, 319 Wis.2d 274, 767 N.W.2d 898, 916 (2009).

Contrarily, the draconian all-or-nothing rule invalidates the entire contract if any part of the non-compete agreement is overly broad. 17A C.J.S. *Contracts* § 381 (2011). Only a few jurisdictions still use this approach. *See, e.g., Rector–Phillips–Morse, Inc. v. Vroman*, 253 Ark. 750, 489 S.W.2d 1, 5 (1973); *Rollins Protective Servs. Co. v. Palermo*, 249 Ga. 138, 287 S.E.2d 546, 549 (1982).

In this case, Islam signed a non-compete agreement more than a year after beginning her employment as a casino host with Atlantis. Pursuant to the non-compete agreement:

> In the event that the employment relationship between Atlantis and [Islam] ends for any reason, either voluntary or non-voluntary, [Islam] agrees that (s)he will not, without the prior written consent of Atlantis, *be employed by, in any way affiliated with, or provide any services to,* any gaming business or enterprise located within 150 miles of Atlantis Casino Resort for a period of one (1) year after the date that the employment relationship between Atlantis and [Islam] ends.

(Emphasis added.)

By modifying and narrowing the broad language describing the scope of Islam's future employment, this court can give effect to the admitted intent of the parties to restrict her future employment as a casino host. Therefore, the text "be employed by, in any way affiliated with, or provide any services to" should be narrowed to "be employed as a casino host," allowing the non-compete provision to survive.

The majority based its decision to invalidate the entire non-compete agreement on *Reno Club v. Young Investment Co.*, 64 Nev. 312, 182 P.2d 1011 (1947); *All Star Bonding v. State*, 119 Nev. 47, 62 P.3d 1124 (2003); *Kaldi v. Farmers Insurance Exchange*, 117 Nev. 273, 21 P.3d 16 (2001); and *Jones v. Deeter*, 112 Nev. 291, 913 P.2d 1272 (1996). The majority's reliance on *Reno Club, All Star Bonding,* and *Kaldi* is unfounded. Not only do *Reno Club, All Star Bonding,* and *Kaldi* fail to discuss non-compete agreements, they also focus on ambiguity (not overbreadth), a factor that does not apply when deciding to alter a non-compete agreement. *See Reno Club,* 64 Nev. at 325, 182 P.2d at 1017 ("[T]here is no ambiguity or uncertainty in the meaning of the language employed in the option agreement . . . , and hence no room for judicial construction."); *All Star Bonding,* 119 Nev. at 51, 62 P.3d at 1126 (explaining that this court is "not free to modify or vary the terms of an unambiguous agreement" (internal quotation marks omitted)); *Kaldi,* 117 Nev. at 281, 21 P.3d at 21 (same); *see also* 17A C.J.S. *Contracts* § 381 (2011) (explaining that the three approaches to altering a non-compete agreement are used when the agreement is overly broad). Further, in *Jones,* this court determined that a five-year restriction was improper and, thus, concluded that the non-compete "covenant [was] per se unreasonable and therefore, unenforceable." 112 Nev. at 296, 913 P.2d at 1275. This conclusory determination should not be construed as establishing a strict rule against modifying and limiting unreasonable portions of non-compete agreements. In fact, this court has allowed preliminary injunctions based on non-compete agreements to be modified in order to make restrictions reasonable. *See, e.g., Ellis v. McDaniel,* 95 Nev. 455, 459, 596 P.2d 222, 225 (1979) (declining to enforce a preliminary injunction based on a non-compete agreement that "purport[ed] to prohibit [appellant] from practicing orthopedic surgery," but modifying the restriction to prohibit appellant "from engaging in the *general practice* of medicine"); *Hansen v. Edwards,* 83 Nev. 189, 191, 193, 426 P.2d 792, 793–94 (1967) (modifying an employment restriction from 100 miles outside of Reno with no time limi-

GOLDEN RD. MOTOR INN, INC. v. ISLAM          Nev.   **165**
Cite as 376 P.3d 151 (Nev. 2016)

tation to Reno's boundary limits for one year because "[a] preliminary injunction may be modified at any time whenever the ends of justice require such action"). The procedural postures of *Ellis* and *Hansen* differ from this case as explained by the majority. While *Ellis* and *Hansen* did not use the expression "blue pencil," they effectively applied the doctrine by modifying the restrictions placed on the employee. Accordingly, I conclude that *Ellis* and *Hansen* demonstrate this court's willingness to preserve a non-compete agreement's reasonable terms.

Moreover, the majority's apparent adoption of the wholesale invalidation rule is a reversion to an antiquated, ill-favored rule. *See Durapin*, 559 A.2d at 1058 (explaining that "[m]ore recent court decisions . . . reject this all-or-nothing rule in favor of some form of judicial modification"); *see also Data Mgmt.*, 757 P.2d at 64 ("There is a need to strike a balance between protecting the rights of parties to enter into contracts, and the need to protect parties from illegal contracts. Obliterating all overbroad covenants not to compete, regardless of their factual settings, is too mechanistic and may produce unduly harsh results."). Quoting a law review article, the majority alleges that the " 'recent trend[ ]' " of courts is to reject the blue pencil doctrine. Majority opinion *ante* at 156 (quoting Griffin Toronjo Pivateau, *Putting the Blue Pencil Down: An Argument for Specificity in Noncompete Agreements*, 86 Neb. L. Rev. 672, 674 (2008)). Interestingly, this recent trend only includes six United States District Court cases, two of which are unpublished, issued from 2003 to 2007. *See* Pivateau, *supra*, at 694–97.

The majority provides several public policy arguments for refusing to adopt the blue pencil test: (1) altering the non-compete agreement may violate the parties' intent, (2) requiring a court to modify or blue pencil a non-compete agreement wastes judicial resources, and (3) leniency favors the employee because a non-compete agreement should be construed against the employer who drafted it. I address each of these arguments in turn.

First, the court takes evidence of the parties' intent into consideration when modifying a non-compete agreement, so any infringement on the parties' intent should be minimal. And contrary to the majority's assertion that modification conflicts with the bench's impartiality, *see* majority opinion *ante* at 157–58, this evidence allows the modification of a non-compete agreement to be based on objective criteria. In fact, the court is able to accurately modify the non-compete agreement in this case because Islam and Atlantis acknowledge their intent to limit Islam's future employment as a casino host and protect Atlantis' gaming trade secrets. The trade secret agreement, which the majority does not invalidate, prohibits Islam from using or disseminating any intellectual property, including customer lists. The ethics and code of conduct agreement, which the majority also does not invalidate, prohibits Islam from disclosing confidential information, including customer lists. The non-compete agreement is an extension of this intent: it protects customer lists from being exploited by competing casinos in the event an employment relationship fails. Because the three agreements relate to each other, this court need not speculate as to the parties' intent. Applying the wholesale invalidation rule completely ignores, rather than violates, the parties' intent in this case.

Second, because the court is already tasked with determining whether the non-compete agreement is overbroad, deciding how to modify an agreement is a natural next step, such that only a negligible amount of extrajudicial resources are being expended. Additionally, the court will not always be charged with modifying an agreement, as such a decision is discretionary. *See* Swift, *supra*, at 251. For example, "clear overreaching on the part of the employer may preclude a" court from exercising its discretion to modify. *Id.* Use of that discretion rejects the majority's suggestion that modification allows an employer to receive a " 'free ride.' " Majority opinion *ante* at 158 (quoting Pivateau, *supra*, at 690). Instead of incentivizing an employer to draft a stricter-than-necessary non-compete agreement with the knowledge that the court will simply limit it, as the majority asserts, modification discourages bad faith while also providing a safety

**166**  Nev.        **376 PACIFIC REPORTER, 3d SERIES**

net to protect agreements that were inadvertently drafted too broadly. And in this case, there is no evidence to suggest Atlantis acted in bad faith in preparing the agreements or seeks to enforce the non-complete agreement against Islam in an overly broad way. Atlantis' claim is directed to Islam's future employment as a casino host and does not seek to limit her employment in another capacity with another casino.

Finally, while the majority focuses on the unfairness to the employee, it is important to note that non-compete agreements are intended to balance the employer's and the employee's interests. *See Employers May Face New Challenges in Drafting Noncompetes,* 19 No. 2 Nev. Emp. L. Letter 4 (2013) ("[R]estrictive covenants strike a delicate balance between employers' interests—protecting confidential information and institutional knowledge, preserving hard-won customer and client relationships, and incentivizing key talent to remain loyal—and employees' interests in maintaining work mobility and the freedom to command competitive compensation for their skills."). Thus, we must not forget that non-compete agreements are extraordinarily important to Nevada businesses, especially in industries that rely on proprietary client lists, such as Atlantis. *See Traffic Control Servs., Inc. v. United Rentals Nw., Inc.,* 120 Nev. 168, 172, 87 P.3d 1054, 1057 (2004) ("Employers commonly rely upon restrictive covenants . . . to safeguard important business interests."). On this note, the majority also contends that modification favors the employer. While the all-or-nothing rule ultimately favors the employee—to the extreme disadvantage of the employer—by removing any restriction placed on future employment, modification also favors the employee by appropriately limiting the restriction.

Moreover, it is difficult to reconcile the majority's concern for Islam in this case when the facts demonstrate that Islam sought to compete as a casino host using trade secret information she appropriated from Atlantis. Islam committed theft, and GSR sanctioned Islam's behavior.

*Uniform Trade Secret Act*

Atlantis' cease and desist letter informed GSR that Islam was improperly soliciting guests in violation of its trade secret agreement, a copy of which was enclosed with the letter. The letter did not "express[ ] doubt," as the majority depicts. *See* majority opinion *ante* at 161. The letter stated that Atlantis "reasonably believe[d] that [Islam's] contact with these guests was facilitated by improper use of Atlantis' information." In response, GSR merely rejected Atlantis' assertions, maintained that there was no wrongdoing, and wrongly asserted that it did not possess any of Atlantis' property. Importantly, during her interview process, Islam provided GSR with a copy of her non-compete agreement with Atlantis. Because the non-compete agreement sought to restrict Islam from employment and, as such, using her book of trade in a competing casino, GSR was on notice that using any information provided by Islam may be improper.

The non-compete agreement and the cease and desist letter play a crucial role in Atlantis' claim against GSR for violation of the Uniform Trade Secret Act. The majority concluded that GSR did not know, or have a reason to know, that it had used improperly obtained information. I disagree.

As defined in NRS 600A.030(2):

"Misappropriation" means:

  . . . .

  (c) . . . use of a trade secret of another without express or implied consent by a person who:

  . . . .

  (2) At the time of disclosure or use, knew or had reason to know that his or her knowledge of the trade secret was:

  (I) Derived from or through a person who had used improper means to acquire it;

  (II) Acquired under circumstances giving rise to a duty to maintain its secrecy or limit its use; or

  (III) Derived from or through a person who owed a duty to the person seeking relief to maintain its secrecy or limit its use.

As stated previously, the non-compete and trade secret agreements sought to restrict Islam from employment *and* using any guest information in a competing casino for one year. Because GSR had knowledge of the non-compete and trade secret agreements soon after it hired Islam, it "had reason to know" that it was potentially using trade secret information "[d]erived from or through a person who owed a duty to . . . maintain its secrecy."[1] NRS 600A.030(2)(c)(2)(III). Accordingly, I conclude that any use of Atlantis' guest information after it hired Islam and decidedly after receiving the cease and desist letter constituted misappropriation in violation of the Uniform Trade Secret Act.

The majority contends that this conclusion incentivizes employers to accuse their former employees' new employers of violating trade secrets. *See* majority opinion *ante* at 161–62. This dubious risk of dishonesty is outweighed by the culture of distrust that the majority is creating by holding that a casino can ignore another casino's report of wrongdoing.

*Conclusion*

Because (1) the non-compete agreement can and should be narrowed instead of being invalidated and (2) GSR misappropriated Atlantis' trade secrets, I believe that the district court erred in dismissing Atlantis' breach of the non-compete agreement claim against Islam, tortious interference with a contractual relationship claim against GSR, and violation of the Uniform Trade Secret Act claim against GSR. Therefore, I would reverse the judgment of the district court with regard to these claims.

We concur: PARRAGUIRRE, C.J., and PICKERING, J.



---

1.  The majority highlights the fact that Atlantis failed to provide GSR with specific information upon GSR's request. *See* majority opinion *ante* at 161–62. Misappropriation only requires a "reason to know," NRS 600A.030(2)(c)(2), so Atlantis was under no obligation to provide evidence to GSR. Atlantis' letter to Islam, which was enclosed with Atlantis' letter to GSR, ex-

HUMBOLDT GENERAL HOSPITAL; and Sharon McIntyre, M.D., Petitioners,

v.

The SIXTH JUDICIAL DISTRICT COURT of the State of Nevada, In and for the County of Humboldt; and the Honorable Michael Montero, District Judge, Respondents,

and

Kelli Barrett, Real Party in Interest.

No. 65562.

Supreme Court of Nevada.

July 28, 2016.

**Background:** Patient brought action against hospital and physician, alleging batter based on alleged lack of informed consent. The Sixth Judicial District Court, Humboldt County, Michael Montero, J., denied defendant's motion to dismiss that was based on patient's failure to file medical expert affidavit. Defendants petitioned for writ of mandamus.

**Holdings:** The Supreme Court, Hardesty, J., held that:

(1) consideration of merits of petition for writ of mandamus challenging denial of motion to dismiss was warranted, and

(2) on an issue of first impression, battery claim based on alleged lack of informed consent was medical malpractice claim that required medical expert affidavit.

Writ granted.

**1. Mandamus ⟺43**

Consideration of merits of petition for writ of mandamus challenging denial of mo-

plained that it possessed electronic records showing Islam's sabotage, and its guests who were not a part of Islam's book of trade had been contacted by GSR. This information sufficiently demonstrates that GSR "had reason to know" about the trade secret violation. NRS 600A.030(2)(c)(2).

# EXHIBIT 16

526 P.3d 1110 (Table)

Unpublished Disposition

This is an unpublished disposition. See Nevada Rules of Appellate Procedure, Rule 36(c) before citing.

Court of Appeals of Nevada.

HALCYON SILVER, LLC, d/b/a Metropolitan Auto Body & Paint,

A Nevada Corporation; and Charles Fox, an Individual, Appellants,

v.

Hollis EVELYNMOE, an Individual, Respondent.

No. 84299-COA

|

Filed March 24, 2023

Halcyon Silver, LLC, d/b/a Metropolitan Auto Body & Paint (Metropolitan), and Charles Fox appeal from a final judgment in a contract action concerning automotive repair and restoration.[1] Eighth Judicial District Court, Clark County; Crystal Eller, Judge.

**Attorneys and Law Firms**

McAvoy Amaya & Revero, Attorneys

Law Office of S. Don Bennion

*ORDER AFFIRMING IN PART, REVERSING IN PART, AND REMANDING*

**\*1** In 2013, Hollis Evelynmoe took his 1970 Ford Mustang (vehicle) to Vegas Stang—at the time, an auto body shop in Las Vegas—which conducted numerous repairs.[2] As relevant to this case, Evelynmoe made the following approximate payments to Vegas Stang: $2,500 for a rebuilt engine, $2,550 for a rebuilt transmission, $1,300 for a new exhaust system, and at least $400 for four tires and rims. Vegas Stang went out of business in 2016, at which time Evelynmoe decided to take his vehicle to Metropolitan for completion of additional repairs. In November 2016, Evelynmoe delivered his vehicle to Metropolitan along with the rebuilt engine, transmission, exhaust system, tires and rims, and the remaining parts installed by Vegas Stang. On November 4, 2016, Evelynmoe paid Metropolitan $4,039.38 to strip the vehicle down to bare metal and examine its component parts, which allowed Metropolitan to generate a preliminary estimate of $40,918.03 for the cost of the full repair and restoration work to be performed. Metropolitan later revised this estimate to reflect Evelynmoe's desire for his vehicle to be converted to a fastback. The revised estimate reflected a cost of $68,704.28, which Evelynmoe approved.

On December 15, 2016, Evelynmoe met with Fox, the owner of Metropolitan, to sign a work authorization contract for Metropolitan to begin working on his vehicle. The contract did not contain a "time is of the essence" provision, nor did it list a specific date in which the work would be completed. Rather, it merely stated that Metropolitan would not be "responsible for the availability of parts, or delays in part shipments beyond their control." Additionally, the contract contained a bolded provision which read, "PLEASE NOTE: A daily storage charge may be applied of up to $70.30 per day for motor vehicles that have not been picked up after 3 working days from the date of notification that repairs have been complete." Further, the contract contained a brief paragraph in which the signee agreed to "pay all legal fees associated with any and all disputes." The contract also stated that "[a]n express mechanics lien is hereby acknowledged on the above vehicle to secure the amount of repairs thereto." Upon signing the contract, Evelynmoe paid Metropolitan $20,000 to begin the work. When Evelynmoe signed the contract, Fox explained that he could reasonably expect the work to be completed by the end of summer 2017.

In the six months after Evelynmoe signed the contract, Metropolitan obtained and installed a fastback conversion kit in the amount of $4,944 and made preparations for paint in the amount of $1,500. In this same timeframe, Evelynmoe made payments of $15,367.46 on January 4, 2017, and $20,000 on February 4, 2017. However, at some point during that time frame, Metropolitan stopped working on Evelynmoe's vehicle. On May 31, 2017, Evelynmoe visited Metropolitan to examine his vehicle's status and select a paint color. Upon visiting, Evelynmoe learned that Metropolitan had not resumed work on his vehicle since the work stoppage. After selecting a paint color, Evelynmoe made a final payment of $12,736.82 to Metropolitan, bringing his collective payments to the $68,704.28 estimated for the completed repair and restoration work. [3]   Upon making this final payment, Fox again told Evelynmoe that he could expect the work on his vehicle to be completed by the end of summer 2017.

 *2  After making his final payment, Evelynmoe returned to Metropolitan approximately once a month to check on the status of his vehicle, only to learn that no further work had been performed by Metropolitan. On April 25, 2018—approximately 11 months after Evelynmoe paid the full price for the repair and restoration work—Evelynmoe discovered again that Metropolitan had performed no further work on his vehicle, whereupon he demanded that Metropolitan cease performing any further work and that they relinquish possession of his vehicle. Evelynmoe then took extensive photographs, which demonstrated that Metropolitan had not completed a majority of the contracted work.

Before Evelynmoe was allowed to retrieve his vehicle, Fox presented him with two forms, an indemnification agreement and a "Stop Work" order. The indemnification agreement required Evelynmoe to forego all legal claims against Metropolitan. The Stop Work order required Evelynmoe to pay Metropolitan $70.30 per day in storage fees and to agree that his vehicle received all of the contracted work. Believing that these agreements misrepresented the condition of his vehicle and required him to forego legal action that he was entitled to pursue, Evelynmoe refused to sign them. Thus, Fox and Metropolitan refused to relinquish Evelynmoe's vehicle to him on April 25, 2018. Evelynmoe arranged for a tow truck to retrieve his vehicle on April 25, 2018; however, he cancelled the tow truck because Fox and Metropolitan would not release any part of the vehicle without him signing the two agreements.

On May 11, 2018, Evelynmoe received a letter from Metropolitan demanding that he pay substantial storage fees or his vehicle would be sold at auction on June 27, 2018. This forced Evelynmoe to file a motion for preliminary injunction, the hearing for which took place on June 26, 2018. The court found Evelynmoe's testimony regarding the work performed by Metropolitan and its refusal to release his vehicle to be credible, and the court granted the preliminary injunction. In its order, the court demanded that Metropolitan return Evelynmoe's vehicle to him "at a mutually convenient time to the parties." Additionally, the court ordered that Metropolitan's lien on Evelynmoe's vehicle for storage fees was still valid. Finally, the court ordered Evelynmoe to post a bond in the amount of $2,000 to secure payment of storage fees should they be awarded. Despite the court's order, Evelynmoe did not post the required bond until September 4, 2019.

Metropolitan did not release Evelynmoe's vehicle until September 5, 2019, when a tow truck hired by Silver Arrow, another auto body shop in Las Vegas, picked it up. Gregory Young, the owner of Silver Arrow, was present at Silver Arrow when Evelynmoe's vehicle arrived. Young recalled that only the shell of the vehicle was received, and that it was missing, at a minimum, the engine, transmission, exhaust system, and four tires with rims that Evelynmoe received from Vegas Stang, as well as the driveshaft, radiator, wiring harness, air conditioning assembly, seats, door panels, glass windows other than the rear window, gas tank, and rear bank drums.

Evelynmoe initiated the underlying action against Metropolitan and Fox in June of 2018. In the operative complaint, Evelynmoe alleged that Metropolitan breached the work authorization contract and the implied covenant of good faith and fair dealing by failing to perform the contracted work on his vehicle. Evelynmoe also asserted a claim for conversion against Metropolitan and Fox, alleging that they wrongfully exerted dominion over his vehicle in a manner inconsistent with his ownership rights. Evelynmoe additionally alleged that Fox made an intentional misrepresentation when he communicated that the contracted work would be completed by the end of summer 2017. In their answer, appellants contested each of Evelynmoe's claims and asserted a counterclaim for unjust enrichment, as they believed they were entitled to storage fees incurred from the time Evelynmoe's motion for preliminary injunction was granted to the time that Evelynmoe posted the $2,000 bond mandated by the court's order.

**\*3** Following a three-day bench trial, the district court entered its findings of fact, conclusions of law, and judgment. Preliminarily, the district court found that "Evelynmoe's testimony was consistent throughout the trial and was extremely credible," and that "Fox'[s] testimony was somewhat inconsistent and at times thoroughly unbelievable." The district court found that Metropolitan materially breached the work authorization contract by failing "to perform a majority of its promised work between December 16, 2016, and April 25, 2018." The district court further found that Metropolitan breached the implied covenant of good faith and fair dealing by performing in a manner that was unfaithful to the purpose of the contract. Moreover, the district court found that Metropolitan and Fox were liable for conversion for exerting wrongful dominion over Evelynmoe's vehicle and parts in a manner inconsistent with his ownership rights. Finding that the legal fees provision of the contract was both procedurally and substantively unconscionable, the district court refused to enforce the provision. And because the written contract governed the duties of the parties, the district court denied both parties' claims for unjust enrichment. Finally, the court found that the estimated completion date communicated by Fox was an estimate rather than a guarantee, and thus, Fox did not make any intentional misrepresentation to Evelynmoe. In accordance with its findings of fact and conclusions of law, the district court awarded Evelynmoe damages of $76,332.90, which were broken down as follows:

   a. $58,232.90 in monetary losses for work not performed by Metropolitan pursuant to the [work authorization] contract;

   b. $11,350.00 for the value of the 1970 Ford Mustang at the time it was delivered to Metropolitan, and the fees for transfer and storage by Silver Arrow Car Restoration; [4]

   c. $400.00 for the conversion of four tires and rims;

   d. $2,500.00 for the conversion of [Evelynmoe]'s rebuilt engine;

   e. $2,550.00 for the conversion of [Evelynmoe]'s transmission; and

   f. $1,300.00 for the conversion of [Evelynmoe]'s exhaust system.

On appeal, appellants argue that the district court erred in ruling in Evelynmoe's favor on his claims for breach of contract, breach of the implied covenant of good faith and fair dealing, and conversion. [5] Appellants further aver that the district court's award of damages violated the double recovery doctrine. Finally, appellants assert that the district court erred in denying their unjust enrichment claim, as well as in refusing to enforce the legal fees provision of the contract as unconscionable.

While Evelynmoe fails to address several of appellants' arguments, he argues that the district court appropriately ruled in his favor on his contract and conversion claims and that the district court correctly denied appellants' unjust enrichment claim and refused to enforce the contract's legal fees provision.

*Metropolitan breached the implied covenant of good faith and fair dealing by failing to perform a majority of its promised work between December 16, 2016, and April 25, 2018*

Metropolitan argues that, because the work authorization contract contained no "time is of the essence" provision, Evelynmoe never expressed dissatisfaction with appellants' progress in completing the contracted work, and both parties were experienced in transactions of this kind, its failure to complete the contracted work on Evelynmoe's vehicle between December 16, 2016, and April 25, 2018, cannot be considered a material breach under *Mayfield v. Koroghli*, 124 Nev. 343, 184 P.3d 362 (2008). Metropolitan further contends that the district court erred in concluding that it breached the implied covenant of good faith and fair dealing because the district court did not make explicit findings of bad faith on its part, even though the district court found that Metropolitan "failed to complete the repair and restoration work on [the vehicle] in a reasonable time" and that Evelynmoe's "justified expectations were denied." Conversely, Evelynmoe argues that, because Metropolitan failed to perform a majority of the contracted work between December 16, 2016, and April 25, 2018, the district court correctly found that Metropolitan materially breached the work authorization contract.

**\*4**  We review the district court's determination that Metropolitan materially breached the contract for clear error. *See Sheehan & Sheehan v. Nelson Malley & Co.,* 121 Nev. 481, 486, 117 P.3d 219, 223 (2005) ("[T]he district court's determination that the contract was or was not breached will be affirmed unless clearly erroneous ...."). Similarly, we review the district court's findings regarding Metropolitan's breach of the implied covenant of good faith and fair dealing for clear error, which will be upheld so long as such findings are supported by substantial evidence. *APCO Constr., Inc. v. Helix Elec. of Nev., LLC,* 138 Nev., Adv. Op. 31, 509 P.3d 49, 53-54 (2022). "A finding is 'clearly erroneous' when although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed." *Unionamerica Mortg. & Equity Tr. v. McDonald,* 97 Nev. 210, 211-12, 626 P.2d 1272, 1273 (1981) (quoting *United States v. U.S. Gypsum Co.,* 333 U.S. 364, 395 (1948)).

The time for performance pursuant to a contract is not considered of the essence unless indicated by an express provision or the circumstances so imply. *Mayfield,* 124 Nev. at 349, 184 P.3d at 366. Where a contract does not contain a clause indicating that time for performance is of the essence, the parties generally must render performance within a reasonable time. *Id.* "What constitutes a reasonable time for a contract's performance is a question of fact to be determined based on the nature of the contract and the circumstances surrounding its making." *Id.* at 346, 184 P.3d at 364. However, in the absence of a provision making time of the essence, "a party's failure to perform within a reasonable time generally does not constitute a material breach of the agreement." *Id.* at 349, 184 P.3d at 366. Nevertheless, we need not decide whether the district court correctly determined that Metropolitan materially breached the contract, as the district court appropriately held Metropolitan liable for breach of the implied covenant of good faith and fair dealing.

Even where a defendant does not breach the express terms of a contract, a plaintiff may still recover contract damages for a defendant's breach of the implied covenant of good faith and fair dealing. *APCO Constr., Inc.,* 138 Nev., Adv. Op. 31, 509 P.3d at 53. A party to a contract breaches the implied covenant of good faith and fair dealing where it performs "in a manner that is unfaithful to the purpose of the contract and the justified expectations of the other party are thus denied." *Hilton Hotels Corp. v. Butch Lewis Prods., Inc.,* 107 Nev. 226, 234, 808 P.2d 919, 923 (1991). Whether a party's performance denies another of their reasonable expectations under a contract "is determined by the various factors and special circumstances that shape these expectations." *See id.* at 234, 808 P.2d at 924.

Our jurisprudence has noted that whether a party acted in bad faith is the primary inquiry in determining whether they breached the implied covenant of good faith and fair dealing. *See Renown Health v. Holland & Hart, LLP,* No. 72039, 2019 WL 1530161, at \*2 (Nev. Apr. 5, 2019) (Order of Affirmance) (citing *Geysen v. Securitas Sec. Servs. USA, Inc.,* 142 A.3d 227, 237-38 (Conn. 2016)). "Examples of bad faith include 'evasion of the spirit of the bargain, *lack of diligence and slacking off,* willful rendering of imperfect performance ... and interference with or failure to cooperate in the other party's performance.' " *Id.* at \*2 (emphasis added) (quoting Restatement (Second) of Contracts § 205 cmt. d (Am. Law Inst. 1981)).

Despite Evelynmoe making his final payment on May 31, 2017, and despite Fox's estimation that the work would be completed by summer 2017, Metropolitan performed no further work on Evelynmoe's vehicle from then until April 25, 2018, when Evelynmoe demanded that his vehicle be returned to him. [6] Metropolitan's lack of diligence in completing the contracted work, which denied Evelynmoe his justified expectations under the contract, illustrates that Metropolitan acted in bad faith, thereby breaching the implied covenant of good faith and fair dealing. [7] Therefore, we affirm the district court's award of damages for the work not performed by Metropolitan, not under the theory that Metropolitan materially breached the contract, but under the alternate theory that Metropolitan breached the implied covenant of good faith and fair dealing.

*Appellants exerted wrongful dominion over the component parts of Evelynmoe's vehicle and are thus liable for conversion*

**\*5**  Whether a conversion has occurred is a question of fact. *Evans v. Dean Witter Reynolds, Inc.,* 116 Nev. 598, 606, 5 P.3d 1043, 1048 (2000). As such, we defer to the district court's findings regarding appellants' conversion of the component parts of Evelynmoe's vehicle so long as they are not clearly erroneous and supported by substantial evidence. *Certified Fire Prot. Inc. v. Precision Constr., Inc.,* 128 Nev. 371, 377, 283 P.3d 250, 254 (2012) ("Where a question of fact has been determined by the

trial court, this court will not reverse unless the judgment is clearly erroneous and not based on substantial evidence." (quoting *Kockos v. Bank of Nev.,* 90 Nev. 140, 143, 520 P.2d 1359, 1361 (1974))).

"Conversion is 'a distinct act of dominion wrongfully exerted over another's personal property in denial of, or inconsistent with his title or rights therein or in derogation, exclusion, or defiance of such title rights.' " *Evans,* 116 Nev. at 606, 5 P.3d at 1048 (quoting *Wantz v. Redfield,* 74 Nev. 196, 198, 326 P.2d 413, 414 (1958)). A party is not considered to have exerted wrongful dominion over property "where it affirmatively submits a genuine dispute regarding the property to the courts and then appropriately holds the subject property pending the court's decision." *Nev. State Educ. Assn v. Clark Cty. Educ. Assn,* 137 Nev. 76, 86, 482 P.3d 665, 675 (2021).

At trial, counsel for appellants claimed that the title to Evelynmoe's vehicle was transferred to Fox following the June 26, 2018, preliminary injunction hearing and before the order granting the preliminary injunction was entered and Evelynmoe posted the requisite $2,000 bond. But the record does not support that the title was transferred, nor was such transfer permitted by the court following the preliminary injunction hearing, The requisite bond pursuant to the preliminary injunction was only to ensure that appellants would be able to recover storage fees should they be awarded by the court pursuant to their counterclaim, not to prevent the sale of the vehicle that the court unequivocally prohibited in its order. Because appellants attempted to transfer the title of Evelynmoe's vehicle to Fox, which the district court prohibited, their actions suggest that they were attempting to assert wrongful dominion over Evelynmoe's vehicle in violation of Nevada law. *See Nev. State Educ. Ass'n,* 137 Nev. at 86, 482 P.3d at 675 ("Of course, [the rule that a party does not exert wrongful dominion over property where it submits a genuine dispute regarding the property to the courts and holds the property pending the court's decision] would not apply if the party s claim of right is made with 'malice,' or if the party improperly disposes of the property." (citations omitted)). Further, the fact that appellants did not raise the dispute of the vehicle's ownership to the court prior to allegedly transferring the title of the vehicle to Fox s name, coupled with the court's finding that appellants never released Evelynmoe's four tires and rims, rebuilt engine, transmission, and exhaust system demonstrates that their actions were inconsistent with Evelynmoe's ownership of the property, and supported the court's finding of liability for conversion. *Id.* at 85-86, 482 P.3d at 674. Therefore, we conclude that the district court did not err in finding that appellants were liable for the conversion of these missing parts and in awarding their corresponding values as damages. [8]

*The district court awarded Evelynmoe duplicative damages in violation of the double recovery doctrine*

**\*6** "Whether a party is entitled to a particular measure of damages is a question of law reviewed de novo." *Dynalectric Co. of Nev., Inc. v. Clark & Sullivan Constructors, Inc.,* 127 Nev. 480, 483, 255 P.3d 286, 288 (2011) (internal quotation marks omitted). Our jurisdiction applied the double recovery doctrine in *Elyousef v. O Reilly & Ferrario, LLC,* 126 Nev. 441, 442, 245 P.3d 547, 548 (2010). "[A] plaintiff can recover only once for a single injury even if the plaintiff asserts multiple legal theories." *Id.* at 444, 245 P.3d at 549. Accordingly, "satisfaction of the plaintiff's damages for an injury bars further recovery for that injury." *Id.*

At trial, testimony established that Evelynmoe suffered damages of $750 to remove the body of his vehicle from Metropolitan. Additionally, Young's testimony demonstrated that as of September 1, 2020, Evelynmoe owed Silver Arrow $2,600 for "[t]he initial retrieval of the car, the moving of the car into the warehouse, and storage [fees] incurred." This testimony indicates that the $2,600 figure also reflected the $750 cost to remove Evelynmoe's vehicle from Metropolitan. Nonetheless, the district court apparently awarded both these amounts in calculating Evelynmoe's damages. Because awarding Evelynmoe both amounts may have permitted him to recover damages twice for the same injury, the district court may have erred by awarding double recovery in violation of the double recovery doctrine and, thus, the court will need to recalculate these damages on remand. *See id.*

Turning to the value of Evelynmoe's vehicle and/or its parts, despite appellants' assertion that no testimony was offered at trial to establish the value of the vehicle when it was first dropped off at Metropolitan, Fox testified that "[t]he entire vehicle as a whole, as a coupe, is probably worth 3,500 to 8 grand." Because Evelynmoe first delivered his vehicle to Metropolitan along with the rebuilt engine, transmission, exhaust system, and four rims with tires, it stands to reason that this estimated value

given by Fox included the value of these parts that accompanied the vehicle. Despite this, the district court awarded Evelynmoe damages of $11,350 "for the value of the 1970 Ford Mustang at the time it was delivered to Metropolitan, and the fees for transfer and storage by Silver Arrow Car Restoration," as well as "$400.00 for the conversion of four tires and rims; $2,500.00 for the conversion of Plaintiff's rebuilt engine; $2,550.00 for the conversion of Plaintiff's transmission; and $1,300.00 for the conversion of Plaintiff's exhaust system."

While the district court did not provide a complete breakdown of the $11,350 figure awarded to Evelynmoe, the order suggests that the court included the higher estimate of $8,000 for the vehicle with parts as provided by Fox's testimony, $2,600 for storage fees charged by Silver Arrow, and $750 for the removal of Evelynmoe's vehicle from Metropolitan. Assuming this correctly demonstrates the district court's award of damages to Evelynmoe, the court erred in awarding double recovery damages based on Metropolitan's conversion of the components after they were already accounted for as part of the vehicle's value when it was delivered to Metropolitan. *See id.* Further, the court may have erred in awarding an amount for the body of the vehicle, as it appears that the body without the component parts was delivered to Silver Arrow Car Restoration and, therefore, returned to Evelynmoe. For these reasons, we reverse and remand this matter to the district court to recalculate the conversion damages awarded so as to not violate the double recovery doctrine based on the award of $11,350. *See id.*

### The district court properly denied appellants' unjust enrichment claim

**\*7** On appeal, appellants are seeking recovery of storage fees incurred as the result of storing Evelynmoe's vehicle under the theory of unjust enrichment. "Whether a claimant has been unjustly enriched is a mixed question of law and fact." *See Desert Miriah, Inc. v. B & L Auto, Inc.,* 12 P.3d 580, 582 (Utah 2000). Here, the district court after making factual findings declined to award appellants' damages for their storage fees based on unjust enrichment.

We review a district court's factual findings for clear error and will uphold such findings so long as they are supported by substantial evidence. *Vegas United Inv. Series 105, Inc. v. Celtic Bank Corp.,* 135 Nev. 456, 458-59, 453 P.3d 1229, 1231 (2019). "Unjust enrichment occurs whenever a person has and retains a benefit which in equity and good conscience belongs to another." *Unionamerica Mortg. & Equity Tr.,* 97 Nev. at 212, 626 P.2d at 1273. A claim for unjust enrichment is unavailable when there is an express, written contract. *Leasepartners Corp. v. Robert L. Brooks Tr.,* 113 Nev. 747, 755, 942 P.2d 182, 187 (1997). "[Permitting] recovery by quasi-contract where a written agreement exists would constitute a subversion of contractual principles." *Lipshie v. Tracy Inv. Co.,* 93 Nev. 370, 379, 566 P.2d 819, 824 (1977).

In this case, the district court determined that the written contract governed the duties of Metropolitan and Evelynmoe, and therefore, the equitable remedy of unjust enrichment did not apply. *See Leasepartners*, 113 Nev. at 755, 942 P.2d at 187. The district court further determined that Evelynmoe did not owe the storage fees to appellants because the "necessity for said storage was caused by [appellants'] refusal to return [Evelynmoe]'s vehicle when requested on April 25, 2018 and not by [Evelynmoe]'s lack of diligence in picking up his car upon completion of repairs." This factual determination by the district court is supported by substantial evidence in the record, including Evelynmoe's testimony, which the district court found credible throughout trial. Therefore, appellants' counterclaim for unjust enrichment as it relates to the storage fees for Evelynmoe's vehicle fails. *Id.* For this reason, we conclude that the district court did not err in denying appellants' counterclaim for unjust enrichment. [9]

### The contract's legal fees provision was unconscionable, and the district court did not err in refusing to enforce it

"Whether, given the trial court's factual findings, a contractual provision is unconscionable is a question of law subject to de novo review." *D.R. Horton, Inc. v. Green,* 120 Nev. 549, 553, 96 P.3d 1159, 1162 (2004), *overruled on other grounds by U.S. Home Corp. v. Michael Ballesteros Tr.,* 134 Nev. 180, 415 P.3d 32 (2018). We will uphold a lower court's findings of fact supporting a finding of unconscionability so long as they are supported by substantial evidence. *Id.*

**\*8** Generally, both procedural and substantive unconscionability are required before a court will render a contractual provision unenforceable by reason of unconscionability. *Burch v. Second Judicial Dist. Court,* 118 Nev. 438, 443, 49 P.3d 647, 650 (2002). Procedural unconscionability is present where a contract is presented on a pre-printed, standardized form, which does

not permit the weaker party to negotiate its terms. *See id.* at 442, 443-44, 49 P.3d at 649-50 (explaining that an application form is procedurally unconscionable where the application is presented on a pre-printed, standardized form, which does not allow the signee "a meaningful opportunity to decide if they [want] to agree" to its terms). On the other hand, "[t]he substantive element of unconscionability focuses on the actual terms of the contract and assesses whether those terms are overly harsh or one-sided." *See, e.g., Henderson v. Watson,* Docket No. 64545, 2015 WL 2092073, at *2 (Nev. Apr. 29, 2015) (Order Affirming in Part, Reversing in Part, and Remanding) (citing *Armendariz v. Found. Health Psychcare Servs., Inc.,* 6 P.3d 669, 690 (Cal. 2000)). A contractual provision is not substantively unconscionable where the provision applies equally to both parties. *Id.* at *2. Procedural and substantive unconscionability need not be present in the same magnitude, and less evidence of procedural unconscionability is required where the presence of substantive unconscionability is so substantial. *See Armendariz,* 6 P.3d at 690.

Here, the contract provided by Metropolitan was a pre-printed, standardized form that Metropolitan utilizes when customers appear inperson to finalize their agreements for repair and/or restoration work. The only portions of the contract that did not contain a pre-printed term were blanks for consumers to fill out their personal information, as well as for the price of the repair and restoration work sought. The legal fees provision in question states, "I agree to pay all legal fees associated with any and all disputes."

Because the work authorization contract was a pre-printed and standardized form, Evelynmoe did not appear to have the ability to negotiate regarding the legal fees provision and was instead required to "take it or leave it." *See Burch,* 118 Nev. at 442, 49 P.3d at 649. This demonstrates the presence of procedural unconscionability. *Id.* at 443-44, 49 P.3d at 650. Although appellants suggest that Evelynmoe could have negotiated a different contract, no language in the contract suggests that this was an option.

Additionally, the presence of substantive unconscionability in the legal fees provision is significant. The contract's requirement that Evelynmoe "pay all legal fees associated with any and all disputes" is entirely one-sided, as it does not require appellants to pay legal fees under any circumstance. Appellants attempt to argue that a reversal of the district court's refusal to enforce the legal fees provision is warranted because the district court relied on *Horton* in coming to its conclusion, which is no longer good law. However, the principle in *Horton* that a provision is procedurally unconscionable where it is not more conspicuous than other terms in a contract, was overruled only in its application to arbitration provisions, which is distinguishable from the legal fees provision at issue here. *U.S. Home Corp.,* 134 Nev. at 190, 415 P.3d at 41 ("Requiring an arbitration clause to be more conspicuous than other contract provisions is exactly the type of law ... the FAA preempts ...." (citation omitted)). The district court's findings still support the presence of procedural unconscionability. *See Burch,* 118 Nev. at 443-44, 49 P.3d at 650. Further, the significant substantive unconscionability of the legal fees provision required less evidence of procedural unconscionability for the court to refuse to enforce the provision. *Armendariz,* 6 P.3d at 690. For the foregoing reasons, we conclude that the district court did not err in refusing to enforce the legal fees provision. [10]

 **\*9**  In light of the foregoing, we affirm the district court's judgment as to appellants' liability, but we reverse the judgment for a partial recalculation of damages in accordance with our disposition.

It is so ORDERED.

**All Citations**

526 P.3d 1110 (Table), 2023 WL 2661524

**Footnotes**

1   Metropolitan and Fox are hereinafter collectively referred to as appellants where appropriate.

2   We recount the facts only as necessary for our disposition.

3   We note that Evelynmoe's payments total $68,104.28, which is $600 short of the $68,704.28 price for the completed repair and restoration work. However, we note that Metropolitan charged Evelynmoe a credit card fee of $600, which is reflected in Metropolitan's invoice for the repair and restoration work and would account for this discrepancy.

4   Although this breakdown of damages does not reflect it, the district court stated in its conclusions of law that "[Evelynmoe] sustained damages in the amount of $11,350.00 caused by Metropolitan's breach of the implied covenant of good faith and fair dealing, because [Evelynmoe]'s justified expectations were denied."

5   This court need not reach appellants' argument that the district court abused its discretion by letting Evelynmoe testify regarding the value of his vehicle and its components, as appellants fail to cite any relevant legal authority to support that expert testimony was required to establish these values of which Evelynmoe had personal knowledge. *See Edwards v. Emperor's Garden Rest.*, 122 Nev. 317, 330 n.38, 130 P.3d 1280, 1288 n.38 (2006) (explaining that this court need not consider an appellant's argument that is not cogently argued or lacks the support of relevant authority).

6   We reject appellants' contention that Evelynmoe's testimony regarding the estimated completion date constituted impermissible parol evidence. *See State ex rel. List v. Courtesy Motors*, 95 Nev. 103, 106, 590 P.2d 163, 165 (1979) (providing that "parol or extrinsic evidence is not admissible to add to, subtract from, vary, or contradict ... written instruments which ... are contractual in nature and which are valid, complete, [u]nambiguous, and unaffected by accident or mistake" (first alteration in original) (internal quotation marks omitted)). The district court did not look to the testimony to vary the terms of the parties' agreement; rather, the court considered the testimony as evidence concerning what constituted a reasonable time for performance by appellants under the contract. Because the contract was silent as to time for performance and, therefore, there was no term in the contract for this extrinsic oral evidence to contradict, we conclude that the district court did not abuse its discretion in admitting Evelynmoe's testimony regarding the estimated completion date.

7   We note that, while the district court did not label Metropolitan's actions as "bad faith conduct," such may be inferred by their failure to conduct any work for nearly a year after Evelynmoe paid in full for the contracted work. *See Pease v. Taylor*, 86 Nev. 195, 197, 467 P.2d 109, 110 (1970) ("[E]ven in the absence of express findings, if the record is clear and will support the judgment, findings may be implied.").

8   We note that the damages awarded to Evelynmoe pursuant to his conversion claim are applicable to both Fox and Metropolitan, and to the extent these damages were or could have been awarded against Metropolitan under the breach of the implied covenant of good faith and fair dealing, we note that the district court must avoid counting these damages twice in recalculating Evelynmoe's appropriate award in accordance with our analysis below.

9   Even if Evelynmoe's failure to timely post the bond voided the preliminary injunction, the work authorization contract supports that appellants still would not be entitled to the return of their storage fees. The work authorization contract states, "PLEASE NOTE: A daily storage charge may be applied of up to $70.30 per day for motor vehicles that have not been picked up after 3 working days from the date of *notification that repairs have been complete*." (Emphasis added.) The plain language of this provision suggests that the storage fees would only begin accruing three days after Metropolitan's completion of the contracted repairs, which never occurred. Further, the preliminary injunction was only related to the storage fees and was not required to preserve the title to the vehicle that remained in Evelynmoe's name following the hearing on the preliminary injunction without the requirement of posting a bond.

10   Insofar as the parties have raised arguments that are not specifically addressed in this order, we have considered the same and conclude that they either do not present a basis for relief or need not be reached given the disposition of this appeal.

2023 WL 2661524

---

**End of Document**

© 2023 Thomson Reuters. No claim to original U.S. Government Works.

# EXHIBIT 17

Case 1:23-cv-00418-MAC   Document 6-1   Filed 02/20/24   Page 203 of 394 PageID #:  249

Huawei Technologies Co., Ltd. v. Yiren Huang, Not Reported in Fed. Supp. (2018)

2018 WL 1964180

2018 WL 1964180
Only the Westlaw citation is currently available.
United States District Court, E.D. Texas, Sherman Division.

HUAWEI TECHNOLOGIES CO., LTD., and Futurewei Technologoies, Inc.

v.

YIREN Ronnie HUANG, and CNEX Labs, Inc.

Civil Action No. 4:17-CV-00893
|
Signed 04/25/2018

**Attorneys and Law Firms**

Andrew S. Boutros, Michael D. Wexler, Seyfarth Shaw LLP, Chicago, IL, Elizabeth Siebman Forrest, Siebman, Burg, Phillips & Smith LLP, Plano, TX, Jesse M. Coleman, Seyfarth Shaw, LLP, Houston, TX, Clyde Moody Siebman, Siebman Burg Phillips & Smith LLP, Sherman, TX, for Huawei Technologies Co., Ltd., and Futurewei Technologoies, Inc.

Bryan Alexander Kohm, Michael J. Sacksteder, Fenwick & West, San Francisco, CA, Christopher John Schwegmann, Lynn Pinker Cox & Hurst LLP, Dallas, TX, Gabriel S. Gross, Latham & Watkins LLP, Menlo Park, CA, for Yiren Ronnie Huang, and CNEX Labs, Inc.

### MEMORANDUM OPINION AND ORDER

AMOS L. MAZZANT, UNITED STATES DISTRICT JUDGE

 **\*1**  Pending before the Court are Defendants CNEX Labs, Inc. and Yiren "Ronnie" Huang's Motion to Dismiss for Improper Venue and for Failure to State a Claim Under Rule 12(b)(6) (Dkt. #14) ("Initial Motion to Dismiss"), Defendants CNEX Labs, Inc. and Yiren "Ronnie" Huang's Motion to Dismiss Plaintiffs' First Amended Complaint for Improper Venue and for Failure to State a Claim Under Rule 12(b)(6) ("Motion to Dismiss") (Dkt. #34), and Defendants CNEX Labs, Inc. and Yiren Ronnie Huang's Motion for Leave to Address Issues Raised at the April 2, 2018 Hearing ("Motion for Leave") (Dkt. #56). Having considered the motions and the relevant pleadings, the Court finds that Defendants' Initial Motion should be denied as moot, Defendants' Motion to Dismiss as to Defendants' 12(b)(3) argument for improper venue should be denied, Defendants' 12(b)(6) argument for failure to state a claim should be granted in part, and Defendants' Motion for Leave should be granted.

### BACKGROUND

Plaintiff Huawei Technologies Co., Ltd. ("Huawei") is a multinational networking and telecommunications equipment and services company headquartered in China. Plaintiff Futurewei Technologies, Inc. ("Futurewei") is a subsidiary of Huawei with several offices throughout the United States, including Plano, Texas. In December 2010, Futurewei offered Yiren "Ronnie" Huang ("Huang") employment as a Principal Engineer for its solid-state drive ("SSD") storage group, to assist in development and implementation of Advance Computing Network ("ACN"), non-volatile memory express ("NVMe"), and SSD technology. Huang accepted the offer in January 2011. Huang worked in the Santa Clara office and was domiciled in Santa Clara County, California. At the Futurewei new hire orientation, Huang signed an employment contract (the "Employment Agreement"), which contained the following forum-selection clause:

**12. General Provisions.**

(a) **Governing Law.** This Agreement will be governed by and construed according to the laws of the State of Texas without regard to conflicts of law principles.

(b) **Exclusive Forum.** I hereby irrevocably agree that the exclusive forum for any suit, action, or other proceeding arising out of or in any way related to this Agreement shall be in the state or federal courts in Texas, and I agree to the exclusive personal jurisdiction and venue to any court on Collin County Texas.

(Dkt. #34, Exhibit 1 at pp. 21–22). The Employment Agreement also contained provisions relating to non-disclosure, non-competition, and non-solicitation.

Based on Huang's job responsibilities, Plaintiffs contend that Huang had access to confidential, proprietary, and trade secret information. On May 31, 2013, Huang ended his employment with Futurewei. On June 3, 2013, Huang, along with others, incorporated CNEX Labs, Inc. ("CNEX"), a Delaware Corporation with its principal place of business in California. Plaintiffs allege, among other things, that Huang incorporated CNEX to compete directly with Plaintiffs, Huang is using Plaintiffs' confidential, proprietary, and trade secret information to develop and improve SSD technology and NVMe related technology for CNEX, and further that Huang and CNEX are improperly soliciting employees away from Plaintiffs. Additionally, Plaintiffs allege that Huang started to engage in this behavior informally prior to leaving Futurewei. Plaintiffs further contend that Huang and CNEX began filing patent applications in June 2013, using the information that Huang obtained through his employment with Futurewei.

**\*2**  Plaintiffs filed suit in the Eastern District of Texas on December 28, 2017, against Defendants seeking declaratory judgment and alleging a variety of causes of action including breach of contract, disclosure and misappropriation of confidential information and trade secrets, tortious interference with contract and prospective contracts, conspiracy claims, Racketeer Influence and Corrupt Organizations Act of 1970 ("RICO") claims, breach of fiduciary duty, and unfair competition under Lanham Act and Texas common and statuary law (Dkt. #1). On the same date, Defendants filed suit of a similar nature in the Superior Court of California, County of Santa Clara (Dkt. #34, Exhibit 5 at p. 1). [1]

In response to this Complaint, Defendants filed their Initial Motion to Dismiss on February 2, 2018 (Dkt. #14). Plaintiffs filed a response (Dkt. #22), but also filed Plaintiffs' First Amended Complaint (Dkt. #27). In response to the First Amended Complaint, on March 9, 2018, Defendants filed the present Motion to Dismiss (Dkt. #34). Plaintiffs filed a response (Dkt. #42), Defendants filed a reply (Dkt. #46), and Plaintiffs filed a sur-reply (Dkt. #50). The Court held a hearing on the Motion to Dismiss on April 2, 2018. After the hearing, Defendants filed a Motion for Leave to Address Issues Raised at the April 2, 2018 Hearing (Dkt. #56). Plaintiffs have not yet filed a response.

### LEGAL STANDARD

**I. Motion to Dismiss for Improper Venue Pursuant to Rule 12(b)(3)**

Federal Rule of Civil Procedure 12(b)(3) allows a party the ability to move the Court to dismiss an action for "improper venue." The Court "must accept as true all allegations in the complaint and resolve all conflicts in favor of the plaintiff." *Mayfield v. Sallyport Global Holdings, Inc.*, No. 6:16-CV-459, 2014 WL 978685, at *1 (E.D. Tex. Mar. 5, 2014) (citing *Ambraco, Inc. v. Bossclip, B.V.*, 570 F.3d 233, 237–38 (5th Cir. 2009) ). In determining whether venue is proper, "the [C]ourt is permitted to look at evidence in the record beyond those facts alleged in the complaints and its proper attachments." *Ambraco*, 570 F.3d at 238. If venue is improper, the Court must dismiss it, "or if it be in the interest of justice, transfer such case to any district or division in which it could have been brought." 28 U.S.C. § 1406(a); *accord* FED. R. CIV. P. 12(b)(3).

**II. Motion to Dismiss for Failure to State a Claim Pursuant to Rule 12(b)(6)**

The Federal Rules of Civil Procedure require that each claim in a complaint include a "short and plain statement ... showing that the pleader is entitled to relief." FED. R. CIV. P. 8(a)(2). Each claim must include enough factual allegations "to raise a right to relief above the speculative level." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007).

A Rule 12(b)(6) motion allows a party to move for dismissal of an action when the complaint fails to state a claim upon which relief can be granted. FED. R. CIV. P. 12(b)(6). When considering a motion to dismiss under Rule 12(b)(6), the Court must accept as true all well-pleaded facts in plaintiff's complaint and view those facts in the light most favorable to the plaintiff. *Bowlby v. City of Aberdeen*, 681 F.3d 215, 219 (5th Cir. 2012). The Court may consider "the complaint, any documents attached to the complaint, and any documents attached to the motion to dismiss that are central to the claim and referenced by the complaint." *Lone Star Fund V (U.S.), L.P. v. Barclays Bank PLC*, 594 F.3d 383, 387 (5th Cir. 2010). The Court must then determine whether the complaint states a claim for relief that is plausible on its face. " 'A claim has facial plausibility when the plaintiff pleads factual content that allows the [C]ourt to draw the reasonable inference that the defendant is liable for the misconduct alleged.' " *Gonzalez v. Kay*, 577 F.3d 600, 603 (5th Cir. 2009) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) ). "But where the well-pleaded facts do not permit the [C]ourt to infer more than the mere possibility of misconduct, the complaint has alleged—but it has not 'show[n]'—'that the pleader is entitled to relief.' " *Iqbal*, 556 U.S. at 679 (alteration in original) (quoting FED. R. CIV. P. 8(a)(2) ).

 **\*3**  In *Iqbal*, the Supreme Court established a two-step approach for assessing the sufficiency of a complaint in the context of a Rule 12(b)(6) motion. First, the Court should identify and disregard conclusory allegations, for they are "not entitled to the assumption of truth." *Id.* Second, the Court "consider[s] the factual allegations in [the complaint] to determine if they plausibly suggest an entitlement to relief." *Id.* at 681. "This standard 'simply calls for enough facts to raise a reasonable expectation that discovery will reveal evidence of the necessary claims or elements.' " *Morgan v. Hubert*, 335 Fed.Appx. 466, 470 (5th Cir. 2009) (citation omitted). This evaluation will "be a context-specific task that requires the reviewing [C]ourt to draw on its judicial experience and common sense." *Iqbal*, 556 U.S. at 679.

Thus, "[t]o survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.' " *Id.* at 678 (quoting *Twombly*, 550 U.S. at 570).

### III. Federal Rule of Civil Procedure 9(b)

Rule 9(b) states, "[i]n alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake. Malice, intent, knowledge, and other conditions of a person's mind may be alleged generally." FED. R. CIV. P. 9(b).

Rule 9(b)'s particularity requirement generally means that the pleader must set forth the "who, what, when, where, and how" of the fraud alleged. *United States ex rel. Williams v. Bell Helicopter Textron, Inc.*, 417 F.3d 450, 453 (5th Cir. 2005). A plaintiff pleading fraud must "specify the statements contended to be fraudulent, identify the speaker, state when and where the statements were made, and explain why the statements were fraudulent." *Herrmann Holdings Ltd. v. Lucent Techs. Inc.*, 302 F.3d 552, 564–65 (5th Cir. 2002). The goals of Rule 9(b) are to "provide[ ] defendants with fair notice of the plaintiffs' claims, protect[ ] defendants from harm to their reputation and goodwill, reduce[ ] the number of strike suits, and prevent[ ] plaintiffs from filing baseless claims." *United States ex rel. Grubbs v. Kanneganti*, 565 F.3d 180, 190 (5th Cir. 2009) (citing *Melder v. Morris*, 27 F.3d 1097, 1100 (5th Cir. 1994) ). Courts are to read Rule 9(b)'s heightened pleading requirement in conjunction with Rule 8(a)'s insistence on simple, concise, and direct allegations. *Williams v. WMX Techs., Inc.*, 112 F.3d 175, 178 (5th Cir. 1997). However, this requirement "does not 'reflect a subscription to fact pleading.' " *Grubbs*, 565 F.3d at 186. "Claims alleging violations of the Texas Insurance Code and the DTPA and those asserting fraud, fraudulent inducement, fraudulent concealment, and negligent misrepresentation are subject to the requirements of Rule 9(b)." *Frith v. Guardian Life Ins. Co. of Am.*, 9 F. Supp. 2d 734, 742 (S.D. Tex. 1998); *see Berry v. Indianapolis Life Ins. Co.*, No. 3:08-CV-0248-B, 2010 WL 3422873, at \*14 (N.D. Tex. Aug. 26, 2010) (" '[W]hen the parties have not urged a separate focus on the negligent misrepresentation claims,' the Fifth Circuit has found negligent misrepresentation claims subject to Rule 9(b) in the same manner as fraud claims."). Failure to comply with Rule 9(b)'s requirements authorizes the Court to dismiss the pleadings as it would for failure to state a claim under Rule 12(b)

203WL 6 31543W0

(6). *United States ex rel. Williams v. McKesson Corp.*, No. 3:12-CV-0371-B, 2014 WL 3353247, at *3 (N.D. Tex. July 9, 2014) (citing *Lovelace v. Software Spectrum, Inc.*, 78 F.3d 1015, 1017 (5th Cir. 1996) ).

# ANALYSIS

Defendants ask the Court to dismiss Plaintiffs' claims because the Eastern District of Texas is not the proper venue for the case and because Plaintiffs failed to properly state a claim for which relief can be granted. Plaintiffs assert that venue is proper and that the First Amended Complaint satisfies *Federal Rules of Civil Procedure 8(a)* and *9(b)*. The Court addresses each basis for dismissal in turn.

## I. Motion to Dismiss for Improper Venue Pursuant to 12(b)(3)

**\*4** Defendants argue that the Court should dismiss Plaintiffs' claims because the Eastern District of Texas is not a proper venue pursuant to the federal venue statutes and the forum-selection clause does not make venue proper. Further, Defendants maintain, that even if the forum-selection clause made venue proper in the Eastern District of Texas, venue is still improper because CNEX is not bound by the agreement and is an indispensable party. The Court first addresses the enforceability and effect of the forum-selection clause, then whether CNEX is properly bound by the forum-selection clause.

## A. Forum-Selection Clause

Defendants ask the Court to dismiss the case arguing that venue is improper under the federal venue statutes and the forum-selection clause does not affect the propriety of venue. Plaintiffs counter that the forum-selection clause contained in Huang's Employment Agreement makes venue proper in the Eastern District of Texas. [2]

When analyzing the enforceability of forum-selection clauses "federal law applies ... in both diversity and federal question cases." *Braspetro Oil Servs. Co. v. Modec (USA), Inc.*, 240 Fed.Appx. 612, 615 (5th Cir. 2007) (citing *Scherk v. Alberto-Culver Co.*, 417 U.S. 506, 516 (1974) ). Under federal law, forum-selection clauses "are prima facie valid and should be enforced unless enforcement is shown by the resisting party to be 'unreasonable' under the circumstances." *M/S Bremen v. Zapata Off-Shore Co.*, 407 U.S. 1, 10 (1972) ("*The Bremen*"). A forum-selection clause may be found unreasonable when the movant shows: (1) that it is the product of fraud or overreaching; (2) that it violates a strong public policy of the forum; (3) that enforcement of the clause effectively deprives plaintiff of his day in court; or (4) that the fundamental unfairness of the chosen law will deprive plaintiff of a remedy. *Haynsworth v. The Corp.*, 121 F.3d 956, 963 (5th Cir. 1997) (citing *Carnival Cruise Lines, Inc. v. Shute*, 499 U.S. 585, 595 (1991) ). The resisting party asserting unreasonableness bears " 'a heavy burden of proof.' " *Carnival Cruise Lines, Inc.*, 499 U.S. at 592 (quoting *The Bremen*, 407 U.S. at 17). If the forum-selection clause is found to be reasonable, courts must then determine whether the claims arise under the forum-selection clause. *Ginter ex rel. Ballard v. Belcher, Predergrast & Laporte*, 536 F.3d 439, 441 (5th Cir. 2008) (citing *Marinechance Shipping Ltd. v. Sebastian*, 143 F.3d 216, 222–23 (5th Cir. 1998) ).

Additionally, courts must also determine whether the forum-selection clause is mandatory or permissive. *Caldas & Sons, Inc. v. Willingham*, 17 F.3d 123, 127 (5th Cir. 1994). "A party's consent to jurisdiction in one forum does not necessarily waive that party's right to have an action heard in a different forum." *City of New Orleans v. Mun. Admin. Serv., Inc.*, 376 F.3d 501, 504 (5th Cir. 2004); *accord Caldas & Sons*, 17 F.3d at 127. "For a forum[-]selection clause to be exclusive, it must go beyond establishing that a particular forum will have jurisdiction and must clearly demonstrate the parties' intent to make that jurisdiction exclusive." *City of New Orleans*, 376 F.3d at 504 (citing *Keaty v. Freeport Indon., Inc.,* 503 F.2d 955 (5th Cir. 1974) ).

**\*5** Here, the parties do not dispute that the clause is mandatory or that Plaintiffs' claims are within the scope of the forum-selection clause. The forum-selection clause states "I hereby irrevocably agree that the *exclusive* forum for any suit, action, or other proceeding arising out of or in any way related to this Agreement shall be in the state or federal courts in Texas, and I

2018 WL 6 31543W0

agree to the *exclusive* personal jurisdiction and venue to any court on Collin County Texas." (Dkt. #34, Exhibit 1 at pp. 21–22) (emphasis added). The clause contains clear language that venue is appropriate only in state or federal courts in Collin County, Texas. As such, the only remaining issue is whether the forum-selection clause is reasonable. If so, then venue is proper in the Eastern District of Texas.

In their reply, Defendants argue that the forum-selection clause is unreasonable and therefore unenforceable based on fraud and overreaching. Defendants maintain that the forum-selection clause is the result of fraud and overreaching because (1) Futurewei materially changed the terms of employment after Huang accepted employment and quit his prior job; (2) Huang was not permitted to consult an attorney or otherwise investigate the legality of the terms; (3) the factual scenario created an inequality of bargaining power; and (4) no one at Futurewei pointed out the terms of the "governing law" or "exclusive forum" section. Plaintiffs contend that the argument is waived because Defendants raised it too late. [3]

> [U]nreasonable fraud or overreaching 'does not mean that any time a dispute arising out of a transaction is based upon an allegation of fraud[,] ... the clause is unenforceable. Rather, it means that an arbitration or forum-selection clause in a contract is not enforceable if the ***inclusion of that clause in the contract*** was the product of fraud or coercion.' Allegations of such [fraudulent] conduct as to the contract as a whole—or portions of it other than the ... [forum-selection] clause—are insufficient, the claims of fraud or overreaching must be aimed straight at the [forum-selection] clause in order to succeed.

*Oxysure Therapeutics, Inc. v. Gemini Master Fund, Ltd.*, No. 4:15-cv-821-ALM-CAN, 2016 WL 4083241, at *4 (E.D. Tex. July 8, 2016), *report and recommendation adopted by*, 2016 WL 4039226 (E.D. Tex. July 28, 2016) (emphasis in original) (alterations in original) (quoting *Haynsworth*, 121 F.3d at 963); *accord Safety-Kleen Sys., Inc. v. McCoy Freightliner, Inc.*, No. 4:10-cv-608, 2011 WL 665812, at *6 (E.D. Tex. Jan. 21, 2011), *report and recommendation adopted by*, 2011 WL 665854 (E.D. Tex. Feb. 14, 2011).

Here, regardless of whether Defendant waived the argument, the Court finds the argument unpersuasive. As to the first three reasons Defendants provided to prove fraud and overreaching, they address the Employment Agreement as a whole, as opposed to being specifically directed toward the forum-selection clause. As to Defendants' first argument—Futurewei materially changed the terms of Huang's employment after accepting his job and quitting his old job—Defendants argue that Huang received an offer letter (the "Offer Letter"), which Huang believed contained all the material terms of employment. According to Huang, the Offer Letter made "no mention that the [Employment Agreement] would include a forum-selection clause or any clause requiring [him] to assign all of [his] inventions relating to Futurewei's business for one year after [he] left the company." (Dkt. #46, Exhibit 2 at ¶ 5). [4] Both of these clauses are contained in the Employment Agreement. As such, there are at least two provisions that Defendants contend Futurewei materially altered between what was contained in the Offer Letter to what was contained in the Employment Agreement. This falls short of a specific challenge to the forum-selection clause. *See Haynsworth*, 121 F.3d at 964.

**\*6** As to Defendants' second argument—Huang was not permitted to consult with an attorney—Huang's declaration claims that he "was not permitted nor encouraged to consult with an attorney before signing [the Employment Agreement]." (Dkt. #46, Exhibit 2 at ¶ 8). This is not a specific challenge to the forum-selection clause, but challenges the entirety of the agreement. Similarly, Defendants' third argument—the alleged inequality of bargaining power—is based on the circumstances surrounding Huang's signing of the Employment Agreement, stated differently, it is a challenge to the entirety of the Employment Agreement, not specifically the forum-selection clause. As previously detailed, a challenge to the Employment Agreement as a whole is insufficient to show that a forum-selection clause is unreasonable.

Finally, Defendants' fourth argument—Futurewei failed to point out the forum-selection clause—also fails to demonstrate fraud or overreaching. " 'A person who signs a written instrument is presumed to know its contents and cannot avoid his obligations by contending that he did not read it, or that it was not explained or that he did not understand it.' " [5] *Haynsworth*, 121 F.3d at 965 n.17 (quoting *In re Cajun Elec. Power Coop. v. Riley Stoker Corp.*, 791 F.2d 353, 359 (5th Cir. 1986) ) (citing *Bonny v. Soc'y of Llyod's*, 3 F.3d 156, 160 n.10 (7th Cir. 1993) ); *St. Petersburg Bank & Trust Co. v. Boutin*, 445 F.2d 1028, 1032 (5th Cir. 1971)

Huawei Technologies Co., Ltd. v. Yiren Huang, Not Reported in Fed. Supp. (2018)

2018 WL 6 31543W0

). Because all of Defendants' arguments fall short, the Court finds Defendants failed to meet their "heavy burden" to show the forum-selection clause is unenforceable. As a result, the Court finds that it should enforce the mandatory forum-selection clause.

Defendants contend that even if the Court finds that the forum-selection clause is enforceable and mandatory, venue is still improper pursuant to the Supreme Court of the United States' holding in *Atlantic Marine*. The Court is unpersuaded. The Supreme Court in *Atlantic Marine* faced a different factual scenario and decided a wholly different issue. In *Atlantic Marine*, the parties entered into a forum-selection clause, which required disputes to be brought in the " 'Circuit Court for the City of Norfolk, Virginia, or the United States District Court for the Eastern District of Virginia, Norfolk Division.' " *Atlantic Marine Const. Co. v. U.S. Dist. Court for the W. Dist. of Tex.*, 571 U.S. 49, 53 (2013). However, when a dispute arose, the plaintiff filed suit in the Western District of Texas, and the defendant subsequently moved to dismiss the suit, arguing that the forum-selection clause made venue "wrong" or "improper" in the Western District of Texas. *Id.* Thus, "[t]he question in [*Atlantic Marine*] concern[ed] the procedure that is available for a defendant in a civil case who seeks to enforce a forum-selection clause." *Id.* at 52. The Court decided that "[w]hether venue is 'wrong' or 'improper' depends exclusively on whether the court in which the case was brought satisfies the requirements of federal venue laws, and those provisions say nothing about a forum-selection clause." *Id.* at 55. Accordingly, the Supreme Court held that the proper vehicle for a defendant to enforce a forum-selection clause is § 1404 or *forum non conveniens*, if the forum-selection clause identified a state or foreign forum. *Id.* at 59–60.

The Supreme Court of the United States' holding in *Atlantic Marine* holding combatted concerns that enforcing a forum-selection clause could flout congressional intent. "[T]he venue statutes reflect Congress' intent that venue should always lie in *some* federal court whenever federal courts have personal jurisdiction over the defendant." *Atlantic Marine*, 571 U.S. at 56 (emphasis in original).

**\*7** "Congress does not in general intend to create venue gaps, which take away with one hand what Congress has given by way of jurisdictional grant with the other." Yet [the defendant's] approach would mean that in some number of cases—those in which the forum-selection clause points to a state or foreign court—venue would not lie in any federal district That would not comport with the statute's design, which contemplates that venue will always exist in some federal court.

*Id.* (quoting *Smith v. United States*, 507 U.S. 197, 203 (1993) ). Consequently, the Court held that "[i]f the federal venue statutes establish that suit may be brought in a particular district, a contractual bar cannot render venue in that district 'wrong,' " thereby ensuring at least one federal court would have proper venue in every case upholding Congressional intent. *Id.* at 58.

While some courts throughout the country[6] have found this holding to be applicable to the current set of facts, the Court respectfully finds *Atlantic Marine* is inapposite to the Court's analysis in this case. Initially, the present case presents an entirely different factual scenario. Here, Plaintiffs filed suit in the venue mandated by the forum-selection clause. Moreover, this set of facts does not present the same risk of running afoul Congress' intent to have venue lie in at least one federal court. This set of facts actually promotes the strong federal policy in favor of enforcing forum-selection clauses. *Calix-Chacon v. Global Int'l Marine, Inv.*, 493 F.3d 507, 513 (5th Cir. 2007) (citing *Stewart Org., Inc. v. Ricoh Corp.*, 487 U.S. 22, 23 (1988) ). The Supreme Court in *Atlantic Marine* identified the importance of enforcing the parties' agreement:

> When parties have contracted in advance to litigate disputes in a particular forum, courts should not unnecessarily disrupt the parties' settled expectations. A forum-selection clause, after all, may have figured centrally in the parties' negotiations and may have affected how they set monetary and other contractual terms; it may, in fact, have been a critical factor in their agreement to do business together in the first place.

*Atlantic Marine*, 571 U.S. at 66.

203 WL 6 31543 W0

The general federal venue statute dictates that venue is proper in:

> (1) a judicial district in which any defendant resides, if all defendants are residents of the State in which the district is located;

> (2) a judicial district in which a substantial part of the events or omissions giving rise to the claim occurred, or a substantial part of property that is the subject of the action is situated; or

> (3) if there is no district in which an action may otherwise be brought as provided in this section, any judicial district in which any defendant is subject to the court's personal jurisdiction with respect to such action.

28 U.S.C. § 1391(b). The Court agrees with the holding in *Atlantic Marine* that "[w]hether the parties entered into a contract containing a forum-selection clause has no bearing on whether a case falls into one of the categories of cases listed in § 1391(b)." *Atlantic Marine*, 571 U.S. at 56.

**\*8** However, what the Court in *Atlantic Marine* did not need to address is that "[v]enue also 'may be proper ... if consented to by the parties in a forum[-]selection clause." *Healthcare Servs. Grp., Inc. v. Skyline Servs. Grp.*, No. 17-2703, 2018 WL 637773, at \*5 (E.D. Pa. Jan. 30, 2018) (quoting *AAMCO Transmissions, Inc. v. Romano*, 42 F. Supp. 3d 700, 706 (E.D. Pa. 2014) ) (citing *Carnival Cruise Lines, Inc.*, 499 U.S. at 591–94); *accord Kevlin Servs., Inc. v. Lexington State Bank*, 46 F.3d 13, 15 (5th Cir. 1995) (holding "we find that the choice of forum provision validly contracts for venue in Dallas County, Texas, thereby granting the district court jurisdiction [7] over [the defendant]."). Several district courts across the country after *Atlantic Marine* have agreed. [8] *See, e.g., Nymbus, Inc. v. Sharp*, No. 3:17-cv-1113, 2018 WL 705003, at \*6 (D. Conn. Feb. 5, 2018); *Healthcare Servs. Grp.*, No. 17-2703, 2018 WL 637773, at \*5; *Kamtel, Inc. v. Bore Tech Const., LLC*, No. 16-cv-633-bbc, 2017 WL 532337, at \*6 (W.D. Wis. Feb. 9, 2017); *Javeler Marine Servs. LLC v. Cross*, No. H-14-0670, 2014 WL 6886097, at \*7 (S.D. Tex. Dec. 4, 2014); *Mach 1 Air Servs., Inc. v. Mainfreight, Inc.*, No. CV-14-01444-PHX-SPL, 2015 WL 11181334, at \*4 (D. Ariz. Mar. 5, 2015).

Not only have courts found that venue is proper based on mandatory venue selection clauses, but also a permissive forum-selection clauses make venue proper. A permissive clause "authorizes filing in a designated forum but does not foreclose other fora." *TruGreen Landcare, L.L.C. v. Telfair Cmty. Ass'n, Inc.*, No. H–12–514, 2013 WL 2147471, at \*1 (S.D. Tex. May 14, 2013) (citing *Breakbulk Transp., Inc. v. M/V Renata*, Civ. A. No. H–07–2985, 2008 WL 1883790, at \*2 (S.D. Tex. Apr. 25, 2008); *Caldas & Sons, Inc. v. Willingham*, 17 F.3d 123, 127–28 (5th Cir. 1994); *Keaty*, 503 F.2d at 956–57). If a permissive clause authorizes filing in the venue designated by the forum-selection clause, it necessarily follows that a mandatory clause would also "authorize[ ] filing in [the] designated forum." *Id.* (citations omitted).

Here, the Court found that the parties entered into a valid and enforceable mandatory forum-selection clause, in which the parties consented to venue in the Eastern District of Texas. Accordingly, venue is proper in the Eastern District of Texas.

Moreover, even if a forum-selection clause does not make venue "proper," dismissal based on improper venue would be inappropriate because "[t]he venue statute 'merely accords to the defendant a personal privilege respecting the venue, or place of suit, which he may assert, or may waive, at his election." *Nymbus*, 2018 WL 705003, at \*6 (quoting *Neribo Co. v. Bethlehem Shipbuilding Corp.*, 308 U.S. 165, 168 (1939) ) (citing *Leroy v. Great W. United Corp.*, 443 U.S. 173, 180 (1979) ). Indeed, the personal privilege of proper venue, "may be waived by express agreement or by conduct." *Hunt v. Bankers Trust Co.*, 799 F.2d 1060, 1068 (5th Cir. 1986); *accord City of New Orleans*, 376 F.3d at 504; *In re RFC & ResCap Liquidating Trust Lit.*, 2017 WL1483374, at \*13 (D. Minn. Apr. 25, 2017). "A party may waive its rights by explicitly stating that it is doing so, by allowing the other party the right to choose venue, or by establishing an exclusive venue within the contract." *City of New Orleans*, 376 F.3d at 504. As previously noted, the parties established exclusive venue in the Employment Agreement. Accordingly, even if venue is not "proper," the parties waived their right to have their suit heard in a proper venue by contractually agreeing to venue in the Eastern District of Texas.

**\*9**  Further, the Court's holding today also makes practical sense in terms of judicial efficiency. Under Defendants' reasoning, the Court would dismiss the case for improper venue allowing Plaintiffs to file in a place of a proper venue. However, once filed in the proper venue, Plaintiffs could then, pursuant to the Supreme Court's holding in *Atlantic Marine*, move to transfer the case under 28 U.S.C. § 1404(a), which "permits transfer to any district where venue is proper ... or to any other district to which the parties have agreed by contract or stipulation." *Atlantic Marine*, 571 U.S. at 59. The Supreme Court of the United States altered the analysis for transferring venue under § 1404(a) when a forum-selection clause is involved because " 'the interest of justice' is served by holding parties to their bargain." *Id.* at 66. "Because [the adjusted transfer analysis] will rarely defeat a transfer motion, the practical result is that forum-selection clauses should control except in unusual cases." *Id.* at 64. Therefore, the newly filed case in a court with proper venue would likely transfer the case back to the Eastern District of Texas. This is an inefficient use of the parties' time and the Court's time. This cannot be the result that the Supreme Court intended based on its holding in *Atlantic Marine.*

Accordingly, because the Court found a valid and enforceable forum-selection clause, selecting the Eastern District of Texas as the agreed to forum and venue for disputes arising out of Huang's Employment Agreement, the Court finds that dismissal based on improper venue inappropriate.

### B. CNEX

Defendants maintain that even if venue is proper as to Huang based on the forum-selection clause, CNEX was not a party or a signatory to the Employment Agreement. Defendants contend that CNEX is an indispensable party, and accordingly, the Court must dismiss Plaintiffs' claims because venue is not proper as to CNEX. Plaintiffs maintain that CNEX is bound by the forum-selection clause as a closely related party.

Several circuits have held that a nonsignatory may be bound to a forum-selection clause if the nonsignatory or alleged conduct is closely related to the contractual relationship. *See, e.g.*, *Marano Enters. of Kan. v. Z-Teca Rests., L.P.*, 254 F.3d 753, 758 (8th Cir. 2001); *Lipcon v. Underwriters at Lloyd's, London*, 148 F.3d 1285, 1299 (11th Cir. 1998); *Hugel v. The Corp. of Lloyd's*, 999 F.2d 206, 209–10 (7th Cir. 1993). The Fifth Circuit has not yet spoken to the issue; however, the Fifth Circuit has recognized a non-exclusive number of theories through which a nonsignatory can be bound to a specialized forum-selection clause, an arbitration clause. *Hellenic Inv. Fund, Inc. v. Det Norske Veritas*, 464 F.3d 514, 517 (5th Cir. 2006). Further, several district courts within the Fifth Circuit have held that a nonsignatory can be bound by a forum-selection clause if the nonsignatory or the alleged conduct is closely related to the contractual relationship. *See, e.g.*, *Red Barn Motors, Inc. v. Nextgear Capital, Inc.*, No. 13-0078-BAJ-RLB, 2014 WL 4986674, at \*5–\*6 (M.D. La. Sept. 29, 2014); *Excel Mktg. Sols., Inc. v. Direct Fin. Sols., LLC*, No. 3:11-cv-109-D, 2011 WL 1833022, at \*6 (N.D. Tex. May 13, 2011); *Alt. Delivery Sols., Inc. v. R.R. Donnelley & Sons Co.*, No. Civ.SA05CA0172-XR, 2005 WL 1862631, at \*15–\*16 (W.D. Tex. July 8, 2005); *Tex. Source Grp., Inc. v. CCH, Inc.*, 967 F. Supp. 234, 237 (S.D. Tex. 1997). The Court joins these courts in finding this to be an appropriate means to bind a nonsignatory to a forum-selection clause.

"A nonparty can be bound to a forum[-]selection clause if the nonparty is 'closely related to the dispute such that it becomes foreseeable that it will be bound.' " *Excel Mktgs. Sols.*, 2011 WL 1833022, at \*6 (quoting *Harrison v. Procter & Gamble Co.*, 2007 WL 431085, at \*2 (N.D. Tex. Feb. 8, 2007) ); *accord Hugel*, 999 F.2d at 209. A nonparty can be "closely related" to the signatory or the alleged conduct can be "closely related" to the contractual relationship. *Duncan v. Banks*, No. SA-15-cv-148-XR, 2015 WL 5511253, at \*19 (W.D. Tex. Sept. 16, 2015) (citing *Alt. Delivery Sols.*, 2005 WL 1862631, at \*16). That is, if the nonsignatory is so inextricably intertwined with the signatories that he should be the subject of the forum-selection clause, it can be enforced against the nonsignatory. *Tex. Source Grp., Inc.*, 967 F. Supp. at 237 (citing *Manetti-Farrow, Inc. v. Gucci Am., Inc.*, 858 F.2d 509, 514 n.5 (9th Cir. 1988); *Graham Tech. Sols., Inc. v. Thinking Pictures, Inc.*, 949 F. Supp. 1427, 1434 (N.D. Cal. 1997) ).

203 WL 6 31543 W0

**\*10**  A case from the Seventh Circuit with a similar set of facts found the requisite close relationship to bind a nonsignatory to the forum-selection clause. *Hugel*, 99 F.2d at 209–10. In *Hugel*, the individual defendant entered into a "General Undertaking" in order to be a member of a corporation, which included a forum-selection clause. *Id.* at 207. The district court found that because the individual defendant was the president and chairman of the board for both corporate defendants and the individual defendant owned 99% of the stock of one of the corporate defendants, which in turn owned 100% of the stock of the other corporate defendant, the corporate defendants were "so closely related to the dispute that they are equally bound by the forum selection clause...." *Id.* at 210. The United States Court of Appeals for the Seventh Circuit held that those "findings [were] not clearly erroneous." *Id.* at 210.

Similarly here, the Court, taking as true the allegations in Plaintiffs' First Amended Complaint, finds CNEX is closely related to Huang and the alleged conduct against CNEX is closely related to Huang's Employment Agreement. Huang incorporated CNEX three days after ending his employment with Futurewei. Huang is the founder, promoter, agent, and officer of CNEX. According to Plaintiffs, Huang began operating as the founder, promoter, agent, and officer of CNEX informally, prior to CNEX's formal incorporation on June 3, 2013. Further, Plaintiffs allege that both Huang and CNEX solicited employees to leave Huawei and join CNEX. Accordingly, the Court concludes that CNEX is inextricably intertwined and closely related such that it is foreseeable it would be bound to the terms of the forum-selection clause.

## II. Motion to Dismiss for Failure to State a Claim Pursuant to 12(b)(6)

Defendants argue that the Court should dismiss Counts 7, 9, and 11–22 pursuant to Rule 12(b)(6). Defendants assert a variety of arguments as to the different counts and the Court will address the arguments in turn.

As to Counts 7, 11–14, 17, 19–20, and 22, Defendants argue that they are time-barred. Plaintiffs counter that the discovery rule, equitable estoppel, and fraudulent concealment all work to toll the applicable statute of limitations. The application of the statute of limitations is an affirmative defense. *KPMG Peat Marwick v. Harris Cty. Hous. Fin. Corp.*, 988 S.W.2d 746, 748 (Tex. 1999); *Nogart v. The Upjohn Co.*, 981 P.2d 79, 87 (Cal. 1999). [9]  Accordingly, Defendants bear the burden of establishing as a matter of law that the statute of limitations applies to Plaintiffs' claims. *See KPMG Peat Marwick v.* 988 S.W.2d at 748; *Nogart*, 981 P.2d at 87. Where, as here, Plaintiffs assert the discovery rule, equitable estoppel, and fraudulent concealment, Defendants bear the burden of disproving their application—or proving the applicability of the statute of limitations in spite of the discovery rule, equitable estoppel, and fraudulent concealment—to prevail on a motion to dismiss. After reviewing the First Amended Complaint, the motion to dismiss, the response, the reply, and the sur-reply, the Court finds that Defendants have not met their burden of demonstrating the applicability to the statute of limitations in spite of the discovery rule, equitable estoppel, and fraudulent concealment, as a matter of law and Plaintiffs have stated plausible claims for purposes of defeating a Rule 12(b)(6) motion to dismiss.

Defendants maintain that the Court should dismiss Counts 9–11, Plaintiffs' claims under the Texas Uniform Trade Secrets Act, because the alleged misappropriation began prior to the Texas Uniform Trade Secrets Act's enactment. Plaintiffs counter that they have alleged a variety of acts extending over the course of several years. Based on the current standard and the face of the pleadings, the Court finds that Plaintiffs have adequately pleaded a cause of action under the Texas Uniform Trade Secrets Act; however, the Court does not foreclose Defendants from raising this argument in a later motion for summary judgment.

**\*11**  As to Counts 15–16 and Count 20, Defendants argue that Plaintiffs' claims for common law civil conspiracy and RICO violations are not sufficiently pleaded under the heightened Rule 9(b) pleading standard. Further, Defendants aver that Plaintiffs have not pleaded the existence of an enterprise with any degree of specificity. Moreover, as to the conspiracy to commit fraud claim, Defendants claim that Plaintiffs' pleading falls far short of meeting the standards set out by Rule 9(b). Plaintiffs maintain that they have adequately pleaded their RICO and conspiracy claims.

Plaintiffs assert a cause of action for common law civil conspiracy based on fraudulent activity. Further, Plaintiffs assert causes of action under RICO based on fraudulent conduct, alleging violations of 18 U.S.C. § 1962(c) and conspiracy to commit unlawful

acts under 18 U.S.C. § 1962(c) pursuant to 18 U.S.C. § 1962(d). Because Plaintiffs' claims are based on fraud, Plaintiffs' must satisfy the heightened pleading standard contained in Rule 9(b). FED. R. CIV. P. 9(b).

"The elements of a common law civil conspiracy are: '(1) two or more persons; (2) an object to be accomplished; (3) a meeting of the minds on the object or course of action; (4) one or more unlawful, overt acts; and (5) damages as the proximate result.' " *Hadnot v. City of Woodville*, No. 9:10-cv-117, 2011 WL 13221060, at *2 (E.D. Tex. Feb. 11, 2011) (quoting *Tri v. J.T.T.*, 162 S.W.3d 552, 556 (Tex. 2005); *Massey v. Armco Steel Co.*, 652 S.W.2d 932, 934 (Tex. 1983) ).

Further, common elements required to prove a violation of a subsection of § 1962 include: "(1) a person who engages in (2) a pattern of racketeering activity (3) connected to the acquisition, establishment, conduct or control of an enterprise." *Whelan v. Winchester Prod. Co.*, 319 F.3d 225, 229 (5th Cir. 2003) (citing *Delta Truck & Tractor, Inc. v. J.I. Case Co.*, 855 F.2d 241, 242 (5th Cir. 1988) ). "A RICO claim, 18 U.S.C. § 1962(c), 'requires (1) conduct (2) of an enterprise (3) through a pattern (4) of racketeering activity.' " *Manax v. McNamara*, 842 F.2d 808, 811 (5th Cir. 1988) (quoting *Sedima, S.P.R.L. v. Imrex Co.*, 473 U.S. 479 (1985) ). "An enterprise is a group of persons or entities associating together for the common purpose of engaging in a course of conduct." *Whelan*, 319 F.3d at 229 (citing *United States v. Turkette*, 452 U.S. 576, 583 (1981) ). "The enterprise may be a legal entity or 'any group of individuals *associated in fact* although not a legal entity.' " *Id.* (emphasis in original) (quoting 18 U.S.C. § 1961(4) ).

"An association-in-fact enterprise is simply a continuing unit that functions with a common purpose." *Boyle v. United States*, 556 U.S. 938, 948 (2009). It " 'must have an ongoing organization or be a continuing unit, such that the enterprise has an existence that can be defined apart from the commission of the predicate acts.' " *Zastrow v. Houst. Auto Imports Greenway Ltd.*, 789 F.3d 553, 562 (5th Cir. 2015) (quoting *Montesano*, 818 F.2d at 427). Stated differently, "[t]he enterprise is not a pattern of racketeering activity, but must exist separate and apart from the pattern of racketeering activity in which it engages." *Whelan*, 319 F.3d at 229 (citing *Atkinson v. Anadarko Bank & Tr. Co.*, 808 F.2d 438, 441 (5th Cir. 1987) ); *accord Manax*, 842 F.2d at 811. An association-in-fact enterprise, "need not have a hierarchical structure or a 'chain of command'; decisions may be made on an ad hoc basis and by any number of methods." *Boyle*, 556 U.S. at 948. "Members of the group need not have fixed roles; different members may perform different roles at different times." *Id.* The plaintiff "must plead specific facts, not mere conclusory allegations, which establishes the enterprise." *Montesano*, 818 F.2d at 427.

 **\*12**  The Court agrees with Defendants that Plaintiffs have failed to plead with the requisite specificity an adequate claim for relief for RICO violations and common law civil conspiracy. However, in their response, Plaintiffs request leave to amend their complaint. Rule 15(a) of the Federal Rules of Civil Procedure provides that a party may amend its pleading once without seeking leave of court or the consent of the adverse party at any time before a responsive pleading is served. FED. R. CIV. P. 15(a). After a responsive pleading is served, "a party may amend only with the opposing party's written consent or the court's leave." *Id.* Rule 15(a) instructs the court to "freely give leave when justice so requires." *Id.* The rule "evinces a bias in favor of granting leave to amend." *Jones v. Robinson Prop. Grp., L.P.*, 427 F.3d 987, 994 (5th Cir. 2005) (quoting *Lyn–Lea Travel Corp. v. Am. Airlines, Inc.*, 283 F.3d 282, 286 (5th Cir. 2002) ). But leave to amend "is not automatic." *Matagorda Ventures, Inc. v. Travelers Lloyds Ins. Co.*, 203 F. Supp. 2d 704, 718 (S.D. Tex. 2000) (citing *Dussouy v. Gulf Coast Inv. Corp.*, 660 F.2d 594, 598 (5th Cir. 1981) ). Whether to allow amendment "lies within the sound discretion of the district court." *Little v. Liquid Air Corp.*, 952 F.2d 841, 845–46 (5th Cir. 1992). A district court reviewing a motion to amend pleadings under Rule 15(a) may consider "whether there has been 'undue delay, bad faith or dilatory motive, ... undue prejudice to the opposing party, and futility of amendment.' " *Jacobsen v. Osborne*, 133 F.3d 315, 318 (5th Cir. 1998) (quoting *In re Southmark Corp.*, 88 F.3d 311, 314–15 (5th Cir. 1996) ). The Court finds no undue delay, bad faith, or dilatory motive. Defendants have not argued that an amendment would cause them any prejudice or that it would be futile. Accordingly, the Court grants Plaintiffs leave to amend their complaint to fix the deficiencies identified by Defendants in their motion to dismiss.

As to Count 21, Defendants argue that "corporate raiding" is not a cause of action under either Texas or California law. Plaintiffs respond that while it might not be an independent tort under Texas or California law, other courts have held the claim to be viable and courts in Texas recognize corporate raiding as engaging in unfair competition. Because Plaintiffs acknowledge that

30

"corporate raiding" is not its own independent tort under either California or Texas law, the Court dismisses the cause of action. However, because the Court grants Plaintiffs leave to file an amended complaint, Plaintiffs may amend its complaint to include this conduct as part of their cause of action for unfair competition.

As to Count 22, Defendants assert that Plaintiffs failed to properly state a claim for unfair competition under the Lanham Act. Further, regarding Count 13, Defendants aver that Plaintiffs did not sufficiently allege a claim for international interference with prospective business relations because they do not identify any third party with which they would have done business, do not allege that there was a reasonable probability of entering into a contractual or business relationship with any third party, and did not allege that the prospective business relationships were disrupted. The Court agrees that Plaintiffs' complaint regarding unfair competition under the Lanham Act and tortious interference with prospective business relationships fall short of stating a plausible claim. Nonetheless, Plaintiffs requested leave to amend their complaint, which the Court should freely grant. FED. R. CIV. P. 15(a). Accordingly, the Court grants Plaintiffs leave to amend their complaint to fix the deficiencies identified by Defendants in their motion to dismiss.

As to Count 17, Defendants argue that the Court should dismiss Plaintiffs' conversion claim under Texas law because conversion does not include intellectual property and Plaintiffs have not alleged the conversion of any physical property. Plaintiffs maintain that the First Amended Complaint also alleges that "[o]ne of Futurewei's employees, a chief engineer who had worked with Huang before his departure to CNEX on June 6, 2014, was caught downloading thousands of Plaintiffs' documents to his personal computer without permission. This included hundreds of documents containing confidential, proprietary, and trade secret information." (Dkt. #27 at ¶ 54); *accord* (Dkt. #27 at ¶¶ 10, 197). Nevertheless, Plaintiffs did not allege that these documents were within the possession, dominion, or control of Defendants. *See Waisath v. Lack's Stores, Inc.*, 474 S.W.2d 444, 447 (Tex. 1971) (explaining "[t]he unauthorized and wrongful assumption and exercise of dominion and control over the personal property of another, to the exclusion of or inconsistent with the owner's rights, is in law a conversion."). As such, the Court finds that this claim is not sufficiently pleaded; however, the Court grants Plaintiffs leave to file an amended complaint to fix the deficiencies noted by the motion to dismiss and this Order.


## CONCLUSION

**\*13**  It is therefore **ORDERED** that Defendants CNEX Labs, Inc.'s and Yiren "Ronnie" Huang's Motion to Dismiss for Improper Venue and for Failure to State a Claim Under Rule 12(b)(6) (Dkt. #14) is hereby **DENIED as moot**, Defendants CNEX Labs, Inc. and Yiren Ronnie Huang's Motion for Leave to Address Issues Raised at the April 2, 2018 Hearing (Dkt. #56) is hereby **GRANTED**, and Defendants CNEX Labs, Inc. and Yiren "Ronnie" Huang's Motion to Dismiss Plaintiffs' First Amended Complaint for Improper Venue and for Failure to State a Claim Under Rule 12(b)(6) (Dkt. #34) is hereby **DENIED** as to the Motion to Dismiss for Improper Venue and hereby **GRANTED in part** as to the Motion to Dismiss for Failure to State a Claim. The Motion to Dismiss for Failure to State a Claim is granted as to Count 21 and the Court hereby **DISMISSES WITH PREJUDICE** corporate raiding as its own independent cause of action. However, Plaintiffs shall file an amended complaint to address the deficiencies identified as to Counts 15–17, 20, and 22, and may also include the allegations of corporate raiding as part of Plaintiffs' claim for unfair competition within fourteen (14) days of this Order. The motion is denied as to the remainder of the grounds asserted.


**All Citations**

Not Reported in Fed. Supp., 2018 WL 1964180

## Footnotes

1    Neither party asked the Court to stay or dismiss this case based on *Colorado River* abstention. Thus, the Court does not engage in an analysis of whether it should abstain from the "virtual unflagging obligation ... to exercise the jurisdiction given to [it].' " *Colo. River Water Conservation Dist. v. United States*, 424 U.S. 800, 817 (1976) (quoting *McClellan v. Carland*, 217 U.S. 268, 282 (1910) ).

2    Plaintiffs additionally argue that venue is proper under 28 U.S.C. § 1391(b)(2) because they claim a substantial part of the events or omissions took place in the Eastern District of Texas. However, it is unnecessary for the Court to analyze whether a substantial part of the events took place in the Eastern District of Texas because the Court finds the forum-selection clause makes venue proper.

3    At the April 2, 2018 hearing, the Court also asked the parties whether Defendants waived this argument by not asserting it in the opening brief for the Motion to Dismiss. After the hearing and the sur-reply, Defendants filed their Motion for Leave arguing that the argument was not waived and maintained that Plaintiffs were not prejudiced by raising the argument in the reply (Dkt. #56). The Court hereby grants the Motion for Leave; however, as the Court further discusses whether or not Defendants raised the argument is immaterial to the Court's analysis.

4    The Court notes that the Offer Letter did indicate that his offer of employment was contingent upon his signing the Employment Agreement (Dkt. #47).

5    To the extent, if any, this is part of the argument as to why there was unequal bargaining power, it is similarly unpersuasive.

6    See generally *G4S Tech., LLC v. WCC Cable, Inc.*, No. 8:17cv182, 2017 WL 4564726 (D. Neb Oct. 10, 2017); *Red Mortgage Capital, LLC v. Shores, LLC*, No. 2:16-cv-678, 2017 WL 1196170 (S.D. Oh. Mar. 31, 2017); *Howmedica Osteonics Corp. v. DJO Global, Inc.*, No. 16-2330, 2017 WL 1136671 (D.N.J. Mar. 27, 2017); *CORT Bus. Servs. Corp. v. Eleven23 Mktg., LLC*, NO. 2:15-cv-2454-GMN-PAL, 2017 WL 701371 (D. Nev. Feb. 22, 2017); *Sightpath Med. Servs. LLC v. Terry*, 4:14-cv-1488-JCH, 2015 WL 362662 (E.D. Mo. Jan. 27, 2015); *Prosperity Bank v. Balboa Music Festival, LLC*, No. 4:13-cv-288, 2014 WL 1023935 (S.D. Tex. Mar. 13, 2014).

7    Venue selection clauses are treated similarly to forum selection clauses. *Alliance Health Grp., LLC v. Bridging Health Option, LLC*, 553 F.3d 397, 399 (5th Cir. 2008) (citing *Duffy & McGovern Accommodation Servs. v. QCI Marine Offshore, Inc.*, 448 F.3d 825, 826 (5th Cir. 2006); *Collin Cty. v. Siemens Bus. Servs., Inc.*, 250 Fed.Appx. 45 (5th Cir. 2007) ).

8    As previously mentioned, there are also several district courts across the country that have not agreed with this result.

9    Defendants argue that California law applies; however, both parties go back and forth between using Texas and California law. Accordingly, the Court will analyze under both at this time.

---

**End of Document**                                                        © 2023 Thomson Reuters. No claim to original U.S. Government Works.

# EXHIBIT 18

Case 1:23-cv-00418-MAC   Document 6-1   Filed 02/20/24   Page 216 of 394 PageID #:  262
Huntsman Corp. v. International Risk Ins. Co., Not Reported in F.Supp.2d (2008)
2008 WL 1836384

2008 WL 1836384
Only the Westlaw citation is currently available.
United States District Court,
E.D. Texas.

HUNTSMAN CORPORATION, Plaintiff,

v.

INTERNATIONAL RISK INSURANCE COMPANY, Defendant/Third-Party Plaintiff,

v.

ACE American Insurance Company, et al., Third-Party Defendants.

Civil Action No. 1:08-CV-029.
|
April 22, 2008.

**Attorneys and Law Firms**

Gilbert Irvine Low, Gary Neale Reger, Orgain Bell & Tucker, Beaumont, TX, for Plaintiff.

David Eric Bernsen, Attorney at Law, Beaumont, TX, Donald Beury McFall, Kenneth R. Breitbeil, McFall Sherwood Breitbeil PC, Houston, TX, for Defendant/Third-Party Plaintiff.

Morris C. Carrington, Mehaffy & Weber, Beaumont, TX, Myles A. Parker, Alexandra F. Markov, Lee Ann C. Thigpen, Carroll Warren & Parker PLLC, Jackson, MS, Kerry K. Brown, Richard Greenlee Urquhart, Zelle Hofmann Voelbel Mason & Gette, Dallas, TX, for Third-Party Defendants.

**MEMORANDUM AND ORDER**

MARCIA A. CRONE, District Judge.

 **\*1** Pending before the court is Third-Party Defendants ACE American Insurance Company, AIG Casualty Company, Allianz Global Risks U.S. Insurance Company, Arch Reinsurance Company of Nebraska, and Zurich American Insurance Company's (collectively, "Third-Party Defendants" or "the Reinsurers") Motion to Transfer Venue (# 28). Third-Party Defendants request that the court transfer this case to the United States District Court for the Southern District of Texas pursuant to the "first-to-file rule." Having reviewed the pending motion, the submissions of the parties, the pleadings, and the applicable law, the court is of the opinion that transfer of this case is appropriate.

I. *Background*

On April 29, 2006, an explosion and fire occurred in the ethylene refrigeration and processing area at Plaintiff Huntsman Corporation's ("Huntsman") Aromatics and Olefins Plant ("the Plant") in Port Arthur, Texas. Huntsman's post-loss investigation revealed that the fire resulted from the ignition of hydrocarbons that escaped from a corroded piping system within the Plant. While no one was injured in the fire, the Plant sustained extensive physical damage, requiring Huntsman to suspend all operations at the ethylene manufacturing facility.

Huntsman's losses from the fire are purportedly covered by a casualty insurance policy, PROP 05-01 ("the Policy"), issued by Defendant International Risk Insurance Company ("IRIC"). IRIC is a "captive" insurance company that is wholly owned by Huntsman and was formed for the sole purpose of insuring the liabilities of the Huntsman companies through the international

Case 1:23-cv-00418-MAC   Document 6-1   Filed 02/20/24   Page 217 of 394 PageID #:  263
Huntsman Corp. v. International Risk Ins. Co., Not Reported in F.Supp.2d (2008)
2008 WL 1836384

reinsurance market. Accordingly, upon issuing the Policy to Huntsman, IRIC negotiated and entered into separate agreements of reinsurance ("the Reinsurance Certificates") with each of the Third-Party Defendants.

After Huntsman notified IRIC and the Reinsurers of the fire, the parties appointed Integra Technical Services Limited ("Integra") to adjust the loss. It is undisputed that from this point forward Huntsman dealt directly with Integra and the Reinsurers regarding the adjustment and payment of its claim. Over the course of the adjustment process, Huntsman submitted several sworn proofs of loss to the Reinsurers and received payments totaling at least $305 million. During July and August of 2007, however, a dispute arose among the parties concerning Huntsman's right to receive additional payments under the Policy and the Reinsurance Certificates. As a result, on August 30, 2007, the Reinsurers filed suit against Huntsman and IRIC in the United States District Court for the Southern District of Texas, seeking a court order compelling the parties to arbitrate their disagreement pursuant to a dispute resolution provision contained in each of the Reinsurance Certificates. In the alternative, the Reinsurers request that the court issue a declaratory judgment stating that the Policy and the Reinsurance Certificates do not include coverage for certain claimed items and that Huntsman did not act with due diligence and dispatch in repairing and rebuilding the Plant.

**\*2**  On September 21, 2007, Huntsman filed the instant action against IRIC in the 58th Judicial District Court of Jefferson County, Texas. According to the state court petition, Huntsman sent a demand letter to IRIC on September 21, 2007, requesting that IRIC pay the entirety of the amounts due under the Policy. That same day, IRIC declined Huntsman's request for payment and stated that in the absence of a judicial declaration of coverage, IRIC would not pay Huntsman any additional amounts for the loss. Huntsman, therefore, asserts claims for breach of contract and anticipatory breach of contract and seeks a declaratory judgment that IRIC is obligated to pay the amounts requested by Huntsman. [1]

On October 3, 2007, counsel for IRIC contacted the Reinsurers and tendered to them the defense of Huntsman's state court action. The Reinsurers rejected IRIC's tender on November 16, 2007, arguing that they have no duty to defend IRIC in this matter because, among other things, they view the claims asserted by Huntsman against IRIC as fictitious and collusive. As an alternative, however, the Reinsurers offered to negotiate, mediate, and/or arbitrate their dispute with IRIC pursuant to the dispute resolution provision in the Reinsurance Certificates.

On December 12, 2007, IRIC filed a Third-Party Petition against the Reinsurers in Huntsman's state court action. IRIC seeks a declaratory judgment that the Reinsurers must accept IRIC's tender of the defense of Huntsman's claims. It further requests that, should the Reinsurers refuse to honor their obligation to accept the tender of defense, the court declare that the Reinsurers must compensate IRIC for any and all liabilities incurred by IRIC in its litigation with Huntsman. In the alternative, IRIC asks that the court compel the Reinsurers to submit to arbitration on the sole issue of whether they must accept IRIC's tender of the defense of Huntsman's action.

Third-Party Defendants removed Huntsman's state court action to this court on January 14, 2008. In their Notice of Removal, the Reinsurers allege that federal jurisdiction is proper under 28 U.S.C. § 1331 because this case concerns arbitration agreements that are not entirely between citizens of the United States. Specifically, they assert that federal question jurisdiction exists pursuant to the New York Convention, 9 U.S.C. §§ 201-208, and the Panama Convention, 9 U.S.C. §§ 301-307, addressing international arbitration agreements. The Reinsurers further contend that diversity jurisdiction exists if the court were to realign the parties in accordance with their true interests in this litigation, namely, by designating Huntsman and IRIC as plaintiffs and the Reinsurers as defendants.

On February 4, 2008, Huntsman filed a motion to remand the case to state court, arguing that Third-Party Defendants, as such, do not have the statutory authority to remove this case to federal court. In particular, Huntsman argues that the Reinsurers may not remove based on diversity jurisdiction because realignment of the parties to allow removal is not permitted, and, in any event, realignment is not appropriate in this case. It also disputes the propriety of removal based on federal question jurisdiction and contends that, even if the court finds a colorable basis for removal, it should use its discretionary powers to remand the case because Huntsman's state law claims predominate.

2008 WL 1836384

**\*3**  On February 6, 2008, the Reinsurers filed the instant motion to transfer venue, asserting that this case should be transferred to the Southern District of Texas based on the first-to-file rule. Specifically, the Reinsurers argue that because the two lawsuits substantially overlap, principles of comity and sound judicial administration favor transfer of this case to the Southern District of Texas, where the first-filed action is currently pending before the Honorable Lee H. Rosenthal.

In response, Huntsman contends that the two actions do not, in fact, substantially overlap and argues that a transfer would not serve judicial efficiency. It also asserts that the first-to-file rule does not apply here because the Southern District lawsuit was improperly filed in anticipation of the instant action. Finally, Huntsman argues that the Reinsurers waived their rights to transfer venue because the Reinsurance Certificates require them to abide by the terms of the Policy, which contains a waiver of venue by IRIC. Similarly, IRIC contends that there is no substantial overlap between the two lawsuits and further asserts that a transfer at this juncture would be premature in light of the pending motions to dismiss in the Southern District action.

II. *Analysis*

At the outset, the parties devote a significant portion of their briefing to the issue of the order in which the court should consider the pending motions in this case. Huntsman and IRIC argue that the court should rule on the motion to remand prior to the motion transfer venue because an order of remand would moot the Reinsurers' motion to transfer. The Reinsurers, however, urge the court to transfer this case without addressing the issue of remand, which is properly left to Judge Rosenthal.

"While it is true that courts generally consider subject matter jurisdiction as a preliminary matter, as other federal district courts have recognized, federal courts need not decide a motion to remand a removed case before ruling on a motion to transfer to another district." *Stewart v. May Dep't Store Co.,* 2002 WL 31844906, at *2 n. 1 (E.D.La. Dec.12, 2002) (citing *Gould v. National Life Ins. Co.,* 990 F.Supp. 1354 (M.D.Ala.1998)); *see also Welsh ex rel. Taylor v. Murry,* 2006 WL 2349604, at *1 n. 1 (W.D.La. Aug.10, 2006); *Watershed Software Group, LLC v. Camping Cos.,* 2002 WL 31528464, at *1 n. 2 (E.D.La. Nov.8, 2002). Deciding the request for transfer before the motion to remand "is particularly appropriate in this case where a related suit is already pending in the transferee district, the remand motion will not suffer any prejudice as a result of the transfer, and transfer at this juncture permits the court who would ultimately try the case to rule on the remand motion." *Stewart,* 2002 WL 31844906, at *2 n. 1 (citing *Gould,* 990 F.Supp. at 1358). Therefore, the court rejects Huntsman and IRIC's contention and finds that, under the circumstances of this case, it is appropriate to rule on the Reinsurers' motion to transfer prior to Huntsman's motion to remand.

**\*4**  Under the first-to-file rule, "when related cases are pending before two federal courts, the court in which the case was last filed may refuse to hear it if the issues raised by the cases substantially overlap." *Cadle Co. v. Whataburger of Alice, Inc.,* 174 F.3d 599, 603 (5th Cir.1999); *accord Street v. Smith,* 456 F.Supp.2d 761, 767 (S.D.Miss.2006); *Nabors Drilling USA, L.P. v. Markow, Walker, P.A.,* 451 F.Supp.2d 843, 845 (S.D.Miss.2006); *see also Save Power Ltd. v. Syntek Fin. Corp.,* 121 F.3d 947, 950 (5th Cir.1997). "The rule rests on principles of comity and sound judicial administration." *Cadle Co.,* 174 F.3d at 603; *accord Save Power Ltd.,* 121 F.3d at 950; *Street,* 456 F.Supp.2d at 767; *Nabors Drilling USA, L.P.,* 451 F.Supp.2d at 845; *see also West GulfMaritime Ass'n v. ILA Deep Sea Local 24,* 751 F.2d 721, 728-29 (5th Cir.1985). " 'The concern manifestly is to avoid the waste of duplication, to avoid rulings which may trench upon the authority of sister courts, and to avoid piecemeal resolution of issues that call for a uniform result.' " *Cadle Co.,* 174 F.3d at 603 (quoting *West Gulf Maritime Ass'n,* 751 F.2d at 729); *accord Save Power Ltd.,* 121 F.3d at 950.

In determining whether to apply the first-to-file rule, the "crucial inquiry is one of 'substantial overlap.' " *Save Power Ltd.,* 121 F.3d at 950 (quoting *Mann Mfg., Inc. v. Hortex, Inc.,* 439 F.2d 403, 408 (5th Cir.1971)); *see Cadle Co.,* 174 F.3d at 603, 606; *West Gulf Maritime Ass'n,* 751 F.2d at 730; *Street,* 456 F.Supp.2d at 768; *Nabors Drilling USA, L.P.,* 451 F.Supp.2d at 845. The two cases need not be identical or involve identical parties for a substantial overlap to exist. *See Save Power Ltd.,* 121 F.3d at 950-51; *West Gulf Maritime Ass'n,* 751 F.2d at 730 (citing *Mann Mfg., Inc.,* 439 F.2d at 408 n. 6). Rather, the court considers only whether " 'the two pending actions [are] so duplicative or ... involve such substantially similar issues that one court should decide the subject matter of both actions.' " *Street,* 456 F.Supp.2d at 768 (quoting *Datamize, Inc. v. Fidelity Brokerage Servs.,*

*LLC,* 2004 WL 1683171, at \*3 (E.D.Tex. Apr.22, 2004)); *Nabors Drilling USA, L.P.,* 451 F.Supp.2d at 845; *Texas Instruments Inc. v. Micron Semiconductor, Inc.,* 815 F.Supp. 994, 997 (E.D.Tex.1993).

In the case at bar, Huntsman and IRIC contend that the Southern District action and the Eastern District action do not substantially overlap, asserting that the two cases involve the interpretation of different contracts–the Policy issued to Huntsman and the Reinsurance Certificates. Huntsman and IRIC's argument is without merit. Both lawsuits involve the same parties, the same loss, and the same underlying insurance policy. At the center of each case is the question of whether Huntsman is due additional sums under the Policy and the Reinsurance Certificates for losses sustained in the Plant fire and the extent of any additional coverage. Moreover, each lawsuit involves an interpretation of the dispute resolution provision contained in the Reinsurance Certificates. While the two actions may not be identical, the court finds that these cases " 'involve such substantially similar issues that one court should decide the subject matter of both actions.' " *Street,* 456 F.Supp.2d at 768 (quoting *Datamize, Inc.,* 2004 WL 1683171, at \*3). Accordingly, "principles of comity and sound judicial administration" favor transfer of this action to the Southern District of Texas. *Cadle Co.,* 174 F.3d at 603; *accord Save Power Ltd.,* 121 F.3d at 950; *Street,* 456 F.Supp.2d at 767; *Nabors Drilling USA, L.P.,* 451 F.Supp.2d at 845.

 **\*5** Huntsman next asserts that the first-to-file rule should not apply in this case because the Reinsurers filed the Southern District action in anticipation of Huntsman's lawsuit in the Eastern District. [2] *See, e.g., American Reliable Ins. Co. v. Arrington,* 269 F.Supp.2d 758, 760 (S.D.Miss.2003) (observing that the first-to-file rule does not apply where the plaintiff files suit for declaratory relief in anticipation of a lawsuit to be filed by the defendant); *California Sec. Co-op, Inc. v. Multimedia Cablevision, Inc.,* 897 F.Supp. 316, 319 (E.D.Tex.1995) (recognizing exception to first-to-file rule when first suit brought in anticipation of the second). In response, the Reinsurers argue that Judge Rosenthal should determine whether the first-filed action in the Southern District was appropriately filed. The court agrees with the Reinsurers' position.

"The Fifth Circuit adheres to the general rule that the court in which an action is first filed is the appropriate court to determine whether subsequently filed cases involving substantially similar issues should proceed." *Save Power Ltd.,* 121 F.3d at 950; *accord Cadle Co.,* 174 F.3d at 606; *Sutter Corp. v. P & P Indus. ., Inc.,* 125 F.3d 914, 918 (5th Cir.1997); *Street,* 456 F.Supp.2d at 768. Therefore, the first-to-file rule " 'not only determines which court may decide the merits of substantially similar issues, but also establishes which court may decide whether the second suit filed must be dismissed, stayed or transferred and consolidated.' " *Id.* (quoting *Sutter Corp.,* 125 F.3d at 918); *accord Cadle Co.,* 174 F.3d at 606; *Nabors Drilling USA, L.P.,* 451 F.Supp.2d at 845. "[O]nce the second-filed court finds that the issues in the two suits might substantially overlap, 'the proper course of action [is] for the court to transfer the case to the [first-filed] court to determine which case should, in the interests of sound judicial administration and judicial economy, proceed.' " *Street,* 456 F.Supp.2d at 768 (quoting *Cadle Co. .,* 174 F.3d at 606) (finding that the question of whether the first-filed action was an improper anticipatory filing is for the first-filed court to determine); *accord Mann Mfg., Inc.,* 439 F.2d at 408; *see also Sutter Corp.,* 125 F.3d at 918; *Save Power Ltd.,* 121 F.3d at 950; *West Gulf Maritime Ass'n,* 751 F.2d at 730. Consistent with this approach, the court finds it appropriate to transfer this case to the Southern District of Texas at this juncture. [3]

III. *Conclusion*

Having reviewed the pending motion, the submissions of the parties, the pleadings, and the applicable law, the court is of the opinion that transfer of this action is appropriate because it substantially overlaps with issues presented in *ACE American Insurance Company, et al. v. Huntsman Corporation, et al.,* No. 4:07-CV-02796, filed in the Southern District of Texas on August 30, 2007. An order transferring this case will be issued accordingly.

**All Citations**

Not Reported in F.Supp.2d, 2008 WL 1836384

2008 WL 1836384

## Footnotes

1      Also on September 21, 2007, Huntsman filed a motion to dismiss the Reinsurers' action in the Southern District of Texas for failure to state a claim upon which relief can be granted. IRIC filed a similar motion to dismiss on September 27, 2007. To date, the court has not ruled on these motions.

2      Huntsman also argues that the Reinsurers do not have standing as third-party defendants to request a transfer. The cases cited by Plaintiff, however, concern transfers under the venue statutes. Huntsman has offered no authority suggesting that this line of reasoning applies to transfers under the first-to-file rule, which is concerned with comity and judicial efficiency.

3      While the court recognizes that motions to dismiss are currently pending before Judge Rosenthal in the Southern District case, it does not find that such a fact warrants departing from the well-established procedure of transferring the second-filed lawsuit once it has been determined that the two cases might substantially overlap. *See Cadle Co.,* 174 F.3d at 606; *Street,* 456 F.Supp.2d at 768. The court further declines to consider Huntsman's argument that the Reinsurers waived their rights to seek a transfer of venue, which may be addressed by the transferee court, if necessary.

**End of Document**                                            © 2024 Thomson Reuters. No claim to original U.S. Government Works.

# EXHIBIT 19

ILIESCU v. REG'L TRANSP. COMM'N          Nev.  **453**
Cite as 522 P.3d 453 (Nev.App. 2022)

John ILIESCU, Jr., and Sonnia Iliescu,
TRUSTEEs OF THE JOHN ILIESCU, JR.
AND SONNIA ILIESCU 1992 FAMILY
TRUST; John Iliescu, Jr., an Individual;
and Sonnia Iliescu, an Individual, Appel-
lants,

v.

The REGIONAL TRANSPORTATION
COMMISSION OF WASHOE
COUNTY, Respondent.

John Iliescu, Jr., and Sonnia Iliescu, Trus-
tees of the John Iliescu, Jr. and Sonnia
Iliescu 1992 Family Trust; John Iliescu,
Jr., an Individual; and Sonnia Iliescu, an
Individual, Appellants,

v.

Regional Transportation Commission
of Washoe County, Respondent.

No. 83212-COA, No. 83756-COA

Court of Appeals of Nevada.

Filed November 17, 2022

**Background:** Trust and its settlors as-
serted claims of waste, breach of contract,
and trespass against county regional trans-
portation commission, alleging that com-
mission and its contractors damaged a
trust-owned parking lot when, without per-
mission, they drove work trucks over it
and parked on it while working on a public
utility easement. The District Court,
Washoe County, David A. Hardy, J.,
granted in part commission's motion to
dismiss, and granted commission's motion
for summary judgment. Trust appealed.

**Holdings:** The Court of Appeals, Gibbons,
C.J., held that:

(1) complaint was not sufficient to place
commission on notice that trust and
settlors sought to hold it liable for
waste;

(2) trust and settlors did not demonstrate
causal connection between any breach
of agreement and damage to parking
lot;

(3) fact issues existed as to whether com-
mission's conduct constituted an inva-
sion of trust's property rights; and

(4) stipulation to pursue compensatory and
punitive damages relating to parking
lot additionally preserved claim for
nominal damages.

Affirmed in part, reversed in part, vacated in
part, and remanded.

1. Counties ⬅222

Complaint by trust and its settlors was
not sufficient to place county regional trans-
portation commission on notice that trust and
settlors sought to hold commission liable for
waste that it allegedly committed when it
damaged a trust-owned parking lot by driv-
ing work trucks over it and parking on it
while working on a public utility easement,
absent any allegations that commission had a
legal right to use the parking lot.  Nev. Rev.
St. § 40.150.

2. Pleading ⬅48

Because Nevada is a notice-pleading ju-
risdiction, a complaint need only set forth
sufficient facts to demonstrate the necessary
elements of a claim for relief so that the
defending party has adequate notice of the
nature of the claim and relief sought.

3. Property ⬅571

A cause of action for waste requires the
defendant to be in or have been in lawful
possession of the property on which the al-
leged waste occurred.  Nev. Rev. St.
§ 40.150.

4. Injunction ⬅1002

Injunctive relief is a remedy, not a sepa-
rate cause of action.

5. Action ⬅2

The question whether a litigant has a
cause of action is analytically distinct and
prior to the question of what relief, if any, a
litigant may be entitled to receive.

6. Counties ⬅129
   Public Contracts ⬅415(5)

Trust and its settlors did not demon-
strate causal connection between any breach

**454**  Nev.         **522 PACIFIC REPORTER, 3d SERIES**

of agreement that allegedly required county regional transportation commission to cooperate with trust so as to minimize interference between construction of public utility easement and trust property and damage to trust-owned parking lot; while trust provided photographs purporting to show state of parking log prior to commission's project, trust did not provide any photographs depicting parking lot after commission completed project, did not provide any deposition testimony stating that commission's breach caused damage, and did not provide any expert testimony regarding causation, scope of repair, diminishment in value, or damages.

**7. Contracts ⟺326**

To prevail on a claim for breach of contract, the plaintiff must establish (1) the existence of a valid contract, (2) that the plaintiff performed, (3) that the defendant breached, and (4 ) that the breach caused the plaintiff damages.

**8. Contracts ⟺326**

Relating to the damages element of a claim for breach of contract, a plaintiff must prove both (1) a causal connection between the defendant's breach and the damages asserted, and (2) the amount of those damages.

**9. Damages ⟺184**

A plaintiff's burden of proving the amount of damages need not be met with mathematical exactitude, but there must be an evidentiary basis for determining a reasonably accurate amount of damages.

**10. Stipulations ⟺1**

A written stipulation is a species of contract.

**11. Contracts ⟺312(1)**

Where the terms of a contract are literally complied with but one party to the contract deliberately contravenes the intention and spirit of the contract, that party can incur liability for breach of the implied covenant of good faith and fair dealing.

**12. Summary Judgment ⟺250**
    **Trespass ⟺67**

Genuine issues of material fact existed as to whether county regional transportation

commission's conduct, in parking on trust-owned parking lot without permission while working on a public utility easement, constituted an invasion of trust's property rights, precluding summary judgment on trespass claim by trust and its settlors.

**13. Trespass ⟺1**

To maintain a trespass action, the plaintiff must demonstrate that the defendant invaded a property right.

**14. Injunction ⟺1217**
    **Trespass ⟺47**

Where the evidence supports a trespass, an award of nominal damages is not improper, and an injunction is an appropriate remedy for the threat of continuing trespass.

**15. Summary Judgment ⟺304**

A court may consider all evidence on file when ruling on a motion for summary judgment.  Nev. R. Civ. P. 56(c)(3).

**16. Stipulations ⟺14(12)**

Landowners' stipulation to pursue compensatory and punitive damages relating to parking lot additionally preserved claim for nominal damages, such that landowners' failure to prove actual damages did not preclude recovery on trespass claim for which landowners were seeking injunctive relief.

**17. Trespass ⟺47**

Nominal damages are awarded by default on a trespass claim until the plaintiff establishes entitlement to some other form of damages, such as compensatory damages.

**18. Trespass ⟺47**

Nominal damages are available to remedy a trespass where compensatory damages are unavailable or unproven.

————

Consolidated appeals from district court orders granting summary judgment and awarding attorney fees and costs in a tort and contract action. Second Judicial District Court, Washoe County; David A. Hardy, Judge.

Albright, Stoddard, Warnick & Albright and D. Chris Albright, Las Vegas, for Appellants.

Woodburn & Wedge and Dane W. Anderson, Reno, for Respondent.

BEFORE THE COURT OF APPEALS, GIBBONS, C.J., TAO and BULLA, JJ.

## OPINION

By the Court, GIBBONS, C.J.:

In this appeal, we address the grants of dismissal and summary judgment as to claims of improper actions by the Regional Transportation Commission of Washoe County that occurred during the completion of a construction project on appellants' property after condemnation proceedings. In so doing, we discuss actions in tort and contract law that remain underdeveloped in Nevada law. We conclude that the district court correctly dismissed appellants' claims for waste and injunctive relief, and correctly granted summary judgment on their contract-based claims. However, the district court erred in granting summary judgment on appellants' claims for trespass and declaratory relief. For the reasons articulated herein, we affirm in part, reverse in part, vacate in part, and remand.

## FACTS AND PROCEDURAL HISTORY

Although this is not an appeal from a condemnation action, the facts underlying this appeal began with one. Respondent Regional Transportation Commission of Washoe County (RTC) filed a complaint in eminent domain seeking to acquire a permanent easement, a public utility easement, and a temporary construction easement on commercial property owned by the John Iliescu, Jr. and Sonnia Iliescu 1992 Family Trust. Appellants John Iliescu, Jr., and Sonnia Iliescu (collectively, the Iliescus) are trustees of the family trust. The RTC sought the easements in furtherance of its "4th Street/Prater Way Complete Street and [Bus Rapid Transit] Project" in Reno, which was intended to improve traffic flow along 4th Street and Prater Way. Specifically, the project included "undergrounding of existing overhead utilities

within the [p]roject area, construction of curbs, gutters, pedestrian ramps and sidewalks, and installation of new lighting fixtures and landscaping within the [p]roject limits." Eventually, the parties stipulated to, and the district court ordered, the taking in exchange for a payment of $11,065 to the Iliescus as just compensation. The court also ordered that the permanent easement and the public utility easement were "perpetual easements" for access to and maintenance of the public utilities.

Ten months after the district court's order in the condemnation proceedings, the Iliescus filed a complaint alleging 12 causes of action against the RTC. According to the Iliescus, during the previous project and despite their objections, the RTC and its contractors drove over and parked their vehicles (including 20-ton work trucks) on the Iliescus' "Remaining Property"—a parking lot on the parcel not subject to condemnation. The Iliescus alleged that the RTC's conduct precluded them at times from using any portion of the "Remaining Property," caused physical damage to the parking lot, and caused both John and Sonnia to suffer severe and ongoing "psychological and emotional anguish, pain and distress, with physical manifestations."

The RTC filed a first motion to dismiss 8 of the complaint's 12 causes of action. During litigation, the parties stipulated that the Iliescus no longer wished to pursue damages for emotional distress or personal injury. The district court therefore dismissed their claim for intentional and/or negligent infliction of emotional distress.

The Iliescus filed an amended complaint alleging 11 causes of action.[1] Thereafter, the RTC filed a supplemental motion to dismiss as to six of the causes of action. The district court granted the RTC's motion to dismiss as to the Iliescus' claims for injunctive relief, breach of fiduciary duty, waste, conversion, and tortious breach of the covenant of good faith and fair dealing. The court denied the

---

1.  The causes of action included breach of contract, breach of the covenant of good faith and fair dealing (contract claim), breach of fiduciary duty, waste, conversion, trespass, civil conspira-
cy, negligence, tortious breach of the covenant of good faith and fair dealing, injunctive relief, and declaratory relief.

motion to dismiss as to the Iliescus' civil conspiracy claim.

The RTC eventually moved for summary judgment as to the Iliescus' remaining claims, which included breach of contract, breach of the implied covenant of good faith and fair dealing, trespass, civil conspiracy, negligence, and declaratory relief. The Iliescus opposed the motion and supported their opposition with various exhibits that had previously been filed in the case. The district court ultimately granted the RTC's motion for summary judgment, ruling that the Iliescus had failed to present any admissible evidence in support of their claims.[2] It subsequently granted the RTC's motion for attorney fees, ruling that although the Iliescus appeared to have good faith bases for bringing their claims, "their counsel failed to produce discovery or dismiss the action if discovery would be impossible due to hardship."[3] The district court awarded the RTC $61,057.07 in attorney fees under NRS 18.010(2)(b) and $3,647.35 in costs as the prevailing party under NRS 18.020. The Iliescus now raise multiple issues on appeal. We address each in turn.

*The district court did, not err in dismissing the Iliescus' claim, for waste*

[1]  The Iliescus argue the district court erred in dismissing their claim for waste and ruling that the RTC was not a guardian or tenant as to their "Remaining Property" (the parking lot) for the purposes of satisfying NRS 40.150.[4] They argue the RTC "had been granted entry rights onto certain portions of [their] [p]roperty" and therefore was a tenant of the property and could commit waste by damaging the surface of the lot with its heavy equipment. The RTC counters that the Iliescus' complaint never alleged that the RTC was a tenant as to their parking lot. It argues that, indeed, the complaint made clear

that the RTC and its contractors used the parking lot despite having no right to do so and over the Iliescus' frequent objections.

[2]  A defendant's motion to dismiss "under NRCP 12(b)(5) is subject to a rigorous standard of review on appeal." *Buzz Stew, LLC v. City of North Las Vegas*, 124 Nev. 224, 227-28, 181 P.3d 670, 672 (2008) (internal quotation marks omitted). In reviewing dismissal under NRCP 12(b)(5), we recognize all factual allegations in the plaintiffs' complaint as true and draw all inferences in their favor. *Id.* at 228, 181 P.3d at 672. A claim should be dismissed under NRCP 12(b)(5) only if it appears beyond a doubt that the plaintiffs could prove no set of facts, which, if true, would entitle them to relief. *Id.* Because Nevada is a "notice-pleading" jurisdiction, a complaint need only set forth sufficient facts to demonstrate the necessary elements of a claim for relief so that the defending party has "adequate notice of the nature of the claim and relief sought." *W. States Constr., Inc. v. Michoff*, 108 Nev. 931, 936, 840 P.2d 1220, 1223 (1992); *see also Droge v. AAAA Two Star Towing, Inc.*, 136 Nev. 291, 308-09, 468 P.3d 862, 878-79 (Ct. App. 2020) (discussing Nevada's liberal notice-pleading standard).

[3]  Nevada law provides for a cause of action against a guardian or tenant of real property who "commit[s] waste *thereon*." NRS 40.150 (emphasis added). "Waste is generally considered a tort defined as the destruction, alteration, misuse, or neglect of property by one in rightful possession to the detriment of another's interest in the same property." 8 Michael Allan Wolf, *Powell on Real Property* § 56.01 (2021). A cause of action for waste requires the defendant to be in or have been in lawful possession of the property on which the alleged waste occurred. *See Stephenson v. Nat'l Bank of*

---

**2.**  On appeal, the Iliescus only challenge the district court's rulings discussed herein.

**3.**  We acknowledge that the Iliescus could have done more to vigorously prosecute their claims before the district court. During the proceedings below, the RTC requested multiple times that the court dismiss the Iliescus' case for lack of prosecution. As pertinent to this appeal, the district court denied each of those requests.

**4.**  "If a guardian, tenant for life or years, joint tenant or tenant in common of real property commit waste thereon, any person aggrieved by the waste may bring an action against the guardian or tenant who committed the waste, in which action there may be judgment for treble damages." NRS 40.150.

*Winter Haven*, 92 Fla. 347, 109 So. 424, 425-26 (1926) ("[W]aste is an abuse or destructive use of the property by one in rightful possession."); *Hamilton v. Mercantile Bank of Cedar Rapids*, 621 N.W.2d 401, 409 (Iowa 2001) ("A claim for waste is an action at law brought by a remainderman against a tenant in lawful possession of land . . . ."); *Mich. Oil Co. v. Nat. Res. Comm'n*, 406 Mich. 1, 276 N.W.2d 141, 147 (1979) ("[T]he ordinary use of the term 'waste' does not refer only to waste of oil and gas, but includes any spoliation or destruction of the land, including flora and fauna, by one lawfully in possession, to the prejudice of the estate or interest of another."); *Meyer v. Hansen*, 373 N.W.2d 392, 395 (N.D. 1985) ("Waste may be defined as an unreasonable or improper use, abuse, mismanagement, or omission of duty touching real estate by one rightfully in possession, which results in a substantial injury."). Not surprisingly, then, each type of tenancy mentioned in NRS 40.150 includes an interest in real property. *See* NRS 40.150 (stating that a waste action can be maintained against a "tenant for life or years, joint tenant or tenant in common of real property").

Here, the Iliescus alleged that, in completing its project, the RTC damaged their parking lot, which was on "that portion of [their] [p]roperty not subject to the condemnation, and not involved in whatsoever nature in the [p]roject." The Iliescus further alleged that they frequently objected to this "unauthorized and illegal use" of their parking lot. The Iliescus did not argue below, nor do they argue on appeal, that the RTC had a legal right to use their parking lot. Rather, both below and on appeal, they argue that the RTC was a tenant only as to the property that was condemned.

Assuming the RTC was a tenant over the Iliescus' condemned property, under NRS 40.150, the RTC could only have committed waste "thereon"—on the condemned property, not on the Iliescus' parking lot. And the Iliescus have not alleged that the RTC committed waste as to the condemned portion of their property. Therefore, even taking every inference in the Iliescus' favor, *see Buzz Stew*, 124 Nev. at 228, 181 P.3d at 672, the district court did not err by dismissing their waste claim.

*The district court did not err in dismissing the Iliescus' separate cause of action for injunctive relief*

[4] The Iliescus argue the district court erred in dismissing their separate cause of action for injunctive relief because "[i]t is entirely possible and even plausible that the RTC" may again "overstep [its] boundaries in accessing and damaging the remaining portions of [their] property" during some future repairs to the RTC's permanent easements.[5] As a threshold matter, injunctive relief is a remedy, not a separate cause of action. *See State Farm Mut. Auto. Ins. Co. v. Jafbros Inc.*, 109 Nev. 926, 928, 860 P.2d 176, 178 (1993) (explaining that a violated right is a prerequisite to granting injunctive relief and an injunction is not appropriate "to restrain an act which does not give rise to a cause of action" (internal quotation marks omitted)); *Knutson v. Vill. of Lakemoor*, 932 F.3d 572, 576 n.4 (7th Cir. 2019) ("With respect to injunctive relief, that is a remedy, not a cause of action, and thus should not be pleaded as a separate count."); *Klay v. United Healthgrp., Inc.*, 376 F.3d 1092, 1100 (11th Cir. 2004) (explaining that "traditional injunctions are predicated upon [a] cause of action"); *Shell Oil Co. v. Richter*, 52 Cal.App.2d 164, 125 P.2d 930, 932 (1942) (explaining that injunctive relief is a remedy, not a cause of action, and thus, a cause of action must be asserted against the party before injunctive relief may be requested against that party); *Terlecki v. Stewart*, 278 Mich.App. 644, 754 N.W.2d 899, 912 (2008) ("It is well settled that an injunction is an equitable remedy, not an independent cause of action."). Therefore, to the extent that the Iliescus pleaded injunctive relief as an independent cause of action, the district court did not err in dismissing that claim. *See Knutson*, 932 F.3d at 576 n.4.

---

5.   The Iliescus also argue that the RTC could have been enjoined to restore their property to the state it was in before the RTC allegedly damaged it. However, they did not make this argument below, and we decline to consider it on appeal.

*See Old Aztec Mine, Inc. v. Brown*, 97 Nev. 49, 52, 623 P.2d 981, 983 (1981) (explaining that issues not argued below are "deemed to have been waived and will not be considered on appeal").

**[5]**   However, "the question whether a litigant has a 'cause of action' is analytically distinct *and prior to* the question of what relief, if any, a litigant may be entitled to receive." *Davis v. Passman*, 442 U.S. 228, 239, 99 S.Ct. 2264, 60 L.Ed.2d 846 (1979) (emphasis added); *see also State Farm*, 109 Nev. at 928, 860 P.2d at 178 ("It is axiomatic that a court cannot provide a remedy unless it has found a wrong."). Therefore, even though we affirm the dismissal of the independent cause of action, as discussed below, we reverse the grant of summary judgment on the Iliescus' trespass claim. Therefore, on remand, they may seek permanent injunctive relief as a remedy for that claim, should they prevail on it.

*The district court did not err in granting the RTC's motion for summary judgment as to the Iliescus' contract-based claims*

**[6]**   The Iliescus argue the district court erred in granting summary judgment in favor of the RTC as to their breach-of-contract claim because the parties had entered into a contract by way of a stipulation in the prior condemnation proceedings. They argue that, at the very least, their evidence that a stipulation existed should have precluded summary judgment. The RTC counters that the prior stipulation was not relevant to any alleged use of or damage to the Iliescus' parking lot. It further argues that summary judgment was proper because the Iliescus failed to provide any evidence of causation or actual damages in support of their breach-of-contract claim.

We review a district court's order granting summary judgment de novo. *Wood v. Safeway, Inc.*, 121 Nev. 724, 729, 121 P.3d 1026, 1029 (2005). Summary judgment is proper if the pleadings and all other evidence on file demonstrate that there exists no genuine dispute of material fact "and that the moving party is entitled to a judgment as a matter of law." *Id.* (internal quotation marks omitted); *see also* NRCP 56(a). "A factual dispute is

genuine when the evidence is such that a rational trier of fact could return a verdict for the nonmoving party." *Wood*, 121 Nev. at 731, 121 P.3d at 1031. In rendering a decision on a motion for summary judgment, all evidence "must be viewed in a light most favorable to the nonmoving party." *Id.* at 729, 121 P.3d at 1029. The party moving for summary judgment must meet its initial burden of production to show there exists no genuine dispute of material fact. *Cuzze v. Univ. & Cmty. Coll. Sys. of Nev.*, 123 Nev. 598, 602, 172 P.3d 131, 134 (2007). The nonmoving party must then "transcend the pleadings and, by affidavit or other admissible evidence, introduce specific facts that show a genuine [dispute] of material fact." *Id.* at 603, 172 P.3d at 134.

**[7–9]**   To prevail on a claim for breach of contract, the plaintiff must establish (1) the existence of a valid contract, (2) that the plaintiff performed, (3) that the defendant breached, and (4) that the breach caused the plaintiff damages. *Saini v. Int'l Game Tech.*, 434 F. Supp. 2d 913, 919-20 (D. Nev. 2006); *Reichert v. Gen. Ins. Co. of Am.*, 68 Cal.2d 822, 69 Cal.Rptr. 321, 442 P.2d 377, 381 (1968). Relating to damages, a plaintiff must prove both (1) a causal connection between the defendant's breach and the damages asserted, and (2) the amount of those damages. *See Mort Wallin of Lake Tahoe, Inc. v. Commercial Cabinet Co.*, 105 Nev. 855, 857, 784 P.2d 954, 955 (1989) ("The party seeking damages has the burden of proving both the fact of damages and the amount thereof."); *Saks Fifth Ave., Inc. v. James, Ltd.*, 272 Va. 177, 630 S.E.2d 304, 311 (2006) ("A plaintiff thus must prove two primary factors relating to damages. First, a plaintiff must show a causal connection between the defendant's wrongful conduct and the damages asserted. Second, a plaintiff must prove the amount of those damages by using a proper method and factual foundation for calculating damages." (internal citations omitted)).[6] The burden of

---

**6.**   *See also Omaha Pub. Power Dist. v. Darin & Armstrong, Inc.*, 205 Neb. 484, 288 N.W.2d 467, 474 (1980) ("It is a basic concept that in any damage action for breach of contract the claimant must prove that the breach of contract complained of was the proximate cause of the alleged

damages."); *Florafax Int'l, Inc. v. GTE Mkt. Res., Inc.*, 933 P.2d 282, 296 (Okla. 1997) ("In order for damages to be recoverable for breach of contract they must be clearly ascertainable . . . and it must be made to appear they are the natural and proximate consequence of the

proving the amount of damages "need not be met with mathematical exactitude, but there must be an evidentiary basis for determining a reasonably accurate amount of damages." *Mort Wallin*, 105 Nev. at 857, 784 P.2d at 955.

Here, the Iliescus alleged that, during the prior condemnation proceedings, they entered into a valid agreement by which the RTC was entitled to complete its project in exchange for compensating the Iliescus for the condemnation. They further alleged that the way in which the RTC carried out the project constituted a breach of the parties' agreement. The Iliescus supported these allegations with a portion of an order from the condemnation proceedings that ordered the parties to "cooperate so as to minimize interference between construction of the [p]roject and [the Iliescus'] use of the remaining land . . . on APN 008-244-15." That order also made multiple references to a stipulation to which the parties had agreed. The Iliescus further provided a detailed quote for services, from Desert Engineering, to repair the parking lot for $84,550.

Below, the RTC met its initial summary judgment burden by pointing out that there was an absence of evidence to support the Iliescus' breach-of-contract claim as to damages. *See Cuzze*, 123 Nev. at 602-03, 172 P.3d at 134 (explaining that where the nonmoving party would bear the burden of persuasion at trial, the party moving for summary judgment can satisfy its burden of production by "pointing out . . . that there is an absence of evidence to support the nonmoving party's case" (omission and internal quotation marks omitted)). Thus, the burden shifted to the Iliescus to "transcend the pleadings" and

demonstrate there was a genuine dispute of material fact as to damages. *Id.* at 603, 172 P.3d at 134.

In response, the Iliescus provided photographs purporting to show the state of the parking lot prior to the RTC's project. They also provided photographs allegedly depicting the RTC's workers during the completion of the project, with their vehicles parked on the Iliescus' parking lot in the background. However, although the Desert Engineering quote may have served to demonstrate a dispute as to the amount of their damages, the Iliescus failed to present any evidence demonstrating a causal connection between the RTC's alleged breach of contract and the damage to the parking lot. They failed to provide photographs depicting the parking lot after the RTC completed its project; deposition testimony stating that the RTC's breach had caused the damage; expert testimony regarding causation, scope of repair, diminishment in value, and damages;[7] or any other evidence related to causation, only argument.

**[10]** Additionally, although the Iliescus provided evidence that the parties had entered into a contract previously,[8] it is unclear how a breach of that contract could have caused damage to the parking lot. Even assuming the RTC had agreed, as the prior district court ordered, to "cooperate so as to minimize interference between construction of the [p]roject and [the Iliescus'] use of [their] remaining land," the Iliescus have not explained how a breach of that agreement could have caused physical damage to their parking lot.[9] Accordingly, the Iliescus did not

---

breach and not speculative and contingent."); *Logan v. Mirror Printing Co. of Altoona*, 410 Pa.Super. 446, 600 A.2d 225, 226 (1991) ("In order to recover for damages pursuant to a breach of contract, the plaintiff must show a causal connection between the breach and the loss."); *Abraxas Petroleum Corp. v. Hamburg*, 20 S.W.3d 741, 758 (Tex. App. 2000) ("The absence of [a] causal connection between the alleged breach [of contract] and the alleged damages will preclude recovery.").

7.   The district court determined that expert evidence was needed on these matters. The Iliescus do not argue that the district court erred in this determination, so this issue is waived. *See Powell*

*v. Liberty Mut. Fire Ins. Co.*, 127 Nev. 156, 161 n.3, 252 P.3d 668, 672 n.3 (2011) (providing that issues not raised on appeal are deemed waived).

8.   "A written stipulation is a species of contract." *DeChambeau v. Balkenbush*, 134 Nev. 625, 628, 431 P.3d 359, 361 (Ct. App. 2018) (quoting *Redrock Valley Ranch, LLC v. Washoe County*, 127 Nev. 451, 460, 254 P.3d 641, 647 (2011)).

9.   We note that, in their stipulation to dismiss their personal injury claims, the Iliescus agreed that they would only pursue compensatory damages in this case as to physical damage to their parking lot—presumably waiving any right to

demonstrate that there existed evidence of causation, an essential element of a breach-of-contract claim, therefore failing to create a genuine dispute as to damages.

[11]  The Iliescus further summarily argue the district court erred in granting summary judgment against them as to their claim for breach of the implied covenant of good faith and fair dealing. "Where the terms of a contract are literally complied with but one party to the contract deliberately countervenes the intention and spirit of the contract, that party can incur liability for breach of the implied covenant of good faith and fair dealing." *Hilton Hotels Corp. v. Butch Lewis Prods., Inc.*, 107 Nev. 226, 232, 808 P.2d 919, 922-23 (1991). However, here, the Iliescus have not developed any argument or provided any relevant authority as to why the district court erred in granting summary judgment as to this claim. Therefore, we need not consider it. *See Edwards v. Emperor's Garden Rest.*, 122 Nev. 317, 330 n.38, 130 P.3d 1280, 1288 n.38 (2006) (explaining that this court need not consider an appellant's argument that is not cogently argued or lacks the support of relevant authority). In light of the foregoing, the district court did not err in granting summary judgment in favor of the RTC as to the Iliescus' contract-based claims.

*The district court erred in granting summary judgment in favor of the RTC as to the Iliescus' trespass claim and their request for declaratory relief*

[12–14]  Finally, the Iliescus argue the district court erred in granting summary judgment in the RTC's favor as to their trespass claim. Nevada has long recognized trespass as an action for injury to a plaintiff's possession of land. *See Rivers v. Burbank*, 13 Nev. 398, 408 (1878). To maintain a trespass action, the plaintiff must demonstrate that the defendant invaded a property right. *Lied v. Clark County*, 94 Nev. 275, 279, 579 P.2d 171, 173-74 (1978). Where the evidence sup-

ports a trespass, an award of nominal damages is not improper. *Parkinson v. Winniman*, 75 Nev. 405, 408, 344 P.2d 677, 678 (1959); *see also Droge*, 136 Nev. at 312 n.17, 468 P.3d at 880 n.17 (stating that the plaintiffs could pursue nominal damages as to their trespass claim). And "an injunction is an appropriate remedy for the threat of continuing trespass." *S.O.C., Inc. v. Mirage Casino-Hotel*, 117 Nev. 403, 416, 23 P.3d 243, 251 (2001).

To prevail on a claim for trespass, the Iliescus would need to prove that the RTC's conduct constituted an invasion of a property right. *See Lied*, 94 Nev. at 279, 579 P.2d at 173-74. Here, the Iliescus alleged the RTC and its contractors parked vehicles on their parking lot "on virtually every workday during the term of the [p]roject." These vehicles allegedly included the workers' personal vehicles ("pick-up trucks, SUV's[,] and automobiles") along with work trucks weighing approximately 20 tons. According to the Iliescus, this conduct occurred without their consent and despite their "frequent objections" to it. The Iliescus supported these allegations with photographs depicting the vehicles parked on the portion of their property not subject to condemnation (the "[r]emaining [p]roperty" or parking lot). The Iliescus also provided photographs appearing to depict workers working on the RTC's project, with trucks parked in the parking lot in the background. In addition, John testified at his deposition without objection that he assumed the trucks were associated with the RTC because the workers who drove them were not associated with him or Sonnia and "were doing RTC work." Similarly, at her deposition, Sonnia testified that the trucks and equipment parked on the Iliescus' property belonged to "construction people working on the RTC project."

[15]  Considering the foregoing, the Iliescus introduced specific facts, using admissible evidence,[10] that demonstrated a genuine

---

recover compensatory damages for any interference with their use of their land.

**10.** A court may consider all evidence on file when ruling on a motion for summary judgment. *Wood*, 121 Nev. at 729, 121 P.3d at 1029; *see also*

NRCP 56(c)(3). The RTC avers that the Iliescus failed to present any admissible evidence for their claims during the proceedings below, apparently only because the Iliescus "submitted no declarations or deposition testimony" in their

dispute of material fact as to their trespass claim. *See Cuzze*, 123 Nev. at 603, 172 P.3d at 134. The RTC does not dispute that the Iliescus owned the property where the easements and parking lot are located, nor does it assert that it had permission or paid rent or some form of remuneration to use the parking lot. The Iliescus' photographs and deposition testimony are evidence such that a rational trier of fact could find that the RTC trespassed on the Iliescus' property and return a verdict in the Iliescus' favor.[11] *See Wood*, 121 Nev. at 731, 121 P.3d at 1031.

[16]  Below, the district court granted summary judgment as to the Iliescus' trespass claim by ruling that they had waived their right to pursue nominal damages—in stipulating to pursue only compensatory damages relating to their parking lot and punitive damages—and had then failed to present evidence as to compensatory damages or punitive damages.[12] In so doing, the district court effectively imposed an element of actual damages onto the trespass claim—an element that has not previously been required to sustain a trespass action in Nevada.[13] *See Lied*, 94 Nev. at 279, 579 P.2d at 173-74; *Parkinson*, 75 Nev. at 408, 344 P.2d at 678; *see also* Restatement (Second) of Torts § 158 (Am. Law Inst. 1965) ("One is subject to liability to another for trespass, *irrespective of whether [he or she] thereby causes harm to any legally protected interest of the other*, if [he or she] intentionally (a) enters land in the possession of the other, or

causes a thing or a third person to do so, or (b) remains on the land, or (c) fails to remove from the land a thing which he is under a duty to remove." (emphasis added)).

[17]  Further, in lieu of compensatory damages, nominal damages may still be awarded. Nominal damages are "awarded by default until the plaintiff establishes entitlement to some other form of damages, such as compensatory . . . damages." *Uzuegbunam v. Preczewski*, 592 U.S. ——, ——, 141 S. Ct. 792, 801, 209 L.Ed.2d 94 (2021). Indeed, as the United States Supreme Court recently recognized in *Uzuegbunam*, "the prevailing rule, 'well established' at common law, was 'that a party whose rights are invaded can *always* recover nominal damages without furnishing any evidence of actual damages.'" *Id.* at ——, 141 S. Ct. at 800 (emphasis added) (internal citations omitted). Consistent with this approach, the Nevada appellate courts have long recognized that nominal damages are a proper remedy for trespass, in cases where actual damages cannot be proven. *See Parkinson*, 75 Nev. at 408, 344 P.2d at 678; *Droge*, 136 Nev. at 312 n.17, 468 P.3d at 880 n.17; *see also Uzuegbunam*, 592 U.S. at ——, 141 S. Ct. at 798 (discussing the importance of nominal damages to claims for trespass).

[18]  Given the relationship between nominal and compensatory damages, and the purpose behind an award of nominal damages, we conclude that, by preserving their claim

---

11.  Although we reverse summary judgment on the trespass claim, we note that the damages available to the Iliescus on this claim may be limited, as the district court has already determined that expert testimony is required to prove certain damages, and that the Iliescus failed to timely identify an expert as required pursuant to NRCP 16.1.

12.  We note that the Iliescus have not pursued the dismissal of their claim for punitive damages on appeal, and therefore, we need not address the propriety of the district court's dismissal of the same. *See Greenlaw v. United States*, 554 U.S. 237, 243, 128 S.Ct. 2559, 171 L.Ed.2d 399 (2008) ("[I]n both civil and criminal cases, in the first instance and on appeal, we follow the principle of party presentation. That is, we rely on the parties to frame the issues for decisions and assign to courts the role of neutral arbiter of matters the parties present.").

13.  The RTC does not argue on appeal that a plaintiff must prove damages as an element of *trespass* and therefore we do not further address this issue. *See Powell v. Liberty Mut. Fire Ins. Co.*, 127 Nev. 156, 161 n.3, 252 P.3d 668, 672 n.3 (2011) (providing that issues not raised on appeal are deemed waived).

opposition to the RTC's motion for summary judgment. The RTC does not cogently argue why any failure on the Iliescus' part to submit declarations or deposition testimony in opposition to the RTC's summary judgment motion would be fatal to their claims where there existed substantial evidence elsewhere in the court file that was presented for the court to consider regarding trespass, nor does it provide relevant authority in support of that argument. Therefore, we need not consider it. *See Edwards*, 122 Nev. at 330 n.38, 130 P.3d at 1288 n.38.

**462** Nev.          **522 PACIFIC REPORTER, 3d SERIES**

to compensatory damages, the Iliescus also preserved nominal damages, as these damages are available to remedy a trespass where compensatory damages are unavailable or unproven. Thus, the district court erred in determining that the Iliescus waived their right to recover nominal damages for trespass.[14] Further, proving damages is particularly unnecessary in this case because the RTC had been granted perpetual easements on the Iliescus' property and the Iliescus were seeking injunctive relief, an appropriate remedy for the threat of continuing trespass.[15] *See S.O.C., Inc.*, 117 Nev. at 416, 23 P.3d at 251.

Accordingly, the district court erred in granting summary judgment in favor of the RTC as to the Iliescus' trespass claim, and thus we reverse the grant of summary judgment on this claim and remand for further proceedings. To the extent that the district court's order granting summary judgment in favor of the RTC as to the Iliescus' request for declaratory relief was predicated on its ruling relating to their trespass claim, that ruling is likewise reversed and remanded for further proceedings.

## CONCLUSION

The district court did not err in dismissing the Iliescus' waste claim because the RTC had no possessory interest as to the Iliescus' parking lot. The court also did not err in dismissing their injunctive relief claim to the extent that it was pleaded as a cause of action. Additionally, the court did not err in granting summary judgment in favor of the

RTC as to the Iliescus' contract-based claims.

The district court, however, erred in granting summary judgment as to the Iliescus' trespass and declaratory relief claims. Because we reverse the district court's order granting summary judgment in favor of the RTC as to these claims, the RTC might not be the prevailing party and the district court's order awarding it attorney fees and costs may no longer be appropriate under NRS 18.010(2)(b) and NRS 18.020. That order, therefore, is necessarily vacated. *See Cain v. Price*, 134 Nev. 193, 198, 415 P.3d 25, 30 (2018) (explaining that where a district court's order granting summary judgment is reversed, it is no longer appropriate to consider the respondents the prevailing party, and an award of attorney fees is inappropriate). Consistent with this opinion, we reverse and remand for further proceedings as to the Iliescus' trespass and declaratory relief claims, and if necessary, to determine if injunctive relief is appropriate.[16]

We concur:

Tao, J.

Bulla, J.



---

**14.** The parties disagree as to whether the Iliescus, by stipulation or otherwise, waived their right to pursue nominal damages in this case because nominal damages were not specifically preserved in the stipulation. However, neither was a claim for nominal damages specifically waived. Further, the parties did not stipulate to dismissal of the Iliescus' trespass claim, nor any damages specifically related to that claim. As explained above, the Iliescus preserved their claim to nominal damages by preserving their claim to compensatory damages and because nominal damages are inherently available for certain types of claims such as trespass.

**15.** As explained above, while the district court correctly dismissed the Iliescus' separate cause of action for injunctive relief, they are nevertheless permitted to seek injunctive relief as a remedy.

**16.** Insofar as the parties have raised arguments that are not specifically addressed in this opinion, we have considered the same and conclude that they either do not present a basis for relief or need not be reached given the disposition of this appeal.

# EXHIBIT 20

2023 WL 2710178

Only the Westlaw citation is currently available.

United States District Court, E.D. New York.

Mary Grace MAGTOLES, Aira C. Tan, Ana Myrene Espinosa, and Ana Mervine
Espinosa, individually and on behalf of all others similarly situated, Plaintiffs,

v.

UNITED STAFFING REGISTRY, INC. d/b/a United Home Care and Benjamin H. Santos, Defendants.

21-CV-1850 (KAM) (PK)

|

Signed March 30, 2023

**Synopsis**

**Background:** Citizens of Republic of Philippines who worked as healthcare professionals in New York area brought putative class action lawsuit against staffing company which employed them and its owner, president, and chief executive officer (CEO), asserting claims under Trafficking Victims Protection Act (TVPA) and state law for breach of contract, unjust enrichment, and fraud, and seeking declaratory and injunctive relief regarding liquidated damages and noncompete-clauses in their employment contracts. Healthcare professionals moved for summary judgment.

**Holdings:** The District Court, Kiyo A. Matsumoto, J., held that:

liquidated damages clause in standard employment contract between healthcare professionals and staffing company was unenforceable;

non-compete clause in standard employment contract between staffing company and nurses was unenforceable;

staffing company breached provision of standard employment contract stating that employer undertook and agreed to pay employees prevailing wages based on location;

company was liable under TVPA provision creating liability for knowingly providing or obtaining labor by means of serious harm or threats of serious harm;

CEO was liable under TVPA provision creating liability for knowingly benefiting from participation in venture engaged in providing or obtaining of labor or services in violation of TVPA; and

fact issues precluded summary judgment on healthcare professional's claims for fraud and unjust enrichment.

Motion granted in part and denied in part.

**Procedural Posture(s):** Motion for Summary Judgment; Request for Declaratory Judgment; Motion for Permanent Injunction.

**Attorneys and Law Firms**

John J.P. Howley, The Howley Law Firm P.C., New York, NY, for Plaintiffs.

Felix Q. Vinluan, Law Office of Felix Q. Vinkuan, Woodside, NY, Manuel B. Quintal, New York, NY, for Defendants.

### MEMORANDUM & ORDER

KIYO A. MATSUMOTO, United States District Judge:

**\*1**  Plaintiffs are citizens of the Republic of the Philippines who work as healthcare professionals in the New York area. Plaintiffs bring this putative class action against Defendants United Staffing Registry, Inc. ("the company"), and its sole owner, president, and chief executive officer, Benjamin H. Santos (collectively "Defendants"), for violations of the Trafficking Victims Protection Act ("TVPA"), 18 U.S.C. § 1589 *et seq.* The complaint also asserts individual claims for breach of contract, unjust enrichment, and fraud, and seeks declaratory and injunctive relief and damages as to specific aspects of Plaintiffs' employment contracts.

Presently before the Court is Plaintiffs' motion for summary judgment. (ECF No. 54.) Plaintiffs request entry of summary judgment: (1) declaring that the liquidated damages and non-compete clauses in their standard employment contracts are unenforceable under both the Trafficking Victims Protection Act, 18 U.S.C. § 1589 *et. seq.*, and under New York common law; (2) permanently enjoining Defendants from threatening or attempting to enforce either the liquidated damages provision or the non-compete clause; (3) finding both Defendants liable for breach of contract in amounts to be determined at trial or inquest, including piercing the corporate veil of corporate Defendant United Staffing Registry, Inc. to hold individual Defendant Santos personally liable; (4) finding both Defendants liable for violations of the TVPA in amounts to be determined at trial or inquest; and (5) awarding Plaintiffs reasonable attorneys' fees and the costs of this action as authorized by 18 U.S.C. § 1595(a). For the reasons set forth below, the Court GRANTS in part and DENIES in part Plaintiffs' motion for summary judgment.

### BACKGROUND

The following facts are drawn from the parties' submissions in connection with this motion, including the parties' Local Civil Rule 56.1 Statements of Facts, opposing 56.1 Statements, and reply 56.1 Statements. [1] Upon consideration of a motion for summary judgment, the Court must construe the facts in the light most favorable to the non-moving party. *See Capobianco v. City of New York*, 422 F.3d 47, 50 n.1 (2d Cir. 2005).

### I. Factual Background
**\*2**  The Court finds the following undisputed facts from the parties' submissions, unless otherwise noted.

#### A. The Defendants
Defendant Benjamin Santos is the sole owner, president, and chief executive officer ("CEO") of Defendant United Staffing Registry, Inc. ("United Staffing"), a staffing company in the business of recruiting foreign-trained nurses and other healthcare professionals, sponsoring them for lawful immigration status that will allow them to work in the United States, and employing them in New York. (Pls. 56.1 at ¶ 9; Defs. Resp. 56.1 at ¶ 9; *see also* ECF No. 45-1 ("United Staffing Dep.") at 17.) United Staffing assigns nurses to work at nursing homes and medical clinics owned and operated by its clients. (Pls. 56.1 at ¶ 7; Defs. Resp. 56.1 at ¶ 7.) Santos and United Staffing have been recruiting foreign nurses and employing them to work in New York for more than 20 years. (Pls. 56.1 at ¶ 10; Defs. Resp. 56.1 at ¶ 10.) Most of the nurses employed by United Staffing are from the Philippines. (Pls. 56.1 at ¶ 6; Defs. Resp. 56.1 at ¶ 6.)

United Staffing requires registered nurses ("RNs") that it sponsors to sign an Employment Agreement, although the timing may depend on whether the nurse was recruited from outside the United States or from within the United States. (ECF No. 45-5 ("Pascual Decl.") at ¶ 6.) Before foreign recruits are sponsored through the immigration process, United Staffing requires them to sign a three-year employment agreement with the company. (Pls. 56.1 at ¶ 11; Defs. Resp. 56.1 at ¶ 11; *see also* ECF

No. 45-4 ("Santos Decl.") at ¶¶ 6-7 ("Those we recruit from abroad are required, as a matter of company practice, to execute an Employment Agreement, which they would present to the U.S. Embassy during their consular interview."); Pascual Decl. at ¶¶ 6-7 ("United Staffing generally requires [non-U.S. citizens and non-lawful permanent residents RNs] whom we recruit and sponsor through the immigration process to sign a three-year Employment Agreement"; "United Staffing requires foreign-trained registered nurses recruited from outside the United States to sign our Employment Agreement before they are sponsored through the Form I-140 immigrant worker petition process.")). [2]

### B. The Nurse Plaintiffs and Their Employment Contracts

**\*3**  In 2018 and 2019, Plaintiffs Mary Grace Magtoles, Aira C. Tan, and Ana Myrene Espinosa (collectively, the "Nurse Plaintiffs") each signed United Staffing's "Standard Contract" to work for the company as an RN. (Pls. 56.1 at ¶ 13; Defs. Resp. 56.1 at ¶ 13; *see, e.g.*, ECF Nos. 28-2 ("Magtoles Contract"), 28-3 ("Tan Contract"), 28-4 ("Ana Myrene Espinosa Contract").) [3] Four provisions of the contracts are relevant to the instant motion.

*First*, United Staffing's standard contract requires nurses to work a minimum number of hours during the three-year contract period. (*See, e.g.*, Magtoles Contract at 3; ECF No. 40-40, Ex. O at 3; ECF No. 40-45, Ex. T at 3.) Most of United Staffing's foreign recruits — including the Nurse Plaintiffs and more than fifty others — signed a contract requiring 6,000 hours of work over the three-year period. [4] (*See, e.g.*, Magtoles Contract; Pascual Decl. ¶ 22.) If a nurse leaves United Staffing's employ before working the specified number of hours, the contract requires the nurse to pay $15 in "liquidated damages" for each hour that the nurse did not complete. [5] (*See, e.g.*, Magtoles Contract at 3; ECF No. 40-40, Ex. O at 3; ECF No. 40-45, Ex. T at 3.) For example, if a nurse signed a contract requiring 6,000 hours of work and then left United Staffing after completing 2,000 hours of work over the course of one year, the nurse would owe $60,000 in "liquidated damages" for the 4,000 remaining hours. [6]

**\*4**  *Second*, the contracts include a three-year, nationwide non-compete clause. (Pls. 56.1 at ¶ 37; Defs. Resp. 56.1 at ¶ 37; *see, e.g.*, Magtoles Contract at 3.) If a nurse leaves United Staffing before completing the minimum number of hours over the course of three years, the nurse cannot:

1. In any manner whatsoever, directly or indirectly, work as a nurse, practice nursing, work as a physician's assistant, or otherwise practice the art of/science of nursing; or

2. Directly or indirectly operate, own, lease (as landlord or tenant), engage or participate in as an owner, partner, employee, joint venturer, shareholder, director, assignor, seller, transferor, or as sales or marketing agent or otherwise, in, for or in connection with any business which competes with [United Staffing] within the United States for a period of THREE (3) YEARS after the EMPLOYEE severs his/her relationship with [United Staffing].

(*See, e.g.*, Magtoles Contract at 3.)

*Third*, the contracts provide that United Staffing will pay the Nurse Plaintiffs "a salary or wage that complies with the laws, rules, regulations and prevailing wages depending on the location of the hospital, health care facility" where the nurse works. (*See, e.g.*, Magtoles Contract at 4; ECF No. 40-40, Ex. O at 4; ECF No. 40-45, Ex. T at 4.)

*Fourth*, the contracts provide that, if the nurse breaches the contract, United Staffing "will report" a change in employment status to "appropriate government authorities, including but not limited to the United States Citizenship and Immigration Service (USCIS) and the Immigration and Customs enforcement (ICE)." (*See, e.g.*, Magtoles Contract at 4.) The contracts also state that "such report may lead to the termination of the Permanent Resident Card (Green Card) and deportation of EMPLOYEE from the United States." (*See, e.g.*, Magtoles Contract at 4; ECF No. 40-40, Ex. O at 11; ECF No. 40-45, Ex. T at 4.)

### C. Plaintiff Ana Mervine Espinosa

Magtoles v. United Staffing Registry, Inc., --- F.Supp.3d ---- (2023)
2023 WL 2610165

Plaintiff Ana Mervine Espinosa (a/k/a "Bhyng Espinosa" [7] ) is a licensed physical therapy aide and a citizen of the Republic of the Philippines. (Pls. 56.1 at ¶ 4; Defs. Resp. 56.1 at ¶ 4.)

## II. Procedural History

Plaintiffs commenced this putative class action on April 6, 2021, bringing claims for violations of the TVPA, conspiracy to violate the TVPA, and attempting to violate the TVPA. (ECF No. 1 ("Compl.") ¶¶ 93-120.) The Nurse Plaintiffs also assert claims for breach of contract and seek declaratory judgment and injunctive relief, and Plaintiff Bhyng Espinosa brings claims for unjust enrichment and fraud. (*Id.* ¶¶ 121-47.)

On June 21, 2021, Defendants filed a letter requesting a pre-motion conference for their motion to dismiss the Complaint for failure to state a claim. (ECF No. 15.) After considering the parties' submissions, this Court issued a Memorandum & Order on December 30, 2021, granting in part and denying in large part Defendants' motion to dismiss. *Magtoles v. United Staffing Registry*, No. 21-CV-1850 (KAM)(PK), 2021 WL 6197063 (E.D.N.Y. Dec. 30, 2021). Based on the liquidated damages provision, non-compete clause, and the immigration notification provision in United Staffing's standard contract, the court concluded that the Nurse Plaintiffs stated plausible claims for violations of the TVPA, breach of contract, and grounds for declaratory judgment. *Id.* at *3-11. Although the Court concluded that Plaintiff Bhyng Espinosa could not assert claims under Section 1589 of the TVPA — because the Complaint failed to allege that she ever started work for United Staffing — the Court found that Ms. Bhyng Espinosa stated plausible claims for trafficking, conspiracy, and attempt under the TVPA, as well as for fraud and unjust enrichment under New York law. *Id.* at *10, *12. On February 8, 2022, Magistrate Judge Kuo issued an order certifying the close of all discovery. (2/8/22 Docket Order.) On May 25, 2022, this Court granted the Nurse Plaintiffs' motion for class certification and approved the notices to the putative class. *Magtoles v. United Staffing Registry, Inc.*, No. 21-CV-1850 (KAM)(PK), 2022 WL 1667005 (E.D.N.Y. May 25, 2022).

**\*5**  Finally, on August 30, 2022, less than a week before the opt-out deadline, Defendants sent an email — without seeking leave from this Court — to United Staffing employees, including members of the certified class in this action, encouraging them to opt out of the class. (ECF No. 57-2 ("8/30/22 Email").) On September 2, 2022, class counsel moved by order to show cause, pursuant to Federal Rule of Civil Procedure 23(d), for an order: (1) prohibiting Defendants and their attorneys, employees, agents, and representatives from communicating with class members regarding this action and the claims asserted without prior court approval; (2) directing Defendants to provide class counsel with the names and email addresses of all individuals who received Defendants' August 30, 2022 email; and (3) authorizing class counsel to send a curative notice to class members. (ECF No. 57-4 at 1.) The Court held an Order to Show Cause Hearing on September 6, 2022. In a September 6, 2022 Memorandum & Order granting class counsel's motion, the Court found:

> As the employer of class members, Defendants sent an email warning class members that "United Staffing filed counterclaims against the nurses for preterminating their contracts." (8/30/22 Email at 1.) Viewed in context, this statement conveys an implicit threat, by the Defendants to their employee class members, that they too will be sued if they choose to remain in the class. This statement is also misleading because it suggests that nurses will face liability for "preterminating their contracts" (*id.*), regardless of whether those contracts (as Plaintiffs contend) are unenforceable.

> ...

> Most notably, Defendants' email suggests that class members opt out with the following response: "I do not understand how your clients are claiming United Staffing forced them to work, when all of us voluntarily signed and we all understood the terms of our employment contract. I guess your clients just would like to get out of their 3-year contracts." (8/30/22 Email at 2.) Defendants' suggested responses also contain several other one-sided statements that parrot Defendants' defenses in this action and encourage class members to opt out, including: "I was not forced to work by United Staffing," "I signed my contract voluntarily," "The contract was clear," and "I was paid correctly." (*Id.*)

(ECF No. 61 at 10-11.)

*Magtoles v. United Staffing Registry, Inc., --- F.Supp.3d ---- (2023)*

2023 WL 2610165

This Court held that Defendants' unauthorized email was "misleading, coercive, and otherwise interfered with the proper administration of this class action." (*Id.* at 8.)

Plaintiffs now move for summary judgment as to: Defendants' liability under the TVPA and on the breach of contract claim; a declaration that the "liquidated damages" and "non-compete" clauses of the standard contract are invalid and unenforceable; and an injunction against the actual or threatened enforcement of those clauses. Plaintiffs also seek summary judgment in favor of Plaintiff Bhyng Espinosa on her claims for fraud and unjust enrichment, on the grounds that she paid Defendants $7,532.00 in connection with obtaining a labor certification, in violation of 20 C.F.R. § 656.12. (ECF No. 54-1 ("Pls. Mem.") at 10.)

## LEGAL STANDARD

Summary judgment shall be granted to a movant who demonstrates "that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "A fact is 'material' for these purposes when it 'might affect the outcome of the suit under the governing law.' " *Rojas v. Roman Catholic Diocese of Rochester*, 660 F.3d 98, 104 (2d Cir. 2011) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986)). No genuine issue of material fact exists "unless there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party." *Anderson*, 477 U.S. at 249, 106 S.Ct. 2505. "If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." *Id.* at 249-50, 106 S.Ct. 2505 (citations omitted).

When bringing a motion for summary judgment, the movant carries the burden of demonstrating the absence of any disputed issues of material fact and entitlement to judgment as a matter of law. *Rojas*, 660 F.3d at 104. In deciding a summary judgment motion, the court must resolve all ambiguities and draw all reasonable inferences against the moving party. *Flanigan v. Gen. Elec. Co.*, 242 F.3d 78, 83 (2d Cir. 2001) (citing *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986)). A moving party may indicate the absence of a factual dispute by "showing ... that an adverse party cannot produce admissible evidence to support the fact." Fed. R. Civ. P. 56(c)(1)(B). Once the moving party has met its burden, the non-moving party "must come forward with admissible evidence sufficient to raise a genuine issue of fact for trial in order to avoid summary judgment." *Jaramillo v. Weyerhaeuser Co.*, 536 F.3d 140, 145 (2d Cir. 2008) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986)). Finally, the "mere existence of a scintilla of evidence in support of the [non-movant's] position will be insufficient; there must be evidence on which the jury could reasonably find for the [non-movant]." *Anderson*, 477 U.S. at 252, 106 S.Ct. 2505.

## DISCUSSION

### I. Enforceability of the Liquidated Damages Provision

**\*6**  Plaintiffs request a declaratory judgment finding the liquidated damages provision of the contracts unenforceable. They also request that Defendants be enjoined from attempting or threatening to enforce the provision.

#### A. Legal Standard

Whether a liquidated damages provision is enforceable "is a question of law, giving due consideration to the nature of the contract and the circumstances." *HLT Existing Franchise Holding LLC v. Worcester Hosp. Grp., LLC*, 609 F. App'x 669, 672 (2d Cir. 2015) (summary order) (internal quotation marks omitted). Such a provision is, in effect, an estimate "made by the parties at the time they enter into their agreement, of the extent of the injury that would be sustained as a result of breach of the agreement." *Truck Rent-A-Ctr., Inc. v. Puritan Farms 2nd, Inc.*, 41 N.Y.2d 420, 424, 393 N.Y.S.2d 365, 361 N.E.2d 1015 (1977). A liquidated damages provision will not be enforced if it is contrary to public policy, "and public policy is firmly set against the imposition of penalties or forfeitures for which there is no statutory authority." *Id.* Accordingly, "[a] provision that

7

2023 WL 2610165

does not serve the purpose of reasonably measuring the anticipated harm, but is instead punitive in nature, serving as a mere 'added spur to performance,' will not be enforced." *Agerbrink v. Model Serv. LLC*, 196 F. Supp. 3d 412, 417 (S.D.N.Y. 2016) (quoting *Priebe & Sons v. United States*, 332 U.S. 407, 413, 68 S.Ct. 123, 92 L.Ed. 32 (1947)).

To that end, "New York courts will construe a purported liquidated damages provision strictly." *Agerbrink*, 196 F. Supp. 3d at 417. Courts will uphold and enforce liquidated damages provisions where (1) actual damages may be difficult to determine *and* (2) the damages amount awarded pursuant to the clause is not clearly disproportionate to the possible loss. *See U.S. Fid. & Guar. Co. v. Braspetro Oil Servs. Co.*, 369 F.3d 34, 70-71 (2d Cir. 2004). If the liquidated damages provision "does not satisfy one or both of these factors then it is considered an impermissible penalty and will not be enforced by the courts." *Union Cap. LLC v. Vape Holdings Inc.*, No. 16-CV-1343 (RJS), 2017 WL 1406278, at *7 (S.D.N.Y. Mar. 31, 2017).

Though the party challenging the liquidated damages provision bears the burden of demonstrating unenforceability, in doubtful cases, courts tend "to favor the construction which makes the sum payable for breach of contract a penalty rather than liquidated damages." *See Rattigan v. Commodore Int'l Ltd.*, 739 F. Supp. 167, 169-70 (S.D.N.Y. 1990) (citation omitted); *see also Bristol Inv. Fund, Inc. v. Carnegie Int'l Corp.*, 310 F. Supp. 2d 556, 566-67 (S.D.N.Y. 2003) ("[A]ny doubt with respect to whether the relevant provision is an unenforceable penalty or a permissible liquidated damages clause should be resolved in favor of a construction which holds that the provision is a penalty.").

Finally, in determining whether one side is exacting an unconscionable penalty, courts should also consider factors such as the sophistication of the parties, whether they were represented by counsel, and whether the contract was negotiated at arm's length. *See Rattigan,* 739 F. Supp. at 172 (internal quotation marks omitted); *Union Cap. LLC*, 2017 WL 1406278, at *7.

**B. Damages Disproportionate to Potential Loss**

 **\*7**  Here, Section 3(b) of the liquidated damages provision provides that "[i]n the event of a breach," a nurse must pay United Staffing $15 for "each hour or part of an hour not performed" of the required 6,000 hours in the contract. (*See, e.g.*, Magtoles Contract at 3.) Section 3(a), in turn, states in relevant part "... that the EMPLOYEE breaches the contract by severing its relationship with the EMPLOYER before completion of the term of THREE (3) YEARS[.]" (*Id.*)

Under these liquidated damages provisions, then, if a nurse pre-terminated his or her contract with United Staffing prior to completing any of the 6,000 hours, the nurse would owe a total of $90,000 — $15 for each hour. As discussed *supra* note 6, Defendants inexplicably "object" to this simple arithmetic based on the contract provisions' plain language, stating it is somehow "not a statement of fact." (Defs. Resp. 56.1 at ¶ 25; Pls. 56.1 at ¶ 25; *see also supra*, notes 5, 6.) The Court finds that this factual calculation, based on Defendants' own contract term, is undisputed.

In *Paguirigan v. Prompt Nursing Employment Agency, LLC*, the employment contracts between the class of Filipino nurses and the employment agency included a liquidated damages provision stating that the employees would pay the "Employer and/or its designee/assignee" $25,000 in the event that the nurses pre-terminated or otherwise breached the employment contract. *See* No. 17-CV-1302 (NG), 2019 WL 4647648, at *2, *8 (E.D.N.Y. Sept. 24, 2019), *aff'd in part, appeal dismissed in part,* 827 F. App'x 116 (2d Cir. 2020) (summary order). Judge Gershon found that the $25,000 was disproportionate to the contemplated injury, and was an unenforceable penalty, because "[c]onsidering that plaintiff's payroll records indicate that she typically made less than $700.00 per week after taxes, it would have taken her almost nine months to pay off the liquidated damages amount, assuming she had no other expenditures such as food or housing." *Id.* at *8.

Here, too, the liquidated damages provision in Plaintiffs' contracts are unenforceable penalties because the damages awarded pursuant to the liquidated damages clause are patently disproportionate to the potential loss. Indeed, the potential liquidated damages that a nurse could be liable for, $90,000, is significantly larger than the amount in *Paguirigan*. Even if a nurse were to pre-terminate her employment agreement with United Staffing after one year and completion of 2,000 hours — the minimum number of hours required annually under Section 1(c) of the contract (*see, e.g.*, Magtoles Contract at 3) — the nurse would still owe $60,000 to United Staffing for the remaining 4,000 hours. Similarly, if a nurse were to cease working for United Staffing

after two years and completion of 4,000 hours, the nurse would still owe $30,000 to United Staffing for the remaining 2,000 hours.

Here, Plaintiff Magtoles' payroll records indicate that in a week where she worked 40.00 hours at her hourly rate of $31.00, her net pay was $924.36 per week after taxes. (ECF No. 43-17 ("Magtoles Payroll Records") at 19.) It would have taken Magtoles approximately 97 weeks — almost *two years* — to pay off a liquidated damages amount of $90,000 had she quit United Staffing's employ without completing any hours, provided she put every dollar she earned towards paying off the amount and provided she "had no other expenditures such as food or housing," or any other living expense — an impossibility. *See Paguirigan*, 2019 WL 4647648, at *8. This nearly two-year period of time necessary to pay liquidated damages would be more than double the time (nine months) that constituted disproportionality in *Paguirigan*.

 **8**  Moreover, *Paguirigan* found that the nine months it would have taken the plaintiff to pay off the $25,000 liquidated damages further supported "the conclusion that this provision is *intended to operate as a means to compel performance*, ensuring that plaintiff and other nurses did not resign prior to the end of their contract terms." *Id.* (internal quotation marks and citation omitted) (emphasis added); *see also Rattigan*, 739 F. Supp. at 169 ("If [a liquidated damages clause] is intended to operate as a means to compel performance, it will be deemed a penalty and will not be enforced.") (citing *Brecher v. Laikin*, 430 F. Supp. 103, 106 (S.D.N.Y. 1977)). Accordingly, the Court follows the reasoning of *Paguirigan* to reach the same conclusion here: the liquidated damages provision is an unenforceable penalty.

Defendants argue that because the liquidated damages provision amount could "diminish[ ] over time, as the employee continues to perform under the agreement," this is "another factor indicating that the amount of actual damages Defendants anticipated resulting from a termination of the agreements prior to their execution was reasonably proportionate to the probable loss from the breach." (ECF No. 55 ("Defs. Mem.") at 23.) This argument is unavailing. The liquidated damages provision in *Paguirigan* also provided for a diminishing of liquidated damages to $16,666.67 or $8,333.34 if the plaintiff pre-terminated or breached the contract in her second or third year, respectively. *Paguirigan*, 2019 WL 4647648, at *2. As in *Paguirigan*, the "diminishing nature" of the liquidated damages amount does not impact the finding of disproportionate damages here.

Defendants also argue that unlike in *Paguirigan*, the standard contracts here do not contain (1) a confession of judgment that Defendants could file in court "should a plaintiff or recruited nurse [terminate] his or her contract early," or (2) language that the provision was intended "to secure Employee's performance of the Employment Term." (Defs. Mem. at 24); *see Paguirigan*, 2019 WL 4647648, at *7. Defendants then assert, in a conclusory fashion, that "[t]hus, the liquidated damages provision in United Staffing's contracts is not a penalty." (Defs. Mem. at 24.)

Defendants mention these distinctions without any accompanying legal authority or arguments as to their legal relevance. Defendants notably fail to recognize that Judge Gershon noted both points only after stating that "it is immaterial that the parties may describe the provision as a penalty." *Paguirigan*, 2019 WL 4647648, at *7. The immateriality of a party's characterization of a liquidated damages provision is a well-established principle of assessing the enforceability of liquidated damages clauses. *See, e.g., Truck Rent-A-Ctr., Inc. v. Puritan Farms 2nd, Inc.*, 41 N.Y.2d 420, 393 N.Y.S.2d 365, 361 N.E.2d 1015, 1018 (1977) ("In interpreting a provision fixing damages, it is not material whether the parties themselves have chosen to call the provision one for 'liquidated damages' ... or have styled it as a penalty.") Neither a confession of judgment nor language that the purpose of a liquidated damages provision is "to secure Employee's performance of the Employment Term" ultimately speak to the crux of the analysis, specifically, whether the liquidated damages provision is plainly disproportionate to the contemplated injury or whether actual damages may be difficult to determine. *See U.S. Fid. & Guar. Co. v. Braspetro Oil Servs. Co.*, 369 F.3d 34, 70 (2d Cir. 2004). Defendants fail to argue or cite contrary material facts or legal authority, and thus fail to present a triable issue of material fact as to the provision's disproportionality to potential loss. The Court therefore finds that the liquidated damages provision is an unenforceable penalty based on disproportionality.

### C. Difficulty of Ascertaining Damages

*Magtoles v. United Staffing Registry, Inc., --- F.Supp.3d ---- (2023)*
2023 WL 2610165

**\*9**  Because the Court has found that the liquidated damages amount is plainly disproportionate to the contemplated injury, the liquidated damages provision is an unenforceable penalty. The Court, however, also finds that the liquidated damages provision is separately unenforceable because actual damages upon a nurse's pre-termination of or breach of the contract would not have been difficult to ascertain when the parties entered into the standard contract.

First, Defendants argue that "the portion of the costs incurred by United Staffing recruitment team in recruiting a particular RN would be unknown at the time the RN executed the agreement, because the total number of RNs that would be successfully recruited on any given recruitment trip to the Philippines would be unknown at the time." (Defs. Mem. at 21.) In affirming the district court's holding that the liquidated damages provision in *Paguirian* was an unenforceable penalty, the Second Circuit rejected the defendants' argument that the liquidated damages provision was necessary to account for recruiting costs:

> [B]y their very nature, these costs had already been incurred by the time the parties signed the contract — after all, Defendants no longer had to expend funds recruiting [plaintiff] once she had signed on the dotted line. As a result, it would be eminently reasonable to expect that [defendant] could have reviewed its expenses (*averaging them to provide a per-nurse cost if necessary*) so as to arrive at a figure for the cost they incurred to recruit [plaintiff].

*Paguirigan v. Prompt Nursing Emp. Agency, LLC*, 827 Fed. App'x 116, 121 (2d Cir. 2020) (summary order) (emphasis added).

This Court arrives at the same conclusion here. By the time a nurse and United Staffing were entering into the standard contract — in other words, the time at which liquidated damages would be estimated — recruiting costs would already have been incurred by United Staffing, and could be averaged to ascertain a "per-nurse" cost if necessary, as the Second Circuit has noted. Therefore, recruiting costs are not difficult to ascertain. Further, Defendants concede that reimbursements for "immigration sponsorship costs, training and living orientation costs ... would have been easily ascertained, considering United Staffing has indeed been in the business for about twenty years now." (Defs. Mem. at 22.)

Defendants also argue that "the costs of replacing a recruited RN that terminated his or her employment prematurely also could not be known at the time United Staffing entered into a contract with the nurse," and, relatedly, that "United Staffing could not know whether or when a nurse would leave his or her employment when hiring the nurse, which would render an amortization of the recruitment costs impossible at the time the contract was entered into." (Defs. Mem. at 21.) It is undisputed, however, that: (1) Most of the nurses employed by United Staffing are from the Philippines, from which Defendants have recruited nurses for years; (2) United Staffing has assigned nurses to work at twenty client facilities in New York City and on Long Island; and (3) Defendants Santos and United Staffing have been recruiting foreign nurses and employing them to work in New York for more than twenty years. (Pls. 56.1 at ¶¶ 6, 8, 10; Defs. Resp. 56.1 at ¶¶ 6, 8, 10.) Based on the undisputed facts before the Court and the unambiguous liquidated damages formula in the contracts, the Court respectfully rejects Defendants' argument that they could not reasonably ascertain the costs of replacing a nurse with their over two decades of experience in recruiting, employing, and assigning nurses, especially because multiple nurses have previously left Defendants' employ. (*See* United Staffing Dep. at 65:02-65:22 (discussing nurses terminating their contracts with United Staffing); at 26:24-27:03 (discussing United Staffing maintaining a nurse's file for at least "six years" after the nurse left United Staffing's employ).) Therefore, far from such costs being "incapable or difficult of precise estimation," the sophistication and experience of United Staffing show otherwise.

**\*10**  Defendants attempt to distinguish the standard contract here with that in *Paguirian*, arguing that the *Paguirian* contracts list numerous costs encompassed in the liquidated damages amount: "recruiting the employee," "sponsoring the Employee for an Immigrant Visa," "training the Employee in practice and procedures," and "orienting the Employee to living in the New York area" (Defs. Mem. at 21-22); *see also Paguirian*, 2019 WL 4647648, at \*2, whereas here, Defendants argue that the damages "envisioned in United Staffing's contracts also include, in addition, estimates for lost profit or lost income." (Defs. Mem. at 22.)

2023 WL 2610165

To support their argument that damages are difficult to ascertain, Defendants point to Human Resources Manager Ferdinand Pascual's "supplemental affidavit," filed months after Defendants' Responsive 56.1 Statement (ECF No. 44) was submitted. As an initial matter, this "supplemental affidavit" contravenes this Court's Chambers Practices III.B.4(i), which states: "Supplements to a 56.1 statement are not permitted absent leave of the Court and a showing of good cause." *See CIT Bank, N.A. v. Donnatin,* No. 17-CV-02167 (ADS), 2020 WL 248996, at *2 (E.D.N.Y. Jan. 16, 2020) ("The Court has broad discretion to determine whether to overlook a party's failure to comply with its individual rules." (citing *Holtz v. Rockefeller & Co.,* 258 F.3d 62, 73 (2d Cir. 2001))) (cleaned up); *cf. Perez v. U.S. Immigr. & Customs Enf't,* No. 19-CV-3154 (PGG), 2020 WL 4557387, at *3 (S.D.N.Y. Aug. 6, 2020), *report and recommendation adopted,* No. 19-CV-3154 (PGG), 2020 WL 5362356 (S.D.N.Y. Sept. 8, 2020) ("A court may enforce its rules and orders by striking noncompliant portions of a party's brief.") (collecting cases).

Here, Defendants failed to request leave of the Court — let alone show good cause — prior to submitting Pascual's "supplemental affidavit." Defendants failed to request leave of the Court at any point after filing their Responsive 56.1 Statement and exhibits on May 10, 2022, nor in the *three full months* prior to the motion being fully submitted on August 25, 2022. Belated supplements to the record deprive a party of the opportunity to appropriately incorporate, respond to, or cite to any such "evidence" in their 56.1 Statements. [8]

Moreover, even if the "supplemental affidavit" did not violate this Court's motion practices, the portions to which Defendants cite in support of their lost profits argument would be inadmissible, to the extent Pascual relies on hearsay or lacks personal knowledge, and because those portions are not relevant to the ascertainment of damages analysis under Fed. R. Evid. 401, 402. Any consideration of lost profits or lost income here would be properly categorized as consequential damages that "must have been brought within the contemplation of the parties as the probable result of a breach at the time of or prior to contracting." *See Kenford Co. v. Cty. of Erie,* 73 N.Y.2d 312, 319, 540 N.Y.S.2d 1, 537 N.E.2d 176 (1989). "Lost profits are consequential damages when, as a result of the breach, the non-breaching party suffers loss of profits on collateral business arrangements." *Tractebel Energy Mktg., Inc. v. AEP Power Mktg., Inc.,* 487 F.3d 89, 109 (2d Cir. 2007).

**\*11** Defendants argue:

> The "lost income" or "lost profit" cannot be ascertained at the time of the execution of the contract because there is no way of knowing when a RN would preterminate; because there is no way of knowing where the RN would be assigned at, and because the future worksite facility is unknown, it cannot be known at the execution of the contract how much said worksite facility would be paying United Staffing for the services of its employees, as various healthcare facilities have different and varying pay schedules and pay rates.

(Defs. Mem. at 22-23.)

Therefore, Defendants' lost income and lost profit arguments are clearly based on "losses in relation to its nursing home clients, and thus properly categorized as consequential damages." *See Paguirigan,* 2019 WL 4647648, at *11 n.9. There is no admissible evidence in the record that "any nurse contemplated, or should have contemplated lost profit damages at the time the contracts were executed," *see id.,* nor is there any admissible evidence suggesting that Defendants themselves contemplated lost profit damages at the time the standard contracts were executed. *Cf. Shred-It USA, Inc. v. Bartscher,* No. 02-CV-4082 (JO), 2005 WL 2367613, at *11 (E.D.N.Y. Sept. 27, 2005) ("Shred-It claims that it can recover its lost profits from the White & Case account. Such a theory requires Shred-It to prove first that the allegedly lost profits constitute damages caused by Bartscher's breach, second that such lost profits are capable of being proved with reasonable certainty, and third *that such a measure of damages was within the parties' contemplation at the time they entered into the Agreement.*") (emphasis added).

Finally, the standard contract's failure to list some or any of the costs contemplated by the liquidated damages provision in fact lends *more* support to finding the provision unenforceable. Unlike in *Paguirigan*, the plain language of the liquidated damages provision here reflects nothing of what costs may have been contemplated by the parties in including such a provision, let alone how the provision is a "reasonable measure" of anticipated damages from breach. *See U.S. Fid. & Guar. Co. v. Braspetro Oil Servs. Co.,* 369 F.3d 34, 70-71 (2d Cir. 2004) (internal quotation marks and citation omitted) ("New York courts will sustain a liquidated damages provision 'only where the specified amount is a reasonable measure of the anticipated harm.' "); *compare Union Cap. LLC v. Vape Holdings Inc.,* No. 16-CV-1343 (RJS), 2017 WL 1406278, at *7 (S.D.N.Y. Mar. 31, 2017) ("Union offers no explanation for how the daily payment is even conceivably linked to the damages Union suffered as a result of Vape's failure to deliver its converted shares. Obviously, the provision serves only to encourage Vape to abide by the terms of the contract, and it thus functions as the prototypical forbidden penalty — an invalid 'added spur to performance.' ") (citation omitted), *with GFI Brokers, LLC v. Santana,* Nos. 06-CV-3988 (GEL), 06-CV-4611 (GEL), 2009 WL 2482130, at *4 (S.D.N.Y. Aug. 13, 2009) (in assessing enforceability of a liquidated damages provision, noting that testimony from the party seeking enforcement "adequately explained the difficulties GFI prospectively anticipated").

### D. Attendant Circumstances

**\*12**  The Court also concludes that the liquidated damages provision is an unenforceable penalty after "due consideration for the nature of the contract and the attendant circumstances." *See U.S. Fid. & Guar. Co.,* 369 F.3d at 71 (citation omitted). The parties' respective bargaining power is also a factor when determining "if one side is exacting an unconscionable penalty." *PacifiCorp Cap. Inc. v. Tano, Inc.,* 877 F. Supp. 180, 184 (S.D.N.Y. 1995); *see also Glob. Crossing Bandwith, Inc. v. OLS, Inc.,* 566 F. Supp. 2d 196, 202 (W.D.N.Y. 2008) (collecting cases).

Ferdinand Pascual is and was the Human Resources Manager at United Staffing, where he has been employed for more than 15 years. (Pls. 56.1 at ¶¶ 106-107; Defs. Resp. 56.1 at ¶¶ 106-107.) Pascual was responsible for making sure that the nurses signed the standard contract. He was also responsible for explaining the standard contract to nurses and answering their questions. (Pls. 56.1 at ¶¶ 108-10; Defs. Resp. 56.1 at ¶¶ 108-10.) Plaintiff Ana Myrene Espinosa testified that, on the date the contract was presented to her, she "needed somebody to explain" the contract, had "to bring it back on that day, the same day," "did not have time to consult someone else," and "didn't really get the chance to read thoroughly the contract, because [she] had to go back before they closed the agency," and "Mr. Ferdi Pasquale [sic] asked [her] to submit it right away." She also testified: "I do understand the contract. *It's just at the time I was really eager to work.* I read it, scanned it really fast, and then signed." (ECF No. 40-28 ("Ana Myrene Espinosa Dep.") at 89:22-91:07 (emphasis added).) In addition, when asked if there came a point when she complained to the United States embassy about the employment agreement, Plaintiff Magtoles testified: "No. I was nervous." (ECF No. 40-26 ("Magtoles Dep.") at 106:15-106:18.)

Moreover, it is undisputed that Defendants were highly experienced in the practice of recruiting Filipino/Filipina nurses and in the use of their contracts that included the liquidated damages provision, which Defendants inserted into dozens of standardized contracts, in contrast to some nurses who relied on Defendants' representatives (such as Pascual) to explain the standard contract. Furthermore, nothing in the record before the Court suggests the parties engaged in any negotiations in the inclusion of the provision, that Plaintiffs had any hand in drafting or including the liquidated damages provision, or that Plaintiffs had any particular "familiarity with American contract law." *See Paguirigan,* 2019 WL 4647648, at *8.

In short, from the undisputed facts, the Court finds that the parties' respective bargaining power was grossly unequal. Under these circumstances and based on the undisputed evidence in the record, the Court cannot find that the liquidated damages provision was a valid and enforceable term of the contract "made by the parties at the time they enter[ed] into their agreement." *See Truck Rent-A-Ctr., Inc. v. Puritan Farms 2nd, Inc.,* 41 N.Y.2d 420, 424, 393 N.Y.S.2d 365, 361 N.E.2d 1015 (1977). The Court also reiterates that if there is "any doubt" as to whether a liquidated damages clause is an unenforceable penalty or a permissible provision, courts should construe such a provision as a penalty. *See, e.g., Bristol Inv. Fund, Inc. v. Carnegie Int'l Corp.,* 310 F. Supp. 2d 556, 566-67 (S.D.N.Y. 2003) (collecting cases); *see also Jordache Enter., Inc. v. Glob. Union Bank,*

2023 WL 2610165

688 F.Supp. 939, 944 (S.D.N.Y. 1988) ("Hostility to liquidated damages clauses reflects a concern that such clauses are often unconscionably imposed by the stronger, or more sophisticated party on the weaker."). [9]

## II. Enforceability of Non-Compete Clause

### A. Declaratory Judgment

 **\*13**  As an initial matter, Defendants do not argue that the non-compete clause is, in fact, enforceable. Instead, Defendants state only that Plaintiffs have "failed to show that there is a 'substantial controversy' 'of sufficient immediacy and reality' to warrant the issuance of a declaratory judgment," and that "there is nothing in the record of the case that will indicate Defendants had threatened to enforce the 'non-compete' provisions of Plaintiffs' employment agreements." (Def. Mem. at 24, 26); *see also Niagara Mohawk Power v. Tonawanda Band of Seneca Indians*, 94 F.3d 747, 752 (2d Cir. 1996).

Tellingly, Defendants have not represented that they will *not* seek enforcement, leaving nurses (and any of their potential employers) "uncertain as to whether [the nurse] will be embroiled in a lawsuit if [the nurse] accepts a position with [a competitor]." *Arakelian v. Omnicare, Inc.*, 735 F. Supp. 2d 22, 41 (S.D.N.Y. 2010) (determining that employer's contention that "Plaintiff has failed to identify any facts that indicate that Omnicare plans to enforce the covenant against her" was "facetious"). It is well-established that where, as here, Plaintiffs are unsure whether they can pursue other employment to make a living, clarification and resolution of the uncertain enforcement of the liquidated damages provision serves "one of the main purposes of declaratory judgments." *See, e.g., id.*; *see also Duane Reade, Inc. v. St. Paul Fire & Marine Ins. Co.,* 411 F.3d 384, 389 (2d Cir. 2005) ("In order to decide whether to entertain an action for declaratory judgment, we have instructed district courts to ask: (1) whether the judgment will serve a useful purpose in clarifying or settling the legal issues involved; and (2) whether a judgment would finalize the controversy and offer relief from uncertainty.").

In sum, Defendants cannot have their cake and eat it too — they cannot argue that Plaintiffs have not shown that Defendants intend to enforce the agreement, while simultaneously preserving the possibility of enforcement down the line. *See Arakelian*, 735 F. Supp. 2d at 41 (on summary judgment, holding that the employer "cannot move to dismiss [employee's] claim; refuse to agree not to enforce the Restrictive Covenants Agreement; and at the same time claim that [employee] has not shown that it intends to enforce the agreement"). The Court agrees with Plaintiffs that, "[h]aving created uncertainty by including the nationwide non-compete clause in their Standard Contract, defendants should not be able to keep the nurses in a state of suspense and apprehension." (ECF No. 56 ("Pls. Reply") at 6.)

### B. Legal Standard of Enforceability

Non-compete provisions are enforceable under New York law only if they are (1) reasonable in duration and geographic scope, (2) "necessary to protect the employer's legitimate interests," (3) "not harmful to the general public," and (4) "not unreasonably burdensome to the employee." *Flatiron Health, Inc. v. Carson*, No. 19-CV-8999 (VM), 2020 WL 1320867, at \*19 (S.D.N.Y. Mar. 20, 2020) (citing *BDO Seidman v. Hirshberg*, 93 N.Y.2d 382, 690 N.Y.S.2d 854, 712 N.E.2d 1220, 1223 (1999) (citations omitted)). A violation of any prong renders the non-compete clause invalid. *Id.* Further, because restrictive covenants in employment agreements may restrain competition, "impinge on individual agency," and restrict "an employee's ability to make a living," New York courts subject such covenants to heightened judicial scrutiny. *Id.* (citing *Oliver Wyman, Inc. v. Eielson,* 282 F. Supp. 3d 684, 693 (S.D.N.Y. 2017) (collecting cases)).

### C. Application

 **\*14**  If a nurse employee were to leave United Staffing before completing the minimum number of hours over the course of three years, the nurse would be prohibited from:

1. In any manner whatsoever, directly or indirectly, work as a nurse, practice nursing, work as a physician's assistant, or otherwise practice the art of/science of nursing; or

2. Directly or indirectly operate, own, lease (as landlord or tenant), engage or participate in as an owner, partner, employee, joint venturer, shareholder, director, assignor, seller, transferor, or as sales or marketing agent or otherwise, in, for or in connection with any business which competes with [United Staffing] within the United States for a period of THREE (3) YEARS after the EMPLOYEE severs his/her relationship with [United Staffing].

(*See, e.g.,* Magtoles Contract at 3.)

### i. Reasonable in duration and geographic scope

Here, the sheer nationwide breadth of the geographic scope alone dooms the clause. Both subsections are unreasonable in geographic scope. As this Court previously noted in denying Defendants' motion to dismiss the action:

> The limitation that a future employer be in competition with United Staffing in the United States – as well as the three-year time limitation – appear to apply only to the clause's second subsection. The first subsection, on its face, prohibits former employees from working as nurses without any limitation as to duration, geography, or a future employer's status as a competitor.

*See Magtoles v. United Staffing Registry, Inc.*, No. 21-CV-1850 (KAM)(PK), 2021 WL 6197063, at *6 (E.D.N.Y. Dec. 30, 2021).

It is undisputed that United Staffing places nurses only at facilities in New York City and on Long Island, and that United Staffing has never placed a nurse anywhere outside the State of New York. (Pls. 56.1 at ¶¶ 35-36; Defs. Resp. 56.1 at ¶¶ 35-36.) The ban that Nurse Plaintiffs cannot "operate, own, lease (as landlord or tenant), engage or participate in" *any* business in competition with United Staffing *within the United States* is baldly unreasonable. *See, e.g., Good Energy, L.P. v. Kosachuk*, 49 A.D.3d 331, 332, 853 N.Y.S.2d 75 (1st Dep't 2008) (non-compete covenant was unreasonable because employer operated in only eight states); *compare Yedlin v. Lieberman*, 102 A.D.3d 769, 770, 961 N.Y.S.2d 186 (2d Dep't 2013) ("The restrictive covenant here *applied to the entire United States*, and would have *precluded the plaintiff from merely 'participating'* in projects that involved the defendants' present or former clients.") (emphasis added), *with Battenkill Veterinary Equine P.C. v. Cangelosi*, 1 A.D.3d 856, 857-58, 768 N.Y.S.2d 504 (3d Dep't 2003) (finding a 35-mile restriction that was "narrower than [employer's] service area" to be "reasonable").

### ii. Necessary to protect the employer's legitimate interests

Cognizable employer interests include the "(1) protection of trade secrets, (2) protection of confidential customer information, (3) protection of the employer's client base, and (4) protection against irreparable harm where the employee's services are unique or extraordinary." *Flatiron Health, Inc.*, 2020 WL 1320867, at *19. Nothing in the record comes even close to implicating any of these, or any other, employer interests. Again, Defendants have simply made no arguments about what possible interest they would have in such an overbroad non-compete provision and, as before, this Court "struggles to imagine how a nurse would possess United Staffing's trade secrets, or how every nurse who signed United Staffing's 'standard employment contract' offered unique or extraordinary services." *See Magtoles*, 2021 WL 6197063, at *7.

### iii. Not harmful to the general public

**Magtoles v. United Staffing Registry, Inc., --- F.Supp.3d ---- (2023)**

2023 WL 2610165

**\*15**  Although the Court recognizes that there are other nurses in the New York area, it would be plainly harmful to the general public if dozens of licensed nurses and practitioners were prohibited from contributing their services to an industry as valuable and important as nursing. *See Flatiron Health, Inc.*, 2020 WL 1320867, at \*22 (finding that "[p]reventing [employee] from working at the job where he would be most productive and make the largest impact ... inflicts not only a private cost to [employee] but also a social cost," and recognizing that "[o]n that public policy ground, New York courts disfavor broad non-competes"). Moreover, as Defendant Santos himself affirms, there is an "ever-growing need of healthcare professionals to take care of our aging American population" and there are not "enough locally-produced registered nurses to take care of our own people." (Santos Decl. at ¶ 2.)

### iv. Not unreasonably burdensome to the employee

A provision that either prevents Plaintiffs from being involved in any capacity in their industry anywhere in the United States, or, even more broadly, simply anywhere that is not United Staffing, is patently unreasonable and unenforceable. *See Good Energy, L.P.*, 49 A.D.3d at 332, 853 N.Y.S.2d 75 ("[T]he covenant effectively excludes defendant from continued employment in the industry."); *see also Brown & Brown, Inc. v. Johnson*, 25 N.Y.3d 364, 12 N.Y.S.3d 606, 34 N.E.3d 357, 370 (2015) ("New York law provides that covenants not to compete should be strictly construed because of the powerful considerations of public policy which militate against sanctioning the loss of a person's livelihood.") (collecting cases) (cleaned up).

For the foregoing reasons, the Court declares the non-compete clause in the employment contracts to be unenforceable and enjoins Defendants from attempting or threatening to enforce it.

## III. Breach of Contract

### A. Legal Standard

To recover for breach of contract under New York law, "a plaintiff must prove (a) the existence of a contract between plaintiff and defendant; (b) performance of the plaintiff's obligations under the contract; (c) breach of the contract by the defendant; and (d) damages to the plaintiff caused by the defendant's breach." *See Javier v. Beck*, No. 13-CV-2926 (WHP), 2014 WL 3058456, at \*9 (S.D.N.Y. July 3, 2014).

In order to decide if a contract's terms were breached, a court considers whether the contract at issue is clear or ambiguous, and interprets the meaning of the contract language. "In a dispute over the meaning of a contract, the threshold question is whether the contract is ambiguous." *Lockheed Martin Corp. v. Retail Holdings, N.V.*, 639 F.3d 63, 69 (2d Cir. 2011). "Under New York law ... the question of whether a written contract is ambiguous is a question of law for the court." *JA Apparel Corp. v. Abboud*, 568 F.3d 390, 396 (2d Cir. 2009). "Ambiguity is determined by looking within the four corners of the document, not to outside sources," *Kass v. Kass*, 91 N.Y.2d 554, 566, 673 N.Y.S.2d 350, 696 N.E.2d 174 (1998), and if one party's interpretation of the contract would "strain[ ] the contract language beyond its reasonable and ordinary meaning," the court is not required to find the language ambiguous. *Hunt Ltd. v. Lifschultz Fast Freight, Inc.*, 889 F.2d 1274, 1277 (2d Cir. 1989) (citing *Bethlehem Steel Co. v. Turner Const. Co.*, 2 N.Y.2d 456, 161 N.Y.S.2d 90, 141 N.E.2d 590, 593 (1957)). If the contract is not ambiguous, then its meaning is likewise a question of law for the court to decide. *JA Apparel Corp.*, 568 F.3d at 397. In interpreting an unambiguous contract, the "court is to consider its '[p]articular words' not in isolation 'but in the light of the obligation as a whole and the intention of the parties as manifested thereby,' but the court is not to consider any extrinsic evidence as to the parties' intentions." *Id.* (citations omitted).

### B. Application

The relevant provision ("prevailing wages provision") in the standard contract states:

> **\*16**  The EMPLOYER undertakes and agrees to pay the EMPLOYEE a salary or wage that complies
> with the laws, rules, regulations and prevailing wages depending on the location of the hospital, health
> care facility where EMPLOYEE works, applicable to Registered Nurses (RNs) and health care givers.

(*See, e.g.,* Magtoles Contract at 4.)

The only issue here is whether Defendants breached this provision of the contract. Plaintiffs argue that Defendants breached this provision in several ways, each of which the Court shall address in turn. (*See* Pls. Mem. at 15-16.)

### i. Failure to Pay All Hours Worked

Plaintiffs first argue that Defendants breached the prevailing wages provision by "failing to pay the Nurse Plaintiffs and other class members for all the hours they worked." (Pls. Mem. at 15-16, citing 56.1 Statements at ¶¶ 47-73.) Plaintiffs' evidence includes Defendants' failure to pay all the hours when Plaintiffs worked overtime at their respective facilities or beyond the time that their shifts were scheduled to end, or paying Plaintiffs less than the hours on their timesheet records. (*See generally* ECF No. 40-27 ("Tan Dep."); Pls. 56.1 at ¶¶ 63-71 and exhibits cited thereto; Defs. Resp. 56.1 at ¶¶ 63-71 and exhibits cited thereto.)

### a. United Staffing's Billing and Payment System

The parties' various purported disputes ultimately rest on one, overarching issue: Although timesheet and payroll records demonstrate that some nurses were not paid for all of the hours their timesheets reflect, Defendants contend that they are not in breach of the contracts because they "rely on the figures of work-hours computed and validated by the facilities" when payroll is prepared. (ECF No. 40-33 ("Ofendo-Reyes Decl.") at ¶ 9.)

Ofendo-Reyes, United Staffing's Financial Controller since 2005, described the billing and payment system, in part, as follows:

> We at United Staffing do not have a hand or participation in the monitoring of our employees' work-hours at the facilities, in the computation or counting of our employees' work-hours, and in the validation of our employees' work-hours. Each facility has its own procedures and policies on how they do these functions, and each facility has its own staff or employees performing these functions.
>
> ...
>
> We at United Staffing rely on the figures of work-hours computed and validated by the facilities when we prepare the payroll of our company. If the time sheets reflect that an employee had worked thirty seven (37) hours for that week, then that's what we prepare and process as the number of hours that our employee has to be paid.
>
> ...
>
> We at United Staffing never make any deductions on our employees' work-hours as validated by the facilities. We always follow the computations of the healthcare facilities.
>
> ...
>
> Our healthcare facility-clients have varied and different work-shifts, work schedules, and length of meal time or break periods.

...

The number of validated work-hours by each of our RN-employees as evidenced by the time sheets or time records we receive from each of our healthcare facility-clients is our basis for sending our invoices or for billing our healthcare facility-clients. This means that if we paid our RN-employee so many hours for a particular work-week, that would also be the number of hours that we would bill our facility-client.

**\*17**  (Ofendo-Reyes Decl. at ¶¶ 5, 9, 12, 18.)

### b. "Nurses' Compensation"

Plaintiffs assert that "[t]he nurses' compensation was not contingent on the amount paid to United Staffing by the facility where the nurse was assigned." (Pls. 56.1 at ¶ 20.) Defendants dispute Plaintiffs' assertion and respond: "Nurses' compensation was contingent on the amount paid to United Staffing by the facility where the nurse was assigned, so long as the nurses' compensation was at least, if not more than, the prevailing wage rates." (Defs. Resp. 56.1 at ¶ 20.)

Defendants do not argue that the provision itself is ambiguous or that its meaning is not clear on its face. Defendants instead rely (almost exclusively) on the extrinsic fact that the healthcare facilities were responsible for validating employee hours, which determined the amount that Defendants paid their nurses and billed their healthcare-facility clients where Defendants assigned their nurses to work. The Court, however, reiterates that Plaintiffs allege a claim for breach of the contract between *Plaintiffs* and *Defendants*. Therefore, in assessing this purported dispute, the Court must first determine whether the contract is ambiguous.

The prevailing wages provision in the parties' contract is not conditioned on the hours validated by Defendants' third-party healthcare-facility clients. The provision states that United Staffing "undertakes and agrees to pay" its nurse employees a salary or wage "that complies with the laws, rules, regulations and prevailing wages depending on the location of the hospital, health care facility[.]" (*See, e.g.,* Magtoles Contract at 4.) The language of this provision is unambiguous. *See, e.g., Abundance Partners LP v. Quamtel, Inc.,* 840 F. Supp. 2d 758, 767 (S.D.N.Y. 2012) ("A contract is unambiguous if on its face it is reasonably susceptible of only one meaning.") (internal quotation marks and citation omitted) (cleaned up). Nowhere does the contract (let alone the section governing payments to employees, entitled "Article II – Schedule/Rates of Wages") state or even suggest that Defendants' contractual obligation to pay employees prevailing wages depends on the particular hours computed by or the validation system of, Defendants' respective facility clients. Defendants do not even bother arguing that the contract says otherwise. *See, e.g., Deutsche Bank Sec., Inc. v. Rhodes,* 578 F. Supp. 2d 652, 662 (S.D.N.Y. 2008) ("If the agreement sets forth the parties' intent clearly and unambiguously, the Court need not look to extrinsic evidence to determine the parties' obligations under the contract.") (collecting cases); *see also Metro. Life Ins. Co. v. RJR Nabisco, Inc.,* 906 F.2d 884, 889 (2d Cir. 1990) (holding that "parties' rights under an unambiguous contract should be fathomed from the terms expressed in the instrument itself *rather than from extrinsic evidence as to terms that were not expressed*") (emphasis added).

Moreover, the parties to the contract are unambiguously United Staffing, through its sole owner, president, and CEO Santos, and their nurse employees. Defendants, again, do not argue about the actual substance or interpretation of the contract. They do not assert that there was, for example, an assignment of contract between Defendants and the healthcare facilities, or that the facilities were otherwise a party to the contract at issue, thereby altering Defendants' contractual obligations to Plaintiffs. Accordingly, the Court finds that there is no genuine dispute of material fact as to whether the nurses' compensation was to be paid as specified in the contract, and was not contingent on the amount paid to United Staffing by the facility where the nurse was assigned. *See Major League Baseball Properties, Inc. v. Salvino, Inc.,* 542 F.3d 290, 312 (2d Cir. 2008) ("Under Rule 56, it is the court's responsibility to determine whether the opposing party's response to the assertion of a material fact presents a dispute that is genuine."); *cf. JA Apparel Corp.,* 568 F.3d at 396 ("Language whose meaning is otherwise plain does not become ambiguous merely because the parties urge different interpretations in litigation.").

### c. Timesheet and Payroll Records

**\*18**  The undisputed record before the Court establishes that Defendants breached the contract's prevailing wages provision by failing to pay multiple class members for all the hours they worked at Defendants' respective client facilities.

When asked if there were times when she worked hours she was not paid for, Plaintiff Tan testified that although she was scheduled to work "from 3:00 [p.m.] to 11:00 [p.m.]," she instead went home "by 2:00 or 3:00 in the morning," and that she was not paid for the hours between 11:00 p.m. and 2:00 a.m. or 3 a.m. [10]  (Tan Dep. at 161:11-161:21.) Further, "Tan was only paid up to the time her shift was scheduled to end. She was not paid for the extra hours." (Pls. 56.1 at ¶ 54.) Defendants "dispute" Tan's sworn factual assertion by responding that "Tan, like all other employees of Defendants, was paid according to the validated number of work-hours given by her facility to Defendants." (Defs. Resp. 56.1 at ¶ 54.) The Court finds that Defendants' contention fails to present a genuine dispute of material fact because it does not directly (or even, indirectly) respond to the substance of the assertion — that Tan "was not paid for the extra hours" she worked past her shift, a violation of the contract's clear language that Defendants pay their employees prevailing wages for this work.

Defendants also admit the following: Tan told Pascual that she was working more hours than United Staffing was paying her for; Tan complained to Pascual that she was not being paid for the additional hours she worked when she worked past the scheduled end of her shift; Plaintiff Magtoles complained to Pascual several times that her scheduled work hours were from 7 a.m. to 3 p.m., but she was actually working until 5 p.m. or 6 p.m.; and Plaintiff Ana Myrene Espinosa complained to Pascual that she was not being paid properly. (Defs. Resp. 56.1 at ¶¶ 57-61.) In Defendants' Responsive 56.1 Statements to Plaintiffs' evidence and assertions, Defendants assert only that "whenever [Pascual] received complaints about wages, such as from [nurse], [he] would refer these to the Accounting Department and sometimes would try to address the concerns by calling the concerned facility and ask them to investigate if the complaint was true and to help the nurses address their concerns." (*Id.*) The portions of Pascual's deposition that Defendants cite in support of this assertion do not address the outcome of their purported requests for an investigation, and consequently, Tan's showing that she was not paid for some of the hours she worked is not disputed. (*See* ECF No. 40-30 ("Pascual Dep.") at 63:17-64:18.)

**\*19**  Defendants also admit the following: "United Staffing received timeclock records from Adira at Riverside Rehab showing that, on June 28, 2020, Nurse Ellaine Garduce clocked in at 7:06 a.m. and clocked out at 4:07 p.m. for a total of nine hours, but *United Staffing paid her for only seven hours.*" (Pls. 56.1 at ¶ 63; Defs. Resp. at ¶ 63 (emphasis added).) Further, Defendants "partially admit[ ] and partially dispute[ ]" Plaintiffs' assertion by adding, "with the understanding that United Staffing paid the validated number of hours, and that Adira, with its own policies and practices, might have deducted break time or meal period, and sent the validated number of hours to United, which United did pay." (*Id.*) In a substantively identical manner, Defendants also admit the same factual assertion that *seven other nurses* (at their varying facilities that validated their timesheet records) worked hours for which they were not paid. (Pls. 56.1 at ¶¶ 64-71; Defs. Resp. at ¶¶ 64-71.) Finally, the Court notes that Defendants drafted and signed the contract with dozens of nurses and had ample opportunity to include in the contracts any explanation — or even mere reference — to the billing and payment process involving Defendants' healthcare-facility clients that Defendants now heavily rely on to dispute Plaintiffs' breach of contract claim.

In sum, the Court finds that the plain language of the contract is unambiguous, again noting that Defendants do not argue otherwise. Simply put, Defendants had a contractual obligation to pay prevailing wages to its nurses and it breached this obligation in multiple ways, as outlined above, and cannot expect the Court to exceed the explicit terms by importing extrinsic evidence. Courts may "not by construction add or excise terms, nor distort the meaning of those used and thereby make a new contract for the parties under the guise of interpreting the writing." *Abundance Partners LP v. Quamtel, Inc.*, 840 F. Supp. 2d 758, 767 (S.D.N.Y. 2012) (citation omitted); *see also Nycal Corp. v. Inoco PLC*, 988 F. Supp. 296, 298 (S.D.N.Y. 1997) (summary judgment "is clearly permissible when the language of the contract provision in question is unambiguous"). For the foregoing reasons, the Court finds that Defendants have failed to raise a genuine issue of fact for trial as to Plaintiffs' breach of contract claim predicated on Defendants' failure to pay Plaintiffs for all hours worked.

### ii. Deductions for meals or breaks not allowed or taken

Plaintiffs also argue that United Staffing breached the contracts' prevailing wages provision by "deducting time for breaks that were not allowed or taken." (Pls. Mem. at 15.) Plaintiffs present evidence that: "The Nurse Plaintiffs were supposed to take 30-minute breaks when they worked an eight-hour shift, but they were not allowed or able to take breaks." (Pls. 56.1 at ¶ 74; *see also, e.g.,* Tan Dep. at 62:15-63:20 (testifying that nurses were "not able to take" a break because "we couldn't even eat because of the kind of the work that we have" at the facility, and that for "more than a year in Regal Heights," she "only can remember probably less than 10 breaks" that she took).)

Defendants dispute Plaintiffs' assertion that "Nurse-Plaintiffs were not allowed or were not able to take breaks," arguing that "Nurse-Plaintiffs were given their meal breaks, depending upon the facility where they worked." (Defs. Resp. 56.1 ¶ 74.) Defendants also cite the following from Ofendo-Reyes' Declaration: "Some facilities give the employees thirty minutes of meal period only. Other facilities would give the employees one full hour of meal time. Most facility-clients follow the 'no work, no pay' rule. So, during meal periods, which are always controlled and determined by the facilities themselves, they do not count any compensable time to our employees." (Ofendo-Reyes Decl. at ¶ 12; Defs. Resp. 56.1 at ¶ 74.) Notwithstanding that the portion of Ofendo-Reyes' Declaration cited is not based on personal knowledge, Defendants assert only that "some facilities" gave breaks of varying lengths. Defendants fail to submit evidence creating a genuine dispute as to Plaintiffs' showing that Plaintiffs were not allowed or were too busy, to take breaks, and were not paid for work during breaks.

**\*20**  The Court agrees with Plaintiffs that Defendants confuse the issue here. Plaintiffs are not claiming that they should have been paid for breaks or meal periods that they actually took, nor are Plaintiffs disputing facilities' "no work, no pay" rule. Instead, Plaintiffs are claiming and submit evidence (which is not comprehensible, as explained *infra*) that Defendants deducted time "for breaks that were not allowed or taken." The Court notes that Ofendo-Reyes lacks personal knowledge as to whether the facilities prohibited Plaintiffs from taking breaks but nonetheless deducted hours for breaks. Nonetheless, the Court cannot grant summary judgment on those grounds because Plaintiffs have not submitted evidence that would allow the Court to conclude that any disparity between the hours the Nurse Plaintiffs worked versus the hours United Staffing actually paid were attributable to deductions for meal periods or breaks. Specifically, in support of their assertions, Plaintiffs vaguely cite, in part, to "Exhibits 15-17" (ECF Nos. 43-17, 43-18, 43-19), more than 400 pages of payroll and time records for Plaintiffs Magtoles, Tan, and Ana Myrene Espinosa. Plaintiffs, however, provide no pin citations nor any other guidance or analysis of their voluminous records to the Court to support their assertion that "Nurse Plaintiffs were paid for only 7.5 hours per day when they actually worked eight hours during their regular shifts." (Pls. 56.1 at ¶ 75.) It is well-established that a court has no obligation to sift through hundreds of pages of records — in this case, extremely detailed records spanning days, weeks, and multiple years of payroll and timesheet documents — to find support for a party's 56.1 Statement. *See, e.g., Amnesty Am. v. Town of W. Hartford*, 288 F.3d 467, 470 (2d Cir. 2002) (citing *Guarino v. Brookfield Twp. Trs.,* 980 F.2d 399, 405–06 (6th Cir. 1992) ("Nothing in either the Rules or case law supports an argument that the trial court must conduct its own probing investigation of the record .... What concept of judicial economy is served when judges ... are required to do the work of a party's attorney?")).

Therefore, the Court denies summary judgment on these grounds because Plaintiffs failed to present evidence in a useful manner establishing that Defendants breached the prevailing wage provision by deducting time for meal periods or breaks Plaintiffs did not actually take.

### iii. Failure to give Plaintiffs 2,000 hours of work per year

Plaintiffs also argue that Defendants breached the contract by failing to give the Nurse Plaintiffs and other class members sufficient full-time work to achieve the contract requirement of at least 2,000 hours per year (and at least 6,000 hours over three years). (Pls. 56.1 at ¶¶ 81-89; *see, e.g.,* Magtoles Contract at 2-4, Article I.1(c), Article I.4(a).) Defendants, in turn, ignore the

contract requirements that Plaintiffs work at least 2,000 hours per year and 6,000 hours over three years, and argue that there is nothing in "United Staffing's standard employment contracts with its employees that required it to give its employees 'full-time work', much less '40 hours per week.' " (Defs. Mem. at 18.) Defendants also argue that even assuming, *arguendo,* that such a provision existed, that "the term 'full-time' is subject to various interpretations, and may mean at least thirty (30) hours per week." [11] (*Id.* at 19.)

Defendants appear to misinterpret Plaintiffs' assertion in Plaintiffs' moving papers and 56.1 Statements. Plaintiffs' arguments about "full-time" work rely on the contract provision requiring at least 2,000 hours of work per year, and do not even mention a specific number of hours a week. Nor do Plaintiffs' moving papers argue that Defendants were obligated by contract to give nurses "40 hours per week" of work. Plaintiffs' 56.1 Statements focus "the lack of full-time work" claim on a six-week period between October 5 to November 15, 2019, where Plaintiffs Magtoles and Tan were not assigned any work by United Staffing. (Pls. 56.1 at ¶ 84; Defs. Resp. 56.1 at ¶ 84.) It is undisputed that United Staffing did not pay Magtoles and Tan any compensation during those six weeks; that Magtoles and Tan had no income during those six weeks; that, during those six weeks, Magtoles and Tan earned no credit towards the 6,000 hours requirement (and thereby, no credit towards the 2,000 hours per year requirement) specified in their contracts; and that, during those six weeks, Magtoles and Tan had no ability to work anywhere else because of the contractual provision requiring that they work exclusively for United Staffing. (*See* Pls. 56.1 at ¶¶ 85-88; Defs. Resp. 56.1 at ¶¶ 85-88.)

 **\*21**  Plaintiffs also state in their 56.1 Statement that, as a result, "United Staffing's failure to give nurses at least 2,000 hours of work per year resulted in the Nurse Plaintiffs being paid less than the annual prevailing wage." (Pls. 56.1 at ¶ 90.) Defendants object to this assertion and respond that it is "not a statement of fact." (Defs. Resp. 56.1 at ¶ 90.) The Court analyzes this claim based on the contract provision requiring the employee to work at least 2,000 hours per year (and at least 6,000 hours over three years). (*See, e.g.,* Magtoles Contract at 2-4, Article I.1(c), Article I.4(a).) Defendants' opposition cites to depositions of Plaintiffs Magtoles and Tan to support Defendants' assertion that they were "in-between jobs, as they resigned from Meadowbrook facility without enough notice for United to find new assignments for them." (Defs. Resp. 56.1 at ¶ 84.) As a result of this genuine dispute of material fact, summary judgment on Plaintiffs' breach of contract claim cannot be awarded on the grounds that Defendants failed to give Nurse Plaintiffs and other class members sufficient work to achieve at least 2,000 hours of work per year.

### iv. Failure to Pay the Prevailing Wage for All Hours Worked

Finally, Nurse Plaintiffs argue that Defendants failed to pay them the prevailing wage for all hours worked. (Pls. Mem. at 15, citing 56.1 Statements at ¶¶ 91-105.) Plaintiffs' assertions primarily involve Defendants paying nurses who worked at Regal Heights Nursing & Rehabilitation Center ("Regal Heights") less than the prevailing wage rate during the nurses' orientation periods. Defendants argue that "Magtoles, Tan and Espinosa each voluntarily signed an orientation wage rate agreement with United Staffing, whereby each of them agreed to be paid $15.00 during their orientation period at Regal Heights." (Defs. Mem. at 15.)

The Orientation Agreement — a letter addressed to each nurse from Pascual — states in part:

> Regal Heights Nursing & Rehabilitation Center, as per their policy, will not pay you/us with an RN rate for the first week that you attend the orientation program. However, in fairness to you and out of our benevolence, we will give you an allowance rate of $15/hour for the duration of [the] first week of the orientation to cover your transportation, food allowance, and a little extra to tide you over during the period of orientation. This is not a company policy and we consider your case as an exception.

(*See, e.g.,* ECF No. 40-51 ("Orientation Agreement") at 3.)

It is undisputed that "[d]uring their first two weeks of work at the Regal Heights Rehabilitation and Care Center in Queens, New York, the Nurse Plaintiffs were paid only $15.00 per hour." (Pls. 56.1 at ¶ 93; Defs. Resp. 56.1 at ¶ 93; *see also* Defs. Mem. at 15 ("It is conceded that Plaintiffs Magtoles, Tan and Espinosa were paid $15.00 per hour during their orientation at the Regal Heights facility sometime in November 2019.")) This plainly breaches the prevailing wage provision of the standard contract, which provides no exceptions or qualifications as to United Staffing's obligation to pay its employee "prevailing wages," nor does anything in the contract suggest that nurses would be paid less during their orientation periods.

Nowhere in the Orientation Agreement or the standard contract does it state that the Orientation Agreement supersedes the standard contract, nor do Defendants even argue now that the Orientation Agreement should supersede the standard contract, or be treated as part of the standard contract. Defendants merely assert that such agreements "were the law between the contracting parties, and United Staffing abided with such agreements." (Defs. Mem. at 15.) To the contrary, Section 2(a) of Article VI of the standard contract states: "This Agreement constitutes the entire Agreement between the parties and shall as of the effective date *hereof supersede any and all other Agreements between the parties.*" (*See, e.g.,* Magtoles Contract at 6 (emphasis added).) The effective dates of Magtoles', Tan's, and Ana Myrene Espinosa's standard contracts were respectively November 22, 2018, November [sic], 2018, and September 17, 2019 — all dates substantially preceding the orientation start date of November 13, 2019. (Magtoles Contract at 7-8; Tan Contract at 7-8; Ana Myrene Espinosa Contract at 7-8; Orientation Agreement at 2-4.) It is also undisputed that the prevailing wage for an RN was $32.21 per hour in Queens County during 2019. (Pls. 56.1 at ¶ 92; Defs. Resp. 56.1 at ¶ 92.)

 **\*22**  On these facts, considering that both the standard contract and the Orientation Agreement are unambiguous, liability has been established against Defendants for breach of contract for class members who were required to sign the Regal Heights Orientation Agreement and thus were paid below the prevailing wage during the orientation period. *See, e.g., Lockheed Martin Corp. v. Retail Holdings, N.V.,* 639 F.3d 63, 69 (2d Cir. 2011) ("When an agreement is unambiguous on its face, it must be enforced according to the plain meaning of its terms.") (citing *South Rd. Assocs. LLC v. IBM,* 4 N.Y.3d 272, 793 N.Y.S.2d 835, 826 N.E.2d 806, 809 (2005)).

## IV. Piercing the Corporate Veil

Plaintiffs also seek to hold Defendant Santos individually liable for breach of contract by piercing the corporate veil of United Staffing. (Pls. Mem. at 21-22.) Santos signed the standard contract in his corporate capacity as sole owner, president, and CEO of United Staffing, rather than in his individual capacity.

As Defendants "do not specifically oppose, or otherwise address," Plaintiffs' summary judgment motion to pierce the corporate veil as to Defendant Santos, they have "seemingly abandoned any defense to that claim." *See Alvarado v. GC Dealer Servs. Inc.,* 511 F. Supp. 3d 321, 353-54 (E.D.N.Y. 2021) (granting a portion of plaintiffs' motion for summary judgment on the grounds that defendants had not addressed, and thus abandoned defense of, the issue); *A.H. by Horowitz v. Precision Indus. Maint. Inc.,* No. 19-CV-298 (FJS/CFH), 2021 WL 2417610, at \*2 (N.D.N.Y. June 14, 2021) (holding that the defendants abandoned affirmative defenses because they "fail[ed] to refute or even address these issues in either their opposition to Plaintiffs' motion [for summary judgment] or their cross-motion for summary judgment"); *see also Azeez v. City of New York,* No. 16-CV-342 (NGG) (SJB), 2018 WL 4017580, at \*6 (E.D.N.Y. Aug. 22, 2018) ("Ordinarily, any issues not addressed in an opposition brief are deemed abandoned by the party opposing the motion.")

In *Jackson v. Fed. Express,* the Second Circuit held that, "[w]here abandonment by a counseled party is not explicit but such an inference may be fairly drawn from the papers and circumstances viewed as a whole, district courts may conclude that abandonment was intended." 766 F.3d 189, 196 (2d Cir. 2014); *see also Kovaco v. Rockbestos-Surprenant Cable Corp.,* 834 F.3d 128, 143-44 (2d Cir. 2016) (reiterating the Second Circuit's holding in *Jackson*). The Second Circuit's reasoning in *Jackson* was as follows:

> [T]here is a relevant distinction to be drawn between fully unopposed and partially opposed motions for summary judgment in counseled cases. While the opponent to such a motion is free to ignore it completely, thereby risking the admission of key facts and leaving it to the court to determine the legal merits of all claims or defenses on those admitted facts, a partial opposition may imply an abandonment of some claims or defenses. Generally, but perhaps not always, *a partial response reflects a decision by a party's attorney to pursue some claims or defenses and to abandon others.*

766 F.3d at 196 (emphasis added).

Here, the Court concludes that Defendants intended to and did abandon any defense to the portion of Plaintiffs' motion seeking a finding piercing the corporate veil as to Defendant Santos. (Pls. Mem. at 21-22.) The circumstances here reflect a "partial response to a motion," as discussed in *Jackson*. *Id.* at 197 (defining a "partial response to a motion" as one "referencing some claims or defenses but not others"). "Preparation of a response to a motion for summary judgment is a *particularly appropriate time for a non-movant party to decide whether to pursue or abandon some claims or defenses.* Indeed, Rule 56 is known as a highly useful method of narrowing the issues for trial." *Id.* at 196 (emphasis added).

**\*23** Defendants' opposition brief — although addressing Plaintiffs' other grounds for summary judgment and despite devoting about a third of its pages to specifically defending against Plaintiffs' breach of contract claim — makes no mention of piercing the corporate veil, let alone any reference to Plaintiffs' arguments in support. (*See generally* Defs. Mem. at 9-19); *see also Netherlands Ins. Co. v. Selective Ins. Co. of Am.*, No. 14-CV-7132 (KPF), 2016 WL 866348, at \*7 (S.D.N.Y. Mar. 3, 2016) (granting declaratory judgment on an issue in plaintiff's favor because "Defendant has abandoned any arguments regarding [the issue] because it failed to discuss this issue in its response brief"); *LPD New York, LLC v. Adidas Am. Inc.*, No. 15-CV-6360 (MKB), 2022 WL 4450999, at \*27 (E.D.N.Y. Sep. 24, 2022) (granting defendants' summary judgment as to certain counterclaims because plaintiff did not dispute or respond to the counterclaims "in its memorandum in opposition ... and therefore has abandoned its defense of these claims") (also collecting cases). Defendants also did not assert any additional facts in opposition to piercing the corporate veil in their Responsive 56.1 Statements, even though those Statements span 53 pages and contain 162 Statements, each of which Defendants responded to. (*See generally* Defs. Resp. 56.1.)

Moreover, Defendants here are counseled parties and thus, their lack of opposition to the corporate veil issue appropriately reflects "a decision by a party's attorney to pursue some claims or defenses and to abandon others." *Jackson*, 766 F.3d at 196.

> Where a partial response to a motion is made—*i.e.,* referencing some claims or defenses but not others —a distinction between *pro se* and counseled responses is appropriate. In the case of a *pro se,* the district court should examine every claim or defense with a view to determining whether summary judgment is legally and factually appropriate. *In contrast, in the case of a counseled party,* a court may, when appropriate, infer from a party's partial opposition that relevant claims or defenses that are not defended have been abandoned.

*Id.* at 197-98 (emphasis added).

In addition, Defendants' counsel Felix Vinluan "is an experienced New York lawyer who has represented United Staffing in employment and immigration matters for at least 10 years." (Pls. 56.1 at ¶ 154; Defs Resp. 56.1 at ¶ 154.) Thus, the Court finds from the papers and circumstances viewed as a whole, as explained above, that Defendants have abandoned any defense or

Magtoles v. United Staffing Registry, Inc., --- F.Supp.3d ---- (2023)

2023 WL 2610165

rebuttal against Plaintiffs' summary judgment motion to pierce the corporate veil as to Defendant Santos and, consequently, Plaintiffs' motion on that issue is granted.

## V. TVPA Claims

The TVPA provides a private right of action to persons who have been subjected to forced labor. 18 U.S.C. § 1595(a). A defendant is liable for forced labor when he "knowingly provides or obtains the labor or services of a person" by any of the following means:

(1) by means of force, threats of force, physical restraint, or threats of physical restraint to that person or another person;

(2) by means of serious harm or threats of serious harm to that person or another person;

(3) by means of the abuse or threatened abuse of law or legal process; or

(4) by means of any scheme, plan, or pattern intended to cause the person to believe that, if that person did not perform such labor or services, that person or another person would suffer serious harm or physical restraint.

*Id.* § 1589(a).

Plaintiffs argue that Defendants are liable under the second, third, or fourth subsections of Section 1589(a).

### A. § 1589(a)(2): Serious Harm or Threats of Serious Harm

TVPA § 1589(c)(2) defines "serious harm" as:

> [A]ny harm, whether physical or nonphysical, including psychological, financial, or reputational harm, that is sufficiently serious, under all the surrounding circumstances, to compel a reasonable person of the same background and in the same circumstances to perform or to continue performing labor or services in order to avoid incurring that harm.

TVPA § 1589(c)(2); *see also Paguirigan*, 2019 WL 4647648, at *16 (stating that § 1589(c)(2) "defines serious harm broadly and includes financial harm as a means by which someone can be threatened under the TVPA").

**\*24** Thus, "the relevant question" under § 1589(c)(2) as applied to § 1589(a)(2) is whether "defendants' conduct constituted a threat of harm serious enough to 'compel a reasonable person of the same background and in the same circumstances to perform or to continue performing labor or services in order to avoid incurring that harm.' " *Paguirigan*, 2019 WL 4647648 at *16. "This standard is a hybrid one," and the inquiry may "consider the 'particular vulnerabilities of a person in the victim's position,' but [must also] find that 'her acquiescence be objectively reasonable under the circumstances.' " *Id.* (citing *United States v. Rivera*, 799 F.3d 180, 186-87 (2d Cir. 2015)).

Defendants first recycle their arguments as to why the liquidated damages provision is enforceable. (*See* Defs. Mem. at 27-28.) As this Court has already found, the liquidated damages provision specifying, *inter alia*, harsh financial consequences, is "unenforceable as a penalty under New York law," and therefore, "this argument fails." *See Paguirigan*, 2019 WL 4647648 at *17. The liquidated damages provision therefore "constitutes a threat of sufficiently serious financial harm to compel a reasonable person of the same background and in the same circumstances to perform or to continue performing labor or services in order to avoid incurring that harm" under the TVPA. *Id.* at *18 (internal quotation marks omitted).

Defendants also argue without supporting evidence that:

2023 WL 2610165

> Plaintiffs' TVPA claims ... fail because they rest on the factually unsupported assumption that all of the recruited RNs subjectively felt compelled to provide labor or services to United Staffing due to the terms of their employment contracts. It is beyond belief that each and every recruited RN has continued to provide labor for United Staffing only because of the contractual obligations contained in their employment contracts, and not out of a desire to continue working for United Staffing, after they had applied for a position with United Staffing, obtained a visa, and moved thousands of miles to voluntarily accept the position.

(Defs. Mem. at 30-31.) Defendants then argue that, in the alternative, "[e]ven if the terms of the contract are unenforceable, Plaintiffs utterly fail to set out facts admissible in evidence which are sufficient to establish that United Staffing violated the TVPA in a class action setting solely based on the terms of the employment contracts, because they fail to prove facts that would show that each and every one of the recruited RNs" only rendered labor because of the contract provisions. (*Id.* at 31.)

Defendants' arguments fail because they have a mistaken view of the law. As stated above, the *language of the TVPA itself* defines "serious harm" as conduct that would compel "*a reasonable person of the same background and in the same circumstances* to perform or to continue performing labor or services in order to avoid incurring that harm." TVPA § 1589(c)(2) (emphasis added). Further, "in the class action context, the inquiry will not look at how each Plaintiff perceived the Defendants' actions or whether he or she subjectively felt compelled to work. Instead, the inquiry will look at the Defendants' actions and assess how a reasonable person from the Plaintiffs' background would respond to those actions." *See Paguirigan*, 2019 WL 4647648, at *16 (internal quotation marks and citation omitted). In addition, the TVPA also "applies to subtle, nonviolent threats that may still effectively compel an individual to keep working." *Id.* (citation omitted) (holding that testimony from several nurses stating "they were never verbally threatened" was "insufficient to avoid TVPA liability").

**\*25**  Defendants next argue that to their knowledge, "there is not a single case where a court had held that a defendant could be liable under the TVPA's forced labor provision solely because it entered into an employment contract containing a provision that was found to be an unenforceable penalty." (Defs. Mem. at 31.) Defendants again misunderstand the law. The inquiry under the TVPA does not turn on such a specific issue. Rather, other considerations contribute to the finding of "serious harm" and liability under § 1589(a)(2) here, including the Court's findings that Defendants breached the plain language of the employment contract in multiple ways, and included an unenforceable non-compete clause into the contract prohibiting the nurses from working in the nursing industry in the United States for three years. *See Paguirigan*, 2019 WL 4647648, at *18 (in finding that employment agency had violated TVPA § 1589(a)(2), considering that the agency had breached the wages provision of the employment contract); *see also Dale Carmen v. Health Carousel, LLC*, No. 20-CV-313, 2021 WL 2476882, at *7 (S.D. Ohio June 17, 2021) ("[I]t is not the amount of liquidated damages, per se, that controls the analysis ... what matters is whether the specified liquidated damages in a given case rise to the level of serious harm considering all of the surrounding circumstances — such as the enforceability of the term, or the employee's pay rate, or other aspects of the arrangement.").

Moreover, multiple nurses — some working through the catastrophic COVID-19 pandemic — testified in their depositions that they were considerably overworked, that facilities were understaffed, and that the difficulties of their work caused near-daily emotional distress. Defendants offer no admissible contrary evidence on this point. In assessing TVPA liability, the Court would be remiss not to take such considerations into account. *See Paguirigan*, 2019 WL 4647648, at *18 (in finding that employment agency had violated TVPA § 1589(a)(2), considering, among other factors, that "[t]hree of the nurses who were deposed complained of being overworked or that the nursing home was understaffed"). After all, "the relevant question" under § 1589(c)(2) is a "hybrid one." *Id.* at *16 (the inquiry may "consider the 'particular vulnerabilities of a person in the victim's position,' but [must also] find that 'her acquiescence be objectively reasonable under the circumstances'") (citing *Rivera*, 799 F.3d at 186-87).

**Magtoles v. United Staffing Registry, Inc., --- F.Supp.3d ---- (2023)**
2023 WL 2610165

Plaintiff Magtoles testified in her deposition that while at Meadowbrook Facility, although she had been oriented as an "entry level" registered nurse, she was given managerial responsibilities, noting "there was no written agreement between [Magtoles], United Staffing, or the Meadowbrook that [she] will do some managerial work" such as "doing the nursing care plans, [and] attending those managerial meetings." (Magtoles Dep. at 126-27.) Magtoles also stated that, as a result, although her "supposed[ ] work hours" were 7:00 a.m. to 3:00 p.m., most of the time she would end up working until 5:00 or 6:00 p.m., without being paid for hours that she worked beyond her shift schedule. (*See id.*) Although Magtoles spoke with Pascual regarding the issue "a few times," she was told "it's still in the adjusting period." (*Id.* at 127:23-128:03.) Magtoles further stated that she experienced emotional distress every time she went to work, including insomnia and anxiety. (*Id.* at 162, 186-87.) She ultimately resigned as a result, and because she was working "more than the regular working hours. Some are unpaid." (*Id.* at 181:09-181:12.)

Plaintiff Ana Myrene Espinosa testified that at the Regal Heights facility, she "worked with 40 patients and with just two aides." (Ana Myrene Espinosa Dep. at 34:19-34:24.) She also testified that her role was "to be a charge nurse, treatment nurse, and med pass nurse all at the same time, which is impossible to take care of 40 patients," and that it was "overwhelming" and "we are overworked." (*Id.* at 34:25-35:05.) Espinosa also stated that after contracting COVID-19 a second time, United Staffing "said they are not going to pay me." "I had to ask them. I had to beg because I have been out from work for two weeks and I don't have any salary or anything." (*Id.* at 56:09-56:20.) Espinosa also stated: "I had those moments when I felt depressed, and it is like almost every day I feel the anxiety when I come to work, because I don't know if I'm going to have those patients and I believe I made Mr. Pasquale [sic] aware of that." (*Id.* at 70:20-70:24.)

**\*26** In explaining her reasons for her resignation, Espinosa testified:

Q: What were the reasons for your resignation?

A: Like I said, we were overworked and it is giving me almost every day anxiety whenever I go to work. It's not safe for the patients. And I even question myself if I want to be a nurse because I cannot provide quality care for my patients. Taking care of 40 patients is impossible. That is why I resigned and I was hoping to get a better job.

Q: Is it fair to say because of these issues you decided to resign?

A: For me it is fair because it is affecting my mental health. I believe it is really important for my profession to be mentally stable. If you are not stable, how can you give quality care?

(*Id.* at 81:20-82:12.)

Finally, Section 1589(a) contains a scienter requirement ("[w]hoever knowingly provides or obtains the labor or services of a person ..."). Defendants argue that the scienter requirement is not met here because, unlike in *Paguirigan*, "the record does not establish that either Defendant has sued any of the four Plaintiffs" and that there is "not even a suggestion that Defendants' standard employment contract has previously been found by any court to be unenforceable." (Defs. Mem. at 35.) Defendants have not cited nor has the Court found any authority suggesting that the § 1589(a) scienter analysis turns on such specific grounds, nor does *Paguirigan* suggest that finding scienter requires such a particular finding.

The Court finds that there is sufficient and undisputed "evidence from which the jury could find that the employer intended to cause the victim to believe that she would suffer serious harm — *from the vantage point of the victim* — if she did not continue to work." *Paguirigan*, 2019 WL 4647648, at \*19 (quoting *Muchira v. Al-Rawaf*, 850 F.3d 605, 618 (4th Cir. 2017)) (emphasis added). Scienter requires sufficient evidence to "find that the defendant knew that the circumstance existed." *United States v. Calimlim*, 538 F.3d 706, 711 (7th Cir. 2008).

As described above, the Court has already found that the liquidated damages provision constitutes a threat of sufficiently serious harm. There is neither evidence nor any serious argument that Defendants, who were responsible for drafting and including the liquidated damages provision in the first place, did not intend for the nurses to believe they would, in fact, have to pay

the liquidated damages provision amount — in other words, *suffer serious financial harm* — if the nurse left United Staffing's employ. The nurses' reliance on Pascual and Vinluan to explain the contract terms, as discussed *supra*, also clearly demonstrates that Defendants "knew that the circumstance existed," *see id.*, and that Defendants "knowingly ... obtain[ed] the labor or services" of the nurses, with the understanding that the liquidated damages provision "would effectively coerce nurses into continuing to work." *See Paguirigan*, 2019 WL 4647648, at *19.

And effectively coerce it did. Despite the extremely fraught work circumstances and adverse impacts on her physical and psychological health that Plaintiff Ana Myrene Espinosa testified to, as described above (including but not limiting to having to "beg" United Staffing to pay her the second time she contracted the COVID-19 virus), Espinosa kept working for Defendants.

*27   **Q:** Were you forced to work by United Staffing?

**A:** I was not forced to work. I believe I have to fulfill my — *I have a contract, so I have to finish it. I don't have a choice.* Even if I feel anxiety going to work, I still have to go to work, even though they don't force us.

(Ana Myrene Espinosa Dep. at 71:07-71:14.) (emphasis added).

Such testimony evokes the circumstances that Congress intended to reach and remedy with the TVPA's broad definition of "harm" — instances "in which persons are held in a condition of servitude through nonviolent coercion." *See Javier v. Beck*, No. 13-CV-2926 (WHP), 2014 WL 3058456, at *6 (S.D.N.Y. July 3, 2014).

The inclusion of the liquidated damages provision was no accident. From the "vantage point of the victim," the Court finds there is sufficient "evidence from which the jury could find that the employer intended to cause the victim to believe that she would suffer serious harm ... if she did not continue to work," *Paguirigan*, 2019 WL 4647648, at *19 (citation omitted), especially when, as the Second Circuit directed in *Rivera*, considered with the "particular vulnerabilities" of the class members here. As discussed *supra*, such vulnerabilities include but are not limited to: Plaintiffs' emotionally and physically difficult work circumstances; reliance on Defendants' representatives to understand the contract; reluctance to complain to the United States embassy about the contract due to being "nervous"; Plaintiffs' lack of negotiating or bargaining power as to the terms of the contract, in comparison to the highly experienced Defendants; and the non-compete clause in the contract, which placed unenforceable restrictions on Plaintiffs' ability to work in the nursing industry should they leave Defendants' employ.

Having found Defendants liable under § 1589(a)(2), the Court does not reach whether Defendants violated § 1589(a)(3) or § 1589(a)(4).

**B. 18 U.S.C. § 1589(b)**

Having found United Staffing liable under § 1589(a)(2), the Court also finds that Defendant Santos is liable under TVPA § 1589(b), which provides:

> Whoever knowingly benefits, financially or by receiving anything of value, from participation in a venture which has engaged in the providing or obtaining of labor or services by any of the means described in subsection [1589](a), knowing or in reckless disregard of the fact that the venture has engaged in the providing or obtaining of labor or services by any of such means, shall be punished as provided in subsection (d).

§ 1589(b).

Magtoles v. United Staffing Registry, Inc., --- F.Supp.3d ---- (2023)

2023 WL 2610165

As discussed above, Defendant Santos is the sole owner, president, and CEO of United Staffing. Santos clearly and undeniably "played a role in this commercial enterprise, the purpose of which is to recruit Filipino nurses to the United States to work at nursing homes affiliated with defendants," and thus, "knowingly benefit[ed] financially from labor obtained in violation of TVPA § 1589(a)." *See Paguirigan*, 2019 WL 4647648, at *19 (quotation marks omitted). Santos and United Staffing have been recruiting foreign nurses and employing them to work in New York for more than 20 years. (Pls. 56.1 at ¶ 10; Defs. Resp. 56.1 at ¶ 10.) Furthermore, Santos acted with " 'know[ledge] or in reckless disregard of the fact that the venture ... engaged in the providing or obtaining of labor or services' through means prohibited by TVPA § 1589(a) — in this case, through the contracts' liquidated damages provisions." *See Paguirigan*, 2019 WL 4647648, at *19. As in *Paguirigan*, individual Defendant Santos "testified regarding [his] direct knowledge of the provision" and "signed the contract itself." *Id.*; (*see, e.g.,* Santos Dep. at 90:07-90:17; United Staffing Dep. at 44:15-45:19.) Thus, Santos had clear knowledge of the provision.

### VI. Plaintiff Bhyng Espinosa's Claims of Fraud and Unjust Enrichment

**\*28** Finally, Plaintiff Bhyng Espinosa seeks summary judgment on her claims for fraud and unjust enrichment. (Pls. Mem. at 10.)

In relevant part, 20 C.F.R. § 656.12(b) provides that "[a]n employer must not seek or receive payment of any kind for any activity related to obtaining permanent labor certification, including payment of the employer's attorneys' fees, whether as an incentive or inducement to filing, or as a reimbursement for costs incurred in preparing or filing a permanent labor certification application[.]" Plaintiff Bhyng Espinosa argues that, "[i]t is undisputed that, relying on the defendants' expertise in immigration matters, [Bhyng] Espinosa paid the defendants $7,532.00 for the "costs and attorneys' fees to obtain a labor certification used in connection with the employer's sponsorship of an individual for an employment-based visa," and that Defendants "should not be permitted to retain those funds." (Pls. Mem. at 10.)

In support, Plaintiff Bhyng Espinosa cites to Plaintiffs' Rule 56.1 Statement ¶ 30, where Plaintiff asserts, in relevant part, "Plaintiff Bhyng Espinosa paid United Staffing $7,532.00 to obtain a labor certification." (Pls. 56.1 ¶ 30.) Defendants, in turn, "object" to that assertion "to the extent that the alleged payments made as purportedly evidenced by Exhibit '9' do not indicate payments were made to 'United Staffing' 'to obtain a labor certification.' " (Defs. Resp. 56.1 at ¶ 30.)

Upon review of "Exhibit 9" and other submitted evidence, the Court denies summary judgment as to Plaintiff Bhyng Espinosa's fraud and unjust enrichment claims. (*See generally* ECF No. 43-11.) Although the receipts allegedly relate to Ms. Bhyng Espinosa's payments for her "lawyer's and newspaper ad fees" (*id.* at 3), "her application" (*id.* at 4), "1/2 of [illegible] — motion to reopen/L.C." (*id.* at 5), and "her balance for the legal fees," (*id.* at 6), none of these receipts clearly reference a labor certification. As such, there is a genuine dispute of material fact as to the purpose of Plaintiff Bhyng Espinosa's payments to Defendants and summary judgment is not appropriate.

### CONCLUSION

For the foregoing reasons, the Court ORDERS as follows:

1. Plaintiffs' requested declaratory and injunctive relief is GRANTED. The Clerk of Court is directed to enter judgment declaring the liquidated damages provision and non-compete clauses in all plaintiffs' contracts to be unenforceable and to enter an injunction permanently enjoining Defendants from attempting or threatening to enforce either.

2. Plaintiffs' summary judgment motion as to liability on the breach of contract claim is:

   a. GRANTED on the following grounds:

      i. failure to pay Plaintiffs for all hours worked;

ii. failure to pay Plaintiffs the prevailing wage during Regal Heights Orientation.

b. DENIED on the following grounds:

i. deduction of time for meal periods or breaks that were not taken.

ii. failure to give Plaintiffs 2,000 hours of work per year.

c. GRANTED as to piercing the corporate veil of Defendant United Staffing to hold Defendant Santos individually liable for breach of contract.

d. Damages to Plaintiff Magtoles and the class caused by Defendants' breach of contract are to be determined at a later date.

**\*29** 3. Plaintiffs' summary judgment motion as to Defendants' liability under the TVPA is GRANTED. Damages to Plaintiff Magtoles and the class under the TVPA are to be determined at a later date.

4. Plaintiff Bhyng Espinosa's summary judgment motion for fraud and unjust enrichment claims against Defendants is DENIED.

5. The class is also entitled to reasonable attorneys' fees, which are to be determined at a later date.

6. No later than one week after the date of this Memorandum and Order, the parties shall contact Magistrate Judge Peggy Kuo to schedule a settlement conference. Further, the parties are strongly encouraged to consent to Magistrate Judge Kuo's jurisdiction in this case.

7. If the parties do not resolve or settle this case, they shall: (a) file a joint status report to the Court within two business days to advise of their failure to settle, and to schedule a status conference to address: how damages are to be determined; Defendants' counterclaim for breach of contract as to Plaintiffs Magtoles, Tan, and Ana Myrene Espinosa; and Plaintiff Bhyng Espinosa's claims for unjust enrichment and fraud, and (b) promptly meet and confer on these issues and present a joint plan to the Court.

**SO ORDERED.**

**All Citations**

--- F.Supp.3d ----, 2023 WL 2710178

## Footnotes

1    (*See* ECF Nos. 43-1, Plaintiffs' Rule 56.1 Statement ("Pls. 56.1"); 67, Defendants' Response to Plaintiffs' Rule 56.1 Statement ("Defs. Resp. 56.1"); 46, Plaintiffs' Reply Rule 56.1 Statement ("Pls. Reply 56.1"); 43-2, Declaration of John J.P. Howley ("Howley Decl.") and exhibits attached thereto; 45, Declaration of Felix Vinluan ("Vinluan Decl.") and exhibits attached thereto; 46-1, Reply Declaration of John J.P. Howley ("Howley Reply Decl.") and exhibit attached thereto.

The Court notes that Defendants first submitted their Response to Plaintiffs' Rule 56.1 Statement at ECF No. 44. That document contravened this Court's Chambers Practices III.B.4(c) which states: "A party's 56.1 Counter Statement to a 56.1 Statement must quote, verbatim, the 56.1 Statement, including all citations, and respond to the moving party's statements of fact immediately beneath each statement." The Court ordered Defendants to re-submit an identical version

Magtoles v. United Staffing Registry, Inc., --- F.Supp.3d ---- (2023)

2023 WL 2610165

of ECF No. 44 with an inclusion of Plaintiffs' corresponding paragraphs per III.B.4(c). (01/24/2023 Docket Entry). Defendants filed their revised Response (ECF No. 67) on January 25, 2023 in accordance with the Court's Order, which the Court cites in this Memorandum and Order.

The Court also incorporates certain documents submitted in connection to the motion to dismiss (ECF Nos. 27-31) and the motion to certify class (ECF No. 40) previously filed in this case, which the parties rely upon in connection with this motion for summary judgment but did not re-submit with the motion.

Finally, all pagination citations, except for citations to deposition transcripts, refer to the page number assigned by the Court's CM/ECF system.

2  Defendants "dispute" Plaintiffs' assertion that "United Staffing required that foreign nurses sign a contract before it would file an immigration petition to sponsor them for permanent residence status or a 'green card,' " (Pls. 56.1 at ¶ 11), arguing that "United Staffing does not have any uniform policy when to require its RN-beneficiaries to sign an Employment Agreement." (Defs. Resp. 56.1 at ¶ 11.) The Court has reviewed the Santos Declaration and Pascual Declaration cited by Defendants, and concludes that Defendants' asserted dispute as to the material fact regarding Defendants' required contract is not genuine. The portions of both Declarations that Defendants cite clearly state, *inter alia*: "Those *we recruit from abroad* are required, as a matter of company practice, to execute an Employment Agreement, which they would present to the U.S. Embassy during their consular interview" (Santos Decl. ¶ 6) (emphasis added), and "United Staffing requires foreign-trained registered nurses recruited from outside the United States to sign our Employment Agreement before they are sponsored through the Form I-140 immigrant worker petition process." (Pascual Decl. ¶ 7.) "Under Rule 56, it is the court's responsibility to determine whether the opposing party's response to the assertion of a material fact presents a dispute that is genuine." *Major League Baseball Properties, Inc. v. Salvino, Inc.*, 542 F.3d 290, 312 (2d Cir. 2008).

3  Defendants' Responsive 56.1 Statements frequently respond: "Undisputed, to the extent that the 'standard contract' referred to is the 'second version' of the employment contract." To the extent such Defendant Responses are attempting to cabin "undisputed" factual assertions as only applying to a "second version," the Court rejects any such attempt. On May 25, 2022, this Court certified "a class of all Filipino nurses who were employed by Defendants at any time since April 5, 2011 pursuant to an employment contract containing a liquidated damages provision, non-compete clause, immigration notification provision, and a prevailing wage requirement." *See Magtoles v. United Staffing Registry, Inc.*, No. 21-CV-1850 (KAM) (PK), 2022 WL 1667005, at *11 (E.D.N.Y. May 25, 2022). Therefore, when appropriate, the Court treats the "standard contract" in parties' 56.1 Statements as the employment agreement with the four provisions at issue, as previously certified. *See Magtoles*, 2022 WL 1667005, at *7 ("[T]he court concludes that the minor variations in the minimum number of hours do not materially affect the TVPA claims or the claims for declaratory and injunctive relief.").

4  Thirteen nurses signed an employment contract requiring the completion of 5,100 hours over the three-year period, rather than 6,000 hours. (Pascual Decl. ¶ 21; *see* ECF No. 40-40, Ex. O at 3.) Similarly, one nurse signed an employment contract requiring the completion of 5,616 hours over the three-year period. (Pascual Decl. ¶ 23; *see* ECF No. 40-45, Ex. T at 3.)

5  Defendants repeatedly dispute Plaintiff's factual statements, such as Pls. 56.1 Statement ¶ 26, without citing to supporting admissible evidence, including by stating: "OBJECTED TO. This is not a statement of fact." (*See, e.g.,* Defs. Resp. 56.1 at ¶¶ 24-27.) Defendants have not stated nor cited to any grounds for "objecting" to the factual assertion: "If a nurse stopped working before completing 6,000 hours of work, the 'liquidated damages' clause provided that she owed United Staffing $15 'for each hour or part of an hour performed of the [6,000-hour] requirement.' " (*See* Pls. 56.1 at ¶ 24; Defs. Resp. 56.1 at ¶ 24.)

It is unclear if Defendants are objecting to whether the plain language of the liquidated damages provision states that the nurse "agrees and binds her/himself to pay the Employer Fifteen Dollars ($15.00) for each hour or part of an hour not

Magtoles v. United Staffing Registry, Inc., --- F.Supp.3d ---- (2023)

2023 WL 2610165

performed of the requirement of Six Thousand (6,000) Hours of work as a reasonable estimate of the damages suffered by the Employer." (*See, e.g.*, Magtoles Contract at 3.) An identical provision is in the contracts requiring 5,100 hours, (Ex. O at 3), and requiring 5,616 hours, (Ex. T).

In any event, because Defendants fail to submit admissible evidence to support their objections, Plaintiffs' factual statements that are supported by admissible evidence are considered undisputed. *See* Fed. R. Civ. P. 56(e)(2); *Baity v. Kralik*, 51 F. Supp. 3d 414, 418 (S.D.N.Y. 2014) (collecting cases) (holding that "responses that do not point to any evidence in the record that may create a genuine issue of material fact do not function as denials, and will be deemed admissions of the stated fact." (alteration, citation, and internal quotation marks omitted)); *see also United States v. Gentges*, 531 F. Supp. 3d 731, 735 n.1 (S.D.N.Y. 2021) ("Any party's failure to provide record support for its challenge to another party's factual statement could allow the Court to deem the challenged facts undisputed.").

6    As discussed *supra* note 5, Defendants have not stated nor cited to any grounds for "objecting" to Plaintiffs' factual assertion that a nurse who was to work 6,000 hours would owe United Staffing for 4,000 remaining hours if the nurse left United Staffing after completing 2,000 hours, based on simple math and the plain language of the contract: the nurse "binds her/himself to pay the Employer Fifteen Dollars ($15.00) for each hour or part of an hour two performance of the requirement of Six Thousand (6,000) Hours of work as a reasonable estimate of the damages suffered by the Employer." (*See, e.g.,* Magtoles Contract at 3.) An identical provision is in the contract requiring 5,100 hours, (Ex. O at 3), and requiring 5,616 hours, (Ex. T).

7    Two of the plaintiffs in this action, Ana Myrene Espinosa and Ana Mervine Espinosa, have notably similar names. In this Memorandum and Order, the Court refers to Ms. Ana Myrene Espinosa by her full name or as "Ms. Espinosa," and refers to Ms. Ana Mervine Espinosa as "Ms. Bhyng Espinosa," as stated in Plaintiffs' Rule 56.1 Statement ¶ 4.

8    In response to Defendants' submission of the "supplemental affidavit," Plaintiffs submitted a second Declaration from counsel John J.P. Howley with an exhibit entitled "Defendants' Response to Plaintiffs' Interrogatory No. 3." (ECF Nos. 56-1, 56-2.) As the Court is not considering the supplemental affidavit submitted by Defendants, the Court also will not consider the Second Declaration nor the attached exhibit. (*See* Pls. Reply. at 5 n.1.)

9    The Court also notes the following, rather troublesome, facts. Felix Vinluan, one of Defendants' counsel in the instant action, was retained by Filipina nurse Ronariza Beltran (who is not a class member) to review her contract with United Staffing. Beltran relied upon Vinluan for legal advice in connection with the contract. At the same time, Vinluan was representing United Staffing in connection with Beltran's contract. (Pls. 56.1 at ¶¶ 117-19; Defs. Resp. 56.1 at ¶¶ 117-19.) Although Vinluan informed Beltran that he was also United Staffing's lawyer, Beltran testified that she did not sign anything waiving any conflicts of interest presented by Vinluan's dual representation of Defendants and their prospective employee. (ECF No. 45-11 ("Beltran Dep.") at 35:15-35:21.)

Defendants rhetorically dispute Plaintiffs' assertion that "Vinluan did not request or obtain from Beltran a waiver of conflicts of interest," speculating that "said waiver could have been granted through a different manner," but offer no evidence of waiver. (Defs. Resp. 56.1 at ¶ 120.) Notably, Defendants' speculation is distinct from any admissible evidence that any such waiver *was* ever granted. Vinluan, an "experienced New York lawyer who has represented United Staffing in employment and immigration matters for at least 10 years," (Pls. 56.1 at ¶ 154; Defs. Resp. 56.1 at ¶ 154), should have recognized the importance of a written waiver of a conflict so plain, but there is no record evidence that he obtained any written conflict waiver.

10   Defendants dispute Plaintiffs' assertion: "When Tan was scheduled to work the 3 p.m. to 11 p.m. shift, she usually ended up working until 2 a.m. or 3 a.m." but was not paid for hours worked past 11 p.m. Defendants respond that the statement "generalizes Tan's work schedules, although the statement may be true only in [sic] few occasions while she worked at the Regal Heights facility and only if it refers to her sometimes working until 2 am, but not until 3 am." (Defs. Resp. 56.1 at ¶ 51.) The Court finds that Defendants' failure to proffer admissible evidence fails to create a genuine dispute,

because Defendants admit the relevant part of the assertion — that there were times when Tan worked multiple hours past her scheduled shift hours, for which she was not paid.

11   The Court finds immaterial factual assertions regarding "full-time work" because this term does not appear in the contract. The Court notes, however, that the 2,000 hours specified in the contract divided by 52 weeks per year is approximately 38.46 hours per week, which could be considered "full time."

---

**End of Document**                                    © 2023 Thomson Reuters. No claim to original U.S. Government Works.

# EXHIBIT 21

Clause and Nevada statute require unavailability); *Drummond v. State*, 86 Nev. 4, 462 P.2d 1012 (1970). NRS 171.198(6) affords this protection by limiting the admissibility of prior officially recorded testimony to a narrow set of circumstances. Before such written testimony can be admitted at a subsequent proceeding, there must be a showing that 1) the defendant was represented by counsel; 2) defendant's counsel had an opportunity to cross-examine the witness; and 3) the witness is shown to be unavailable. *Aesoph v. State*, 102 Nev. 316, 320, 721 P.2d 379, 381–82 (1986).

In the instant case, Anderson properly objected to the State's introduction of Trooper Sacha's written testimony. Yet contravening the requirements of NRS 171.198(6) and accompanying Nevada case law, the State failed to prove that Trooper Sacha was unavailable to testify. Therefore, it was error for the district court to consider Trooper Sacha's written testimony.

[2] The State tries to fend off the impact of this oversight by claiming that the error was harmless. This contention is wrong. Trooper Sacha's written testimony was the only evidence relied upon by the State at the suppression hearing. Absent this testimony, the State simply could not have carried its burden of proving that Anderson's detention conformed with constitutional mandate.

Based upon the foregoing, we conclude that the district court improperly admitted Trooper Sacha's written testimony at Anderson's suppression hearing. The error was not harmless and warrants reversing Anderson's corresponding conviction. As a result of our conclusion, it is unnecessary to consider any of Anderson's other contentions of error.



David MASON, George Randal, Madeline Davis, James Dunn, John Mason, Melvin Steinberg, Thomas Bohnett, Robert Fitzgerald and Joseph Royce, d/b/a Puebla Estates, a Nevada general partnership, Appellants/Cross–Respondents,

v.

Manouchehr FAKHIMI, Respondent/Cross–Appellant.

No. 22383.

Supreme Court of Nevada.

Dec. 23, 1993.

Vendor brought suit against purchaser of real estate seeking award of liquidated damages for breach of contract. Purchaser counterclaimed for attorney's fees. The Eighth Judicial District Court, Clark County, Donald M. Mosley, J., awarded damages for lesser amount than specified in liquidated damages provision after finding provision unenforceable. Vendor appealed, and purchaser cross-appealed. The Supreme Court held that: (1) liquidated damages provision in contract was not penalty and was therefore enforceable, and (2) defaulting purchaser in auction setting was not entitled to return of deposit because deposit did not amount to an unenforceable penalty.

Reversed and remanded with instructions.

1. Damages ⚖️76
"Liquidated damages" are sum which party to contract agrees to pay if he fails to perform, and which, having been arrived at by good faith effort to estimate actual damages that will probably ensue from breach, is recoverable as agreed-upon damages should breach occur.

See publication Words and Phrases for other judicial constructions and definitions.

2. Damages ⚖️80(1)
In order to prove that liquidated damages provision constitutes penalty, challeng-

**334** Nev.      **865 PACIFIC REPORTER, 2d SERIES**

ing party must persuade court that liquidated damages are disproportionate to actual damages sustained by injured party.

**3. Damages** ⟷79(5)

Liquidated damages provision in real estate purchase contract for ten percent of purchase price was valid where damages in event of breach of contract were very difficult to estimate with any certainty.

**4. Damages** ⟷85

Defaulting purchaser of real estate at auction is not entitled to return of his earnest money deposit when there is signed liquidated damages provision in purchase agreement, and there is no basis for purchaser's failure to perform.

**5. Damages** ⟷81, 85

As defaulting purchaser who understood liquidated damages provision in agreement to purchase real estate bought at auction, purchaser was not entitled to return of his deposit, where liquidated damages provision, which coincided with amount of deposit, did not amount to penalty.

**6. Appeal and Error** ⟷173(12)

Where purchaser did not seek rescission of real estate purchase contract in trial court, issue of whether alleged misrepresentations by vendor entitled purchaser to rescission would not be addressed on appeal.

———

Morse & Mowbray and Marsha Tarte and Christopher H. Byrd, Las Vegas, for appellants/cross-respondents.

Hamilton & Lynch, Reno, for respondent/cross-appellant.

*OPINION*

PER CURIAM:

*FACTS*

Appellant/cross-respondent Puebla Estates ("Puebla") is a Nevada general partnership comprised of David Mason, George Randal, Madeline Davis, James Dunn, John Mason, Melvin Steinberg, Thomas Bohnett, Robert Fitzgerald and Joseph Royce. Puebla owned thirty-five four-plex apartments which it had

purchased in March 1988 with the intent of selling them. In August 1988, David Mason ("Mason"), managing partner, arranged for eighteen units to be auctioned by Eric Nelson Auctioneering. The auction was advertised in newspapers of general circulation in Las Vegas; Orange County, San Francisco, and Los Angeles, California; and Phoenix, Arizona. The advertisements noted the location of the units near Nellis Air Force Base, and some advertisements stressed the "prime tenants," and high income that was possible due to the shortage of Nellis housing.

Respondent/cross-appellant Manouchehr Fakhimi ("Fakhimi") and his real estate advisor, Mike Auerbach ("Auerbach"), inspected the units the day before the auction, which was held on October 4, 1988. Fakhimi was advised prior to the auction that the property was being sold "as is" and that the buyer was responsible for verifying any information regarding the units.

Fakhimi was the highest bidder for six of the units, and his bid was accepted by Mason on behalf of Puebla. Fakhimi then signed a standard purchase agreement and earnest money receipt for each of the properties and delivered a check for $69,700 to the auctioneer. The check represented ten percent of the total purchase price for all six units. Paragraph six of the agreement stated, "If BUYER defaults in his performance under this contract, SELLER may elect to retain the deposit as reasonable liquidated damages for such default." In his deposition, Fakhimi stated that he understood that this paragraph meant that if he failed to perform, Puebla could keep his deposit. Mason signed the standard purchase agreement and earnest money receipts and returned them to Eric Nelson, the selling agent, on October 4, 1988.

Approximately two weeks later, Fakhimi stopped payment on the check after learning from Auerbach that a wing of Nellis Air Force Base was possibly scheduled to close. Fakhimi did no independent investigation prior to stopping payment, nor did he contact either Mason or the auctioneer.

MASON v. FAKHIMI                    Nev. **335**
Cite as 865 P.2d 333 (Nev. 1993)

After Fakhimi defaulted on the agreement, Puebla resold the units to the next highest bidder at a loss of $23,000. Mason spent approximately sixty hours contacting other buyers, negotiating sales, and arranging financing.

Puebla filed a complaint against Fakhimi requesting an award of the liquidated damages, attorney's fees and costs. In the alternative, Puebla sought general and special damages. Fakhimi answered with seven affirmative defenses, including fraudulent concealment of material facts, and counterclaimed for attorney's fees.

The case was presented to the court on statements of fact from both parties. The district court held that Fakhimi breached the standard purchase agreements by not completing the purchase of the six units. However, the court found that liquidated damages of $69,700 were disproportionate to the actual damages of $38,000. Therefore, the liquidated damages provision was an unenforceable penalty. In the alternative, the court awarded Puebla $38,000 which represented the $23,000 loss from the resale and $15,000 as payment for the time Mason spent reselling the units.

Puebla now appeals the district court's decision that the liquidated damages provision in the purchase agreement was an unenforceable penalty. Fakhimi appeals the district court's award of damages to Puebla and its refusal to allow him to rescind the contract. We address each argument in turn.

### DISCUSSION

[1] We turn first to the issue of whether the liquidated damages provision in this contract was an unenforceable penalty. Liquidated damages are the sum which a party to a contract agrees to pay if he fails to perform, and which, having been arrived at by a good faith effort to estimate the actual damages that will probably ensue from a breach, is recoverable as agreed-upon damages should a breach occur. *Joseph F. Sanson Investment v. 268 Limited*, 106 Nev. 429, 435, 795 P.2d 493, 496–97 (1990).

However, liquidated damages provisions may amount to unenforceable penalties.

As distinguished from liquidated damages, the term "penalty," as used in contract law, is a sum inserted in a contract, not as the measure of compensation for its breach, but rather as a punishment for default, or by way of security for actual damages which may be sustained by reason of non-performance, and it involves the idea of punishment.... [The] distinction between a penalty and liquidated damages is that a penalty is for the purpose of securing performance, while liquidated damages is the sum to be paid in the event of non-performance.

22 AM.JUR.2d *Damages* § 684 (1980).

[2] This court has held that liquidated damages provisions are generally prima facie valid, and the party challenging the provision must establish that the provision amounts to a penalty. *Haromy v. Sawyer*, 98 Nev. 544, 546, 654 P.2d 1022, 1023 (1982). In order to prove that such a provision constitutes a penalty, the challenging party must persuade the court that the liquidated damages are disproportionate to the actual damages sustained by the injured party. *Id.* at 547, 654 P.2d at 1023.

[3] Puebla argues that the liquidated damages provision in the purchase agreement is enforceable. It maintains that the stipulated amount was a reasonable forecast of damages since its out-of-pocket loss plus the additional time lost could have been more than ten percent. Puebla claims that damages upon breach were not possible to accurately estimate at the time of contracting because it had no way of predicting when resale might occur or the resale price of the units.

Fakhimi argues that the liquidated damages were disproportionate to the actual loss sustained because the actual damages were one-third of the liquidated damages. Therefore, he claims, the provision was an unenforceable penalty.

We agree with Puebla that damages in the event of breach of a real estate sales contract are very difficult to estimate with any certainty. Since it was not possible for Puebla to accurately determine what actual damages would be in the event of a breach, the provi-

sion fits this court's requirements for the validity of liquidated damages provisions as stated in *Haromy*. Fakhimi did not rebut the presumption that the liquidated damages clause was valid. Fakhimi did not prove that the application of the liquidated damages clause amounts to an unenforceable penalty by demonstrating that the liquidated damages are disproportionate to the actual damages.

A number of out-of-state courts have also found that liquidated damages provisions are enforceable, particularly in the area of real estate sales contracts. *See, e.g., Hooper v. Breneman,* 417 So.2d 315 (Fla.Dist.Ct.App. 1982) (13.3 percent of purchase price); *Gomez v. Pagaduan,* 613 P.2d 658 (Haw.Ct.App. 1980); *Curtin v. Ogborn,* 394 N.E.2d 593 (Ill.App.Ct.1979) (approximately 7 percent of purchase price); *Wilfong v. W.A. Schickedanz Agency, Inc.,* 85 Ill.App.3d 333, 40 Ill. Dec. 625, 406 N.E.2d 828 (Ill.App.Ct.1980) (10 percent of purchase price).

In view of the foregoing, we hold that the district court erred in holding that the liquidated damages provision in the instant case was an unenforceable penalty.

[4] We now turn to the question of whether a defaulting purchaser in an auction setting is entitled to a return of his deposit. This is an issue of first impression in this state. We note the following authority:

> [W]here it has been stipulated that the deposit shall be forfeited if the purchaser does not comply with his contract, the deposit, in such an event, may not be recovered back either at law or in equity.... It has been said that the test to be applied is that if the deposit is unreasonable in amount and the actual damages will be negligible or capable of actual measurement, the forfeiture of the deposit will not be permitted even though this is expressly agreed; but if the deposit is reasonable in amount, a provision forfeiting it in case of a breach will be enforced.

7A C.J.S. § 18b *Auctions and Auctioneers* (1980); *see also* 7 Am.Jur.2d *Auctions and Auctioneers* § 41 (1980).

The above authority appears to be the prevailing view. A defaulting purchaser of real estate at auction is not entitled to a return of his earnest money deposit when there is a signed liquidated damages provision in the purchase agreement, and there is no basis for the vendee's failure to perform. *See Bailey v. Montgomery,* 31 Ark.App. 1, 786 S.W.2d 594, 597–98 (1990); *see also Bamberg v. Griffin,* 394 N.E.2d 910, 914 (Ill.App.Ct.1979) ("The provision for earnest money in a contract, in the absence of an express provision to the contrary, will be interpreted as a provision for liquidated damages and enforced without actual proof of damages being required."); *Hamrick v. Summey,* 282 S.C. 424, 320 S.E.2d 703 (1984) (deposit by a prospective purchaser to ensure compliance with the sales contract is usual and customary at auctions).

[5] Fakhimi was fully aware of, and understood, the deposit/liquidated damages provision in the purchase agreement. Accordingly, we hold that as a defaulting purchaser, Fakhimi is not entitled to a return of his deposit, particularly because the liquidated damages provision in this agreement does not amount to a penalty. Had the liquidated damages provision amounted to a penalty, Fakhimi would have been able to recover the difference between the liquidated damages and the actual damages sustained by Puebla.

[6] We now turn to the issue of rescission. Fakhimi argues that he is entitled to rescind the contract due to misrepresentations on the part of Puebla. However, Fakhimi did not seek rescission of the contract in the court below. We have stated that this court may decline to decide an issue that was not fully litigated or decided by the district court. *McKay v. City of Las Vegas,* 106 Nev. 203, 789 P.2d 584 (1990). Accordingly, we decline to address this issue.

In addition, we do not address the propriety of the district court's award of damages to Puebla for time spent reselling the units since we hold that the liquidated damages provision in this case was not an unenforceable penalty.

In conclusion, we hold that the liquidated damages provision in this contract was not a penalty and is therefore enforceable. In ad-

Case 1:23-cv-00418-MAC   Document 6-1   Filed 02/20/24   Page 267 of 394 PageID #:  313

dition, we hold that a defaulting purchaser in an auction setting is not entitled to a return of his deposit provided the deposit does not amount to an unenforceable penalty.

Accordingly, we reverse the decision of the district court regarding the enforcement of the liquidated damages provision and remand this case to the district court with instruc-

tions to enter judgment consistent with this opinion.



# EXHIBIT 22

2015 WL 13906343

2015 WL 13906343
Only the Westlaw citation is currently available.
United States District Court, E.D. Texas, Beaumont Division.

Raju MEGANATHAN, et al.
v.
SIGNAL INTERNATIONAL L.L.C., et al.

1:13-CV-497
|
Signed 06/17/2015

**Attorneys and Law Firms**

Joshua Samuel Sohn, Michael D. Hynes, Timothy H. Birnbaum, Pro Hac Vice, John Blake Dodson, DLA Piper LLP, New York, NY, Brett David Solberg, DLA Piper USA LLP, Houston, TX, for Raju Meganathan, Saravanachlevan Narayanasamy, Saravanan Ramasamy, Maruthamuthu Mayavu.

Alan Dean Weinberger, Elham R. Rabbani, Pro Hac Vice, Erin Casey Hangartner, Pro Hac Vice, Hal D. Ungar, Pro Hac Vice, Kevin Patrick Maney, Lance R. Rydberg, Lauren Masur Davis, Mitchell P. Hasenkampf, Robert L. Keller, II, Hangartner, Rydberg, Terrell & Hart, LLC, Patricia Bollman, Patricia A. Bollman, APLC, New Orleans, LA, James L. Cornblatt, Patricia A. Bollman, APLC, Metarie, LA, for Signal International L.L.C., Signal International, Inc., Signal International Texas, G.P., Signal International Texas, L.P.

Timothy W. Cerniglia, Timothy W. Cerniglia, PLC, New Orleans, LA, for Malvern C. Burnett, Gulf Coast Immigration Law Center, L.L.C., Law Offices of Malvern C. Burnett, A.P.C.

## ORDER SEVERING AND TRANSFERRING SIGNAL'S CROSS-CLAIMS TO THE EASTERN DISTRICT OF LOUISIANA

Zack Hawthorn, United States Magistrate Judge

 **\*1**  This case is assigned to the Honorable Marcia Crone, United States District Judge, and is referred to the undersigned United States magistrate judge for all pretrial matters. (Doc. No. 2.) Per the "first-to-file" rule, and in the interests of judicial economy, the undersigned finds that Signal's cross-claims should be severed from the main action and transferred to the Eastern District of Louisiana.

## I. Background

On March 7, 2008, a putative class action was filed in the Eastern District of Louisiana on behalf of over five hundred plaintiffs who were allegedly victims of human trafficking. (See Doc. No. 1, David v. Signal Int'l, L.L.C., No. 2:08-1220 (E.D. La. March 7, 2008)). The court in David denied class certification (as to all claims except the plaintiffs' FLSA claims), which caused the putative class members to file suit in the district where their injuries allegedly occurred. The Plaintiffs in this case filed suit in the Eastern District of Texas because they claim to have suffered their injuries at a Signal facility in Orange, Texas.

Like in David, the Plaintiffs in this case sued numerous defendants. (See Doc. No. 1); (See also Doc. No. 1, David v. Signal Int'l, L.L.C., No. 2:08-1220 (E.D. La. March 7, 2008)) (naming twelve defendants). For convenience, the Plaintiffs grouped the

2015 WL 13906343

Defendants into three categories: "Signal" (collectively, Signal International, L.L.C., Signal International Texas, G.P., Signal International Texas, L.P., and Signal International, Inc.), "Recruiter Defendants," (collectively, Global Resources, Inc., Michael Pol, Dewan Consultants Pvt., Ltd., and Sachin Dewan), and "Facilitator Defendants" (collectively, Malvern C. Burnett, Malvern C. Burnett A.P.C., and the Gulf Coast Immigration Center, L.L.C.). Also common to both cases are cross-claims Signal filed against these defendants. (Doc. No. 61, pp. 55–75.); (Doc. No. 60, David v. Signal, Int'l, L.L.C., No. 2:08-1220 (E.D. La. May 9, 2008)). [1] Signal filed its cross-claims in the David case in 2008, and filed its cross-claims in this case in 2014. The cross-claims in David were recently tried, and a jury returned a verdict in favor of the cross-defendants on each claim. (Doc. No. 2387, David v. Signal, Int'l, L.L.C., No. 2:08-1220 (E.D. La. April 27, 2015)).

In addition to this case, there are four other cases pending in the Eastern District of Texas involving these same Defendants and the same allegations of trafficking. Signal filed cross-claims in those cases as well. In two of those cases—Samuel and Joseph—Burnett moved to have Signal's cross-claims transferred to the Eastern District of Texas under the "first-to-file" rule. The undersigned granted Burnett's motion, and no objections were filed.

## II. Analysis

**\*2** "Under the first-to-file rule, when related cases are pending before two federal courts, the court in which the case was last filed may refuse to hear it if the issues raised by the cases substantially overlap." Int'l Fid. Ins. Co. v. Sweet Little Mex. Corp., 665 F.3d 671, 677 (5th Cir. 2011) (citation omitted). "In such a case, the district court in which the later action was filed may dismiss, stay, or transfer the suit in order to avoid duplicative litigation and enforce the principle of comity." Carter v. Dep't of Veterans Affairs, 228 F. App'x 399, 402 (5th Cir. 2007) (per curiam). "In deciding whether to apply the first-to-file rule, the Court must resolve two questions: (1) are the two pending actions so duplicative or do they involve such substantially similar issues that one court should decide the subject matter of both actions, and if so, (2) which of the two courts should take the case." Datamize, Inc. v. Fid. Brokerage Servs., LLC, 2:03-CV-321-DF, 2004 WL 1683171, at \*3 (E.D. Tex. Apr. 22, 2004) (Folsom, J.) (citing Tex. Instruments v. Micron Semiconductor, 815 F. Supp. 994, 997 (E.D. Tex. 1993)). "Only the first issue is for the second-filed court to decide, however, for in this circuit, '[o]nce the likelihood of a substantial overlap between the two suits ha[s] been demonstrated, it [is] no longer up to the [second filed court] to resolve the question of whether both should be allowed to proceed.' " Nabors Drilling USA, L.P. v. Markow, Walker, P.A., 451 F. Supp. 2d 843, 845 (S.D. Miss. 2006) (alteration in original) (quoting Cadle Co. v. Whataburger of Alice, Inc., 174 F.3d 599, 605–06 (5th Cir. 1999)). The application or propriety of transfer under the first-to-file rule may be raised sua sponte. Strukmyer, L.L.C. v. Infinite Fin. Solutions, Inc., No. 3:13-cv-3798, 2013 WL 6388563, at \*5 (N.D. Tex. Dec. 5, 2013); Walker Grp., Inc. v. First Layer Comm'ns, Inc., 333 F. Supp. 2d 456, 460–61 (M.D.N.C. 2004).

The undersigned finds that the first prong of the first-to-file rule is satisfied here. Signal's cross-claims in David are not just similar or related to the ones in this case—they are virtually identical. White v. Peco Foods, Inc., 546 F. Supp. 2d 339, 342 (S.D. Miss. 2008) ("The first-to-file rule does not require that cases be identical, but merely that there is a substantial overlap in issues and parties."). First, the only difference in the parties between the two cases is that Signal sued an additional three Defendants in David (the "Labor Broker Defendants") who are not parties to this action. [2] Compare (Doc. No. 61) with (Doc. No. 60, David v. Signal, Int'l, L.L.C., No. 2:08-1220 (E.D. La. May 9, 2008)); see also Save Power Ltd. v. Syntek Fin. Corp., 121 F.3d 947, 951 (5th Cir. 1997) ("Complete identity of parties is not required for dismissal or transfer of a case filed subsequently to a substantially related action."). It is also worth noting that Signal's cross-claims are in no way impacted by the difference in the make-up of the plaintiffs in each case.

Second, Signal asserted nearly identical cross-claims in each case. The only variation is that Signal asserted a claim for tortious interference with contract in David that it did not include here. In addition, beyond just pleading the same causes of action against the same defendants, resolution of Signal's cross-claims involves the same facts and raises the same issues in both cases. In contrast, the undersigned denied Signal's and Burnett's requests to transfer the Plaintiffs' claims to the Eastern District of Louisiana in part because the Plaintiffs in this case worked at a different facility than the plaintiffs in David, and as such, the

2015 WL 13906343

proof and facts for the claims would differ between the two cases. (Doc. No. 44.) This is not the case for Signal's cross-claims. Accordingly, the undersigned finds that there is substantial overlap between Signal's cross-claims in this case and those in *David.*

Therefore, the proper course of action is to either transfer, stay, or dismiss Signal's cross-claims. The undersigned perceives no benefit to merely staying these claims. In fact, Signal's cross-claims were recently tried in *David*, and the parties are now arguing about the preclusive effect of that judgment. In the interest of judicial economy, one court should decide these claims and any related ancillary issues.

 **\*3**  Accordingly, the most efficient manner of resolving these claims is to transfer them. But, in order to transfer just Signal's cross-claims, as opposed the entire case (including the Plaintiffs' claims), Signal's cross-claims must first be severed from the main case. Pursuant to Federal Rule of Civil Procedure 21, a "trial court has broad discretion to sever issues to be tried before it." Brunet v. United Gas Pipeline Co., 15 F.3d 500, 505 (5th Cir. 1994) (citing FED. R. CIV. P. 21); see also United States v. O'Neil, 709 F.2d 361, 366 (5th Cir. 1983) (noting that under Rule 21 a district court properly severed a party's counterclaims). The undersigned has authority under Rule 21 to sever Signal's cross-claims even though no party has requested such relief. See Brunet, 15 F.3d at 505; United States v. Nat'l R.R. Passenger Corp., No. CIV.A 86-1094, 2004 WL 1335723, at \*6 (E.D. Pa. June 15, 2004) ("Thus, while neither party has asked this Court to sever, Rule 21 permits a court to sever claims *sua sponte.*").

### III. Conclusion

For the reasons discussed above, it is **ORDERED** that the Clerk of Court be **DIRECTED** to sever from this action Signal's cross-claims against cross-defendants Malvern C. Burnett, Sachin Dewan, Dewan Consultants Pvt., Ltd., Global Resources, Inc. Gulf Coast Immigration Law Center, L.L.C., Law Offices of Malvern C. Burnett, A.P.C. and Michael Pol; and it is further

**ORDERED** the Clerk of Court shall **TRANSFER** Signal's cross-claims against Malvern C. Burnett, Sachin Dewan, Dewan Consultants Pvt., Ltd., Global Resources, Inc. Gulf Coast Immigration Law Center, L.L.C., Law Offices of Malvern C. Burnett, A.P.C. and Michael Pol to the Eastern District of Louisiana.

### All Citations

Not Reported in Fed. Supp., 2015 WL 13906343

### Footnotes

1       In this case, Signal claims that is has suspended its cross-claims against defendant Michael Pol (Doc. No. 61, p. 55 n. 1), and in *David*, Signal's claims against him have been dismissed. (Doc. No. 1976, David v. Signal, Int'l, L.L.C., No. 2:08-1220 (E.D. La. Dec. 5, 2014)).

2       Signal also filed a third-party claim against Zito Companies, L.L.C. that was dismissed. (Doc. No. 391, David v. Signal, Int'l, L.L.C., No. 2:08-1220 (E.D. La. April 7, 2009)).

End of Document                                         © 2024 Thomson Reuters. No claim to original U.S. Government Works.

# EXHIBIT 23

all of the district court's holdings. Therefore, we affirm the district court's decision.

YOUNG, C.J., and STEFFEN, ROSE, JJ., and GUY[1] and BONAVENTURE,[2] District Judges, concur.



MORT WALLIN OF LAKE TAHOE, INC., Appellant/Cross–Respondent,

v.

COMMERCIAL CABINET CO., INC., a Nevada corporation, Respondent/Cross–Appellant.

No. 19266.

Supreme Court of Nevada.

Dec. 28, 1989.

Rehearing Denied March 6, 1990.

Construction contractor brought action against store owner for monies due, and store owner filed complaint for compensatory and punitive damages for defective work and materials. The Eighth Judicial District Court, Clark County, Donald M. Mosley, J., awarded $116,714 to contractor and $110,000 to owner, and appeals were taken. The Supreme Court, 103 Nev. 238, 737 P.2d 515, affirmed damage award to contractor, but remanded for District Court to set out more clearly the basis for store owner's award. After remand, the Supreme Court held that: (1) award of $10,000 damages for remedial repairs to defective wall panels was adequately supported in the record, and (2) damage award for diminution of value of property caused by breach of contract was not supported by the record.

Affirmed in part and vacated in part.

1. Damages ⬅189

Award of $10,000 damages for remedial repairs to defective wall panels was adequately supported in the record.

2. Damages ⬅120(3)

Where cost of removal and completion of project would have been economically wasteful, appropriate measure of damages for breach of construction contract was diminution of value of property caused by breach.

3. Damages ⬅189

Damage award for diminution of value of property caused by breach of construction contract was not supported by the record, absent evidence as to diminished value of the premises as a result of contractor's actual performance, compared with anticipated value of premises if performance had been rendered as required.

4. Damages ⬅184

Amount of damages need not be met with mathematical exactitude, but there must be an evidentiary basis for determining reasonably accurate amount.

5. Damages ⬅189

Judge's personal visit to work site may have been helpful in analyzing or understanding evidence of diminution of value, but could not alone be the source of evidence to support award of damages for breach of construction contract.

George E. Graziadei and Scott M. Cantor, Las Vegas, for appellant/cross-respondent.

Lang & Leeds, Las Vegas, for respondent/cross-appellant.

OPINION

PER CURIAM:

This is an appeal from the district court's Supplemental Findings of Facts and Con-

---

1. The Honorable Addeliar D. Guy, Judge of the Eighth Judicial District Court, was designated by the Governor to sit in place of the Honorable John C. Mowbray, Justice. Nev. Const. art. VI, § 4.

2. The Honorable Joseph T. Bonaventure, Judge of the Eighth Judicial District Court, was designated by the Governor to sit in place of the Honorable Charles E. Springer, Justice. Nev. Const. art. VI, § 4.

MORT WALLIN v. COMMERCIAL CABINET CO.   Nev. **955**

Cite as 784 P.2d 954 (Nev. 1989)

clusions of Law rendered in response to our original order of remand. In that order, we affirmed the district court's damage award to Commercial Cabinet but remanded for the district court to set out more clearly the basis for Wallin's award. *Commercial Cabinet Co. v. Wallin*, 103 Nev. 238, 737 P.2d 515 (1987). From the record before us at that time, we could not effectively review the lump sum award to Wallin. *Id.* at 240, P.2d at 517.

[1] Upon remand, the district court determined that $10,000.00 of Wallin's award was for remedial repairs to the defective wall panels and $100,000.00 was for diminution in value to the store. We affirm the $10,000.00 award for cost of remedial repair. Such an award is more than adequately supported in the record, was not contested on appeal and therefore will stand undisturbed by this court. *Brandon v. Travitsky*, 86 Nev. 613, 615, 472 P.2d 353, 355 (1970).

[2, 3] The defect we perceive in the proceedings below is in the basis for the $100,-000.00 award for diminution of value. We agree with the district court that on these facts the award of approximately $350,-000.00 sought by Wallin for the cost of removal and completion would have been economically wasteful. Because we agree with the district court's economic waste conclusion, we discern no error in its determination that the appropriate measure of damages is the diminution in the value of the property caused by the breach.

Having agreed with the district court's reasoning and determination regarding the measure of damages, we nevertheless conclude that there is insufficient support in the record for the damages awarded. Appellant claims that there is substantial evidence to support the district court's award. We disagree.

The fact that the property suffered at least some diminution in value seems obvious. However, the record reveals no evidence directed to an evaluation of the diminished value of the premises as a result of Commercial Cabinet's actual performance compared with the anticipated value of the premises if performance had been

rendered as required by the contract between the parties.

[4] The party seeking damages has the burden of proving both the fact of damages and the amount thereof. *Kelly Broadcasting v. Sovereign Broadcast*, 96 Nev. 188, 193–194, 606 P.2d 1089, 1093 (1980); *Alper v. Stillings*, 80 Nev. 84, 86–87, 389 P.2d 239, 240 (1964). The latter aspect of the burden need not be met with mathematical exactitude, but there must be an evidentiary basis for determining a reasonably accurate amount of damages. *Central Bit Supply v. Waldrop Drilling*, 102 Nev. 139, 142, 717 P.2d 35, 37 (1986); *Haner v. Quincy Farm Chemicals, Inc.*, 97 Wash.2d 753, 649 P.2d 828, 830 (1982); *Reposa v. Buhler*, 770 P.2d 235, 230 (Wyo.1989). Therefore, evidence going only to the fact of diminution in value alone will not, without more, establish a basis for an award of substantial damages.

The plaintiff must provide to the court an evidentiary basis upon which it may properly determine the amount of plaintiff's damages. *Short v. Wise*, 239 Kan. 171, 718 P.2d 604, 609 (1986); *State ex rel. Stephan v. Wolfenbarger and McCulley, P.A.*, 236 Kan. 183, 690 P.2d 380, 385 (1984). This case required qualified expert testimony about diminution in value or other equally competent evidence on the issue. There is no requirement that absolute certainty be achieved. Obviously, once the fact of damage has been established, some uncertainty in the amount is allowed. *Bader v. Cerri*, 96 Nev. 352, 357–58, 609 P.2d 314, 318 (1980). However, here there is a complete absence of any competent evidence to allow the trier of fact to arrive at any sustainable amount of diminution in value, much less $100,000.00.

[5] Wallin failed to establish a proper evidentiary foundation for the $100,000.00 diminution award granted by the district court. In an attempt to reach fairness and bridge the evidentiary gap in Wallin's evidence, the trial judge personally visited the work site. Such a visit may be helpful in analyzing or understanding evidence of diminution in value; however, it alone can-

**956** Nev.          **784 PACIFIC REPORTER, 2d SERIES**

not be the source of the evidence. The court cannot assume the role of an expert and thereby relieve plaintiff of the need to present evidence in support of its claim. Evidence essential to sustain a damages award must be in the record and available for meaningful appellate review.

Because Wallin failed to carry its burden to reasonably establish the amount of the diminution in property value, it is only entitled to the $10,000.00 for remedial repairs.

We have considered all other issues and objections raised by Wallin but not discussed herein and conclude that they lack merit.

For the reasons noted above, we vacate the $100,000.00 award and affirm the $10,000.00 award for remedial repairs.



**Rodney Lyn EMIL, Appellant,**

v.

**The STATE of Nevada, Respondent.**

**No. 19431.**

Supreme Court of Nevada.

Dec. 28, 1989.

Rehearing Denied March 6, 1990.

Defendant was convicted of murder in the first degree with use of deadly weapon and the jury imposed the death penalty. Judgment was entered in the Eighth Judicial District Court, Clark County, Carl J. Christensen, J. Defendant appealed. The Supreme Court held that: (1) testimony of witness that he heard defendant state that his mother had hired him to kill his stepfather was admissible, even though witness could not see defendant; (2) results of polygraph test were properly excluded in penalty phase of trial; (3) evidence of prior murder conviction could be admitted as aggravating factor in penalty phase through testimony as well as through certified copy of conviction; (4) court committed harmless error by admitting evidence from earlier conviction which was intended to inflame and agitate jury; (5) defendant was given adequate notice of State's intention to introduce prior conviction; and (6) prosecution did not commit misconduct by arguing that defendant's youth was not a mitigating factor.

Affirmed.

**1. Criminal Law ⊕37(5)**

Testimony of witness who knew defendant, that he overheard defendant stating that his mother had hired him to kill his stepfather, was admissible in murder trial even though witness could not see defendant. N.R.S. 52.065.

**2. Homicide ⊕253(1)**

Evidence supported conviction for murder in the first degree with the use of a deadly weapon; a witness testified that he saw defendant fire revolver and saw victim fall, and testimony was corroborated by the presence at the scene of the crime of broken glass from the truck in which victim was sitting when shot.

**3. Homicide ⊕358(1)**

Results of polygraph examination are not admissible at penalty phase of capital murder trial, absent stipulation by both parties.

**4. Homicide ⊕357(5)**

Evidence of conviction for a prior murder was admissible as an aggravating factor in the penalty phase of a capital murder trial, even though at the time the second murder was committed defendant had not been convicted, charged or even arrested for the first murder. N.R.S. 200.033, subd. 2.

**5. Homicide ⊕358(1)**

Testimony regarding prior murder was admissible at penalty phase of capital murder case, to establish aggravating circumstances, despite claim that evidence on point should have been limited to certified copy of conviction. N.R.S. 200.033, subd. 2.

# EXHIBIT 24

Case 1:23-cv-00418-MAC  Document 6-1  Filed 02/20/24  Page 277 of 394 PageID #: 323

Paguirigan v. Prompt Nursing Employment Agency LLC, Not Reported in Fed. Supp....

203WL 6 151451©

2019 WL 4647648
Only the Westlaw citation is currently available.
United States District Court, E.D. New York.

Rose Ann PAGUIRIGAN, individually and on behalf of all others similarly situated, Plaintiff,

v.

PROMPT NURSING EMPLOYMENT AGENCY LLC d/b/a/ Sentosa Services, Sentosacare LLC, Sentosa Nursing Recruitment Agency, Benjamin Landa, Bent Philipson, Berish Rubenstein a/k/a Barry Rubenstein, Francis Luyun, Golden Gate Rehabilitation & Health Care Center LLC, and Spring Creek Rehabilitation and Nursing Center, Defendants.

17-cv-1302 (NG) (JO)
|
Signed 09/23/2019
|
Filed 09/24/2019

**Attorneys and Law Firms**

Leandro Bolesa Lachica, John J.P. Howley, Law Offices of John Howley, New York, NY, for Plaintiff.

Elliot Hahn, Hahn Eisenberger PLLC, Seth Eisenberger, Law Office of Seth Eisenberger, Brooklyn, NY, Sheldon Eisenberger, Alan M. Pollack, Robinson Brog Leinwand Greene Genovese & Gluck PC, New York, NY, for Defendants.

**OPINION & ORDER**

GERSHON, United States District Judge:

*1 Plaintiff Rose Ann Paguirigan brings claims, on behalf of herself and a class of similarly situated Filipino nurses, for violations of the Trafficking Victims Protection Act ("TVPA"), 18 U.S.C. §§ 1589 et seq., against defendants Prompt Nursing Employment Agency LLC ("Prompt Nursing"), Sentosacare LLC ("Sentosacare"), Sentosa Nursing Recruitment Agency ("Sentosa Agency"), Benjamin Landa, Bent Philipson, Berish Rubenstein, Francis Luyun, Golden Gate Rehabilitation and Health Care Center LLC ("Golden Gate"), and Spring Creek Rehabilitation and Nursing Center ("Spring Creek"). Plaintiffs also seek damages for breach of contract against Prompt Nursing, Rubenstein, Landa, and Philipson, and a declaratory judgment regarding certain aspects of their employment contracts.

All defendants previously moved under Federal Rule of Civil Procedure 12(b)(6) to dismiss the TVPA claims and the declaratory judgment claim, and defendants Landa, Philipson, and Rubenstein moved to dismiss the breach of contract claim as alleged against them individually. I denied that motion in full. *Paguirigan v. Prompt Nursing Emp't Agency LLC*, 286 F. Supp. 3d 430 (E.D.N.Y. 2017). I subsequently granted the named plaintiff's motion to certify a class comprised of "all nurses who were recruited by the defendants in the Philippines and were employed by the defendants in the United States at any time since December 23, 2008," and I appointed her counsel as class counsel under Rule 23(g). *Paguirigan v. Prompt Nursing Emp't Agency LLC*, 2018 WL 4347799 (E.D.N.Y. Sept. 12, 2018). The records defendants produced at the class certification stage establish that there are more than 200 known class members.

Defendants now move for summary judgment dismissing all of plaintiffs' claims, and granting Prompt Nursing's counterclaim for breach of the named plaintiff's employment contract. Plaintiffs also move for summary judgment on all of their claims, including a declaration that the liquidated damages provision and confessions of judgment are unenforceable, and a permanent injunction preventing defendants from threatening or attempting to enforce either.

WESTLAW  T 202homsn Rseu tr.tNRcl s aigu l.s sNGegi Govck s7t Nen te. L sN8Rc

**APP. 273**

3

203 WL 6 151451©

## I. Factual Background

Except as otherwise noted, the following facts are undisputed.

### A. Defendants' Employment of the Named Plaintiff and their Legal Actions Against Her

In either 2006 or 2007, plaintiff, a Filipino citizen, attended a meeting in the Philippines regarding a nursing home job in New York. The meeting was organized by defendant Sentosa Agency, a recruiting agency registered in the Philippines. Defendants Luyun—who is the sole proprietor of Sentosa Agency—and Philipson were in attendance.

In 2007, defendant Golden Gate, a nursing home located in Staten Island, New York, submitted a visa application on plaintiff's behalf. After plaintiff and Golden Gate agreed that a visa application would be submitted, the U.S. government issued a Prevailing Wage Determination for plaintiff of $26.87 per hour. Eight years later, plaintiff was notified of a visa interview with the United States Consulate in the Philippines. At the time of the interview, the United States Consulate required confirmation that a job was still available. On April 15, 2015, defendant Landa, who is the CEO, managing partner, and one of the owners of Golden Gate, [1] signed a letter addressed to the U.S. Consulate affirming that an employment position was still available and stating that Golden Gate had offered plaintiff a position at $29.00 per hour. On that day, Landa also signed the last page of plaintiff's employment contract with Golden Gate.

**\*2**  On April 22, 2015, one week later, plaintiff herself signed the employment contract with defendant Golden Gate, which was for a three-year term. When plaintiff signed the contract, Landa's letter to the U.S. Consulate was attached to the front of the contract. Plaintiff's signature appears on each page of the contract, but does not appear on the letter. [2]

The contract states the following regarding wages:

> As of the Commencement Date, Employee will be paid a base salary in accordance with the prevailing wage for the geographic area in which the employee is assigned to work, as determined by the National Prevailing Wage and Helpdesk Center (NPWC) of the United States Department of Labor.

Contract IV (1). (The parties dispute the exact mechanism by which the National Prevailing Wage and Helpdesk Center ("NPWC") determines a prevailing wage, but it is agreed that in essence the NPWC determines prevailing wages at the request of an employer for a particular employee as part of the visa process and also lists the prevailing wage by geographic area online and elsewhere. NPWC determines prevailing wages on an hourly and annual salary basis.)

"Commencement Date" is defined as the "date when Employee first starts to provide direct nursing care to residents/patients after completing the orientation and training as described in Article IV." Contract III.

The contract further provides that:

> Both the Employer and Employee agree that the Employer and/or its designee/assignee has or will incur substantial expenses and has or will expend enormous resources and time in recruiting the Employee for employment as contemplated herein, sponsoring the Employee for an Immigrant Visa, training the Employee in practice and procedures, and orienting the Employee to living in the New York area. In as much as the parties agree that damages would be difficult to calculate if the Employee willfully, voluntarily, and without cause terminates the Agreement before the completion of the three (3) year term,

203 WL  6 151451©

and/or if the Employer terminated the Agreement pursuant to Article VI(2)(i) or (ii), [3] the parties agree that such an act shall result in an obligation by the Employee to pay the Employer and/or its designee/ assignee Twenty Five Thousand Dollars ($25,000) as liquidated damages (the "Liquidated Damage").

Contract VII (4). Section VII (4)(a) states that the liquidated damages are reduced to $16,666.67 should plaintiff pre-terminate or breach the employment contract in her second year, and are reduced to $8,333.34 should she do so in her third year. Contract VII (4)(a).

 **3**  Finally, "in order to secure Employee's performance of the Employment Term," Section VII (4) of the contract requires plaintiff to execute a confession of judgment for the amount of liquidated damages, which may be filed in court in the event that she fails "to complete the employment term." Plaintiff is also required to "pay upon demand all reasonable costs and expenses (including attorney's fees), and disbursements[ ] incurred by the Employer and/or its designee/assignee to enforce any of [the] rights of the Employer and/or its designee/assignee hereunder and/or collect the aforementioned liquidated damages." Contract VII (4).

In a separate document dated April 22, 2015, plaintiff signed an acknowledgment of costs related to her recruitment. This document is titled "Declaration and Undertaking" and states that Sentosacare expended $3,685 for attorneys' fees, filing fees, visa fees, airfare, and miscellaneous fees in connection with plaintiff's hiring and travel to the United States. Sentosacare is a company co-owned by defendants Landa and Philipson that provides consultants to nursing homes.

Once plaintiff arrived in the United States, Golden Gate verbally assigned her contract to defendant Prompt Nursing, a staffing agency owned by defendant Rubenstein that provides nurses to nursing homes. On June 22, 2015, plaintiff began working at defendant Spring Creek, a nursing home located in Brooklyn, New York. Landa is a managing partner and owner of Spring Creek. [4] On or about June 22, 2015, plaintiff signed an "Employer and Wage Acknowledgment" form, which states that her employer is Prompt Nursing and that her pay is $29.00 per hour.

Plaintiff quit her job on March 7, 2016. Defendant Prompt Nursing then sued plaintiff and two other Filipino nurses to enforce the $25,000 liquidated damages provision in their contracts and for $250,000 from each for tortious interference with contract and prospective business relations, and an additional $250,000 from each in punitive damages. Those lawsuits were voluntarily dismissed after plaintiff filed this action.

### B. Legal Actions Directed at Other Nurses

Plaintiff has presented evidence concerning past legal actions taken by defendants against Filipino nurses. Defendants acknowledge that these actions occurred, but they dispute their responsibility. The events are recounted in detail in other judicial opinions, including one case—*Anilao v. Spota*, 774 F. Supp. 2d 457 (E.D.N.Y. 2011)—which is ongoing in this district. *See Matter of Vinluan v. Doyle*, 60 A.D.3d 237, 240 (2d Dep't 2009); *SentosaCare LLC v. Anilao*, Index No. 6079/2006 (Sup. Ct. Nassau Cty. May 20, 2010) (hereafter "*Anilao*, Order").

Briefly, in April 2006, ten nurses recruited by Sentosa Agency in the Philippines resigned from their jobs at nursing homes in New York. Following these resignations, an administrator at one of the nursing homes alerted the New York State Education Department ("Education Department") that the nurses had abandoned their patients by simultaneously resigning without adequate notice. After an investigation, the Education Department took no action against the nurses.

Subsequently, defendants Philipson and Landa met with the Suffolk County District Attorney on May 31, 2006. In March 2007, a Suffolk County grand jury indicted the ten nurses and their attorney for conspiracy to endanger the welfare of a child and endangering the welfare of a physically disabled person. The nurses and the attorney sought a writ of prohibition to stop the criminal proceeding. The Appellate Division, Second Department, granted the writ, declining to find that "this is such

an 'extreme case' that the State's interest in prosecuting the petitioners for misdemeanor offenses based upon the speculative possibility that the nurses' conduct could have harmed the pediatric patients at Avalon Gardens justifies abridging the nurses' Thirteenth Amendment rights by criminalizing their resignations from the service of their private employer." *Vinluan*, 60 A.D.3d at 249. The court further held that "the prosecution impermissibly violates [the attorney's] constitutionally protected rights of expression and association in violation of the First and Fourteenth Amendments." *Id.* at 250.

 **\*4** During the period from 2006 through 2008, defendants Sentosacare, Sentosa Agency, Prompt Nursing, Philipson, Rubenstein, Luyun, Golden Gate, and other nursing homes owned by defendants brought a series of civil suits against more than 30 Filipino nurses in attempts to enforce the liquidated damages provision. In one decision related to those lawsuits, the New York State Supreme Court, Nassau County, found that "the liquidated damages provision at issue is unenforceable as damages flowing from any proven breach by defendant Nurses will easily be ascertained at trial." *Anilao*, Order at 6.

Additional relevant undisputed facts not discussed here will be addressed in the discussion section below.

## II. Discussion

### A. Legal Standard

A party is entitled to summary judgment if "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). Only disputes relating to material facts—i.e., "facts that might affect the outcome of the suit under the governing law"—will properly preclude the entry of summary judgment. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). An issue of fact is "genuine" if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.*

The moving party bears the burden of demonstrating "the absence of a genuine issue of material fact." *Celotex*, 477 U.S. at 323. Once the moving party has asserted facts showing that the non-movant's claims cannot be sustained, the nonmoving party must "come forward with specific facts showing that there is a genuine issue for trial." *Matsushita Electric Ind. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (internal quotation marks omitted).

In determining whether to grant summary judgment, the court must "construe all evidence in the light most favorable to the nonmoving party, drawing all inferences and resolving all ambiguities in its favor." *Dickerson v. Napolitano*, 604 F.3d 732, 740 (2d Cir. 2010). However, the mere existence of a scintilla of evidence in support of the non-moving party's position will be insufficient; there must be evidence on which the jury could reasonably find for the non-moving party. *Anderson*, 477 U.S. at 252. Where, as here, both parties move for summary judgment, the court need not "grant judgment as a matter of law for one side or the other." *Schwabenbauer v. Bd. of Ed. of City Sch. Dist. of City of Olean*, 667 F.2d 305, 313 (2d Cir. 1981). "Rather, the court must evaluate each party's motion on its own merits, taking care in each instance to draw all reasonable inferences against the party whose motion is under consideration." *Id.*

### B. Plaintiffs' Breach of Contract Claim

Both sides move for summary judgment on plaintiffs' breach of contract claim against defendants Prompt Nursing, Rubenstein, Landa, and Philipson. The named plaintiff claims she was owed more than $29.00 per hour under the contract and that she was to be paid a base salary as opposed to an hourly wage. In order to recover for breach of contract, "a plaintiff must prove (a) the existence of a contract between plaintiff and defendant; (b) performance of the plaintiff's obligations under the contract; (c) breach of the contract by the defendant; and (d) damages to the plaintiff caused by the defendant's breach." *Javier v. Beck*, 2014 WL 3058456, at \*9 (S.D.N.Y. July 3, 2014).

"In a dispute over the meaning of a contract, the threshold question is whether the contract is ambiguous." *Lockheed Martin Corp. v. Retail Holdings, N. V.*, 639 F.3d 63, 69 (2d Cir. 2011). "Under New York law ... the question of whether a written contract is ambiguous is a question of law for the court." *JA Apparel Corp. v. Abboud*, 568 F.3d 390, 396 (2d Cir. 2009). "Ambiguity

203WL 6 151451©

is determined by looking within the four corners of the document, not to outside sources," *Kass v. Kass*, 91 N.Y.2d 554, 566 (1998), and if one party's interpretation of the contract would "strain[ ] the contract language beyond its reasonable and ordinary meaning," the court is not required to find the language ambiguous, *Hunt Ltd. v. Lifschultz Fast Freight, Inc.*, 889 F.2d 1274, 1277 (2d Cir. 1989) (citing *Bethlehem Steel Co. v. Turner Const. Co.*, 2 N.Y.2d 456, 459 (1957)).

 **5**  If the contract is not ambiguous, then its meaning is likewise a question of law for the court to decide. *JA Apparel Corp.*, 568 F.3d at 397. In interpreting an unambiguous contract, the "court is to consider its '[p]articular words' not in isolation 'but in the light of the obligation as a whole and the intention of the parties as manifested thereby,' but the court is not to consider any extrinsic evidence as to the parties' intentions...." *Id.* (citations omitted).

As stated above, the contract's relevant wage provision provides:

> As of the Commencement Date, Employee will be paid a base salary in accordance with the prevailing wage for the geographic area in which the employee is assigned to work, as determined by the National Prevailing Wage and Helpdesk Center (NPWC) of the United States Department of Labor.

Contract IV (1). "Commencement Date" is defined as the "date when Employee first starts to provide direct nursing care to residents/patients after completing the orientation and training as provided in Article IV." Contract III.

Neither party argues that the contract is ambiguous. Defendants urge me to find that the phrase "as determined by National Prevailing Wage and Helpdesk Center" refers to the prevailing wage determination provided to plaintiff in 2007. They also note that, under the contract, plaintiff was entitled to only $12.00 per hour for her first four weeks of employment and argue that the contract's inclusion of the phrase "[a]s of the Commencement Date" is meant only to indicate when this initial four-week period ends. Plaintiff argues that defendants' interpretation is contrary to the contract's plain language and that the contract requires that plaintiff be paid the prevailing wage as of the Commencement Date. In 2007, the hourly prevailing wage was $26.87. The parties agree that, when plaintiff began working for Prompt Nursing in 2015, the prevailing wage exceeded this amount.

The contract is unambiguous. I also find that defendants' interpretation is at odds with the contract's plain language and must be rejected. The phrase "prevailing wage" refers to the prevailing wage as of the Commencement Date. There is nothing in the text of the contract to suggest that the phrase "as determined by National Prevailing Wage and Helpdesk Center" is meant to refer to the prevailing wage determination that was made almost a decade prior to the Commencement Date. Even if one purpose for the inclusion of the phrase "[a]s of the Commencement Date" was to indicate when the initial four-week period ends, the meaning of the text is unchanged.

Defendants argue that the holding in *Rosales v. Hispanic Emp. Leasing Program, LLC*, 2008 U.S. Dist. LEXIS 96417, at *4–6, 2008 WL 5083507 (W.D. Mich. Nov. 26, 2008), must be treated "as part of the contract 'as though it were expressed or referred to therein.' " Defs.' Reply at 11. That decision, of course, is not binding on this court, and there is no sound basis for treating it as part of the contract. Moreover, the *Rosales* court was not addressing the issue presented here. In *Rosales*, the court held that the employer was obligated to pay the prevailing wage previously calculated by the government and not the prevailing wage in effect when the employees began working. There is no indication that the *Rosales* court was asked to interpret a contract that provides for payment of the prevailing wage as of the employee's Commencement Date.

Alternatively, defendants argue that I should reject plaintiff's interpretation because it undermines the protections given United States workers under 8 U.S.C. § 1182(a)(5)(A) and 20 C.F.R. § 656.21. But defendants have failed to convince me that an interpretation that requires defendants to pay their employees the prevailing wage "[a]s of the Commencement Date" undermines the policies underlying these provisions.

**\*6**  Defendants also make much of the letter affixed to plaintiff's contract, which states that she was to be paid $29.00 per hour; they argue that it should be treated as the "first page" of the contract. Whether multiple writings should be construed as one agreement depends on the intent of the parties. *See TVT Records v. Island Def Jam Music Grp.*, 412 F.3d 82, 89 (2d Cir. 2005). "Under New York law, 'all writings which form part of a single transaction and are designed to effectuate the same purpose [must] be read together, even though they were executed on different dates and were not all between the same parties.' " *Id.*

Here, the letter is plainly not part of the contract. According to Philipson, the letter was created for the purpose of confirming that a job was still available. Philipson Declaration, ¶ 9. Therefore, it did not share the "same purpose" as the contract. *TVT Records*, 412 F.3d at 89. The letter is from Landa to the U.S. Embassy in Manila, was signed by Landa a week prior to the contract's execution, and, unlike each of the 10 pages of the contract, was not signed by plaintiff. Although "the fact that the two documents at issue here were not executed at the same time or by the same parties is not dispositive, this fact does weigh against a conclusion that the documents were intended to be read together as a single contract." *In re Lehman Bros. Holdings Inc.*, 479 B.R. 268, 279 (S.D.N.Y. 2012), *aff'd*, 513 F. App'x 75 (2d Cir. 2013) (citations omitted). While it is typically a fact issue whether multiple writings should be construed as one agreement, the question is a matter of law if, as here, "the documents in question reflect no ambiguity as to whether they should be read as a single contract." *TVT Records*, 412 F.3d at 89.

Defendants contend that *Hallmark Synthetics Corp. v. Sumitomo Shoji New York, Inc.*, 26 A.D.2d 481, 484 (1st Dep't 1966), *aff'd*, 20 N.Y.2d 871 (1967), requires me to treat the letter as part of the contract because "letters and other instruments may be construed as part of a contract where they are referred to therein or annexed thereto." *Id.* However, that case held that "[t]he purpose of a written agreement must be ascertained from the instrument itself, if it is possible to do so...." *Id.* (internal quotation marks omitted). Here, I can do just that: the contract is straightforward, and defendants may not introduce parol evidence, such as the letter, to "*create* an ambiguity in the agreement" that is otherwise unambiguous. *W. W. W. Assocs., Inc. v. Giancontieri*, 77 N.Y.2d 157, 163 (1990) (emphasis in original).

Notably, the contract's integration clause provides that the contract "supersedes all previous employment contracts and *constitutes the entire agreement* between the parties," Contract VIII (7) (emphasis added), and Section VIII (3) states that any amendments are to be "in writing and executed in multiple copies." In sum, I decline to treat the letter as part of the contract.

I further reject defendants' argument that plaintiff ratified the contents of the April 15 letter through her subsequent conduct. In support of this argument, defendants rely on a wage acknowledgment form that plaintiff signed, which states that her hourly pay is $29.00 per hour, as well as plaintiff's deposition testimony, where she stated that she understood that the letter was an offer to be paid $29.00 per hour pursuant to the contract, and that the contract was for $29.00 when she signed it.

The cases that defendants rely on discuss whether a party has ratified the contract such that it may no longer assert claims for fraud and fraudulent inducement, *Sotheby's Fin. Servs., Inc. v. Baran*, 2003 WL 21756126, at \*5–6 (S.D.N.Y. July 29, 2003), *aff'd*, 107 F. App'x 235 (2d Cir. 2004), or that a deed was forged, *Cashel v. Cashel*, 94 A.D.3d 684, 686–687 (2d Dep't 2012), or that the principal did not authorize its agent to enter into the contract, *Cologne Life Reinsurance Co. v. Zurich Reinsurance (N. Am.), Inc.*, 286 A.D.2d 118, 126–129 (1st Dep't 2001). In other words, these cases focus on parties' attempts to be relieved from contractual obligations.

**\*7**  Here, plaintiff is not attempting to disavow or dispute the contract. Rather, relying on the contract's clear language, she asserts that the defendants breached by failing to pay her the prevailing wage and a base salary. Plaintiff should not be faulted for initially accepting defendants' representation that the $29.00 hourly rate was in fact the prevailing wage. Indeed, she testified that she learned the prevailing wage was higher than $29.00 per hour only after she came to New York and spoke to her colleagues, which was after she had signed the wage acknowledgment form.

Finally, defendants assert that plaintiff has provided no basis for her claim that she was to be paid a base salary as opposed to an hourly wage. To the contrary, plaintiff has provided a basis: the contract's clear language. As noted above, the contract states that, "[a]s of the Commencement Date, Employee will be paid a *base salary* in accordance with the prevailing wage for

Pagdilingan v. Prompt Nursing Employment Agency LLC, Not Reported in Fed. Supp....
203WL 6 151451©

the geographic area in which the employee is assigned to work...." Contract IV (1) (emphasis added). In light of the contract's unambiguous text, no further support is needed. Defendants also assert that plaintiff has failed to satisfy the damages element of her breach of contract claim and argue that she was actually overpaid. Plaintiff has submitted a summary pursuant to Federal Rule of Evidence 1006 depicting the difference between what each class member was paid and what each is owed if paid the prevailing wage as of their Commencement Date and a base salary. This document is sufficient to show that damages accrued, and, because plaintiff was owed a base salary, it is apparent that her damages exceed the amount by which defendants claim she was overpaid.

Based on these undisputed facts, I find that plaintiff has met the elements for her breach of contract claim. She has proven that a contract existed between her and defendant Prompt Nursing; that she performed under the contract; that Prompt Nursing breached the contract by failing to pay her the prevailing wage as of her Commencement Date and by failing to pay her a base salary; and that she was damaged. *See Javier*, 2014 WL 3058456, at *9.

As for the rest of the class, the provisions specifying the wage and defining "Commencement Date" are identical in each contract defendants produced at the class certification stage. Each contract references a base salary, and each was assigned to Prompt Nursing. It is undisputed that none of the class members was paid a base salary commensurate with the prevailing wage in effect as of his or her "Commencement Date." There is therefore no meaningful difference between the named plaintiff and the class as to each element of the breach of contract claim. Accordingly, class-wide liability has been established against Prompt Nursing for breach of contract.

### C. Plaintiffs' Application to Find the Liquidated Damages Provision Unenforceable

Plaintiffs request a declaratory judgment finding the liquidated damages provision unenforceable. They also request that defendants be enjoined from attempting or threatening to enforce the liquidated damages provision or the confessions of judgment.

The question of whether a liquidated damages provision is enforceable "is a question of law, giving due consideration to the nature of the contract and the circumstances." *HLT Existing Franchise Holding LLC v. Worcester Hosp. Grp., LLC*, 609 F. App'x 669, 672 (2d Cir. 2015) (internal quotation marks omitted). Such a provision is, in effect, an estimate "made by the parties at the time they enter into their agreement, of the extent of the injury that would be sustained as a result of breach of the agreement"; it will not be enforced if it is contrary to public policy, "and public policy is firmly set against the imposition of penalties or forfeitures for which there is no statutory authority." *Truck Rent-A-Ctr., Inc. v. Puritan Farms 2nd, Inc.*, 41 N.Y.2d 420, 424 (1977). Accordingly, "[a] provision that does not serve the purpose of reasonably measuring the anticipated harm, but is instead punitive in nature, serving as a mere 'added spur to performance,' will not be enforced." *Agerbrink v. Model Serv. LLC*, 196 F. Supp. 3d 412, 417 (S.D.N.Y. 2016) (quoting *Priebe & Sons v. United States*, 332 U.S. 407, 413 (1947)).

 **\*8** " ' 'New York courts will construe a purported liquidated damages provision strictly,' and 'where the damages flowing from a breach of a contract are easily ascertainable, or the damages fixed are plainly disproportionate to the contemplated injury, the stipulated sum will be treated as a penalty and disallowed.' " *Agerbrink*, 196 F. Supp. 3d at 417 (quoting *U.S. Fid. & Guar. Co. v. Braspetro Oil Servs. Co.*, 369 F.3d 34, 71 (2d Cir. 2004)). While the New York Court of Appeals has cautioned courts against interfering with liquidated damages provisions, if either of these factors is not satisfied, the provision will be deemed unenforceable. *Union Capital LLC v. Vape Holdings Inc.*, 2017 WL 1406278, at *7 (S.D.N.Y. Mar. 31, 2017). In doubtful cases, courts tend "to favor the construction which makes the sum payable for breach of contract a penalty rather than liquidated damages," and the party challenging the liquidated damages provision bears the burden of proving its unenforceability. *Rattigan v. Commodore Int'l Ltd.*, 739 F. Supp. 167, 169–170 (S.D.N.Y. 1990) (internal quotation marks omitted). Courts also often consider the sophistication of the parties, whether they were represented by counsel, and whether the contract was negotiated at arms length "in determining whether one side is not exacting an unconscionable penalty." *Id.* at 172 (internal quotation marks omitted).

203WL 6 151451©

Here, the liquidated damages provision is a penalty. The contract required plaintiff to submit a confession of judgment, for an amount of $25,000 if she quit in her first year, that would be held by defendants during her employment term, and could be filed in the event that plaintiff terminated her contract early. Contract VII (4). Considering that plaintiff's payroll records indicate that she typically made less than $700.00 per week after taxes, it would have taken her almost nine months to pay off the liquidated damages amount, assuming she had no other expenditures such as food or housing. This supports the conclusion that this provision is "intended to operate as a means to compel performance," ensuring that plaintiff and other nurses did not resign prior to the end of their contract terms. *Rattigan*, 739 F. Supp. at 169; *see Perthou v. Stewart*, 243 F. Supp. 655, 658 (D. Or. 1965). Indeed, even though it is immaterial that the parties may describe the provision as a penalty, *Truck Rent–A–Ctr.*, 41 N.Y.2d at 425, the confession of judgment provision goes much further and outright states that its purpose is to "secure Employee's performance of the Employment Term," Contract VII (4). Furthermore, although New York courts are hesitant to invalidate such provisions when they are negotiated at arms length, here I agree with the Nassau County Supreme Court's assessment that the parties were of "unequal bargaining power" and that the contract was "not achieved through arms length negotiation." *Anilao*, Order at 6. Plaintiff was not represented by counsel when she executed the contract, and there is no evidence she had any familiarity with American contract law. [5]

Turning to the question of ascertainability, I agree with the Nassau County Supreme Court's conclusion that the liquidated damages provision is unenforceable because defendants' damages were ascertainable. *See Anilao*, Order at 6. [6] The contract states that the liquidated damages provision was implemented to reimburse defendants for several types of costs:

> the Employer and/or its designee/assignee has or will incur substantial expenses and has or will expend enormous resources and time in recruiting the employee for employment as contemplated herein, sponsoring the Employee for an Immigrant Visa, training the Employee in practice and procedures, and orienting the Employee to living in the New York area.

Contract VII (4).

**\*9** Plaintiff signed a Declaration and Undertaking indicating that $3,685.50 in costs were incurred on her behalf for lawyer's fees, filing fees, visa fees, ICHP visa screening fees, miscellaneous expenses, and airfare. As demonstrated by this form, many of the costs listed in Section VII (4) of the contract were tracked, easy to determine, and could be ascertained at the time the contract was entered into. Upon arrival in New York, defendants gave plaintiff temporary housing for two months. The apartment's monthly rent was $1,500 per month, totaling $375 per nurse living there. Thus, the total cost of plaintiff's housing was $750—one could not reasonably argue that this was unascertainable. Finally, the contract permitted defendants to recoup "further orientation and 'hands on' training costs" [7] by initially only paying plaintiff $12 per hour for her first four weeks on the job, which invites the question why liquidated damages would be needed to account for training and orientation costs in the first place. Contract IV (2). In light of defendants' extensive experience in this business, it is simply not possible that any of these costs would be difficult or impossible to determine from one nursing contract to the next. *See, e.g.*, Philipson Deposition ("Dep.") at 9–10 (stating that he first went to the Philippines to recruit nurses around 2000 and has been there "many" times).

In order to demonstrate that the liquidated damages provision is proportional to their probable loss, defendants offer the expert testimony of Michael Kupka. Kupka is the Managing Director of the Forensic Accounting and Dispute Resolution Department of Mazars USA LLP's New York location. He has more than 17 years of experience in public and forensic accounting. He is a certified public accountant, accredited in business evaluation and financial forensics, a certified fraud examiner, and a certified valuation analyst. Kupka concludes that, as to the named plaintiff, Golden Gate's potential damages are up to $26,182 in recruiting costs and up to $114,114 in increased operating costs, and that Prompt Nursing's damages can be measured as either $26,182 in recruiting costs or $35,951 in lost profits. Kupka Report ("Rep.") at 13.

©

Case 1:23-cv-00418-MAC   Document 6-1   Filed 02/20/24   Page 285 of 394 PageID #:  331

Pagdrigan v. Prompt Nursing Employment Agency LLC, Not Reported in Fed. Supp....

203 WL 6 151451©

Rule 56(e) requires that affidavits submitted on summary judgment "set forth such facts as would be admissible in evidence." "Therefore 'it is appropriate for district courts to decide questions regarding the admissibility of evidence on summary judgment,' and the trial court need only consider admissible evidence in ruling on a summary judgment motion." *Cibbarelli v. Bombardier, Inc.*, 2004 WL 3090594, at *3 (E.D.N.Y. Sept. 3, 2004) (quoting *Raskin v. Wyatt Co.*, 125 F.3d 55, 66 (2d Cir. 1997)). The admissibility of expert testimony is governed by Rule 702 of the Federal Rules of Evidence, which provides:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if: (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue; (b) the testimony is based on sufficient facts or data; (c) the testimony is the product of reliable principles and methods; and (d) the expert has reliably applied the principles and methods to the facts of the case.

Fed. R. Evid. 702; *see Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 588 (1993). "[W]hen an expert opinion is based on data, a methodology, or studies that are simply inadequate to support the conclusions reached, *Daubert* and Rule 702 mandate the exclusion of that unreliable opinion testimony." *Amorgianos v. Nat'l R.R. Passenger Corp.*, 303 F.3d 256, 266 (2d Cir. 2002). An expert's assumptions "based on conclusory statements of the expert's client, rather than on the expert's independent evaluation are not reasonable." *Supply & Bldg. Co. v. Estee Lauder Int'l, Inc.*, 2001 WL 1602976, at *4 (S.D.N.Y. Dec. 14, 2001). Here, Kupka's opinion lacks a proper evidentiary basis and is therefore unreliable.

**\*10**  First, Kupka assumed that Golden Gate incurred direct recruiting costs, and used that as a basis for calculating Golden Gate's potential damages of $26,182. Kupka Rep. at 3; Kupka Dep. at 15. This assumption, however, is belied by Philipson's testimony that the nursing home does not pay anything towards the cost of recruiting. Defendants argue that Golden Gate, and Prompt Nursing, once it was assigned the contract, were responsible for paying recruitments costs that were expended by other entities. But when asked about the costs listed in the Declaration and Undertaking, Kupka admitted that he did not see any documents stating that "Golden Gate was responsible for any of" those expenses and that his basis for believing that Golden Gate paid for or was responsible for these costs "was communicated to [him] as part of the underlying facts of this case" by counsel. Kupka Dep. at 18–20. Similarly, Kupka stated that his assumption that Golden Gate was responsible for costs associated with sponsoring nurses' visa status was based on "discussions with the counsel" and "[a]n employment agreement that was signed by Golden Gate," but admitted that he has not "seen any evidence that Golden Gate actually paid any" of these costs. *Id.* at 21–23. Nor does the "Documents and Information Considered" page in Kupka's report reference any documents purporting to show that Golden Gate reimbursed other entities for recruitment costs. Kupka Rep., Attachment 3; *see Supply & Bldg. Co.*, 2001 WL 1602976, at *5 (excluding expert testimony when expert's opinion was based on client's assurances that were contradicted by other evidence).

Furthermore, Kupka reached the $26,182 recruiting costs figure by assuming that Prompt Nursing incurred a variety of costs related to recruitment in 2015, including but not limited to, $388,510 for office expenses, $105,225 for auto and travel expenses, and $97,352 for licenses and permits, for a total of $864,373. Kupka Dep. at 50–57. Kupka determined the average cost of recruiting a nurse in 2015 was $26,182 by rounding down the recruiting costs to $864,000, and then dividing by 33, the number of nurses that were recruited in that year. Kupka Rep. at 11. The figures Kupka relied on, however, were solely derived from a one-page summary that was provided by defendants' counsel that Kupka refers to as a "Profit and Loss Statement" for Prompt Nursing. [8]

Kupka, at his deposition, revealed that he knew little about the numbers listed in this one-page summary. Kupka did not know where the numbers came from, who created the document, when it was created, or why it was created. For the "general and administrative" expenses, Kupka did not know the specifics of what is included in each number listed (such as what is included in office expenses). Kupka Dep. at 50–89. Kupka did not know whether the summary was created in the ordinary course of business or whether it was created specifically for this lawsuit. *Id.* at 48. When asked whether a specific cost, such as

Case 1:23-cv-00418-MAC   Document 6-1   Filed 02/20/24   Page 286 of 394 PageID #:  332

Paguirigan v. Prompt Nursing Employment Agency LLC, Not Reported in Fed. Supp....

203 WL 6 151451©

"Maintenance" costs, constituted all of Prompt Nursing's "Maintenance" costs (as it seems), or just its "Maintenance" costs allocated to recruitment, Kupka either stated that he did not know, or that he assumed the cost was only related to recruitment because the document's header says recruitment costs and because that is what defendants' attorneys told him. *Id.* at 50–89. Other than defendant Rubenstein, Kupka never spoke with anyone at Prompt Nursing about its recruitment costs. *Id.* at 10.

Similarly, regarding Golden Gate's increased operating costs of up to $114,114, Kupka determined that number by assuming that Golden Gate would have to pay $52.20 per hour for a permanent replacement nurse from a third-party staffing agency for the remainder of plaintiff's contract term, or approximately 27 months. Kupka Report at 3; Kupka Dep. at 32, 36–37. The $52.20 figure is based solely on a redacted invoice provided to Kupka by defendants' counsel for a staffing agency nurse in 2015 addressed to Sentosacare. Kupka's assumption that "defendants could not simply replace one sponsored nurse from the Philippines with another" was based on his understanding of the facts of the case presented to him by counsel for defendants and "[his] understanding of the overall industry." Kupka Dep. at 28–32. When asked about the sources that informed his understanding of the industry, Kupka referenced only "articles I have read, just to familiarize myself with the overall state of the industry," and stated that he did not list these in his report because "[i]t's general information that I obtained with no specific documents that I could list as part of the research." *Id.*

 **\*11**  Like the recruiting cost summary, Kupka knew little about this invoice and the nurse referenced in it. For example, he did not know how many years of experience she had, whether she was assigned to work at Golden Gate, whether she worked on a temporary or permanent basis, whether she was a staff or supervising nurse, what shift she worked, and whether she was paid a shift differential. *Id.* at 37–40. He did not know why the invoice says Sentosacare on it or whether Sentosacare or Golden Gate paid the amount owed. *Id.* at 40. Kupka also did not know, and did not ask, who actually replaced plaintiff at Spring Creek when she resigned from Prompt Nursing, what Spring Creek did to find a replacement for her, how long it took Spring Creek and Prompt Nursing to find a replacement, whether Prompt Nursing ever found a replacement for her, whether she was replaced with a sponsored nurse, a nurse from an agency, or a nurse from Prompt Nursing. *Id.* at 33–36. Kupka never reviewed any Golden Gate documents. *Id.* at 16. Kupka never asked anyone from Golden Gate whether they would in fact need to find a permanent replacement for plaintiff from a staffing agency; his assumption that Golden Gate would face increased operating costs was based on his "discussions with the counsel." *Id.* at 11, 32.

Courts have excluded expert testimony when it is based "on the conclusory statements of [the expert's client], and not on his independent evaluation of the facts." *CIT Grp./Bus. Credit, Inc. v. Graco Fishing & Rental Tools, Inc.*, 815 F. Supp. 2d 673, 677 (S.D.N.Y. 2011) (quoting *Argus, Inc. v. Eastman Kodak Co.*, 612 F. Supp. 904, 926 (S.D.N.Y. 1985), *aff'd*, 801 F.2d 38 (2d Cir. 1986)). "[A]ny expert should be aware that a party and counsel in a litigation have an interest in the outcome and that an expert study should not be dependent on the information they supply." *Rowe Entm't, Inc. v. William Morris Agency, Inc.*, 2003 WL 22124991, at *3 (S.D.N.Y. Sept. 15, 2003). Moreover, "[a]n expert who simply repeats the hearsay of the client who retained him, without any independent investigation or analysis, does not assist the trier of fact in understanding matters that require specialized knowledge." *Arista Records LLC v. Usenet.com, Inc.*, 608 F. Supp. 2d 409, 429 (S.D.N.Y. 2009). Here, Kupka's failure to base his recruiting costs and increased operating costs analysis on his own "independent evaluation," but rather on a one-page summary, an invoice, untested and contradicted facts provided by defense counsel, and a discussion with one of the defendants in this action, makes his testimony unreliable and does not assist the trier of fact. *CIT Grp*, 815 F. Supp. 2d at 677 (quoting *Argus*, 612 F. Supp. at 926). Kupka's expert opinion is therefore inadmissible. [9]

For this reason, I decline to consider the damages provided in defendants' expert report in my assessment of the liquidated damages provision, which is present in each class member's contract. I also decline to consider defendants' declarations concerning these damages, all of one of which was submitted on reply, that essentially restate and comment upon the analysis provided in the Kupka report, and fail to provide a sufficient evidentiary basis for concluding what their costs were. Given that the record contains admissible evidence of only $4,435.50 [10] in damages, which plaintiff has demonstrated were ascertainable at the time of the contract, it is evident that the liquidated damages provision does not bear "a reasonable proportion to the probable loss" and is an unenforceable penalty. *Truck Rent-A-Ctr., Inc.*, 41 N.Y.2d at 425. Because each class member's contract contains the same liquidated damages provision, this conclusion applies across all contracts.

Case 1:23-cv-00418-MAC   Document 6-1   Filed 02/20/24   Page 287 of 394 PageID #:  333

Paguirigan v. Prompt Nursing Employment Agency LLC, Not Reported in Fed. Supp....

203 WL  6 151451©

**\*12**  Prompt Nursing's counterclaim for breach of contract against the named plaintiff is therefore limited to "actual damages proven." *JMD Holding Corp. v. Cong. Fin. Corp.*, 4 N.Y.3d 373, 380 (2005) (internal quotation marks omitted).

### D. Plaintiffs' Requested Declaratory and Injunctive Relief

In order to be entitled to a declaratory judgment, a plaintiff must demonstrate that there is "a substantial controversy, between the parties having adverse legal interests, of sufficient immediacy and reality to warrant the issuance of a declaratory judgment." *Niagara Mohawk Power Corp. v. Tonawanda Band of Seneca Indians*, 94 F.3d 747, 752 (2d Cir. 1996) (internal quotation marks omitted). Further, in deciding whether to entertain a declaratory judgment action, district courts should ask: "(1) whether the judgment will serve a useful purpose in clarifying or settling the legal issues involved; and (2) whether a judgment would finalize the controversy and offer relief from uncertainty." *Duane Reade, Inc. v. St. Paul Fire & Marine Ins.* Co., 411 F.3d 384, 389 (2d Cir. 2005). Here, there is a substantial controversy concerning whether plaintiff and the other class members may be sued under their contracts' liquidated damages provisions for resigning prior to the end of their contract terms. And a decision regarding plaintiffs' requested declaratory relief will serve the useful purpose of finalizing this aspect of the parties' dispute.

Having found the provision to be a penalty, I therefore grant plaintiffs' requested declaratory relief. The liquidated damages provision and confessions of judgment will be declared unenforceable, and defendants will be enjoined from attempting or threatening to enforce either.

### E. Piercing the Corporate Veil

Because defendants Rubenstein, Philipson, and Landa [11] were not signatories to the contract, plaintiffs seek to hold these individual defendants liable for breach of contract by piercing the corporate veil of Prompt Nursing. [12]  Under New York law, a non-signatory to the contract may be held liable for breach of contract where the plaintiff demonstrates "that the non-signatory was the 'alter ego' of one or more of the signatories to the contract." *Kaliner v. Mt. Vernon Monetary Mgmt. Corp.*, 2008 WL 4127767, at \*2 (S.D.N.Y. Sept. 3, 2008). In order to pierce the corporate veil, plaintiff must demonstrate "(i) that the owner exercised complete domination over the corporation with respect to the transaction at issue; and (ii) that such domination was used to commit a fraud or wrong that injured the party seeking to pierce the veil." *Thrift Drug, Inc. v. Universal Prescription Adm'rs*, 131 F.3d 95, 97 (2d Cir. 1997) (internal quotation marks omitted). In determining whether complete control exists, courts have considered the following factors, none of which is decisive:

> (1) disregard of corporate formalities; (2) inadequate capitalization; (3) intermingling of funds; (4) overlap in ownership, officers, directors, and personnel; (5) common office space, address and telephone numbers of corporate entities; (6) the degree of discretion shown by the allegedly dominated corporation; (7) whether the dealings between the entities are at arms length; (8) whether the corporations are treated as independent profit centers; (9) payment or guarantee of the corporation's debts by the dominating entity, and (10) intermingling of property between the entities.

**\*13**  *Freeman v. Complex Computing* Co., 119 F.3d 1044, 1053 (2d Cir. 1997).

Plaintiffs argue that Prompt Nursing is a corporate shell used by defendants to harm Filipino nurses, including by paying them less than what is owed under their contracts, using an unenforceable liquidated damages provision to secure their employment, and suing them for the liquidated damages amount. Prompt Nursing does business as Sentosa Services and the other non-individual defendants (other than the nursing homes Golden Gate and Spring Creek) all bear the same Sentosa name. Plaintiffs argue that this arrangement was created so that nurses would view the Sentosa companies as a single, integrated corporate enterprise. When the nurses want to pursue legal action against defendants, however, defendants insist that Prompt Nursing is

an entirely separate entity. Plaintiffs contend that this arrangement benefited defendants Rubenstein, Philipson, and Landa and nursing homes, such as Spring Creek and Golden Gate, owned by Philipson, Landa, or Philipson's wife.

The deposition testimony supports the conclusion that Prompt Nursing, which is owned by Rubenstein, did not adhere to corporate formalities and that dealings between Prompt Nursing and its nursing home clients were not conducted at arms length. Philipson travels to the Philippines to recruit nurses. When asked who pays for his trips to the Philippines to recruit nurses, Philipson stated that "[s]ometimes the nursing homes would pay for it, at times Prompt Nursing recruitment -- I don't recall, Prompt something, would have paid for it." Philipson Dep. at 14. He later clarified that initially the nursing homes paid for his trips, but once Prompt Nursing came into existence, only Prompt Nursing would. *Id.* When asked how Prompt Nursing would pay for his travel expenses, Philipson said that there was "no set specific way," and that he may be reimbursed by Prompt Nursing, or Prompt Nursing would pay his expenses in advance. *Id.* at 15.

Rubenstein testified that Prompt Nursing pays Sentosa Agency for all "expenses for the recruitment [of the nurse]" as part of the responsibilities it takes on when it assumes the nurse's contract. Rubenstein Dep. at 86. He also stated that Prompt Nursing reimburses Sentosa Agency for its personnel and office expenses. *Id.* at 89–90. Prompt Nursing pays Sentosa Agency by wire after it receives an invoice, but only sometimes keeps a record of the payment. *Id.* Similarly, Prompt Nursing's nursing home clients pay Prompt Nursing for its services, but there is no written agreement "on what those payments are." *Id.* at 91. Rather, the amount Prompt Nursing will charge is negotiated between Philipson and Rubenstein, and nothing is put in writing. *Id.* Rubenstein stated that Prompt Nursing does not engage in any nurse recruiting, but did not know why his email address appears on letters to the U.S. Embassy. *Id.* at 12, 92.

 **\*14**  Rubenstein testified that all of the nursing contracts produced by defendants in this action were assigned to Prompt Nursing. *Id.* at 27–83. He also testified that, for all but one of the contracts, [13] assignment negotiations occurred between him, negotiating on behalf of Prompt Nursing, and Philipson, negotiating on behalf of the nursing home. *Id.* at 27–83. Landa is also authorized to enter into a general agreement to assign nurse contracts to Prompt Nursing. Philipson Dep. at 16–17. When asked if there were any contracts with Filipino nurses that Golden Gate did not assign to Prompt Nursing, Philipson stated that "I would have to check my records," and "I wouldn't know. Sitting here, I would not be able to tell you." *Id.* at 18. No evidence has been presented that Prompt Nursing provides nurses to nursing homes other than those affiliated with defendants, or that the nursing homes affiliated with defendants assign contracts to staffing agencies other than Prompt Nursing.

When it receives a nurse's contract by assignment, Prompt Nursing never pays anything for the assignment. *Id.* at 18–19. There is never a written record of the assignment, and Philipson testified that he did not think there is ever a record of the date of the assignment. *Id.* at 19.

Rubenstein's deposition also indicates that he directed Prompt Nursing's wrongful conduct. Regarding the unenforceable penalty provision that Prompt Nursing used to secure nurses' employment, Rubenstein stated that he selected [14] the liquidated damages amounts himself based on "costs of business," stating that "I went over the numbers and it made sense," and "[i]t costs Prompt Nursing a lot of money to run the business, and based on my calculations, this is an estimated number that's what I feel is the damages." Rubenstein Dep. at 37–39. Rubenstein does not recall whether any nurses ever directly paid him the liquidated damages amount after resigning, and he does not know whether Prompt Nursing has records of any of those payments. *Id.* at 92–94. When asked how Prompt Nursing determined what to pay a particular nurse under her employment contract, Rubenstein stated that "we based" the wage on the prevailing wage determination that was issued in 2007, and that Prompt Nursing did not calculate what the appropriate prevailing wage was for the contract. *Id.* at 41–42. As for the lawsuits Prompt Nursing brought against the nurses who resigned in 2016, Rubenstein testified to the facts that he believes support Prompt Nursing's tortious interference claims: he discussed how the nurses were threatening to leave, and, "being in the business for a while," he could tell that "this was a coordinated effort" that was being instigated by the three nurses who resigned. *Id.* at 95–101.

Defendants have offered no evidence to rebut plaintiff's claim that Prompt Nursing's corporate veil should be pierced. They merely make a conclusory statement that each corporate defendant operates separately and maintains corporate formalities. Most

Paguirigan v. Prompt Nursing Employment Agency LLC, Not Reported in Fed. Supp....

203 WL 6 151451©

importantly, defendants have offered no explanation as to why the nurses' contracts were assigned, seemingly gratuitously, [15] to Prompt Nursing without any documentation or payment. *Freeman*, 119 F.3d at 1053 (listing corporations' failure to deal at arms length as a corporate control factor).

**\*15**  The critical question in any veil piercing analysis is "whether the corporation is a 'shell' being used by the individual shareowners to advance their own 'purely personal rather than corporate ends.' " *Wm. Passalacqua Builders, Inc. v. Resnick Developers S., Inc.*, 933 F.2d 131, 138 (2d Cir. 1991). Here, I am satisfied that Prompt Nursing is just that, a shell used to carry out defendants' scheme of paying nurses less than they are owed, using an unenforceable liquidated damages provision to secure the nurses employment, and suing those nurses who quit for the liquidated damages amount. By assigning the nurses' contracts to Prompt Nursing, defendants were able to carry out this scheme while simultaneously protecting themselves, and the other nursing homes affiliated with defendants, from liability arising from these activities.

While it is apparent that this scheme benefitted all defendants, I find that only Rubenstein, as the owner of Prompt Nursing, exercised sufficient control over the company to be held liable. As for Philipson and Landa—who assign and have the authority to assign nurse contracts to Prompt Nursing—it is apparent that they participated in this scheme. But they are unaffiliated with Prompt Nursing [16] and their dealings with Prompt Nursing were on behalf of other corporate entities. Plaintiffs have failed to prove that Philipson and Landa sufficiently dominated Prompt Nursing such that they may be held liable as "equitable owners" of the company. *Freeman*, 119 F.3d at 1051. Therefore, Prompt Nursing's veil may be pierced only to reach Rubenstein, the actual owner of the company.

Based on the undisputed facts, plaintiffs' summary judgment motion to pierce the corporate veil is granted as to Rubenstein but denied as to the other individual defendants. Defendants' summary judgment motion on the veil piercing issue is denied as to Rubenstein but granted as to Philipson and Landa. In light of my finding class-wide liability on the breach of contract claim, both Prompt Nursing and Rubenstein are liable for breach of contract damages owed to the class.

### F. TVPA Claims

Both sides move for summary judgment on plaintiffs' claims brought under 18 U.S.C. §§ 1589 *et seq.*

#### 1. 18 U.S.C. § 1589(a)

TVPA § 1589 prohibits obtaining the labor or services of a person by using:

(1) "force, threats of force, physical restraint, or threats of physical restraint," (2) "serious harm or threats of serious harm," (3) "the abuse or threatened abuse of law or legal process," or (4) "any scheme, plan, or pattern intended to cause the person to believe that, if that person did not perform such labor or services, that person would suffer serious harm or physical restraint."

18 U.S.C. § 1589(a). Congress enacted § 1589 in response to the Supreme Court's holding in *United States v. Kozminski*, 487 U.S. 931 (1988), which limited the definition of involuntary servitude to "physical" or "legal" coercion. *United States v. Dann*, 652 F.3d 1160, 1169 (9th Cir. 2011) (quoting *Kozminski*, 487 U.S. at 952). Through § 1589, Congress "intended to provide federal prosecutors with the tools to combat severe forms of worker exploitation" and to address situations in which "traffickers threaten harm to third persons without their victims without physical violence," all while taking into account "the individual circumstances of [the] victim[ ] ... including [ ] age and background." *Paguirigan*, 286 F. Supp. 3d at 438–439 (quoting H.R. Conf. Rep. No. 106–939, at 101) (internal quotation marks omitted).

Here, plaintiffs contend that defendants violated § 1589(a) in two ways. First, plaintiffs argue that defendants' conduct constituted a threat of "serious harm" under § 1589(a)(2). TVPA § 1589(c)(2), which defines serious harm broadly and includes financial harm as a means by which someone can be threatened under the TVPA, states:

Paguirigan v. Prompt Nursing Employment Agency LLC, Not Reported in Fed. Supp....
203 WL 6 151451©

*16  any harm, whether physical or nonphysical, including psychological, financial, or reputational harm, that is sufficiently serious, under all the surrounding circumstances, to compel a reasonable person of the same background and in the same circumstances to perform or to continue performing labor or services in order to avoid incurring that harm.

Thus, the relevant question under § 1589(a)(2) is whether defendants' conduct constituted a threat of harm serious enough to "compel a reasonable person of the same background and in the same circumstances to perform or to continue performing labor or services in order to avoid incurring that harm." As articulated by the Second Circuit in *United States v. Rivera*, 799 F.3d 180 (2d Cir. 2015), this standard is a hybrid one. The factfinder is permitted to consider the "particular vulnerabilities of a person in the victim's position," but is required to find that "her acquiescence be objectively reasonable under the circumstances." *Id.* at 186–187; *see Hongxia Wang v. Enlander*, 2018 WL 1276854, at *5 (S.D.N.Y. Mar. 6, 2018). In the class action context, "the inquiry will not look at how each Plaintiff perceived the Defendants' actions or whether he or she subjectively felt compelled to work. Instead, the inquiry will look at the Defendants' actions and assess how a reasonable person from the Plaintiffs' background would respond to those actions." *Tanedo v. E. Baton Rouge Par. Sch. Bd.*, 2011 WL 7095434, at *8 (C.D. Cal. Dec. 12, 2011).

Second, plaintiff argues that defendants' actions constituted "abuse or threatened abuse of law or legal process" under § 1589(a)(3). That phrase is further defined as "the use or threatened use of a law or legal process, whether administrative, civil, or criminal, in any manner or for any purpose for which the law was not designed, in order to exert pressure on another person to cause that person to take some action or refrain from taking some action." § 1589(c)(1).

Plaintiff relies on the following actions by defendants to support her claims under TVPA §§ 1589(a)(2) and (a)(3): The inclusion of a $25,000 liquidated damages provision in each contract; defendants' filing of lawsuits to enforce the $25,000 liquidated damages provision against nurses who resigned, including lawsuits in 2016 that included claims for $250,000 in tortious interference with contract and business relations damages, despite the liquidated damages provision having been found unenforceable by the Nassau County Supreme Court in 2010; the filing of a professional disciplinary complaint against 10 nurses who resigned in 2006 that resulted in no action against the nurses; Philipson and Landa's meeting with the Suffolk County District Attorney, followed by the prosecution of those same 10 nurses and their attorney. Defendants make multiple arguments as to why the TVPA's prohibitions are inapposite here. Each will be discussed in turn.

Defendants first correctly note that plaintiff, as well as several other nurses, testified that they were never verbally threatened by defendants. Paguirigan Dep. at 26–31, 404; Valdez Dep. at 83, 104–105; Bane Dep. at 61–62, 99; Padernal Dep. at 74. That fact alone, however, is insufficient to avoid TVPA liability, as the statute applies to subtle, nonviolent threats that may still effectively compel an individual to keep working. *See Dann*, 652 F.3d at 1169.

*17  Second, defendants argue that, because the liquidated damages provision is not a penalty, their efforts to enforce the provision constituted a valid exercise of their contractual rights, and therefore cannot give rise to liability under the TVPA. In support, defendants rely on *Panwar v. Access Therapies*, Inc., 2015 U.S. Dist. LEXIS 38117, at *8–15, 2015 WL 1396599 (S.D. Ind. Mar. 25, 2015), which found that defendants' efforts to enforce a liquidated damages provision that was valid under Indiana law did not give rise to TVPA liability. Since I have already found the provision to be unenforceable as a penalty under New York law, this argument fails.

In a similar vein, defendants argue that plaintiff is essentially claiming that her labor was obtained through economic duress, and they make several arguments as to why economic duress is not applicable in this context. But plaintiff is not arguing that she was subjected to economic duress. Economic duress is typically used to void a contract on the ground that "the complaining party was compelled to agree to its terms by means of a wrongful threat which precluded the exercise of its free will." *Stewart*

*M. Muller Constr. Co. v. New York Tel. Co.*, 40 N.Y.2d 955, 956 (1976). Here, plaintiff is not seeking to void or disavow the contract. Economic duress is simply not in issue.

Defendants' reference to 20 C.F.R. § 655.731(c)(10)(i)(B), which states that "the employer is permitted to receive bona fide liquidated damages from the H–1B nonimmigrant who ceases employment with the employer prior to an agreed date," is similarly misplaced. First, the visas at issue in this lawsuit are not H-1B visas, but EB-3 visas. Second, of course, there is no prohibition against defendants placing a valid liquidated damages provision in their contracts. The provision at issue here, however, is a penalty under New York law, and 20 C.F.R. § 655.731(c)(10)(i)(A) explicitly provides that the "employer is not permitted to require (directly or indirectly) that the nonimmigrant pay a penalty for ceasing employment with the employer prior to an agreed date."

Defendants also make much of the named plaintiff's and other class members' deposition testimony, and argue that it supports their argument that the liquidated damages provision did not amount to a "threat of serious harm." For example, class member Padernal testified that she entered into the contract with the intent to work only for the first two years of her contract because the remaining payment of $8,000 was "affordable to [her]," Padernal Dep. 58, and Paguirigan testified that she entered into the contract knowing she would have to pay a penalty if she terminated her contract early, Paguirigan Dep. at 166–167. Padernal also stated that she viewed working for Sentosa as a stepping-stone; class member Bane stated that his ultimate goal was to come to America. Padernal Dep. at 94–95; Bane Dep. at 32.

Defendants misapprehend the serious harm requirement. As noted above, the serious harm requirement asks whether a reasonable person "of the same background and in the same circumstances" would "perform or ... continue performing labor or services in order to avoid incurring that harm." One nurse's testimony that she could afford $8,000 by no means establishes how a reasonable person would respond to the $25,000 penalty during the first year of work. Section 1589 was designed to combat "severe forms of worker exploitation" that do not amount to actual involuntary servitude. *Paguirigan*, 286 F. Supp. 3d at 437. An employee's prior awareness of the harm does not make a defendant's actions, if indeed in violation of the TVPA, any less exploitative. Nor does a nurse's desire to come to the United States, or that he or she viewed the job as a stepping stone, give an employer license to subject him or her to unlawful work conditions in violation of the TVPA. [17]

**\*18** Moreover, defendants' references to the record omit several notable statements by plaintiff. Plaintiff stated during her deposition that the liquidated damages provision "is the reason why we were not able to leave or we are scared. We have that fear because we don't have that ability to pay the $25,000." Paguirigan Dep. at 354. She also stated that she quit because she was working "in the unsafe environment" due to understaffing, but that she felt she was putting "my professional license at stake ... if I continue working," and because of fear she felt from being "trapped because I'm thinking about the contract which says that there's the provision of the $25,000 to be paid or I will be penalized with the $25,000 if I just leave." Paguirigan Dep. at 26–30.

Finally, defendants contend that plaintiff has not provided evidence of damages resulting specifically from the TVPA violations, so her TVPA claims must be dismissed. TVPA § 1595(a) provides that "an individual who is a victim of a violation of this chapter may bring a civil action against the perpetrator ... and may recover damages and reasonable attorneys fees." The statute has been interpreted to provide both compensatory damages, including compensation for emotional distress, and punitive damages. *See Ditullio v. Boehm*, 662 F.3d 1091, 1096–1098 (9th Cir. 2011); *Lagasan v. Al-Ghasel*, 92 F. Supp. 3d 445, 457–458 (E.D. Va. 2015). Defendants offer no persuasive authority that a finding of TVPA liability requires a finding of damages. In any event, the record here sufficiently supports the existence of damages under the TVPA, and this argument therefore fails.

Having reviewed the record and considered the parties' arguments, I find on the undisputed facts that defendant Prompt Nursing violated TVPA § 1589(a)(2). [18] The nurses in this lawsuit were all recent arrivals from the Philippines. They were not paid the prevailing wage and a base salary, despite the terms of their contracts. Three of the nurses who were deposed complained of being overworked or that the nursing home was understaffed, and the fourth stated that he was unjustifiably suspended. Padernal Dep. at 51; Bane Dep. at 60–61; Paguirigan Dep. at 29; Valdez Dep. at 83. Paguirigan testified that "[w]e were just ... fed the good side, but they never told us that you're going to work 16-hour shift, with less staff...." Paguirigan Dep. at 146.

Case 1:23-cv-00418-MAC   Document 6-1   Filed 02/20/24   Page 292 of 394 PageID #:  338

Pagdilngan v. Prompt Nursing Employment Agency LLC, Not Reported in Fed. Supp....

203 WL 6 151451©

Critically, if she or any nurse wanted to stop working for defendants during the first year of the contract, he or she would have had to pay the employer $25,000 pursuant to the liquidated damages provision. This provision constitutes a threat of sufficiently serious financial harm "to compel a reasonable person of the same background and in the same circumstances to perform or to continue performing labor or services in order to avoid incurring that harm." TVPA § 1589(c)(2). Indeed, the confession of judgment requirement, which is part of the liquidated damages provision, explicitly states that it is meant to "[s]ecure Employee's performance of the Employment Term." Contract VII (4). I also note that the $25,000 figure is larger than any sum threatened in the TVPA cases referenced by the parties. *See Dann*, 652 F.3d 1160 at 1171 (threat of $8,000 payment); *Javier*, 2014 WL 3058456, at *6 (threatened enforcement of $15,000 confession of judgment); *Nunag–Tanedo*, 790 F.Supp.2d 1134, 1144 (C.D. Cal. 2011) (threatened payment of $10,000); *Macolor v. Libiran*, 2016 WL 1488121, at *4 (S.D.N.Y. Mar. 25, 2016), *report and recommendation adopted*, 2016 WL 1453039 (S.D.N.Y. Apr. 13, 2016) ($20,000 liquidated damages provision that applied if plaintiff stopped working). In reaching my conclusion, I have considered the "particular vulnerabilities" of plaintiff and other class members—all of them recent immigrants to the United States—and have also focused on whether it would be objectively reasonable for them to continue working under the circumstances. *Rivera*, 799 F.3d at 186–187.

 **\*19**   Regarding TVPA § 1589(a)'s scienter requirement, the statute contains an express scienter requirement, ("[w]hoever knowingly provides or obtains the labor or services of a person...."), and one of its subsections, TVPA § 1589(a)(4), contains a second scienter requirement ("by means of any scheme, plan, or pattern *intended* to cause the person to believe that, if that person did not perform such labor or services, that person or another person would suffer serious harm or physical restraint...."). 18 U.S.C. § 1589(a)(4) (emphasis added); *United States v. Calimlim*, 538 F.3d 706, 710–711 (7th Cir. 2008). As stated in *Muchira v. Al–Rawaf*,

> There must be evidence from which the jury could find that the employer intended to cause the victim to believe that she would suffer serious harm—from the vantage point of the victim—if she did not continue to work. The linchpin of the serious harm analysis under § 1589 is not just that serious harm was threatened but that the employer intended the victim to believe that such harm would befall her if she left her employment.

850 F.3d 605, 618 (4th Cir. 2017) (internal quotation marks and citations omitted). Here, the contract, of which Prompt Nursing was the assignee, explicitly states that the confession of judgment provision was meant "to secure Employee's performance of the Employment Term." Prompt Nursing also attempted to enforce the liquidated damages provision against plaintiff and two other nurses in 2016—in addition to suing for $250,000 in tortious interference damages—even though the liquidated damages provision had been found unenforceable in 2010 by the Nassau County Supreme Court. On these undisputed facts, it is apparent that Prompt Nursing acted with knowledge and intent that the liquidated damages provision would effectively coerce nurses into continuing to work.

### 2. 18 U.S.C. § 1589(b)

Having found that Prompt Nursing violated TVPA § 1589(a), I also find on the undisputed facts that the remaining defendants are liable under TVPA § 1589(b). Section 1589(b) provides that "[w]hoever knowingly benefits, financially or by receiving anything of value, from participation in a venture which has engaged in the providing or obtaining of labor or services by any of the means described in subsection [1589](a), knowing or in reckless disregard of the fact that the venture has engaged in the providing or obtaining of labor or services by any of such means, shall be punished as provided in subsection (d)." As discussed above, Rubenstein is the owner of Prompt Nursing; Luyun is the sole proprietor of Sentosa Agency; Landa and Philipson co-own Sentosacare; Landa is an owner of Spring Creek and Golden Gate; and Philipson or his wife is an owner of Spring Creek. [19] Therefore, each defendant played a role in this commercial enterprise, the purpose of which is to recruit Filipino nurses to the

Case 1:23-cv-00418-MAC   Document 6-1   Filed 02/20/24   Page 293 of 394 PageID #:  339

Pagdilgan v. Prompt Nursing Employment Agency LLC, Not Reported in Fed. Supp....

203 WL  6 151451©

United States to work at nursing homes affiliated with defendants. Thus, each defendant "knowingly benefit[ed]" financially from labor obtained in violation of TVPA § 1589(a).

Moreover, each defendant acted with "know[ledge] or in reckless disregard of the fact that the venture ... engaged in the providing or obtaining of labor or services" through means prohibited by TVPA § 1589(a)—in this case, through the contracts' liquidated damages provisions. Indeed, defendants Philipson, Luyun, and Rubenstein all testified regarding their direct knowledge of the provision, and Landa signed the contract itself. Philipson Dep. at 43–44; Luyun Dep. at 55–60; Rubenstein Dep. at 36–40; Hahn Dec. Exh. H. The standard Golden Gate contract and the standard Spring Creek contract both contain the liquidated damages provision—as do all the contracts defendants produced. Thus, Golden Gate and Spring Creek knew of the provision.

 **20**  As for Sentosa Agency, Luyun is the sole proprietor of Sentosa Agency, and the latter therefore has "no separate existence, but rather exists as the so-called 'alter ego' of the owner." *United Parcel Serv. of Am., Inc. v. Net, Inc.*, 225 F.R.D. 416, 421 (E.D.N.Y. 2005). As for Sentosacare, Landa and Philipson are the owners of the company, with each retaining a 50 percent ownership share. Philipson Dep. at 6–7. "As a general matter, knowledge that an agent acquires in the scope of his agency is imputed to the principal, meaning that the latter is bound by that information even if he never actually received it." *J.J J. Properties Inc. v. Travelers Indem. Co.*, 2008 WL 2735865, at *3 (S.D.N.Y. July 7, 2008).[20] Because there is no evidence that Landa or Philipson acted outside the scope of his agency, their knowledge as Sentosacare's sole owners may therefore be imputed to the company itself. *See also Baker v. Latham Sparrowbush Assocs.*, 72 F.3d 246, 255 (2d Cir. 1995) ("The knowledge of a director, officer, sole shareholder or controlling person of a corporation is imputable to that corporation.") (internal quotation marks omitted). In any event, both Sentosa Agency and Sentosacare operated with at least "reckless disregard" of the liquidated damages provision in light of their involvement in bringing nurses to the United States. 18 U.S.C. § 1589(b).

### 3. 18 U.S.C. § 1590(a)

TVPA § 1590(a) extends liability to "any person who knowingly recruits, harbors, transports, provides, or obtains by any means, any person for labor or services in violation of this chapter...." Defendants Luyun, Philipson, and Sentosa Agency "knowingly recruit[ed]" nurses to work in nursing homes; defendants Prompt Nursing, Sentosacare, Rubenstein, and Landa knowingly "provid[ed]" nurses to work in nursing homes[21]; and defendants Spring Creek and Golden Gate knowingly "obtain[ed]" nurses. Thus, each defendant knowingly recruited, provided, or obtained persons "for labor or services in violation of this chapter." 18 U.S.C. § 1590(a). The same undisputed facts regarding each defendant's role in this enterprise therefore support their liability under TVPA § 1590(a).

### 4. 18 U.S.C. § 1594(b)

Defendants have also violated TVPA § 1594(b), the conspiracy provision, which extends liability to whoever conspires with another to violate, *inter alia*, TVPA §§ 1589 and 1590.[22] For there to be a conspiracy, there must be an agreement to violate the prohibition on forced labor. *Stein v. World-Wide Plumbing Supply Inc.*, 71 F. Supp. 3d 320, 330 (E.D.N.Y. 2014). There need not be proof of an explicit agreement, but the "evidence must be sufficient to permit the jury to infer that the defendant and other alleged coconspirators entered into a joint enterprise with consciousness of its general nature and extent." *United States v. Svoboda*, 347 F.3d 471, 477 (2d Cir. 2003) (internal quotation marks omitted). As detailed above, on the undisputed facts, defendants "entered into a joint enterprise" for purposes of bringing nurses to the United States to work at nursing homes, including at defendants Spring Creek and Golden Gate, and violated TVPA §§ 1589 and 1590 in doing so. *Id.* Defendants acted with "consciousness of [the conspiracy's] general nature and extent," as each defendant was aware of the liquidated damages provision. *Id.* Thus, each defendant is liable under TVPA § 1594(b).

WESTLAW   T 202homsn Rseu tr.tNRl saigu l .s sNlegi Govck s7t Nen te. L sNRc

APP. 289   34

Paduriran v. Prompt Nursing Employment Agency LLC, Not Reported in Fed. Supp....

203 WL 6 151451©

## G. Damages and Attorneys' Fees Under TVPA § 1595(a)

*21  TVPA § 1595(a) provides that "[a]n individual who is a victim of a violation of this chapter may bring a civil action ... in an appropriate district court of the United States and may recover damages and reasonable attorneys fees." Because the liquidated damages provision is in each contract, plaintiff has established class-wide liability under the TVPA against all defendants. And having found that the plaintiff and the rest of the class are entitled to damages under the TVPA, I also find that they are entitled to reasonable attorneys' fees. Class counsel may file a motion for fees at the conclusion of the case. Damages under the TVPA will be determined at a later time.

## H. Prompt Nursing's Breach of Contract Counterclaim Against the Named Plaintiff

The only remaining claim is Prompt Nursing's counterclaim against the named plaintiff for breach of her employment contract and attorneys' fees under the contract, which as discussed above, is limited to "actual damages proven." *JMD Holding Corp.*, 4 N.Y.3d at 380. Resolution of this claim also will be determined at a later time.

## III. Conclusion

For the reasons set forth above, the Clerk of Court is directed to enter partial summary judgment as follows:

1. Defendants' summary judgment motion regarding plaintiff's breach of contract claim is granted as to Landa and Philipson. Except for Prompt Nursing's counterclaim for breach of contract against the named plaintiff, which remains undecided, the rest of defendants' summary judgment motion is denied.

2. Plaintiffs' summary judgment motion as to liability on the breach of contract claim is granted against Prompt Nursing and Rubenstein. Damages to the plaintiff and the class caused by defendants' breach of contract are to be determined at a later time.

3. Plaintiffs' requested declaratory and injunctive relief is granted. The Clerk of Court is directed to enter judgment declaring the liquidated damages provision in all plaintiffs' contracts, and the confessions of judgment, to be unenforceable and to enter an injunction permanently enjoining defendants from attempting or threatening to enforce either.

4. Plaintiffs' summary judgment motion as to liability on the TVPA claims is granted against all defendants. Damages to the plaintiff and the class under the TVPA are to be determined. The class is also entitled to reasonable attorneys' fees, which are to be determined at a later date.

5. The parties are directed to appear for a status conference on November 4, 2019, at 2:00 PM to address how damages are to be determined and to address Prompt Nursing's counterclaim for breach of contract as to the named plaintiff. The parties are further directed to promptly meet and confer on these issues and attempt to present a joint plan to the court. By October 17, 2019 the parties should submit written proposals to the court.

**SO ORDERED.**

**All Citations**

Not Reported in Fed. Supp., 2019 WL 4647648

**Footnotes**

Case 1:23-cv-00418-MAC   Document 6-1   Filed 02/20/24   Page 295 of 394 PageID #:  341

Paguirigan v. Prompt Nursing Employment Agency LLC, Not Reported in Fed. Supp....

203 WL  6 151451©

1    Landa owns approximately 55 percent of Golden Gate. Philipson's wife also has an ownership interest in Golden Gate of approximately 25 percent.

2    This appears to have been a standard practice for defendants. Each of the contracts produced at the class certification stage has a letter attached to it. Like plaintiff's contract, each page of the contract is signed by the employee, but none of the attached letters is signed by the employee.

3    Under Article VI (2)(i) and (ii), the employer may terminate the agreement under the following conditions:

> i. Employee willfully or intentionally undertakes or commits any conduct that is harmful to Employer's practice or reputation;

> ii. Breach of any term or condition of this Agreement as determined by Employer and/or its designee/assignee, which shall include, but not be limited to, Employee's failure or refusal to comply with the reasonable directions, policies, standards and regulations that Employer and/or its designee/assignee may establish from time to time.

4    Landa owns approximately 48 percent of Spring Creek, and Philipson, or his wife, owns approximately 38 percent.

5    Other class members who were deposed indicated they were not represented by counsel when they signed their contracts or did not show the contract to a lawyer before signing.

6    Defendants argue that the *Anilao* decision does not have res judicata effect because the case settled before trial, and in the same decision, the court denied the nurses' motion for summary judgment. Plaintiff has not argued that the decision constitutes res judicata, and I do not rely on it as such.

7    Although the contract refers to "further" orientation and training, there is no evidence, and defendants do not argue, that any training or orientation occurred prior to the nurse beginning work in the United States. As with each provision discussed above, the provision concerning "further" orientation and training is in each contract, but several contracts specify that the applicable minimum wage would be paid as opposed to $12.00 per hour.

8    Kupka, however, admitted that this document does not show income or losses and that it could be argued that Profit and Loss Statement is "not the best description of this document." Kupka Dep. at 47–49.

9    In addition, the section of Kupka's report concerning lost profits is irrelevant. "Lost profits are consequential damages when, as a result of the breach, the non-breaching party suffers loss of profits on collateral business arrangements." *Tractebel Energy Mktg., Inc. v. AEP Power Mktg., Inc.*, 487 F.3d 89, 109 (2d Cir. 2007). Here, Kupka's analysis is based on Prompt Nursing's losses in relation to its nursing home clients, and is therefore properly categorized as consequential damages that "must have been brought within the contemplation of the parties as the probable result of a breach at the time of or prior to contracting." *Kenford Co. v. Cty. of Erie*, 73 N.Y.2d 312, 319 (1989). There is no evidence that any nurse contemplated, or should have contemplated lost profit damages at the time the contracts were executed. *Id.; see also Valentine Dolls, Inc. v. McMillan*, 25 Misc. 2d 551 (Sup. Ct. Kings Cty. 1960) (holding that lost profits are not recoverable in a breach of contract action against an employee). Therefore, even if Kupka's testimony were admissible, I would still not consider his lost profits analysis.

10    This figure is comprised of the amounts listed in the Declaration and Undertaking together with plaintiff's rent.

11    Landa signed the contract as a representative of Golden Gate, and not in his personal capacity.

12    LLC veil-piercing is permitted under New York law. *Retropolis, Inc. v. 14th St. Dev. LLC*, 17 A.D.3d 209, 210 (N.Y. 2005).

13   As to this one contract, which was between nurse Robin Ancheta and Immediate Home Care, Rubenstein could not recall who negotiated on behalf of the nursing home. At the time this contract was assigned, Rubenstein was a managing partner of Immediate Home Care. Rubenstein Dep. at 56–57.

14   Philipson testified that he was also involved in calculating the liquidated damages amounts. Philipson Dep. at 43–44.

15   Defendants argue that there was consideration for these assignments because Prompt Nursing assumed all liabilities and responsibilities under the contract. Defs.' Mot. at 7. This does not explain the purpose of this arrangement and why its existence was never documented.

16   No evidence has been presented indicating that either Philipson or Landa have an ownership interest in Prompt Nursing.

17   Defendants also point out that several nurses were aware of the "2007 incident," presumably referring to the administrative complaint, the attempted prosecution, or the civil suits for breach of contract defendants filed against the nurses, through news reports in the Philippines, yet entered into their contracts anyway. Defs.' Mot. at 12. This argument fails for the same reasons as the others addressed above.

18   Having found liability under § 1589(a)(2), I do not reach whether any defendant violated § 1589(a)(3).

19   For several of the nursing homes that Philipson was asked about in his deposition, he could not recall whether he or his wife has an ownership interest. Philipson Dep. at 9, 37.

20   This general rule does not apply when the agent has "totally abandoned" the interests of the principal, an exception that is inapplicable here. *In re Mediators, Inc.*, 105 F.3d 822, 827 (2d Cir. 1997).

21   Prompt Nursing is a staffing agency that "provides" nursing homes with nurses. Landa is involved in the visa application process—he provided the letter addressed to the embassy for plaintiff's visa—and thus he also "provides" nursing homes with nurses. Sentosacare paid the costs listed on the Declaration and Undertaking that plaintiff signed, and thus it is also involved in "provid[ing]" nursing homes with nurses. Rubenstein, in addition to being the owner of Prompt Nursing, testified to his personal involvement in Prompt Nursing's business, as described earlier. He is therefore also involved in "provid[ing]" nursing homes with nurses.

22   Having found that defendants violated §§ 1589 and 1590, there is no need to consider whether they are liable for attempt under § 1594(a).

---

**End of Document**                                    © 2023 Thomson Reuters. No claim to original U.S. Government Works.

# EXHIBIT 25

498 P.3d 1290 (Table)
Unpublished Disposition
This is an unpublished disposition. See Nevada Rules of Appellate Procedure, Rule 36(c) before citing.
Court of Appeals of Nevada.

David Lee PHILLIPS, an Individual; and Arthur Icke, an Individual, Appellants,

v.

VALLEY VIEW SURGICAL, LLC, a Nevada Limited Liability Company, Respondent.
David Lee Phillips, an Individual; and Arthur Icke, an Individual, Appellants,

v.

Valley View Surgical, LLC, a Nevada Limited Liability Company, Respondent.

No. 81592-COA, No. 81793-COA
|
FILED NOVEMBER 17, 2021

David Lee Phillips and Arthur Icke appeal from the district court's findings of facts and conclusions of law following a bench trial and a later order awarding plaintiff attorney fees. Eighth Judicial District Court, Clark County; Richard Scotti, Judge.

**Attorneys and Law Firms**

Christopherson Law Offices

Royal & Miles, LLP

*ORDER OF AFFIRMANCE*

**\*1** Icke suffered a shoulder injury in a 2015 car accident, and he maintained a personal injury action to recover damage from the accident.[1] He retained co-appellant Phillips as his personal injury attorney. Concerned that Icke's insurance would not cover the surgery, Phillips and Icke entertained alternative funding options. Specifically, Phillips and Icke contacted Valley View Surgical, LLC, about funding Icke's shoulder surgery.

Valley View does not perform surgeries; it is a medical financing company. In some cases, Valley View pays for a patient's operation upfront so long as the patient signs a lien giving Valley View an interest in the patient's subsequent personal injury proceeds. Before entering these arrangements, Valley View investigates the patient's claim to evaluate the risk involved with paying for the surgery upfront. Relatedly, Valley View only provides this service if the injured party has retained counsel. Valley View then gives the patient and his attorney a rough estimate of the final cost before proceeding to fund the surgery.

After the medical services are performed, the medical providers issue an itemized accounting to Valley View, and Valley View issues a comprehensive invoice to the patient. Valley View has a relationship with the medical providers, so the rates billed to Valley View by the medical providers are sometimes less than the amount billed to standard consumers. Nevertheless, to make its profit, the amount in this invoice is greater than the total amount billed to Valley View by the medical providers. The formula used to calculate this mark-up is proprietary, so the forms supporting the agreement are vague with respect to how Valley View reaches the figure in its comprehensive invoice. That invoice is then satisfied via the lien against the patient's eventual personal injury proceeds.

Phillips, Icke, and Valley View followed that business model here. Valley View investigated Icke's claim and gave Phillips a general quote for the operation. In the end, Valley View determined that the relevant car insurance policies provided sufficient coverage to provide upfront funding for Icke's shoulder surgery.

On the morning of his surgery, Icke reported to Affinity Surgery Center. After arriving, and shortly before the operation, Affinity personnel gave Icke three documents, all of which were from Valley View, not Affinity Surgery Center. The documents included the lien agreement, a waiver of private medical insurance, and a disclosure that stated Valley View was not a medical provider. In the disclosure, Icke agreed to pay a usual and customary amount to be set by Valley View. Icke signed all the forms and had the shoulder surgery. After the surgery, Phillips, Icke's attorney, received the same lien agreement (but not the other two forms), and he signed the lien agreement under language that provided "[t]he undersigned attorney of record acknowledges this lien and agrees to observe the above terms for the protection of said medical provider."

 **2  With the surgery complete, Valley View received the bills from the medical provider, composed the comprehensive invoice for Icke and Phillips, sent the invoice to Phillips, and started following Icke's case. Primarily, Valley View followed Icke's case by way of updates from Phillips's law firm. In the months after the surgery, Valley View representative Stefanie Hass communicated with a woman named Tiffany in Phillips's office. After some time, Tiffany left Phillips's office and Hass communicated directly with Phillips. Despite Hass's diligent efforts, communication was sparse as many of her requests for an update went unanswered. Occasionally, and as late as December 2017, Phillips responded to Hass's inquiry by saying Icke's claim was still open. Based on these representations, Valley View waited for a resolution. During this period, Hass kept a communication log as she does with all cases after Valley View pays for the medical services.

That December 2017 message was the last between Phillips and Valley View. In June 2018, after several more requests for information, Hass notified Phillips that she was going to involve Valley View's legal counsel because Phillips had stopped responding. After counsel for Valley View was involved, Valley View learned that Icke's claim had actually settled in 2016. The claim had settled for the policy limits on two applicable insurance policies, and Phillips had used Valley View's invoice to help secure $150,000 in total insurance proceeds.

Valley View sued both Icke and Phillips to enforce its lien contract. In December 2018, Valley View extended an offer of judgment under NRCP 68 to Phillips and Icke, offering to settle the case for $49,999. Phillips and Icke did not accept this offer. The case eventually went to a two-day bench trial where Valley View called two witnesses: Stefanie Hass and David Phillips. The parties submitted closing arguments in writing, and the district court issued its findings of fact and conclusions of law in July 2020. The district court found the lien contract enforceable and entered a judgment against Phillips and Icke. Subsequently, Valley View filed a motion for attorney fees based on NRCP 68. Phillips and Icke timely appealed the district court's findings and conclusions. Afterward, the district court granted the motion for attorney fees in the amount of $42,185 and for costs in the amount of $7,126.45. Phillips and Icke timely appealed the fees order as well. We now address these consolidated appeals.

Foremost is Phillips and Icke's challenge to the enforceability of the lien contract. Contract enforceability prompts a dual standard of review; we review questions of law de novo while giving deference to the district court's factual determinations. *Whitemaine v. Aniskovich*, 124 Nev. 302, 308, 183 P.3d 137, 141 (2008).

Phillips and Icke offer numerous theories, arguing each is sufficient to preclude enforcement of the lien contract here. Namely, they argue Valley View did not prove that it was entitled to Phillips and Icke's performance, that Valley View's practices are deceptive, that the agreement offends public policy, and that the agreement is unconscionable. We address each point in turn below.

First, Phillips and Icke assert they did not owe Valley View, a medical financing company, any duties because Phillips and Icke signed a lien with the "medical provider" while Valley View is a medical financier, not a medical provider.[2] In other words, Phillips and Icke argue that their misunderstanding regarding the nature of Valley View's business renders the lien agreement unenforceable. We disagree.

2023 WL 61504©T

 **\*\*3**  A unilateral mistake makes a contract voidable only if the mistake is material. *Home Savers, Inc. v. United Sec. Co.*, 103 Nev. 357, 358-59, 741 P.2d 1355, 1356 (1987). Further, a "contract should be construed, if logically and legally permissible, so as to effectuate valid contractual relations, rather than in a manner which would render the agreement invalid, or render performance impossible." *Mohr Park Manor, Inc. v. Mohr*, 83 Nev. 107, 111, 424 P.2d 101, 104 (1967).

Here, it is undisputed that Phillips, Icke, and Valley View agreed to a contractual relationship wherein Icke would receive a shoulder surgery and Phillips would ensure Valley View received compensation via a lien on Icke's later personal injury recovery. The sole dispute on this point deals with a slight incongruity between the language on the lien and the nature of Valley View's business.[3] Despite Phillips and Icke initially contacting Valley View, Valley View's investigation into Icke's personal injury claim, and the quote from Valley View to Phillips and Icke, they assert language discrepancy renders the entire agreement unenforceable notwithstanding the parties' understanding of the relationship before Icke underwent surgery. Phillips and Icke agreed to a lien on Icke's personal injury recovery with Valley View; their only arguable mistake is with respect to their interpretations of Valley View's business. This lien contract can be logically construed as a valid agreement, and because any mistake on the part of the parties was immaterial, we elect to construe it as an enforceable agreement.

In all, we disagree that the use of the "medical provider" language in Valley View's lien can invalidate an otherwise understood and agreed-to lien contract.

After challenging the language of the lien, Phillips and Icke assert the agreement should not be enforced because Valley View's business is a deceptive trade practice. While we acknowledge some understandable confusion we agree with the district court that no deceptive practice occurred.

Under the Nevada Deceptive Trade Practices Act (NDTPA), a business may not knowingly make a false representation as to its affiliation with another entity, NRS 598.0915(3), or any other element of the transaction, NRS 598.0915(15). "Knowingly" is "the intent to do that which the law prohibits." *Poole v. Nev. Auto Dealership Invs., LLC*, 135 Nev. 280, 283-84, 449 P.3d 479, 483 (Ct. App. 2019) (internal quotation marks omitted). And finally, the commercial entity's misrepresentation must relate to a material fact, meaning either (a) a reasonable person would attach importance to the fact, or (b) the representing party has reason to know the recipient will find the fact important. *Id.* at 287-90, 449 P.3d at 485-87.

Here, and similar to the discussion above, any mistake or alleged deception falls to an inconsequential fact. Phillips and Icke sought alternative funding solutions for Icke's shoulder surgery, and they started the process with Valley View. In the end, the parties agreed to a lien on Icke's recovery in exchange for upfront surgery funding. The nature of Valley View's business is immaterial. Moreover, Phillips and Icke cite NRS 598.0915(3) and (15), but they fail to show Valley View knowingly misrepresented any affiliation. Phillips and Icke merely demonstrate that Valley View's full name (Valley View Surgical) is similar to another entity in the area (Valley View Surgery Center).

 **\*\*4**  Thus, Phillips and Icke have failed to show that Valley View acted with the requisite intent to violate the NDTPA, and the district court did not err on this point when it enforced the lien contract.

Next, Phillips and Icke assert the lien should not be enforced because it offends public policy. We disagree.

Any contract that tends to operate to the detriment of the public interest is void. *Clark County v. Bonanza No. 1*, 96 Nev. 643, 652, 615 P.2d 939, 945 (1980). A contract operates to the detriment of the public interest when the interest in the contract's enforcement is clearly outweighed by a public policy against enforcement. *Sylver v. Regents Bank, N.A.*, 129 Nev. 282, 290, 300 P.3d 718, 723 (2013). For example, the Nevada Supreme Court has refused to enforce contracts that deter whistleblowing. *Clark v. Columbia/HCA Info. Servs., Inc.*, 117 Nev. 468, 480-81, 25 P.3d 215, 223-24 (2001) (noting whistleblowing was one of two justifications for denying enforceability). Thus, to refuse enforcement under public policy, the effects of the contract must have implications for the public at large.

2023 WL 61504©T

Here, the lien contract does not threaten the public at large. Unlike agreements that deter whistleblowing, the public is, on an individual scale, helped by lien contracts such as the one in this case. Phillips and Icke entertained alternative funding solutions because they were concerned that Icke's insurance would not cover the operation. After Valley View agreed to fund the operation, Icke proceeded with the surgery to repair his shoulder. We acknowledge Phillips and Icke's arguments regarding Valley View's proprietary formula for cost calculation and the fact that paying for an operation through Valley View may be more expensive than it would be otherwise. At the same time, however, we recognize that Icke may not have received the surgery without Valley View.

Thus, the district court did not err when it enforced the contract despite Phillips and Icke's public policy challenges. [4]

Finally, Phillips and Icke ask this court to refuse enforcement of the lien because it is unconscionable. Again, we not persuaded.

This court may refuse to enforce a contract upon a determination that the contract is unconscionable. *Burch v. Second Judicial Dist. Court*, 118 Nev. 438, 441, 49 P.3d 647, 649 (2002). To prevent enforcement, the party arguing unconscionability must establish both procedural and substantive unconscionability. *D.R. Horton, Inc. v. Green*, 120 Nev. 549, 553-54, 96 P.3d 1159, 1162 (2004), *overruled on other grounds by U.S. Home Corp. v. Michael Ballesteros Tr.*, 134 Nev. 180, 192, 415 P.3d 32, 42 (2018). Procedural unconscionability occurs when a party lacks an opportunity to meaningfully review the terms or the meaning of those terms are not readily apparent from the face of the agreement. *Id.* at 554, 96 P.3d at 1162. Put another way, procedural unconscionability generally involves one party's failure to reasonably inform the other. *U.S. Home Corp.*, 134 Nev. at 190, 415 P.3d at 40-41. Substantive unconscionability refers more to the one-sidedness of the terms. *D.R. Horton*, 120 Nev. at 554, 96 P.3d at 1162-63.

 **5 The documents here are not unconscionable and do not warrant this court's intervention. Procedurally, Icke was in a challenging position where he was presented with the forms at the medical center shortly before his surgery. However, the procedural concerns on this agreement end there. The forms themselves do not contain any fine print or hidden clauses, they are not overwhelmingly long, and they are not difficult to understand. Moreover, the documents are clearly titled and affiliated with Valley View. Substantively, Phillips and Icke concede in their briefing that this half of the analysis is the weaker of the two. The terms here are not especially one-sided. Icke receives a shoulder surgery without any upfront payment. Valley View receives a profitable return at a later date after bearing the risk of Icke receiving a personal injury recovery and in a sufficient amount.

Accordingly, the agreement here is neither procedurally nor substantively unconscionable, and we decline to intervene on these grounds.

Having determined the lien contract is enforceable, we turn now to the district court's award of attorney fees under NRCP 68. We will not disturb a fee award under NRCP 68 absent an abuse of discretion by the district court. *O'Connell v. Wynn Las Vegas, LLC*, 134 Nev. 550, 555-56, 429 P.3d 664, 669 (Ct. App. 2018).

NRCP 68 governs offers of judgment and the concomitant penalties. It applies to multiple defendants if (1) there is a single common theory of liability against the defendants, and (2) the same plaintiff entity is authorized to settle the case against the defendants. NRCP 68(c)(2). This rule was amended in 1999; the rule now permits un-apportioned offers to multiple defendants. Under NRCP 68(f), if defendants reject a qualifying offer, the defendants-offerees "must pay the offeror's post-offer costs and expenses." To assist in future analyses, the Nevada Supreme Court issued factors in the *Beattie* decision:

> (1) whether the plaintiffs claim was brought in good faith; (2) whether the defendants' offer of judgment was reasonable and in good faith in both its timing and amount; (3) whether the plaintiffs decision to

2023 WL 61504©T

reject the offer and proceed to trial was grossly unreasonable or in bad faith; and (4) whether the fees sought by the offeror are reasonable and justified in amount.

*Beattie v. Thomas*, 99 Nev. 579, 588-89, 668 P.2d 268, 274 (1983). These are factors for the district court to weigh; they are not elements. *Id*. at 589, 668 P.2d at 274. The district court must consider these factors before awarding the full amount of fees requested. *Id*.

Here, the fact that Valley View made the offer to multiple defendants without apportioning the offer is immaterial due to the 1999 NRCP 68 amendments. Next, the district court considered all the factors under *Beattie* on the way to granting fees under the offer of judgment rule. The district court couched its *Beattie* analysis in the fact that the offer of judgment, $49,999, was reasonable compared to Valley View's actual recovery of over $60,000.

Thus, Phillips and Icke's arguments on the un-apportioned offer are misplaced based on outdated court rules, and the district court considered the *Beattie* factors before awarding fees. We discern no abuse of discretion here.

In addition to the propriety of the award, Phillips and Icke also challenge its amount as outrageous for a two-day trial. When determining the reasonableness of an award, a district court must consider the *Brunzell* factors:

> (1) the qualities of the advocate: his ability, his training, education, experience, professional standing and skill; (2) the character of the work to be done: its difficulty, its intricacy, its importance, time and skill required, the responsibility imposed and the prominence and character of the parties where they affect the importance of the litigation; (3) the work actually performed by the lawyer: the skill, time and attention given to the work; (4) the result: whether the attorney was successful and what benefits were derived.

**6  *Brunzell v. Golden Gate Nat'l Bank*, 85 Nev. 345, 349, 455 P.2d 31, 33 (1969).

Here, Phillips and Icke's argument misconstrues the nature of the fee award. As an award issued under NRCP 68, this award does not compensate Valley View for the trial; it compensates Valley View for fees incurred between Phillips and Icke's rejection of the Rule 68 offer and the case's final resolution. From this perspective, the attorney fees are understandable as Valley View issued the offer in December 2018 and the trial concluded in March 2020.

Without more, there is insufficient evidence the district court abused its discretion here. Accordingly, we

ORDER the judgment of the district court  **1291  AFFIRMED. [5]

**All Citations**

498 P.3d 1290 (Table), 2021 WL 5370984

## Footnotes

1        We recount the facts only as necessary for our disposition.

2    Phillips and Icke also challenge the lien because it does not fit any of the statutory lien categories under NRS Chapter 108; however, they do not offer any authority to support the proposition that all liens must come from NRS Chapter 108 and in fact argue this case as a lien contract. Accordingly, we reject this argument. *Edwards v. Emperor's Garden Rest.*, 122 Nev. 317, 330 n.38, 130 P.3d 1280, 1288 n.38 (2006) (explaining that this court need not consider an appellant's argument that is not cogently argued or lacks the support of relevant authority).

3    As an aside, we note that this argument only applies to Phillips because Icke signed a separate acknowledgement that explained the nature of Valley View's business.

4    Further, a contract may be void for public policy if its formation represents a violation of a statute. *See Sylver*, 129 Nev. at 290-91, 300 P.3d at 724. We considered the statutes cited by Phillips and Icke and conclude they are inapplicable. *E.g.*, NRS Chapter 604C (passed in 2019 and not retroactive); NRS 645E.920 (repealed statute governing mortgage bankers).

5    Insofar as the parties raise arguments that are not specifically addressed in this order, we have considered the same and conclude that they either do not present a basis for relief or need not be reached given the disposition of this appeal.

---

**End of Document**                                   © 2023 Thomson Reuters. No claim to original U.S. Government Works.

# EXHIBIT 26

2016 WL 4703067

2016 WL 4703067
Only the Westlaw citation is currently available.
United States District Court, E.D. Texas, Sherman Division.

Tyson PHILLIPPS, as Trustee for 1401 Trail View Trust Jenny L. Sanchez

v.

WELLS FARGO BANK, N.A.

CASE NO. 4:16-CV-420
|
Signed 09/08/2016

**Attorneys and Law Firms**

Wade Travis Kricken, Dallas, TX, for Tyson Phillipps.

Robert T. Mowrey, Jason Levi Sanders, Vincent J. Hess, Locke Lord LLP, Dallas, TX, for Wells Fargo Bank, N.A.

## MEMORANDUM OPINION

AMOS L. MAZZANT, UNITED STATES DISTRICT JUDGE

**\*1** Pending before the Court is Defendant's Motion to Dismiss (Dkt. #8). The Court, having considered the relevant pleadings, finds that Defendant's motion should be granted.

## BACKGROUND

Plaintiff commenced this lawsuit against Defendant in state court. After Defendant removed this case, the Court entered its Order and Advisory, giving Plaintiff an opportunity to file an amended complaint. Plaintiff did not file filed an amended complaint. On August 11, 2016, Defendant filed a motion to dismiss (Dkt. #8). No response was filed. However, in the Rule 26(f) report, it was noted that Plaintiff is not opposed to the motion to dismiss.

## LEGAL STANDARD

Defendant moves for dismissal under Rule 12(b)(6) of the Federal Rules of Civil Procedure, which authorizes certain defenses to be presented via pretrial motions. A Rule 12(b)(6) motion to dismiss argues that, irrespective of jurisdiction, the complaint fails to assert facts that give rise to legal liability of the defendant. The Federal Rules of Civil Procedure require that each claim in a complaint include "a short and plain statement ... showing that the pleader is entitled to relief." FED. R. CIV. P. 8(a)(2). The claims must include enough factual allegations "to raise a right to relief above the speculative level." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007). Thus, "[t]o survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.' " *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Twombly*, 550 U.S. at 570).

Rule 12(b)(6) provides that a party may move for dismissal of an action for failure to state a claim upon which relief can be granted. FED. R. CIV. P. 12(b)(6). The Court must accept as true all well-pleaded facts contained in the plaintiff's complaint and view them in the light most favorable to the plaintiff. *Baker v. Putnal*, 75 F.3d 190, 196 (5th Cir. 1996). In deciding a Rule 12(b)

Phillipps v. Wells Fargo Bank, N.A., Not Reported in Fed. Supp. (2016)

2016 WL 4703067

(6) motion, "[f]actual allegations must be enough to raise a right to relief above the speculative level." *Gonzalez v. Kay*, 577 F.3d 600, 603 (5th Cir. 2009) (quoting *Twombly*, 550 U.S. at 555). "The Supreme Court recently expounded upon the *Twombly* standard, explaining that '[t]o survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face.' " *Gonzalez*, 577 F.3d at 603 (quoting *Iqbal*, 556 U.S. at 678). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* "It follows, that 'where the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged – but it has not 'shown' – 'that the pleader is entitled to relief.' " *Id.*

In *Iqbal*, the Supreme Court established a two-step approach for assessing the sufficiency of a complaint in the context of a Rule 12(b)(6) motion. First, the Court should identify and disregard conclusory allegations for they are "not entitled to the assumption of truth." *Iqbal*, 556 U.S. at 664. Second, the Court "consider[s] the factual allegations in [the complaint] to determine if they plausibly suggest an entitlement to relief." *Id.* "This standard 'simply calls for enough facts to raise a reasonable expectation that discovery will reveal evidence of' the necessary claims or elements." *Morgan v. Hubert*, 335 Fed.Appx. 466, 470 (5th Cir. 2009). This evaluation will "be a context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Iqbal*, 556 U.S. at 679.

 **\*2**  In determining whether to grant a motion to dismiss, a district court may generally not "go outside the pleadings." *Scanlan v. Tex. A&M Univ.*, 343 F.3d 533, 536 (5th Cir. 2003). When ruling on a motion to dismiss a *pro se* complaint, however, a district court is "required to look beyond the [plaintiff's] formal complaint and to consider as amendments to the complaint those materials subsequently filed." *Howard v. King*, 707 F.2d 215, 220 (5th Cir. 1983); *Clark v. Huntleigh Corp.*, 119 Fed.Appx. 666, 667 (5th Cir. 2005) (finding that because of plaintiff's *pro se* status, "precedent compels us to examine all of his complaint, including the attachments"); FED. R. CIV. P. 8(e) ("Pleadings must be construed so as to do justice."). Furthermore, a district court may consider documents attached to a motion to dismiss if they are referred to in the plaintiff's complaint and are central to the plaintiff's claim. *Scanlan*, 343 F.3d at 536.


## DISCUSSION AND ANALYSIS

Plaintiff is unopposed to the granting of the motion to dismiss. A review of Defendant's motion also illustrates that Plaintiff has no plausible claims against Defendant.

It is therefore **ORDERED** that Defendant's Motion to Dismiss (Dkt. #8) is hereby **GRANTED** and Plaintiff's claims against Defendant are **DISMISSED** with prejudice.

All motions not previously granted are hereby **DENIED**.

The Clerk is directed to **CLOSE** this civil case.

**SIGNED this 8th day of September, 2016.**


**All Citations**

Not Reported in Fed. Supp., 2016 WL 4703067

---

**End of Document**    © 2023 Thomson Reuters. No claim to original U.S. Government Works.

# EXHIBIT 27

2020 WL 3073345
Only the Westlaw citation is currently available.
United States District Court, D. Nevada.

PROTHERA, INC., d\b\a SFI USA, Plaintiff,

v.

ZHOU J. YE, Defendant.

Case No. 3:18-cv-00410-MMD-CLB
|
Signed 06/10/2020

**Attorneys and Law Firms**

Glenn Mark Azzinari, Pro Hac Vice, A.Y. Strauss, New York, NY, Frank C. Gilmore, Robison, Sharp, Sullivan & Brust, Reno, NV, for Plaintiff.

W. West Allen, Ryan T. O'Malley, Howard & Howard Attorneys PLLC, Las Vegas, NV, for Defendant.

ORDER

MIRANDA M. DU, CHIEF UNITED STATES DISTRICT JUDGE

**I. SUMMARY**

 **\*1** Plaintiff Prothera, Inc., doing business as SFI USA, sued Defendant Zhou J. Ye for trademark infringement, breach of contract, and related causes of action, for pretending to be a doctor in order to purchase Plaintiff's nutraceuticals, and then selling them—without permission and at a profit—on Amazon's online marketplace. (ECF No. 1.) Before the Court is Plaintiff's motion for partial summary judgment on only its breach of contract claim ("Motion"). [1] (ECF No. 43.) Because the Court is persuaded by the only argument Defendant raised in opposition to the Motion, that the liquidated damages clause in the contract between the parties upon which Plaintiff relies in its Motion is unenforceable—and as further explained below—the Court will deny the Motion.

**II. BACKGROUND**

Notably, there are no factual disputes pertinent to the Motion. (ECF Nos. 43 at 3-7, 47 at 1-5, 51 at 2.) Defendant instead makes the single, and purely legal, argument that the Motion should be denied because the liquidated damages clause in the operative contract is unenforceable, and Plaintiff seeks to establish its damages in the Motion via that liquidated damages clause. (ECF No. 47 at 5-13.)

Plaintiff seeks to sell its products only through healthcare providers. (ECF No. 51 at 2.) Defendant is not a healthcare provider. (*Id.*) To get Plaintiff's products for resale, Defendant pretended to be a healthcare provider, specifically by finding healthcare providers' names and credentials on the internet, and using those assumed identities to enter into a contract with Plaintiff to resell Plaintiff's products. (*Id.*) More specifically, to obtain Plaintiff's products for unauthorized resale, Defendant executed the ProThera Inc. d/b/a SFI USA HCP Product Purchase Terms and Conditions (the "Agreement"). (*Id.*; *see also* ECF No. 47-1 (Agreement).) The Agreement prohibits advertising, listing, offering for sale, selling, or distributing Plaintiff's products online, including through Amazon. (ECF No. 51 at 2.) Nonetheless, Defendant did. (*Id.*)

The Agreement contains a liquidated damages clause. (*Id.*) It reads:

> **Liquidated Damages**. HCP acknowledges that the Sections are necessary and proper in order to protect SFI's brand reputation and goodwill, and to preserve authorized health care practitioners' (including HCP's) ability to make a reasonable margin on Product sales. HCP agrees that if it violates the Sections, SFI will be damaged in an amount that will be difficult or impossible to ascertain. Accordingly, HCP agrees to pay liquidated damages to compensate SFI for damages resulting from HCP's breach of the Sections (the "Liquidated Damages"). The parties have made advance provision for Liquidated Damages to avoid controversy, delay and expense in the event of any breach of the Sections. Liquidated Damages shall be an amount equal to $500.00 for each separate breach for each day of breach. Each breach with respect to a Product shall be considered a separate breach for the purposes of this Section. For example, if HCP is in breach with respect to three different Product for a period of 10 days, HCP will be deemed to have committed 30 breaches and be subject to Liquidated Damages of $6,000.00. The Liquidated Damages are estimated based on the various damages that SFI expects to suffer upon any breach of the Sections, including lost sales; infringement of SFI's trademarks and other intellectual property; irreparable harm to SFI's business, customer relationships, goodwill and quality control procedures; and costs of investigating breaches. HCP agrees that the Liquidated Damages are not a penalty and are reasonably estimated in light of the anticipated or actual harm that would be caused by a breach and the difficulty of proving the amount of loss and otherwise providing an adequate remedy to SFI and other affected health care providers. HCP hereby waives any defense to SFI's right to obtain liquidated damages on the basis that actual damages are calculable or that the liquidated damages do not represent a reasonable determination of damages or otherwise constitute a penalty.

**\*2**  (ECF No. 47-1 at 3.) There is no dispute here that Defendant is "HCP," and Plaintiff is "SFI," as those terms are used in the liquidated damages clause.

As Plaintiff explains, the only dispute as to the Motion is about this liquidated damages clause. (ECF No. 51 at 2.) Plaintiff relies on the liquidated damages clause for the damages element of its prima facie breach of contract claim. (ECF No. 43 at 10-13.) Using this clause, Plaintiff calculated that Defendant breached the Agreement 300 times because Defendant made 300 unauthorized sales of Plaintiff's products, and thus Plaintiff is entitled to $150,000 in damages, or $500 per breach multiplied by the 300 breaches. (*Id.* at 12-13.) As noted, Defendant counters that Plaintiff has not shown it is entitled to summary judgment because its breach of contract claim depends in part on the liquidated damages clause, which Defendant argues is unenforceable. (ECF No. 47.)

## III. LEGAL STANDARD

"The purpose of summary judgment is to avoid unnecessary trials when there is no dispute as to the facts before the court." *Nw. Motorcycle Ass'n v. U.S. Dep't of Agric.*, 18 F.3d 1468, 1471 (9th Cir. 1994). Summary judgment is appropriate when the pleadings, the discovery and disclosure materials on file, and any affidavits "show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). An issue is "genuine" if there is a sufficient evidentiary basis on which a reasonable fact-finder could find for the nonmoving party and a dispute is "material" if it could affect the outcome of the suit under the governing law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). Where reasonable minds could differ on the material facts at issue, however, summary judgment is not appropriate. *See id.* at 250-51. "The amount of evidence necessary to raise a genuine issue of material fact is enough 'to require a jury or judge to resolve the parties' differing versions of the truth at trial.' " *Aydin Corp. v. Loral Corp.*, 718 F.2d 897, 902 (9th Cir. 1983) (*quoting First Nat'l Bank v. Cities Serv. Co.*, 391 U.S. 253, 288-89 (1968)). In evaluating a summary judgment motion, a court views all facts and draws all inferences in the light most favorable to the nonmoving party. *See Kaiser Cement Corp. v. Fishbach & Moore, Inc.*, 793 F.2d 1100, 1103 (9th Cir. 1986).

The moving party bears the burden of showing that there are no genuine issues of material fact. *See Zoslaw v. MCA Distrib. Corp.*, 693 F.2d 870, 883 (9th Cir. 1982). Once the moving party satisfies Rule 56's requirements, the burden shifts to the party resisting the motion to "set forth specific facts showing that there is a genuine issue for trial." *Anderson*, 477 U.S. at 256. The nonmoving party "may not rely on denials in the pleadings but must produce specific evidence, through affidavits or admissible discovery material, to show that the dispute exists," *Bhan v. NME Hosps., Inc.*, 929 F.2d 1404, 1409 (9th Cir. 1991), and "must do more than simply show that there is some metaphysical doubt as to the material facts." *Orr v. Bank of Am., NT & SA*, 285 F.3d 764, 783 (9th Cir. 2002) (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986)). "The mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient." *Anderson*, 477 U.S. at 252.

## IV. DISCUSSION

**\*3**  Defendant argues the liquidated damages clause in the Agreement is unenforceable because it imposes a penalty for breach that does not reasonably approximate the actual damages Plaintiff will suffer in the event of breach—nor did it here. (ECF No. 47 at 7.) Plaintiff counters that liquidated damages clauses are presumed valid in Nevada, and the clause is enforceable as written despite Defendant's contrary interpretation, which Plaintiff argues is unreasonable. (ECF No. 51 at 5-8.) The Court agrees with Defendant. The Court will first discuss the governing law, and then analyze the liquidated damages clause in the context of the parties' arguments.

To start, "[a] plaintiff in a breach of contract action must 'show (1) the existence of a valid contract, (2) a breach by the defendant, and (3) damage as a result of the breach.' " *Brown v. Kinross Gold U.S.A., Inc.*, 531 F. Supp. 2d 1234, 1240 (D. Nev. 2008) (quoting *Saini v. Int'l Game Tech.*, 434 F. Supp. 2d 913, 920-21 (D. Nev. 2006)). [2] The parties' arguments about the liquidated damages clause are situated within the damages element of Plaintiff's breach of contract claim, as Plaintiff moved for summary judgment on its breach of contract claim only. (ECF Nos. 43, 47.)

Next, the parties' arguments about the liquidated damages clause require the Court to interpret that clause in light of the Agreement. Interpretation of a contract is a question of law. *See Shelton v. Shelton*, 78 P.3d 507, 510 (Nev. 2003). [3] "A basic rule of contract interpretation is that '[e]very word must be given effect if at all possible.' " *Musser v. Bank of Am.*, 964 P.2d 51, 54 (Nev. 1998) (alteration in original) (quoting *Royal Indem. Co. v. Special Serv. Supply Co.*, 413 P.2d 500, 502 (Nev. 1966)). Additionally, when construing a contract, a court should consider the contract as a whole and "should not interpret a contract so as to make meaningless its provisions." *Phillips v. Mercer*, 579 P.2d 174, 176 (Nev. 1978). Under contract law generally, when a term is unambiguous, a court must construe it from the language contained within it. *See Chwialkowski v. Sachs*, 834 P.2d 405, 406 (Nev. 1992). A contract is unambiguous if it is not susceptible to more than one reasonable interpretation. *See Margrave v. Dermody Props.*, 878 P.2d 291, 293 (Nev. 1994). "The usual rule of interpretation of contracts is to read provisions so that they harmonize with each other, not contradict each other. That task of construction is for the court." *Peterson v. Minidoka Cty. Sch. Dist. No. 331*, 118 F.3d 1351, 1359 (9th Cir.), *amended by* 132 F.3d 1258 (9th Cir. 1997).

**\*4**  But most importantly here, whether the liquidated damages clause is enforceable turns on whether it is a penalty. Liquidated damages provisions are presumed valid in Nevada. *See Khan v. Bakhsh*, 306 P.3d 411, 414 (Nev. 2013). Their purpose is to "serve as a good-faith effort to fix the amount of damages when contractual damages are uncertain or immeasurable." *Id.* (citation omitted). To successfully argue a liquidated damages provision is unenforceable, the party challenging its application must establish that it amounts to a penalty. *See Haromy v. Sawyer*, 654 P.2d 1022, 1023 (Nev. 1982). "In order to prove a liquidated damage clause constitutes a penalty, the challenging party must persuade the court that the liquidated damages are disproportionate to the actual damages sustained by the injured party." *Id.* (citation omitted). The "distinction between a penalty and liquidated damages is that a penalty is for the purpose of securing performance, while liquidated damages is the sum to be paid in the event of non-performance." *Mason v. Fakhimi*, 865 P.2d 333, 335 (1993) (citation omitted).

In the Agreement, Plaintiff is entitled to liquidated damages if the other party (here, Defendant) breaches any of the Sections. (ECF No. 47-1 at 3, § 11.) The Sections are elsewhere defined as sections 2, 5, 6, 7, 8, 9, and 13 of the Agreement. (*Id.* at §

10.) Section 2 requires Defendant to represent that he would only purchase Plaintiff's products to resell to patients under his direct professional care, [4] and that Defendant would not sell them on the internet. (*Id.* at 2 § 2.) Section 5 restricts Defendant to only selling Plaintiff's products to his patients for their personal use, in reasonable quantities. (*Id.* at § 5.) Section 6 prohibits Defendant from reselling Plaintiff's products online without first getting Plaintiff's written permission, specifically including on Amazon, and from advertising online, though resale on certain online dispensaries is permitted. (*Id.* at § 6.) Section 6 also specifically prohibits certain acts, stating that Defendant: "shall not advertise, list, offer for sale, sell or distribute" Plaintiff's products online. (*Id.*) Section 7 prohibits resale to other resellers. (*Id.* at § 7.) Section 8 provides that Defendant may only market Plaintiff's products at Defendant's physical place of business, subject to certain further restrictions. (*Id.* at 2-3, § 8.) Section 9 imposes certain quality assurance obligations on Defendant, and requires that he immediately report any adverse events to Plaintiff. (*Id.* at 3, § 9.) Section 13 specifies that Plaintiff continues to own its intellectual property, and gives Defendant a license to use that intellectual property to sell and market Plaintiff's products. (*Id.* at 3-4, § 13.) Thus, violation of any of these sections, including engaging in any of the acts they prohibit, or failing to comply with any of the obligations they impose, entitles Plaintiff to liquidated damages.

As Plaintiff repeatedly emphasizes in its briefing (ECF No. 43 at 11, 51 at 7-8), much of the liquidated damages clause is devoted to explaining why it should not be construed as a penalty. (ECF No. 47-1 at 3, § 11.) But the key portion, which actually specifies how liquidated damages must be calculated, provides:

> Liquidated Damages shall be an amount equal to $500.00 for each separate breach for each day of breach. Each breach with respect to a Product shall be considered a separate breach for the purposes of this Section. For example, if HCP is in breach with respect to three different Product for a period of 10 days, HCP will be deemed to have committed 30 breaches and be subject to Liquidated Damages of $6,000.00.

**\*5**  (*Id.*) Product is elsewhere defined as any of Plaintiff's products that Defendant purchases. (*Id.* at 2.) Thus, reading the liquidated damages provision in light of the rest of the Agreement, Defendant must pay Plaintiff $500 for each and every breach of sections 2, 5, 6, 7, 8, 9, and 13 of the Agreement, per day that Plaintiff is in breach.

As Defendant argues, calculating the amount Defendant owes Plaintiff in line with the plain meaning of this liquidated damages provision leads to staggering liability—much more than the $150,000 Plaintiff seeks here. (ECF No. 47 at 8-10.) Plaintiff calculated the $150,000 it seeks using a spreadsheet that showed Defendant's actual sales, and then multiplied those sales by $500. (ECF No. 43 at 12-13, 51 at 6.) But this approach does not follow from the liquidated damages clause, or even from Plaintiff's own argument. Immediately before laying out this calculation, Plaintiff correctly argues that "the liquidated damages clause is triggered by any breaches of sections 2, 5, 6, 7, 8, 9, or 13" of the agreement. (ECF No. 42 at 12.) Thus, breach cannot be limited merely to sales, as those sections prohibit many acts and omissions beyond sales. And in this case, there is no dispute that Defendant committed myriad breaches—many more than the 300 sales Plaintiff seeks to hold him liable for. Plaintiff's calculation of damages therefore does not align with the language of the Agreement.

There are also other reasons why Plaintiff's calculation is incorrect given the terms of the Agreement. First, Plaintiff's calculation does not account for the 'each day of breach' concept. (ECF No. 47-1 at 3, § 11.) Construing only a sale as a breach means you can only have one breach per product. But the Agreement must have intended to treat more than just sales as a breach, because, logically, it is unlikely you could have a sale of Plaintiff's product across multiple days. [5]  The 'each day of breach' concept appears more likely an attempt to capture the "advertise, list, offer for sale" concepts that are also prohibited by Section 6. (*Id.* at 2, § 6.) Thus, limiting breach to individual sales, without also going after the advertising, listing, and offering also prohibited by the Agreement does not align with the language of the Agreement. Second, Plaintiff's calculation does not align with the example offered in the liquidated damages provision, which expressly relies on the 'each day of breach' concept. (ECF No. 47-1 at 3, § 11.) The example assumes breach as to three different products over 10 days, and arrives at 30 breaches. (*Id.*) If

6

Plaintiff used the same formula to calculate Defendant's damages liability here, it would have arrived at a much higher number than it did in its Motion. Third, Plaintiff's calculation does not account for the 'each breach with respect to a Product will be considered a separate breach' concept. That concept contemplates liability for at least products offered for sale, but not actually sold—but Plaintiff's calculation does not.

To the contrary, Defendant's absurd [6] argument he should be on the hook for approximately $2.8 million instead of the $150,000 Plaintiff seeks is actually more persuasive—as it aligns better with the language of the Agreement. (ECF No. 47 at 8-10.) As described *supra*, the liquidated damages clause of the Agreement makes a number of different actions or omissions a breach —well beyond mere sales—and then multiplies liability for those breaches by product, and by day of breach. (ECF No. 47-1 at 3, § 11.) Given Defendant's myriad breaches of the Agreement, his interpretation of the liquidated damages clause matches the plain language of the Agreement.

 **\*6**  This finding does not mean the Agreement is ambiguous. Quite to the contrary. It is instead unambiguous that the liquidated damages clause was intended as a penalty. It seeks to impose massive liability for breaching the contract—evidencing its intent to secure compliance. *See Mason*, 865 P.2d at 335 (explaining that a liquidated damages clause constitutes a penalty, and is thus unenforceable, when its purpose is to secure compliance and not reasonably estimate damages). Moreover, the damages Plaintiff could recover under the liquidated damages clause as written are entirely untethered from, and greatly exceed, actual damages. *See Am. Fire & Safety, Inc. v. City of N. Las Vegas*, 849 P.2d 352, 355 (Nev. 1993) ("[a] penalty is a sum named, which is disproportionate to the damage which could have been anticipated from breach of the contract") (citing 5 *Williston on Contracts* § 776). This case is a good example, where Defendant argues he only made some $25,000 in profit reselling Plaintiff's products (ECF No. 47 at 8), and Plaintiff argues Defendant made some $87,000 in revenue (ECF No. 43 at 7). Both amounts are significantly lower than both the amount Defendant persuasively argues he should be required to pay if Plaintiff enforced the liquidated damage as written, and even the amount Plaintiff seeks. *See Khan*, 306 P.3d at 414 (invalidating liquidated damages clause when, by its terms, it sought 150% of actual damages). In sum, the liquidated damages clause is unenforceable because it was intended as a penalty.

And while the Court does not condone Defendant's wanton disregard for the Agreement, and appreciates Plaintiff's restraint in not seeking the overwhelming damages it could seek against Defendant under the liquidated damages clause, the Court's findings here are actually informed by a different set of considerations. That is Nevada's prohibition on 'blue penciling,' or re-writing unenforceable contract provisions to make them enforceable. *See Golden Rd. Motor Inn, Inc. v. Islam*, 376 P.3d 151, 156 (Nev. 2016) (invalidating overbroad noncompete provision in employment contract, and also stating the general principle that, "[r]ightfully, we have long refrained from reforming or 'blue penciling' private parties' contracts.") (footnote omitted). [7]  As explained *supra*, Plaintiff's proposed interpretation of the liquidated damages clause does just that. By narrowing the definition of breach to only unauthorized sales to arrive at a damages amount closer to actual damages, Plaintiff's approach attempts to reform the liquidated damages clause to make it enforceable—which the Court cannot do.

In addition, the Court agrees with Defendant that liquidated damages clauses should be interpreted based on their effect, not based on disclaimer language added by the drafter stating the liquidated damages clause is not a penalty. (ECF No. 47 at 12.) If the converse were true, parties would—as Plaintiff did here (ECF No. 47-1 at 3)—include language explaining why their liquidated damages provision was not a penalty, and thus be free to impose punitive liquidated damages clauses on counterparties to their agreements. Plaintiff's approach of relying on disclaimer language in a liquidated damages clause (ECF No. 43 at 11, 51 at 7-8) would also render the analysis as to whether the liquidated damages clause constituted a penalty unnecessary. But, again as discussed *supra*, Nevada law is clear that is the analysis the Court must undertake. Thus, the Court accords no weight to the disclaimer language in the Agreement's liquidated damages clause.

Plaintiff also argues that the Court should not find for Defendant here because Plaintiff has presented evidence, and Defendant has presented none. (ECF No. 51 at 1, 3-6, 8.) But the applicable standard does not require Defendant to present any evidence. *See, e.g., Mason*, 865 P.2d at 335 ("In order to prove that such a provision constitutes a penalty, the challenging party must persuade the court that the liquidated damages are disproportionate to the actual damages sustained by the injured party.").

Defendant is merely required to persuade the Court. And here, Defendant has persuaded the Court the liquidated damages clause of the Agreement constitutes a penalty. The liquidated damages clause is therefore unenforceable.

**\*7**  Because the liquidated damages clause is unenforceable, Plaintiff has not satisfied its initial burden to make out a prima facie breach of contract claim. *See, e.g., Brown*, 531 F. Supp. 2d at 1240 (stating that damages are an element of a breach of contract claim). The Court must therefore deny Plaintiff's Motion.

## V. CONCLUSION

The Court notes that the parties made several arguments and cited to several cases not discussed above. The Court has reviewed these arguments and cases and determines that they do not warrant discussion as they do not affect the outcome of the Motion before the Court.

It is therefore ordered that Defendant's motion for summary judgment (ECF No. 43) is denied.

## All Citations

Slip Copy, 2020 WL 3073345

## Footnotes

1    Defendant filed a response (ECF No. 47), and Plaintiff filed a reply (ECF No. 51). Both parties filed declarations with exhibits in support of their briefing. (ECF Nos. 44, 48.)

2    Some courts characterize a breach of contract claim under Nevada law as having four elements. *See, e.g., Padilla Constr. Co. of Nevada v. Big-D Constr. Corp.*, 386 P.3d 982 (Table), 2016 WL 6837851, at \*1 (Nev. 2016) ("there are four elements to a claim for breach of contract in Nevada[:] '(1) formation of a valid contract; (2) performance or excuse of performance by plaintiff; (3) material breach by the defendant; and (4) damages' ") (quoting *Laguerre v. Nev. Sys. of Higher Educ.*, 837 F. Supp. 2d 1176, 1180 (D. Nev. 2011)). In this case, Plaintiff characterized it as having three elements. (ECF No. 43 at 8.) Regardless, to the extent there is a fourth element, it is immaterial here—for two reasons. First, the parties' dispute centers on the damages prong, which is present in either the three or four element formulation. Second, there is no dispute here that Plaintiff performed its obligations under the Agreement.

3    This makes the parties' arguments as to whether the liquidated damages clause is enforceable suitable for resolution by the Court at summary judgment. In addition, and separately, the Court notes neither party disputes that Nevada law governs the Court's analysis.

4    Of course, all the references to patients here do not really apply to these circumstances, because Defendant is not a healthcare provider. But the fact that Defendant clearly breached many provisions of the Agreement is not particularly relevant to the parties' arguments, so the Court will not repeatedly mention the many ways in which Defendant breached the Agreement in reselling Plaintiff's products on Amazon.

5    Installment payments and financing are of course common for many types of sales, but there is no evidence before the Court this is how end customers pay for Plaintiff's products, which are, for example, bottles of Vitamin C tablets.

6    At first blush, because he is asking to be held significantly more liable than Plaintiffs asked for him to be. But this strategy is merely an effective rhetorical device.

WESTLAW   © 2021 Thomson Reuters. No claim to original U.S. Government Works.

7    In *Golden Road*, the Nevada Supreme Court explained this doctrine is supported by public policy considerations. *See* 376 P.3d at 156. The *Golden Road* court specifically explained that allowing blue-pencilling would virtually allow a court to write a new contract for the parties, which impermissibly tramples on the contracting parties' intent. *See id.* at 157. The prohibition on blue-pencilling also preserves judicial resources (*see id.* at 157-58), and protects less sophisticated parties who may comply with a particularly punitive or onerous contractual term simply because they are unaware the clause is unenforceable (*see id.* at 157).

---

**End of Document**                                           © 2023 Thomson Reuters. No claim to original U.S. Government Works.

# EXHIBIT 28

Case 1:23-cv-00418-MAC   Document 6-1   Filed 02/20/24   Page 316 of 394 PageID #: 362

**RENO CLUB, Inc., v. YOUNG INV. CO.**

**No. 3478.**

Supreme Court of Nevada.

July 7, 1947.

**1. Landlord and tenant ⟷22(1)**

Under option agreement which recited in first sentence that lessor gave and thereby granted an option to lease described premises upon termination of one year lease, and recited in second sentence that in event general war had not been concluded and peace treaties executed at the end of one year, "this option" should continue from month to month thereafter until general treaty of peace had been concluded, the optionee was given a definite and positive right to exercise option upon termination of the one year lease regardless of whether general war had been concluded and peace treaties executed.

**2. Landlord and tenant ⟷22(1)**

"Continue" within option to lease described premises upon termination of one year lease provided that in the event general war had not been concluded at end of one year "this option" should "continue" from month to month thereafter until general treaty of peace had been concluded, presupposed or assumed the immediate existence of an option which was not dependent for its being upon conclusion of the war.

See Words and Phrases, Permanent Edition, for all other definitions of "Continue".

**3. Contracts ⟷143**

The court may not create for the parties a new contract which they have not created or intended themselves.

**4. Landlord and tenant ⟷22(1)**

"Continue" within option agreement providing that in the event general war had not been concluded in one year option should "continue" from month to month until general treaty of peace had been concluded meant to prolong or extend that which was already in existence and could not be construed to mean "postpone" which means to put off or defer the coming into existence of a right, obligation, condition or other thing.

See Words and Phrases, Permanent Edition, for all other definitions of "Postpone".

**5. Contracts ⟷152**

Words in a contract must be presumed to have been used in their ordinary sense, and must be given the meaning usually and ordinarily attributed to them, in absence of clear evidence of a different intention.

**6. Landlord and tenant ⟷22(1)**

An option agreement giving and granting an option to lease described premises upon termination of one year lease and providing that in event general war had not been concluded at the end of one year then "this option" should continue from month to month thereafter until general treaty of peace had been concluded contained no ambiguity or uncertainty which would permit of judicial construction.

**7. Contracts ⟷153**

A contract should be construed, if possible and legally, to effectuate valid contractual relations, rather than in a manner which would render the contract invalid, or render performance impossible.

**8. Contracts ⟷154**

A contract should not be construed so as to lead to an absurd result.

**9. Contracts ⟷154**

A contract should be given a reasonable and fair interpretation.

**10. Contracts ⟷9(3)**

A fixed period in which an option or other similar agreement shall be operative is essential to its validity.

**11. Pleading ⟷214(1)**

Allegations of amended complaint were to be taken as true for purpose of demurrer.

**12. Landlord and tenant ⟷22(1)**

An option to lease described premises upon termination of one year lease with provision that in event general war had not been concluded at end of one year the option should continue from month to month until general treaty of peace had been concluded would not be construed as being ineffective after expiration of the one year until peace treaties had been concluded, since such construction would result in invalidity, an absurd result, and would not be reasonable and fair.

**13. Contracts ⬡170(1)**

Courts properly consider interpretation which parties themselves, by words or actions, have placed upon contracts.

**14. Equity ⬡56**

Equity regards substance and not form, in the interest of real justice, unhampered by too great adherence to technicality.

**15. Specific performance ⬡114(2)**

In action against lessor for specific performance of option to lease premises which lessee occupied at time of option under an unexpired lease with option to renew but which lessee desired to surrender for duration of war, where parties had several times theretofore renewed original lease between them, complaint would be construed as alleging in effect that unexpired portion of last renewal lease should be restored to lessee, and as alleging an option in which provisions and covenants of original lease were implied in fact, and as so construed complaint was not incomplete, uncertain or ambiguous as failing to allege all essential elements of option.

———

Appeal from Second Judicial District Court, Washoe County; Wm. McKnight, Judge.

Action by Reno Club, Inc., against the Young Investment Co. for specific performance of a contract to lease property. From a judgment dismissing the complaint, plaintiff appeals.

Reversed and cause remanded with instructions.

M. A. Diskin, of Reno, for appellant.

Morgan, Brown & Wells and Harland L. Heward, all of Reno, for respondent.

HORSEY, Justice.

This is an action for specific performance. Appellant will be referred to herein as plaintiff, respondent as defendant.

The defendant, in the district court, demurred to the amended complaint, the demurrer was sustained, the plaintiff elected to stand upon its amended complaint, and judgment of dismissal was thereupon ordered by that court, and this appeal is from such judgment.

Besides the formal allegations, it was alleged, in substance, in the amended complaint that the defendant corporation, at all times mentioned therein, was the owner of the premises consisting of that certain storeroom and basement known as 232 North Virginia Street, Reno, Washoe County, Nevada, in what is known as the "Quinn Building", together with the appurtenances, certain fixtures and personal property situated upon said premises.

That on the 29th day of October, 1934, defendant, as lessor of the above described premises, made, executed and delivered to plaintiff, as lessee, a written lease for the period beginning October 27, 1934, and ending October 26, 1937, at a monthly rental of $250, the first and last month being paid in advance; that under the terms and provisions of said lease, plaintiff, as lessee, was granted the option of extending said lease for an additional period of three years; that immediately after the execution of said lease, plaintiff entered into possession of said premises, and fully complied with the terms thereof.

That, pursuant to the said option for three years' extension of said lease, the defendant, on August 29, 1936, granted plaintiff, as lessee, an extension of said lease, from October 26, 1937, to October 26, 1940, under the same terms and conditions as in the original lease, and at the same time, in the same instrument, the defendant, as lessor, gave and granted to plaintiff, as lessee, an option for a further extension of said lease, and said lease was thereupon renewed for a period expiring October 26, 1943.

That on November 25, 1939, by an agreement in writing, and for the consideration therein expressed, the defendant, as lessor, gave and granted plaintiff, as lessee, the right and option to extend or renew the lease dated October 29, 1934, to and including October 26, 1948, under the same terms and conditions.

That during all the time mentioned in the amended complaint, and to and including May 11, 1942, plaintiff was in possession of the said premises, and had fully complied with all the terms of said lease and extensions thereof; that plaintiff, at great cost and expense, had fitted and furnished the

said premises with a complete Tango coun-
ter, and 100 cushioned stools, and a com-
plete public address system with micro-
phones, together with office equipment and
furnishings.

That on May 11, 1942, plaintiff was in
complete possession of the premises here-
inabove described, and had complied with
all the provisions of said lease, and was en-
titled to retain possession of the said prem-
ises as lessee until October 26, 1943, and,
as above stated, owned and possessed a
written option for an extension of said
lease until October 26, 1948. That on said
May 11, 1942, the defendant promised and
agreed with the plaintiff that if plaintiff
would surrender possession of said prem-
ises, and would surrender said lease and op-
tion for renewal, to defendant for cancel-
lation, that defendant would immediately
make, execute and deliver to plaintiff a
written option, under the terms of which
plaintiff would have the right at any time
after one (1) year from May 11, 1942, to
lease the aforesaid premises for a period
extending to October 26, 1948, at a rental of
$350 per month.

That on May 11, 1942, in reliance upon
said representations and agreement of de-
fendant, plaintiff surrendered possession of
the aforesaid premises to defendant, and
delivered to defendant for cancellation the
aforesaid lease and option for renewal, and
thereupon the defendant prepared, executed
and delivered to plaintiff an option in words
and figures as follows, to wit:

"Reno, Nevada,
"May 11, 1942

"Reno Club, Inc.
"Reno, Nevada.

"Gentlemen:

"In consideration of the sum of $1.00
paid to the undersigned, Young Investment
Company, a corporation, together with oth-
er good and valuable consideration, the
undersigned hereby gives and grants to the
Reno Club, Inc., or to its assigns, the ex-
clusive right and option to lease the prem-
ises known as 232 North Virginia Street,
Reno, Nevada, together with the appurten-
ances, fixtures, trade fixtures and equip-
ment now therein, upon the termination of
a lease which the undersigned has executed

to William Harrah, which lease extends
for a period of one year.

"In the event that the general war in
which the so-called 'United Nations' are at
war with the Axis Nations of the world
has not been concluded and peace treaties
executed at the end of one year, then this
option shall continue from month to month
thereafter until the general treaty of peace
has been concluded between the Axis Na-
tions on the one part and the United Na-
tions on the other part.

"The lease for which this option is giv-
en shall be for a term which is to be con-
cluded October 26, 1948, and the rental
shall be $350.00 per month.

"Young Investment Company,
"By F. P. Quinn

"President
"(Seal)

"Wm. M. Kearney
"Secy."

The foregoing allegations of the amend-
ed complaint are followed by other allega-
tions therein appropriate to complete the
statement of a cause of action for specific
performance.

The plaintiff, in the prayer to the amend-
ed complaint, demands judgment that the
defendant be required to specifically per-
form the said agreement, and to execute
and deliver a lease for the premises de-
scribed, and to let plaintiff into possession
thereof, and for such further relief as may
be equitable, and for costs of the action.

The defendant demurred to the amended
complaint upon the following grounds:

"I. That the said amended complaint
does not state facts sufficient to constitute a
cause of action."

"II. That the allegations contained in
the second sentence in paragraph VII of
plaintiff's amended complaint are uncertain
in that it cannot be determined therefrom,
or at all, when the improvements were made
upon the premises in question, what the
cost of the improvements was at the time
they were constructed and what the value
of said improvements now is."

The district court sustained the defend-
ant's said demurrer, and District Judge
McKnight, in his written order so doing
and ordering that judgment of dismissal

be entered, stated, as grounds and reasons for sustaining the demurrer, the following:

"(a) That under the terms of the option agreement set forth in Paragraph IX of the amended complaint, the plaintiff has no legal right to demand a lease from defendant for the premises described, until the general Peace Treaties have been concluded between the United Nations and the Axis Nations.

"(b) That plaintiff's action in instituting this suit is premature, and no legal obligation exists in defendant to execute to plaintiff a lease for the said premises until the Peace Treaties between the United Nations and the Axis Nations are concluded.

"(c) That the memorandum agreement set forth in Paragraph IX of said amended complaint, is incomplete, uncertain and ambiguous in its provisions, and not capable of being specifically performed.

We are, on this appeal, required to determine the correctness of the district court's foregoing order sustaining the demurrer and ordering the entering of judgment of dismissal.

[1]  The option agreement appears to be in ordinary and plain language.  Its meaning seems clear.  With a usual recital as to consideration, it unequivocally and unconditionally, in the first paragraph of the option, in the form of a letter, "hereby gives and grants to the Reno Club, Inc., or to its assigns, the exclusive right and option to lease the premises known as 232 North Virginia Street, Reno, Nevada, together with the appurtenances, fixtures, trade fixtures and equipment now therein, upon the termination of a lease which the undersigned has executed to William Harrah, which lease extends for a period of one year."  There is no condition or proviso attached to the sentence, to the effect that the option, or the right to exercise it, is conditional upon the conclusion of the war, or the execution of any peace treaty, or treaties.  By the language used, "gives and grants hereby", the conclusion that the defendant thereby agreed to, and granted, an immediate and unconditional option to lease the said premises "upon the termination of a lease which the undersigned has executed to William Harrah,

which lease extends for a period of one year", seems clearly indicated.  The optionee, Reno Club, Inc., was given the definite, positive right to exercise the option upon the termination of the Harrah lease, at the end of the year for which said lease had been given, and regardless and irrespective of whether or not the general war mentioned in the next paragraph of the option had been concluded and a peace treaty, or treaties, executed.

It appeared from the oral argument, at one point, that the Reno Club, Inc. was then owned by an enemy alien, who, doubtless for reasons of a personal nature, might not desire, or deem it expedient, to resume active business of the nature in which he had been engaged under the original lease and the renewal he was surrendering, until the war had been concluded.  Carrying out that idea, or policy, he doubtless contemplated that if the war had not been concluded and peace treaties executed, or, at least, if the war had not been concluded, by the end of the one-year term of the Harrah lease, he would not be in a position to exercise the option as provided in the first paragraph thereof, that is upon the termination of the Harrah lease, but would need more time.

Apparently, because of that situation paragraph two was included.  Paragraph two of the option letter contains the words "this option", meaning the option which had been, as above stated, positively and unconditionally granted by the preceding paragraph one, and provided for its continuance or extension, subject to the condition precedent "that the general war in which the so-called 'United Nations' are at war with the Axis Nations of the world has not been concluded and peace treaties executed at the end of one year".

[2]  Not only do we have, in paragraph one, language sufficient to show that the parties intended an option in praesenti, to come into existence immediately upon the option being signed and delivered to plaintiff, and, in paragraph two, such option designated as "this option" (an existing option, and not a proposed or deferred option), but also by the use of the word "continue", with its unmistakable meaning, as said word is defined in the dictionaries and

applied by numerous legal authorities, we have a situation wherein the parties must be deemed to have presupposed or assumed the immediate existence of the option. It is only an existing condition or thing, and not something which has not yet come into existence, which, according to the ordinary, plain and usual meaning of the word "continue", may be continued.

The word "continue" is defined in Webster's New International Dictionary, p. 487, as follows:

1. To remain in a given place or condition; to remain in connection; to abide; to stay.

2. To be permanent or durable; to endure; to last.

3. To be steadfast or constant in any course; to persevere; abide; endure; persist; to keep up or maintain a particular condition, course, or series of actions.

1. To unite; to connect.

2. To protract or extend in duration; to persevere or persist in; to cease not.

3. To carry onward or extend; to prolong or produce; to add to or draw out in length, duration or development.

4. To retain; to suffer or cause to remain.

It will readily be perceived that all the different phases of the definition, and all phases of meaning, of the word "continue" disclose that it presupposes, and relates in its operation to, an existing thing or condition, or to an existing right, obligation, cause of action, law, or other thing.

"To continue" means to keep on. H. F. Wilcox Oil & Gas Co. v. Lewis, 173 Okl. 640, 49 P.2d 782, 786; Bridges v. Koppelman, 63 Misc. 27, 35, 36, 37, 117 N.Y.S. 306, 312, (applying Webster's foregoing definitions).

In Patterson v. Rousney, 58 Okl. 185, 159 P. 636, 639, it is stated, on pages 639, 640:

"Webster defines the word 'continue' to mean:

" '(2) To protract or extend in duration; to preserve or persist in; to cease not; (3) to carry onward or extend; to prolong or produce; to add to, or draw out in length, duration, or development; (4) to retain, suffer, or cause to remain.'

"Giving the word 'continue' the meaning ascribed thereto by Webster, it means that the right to institute an action upon an existing right, contract or claim shall remain or extend or be prolonged the same length of time as if no change had taken place. Had no change taken place the plaintiff's right to institute suit upon the note would have been extended, continued, or prolonged for a period of 5 years from the date it matured, and this construction gives harmony and symmetry to the Constitution, effects the change without confusion, and brings about a result that is just, equal, and right. We are not without legal definition of the word 'continue' to support us in this view. In Williams, Adm'r, v. United States, 154 U.S. 648, 14 S.Ct. 1188, 25 L.Ed. 309, a surgeon in the Continental Army who accepted an appointment in the new regiment of guards authorized by the resolution of January, 9, 1799, was held 'not to continue in service' until the end of the war,' within the meaning of the resolution of Congress under which the claim in that case was made, the reason that the service was not continuous but was interrupted and broken by his re-enlistment in another branch of the service.

"In Bridges v. Koppelman, 63 Misc. 27, 117 N.Y.S. 306, the sixth paragraph of the syllabus is as follows:

" 'The word "continue," as used in Civil Code Procedure, § 26, providing that a special proceeding pending may be continued from time to time before one or more of the judges of the court, means to keep up, to protract or extend in duration, to extend, or prolong.'

"In Engmann v. Estate of John Immel, Deceased, 59 Wis. 249, 18 N.W. 182, in defining the word 'continue' under a statute providing that payment upon an existing claim shall be sufficient evidence upon a new or continuing contract, said:

" 'The word "continuing," as here used has the natural meaning of perpetrating, protracting, or prolonging from one time to another.'

"It appears that the purpose of adopting the provisions of the Schedule is, as expressed therein, to declare that existing rights, contracts, and claims shall continue as if no change in the form of government had taken place; that is, they shall continue to exist and be capable of enforcement without being liable to be defeated by the plea of limitation for the same period of time they would have thus continued under the laws in force at the time the cause of action accrued."

It will be noted that, among other cases, the Supreme Court of Oklahoma, in the above excerpt from their opinion, have cited, and quoted from, Bridges v. Koppelman, supra.

See, also, numerous other cases referring to, and applying, the meaning of the word "continue", cited and digested in Vol. 9 Words and Phrases, Perm.Ed., pages 163–167.

The lower court, in holding "that under the terms of the option agreement set forth in Paragraph IX of the amended complaint, the plaintiff has no legal right to demand a lease from defendant for the premises described, until the general Peace Treaties have been concluded between the United Nations and the Axis Nations," and "that plaintiff's action in instituting this suit is premature," * * * has adopted the theory of the defendant, which, in effect, is that by virtue of paragraph two of the option the parties, by the word "continue" in the sense in which it was there used, did not assume the then existence of the option, and that its duration merely was being extended or prolonged, but that they intended that the commencement or effectiveness of the option right itself was being deferred or projected into the future—that such right would not come into existence at all until the peace treaties were concluded. That construction does violence to the clear, plain, ordinary meaning of the word "continue", and virtually substitutes for that word the words "be postponed", so that the option agreement would be, in effect, the same as though the second paragraph of the agreement read:

"In the event that the general war in which the so-called 'United Nations' are at war with the Axis Nations of the world has not been concluded and peace treaties executed at the end of one year, then this option shall be postponed from month to month thereafter until the general treaty of peace has been concluded between the Axis Nations on the one part and the United Nations on the other part."

[3]   This would be virtually creating a new contract for the parties, which they have not created or intended themselves, and which, under well settled rules of construction, the court has no power to do.

[4, 5]   The word "postpone" has a meaning that is very different from, and practically opposite to, that of the word "continue", in the sense that the former means to put off or defer the coming into existence of a right, obligation, condition or other thing, whilst the word: "continue", as has been pointed out, means to prolong or extend that which is already in existence.

The word "postpone" is defined in Webster's New International Dictionary, supra, at p. 1682, as follows:  "To defer to a future or later time;  to put off;  delay."

In the absence of any sound reason to believe the parties to the option agreement intended the word "continue" to mean "be posponed", it cannot properly be so construed.  In the absence of clear evidence of a different intention, words must be presumed to have been used in their ordinary sense, and given the meaning usually and ordinarily attributed to them.  See 12 Am.Jur. secs. 227–229, pp. 745–753.  In Sec. 228, on page 749, it is stated:

"No Right to Make Agreement for Parties—Interpretation of an agreement does not include its modification or the creation of a new or different one.  A court is not at liberty to revise an agreement while professing to construe it.  Nor does it have the right to make a contract for the parties—that is, a contract different from that actually entered into by them.  Neither abstract justice nor the rule of liberal construction justifies the creation of a contract for the parties which they did not make themselves or the imposition upon one party to a contract of an obligation not assumed.  Courts cannot make for the parties better agreements than they them-

selves have been satisfied to make or re-write contracts because they operate harshly or inequitably as to one of the parties. If the parties to a contract adopt a provision which contravenes no principle of public policy and contains no element of ambiguity, the courts have no right, by a process of interpretation, to relieve one of them from disadvantageous terms which he has actually made.

"There is no right to interpret the agreement as meaning something different from what the parties intended as expressed by the language they saw fit to employ. The court is not at liberty, either to disregard words used by the parties, descriptive of the subject matter or of any material incident, or to insert words which the parties have not made use of. It cannot reject what the parties inserted, unless it is repugnant to some other part of the instrument. The court can properly interpret a contract only as the parties make it, and cannot substitute words for those used by them. Neither a court of law nor a court of equity can interpolate in a contract what the contract does not contain.

"The court has no power by interpretation to engraft on a contract a limitation inconsistent with the apparent object of the parties. It cannot interpolate a stipulation or words into a contract where such are not implied by anything that appears on the face of the contract and where the surrounding circumstances do not authorize or require a construction of the contract that would import such stipulation or words into it. It can go no further than to collect the intention from the language employed as applied to the subject matter in view of the surrounding circumstances."

See, also, Sec. 236, pp. 758–762.

[6]  It is our view that there is no ambiguity or uncertainty in the meaning of the language employed in the option agreement executed by the defendant and dated at Reno, Nevada, May 11, 1942, same being above set forth, and hence no room for judicial construction.

There are other well known and generally accepted rules of construction which preclude that adopted by the lower court in sustaining the demurrer. Other rules

182 P.2d—64½

of construction or interpretation which appear applicable to the situation existing in the instant case are substantially as follows:

[7]  1.  A contract should be construed, if possible and the same can be done legally, to effectuate valid contractual relations, rather than in a manner which would render same invalid, or render performance impossible.

[8]  2.  A contract should not be construed so as to lead to an absurd result.

[9]  3.  A contract should be given a reasonable and fair interpretation.  12 Am.Jur., secs. 250–251, pp. 791–795.

In footnote 12 to the text, on page 793, it is stated: "It is not the duty of a court, by legal subtility, to overthrow a contract, but rather to uphold it and give it effect; and no strained or artificial rule of construction is to be applied to any part of it.  If there is no ambiguity and the meaning of the parties can be clearly ascertained, effect is to be given to the instrument used."  Citing In re Binghamton Bridge (Chenango Bridge Co. v. Binghamton Bridge Co.) 3 Wall., 70 U.S. 51, 18 L.Ed. 137.

In Williston on Contracts, Vol. II, sec. 620, pp. 1202–1203, it is stated:

"Sec. 620.  Secondary Rules:  The Instrument Will Be Construed If Possible So That It Shall Be Effective And Reasonable.

"A construction which makes the contract lawful will be preferred over one which would make it unlawful; a construction which renders the contract valid and its performance possible will be preferred to one which makes it void or its performance impossible or meaningless; a construction which makes the contract fair and reasonable will be preferred to one which leads to harsh or unreasonable results.  *  *  *"

[10-12]  As pointed out by counsel for plaintiff, in appellant's opening brief, on page 8:  *  *  *  "If the option may not be legally exercised one year after the date of the contract and any time prior to signing the Peace Treaties, then plaintiff has no rights under the contract be-

cause the option is terminated when the Peace Treaties are concluded."

In other words, counsel means that the option would go into effect upon the conclusion of the peace treaties (according to the lower court's construction), and, by force of the limitation of the term or duration of the option (which, in the language thereof, "is until the general treaty of peace has been concluded between the Axis Nations on the one part and the United Nations on the other part", would simultaneously terminate.

The lower court has stated, in the above quoted paragraph (b) of its written opinion and order, the following: "(b) That plaintiff's action in instituting this suit is premature, and no legal obligation exists in defendant to execute to plaintiff a lease for the said premises until the Peace Treaties between the United Nations and the Axis Nations are concluded."

The clear limitation, above quoted, upon the duration of the option, made certain by the use of the word "until", the effect and significance of which is ably presented by plaintiff's counsel, on pages 8 to 10 of his opening brief, precludes the option continuing beyond that same event,—the conclusion of the peace treaties.

We are confronted with a construction of the lower court which, in our view, clearly violates the three rules of construction above quoted. It would make of the transaction an idle ceremony. Invalidity, rather than a valid, enforceable contract, would result, because the period of duration of the option would expire before plaintiff could possibly exercise his rights thereunder. And if, by any possibility, the word "after" could be properly interpolated in the option following the word "until" (which we believe the court would have no right or authority to do), then, and in that event, the agreement would, by such construction, be rendered so indefinite and incomplete as to time, that it most likely would be void for uncertainty, having, under such construction, no stipulated or agreed time of duration or termination.

A fixed period in which an option or other similar agreement shall be operative, is essential to its validity; otherwise, it is too incomplete and uncertain to be enforceable.

It is also clear that the construction of the lower court, which would make of the transaction an idle ceremony, leads to an absurd consequence.

And likewise, such construction violates the remaining of the three rules above mentioned, namely, that agreements must receive a reasonable and fair interpretation.

The plaintiff evidently surrendered up, according to the allegations of its amended complaint (and for the purpose of the demurrer those allegations must be taken as true), a lease which, together with the right of renewal, had more than six years to run. And it is alleged, in substance, that at the time the option was given, May 11, 1942, plaintiff's leasehold right and extension or renewal rights thereunder were of the value of $100 per month in excess of and above the rentals payable under said lease, a total difference of more than $7,700 for the period of more than six years and five months then remaining of the lease and the last renewal period.

Is it reasonable to believe that the plaintiff meant to surrender its leasehold rights of such value, and receive nothing in return, except a mere written option and the dubious pleasure of an idle ceremony. Such an interpretation is neither fair nor reasonable.

[13]  We might mention, too, that it is contrary to the interpretation placed upon the agreement by the parties themselves.

It is alleged in paragraph X of the complaint, as above stated, that on May 15, 1942 (four days after the option was signed) the defendant rented the premises for a year at a rental of $650 per month, with a provision in the lease that after the expiration of said one-year period the lessee's tenancy would be from month to month. This coincides almost perfectly with the terms of the option. The plaintiff could not exercise the option until the termination of the Harrah lease, at the end of one year. After that, it had the right that its option continue from month to month until the peace treaties were concluded. The defendant, therefore, it ap-

pears probable, recognized as effective the continuation from month to month of the option after the expiration of the Harrah lease, that is, after one year, and made its interim rental upon similar terms, so it would be in a position, doubtless, to comply with the terms of the option, should the plaintiff exercise its rights thereunder. The courts properly take into consideration, in interpreting contracts, the interpretation which the parties themselves, by words or actions, have placed upon them. 12 Am.Jur, sec. 249, pp. 787–791.

It may be stated by way of digression that if, as the lower court decided, the option was not to take effect until the peace treaties were concluded, the phrase "from month to month" would be meaningless and entirely inappropriate. There would be no sensible reason to defer the option "from month to month". It would have been deferred merely until the peace treaties were concluded, had such theory been intended by the parties. As to this phrase "from month to month", the defendant, in his brief, has argued that same would, under the lower court's construction, afford the plaintiff at least until the end of the current month after the conclusion of the general peace treaty, or treaties, in which to exercise the option. We cannot agree with that construction. It is our view that the period of duration of the option is limited by the use of the word "until", and that the phrase "from month to month" could operate merely within the scope of the term or duration of the option as thus limited.

[14, 15]  Now we are confronted with the following question: Did the lower court commit error in sustaining the demurrer upon the ground "that the memorandum agreement set forth in Paragraph IX of said amended complaint is incomplete, uncertain and ambiguous in its provisions, and not capable of being specifically performed"?

The only special demurrer interposed upon the ground of uncertainty is directed merely to the allegation, in the second sentence of paragraph VII of the amended complaint, as to the improvements or furnishings placed upon or in the property, when they were made, their cost and present value. There is nothing in the lower court's order, or decision, indicating that that court was passing upon that special demurrer. The court has decided, generally, that "the memorandum agreement is incomplete, uncertain and ambiguous in its provisions, and not capable of being specifically performed", apparently upon the theory that such incompleteness, uncertainty and ambiguity goes to the extent of making the statement of the cause of action in the amended complaint so defective as to come within the scope of a general demurrer upon the ground that the complaint fails to state facts sufficient to constitute a cause of action.

The lower court has not pointed out wherein the agreement is incomplete, uncertain or ambiguous, but, in view of the arguments of respective counsel in the briefs, we believe that such ruling is predicated upon the theory advanced by counsel for defendant, to the effect that the option agreement contemplated a lease, the terms of which required future negotiation, and that until all the terms of the proposed lease had been negotiated, developed and agreed upon, there was no completed contract, and hence no basis upon which the court could formulate a decree of specific performance based upon the agreement of the parties.

This presents a question which has been much litigated, and concerning which there is some conflict in the authorities. The authorities very generally, we believe, adhere to the rule that when in the option agreement, or in the negotiations of the parties, there appears the intention that further negotiation shall be had as to the terms of the proposed lease,—that there remain questions as to terms and provisions yet to be settled in the future negotiations as contemplated, then and in that event, the proposed lease is incomplete and not yet sufficiently developed upon which to establish the basis of a decree of specific performance.

On the other hand, many authorities take the view that if the option for a lease contains all the essential terms of a simple, ordinary lease, that is to say, the names of

**1020** Nev.    182 PACIFIC REPORTER, 2d SERIES

the parties, a description of the property to be leased, the amount of rental, when same is payable, and the term or duration of the lease, and does not indicate any expectation of further provisions to be thereafter negotiated, same is sufficiently complete to constitute a binding contract, and to serve as a basis for specific performance, —that the usual, ordinary covenants and provisions of leases in the community or vicinity where the property is situated are deemed contemplated by the parties, and further negotiations are unnecessary.

The case of Bennett v. Moon, 110 Neb. 692, 194 N.W. 802, 31 A.L.R. 495, is a leading case adhering to this latter view. An excellent annotation to that case occurs on pages 502 to 511, of 31 A.L.R., in which the learned author has discussed and cited many authorities. We quote from the opinion as same appears, 110 Neb. 692, 194 N.W. 802, 804, 31 A.L.R. 495, on pages 499, 500, as follows:

"This brings us to the real or main matter of controversy in this case, which is that, where the material elements of the agreement to lease are definitely agreed upon, but the contract is silent as to the general, usual and ordinary covenants and conditions, can such a contract be enforced by specific performance? In other words, are these covenants and conditions to be implied in law, or must they be definitely set forth in the agreement in order to be inserted in the lease by decree of a court of equity? While the contract provides 'that a lease shall be executed covering the agreement between the parties hereto as to said building,' it is silent as to the usual conditions, covenants and other general provisions contained in an ordinary lease.

"From an examination of the recognized text-books and the adjudicated cases, it appears that it has long since been the settled law that, where there is no specification in the contract to execute a lease covering the usual and ordinary covenants and provisions, these will be implied by the courts of equity. This rule was established in England as early as the famous decision in Dumpor's Case, and is clearly stated in Church v. Brown, 15 Ves.Jr.(Eng.) 258, 271, [33 Eng.Reprint, 757, 15 Eng.Rul.Cas. 688], in this language: 'There was no sort

of a difference whether the agreement in the terms of it did or did not refer to usual or proper covenants; that in every agreement, whether as to freehold or leasehold estate, it was implied that there were to be usual and proper covenants.'

"This rule of law is recognized, with some exceptions, by the courts of this country. In 36 Cyc. 792, the general principle of construction is briefly stated thus: 'A contract to execute a lease calls for a lease with the usual covenants.'

"The annotator of the L.R.A. states the rule to be: 'Specific performance of an agreement for a lease will be decreed with such covenants as are usual and incident to leases of the same kind, and such as flow from the contract and are necessary to give it effect.' Note in 20 L.R.A. 36.

"The same principle of law is announced in Eaton v. Whitaker, 18 Conn. 222, 44 Am. Dec. 586, in which the court say: 'Where nothing was said as to its terms, at the time when the agreement was made,' the decree will require the demurring party 'to execute a lease containing the usual provisions.'"

The rule so ably set forth in Bennett v. Moon, supra, and which, as therein stated, was established in England as early as the famous decision in "Dumpor's Case", we believe has been followed very generally, both in England and in the United States. This rule excludes from its operation and effect all cases in which the agreement, or negotiations in connection therewith, indicate that the parties contemplated future negotiations and agreement as to the provisions of the proposed lease.

We realize that there are some cases, however, including certain authorities cited by defendant, which are not distinguishable from the doctrine in Bennett v. Moon, because of the foregoing exception, and which do not agree that, in the absence of any indication in the agreement that future negotiations are contemplated, that the "usual or ordinary covenants" in the particular locality shall be deemed implied by equity in the proposed lease. Some of these authorities do not consider the term "usual or ordinary covenants" sufficiently certain to afford the basis for a decree of specific performance, contending that there

RENO CLUB v. YOUNG INV. CO.
Cite as 182 P.2d 1011

Nev.   1021

is no criterion by which to determine what are and what are not usual and ordinary covenants in a particular community.

In Jones on Landlord and Tenant, the distinguished author, in Sec. 137a, pp. 170, 171, has stated:

"Sec. 137a. What Constitutes a Valid Agreement.—Under the authorities, to create a valid contract of lease, but few points of mutual agreement are necessary: First, there must be a definite agreement as to the extent and bounds of the property leased; second, a definite and agreed term; and third, a definite and agreed price of rental, and the time and manner of payment. These appear to be the only essentials. If the parties are fully agreed, there is a binding contract, notwithstanding the fact that a formal contract is to be prepared and signed; but the parties must be fully agreed and must intend the agreement to be binding. From the very nature of such an agreement, it is obvious that the parties contemplate the execution of a more formal instrument which may contain additional details as to the terms of the demise and the rights and obligations of the parties. The mere fact that a written lease was in contemplation does not relieve either of the contracting parties from the responsibility of a contract which was already expressed in writing and a valid agreement for a lease may be made by letters and telegrams. When one party refuses to execute the lease according to the contract thus made, the other has a right to fall back on the written propositions as originally made. The absence of the formal agreement contemplated is not material. * * *"

The option agreement involved in the instant case contains all the essential elements prescribed in the rule as set forth by Mr. Jones, and in Bennett v. Moon, supra, with the possible exception of an item as to when and in what manner the rental shall be payable, but the rental was undoubtedly intended to be paid in the manner and at the time conforming to the customary course of dealing between the parties under the original lease dated the 29th day of October, 1934, and the several renewals thereof.

This brings us to the question or proposition as to the effect which the previous course of dealing of the parties in the matter of the agreed provisions of the said original lease and the renewals thereof should have in relation to the determination of whether or not those provisions may be fairly implied and deemed contemplated by the parties in connection with the option of May 11, 1942. It has been pointed out that the doctrine in Bennett v. Moon, supra, and of the many other authorities expounding similar views, is that equity, in the absence of any showing of a contrary intention, will presume that the parties intended, if their agreement contains the principal essentials of a lease, that the provisions and covenants usually employed in the community where the property is situated shall be deemed impliedly incorporated in the proposed lease. But in the instant case, the question arises of whether or not, as to the lease proposed or contemplated by the option, the provisions of the original lease of October 29, 1934, as renewed, shall be implied, because actually settled and agreed upon by the parties, and repeatedly adhered to in their previous course of dealing. This sort of implication of provisions comes under the classification of agreements or contracts implied in fact, as distinguished from those implied by law or equity. If the foregoing proposition of whether or not the parties actually intended that the provisions of the original lease, as renewed, should be implied, in the option as to the proposed lease of a portion of the term provided by the last renewal of the original lease, be answered in the affirmative, it will be unnecessary for us to determine in the instant case whether or not this court should follow and apply the doctrine enunciated in Dumpor's case, Bennett v. Moon, supra, and the cases adhering to that doctrine. If we should determine that the transaction whereby plaintiff received the option of May 11, 1942, was merely tantamount to a reservation or retention by plaintiff of a portion of the term of the original lease as last renewed, it is obvious that if a portion of the term of the lease is retained or reserved, all its parts, including its provisions and covenants, are likewise retained and reserved. And the criterion by which to determine the appropriateness of the proposed lease submitted to defendant in May, 1946, for execution, and the correctness of de-

fendant's action in refusing to execute such lease, would be whether or not the provisions thereof were identical with the provisions of the original lease as renewed, and not the question of whether or not the covenants and provisions of the tendered form of lease were usual or customary in the community. In determining the question of whether or not the provisions and covenants of the original lease as renewed shall be deemed implied in fact, by virtue of the intention of the parties in connection with the option of May 11, 1942, the principal inquiry should be: What was the intention of the parties?

The original lease of October 29, 1934, had been extended, or renewed, by the parties three times prior to the option agreement of May 11, 1942, and such extensions or renewals were invariably upon the same terms and conditions as embodied in the original lease, according to the allegations of the amended complaint, which must be taken as true. The first of those renewals or extensions was from October 29, 1934, to October 26, 1937; the second from October 26, 1937, to October 26, 1940, the third from October 26, 1940, to October 26, 1943. And, by agreement made November 25, 1939, defendant gave plaintiff an option to renew or extend the lease to October 26, 1948, an extension of five years. On May 11, 1942, the date of the option involved in the instant case, the plaintiff, Reno Club, Inc., was in possession, under the renewal of its lease to October 26, 1943. Thus the plaintiff had one year and more than five months as yet unexpired on the last renewal of its lease and had, also, the said option for an additional renewal of five more years, a total of more than six years and five months. It is alleged in the amended complaint, as has already been stated, that the rental value of the leasehold rights of plaintiff on the date of the option was at least $100 per month in excess of the rental provided by plaintiff's lease, and in four days after plaintiff surrendered the lease, May 15, 1942, the defendant rented the premises for $650 per month. By virtue of the surrender of the remainder of its lease and of its option for renewal to October 26, 1948, the plaintiff was yielding up an excess value, or profit,

of at least $7,700, under the estimate of excess value, and more than $23,000 if figured upon the basis of the rental paid by plaintiff's immediate successor in the tenancy. The plaintiff, apparently, was unwilling to yield up so valuable an asset unconditionally and gratuitously; and yet, due to the war, was not at that time desirous of continuing active operations. It is reasonable to infer that the plaintiff therefore required, in consideration of yielding up its valuable lease and option for renewal, that it receive back an option for a portion of the term it was surrendering up, such portion to be the portion of the term of the original lease (as extended) remaining from the date subsequent to the end of the Harrah lease (one year from date) upon which it should elect to exercise its said option, and to October 26, 1948. It is significant that the terminal date of the proposed lease under the option of May 11, 1942, is identical with the date of the termination of the last renewal period of the original lease of October 29, 1934. "Equity regards the substance and not the form", is an ancient maxim of equity jurisprudence, venerable, and cherished not alone because of its maturity, but also by reason of its proven value as an instrumentality contributing to the accomplishment of real justice and equity, unhampered by too great adherence to technicality. The plaintiff being the owner of the unexpired lease of October 29, 1934, as extended, and of the option for renewal to October 26, 1948, and both parties being satisfied with the terms thereof, as evidenced by their repeated prior renewals under the same terms and conditions, plaintiff undoubtedly was unwilling, as before indicated, to give up all its right to the premises, but wished to reserve, or retain, an option upon the portion of the term above specified.

Regardless of the fact that, in form, the option did not expressly reserve or retain such portion of the term and renewal period, it was in substance to that effect, in view of the background and evident intention of the parties. It amounted to an agreement that, under the conditions set forth therein as to time of taking effect, amount of rental, etc., there should be restored to plaintiff, at its option, such portion

of the term of the last renewal of the original lease as remained at the time plaintiff should elect to exercise the option. Under the maxim that equity regards the substance and not the form, it makes little difference whether there was a formal surrender agreement with an express reservation in the same instrument of a portion of the term of the surrendered lease, or two separate instruments, a surrender agreement and a separate option, or merely a surrender by delivery of the old lease and option for renewal, and a written option back whereby the optionee could have restored to him a portion of the term. In either event, it would be, in effect, the retention at its option, by plaintiff, of a portion of the term of the surrendered lease with its identical provisions and covenants, except as expressly changed in the option agreement.

It is reasonable to believe that this theory was agreeable to the defendant. As has been pointed out, defendant had repeatedly extended and renewed the original lease of October 29, 1934, upon the same terms embodied therein. It is also reasonable to believe that the changes expressed in the option agreement were all the modifications of the original terms which defendant desired, or same would have been expressed in the option. We believe it is fair to imply in fact, therefore, that, in connection with the option of May 11, 1942, both parties thereto intended that all terms and conditions of the original lease of October 29, 1934, and of the unexpired renewal thereof executed November 25, 1939, should apply as between the plaintiff and defendant in relation to that portion of the term of the last renewal lease which the option agreement provided, in effect, should be restored to plaintiff upon its exercise of its rights thereunder, except as to the provisions changed expressly by the terms of the option. The plaintiff, in

its amended complaint, has alleged that the proposed lease tendered by the defendant in the month of May, 1946, contained identical covenants and agreements contained and set forth in the original lease of October 29, 1934, (and which lease, as has been shown, plaintiff surrendered to defendant May 11, 1942), except as to the amount of rental charged, the term thereof, and the absence of the right of renewal. These allegations, for the purpose of the demurrer, must be taken as true.

For the reasons stated and indicated, we are convinced that the amended complaint states facts sufficient to constitute a cause of action, and that the memorandum agreement set forth in paragraph IX of the amended complaint is not incomplete, uncertain or ambiguous. If it should develop at the trial that the tendered lease contains any provisions or covenants not included in the original lease of October 29, 1934, such provisions or covenants should be, and undoubtedly would be, rejected and not embraced within the trial court's decree. Our view being that the demurrer should have been overruled, and that the decision and order of the district court in sustaining same was unreasonable, unjustifiable and clearly wrong, and if upheld by this court would result in a grave injustice to the plaintiff, reversal is inevitable. It is, therefore, ordered that the judgment of the district court be, and the same is hereby, reversed, and the cause remanded with instructions to that court to enter its order overruling defendant's demurrer to plaintiff's amended complaint, and allowing defendant such time to answer as the district court may deem appropriate.

BADT, J., concurs.

EATHER, C. J., because of illness, did not participate in the preparation and rendition of the foregoing opinion.



# EXHIBIT 29

527 P.3d 973 (Table)

Unpublished Disposition

This is an unpublished disposition. See Nevada Rules of Appellate Procedure, Rule 36(c) before citing.

Court of Appeals of Nevada.

Richard L. SHERMAN, an Individual, Appellant,

v.

Larry SMEAD, an Individual, Respondent.

Richard L. Sherman, an Individual, Appellant,

v.

Larry Smead, an Individual, Respondent.

No. 83603-COA, No. 84071-COA

|

Filed April 14, 2023

Richard L. Sherman appeals from both a district court order granting partial summary judgment, certified as final under NRCP 54(b), Docket No. 83603-COA, and an order granting a motion for attorney fees and costs, Docket No. 84701-COA, which have been consolidated for this appeal. Eighth Judicial District Court, Clark County; Carli Lynn Kierny, Judge.

**Attorneys and Law Firms**

Olson, Cannon, Gormley, & Stoberski

Maier Gutierrez & Associates

*ORDER OF REVERSAL AND REMAND*

*Facts and Procedural History*

**\*1**  In this case, former employees of respondent Larry Smead, who is a private electrical contractor and the owner of SASCO and related entities, retained Sherman to represent them in employment matters against Smead. [1]  In November 2011, one of the former employees reached a settlement agreement with Smead to resolve the employment dispute between them. This 2011 settlement agreement contained the following Covenants clause pertaining to Sherman and the lawyers in his firm:

> 6. Covenants of Magpiong's Attorneys. Magpiong's Attorneys, and each member of their respective firms, each further covenant and agree that he/she/it shall not publish any of the Smead Released Parties names in any manner in association with their law practice or in any way publish, promote, advertise or reference their participation in any action against any of the Smead Released Parties, inclusive of this Action.

The 2011 settlement agreement also generally allowed for an award of attorney fees and costs to be awarded to the nonbreaching party in the event of a breach of the agreement:

> e. Attorneys' Fees. In the event of the bringing of any action, arbitration or suit by a Party hereto against another Party hereunder by reason of any breach of any of the covenants, agreements or provisions on

the part of the other Party arising out of this Agreement, then in that event, the prevailing Party will be entitled to have recovery of and from the other Party all costs and expenses of the action, arbitration or suit, reasonable attorneys' fees and any other professional fees resulting therefrom.

Subsequently, in 2018, Sherman was retained by two other former employees of Smead, Richard Rivetti and Jeffrey Hicks, to represent them in separate employment matters against Smead. Sherman sent a prelitigation letter to Smead on behalf of Rivetti —attempting to foster early settlement negotiations—and in doing so, alluded to prior litigation against Smead without stating any specific names. In the letter, Sherman stated the following:

[a]s you may recall, our office previously asserted claims on behalf of not less than five (5) high-level employees of yours in the past. Mr. Rivetti's claims are strikingly similar to the claims previously filed against you, and the stories we have heard countless times from your former employees.

...

As was the case in the five previous cases filed by our office (each of which settled, but only after you had paid your lawyers sums that could have been avoided had you not rejected our offers to engage in early settlement discussions), we are willing to discuss the scheduling of a mediation or settlement meeting ....

**\*2**  Further, in a footnote, Sherman added:

[w]e note here the Motion for Terminating Sanctions, which was filed against you and your companies in one of the previous cases we handled, based upon attempts to hide relevant documents in that case. You may recall that Motion was filed shortly before that matter settled and after the initial hearing thereon, but before an order was issued by the Court.

In 2019, Sherman sent a similar prelitigation letter to Smead on behalf of Hicks. In a footnote, Sherman specifically referenced the prior 2011 litigation against Smead:

[w]e are especially dismayed that Larry would continue to destroy emails and insist they not exist after we filed a Motion for Terminating Sanctions against him in the Magpiong case for this very misconduct, where he attempted to defraud the Court by deleting the key emails in the case.

In the body of the letter, Sherman also emphasized Smead's conduct in the case involving Hicks to that in the Magpiong litigation:

Larry instructed Mr. Hicks to [engage in conduct] (which you may recall was similar to the illegal misconduct that Mr. Magpiong had observed and objected to, leading to his own wrongful terminations and his lawsuit in California);

...

[W]e know this is because Larry uses the "forgiving" of these notes as a weapon against employees whom he wishes to retaliate against, as we experienced first-hand with Mr. Magpiong ....

In response to receiving these prelitigation letters, Smead filed a complaint in district court, asserting claims for breach of contract, breach of the implied covenant of good faith and fair dealing, declaratory relief, and requesting attorney fees and costs. Smead alleged that Sherman breached the 2011 settlement agreement by disparaging Smead and referencing the 2011 litigation in Sherman's letters to him. Smead also sought a judicial declaration "that the [s]ettlement [a]greement is valid and binding and that Sherman's failure to comply with the terms of the [s]ettlement [a]greement is a breach thereof. Smead has sustained damages in excess of $15,000.00 as a direct and proximate result of Sherman's breach of the [s]ettlement [a]greement."

In July 2021, Smead filed a motion for partial summary judgment alleging that there were no genuine disputes of material fact as to Sherman's breach of the 2011 settlement agreement by referencing the 2011 litigation in the letters, and that Smead was entitled to declaratory relief to establish the validity of the settlement agreement and to an award of attorney fees and costs. In turn, Sherman filed his own motion for summary judgment arguing that he did not breach the 2011 settlement agreement and later arguing that Smead's opposition failed to counter Sherman's motion with genuine disputes of material fact to support such a breach, and therefore, Sherman was entitled to summary judgment. After conducting a hearing, the district court granted Smead's motion for partial summary judgment in August 2021 and denied Sherman's motion. [2]

 **\*3**  In its order, the district court found that Sherman breached the terms of the 2011 settlement agreement by referencing the prior litigation in the prelitigation letters sent on behalf of Rivetti and Hicks, and that the breach of contract claim damages were proven as evidenced by the attorney fees and costs incurred by Smead in having to litigate the claims. The district court further granted Smead's request for declaratory relief, finding that (1) the 2011 settlement agreement was valid and enforceable; (2) Sherman breached the agreement; and (3) an award to Smead of monetary damages in the form of attorney fees and costs was appropriate. Sherman appealed that decision. After Smead filed his memorandum for attorney fees and costs, the court awarded him the amount of $60,266.96. Subsequently, Sherman also appealed the award of attorney fees and costs. In February 2022, the district court entered the parties' stipulation and order to certify the court's August 2021 order granting Smead's motion for partial summary judgment as a final judgment, pursuant to NRCP 54(b). [3]  The appeals were consolidated.

On appeal, Sherman argues that the district court erred in granting summary judgment because (1) its interpretation of the 2011 settlement agreement in Smead's favor was incorrect, (2) Smead did not present evidence in support of the element of damages for his breach of contract claim, (3) declaratory relief should not have been granted for the purpose of awarding monetary damages, and (4) the award of attorney fees and costs was not justified.

Conversely, Smead argues that the district court properly granted his claim for declaratory relief, and any error in granting summary judgment on the breach of contract claim and awarding attorney fees as damages was harmless because the grant of declaratory relief allowed the district court to award such damages. Nevertheless, Smead also argues that Sherman breached the 2011 settlement agreement, and that the award of attorney fees permitted under the settlement agreement qualifies as special damages to support his breach of contract claim. Alternatively, Smead contends that the award of attorney fees and costs was warranted as he was the prevailing party. We agree with Sherman and therefore necessarily reverse and remand.

*Standard of Review and Relevant Authority*

As a preliminary matter, we review a district court's grant of summary judgment de novo. *Iliescu, Tr. of John Iliescu, Jr. & Sonnia Iliescu 1992 Family Tr. v. Reg'l Transp. Comm'n of Washoe Cty.,* 138 Nev., Adv. Op. 72, 522 P.3d 453, 458 (Ct. App. 2022). Summary judgment is proper if the pleadings and all other evidence on file demonstrate that there exists no genuine dispute of material fact "and that the moving party is entitled to a judgment as a matter of law." *Id.* (internal quotation marks omitted); *see also* NRCP 56(a). "A factual dispute is genuine when the evidence is such that a rational trier of fact could return a verdict for the nonmoving party." *Wood v. Safeway, Inc.,* 121 Nev. 724, 731, 121 P.3d 1026, 1031 (2005). In rendering a decision on a motion for summary judgment, all evidence "must be viewed in a light most favorable to the nonmoving party." *Id.* at 729, 121 P.3d at 1029. Additionally, while we generally review an award of attorney fees for an abuse of discretion, *Albios v. Horizon Cmtys., Inc.,* 122 Nev. 409, 417, 132 P.3d 1022, 1027-28 (2006), whether attorney fees constitute special damages for the purpose of satisfying a breach of contract claim is subject to de novo review because this issue involves a question of law, *Pardee Homes of*

*Nev. v. Wolfram*, 135 Nev. 173, 176, 444 P.3d 423, 426 (2019). Furthermore, whether a determination in an action for declaratory judgment is proper is a matter for the district court's discretion and will not be disturbed on appeal unless the district court abused that discretion. *Cty. of Clark, ex rel. Univ. Med. Ctr. v. Upchurch*, 114 Nev. 749, 752, 961 P.2d 754, 756 (1998).

**\*4** Relevant here, "[a] settlement agreement is a contract governed by general principles of contract law." *Power Co. v. Henry*, 130 Nev. 182, 189, 321 P.3d 858, 863 (2014). To prove a breach of contract, a plaintiff must demonstrate that a valid contract exists, there was a breach of the contract, and that damages occurred. *See Iliescu*, 138 Nev., Adv. Op. 72, 522 P.3d at 458. Breach of contract is the material failure to perform "a duty arising under or imposed by agreement." *Bernard v. Rockhill Dev. Co.,* 103 Nev. 132, 135, 734 P.2d 1238, 1240 (1987) (internal quotation marks omitted).

This court also reviews contract interpretation de novo by looking to the language of the contract and surrounding circumstances. *Redrock Valley Ranch, LLC v. Washoe County*, 127 Nev. 451, 460, 254 P.3d 641, 647-48 (2011). When reviewing a contract, the objective "is to discern the intent of the contracting parties." *Davis v. Beling*, 128 Nev. 301, 321, 278 P.3d 501, 515 (2012) (internal quotation marks omitted). In doing so, we will enforce the contract as written, so long as it is clear and unambiguous. *Id.; see also Canfora v. Coast Hotels & Casinos, Inc.,* 121 Nev. 771, 776, 121 P.3d 599, 603 (2005) (noting that the appellate court interprets unambiguous contracts according to the plain language of their written terms). However, "[a]n interpretation which results in a fair and reasonable contract is preferable to one that results in a harsh and unreasonable contract." *Dickenson v. State, Dep't of Wildlife*, 110 Nev. 934, 937, 877 P.2d 1059, 1061 (1994). And we will not construe a contract "so as to lead to an absurd result." *Reno Club, Inc. v. Young Inv. Co.*, 64 Nev. 312, 325, 182 P.2d 1011, 1017 (1947). We now address each of Sherman's arguments.

*The district court erred in its interpretation of the Covenants clause*

Sherman argues that the district court erred in its interpretation of the Covenants clause to find that he breached the 2011 settlement agreement by merely referencing the Magpiong litigation in subsequent prelitigation letters sent to Smead. We agree. By interpreting the Covenants clause to prohibit the mere "reference" to the parties' prior litigation, the district court failed to consider the context of how the word reference is used in the agreement. "The doctrine of *noscitur a sociis* teaches us that 'words are known by—acquire meaning from—the company they keep.' " *Bldg. Energetix Corp. v. EHE, LP,* 129 Nev. 78, 85, 294 P.3d 1228, 1234 (2013) (quoting *Ford v. State*, 127 Nev. 608, 622 n.8, 262 P.3d 1123, 1132 n.8 (2011)). "When several nouns or verbs or adjectives or adverbs—any words—are associated in a context suggesting that the words have something in common, they should be assigned a permissible meaning that makes them similar." Antonin Scalia & Bryan A. Garner, *Reading Law: The Interpretation of Legal Texts* 195 (2012).

In this case, the Covenants clause contained a list of similar words that were associated with one another: "publish, promote, advertise or reference."[4] The district court erred by assigning an overly broad meaning to the word "reference" that did not comport with the meaning of the related terms, all of which contemplated some form of communication to a third party in an effort to solicit business. Thus, it was unreasonable for the district court to interpret the contract to preclude Sherman from merely referencing the prior litigation in discussions with Smead, as Smead could not be considered a third party as he was already aware of the Magpiong litigation, and could not be surprised by the information, nor harmed by it. *See Dickenson,* 110 Nev. at 937, 877 P.2d at 1061. Instead, based on our review of the plain language of the contract, the Covenants clause was designed to ensure that Sherman would not publicize the prior litigation or use it for advertising purposes, such as to solicit new clients against Smead. There is no indication in the record, at this point in the litigation, that either of the letters or the information related to the Magpiong litigation was used to advertise or solicit further business for Sherman, as the prelitigation letters were specifically sent to Smead to foster early settlement negotiations after Sherman had already been retained by Rivetti and Hicks. Thus, based on the principles of statutory construction, we conclude that the district court erred, without more, in finding that mere references to the Magpiong litigation in subsequent prelitigation letters was sufficient to demonstrate a breach.

*Smead's breach of contract claim currently fails for lack of damages*

**\*5** Sherman argues that even if there was a breach of the settlement agreement, Smead failed to set forth the element of damages required for a breach of contract claim, and therefore his claim fails as a matter of law. *See Richardson v. Jones & Denton,* 1 Nev. 405, 408 (1865) ("It is necessary to establish actual damages resulting from [a claimed] breach [of contract])." Conversely, Smead argues that the attorney fees he incurred in litigating his case constitute such damages. We agree with Sherman and address this argument in the alternative.

Attorney fees may be awarded as either (1) "fees as a cost of litigation" or (2) "fees as an element of damage[s]." *Sandy Valley Assocs. v. Sky Ranch Estates Owners Ass'n,* 117 Nev. 948, 955, 35 P.3d 964, 968-69 (2001), *receded from on other grounds by Morgan v. Felton,* 123 Nev. 577, 586, 170 P.3d 982, 988 (2007); *see generally Liu v. Christopher Homes, LLC,* 130 Nev. 147, 321 P.3d 875 (2014) (clarifying the extent to which *Horgan* receded from *Sandy Valley).* While attorney fees are not awarded "unless there is a statute, rule or contract providing for such an award," the Nevada Supreme Court has allowed for attorney fees to constitute special damages [5] in limited circumstances. *Pardee,* 135 Nev. at 174, 444 P.3d at 424.

In *Sandy Valley,* the supreme court concluded that attorney fees are only to be considered special damages "when a party claims it has incurred attorney fees as foreseeable damages arising from tortious conduct or a breach of contract." 117 Nev. at 956, 35 P.3d at 969. However, the supreme court also indicated that "[b]ecause parties always know lawsuits are possible when disputes arise, the mere fact that a party was forced to file or defend a lawsuit is insufficient to support an award of attorney fees as damages." *Id.* at 957, 35 P.3d at 969. Further, the supreme court has specifically stated that special damages are inappropriate where "a plaintiff merely seeks to recover fees incurred for prosecuting a breach-of-contract action against a breaching defendant." *Pardee,* 135 Nev. at 178, 444 P.3d at 426.

The supreme court outlined the necessary steps to properly plead a claim for attorney fees as special damages and defined three limited circumstances in which a party can request such fees as special damages. *Sandy Valley,* 117 Nev. at 956-58, 35 P.3d at 969-70. To properly plead and potentially receive an award of fees, (1) the attorney fees "must be pleaded as special damages in the complaint pursuant to NRCP 9(g)"; (2) the attorney fees must be "proved by competent evidence just as any other element of damages"; and (3) the attorney fees "must be the natural and proximate consequence of the injurious conduct." *Id.* at 956-57, 35 P.3d at 969. The three limited circumstances to recover attorney fees as special damages are when (1) the fees are "an element of damage in cases when a plaintiff becomes involved in a third-party legal dispute as a result of a breach of contract or tortious conduct by the defendant"; (2) the fees are incurred while recovering real or personal property taken because of the wrongful conduct of the defendant or when clarifying or removing a cloud upon the title of the property; and (3) in actions for declaratory or injunctive relief when "the actions were necessitated by the opposing party's bad faith conduct." *Id.* at 957-58, 35 P.3d at 970.

**\*6** In this case, at this point in time, the only damages Smead has alleged for his breach of contract claim are in the form of attorney fees and costs incurred as a result of bringing a civil suit against Sherman for allegedly breaching the 2011 settlement agreement. [6] As noted above, *Sandy Valley* and *Pardee Homes* prohibit an award of attorney fees as special damages incurred simply by commencing an action based on the injurious conduct of another. *See Pardee Homes,* 135 Nev. at 178, 444 P.3d at 427 ("[U]nder [the respondents'] theory, any breach-of-contract suit would warrant attorney fees as special damages because it would be foreseeable that an aggrieved party would retain the services of an attorney to remedy a breach. This conflicts with our caselaw."). Further, merely bringing a lawsuit which results in fees and costs being incurred does not support that such fees and costs are the "natural and proximate consequence" of Sherman's conduct. *See Sandy Valley,* 117 Nev. at 957, 35 P.3d at 969-70 ("As a practical matter, attorney fees are rarely awarded as [special] damages simply because parties have a difficult time demonstrating that the fees were proximately and necessarily caused by the actions of the opposing party and that the fees were a reasonably foreseeable consequence of the breach or conduct.").

Therefore, we conclude that Smead has failed to prove the element of damages required for breach of contract, thereby precluding the grant of summary judgment. *See Mort Wallin of Lake Tahoe, Inc. v. Commercial Cabinet Co.,* 105 Nev. 855, 857, 784 P.2d 954, 955 (1989) ("The party seeking damages has the burden of proving both the fact of damages and the amount thereof."); *see also Nev. Cap. Ins. Co. v. Farmers Ins. Exch.,* No. 70572, 2018 WL 4614152, at \*2 (Nev. Sept. 21, 2018) (stating

that "a failure to establish 'the existence or cause of damage' will bar recovery" (quoting *Knier v. Azores Constr. Co.,* 78 Nev. 20, 24, 368 P.2d 673, 675 (1962))).

Further, we are also not persuaded by Smead's allegation that he was disparaged by the reminder of the litigation in the letters and that this was sufficient to satisfy the damages element for a breach of contract claim. We note that the Rivetti letter did not specifically refer to any former employees by name or identify the litigation by party name. And to the extent the Hicks letter referenced Magpiong by name, this information was directed to Smead, who was already in possession of it, thus the mere reference to it in the letter could not have given rise to money damages necessary to recover on a breach of contract claim. *Cf. Rd. & Highway Builders, LLC v. N. Nev. Rebar, Inc.,* 128 Nev. 384, 392, 284 P.3d 377, 382 (2012) (stating that money damages ordinarily "make the aggrieved party whole and ... place the plaintiff in the position he would have been in had the contract not been breached" (internal quotation marks omitted)). Smead also fails to disclose any damages he sustained as a result of the disclosure for the purpose of settlement negotiations that was directed to him and not to a third party. *Cf. Pegasus v. Reno Newspapers, Inc.,* 118 Nev. 706, 718, 57 P.3d 82, 91 (2002) (holding that to establish defamation a false statement must be published to a third party without privilege); *Nev. Ind. Broadcasting v. Allen,* 99 Nev. 404, 418, 664 P.2d 337, 346 (1983) (concluding that a political candidate was entitled to recover under defamation per se for comments that were publicly made and thus injured his professional reputation).

 **\*7**  Accordingly, Smead has not demonstrated any breach of contract damages incurred as a result of receiving the prelitigation letters from Sherman. And as noted above, the district court erred by finding that the attorney fees Smead incurred merely as the cost of litigation constituted special damages in contravention of *Sandy Valley*. Thus, even assuming there was a breach of the settlement agreement, Smead has failed at this juncture to establish the element of damages necessary to support his claim for breach of contract as a matter of law and, therefore, the district court erred in granting Smead summary judgment on his breach of contract claim.

*The district court abused its discretion in resolving the declaratory relief claim*

Sherman argues that the district court abused its discretion in granting declaratory relief to award attorney fees and costs as special damages. The Nevada Supreme Court has held that "declaratory relief determines [the parties'] legal rights *without* undertaking to compel either party to pay money or to take some other action to satisfy such rights as are determined to exist by the declaratory judgment." *Aronoff v. Katleman,* 75 Nev. 424, 432, 345 P.2d 221, 225 (1959) (emphasis added). To the extent the district court granted declaratory relief in its entirety for the purpose of awarding Smead his attorney fees and costs as monetary damages to satisfy a breach of the 2011 settlement agreement, not to determine a legal right, the district court abused its discretion in awarding declaratory relief.

In reaching this decision, we are mindful that a court is permitted to award attorney fees and costs as special damages under the limited declaratory relief exception stated in *Sandy Valley,* 117 Nev. at 957-58, 35 P.3d at 970. Even assuming, without deciding, that this exception applies, the district court failed to make findings as to whether Sherman's conduct constituted bad faith to properly award Smead his attorney fees and costs based on the declaratory relief exception set forth in *Sandy Valley*. Further, whether Sherman engaged in bad faith conduct is typically a decision for the jury or trier of fact, and therefore, summary judgment is inappropriate where genuine disputes remain as to Sherman's intent in referencing the prior litigation. *See Lee v. GNLV Corp.,* 117 Nev. 291, 296, 22 P.3d 209, 212 (2001) ("Whether a defendant's conduct was 'reasonable' under a given set of facts is generally an issue for the jury to decide."); *see also Myers v. Miller,* No. 81189, 2021 WL 4238033, at \*1 (Nev. Sept. 16, 2021) (Order of Reversal and Remand) (concluding that the district court erred when it found that the appellant's conduct was unreasonable and constituted bad faith at the summary judgment stage on a breach of contract claim, because that is a question for the jury); *cf. Armentrout v. Mead,* No. 83858-COA, 2022 WL 17185094, at \*9 (Nev. Ct. App. Nov. 23, 2022) (Order of Affirmance) (concluding, in the alternative, that attorney fees as special damages were incurred when the district court found that a party acted in bad faith). Thus, the district court abused its discretion in granting declaratory relief for the purpose of awarding attorney fees and costs as special damages without making the requisite findings necessary under *Sandy Valley*.

Therefore, we reverse the district court's order granting partial summary judgment because mere references to the prior litigation did not, in and of themselves, constitute a breach of the Covenants clause, and because Smead has failed to demonstrate the element of damages necessary to state a claim for breach of contract, and further failed to establish a claim for declaratory relief at this time. We also necessarily reverse the order granting attorney fees and costs. *See, e.g., Cain v. Price,* 134 Nev. 193, 198, 415 P.3d 25, 30 (2018) (explaining that where a district court's order granting summary judgment is reversed, it is no longer appropriate to consider the respondents the prevailing party, and an award of attorney fees is inappropriate).

**\*8**  Accordingly, we

ORDER the judgments of the district court REVERSED AND REMAND this matter to the district court for proceedings consistent with this order. [7]

**All Citations**

527 P.3d 973 (Table), 2023 WL 2960921

**Footnotes**

1       We do not recount the facts except as necessary to our disposition.

2       We note that Sherman did not appeal the district court's denial of his motion for summary judgment. Our order should not be taken as an opinion as to the merits of that denial.

3       We note that NRCP 54(b) certification was required as the district court did not resolve all claims pending below.

4       In interpreting the contract, we look to the plain language contained in the Covenants clause. Black's Law Dictionary defines "publish" as "to communicate (defamatory words) to someone other than the person defamed." *Publish*, *Black's Law Dictionary* (11th ed. 2019). An advertisement or to advertise is defined as "[a] commercial solicitation; an item of published or transmitted matter made with the intention of attracting clients or customers." *Advertisement*, *Black's Law Dictionary* (11th ed. 2019). To reference is defined as "the act of referring or consulting." *See Reference, Merriam-Webster's Collegiate Dictionary* (11th ed. 2020). Further, to promote is to "move forward" and "contribute to the growth or prosperity of." *Promote, Merriam-Webster's Collegiate Dictionary* (11th ed. 2020).

5       Special damages are actual pecuniary losses that can be determined with relative certainty. 25 C.J.S Damages § 4 (2022).

6       To the extent Smead contends that the attorney fees and costs incurred in pursuing his claim of breach of contract can satisfy the element of contractual damages via the settlement agreement's "prevailing party" language, this argument fails in light of our disposition. As discussed above, pursuant to *Sandy Valley,* attorney fees incurred in pursuing a lawsuit do not satisfy the required element of contract damages, but assuming there are quantifiable contract damages, attorney fees and costs may be recoverable by the prevailing party where a contract so provides. *Miller v. Wilfong,* 121 Nev. 619, 623, 119 P.3d 727, 730 (2005) (noting that attorney fees are recoverable if "allowed by express or implied agreement or when authorized by statute or rule" (internal quotation marks omitted)); *cf. Golightly & Vannah, PLLC v. TJ Allen, LLC,* 132 Nev. 416, 422, 373 P.3d 103, 107 (2016) (stating that where judgment in favor of the respondent must be reversed, the respondent is no longer the prevailing party and the award of fees and costs is reversed).

7       Insofar as the parties have raised arguments that are not specifically addressed in this order, we have considered the same and conclude that they either do not present a basis for relief or need not be reached given the disposition of this appeal.

**Sherman v. Smead, 527 P.3d 973 (2023)**

---

**End of Document**                                               © 2023 Thomson Reuters. No claim to original U.S. Government Works.

# EXHIBIT 30

2009 WL 1544255
Only the Westlaw citation is currently available.
United States District Court,
S.D. Texas,
Houston Division.

TWIN CITY INSURANCE COMPANY, Plaintiff,
v.
KEY ENERGY SERVICES, INC., Defendant.

Civil Action No. H–09–0352.
|
June 2, 2009.

**Attorneys and Law Firms**

Harvey G. Brown, Jr., Wright Brown Close LLP, Houston, TX, Michael F. Perlis, Richard R. Johnson, Stroock & Stroock & Lavan, LLP, Los Angeles, CA, for Plaintiff.

Jeremy C. Smith, John Mark Sylvester, K & L Gates LLP, Pittsburgh, PA, Lyle R. Rathwell, Rathwell De Ford & Wallison, The Woodlands, TX, for Defendant.

### *MEMORANDUM OPINION AND ORDER*

SIM LAKE, District Judge.

 **\*1**  Pending before the court is Defendant Key Energy Services, Inc.'s ("Key Energy") Motion to Dismiss Plaintiff's Complaint or, in the Alternative, to Stay Action, and Brief in Support (Docket Entry No. 9). [1] For the reasons stated below, Key Energy's motion to dismiss will be granted, and this action will be transferred to the Western District of Texas.

### I. *Background*

This dispute arises out of an excess financial products insurance policy ("the Excess Policy") issued by Twin City to Key Energy. [2] The Excess Policy provided up to $10 million in coverage for the period beginning at 12:01 a.m. on August 23, 2003, and ending at 12:01 a.m. on August 23, 2004. [3] The Excess Policy provided coverage for losses incurred above and beyond the policy limits of two other underlying insurance policies. [4] The primary underlying policy ("the Primary Policy") was issued by National Union Fire Insurance Company ("National Union"), and provided coverage in the amount of $10 million with a $1 million deductible. [5] The secondary underlying policy ("the Secondary Policy") was issued by RLI Insurance Company ("RLI"), and provided coverage in the amount of $10 million in excess to the coverage provided by the Primary Policy. [6] All three policies insured Key Energy and its directors and officers against, among other things, liability and defense costs arising from certain types of lawsuits, including securities and shareholder derivative suits. [7]

Paragraph II.A of the Excess Policy provided that "liability for any loss shall attach to the Underwriters only after the Primary and Underlying Excess Insurers shall have duly admitted liability and shall have paid the full amount of their respective

Case 1:23-cv-00418-MAC   Document 6-1   Filed 02/20/24   Page 340 of 394 PageID #:  386
Twin City Insurance Co. v. Key Energy Services, Inc., Not Reported in F.Supp.2d (2009)
2003 WL 6155211

liability ....." [8] Upon satisfaction of those conditions, "the Underwriters shall then be liable to pay only such additional amounts up to the [$10 million policy limit] ....." [9]

In 2004 Key Energy was sued in multiple securities class action and shareholder derivative suits in several forums, including federal court in the Western District of Texas, and in Texas state court in Midland County, Texas, and Harris County, Texas. [10] In November of 2007 Key Energy entered into settlement agreements to conclude the securities class action and shareholder derivative suits. [11] Under the settlement agreements, Key Energy agreed to pay a combined sum of $16,625,000. [12] Key Energy alleges that it incurred an additional $5,289,424.56 in defense and settlement costs, resulting in total expenses of $21,914,424.56. [13]

Key Energy made a claim on the Primary Policy, and National Union paid the full $10 million limit on the policy. [14] Key Energy also made a claim on the Secondary Policy, but RLI did not pay the full $10 million limit on that policy. [15] Instead, Key Energy and RLI entered into a settlement agreement under which RLI agreed to pay $9 million in exchange for Key Energy's release of RLI's obligation to pay under the Secondary Policy. [16]

*2 Key Energy also filed a claim on the Excess Policy. Key Energy alleged that Twin City owed it $914,424.56—an amount calculated by subtracting the $1 million deductible and the $20 million maximum coverage provided by the Primary and Secondary Policies from Key Energy's total expenses of $21, 914, 424.56. [17] Twin City, however, refused to pay. [18] Twin City asserted, and still maintains, that coverage was not available under the Excess Policy because RLI neither admitted liability nor paid the full amount of its liability under the Secondary Policy. [19]

The Excess Policy incorporated by reference the Primary Policy, [20] which included an alternative dispute resolution ("ADR") provision. [21] Under the ADR provision, the parties were required to attempt to settle any disputes arising from the policy through either mediation or arbitration before resorting to traditional litigation. [22] Accordingly, Key Energy requested mediation in August of 2008. [23] The mediation took place in December of 2008, but the parties were unable to reach a settlement. [24]

The ADR provision provided that if mediation was unsuccessful, either party could commence a judicial proceeding after 120 days had elapsed from the termination of the mediation. [25] Twin City and Key Energy, however, agreed to shorten the 120–day waiting period to sixty-two days. [26] Under the shortened waiting period, the first day that a suit could be filed was February 9, 2009. [27]

At 12:03 a.m. on February 9, 2009, Key Energy filed a petition in the District Court of Midland County, Texas ("the Midland Action") . [28] In its petition, Key Energy asserted a breach of contract claim, alleging that it was entitled to recover at least $914,424.56 in unpaid settlement and defense costs arising from the class action and shareholder derivative actions under the Excess Policy. [29] Key Energy also sought a declaratory judgment declaring, among other things, that Twin City was obligated to pay under the Excess Policy. [30]

Just over eight hours later—at 8:16 a.m. on the same day, February 9, 2009—Twin City filed this action in federal court in the Southern District of Texas, Houston Division. [31] In this action, Twin City seeks a declaratory judgment that it is not liable to Key Energy for any amount under the Excess Policy. [32] Twin City also asserts a claim for breach of contract, alleging that Key Energy breached several provisions of the Excess Policy and thereby caused Twin City to incur damages in the form of attorney's fees and other expenses in responding to Key Energy's claim and request for ADR. [33] Twin City alleges that it attempted to

2003 WL 6155211

file its federal complaint soon after midnight on February 9, but because of difficulties with the court's electronic filing system, it was unable to file the complaint until 8:16 a.m. [34]

On March 12, 2009, Key Energy filed the pending Motion to Dismiss Plaintiff's Complaint, or in the Alternative, to Stay Action, and Brief in Support (Docket Entry No. 9). Because of the similarity of the issues presented in the Midland Action, Key Energy asserted that the court was required to dismiss or stay this action pursuant to the Anti–Injunction Act, 28 U.S.C. § 2283. [35] Alternatively, Key Energy asserted that the court should exercise its discretion under the Declaratory Judgment Act and the Supreme Court's decision in *Brillhart v. Excess Insurance Company of America,* 316 U.S. 491, 62 S.Ct. 1173, 86 L.Ed. 1620 (1942), [36] to dismiss or stay this action.

**\*3**  The next day, on March 13, 2009, Twin City removed the Midland Action to the federal district court in the Western District of Texas, Midland–Odessa Division. [37]  The Midland Action was designated as case number 7:09–CV–24, and was assigned to United States District Judge Robert Junell. [38]  On March 17, 2009, Twin City filed in the Midland Action an Opposed Motion to Stay or Transfer Venue and Memorandum in Support. [39]  Twin City requested that Judge Junell transfer the Midland Action to the Southern District of Texas, Houston Division, or, alternatively, that he stay the Midland Action until this court has ruled on Twin City's pending motion for summary judgment. [40]  Twin City's motion to stay or transfer is still pending before Judge Junell. [41]

## II. *Motion to Dismiss or Stay*

When Key Energy filed its motion to dismiss or stay this action the Midland Action was pending in state court. Key Energy therefore invoked the Anti–Injunction Act and the *Brillhart* doctrine, which require federal courts to defer to state courts in certain situations. Now that the Midland Action has been removed to federal court, the "standard for dismissal due to the pendency of a parallel federal proceeding rather than the stricter standard governing abstention due to the pendency of a related state court proceeding" governs the court's resolution of Key Energy's motion. [42]  *Igloo Products Corp. v. The Mounties, Inc.,* 735 F.Supp. 214, 217 (S.D.Tex.1990). Specifically, the "first-to-file rule" controls in this situation. [43]  *See id.*

### A. The First–to–File Rule

The first-to-file rule is based on "principles of comity and sound judicial administration." *Save Power Ltd. v. Syntek Fin. Corp.,* 121 F.3d 947, 950 (5th Cir.1997). It "requires federal district courts—courts of coordinate jurisdiction and equal rank—to exercise care to avoid interference with each other's affairs." *West Gulf Maritime Ass'n v. ILA Deep Sea Local 24,* 751 F.2d 721, 728 (5th Cir.1985).

"Under the first-to-file rule, when related cases are pending before two federal courts, the court in which the case was last filed may refuse to hear it if the issues raised by the cases substantially overlap." *Cadle Co. v. Whataburger of Alice, Inc.,* 174 F.3d 599, 603 (5th Cir.1999) (citing *Save Power,* 121 F.3d at 950; *West Gulf Maritime,* 751 F.2d at 728). The rule vests in the court in which the first of the two related actions was filed the responsibility of "determin[ing] whether subsequently filed cases involving substantially similar issues should proceed." *Sutter Corp. v. P & P Indus., Inc.,* 125 F.3d 914, 920 (5th Cir.1997). Therefore, the second-filed court should usually stay, dismiss, or transfer the action over which it is presiding in deference to the first-filed court. *See West Gulf Maritime,* 751 F.2d at 729 & n. 1, 730. This enables the court in which the first related action was filed to "decide whether the second suit filed must be dismissed, stayed or transferred and consolidated." *Sutter Corp.,* 125 F.3d at 920.

**\*4**  Twin City does not dispute that the issues presented in this action "substantially overlap" with the issues presented in the Midland Action. [44]  Indeed, both cases ultimately require the resolution of whether Twin City is liable to Key Energy under the

**APP. 337**  k

Excess Policy. Twin City does not contend that this action is the first-filed action. Twin City concedes that the Midland Action, although not removed to federal court until after this action was initiated, is the first-filed action based on the time Key Energy filed its petition in state court. [45] *See Igloo Products,* 735 F.Supp. at 217 (holding that for first-to-file rule purposes, "[t]he Court considers the date of filing in state court to be the relevant benchmark" for a federal action that has been removed from state court). *Accord Poche v. Geo–Ram, Inc.,* No. 96–1437, 1996 WL 371679, at *2 (E.D.La. July 2, 1996) ("Since Geo–Ram filed its suit in the Texas state court before Poche filed his suit here, the Court finds that the controversy was 'first-filed' in the Southern District of Texas.") (citing *Igloo Products,* 735 F.Supp. at 217). Twin City argues, however, that several "compelling circumstances" justify a departure from the first-to-file rule.

**B. Compelling Circumstances**

In *Mann Manufacturing, Inc. v. Hortex, Inc.,* 439 F.2d 403, 407 (5th Cir.1971),—the Fifth Circuit's seminal first-to-file rule decision—the Court of Appeals stated that the first-to-file rule should be followed "[i]n the absence of compelling circumstances." The court, however, did not provide any guidance or examples as to what sort of circumstances it would consider "compelling." *See id.* Twin City argues that several circumstances satisfy the "compelling" standard and that this court should not defer to the Western District of Texas.

   1. *Twin City's Technical Difficulties and Minimal Time Difference in Filing*

Twin City first asserts that because the parties had agreed that they could file suit on February 9, 2009, and that Twin City only lost the veritable race to the courthouse due to technical difficulties with this court's electronic filing system, and even then that only eight hours separated the parties' filings, it would be unfair to force Twin City to proceed in Key Energy's preferred forum.

The court is not persuaded by Twin City's assertion that it was disadvantaged because it was unable to access the court's electronic filing system. Twin City included with its brief in opposition to Key Energy's motion to stay or transfer the affidavit of Jennifer Hornback, the legal secretary who attempted to file Twin City's complaint with the court soon after midnight on February 9, 2009. [46] Ms. Hornback stated in her affidavit that she first attempted to electronically file Twin City's complaint at 12:10 a.m. —seven minutes after Key Energy's petition had been filed in state court. [47] Therefore, even if Ms. Hornback had succeeded in electronically filing Twin City's complaint on her first attempt, this would still be the second-filed action.

**\*5** Nor does the court conclude that the minimal difference in filing times justifies a deviation from the first-to-file rule. Other courts to consider such an argument have concluded that the first-to-file rule is no less applicable even when parallel suits are filed "almost simultaneously." *See Eastman Med. Prods., Inc. v. E.R. Squibb & Sons, Inc.,* 199 F.Supp.2d 590, 595 (N.D.Tex.2002) (rejecting the defendant's argument that the first-to-file rule should not be adhered to because the two parallel federal court actions were filed "almost simultaneously"). *Accord Sabre Inc. v. Northwest Airlines, Inc.,* No. 4:04–CV–612–Y, 2004 WL 2533867, at *3 (N.D.Tex. Nov. 8, 2004) (same) (citing *Eastman Med. Prods.,* 199 F.Supp.2d at 595). As Judge Lynn has explained, "[a]lthough the 'first to file' rule is pedestrian, its simplicity furthers comity between the courts and should not be casually ignored." *Eastman Med. Prods.,* 199 F.Supp.2d at 595.

   2. *The Midland Action was Anticipatory*

Twin City next argues that Key Energy filed the Midland Action in anticipation of being sued, and thereby engaged in forum shopping. As Twin City points out, several courts in the Fifth Circuit have concluded that an anticipatory suit initiated for the purpose of obtaining a favored forum constitutes a compelling circumstance that justifies a deviation from the first-to-file rule. *See, e.g., Frank's Tong Serv., Inc. v. Grey Wolf Drilling Co., L.P.,* No. H–07–637, 2007 WL 5186798, at *4 (S.D.Tex. Sept.11, 2007) ("[A]n anticipatory suit is also one of the compelling circumstances courts cite when declining to apply the first-filed rule."); *Igloo Products,* 735 F.Supp. at 217 ("[O]ne of the special circumstances cited by courts that have declined to apply the first-filed rule is an indication that the first-filed suit was initiated in anticipation of the subsequent suit."). [48] The court concludes, however, that such a compelling circumstance does not exist in this case.

2003 WL 6155211

Twin City admits that it was attempting to file this action shortly after midnight on February 9, 2009. [49] In this case *both* parties were literally racing to file in their preferred forum. Both parties were attempting to file anticipatory suits. Twin City lost the race, and now argues that because it lost, it should receive its choice of forum. The court is not persuaded. Accepting Twin City's argument would essentially replace the first-to-file rule with the second-to-file rule in situations such as this where both parties have agreed that litigation can be initiated on a date certain and both file suit on that date in different forums. That would be an illogical and unworkable rule, and the court declines to follow it.

Furthermore, the primary reason courts have recognized the anticipatory suit exception to the first-to-file rule is to avoid penalizing a party that has attempted to settle a dispute out of court. *See, e.g., Johnson Bros. Corp. v. Int'l Brotherhood of Painters,* 861 F.Supp. 28, 29 (M.D.La.1994) (invoking the anticipatory exception to the first-to-file rule because "[a]pplication of the 'first-filed' rule would penalize [the defendant in the first-filed action] for its efforts to settle this matter out of court"). An inequity justifying deviation from the first-to-file rule arises when Party A notifies Party B of a dispute in an effort to settle the dispute without initiating litigation only to have Party B rush to the courthouse to secure its desired forum in the event that settlement discussions fail. That is not the situation in this case. The parties in this case had already engaged in ADR and had reached an impasse before either this action or the Midland Action was initiated. Neither party was taken by surprise or penalized for engaging in the ADR process. Both parties knew that suits would be filed after the expiration of the sixty-two day waiting period and both had an equal opportunity to secure their desired forum. Accordingly, the anticipatory exception to the first-to-file rule is not applicable in this case.

### 3. *Transfer of Venue Factors*

**\*6** Twin City next contends that the court should look "to the considerations that govern transfer of venue for forum non conveniens under 28 U.S.C. § 1404(a)" to determine whether compelling circumstances justifying departure from the first-tofile rule are present in this case. [50] *Igloo Products,* 735 F.Supp. at 218 (citing *Superior Savings Ass'n v. Bank of Dallas,* 705 F.Supp. 326, 330–31 (N.D.Tex.1989); *Merle Norman Cosmetics v. Martin,* 705 F.Supp. 296, 298–301 (E.D.La.1988)). The court declines to do so in this case.

Currently pending before the Western District of Texas in the Midland Action is Twin City's Opposed Motion to Stay or Transfer Venue. [51] In that motion Twin City asserts that the Midland Action should be transferred to the Southern District of Texas pursuant to 28 U.S.C. § 1404(a). [52] Therefore, in order to rule on that motion, Judge Junell will have to evaluate the same considerations that Twin City is asking this court to evaluate. A primary purpose of the first-to-file rule is "to avoid rulings which may trench upon the authority of sister courts ...." *West Gulf Maritime,* 751 F.2d at 729. If this court were to evaluate the § 1404(a) factors, i.e., make a determination as to whether "the convenience of parties and witnesses" and "the interest of justice" favors venue in Houston, 28 U.S.C. § 1404(a), this court would find itself doing exactly what the first-to-file rule is designed to avoid.

Moreover, the Fifth Circuit explained in *Sutter Corp.*—decided seven years after *Igloo Products*—that "the 'first-to-file rule' not only determines which court may decide the merits of substantially similar cases, but also establishes which court may decide whether the second suit filed must be dismissed, stayed or *transferred* and consolidated." *Sutter Corp.,* 125 F.3d at 920 (emphasis added). Thus, the Fifth Circuit made clear that it is the first-filed court, not this court, that should make the § 1404(a) determination.

### 4. *Relative Progress in Each Action*

Twin City also contends that the court should consider "how much progress has been made in the two actions" in deciding whether or not to follow the first-to-file rule. *Stewart v. Western Heritage Ins. Co.,* 438 F.3d 488, 492 (5th Cir.2006) (quoting *Murphy v. Uncle Ben's, Inc.,* 168 F.3d 734, 738 (5th Cir.1999)). The *Stewart* case relied on by Twin City for this proposition, however, is not a first-to-file case, but instead involves *Colorado River* abstention, which applies when a federal court considers

2003 WL 6155211

whether to stay an action in deference to a parallel action in *state* court. *See Stewart,* 438 F.3d at 491. *See also Colorado River Water Conservation Dist. v. United States,* 424 U.S. 800, 96 S.Ct. 1236, 1244, 47 L.Ed.2d 483 (1976). Moreover, as Key Energy points out, the Midland Action has actually progressed further than this action. In the Midland Action, Judge Junell has entered a scheduling order, [53]  Twin City has filed an answer, [54]  and the pleadings are now closed. [55]  In this case, no answer has been filed and no scheduling order has been entered. Therefore, to the extent that the relative progress of each action is relevant to the court's decision to follow the first-to-file rule, it favors following the rule.

### 5. *Piecemeal Litigation*

**\*7**  Lastly, Twin City asserts that "given the presence of Twin City's breach of contract action, dismissing Twin City's declaratory relief action would actually create the very piecemeal litigation that the first-to-file rule was designed to avoid." [56]  Twin City is correct that one of the purposes of the first-to-file rule is to "avoid piecemeal resolution of issues that call for a uniform result." *West Gulf Maritime,* 751 F.2d at 729. The applicability of the first-to-file rule, however, is not limited only to declaratory judgment claims. *See, e.g., Whataburger of Alice,* 174 F.3d at 602–06 (holding that the district court correctly concluded that the first-to-file rule applied to the plaintiff's second-filed RICO and state law tort claims). Therefore, this court will not dismiss or transfer only Twin City's declaratory judgment claim. The court will instead transfer the entire action to the Western District of Texas.

### C. Conclusion

The parties' dispute has spawned two parallel federal actions. Because this action was initiated after the Midland Action, the first-to-file rule provides that this court should be the one to defer. Accordingly, the court will transfer this action to the Western District of Texas. *See Whataburger of Alice,* 174 F.3d at 606 ("[O]nce the district court found that the issues might substantially overlap, the proper course of action was for the court to transfer the case to the [first-filed] court ....").

### III. *Order*

Based on the foregoing analysis, Defendant Key Energy Services, Inc.'s Motion to Dismiss Plaintiff's Complaint (Docket Entry No. 9) is **GRANTED.** This action is **TRANSFERRED** to the Midland–Odessa Division of the United States District Court for the Western District of Texas.

### All Citations

Not Reported in F.Supp.2d, 2009 WL 1544255

### Footnotes

1    In response, Twin City filed an Opposition to Defendant Key Energy Services, Inc.'s Motion to Dismiss Plaintiff's Complaint or, in the Alternative, to Stay Action and Memorandum in Support (Docket Entry No. 18). Key Energy then filed a Reply Brief in Support of Motion to Dismiss Plaintiff's Complaint or, in the Alternative, to Stay Action (Docket Entry No. 19).

2    *See* Complaint, Docket Entry No. 1, at ¶ 4.

3      *Id. See also* Excess Policy, Declarations, Items B–C (included in Plaintiff Twin City Fire Insurance Company's Opposition to Defendant Key Energy Services, Inc.'s Motion to Dismiss Plaintiff's Complaint or, in the Alternative, to Stay Action and Memorandum in Support, Docket Entry No. 18, at Exhibit C to Exhibit 1).

4      *See* Excess Policy, ¶ I.

5      *See* Excess Policy, Declarations, Item D. *See also* Primary Policy, Declarations, Items 3–4 (included in Plaintiff Twin City Fire Insurance Company's Opposition to Defendant Key Energy Services, Inc.'s Motion to Dismiss Plaintiff's Complaint or, in the Alternative, to Stay Action and Memorandum in Support, Docket Entry No. 18, at Exhibit A to Exhibit 1).

6      *See* Excess Policy, Endorsement No. 1. *See also* Secondary Policy, Declarations, Items 3–4 (included in Plaintiff Twin City Fire Insurance Company's Opposition to Defendant Key Energy Services, Inc.'s Motion to Dismiss Plaintiff's Complaint or, in the Alternative, to Stay Action and Memorandum in Support, Docket Entry No. 18, at Exhibit B to Exhibit 1).

7      Defendant Key Energy Services, Inc.'s Motion to Dismiss Plaintiff's Complaint or, in the Alternative, to Stay Action, and Brief in Support, Docket Entry No. 9, at 2. *See also* Primary Policy, ¶ 1.

8      Excess Policy, ¶ II.A.

9      *Id.*

10     Complaint, Docket Entry No. 1, ¶ 8; Defendant Key Energy Services, Inc.'s Motion to Dismiss Plaintiff's Complaint or, in the Alternative, to Stay Action, and Brief in Support, Docket Entry No. 9, at 3.

11     Complaint, Docket Entry No. 1, ¶ 9; Defendant Key Energy Services, Inc.'s Motion to Dismiss Plaintiff's Complaint or, in the Alternative, to Stay Action, and Brief in Support, Docket Entry No. 9, at 3.

12     Defendant Key Energy Services, Inc.'s Motion to Dismiss Plaintiff's Complaint or, in the Alternative, to Stay Action, and Brief in Support, Docket Entry No. 9, at 3.

13     *Id.* at 4.

14     Complaint, Docket Entry No. 1, ¶ 10; Defendant Key Energy Services, Inc.'s Motion to Dismiss Plaintiff's Complaint or, in the Alternative, to Stay Action, and Brief in Support, Docket Entry No. 9, at 3–4.

15     Complaint, Docket Entry No. 1, ¶ 11; Defendant Key Energy Services, Inc.'s Motion to Dismiss Plaintiff's Complaint or, in the Alternative, to Stay Action, and Brief in Support, Docket Entry No. 9, at 4.

16     *Id.*

17     Complaint, Docket Entry No. 1, ¶ 12; Defendant Key Energy Services, Inc.'s Motion to Dismiss Plaintiff's Complaint or, in the Alternative, to Stay Action, and Brief in Support, Docket Entry No. 9, at 4.

18     Complaint, Docket Entry No. 1, ¶ 13; Defendant Key Energy Services, Inc.'s Motion to Dismiss Plaintiff's Complaint or, in the Alternative, to Stay Action, and Brief in Support, Docket Entry No. 9, at 4.

19     *Id.*

20     *See* Excess Policy, ¶ III.A.

21     Primary Policy, ¶ 17.

Case 1:23-cv-00418-MAC   Document 6-1   Filed 02/20/24   Page 346 of 394 PageID #:  392
Twin City Insurance Co. v. Key Energy Services, Inc., Not Reported in F.Supp.2d (2009)

2003 WL 6155211

22    *Id.*

23    Complaint, Docket Entry No. 1, ¶ 14; Defendant Key Energy Services, Inc.'s Motion to Dismiss Plaintiff's Complaint or, in the Alternative, to Stay Action, and Brief in Support, Docket Entry No. 9, at 5.

24    Defendant Key Energy Services, Inc.'s Motion to Dismiss Plaintiff's Complaint on, in the Alternative, to Stay Action, and Brief in Support, Docket Entry No. 9, at 5; Plaintiff Twin City Fire Insurance Company's Opposition to Defendant Key Energy Services, Inc .'s Motion to Dismiss Plaintiff's Complaint or, in the Alternative, to Stay Action and Memorandum in Support, Docket Entry No. 18, at 3.

25    Primary Policy, ¶ 17.

26    Plaintiff Twin City Fire Insurance Company's Opposition to Defendant Key Energy Services, Inc.'s Motion to Dismiss Plaintiff's Complaint or, in the Alternative, to Stay Action and Memorandum in Support, Docket Entry No. 18, at 3 n. 1; Letter from John M. Sylvester to Richard R. Johnson (Jan. 5, 2009) (documenting "the parties' agreement to shorten the waiting period ... to 62 days from 120 days from termination of the mediation," and stating that "the first day that a party can file suit against the other is February 9, 2009") (included in Plaintiff Twin City Fire Insurance Company's Opposition to Defendant Key Energy Services, Inc.'s Motion to Dismiss Plaintiff's Complaint or, in the Alternative, to Stay Action and Memorandum in Support, Docket Entry No. 18, at Exhibit H to Exhibit 1).

27    *Id.*

28    Defendant Key Energy Services, Inc.'s Motion to Dismiss Plaintiff's Complaint or, in the Alternative, to Stay Action, and Brief in Support, Docket Entry No. 9, at 5; Plaintiff Twin City Fire Insurance Company's Opposition to Defendant Key Energy Services, Inc .'s Motion to Dismiss Plaintiff's Complaint or, in the Alternative, to Stay Action and Memorandum in Support, Docket Entry No. 18, at 3 n. 2; Petition, *Key Energy Servs., Inc. v. Twin City Fire Ins. Co.,* No. CV46816 (D. Ct. Midland County, Tex. Feb. 9, 2009) (time stamped as filed at 12:03 a.m. on February 9, 2009) (included in Defendant Key Energy Services, Inc.'s Motion to Dismiss Plaintiff's Complaint or, in the Alternative, to Stay Action, and Brief in Support, Docket Entry No. 9, at Exhibit D).

29    Petition, *Key Energy Servs., Inc. v. Twin City Fire Ins. Co.,* No. CV46816, ¶¶ 32–35 (D. Ct. Midland County, Tex. Feb. 9, 2009).

30    *Id.* ¶¶ 23–31.

31    Defendant Key Energy Services, Inc.'s Motion to Dismiss Plaintiff's Complaint or, in the Alternative, to Stay Action, and Brief in Support, Docket Entry No. 9, at 5; Plaintiff Twin City Fire Insurance Company's Opposition to Defendant Key Energy Services, Inc .'s Motion to Dismiss Plaintiff's Complaint or, in the Alternative, to Stay Action and Memorandum in Support, Docket Entry No. 18, at 3 n. 2; Notice of Electronic Filing, *Twin City Ins. Co. v. Key Energy Servs., Inc.,* No. 4:09–CV–352 (S.D.Tex. Mar. 12, 2009) (indicating that Twin City's Complaint (Docket Entry No. 1) was filed at 8:16 a.m. on February 9, 2009) (included in Defendant Key Energy Services, Inc.'s Motion to Dismiss Plaintiff's Complaint or, in the Alternative, to Stay Action, and Brief in Support, Docket Entry No. 9, at Exhibit E).

32    Complaint, Docket Entry No. 1, ¶¶ 18–22.

33    *Id.* ¶¶ 15–17.

34    Plaintiff Twin City Fire Insurance Company's Opposition to Defendant Key Energy Services, Inc.'s Motion to Dismiss Plaintiff's Complaint or, in the Alternative, to Stay Action and Memorandum in Support, Docket Entry No. 18, at 3 n. 2, 8; Affidavit of Jennifer Hornback (Apr. 1, 2009) (included in Plaintiff Twin City Fire Insurance Company's Opposition to Defendant Key Energy Services, Inc .'s Motion to Dismiss Plaintiff's Complaint or, in the Alternative, to Stay Action and Memorandum in Support, Docket Entry No. 18, at Exhibit 2).

**APP. 342**   9

2003 WL 6155211

35    The Anti–Injunction Act, 28 U.S.C. § 2283, provides that "[ a] court of the United States may not grant an injunction to stay proceedings in a State court except as expressly authorized by Act of Congress, or where necessary in aid of its jurisdiction, or to protect or effectuate its judgments."

36    In *Brillhart* the Supreme Court held that where a federal declaratory judgment suit and a state court suit "present[ ] the same issues, not governed by federal law, between the same parties," the federal court should decline to hear the declaratory judgment suit if "the questions in controversy between the parties to the federal suit ... can better be settled in the proceeding pending in state court." *Brillhart,* 62 S.Ct. at 1176.

37    Declaration of Richard R. Johnson, ¶ 7 (Apr. 1, 2009) (included in Plaintiff Twin City Fire Insurance Company's Opposition to Defendant Key Energy Services, Inc.'s Motion to Dismiss Plaintiff's Complaint or, in the Alternative, to Stay Action and Memorandum in Support, Docket Entry No. 18, at Exhibit 1). *See also* Defendant Twin City Fire Insurance Company's Notice of Removal of Action Under 28 U.S.C. Section 1441, *Key Energy Servs., Inc. v. Twin City Fire Ins. Co.,* No. 7:09–CV–24, Docket Entry No. 1 (W.D.Tex. Mar. 13, 2009) (included in Plaintiff Twin City Fire Insurance Company's Opposition to Defendant Key Energy Services, Inc .'s Motion to Dismiss Plaintiff's Complaint or, in the Alternative, to Stay Action and Memorandum in Support, Docket Entry No. 18, at Exhibit F to Exhibit 1).

38    *See* Docket Sheet, *Key Energy Servs., Inc. v. Twin City Fire Ins. Co.,* No. 7:09–CV–24 (W.D. Tex. June 1, 2009). The court obtained the Docket Sheet from the Midland Action through the Western District of Texas' electronic document filing system.

39    Defendant Twin City Fire Insurance Company's Opposed Motion to Stay or Transfer Venue and Memorandum in Support, *Key Energy Servs ., Inc. v. Twin City Fire Ins. Co.,* No. 7:09–CV–24, Docket Entry No. 11 (W.D.Tex. Mar. 17, 2009) (included in Plaintiff Twin City Fire Insurance Company's Opposition to Defendant Key Energy Services, Inc .'s Motion to Dismiss Plaintiff's Complaint or, in the Alternative, to Stay Action and Memorandum in Support, Docket Entry No. 18, at Exhibit G to Exhibit 1).

40    *Id.*

41    *See* Docket Sheet, *Key Energy Servs., Inc. v. Twin City Fire Ins. Co.,* No. 7:09–CV–24 (W.D. Tex. June 1, 2009).

42    *See* Plaintiff Twin City Fire Insurance Company's Opposition to Defendant Key Energy Services, Inc.'s Motion to Dismiss Plaintiff's Complaint or, in the Alternative, to Stay Action and Memorandum in Support, Docket Entry No. 18, at 7; Defendant Key Energy Services, Inc.'s Reply Brief in Support of Motion to Dismiss Plaintiff's Complaint or, in the Alternative, to Stay Action, Docket Entry No. 19, at 3–4.

43    The *Igloo Products* court referred to the rule as the "first-filed rule," but the Fifth Circuit usually refers to the rule as the "first-to-file rule." *See, e.g., Cadle Co. v. Whataburger of Alice, Inc.,* 174 F.3d 599, 603 (5th Cir.1999).

44    *See* Plaintiff Twin City Fire Insurance Company's Opposition to Defendant Key Energy Services, Inc.'s Motion to Dismiss Plaintiff's Complaint or, in the Alternative, to Stay Action and Memorandum in Support, Docket Entry No. 18, at 7–12.

45    *See* Plaintiff Twin City Fire Insurance Company's to Defendant Key Energy Services, Inc.'s Motion Plaintiff's Complaint or, in the Alternative, to Stay Memorandum in Support, Docket Entry No. 18, at 7–8 & n. 9

46    *See* Affidavit of Jennifer Hornback (Apr. 1, 2009) (included in Plaintiff Twin City Fire Insurance Company's Opposition to Defendant Key Energy Services, Inc.'s Motion to Dismiss Plaintiff's Complaint or, in the Alternative, to Stay Action and Memorandum in Support, Docket Entry No. 18, at Exhibit 2).

47    *Id.*

2003 WL 6155211

48  *See also, e.g., Geo–Ram,* 1996 WL 371679, at *2 ("Courts in this circuit have consistently found that filing suit in anticipation of being sued is grounds for setting aside the first-filed rule."); *Johnson Bros. Corp. v. Int'l Brotherhood of Painters,* 861 F.Supp. 28, 29 (M.D.La.1994) (" 'Compelling circumstances' exist when a declaratory action is filed in anticipation of another lawsuit in order to secure a more favorable forum."); *Merle Norman Cosmetics v. Martin,* 705 F.Supp. 296, 298 (E.D.La.1988) ("[A] complaint filed in anticipation of a subsequent suit brought by the defendant to the first action can avoid the operation of the first filed rule."). *Cf. also Mission Ins. Co. v. Puritan Fashions Corp.,* 706 F.2d 599, 602 (5th Cir.1983) (concluding that the district court "acted within its discretion in considering the anticipatory nature of this [first-filed declaratory judgment] suit" in deciding to dismiss it due to the pendency of a second-filed, parallel suit in California state court); *Amerada Petroleum Corp. v. Marshall,* 381 F.2d 661, 663 (5th Cir.1967) ("That Amerada's petition for declaratory judgment apparently was in anticipation of the New York suit [wa]s an equitable consideration which the district court was entitled to take into account" when it decided to stay the first-filed declaratory judgment suit due to the pendency of the second-filed, parallel action in the Southern District of New York.).

49  *See* Defendant Key Energy Services, Inc.'s Motion to Dismiss Plaintiff's Complaint or, in the Alternative, to Stay Action and Memorandum in Support, Docket Entry No. 18, at 8, Exhibit 2.

50  28 U.S.C. § 1404(a) provides: "For the convenience of parties and witnesses, in the interest of justice, a district court may transfer any civil action to any other district or division where it might have been brought."

51  *See* Defendant Twin City Fire Insurance Company's Opposed Motion to Stay or Transfer Venue and Memorandum in Support, *Key Energy Servs., Inc. v. Twin City Fire Ins. Co.,* No. 7:09–CV–24, Docket Entry No. 11 (W.D.Tex. Mar. 17, 2009) (included in Plaintiff Twin City Fire Insurance Company's Opposition to Defendant Key Energy Services, Inc.'s Motion to Dismiss Plaintiff's Complaint or, in the Alternative, to Stay Action and Memorandum in Support, Docket Entry No. 18, at Exhibit G to Exhibit 1).

52  *See id.*

53  *See* Scheduling Order, *Key Energy Servs., Inc. v. Twin City Fire Ins. Co.,* No. 7:09–CV–24, Docket Entry No. 14 (W.D.Tex. Mar. 25, 2009) (included in Defendant Key Energy Services, Inc.'s Reply Brief in Support of Motion to Dismiss Plaintiff's Complaint or, in the Alternative, to Stay Action, Docket Entry No. 19, at Exhibit 7).

54  *See* Docket Sheet, *Key Energy Servs., Inc. v. Twin City Fire Ins. Co.,* No. 7:09–CV–24 (W.D. Tex. June 1, 2009) (listing Twin City's Original Answer as Docket Entry No. 10).

55  *See* Scheduling Order, *Key Energy Servs., Inc. v. Twin City Fire Ins. Co.,* No. 7:09–CV–24, Docket Entry No. 14 (W.D.Tex. Mar. 25, 2009) (setting deadline for motions for leave to amend or supplement pleadings as May 18, 2009) (included in Defendant Key Energy Services, Inc.'s Reply Brief in Support of Motion to Dismiss Plaintiff's Complaint or, in the Alternative, to Stay Action, Docket Entry No. 19, at Exhibit 7).

56  Plaintiff Twin City Fire Insurance Company's Opposition to Defendant Key Energy Services, Inc.'s Motion to Dismiss Plaintiff's Complaint or, in the Alternative, to Stay Action and Memorandum in Support, Docket Entry No. 18, at 11.

---

End of Document                                                    © 2024 Thomson Reuters. No claim to original U.S. Government Works.

# EXHIBIT 31

Vorrey v. City of Brownsville, Texas, Not Reported in Fed. Supp. (2018)

203 WL 6 12534©W

2018 WL 7291458

Only the Westlaw citation is currently available.

United States District Court, S.D. Texas, Brownsville Division.

Sesha Sai VORREY, Plaintiff,

v.

CITY OF BROWNSVILLE, TEXAS, Defendant.

Civil Action No. B: 17-cv-222

|

Signed 10/05/2018

**Attorneys and Law Firms**

Anthony P. Troiani, Brownsville, TX, for Plaintiff.

John-Michael Wyman Hayward, Ricardo J. Navarro, Robert Lee Drinkard, Denton Navarro Rocha Bernal & Zech, P.C., Harlingen, TX, for, Defendant.

## REPORT AND RECOMMENDATION OF THE MAGISTRATE JUDGE

Ronald G. Morgan, United States Magistrate Judge

**\*1**  On July 16, 2018, Defendant – City of Brownsville, Texas ("the City") – filed a motion to dismiss, pursuant to FED. R. CIV. P. 12(b)(1) and 12(b)(6). Dkt. No. 18.

On August 7, 2018, Plaintiff – Sesha Sai Vorrey ("Vorrey") – filed a response. Dkt. No. 27.

On August 10, 2018, the City filed a reply, as well as a motion to strike the exhibits that Vorrey attached to his response. Dkt. No. 28. On August 30, 2018, Vorrey filed a surreply. Dkt. No. 29.

The motion to dismiss has been referred to the undersigned, pursuant to 28 U.S.C. § 636(b)(1)(B). After reviewing the record and the relevant caselaw, it is recommended that the motion to dismiss be granted, for the reasons set out below. [1]

## I. Background

### A. Factual Background

In April 2004, Vorrey was hired as the airport operations director for the Brownsville/South Padre Island International Airport. Dkt. No. 16, pp. 3-4; Dkt. No. 16-1, p. 1. Vorrey is a native of India and was authorized to work in the United States as the result of a H-1B non-resident visa. Id.

"To obtain an H-1B visa, an employer must first obtain approval from the U.S. Department of Labor ("DoL") by filing a Labor Condition Application ("LCA"). The LCA requires an employer to represent that it intends to employ a particular foreign worker for a specific position for a given period of time." U.S. v. Nanda, 867 F.3d 522, 525 (5th Cir. 2017), cert. denied, 138 S. Ct. 1578, 200 L.Ed. 2d 765 (2018). Once the visa is issued, "the worker possesses lawful nonimmigrant status and may reside in the United States and work for the sponsoring employer until either the visa expires or her employment with the sponsoring employer is terminated." Id.

203 WL 6 12534©W

In June 2008, Vorrey was promoted to Chief Operations Officer at the airport. Dkt. No. 16-1, p. 1.

Vorrey's H-1B visa "was extended without issue in 2007, 2010 and 2013." Dkt. No. 16, p. 4. Vorrey served as the acting interim director of the airport from August 2015 until April 2016. Id.

Vorrey applied for the permanent airport director position, but in April 2016, the City hired Bryant Walker for that position. Dkt. No. 16, pp. 4-5. Vorrey was chosen, instead, to be the assistant airport director. Id.

On April 12, 2016, Vorrey attended a meeting with the City Manager, the City External Auditor, an airport consultant and the interim Director of Aviation for the airport. Dkt. No. 16, p. 5. During a lunch, the City Manager stated that Vorrey looked like a "Pakistani" and that Vorrey "needed to wear a tag to let everyone know that he is Indian and not Pakistani." Id. Vorrey claims to have been "deeply offended" by these remarks, but, at the time, took no action. Id.

On August 25, 2016, "the City of Brownsville scheduled a meeting between the airport staff and a local advertising agency." Dkt. No. 16, p. 5. Vorrey was not invited to the meeting or made aware of its existence. Id. Walker took an intern to the meeting instead. Id.

 *2  The next day, Walker "allegedly submitted" another H-1B visa extension request to USCIS; the request was returned by USCIS, seeking additional information. Dkt. No. 16, p. 6. USCIS sought "a job description and percentage of the time worked" and requested a response by December 24, 2016. Id.

On September 22, 2016, Walker assigned Vorrey the task of estimating the new airport terminal expenses and requested a response by the close of business that day. Dkt. No. 16, p. 6. A similar request was made to the maintenance supervisor, who is not Indian, but the maintenance supervisor was given more time to complete the task. Id.

On September 23, 2016, Federal Aviation Officials met with airport officials. Dkt. No. 16, p. 6. Despite the importance of the meeting, Vorrey, again, was not invited or informed about the meeting and Walker, again, took an intern to the meeting instead of Vorrey. Id.

On September 28, 2016, Vorrey's immigration attorney asked the City and Walker to provide "a job description and percentage of the time worked," in response to USCIS's request for additional information. Dkt. No. 16, p. 6. Walker never responded. Id, p. 7.

In October 2016, Walker informed USCIS that he believed that Vorrey had forged his, i.e. Walker's, signature on the LCA documentation. Dkt. No. 16-3, p. 2.

On November 29, 2016, the City Manager notified Vorrey that he was suspended and that an investigation was being undertaken as to whether Vorrey had forged Walker's signature on the LCA. Dkt. No. 16, p. 7.

On that same day, Walker emailed Terry Damman, a USCIS official, asking if there was "any requirement or obligation" that the City respond to the request for information and what the result would be if the City chose not to respond. Dkt. No. 16-3, p. 1.

On November 30, 2016, Damman responded to Walker that if a response was not provided by the deadline – December 24, 2016 – then the H-1B visa application would be "automatically denied for failure to respond." Dkt. No. 16-3, p. 1.

On January 31, 2017, USCIS formally denied Vorrey's H-1B visa extension application. Dkt. No. 16, p. 7.

On February 6, 2017, Ms. Wendy Carlson – a handwriting expert hired by Vorrey – determined that neither Vorrey nor Walker were the person who signed Walker's name on the disputed LCA form. Dkt. No. 16, p. 8. The complaint does not state if Carlson ever identified the person who signed Walker's name.

On February 10, 2017, Walker issued a formal termination letter to Vorrey. Dkt. No. 16-4. In justifying the decision, Walker cited the denial of the visa application, "as well as ... my loss of confidence in your credibility and your ability to carry out the duties and functions of the position you held at the airport." Id.

On April 27, 2017, Vorrey filed a claim with the Equal Employment Opportunity Commission, claiming employment discrimination. Dkt. No. 16, p. 10. On June 9, 2017, Vorrey received a "right to sue letter." Id.

### B. Procedural Background

On September 8, 2017, Vorrey filed a complaint in the 197th District Court in Cameron County, Texas. Dkt. No. 1-1. Vorrey pled claims of discrimination based on race, color and national origin, libel, quantum meruit, retaliation, and slander against the City. Id.

On September 22, 2017, Vorrey served the City with a copy of his complaint. Dkt. No. 1.

**\*3** On October 23, 2017, the City timely [2] removed the case to this Court, alleging that the state court complaint raised claims under federal law. Dkt. No. 1. Vorrey agrees that the Court has subject matter jurisdiction over his claims. Dkt. No. 3, p. 2.

On February 23, 2018, the City filed a motion to dismiss pursuant to FED. R. CIV. P. 12(b)(1) and 12(b)(6). Dkt. No. 6.

On March 16, 2018, Vorrey timely filed his first amended petition, which he was permitted to file as a matter of right under FED. R. CIV. P. 15(a). Dkt. No. 7. On March 23, 2018, the Court denied the City's motion to dismiss as moot, based on the amended complaint. Dkt. No. 8.

On March 28, 2018, the City filed a renewed motion to dismiss. Dkt. No. 9. On May 1, 2018, Vorrey filed an opposed motion for leave to file a second amended complaint. Dkt. No. 12. The City never filed a response in opposition to the motion for leave.

On July 5, 2018, the Court granted the motion for leave to file the second amended complaint, making that complaint the operative complaint in this case. Dkt. No. 15.

In the second amended complaint, Vorrey alleged that (1) the City discriminated against him based on his "race, color and national origin"; and, (2) the City did not reimburse him for the fees and costs associated with his unsuccessful H-1B visa application, as required by federal law. Dkt. No. 16. As to the first claim, Vorrey alleges that the City discriminated against him by: (1) not hiring him as the airport director; (2) falsely accusing him of forging Walker's signature; (3) refusing to complete the LCA form; and (4) terminating his employment. Id. Vorrey abandoned his claims of libel, quantum meruit, retaliation, and slander against the City. Id.

On July 16, 2018, the City filed a renewed motion to dismiss the second amended complaint. Dkt. No. 18. In that motion, the City argues that, as to the alleged discriminatory acts, the failure to promote claim is untimely filed and that Vorrey has not pled a prima facie case of discrimination as to the remaining three claims. Regarding the failure to reimburse claim, the City argues that there is no private right of action for such a failure and any claim must first be pursued administratively. Id.

On August 7, 2018, Vorrey timely filed a response to the motion to dismiss. Dkt. No. 27. Vorrey argues that the entire series of events – "a string of adverse actions" – create an adverse employment action, so he has made a prima facie case of discrimination. He also reasserts his argument that the failure to reimburse Vorrey violated federal law. Id. Vorrey attached exhibits to his response, including documents that he provided to the City regarding his immigration status, immigration applications and his proof that he did not forge Walker's signature.

203 WL 6 12534©W

On August 10, 2018, the City filed a reply brief and a motion to strike the exhibits that Vorrey attached to his response. Dkt. No. 28. The City argued that the Court cannot consider those documents in deciding a motion to dismiss. Id.[3]

**\*4** On August 30, 2018, Vorrey filed a surreply. Dkt. No. 29.

## II. Applicable Law

### A. Motion to Dismiss For Lack of Jurisdiction

The threshold question, before considering the substance of any claim, is whether the court possesses jurisdiction over the claim. This is the case, because federal courts are courts of limited jurisdiction, whose authority exists only within the boundaries established by Congress and the United States Constitution. Ruhrgas AG v. Marathon Oil Co., 526 U.S. 574, 583-84 (1999). A plaintiff bears the burden of proving jurisdiction. Choice Inc. of Tex. v. Greenstein, 691 F.3d 710, 714 (5th Cir. 2012).

In determining whether jurisdiction exists, the Court may consider: "(1) the complaint alone; (2) the complaint supplemented by undisputed facts evidenced in the record; or (3) the complaint supplemented by undisputed facts plus the court's resolution of disputed facts." Ramming v. U.S., 281 F.3d 158, 161 (5th Cir. 2001). Conclusory allegations or "legal conclusions masquerading as factual conclusions will not suffice to prevent a motion to dismiss." Wells v. Ali, 304 Fed. App'x. 292, 293 (5th Cir. 2008) (quoting Fernandez–Montes v. Allied Pilots Ass'n, 987 F.2d 278, 284 (5th Cir. 1993) ).

### B. Motion to Dismiss For Failure To State A Claim

"A motion to dismiss under Rule 12(b)(6) tests only the formal sufficiency of the statements of the claims for relief. It is not a procedure for resolving contests about the facts or merits of the case .... [T]he Court must take the plaintiffs' allegations as true, view them in a light most favorable to plaintiffs, and draw all inferences in favor of the plaintiffs." Askanase v. Fatjo, 828 F. Supp. 465, 469 (S.D. Tex. 1993) (citing Scheuer v. Rhodes, 416 U.S. 232, 236 (1974) ); Garrett v. Commonwealth Mortgage Corp. of Am., 938 F.2d 591, 593 (5th Cir. 1991) ).

The plaintiff must plead "enough facts to state a claim to relief that is plausible on its face." Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007). Consistent with this requirement, "plaintiffs must allege facts that support the elements of the cause of action in order to make out a valid claim." City of Clinton v. Pilgrim's Pride Corp., 632 F.3d 148, 152-53 (5th Cir. 2010). "Factual allegations must be enough to raise a right to relief above the speculative level, on the assumption that all the allegations in the complaint are true (even if doubtful in fact)." Twombly, 550 U.S. at 589. "[R]egardless of whether the plaintiff is proceeding pro se or is represented by counsel, conclusory allegations or legal conclusions masquerading as factual conclusions will not suffice to prevent a motion to dismiss." McConathy v. Dr.Pepper/Seven Up Corp., 131 F.3d 558, 561 (5th Cir. 1998).

Whether a complaint states a plausible claim for relief is a context-specific task that requires the reviewing court to draw on its judicial experience and common sense. Iqbal v. Ashcroft, 556 U.S. 662, 678 (2009). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Id. It follows that, "where the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged – but it has not 'show[n]' – 'that the pleader is entitled to relief.' "Id. at 1950 (quoting Fed. R. Civ. P. 8(a)(2) ).

### C. Employment Discrimination

**\*5** It is not entirely clear from the second amended complaint whether Vorrey is making his employment discrimination claims under state or federal law, so the Court will consider it under both. Both state and federal law, however, utilize the three-part, burden-shifting test, known as the McDonnell Douglas[4] test, to judge claims of employment discrimination. Goudeau v. Nat'l Oilwell Varco, L.P., 793 F.3d 470, 474 (5th Cir. 2015).

203 WL 6 12534©W

"Under the McDonnell Douglas analysis, a plaintiff is entitled to a presumption of discrimination if he can meet the minimal initial burden of establishing a prima facie case." Reed v. Neopost USA, Inc., 701 F.3d 434, 439 (5th Cir. 2012). The standards for whether a plaintiff has pled a prima facie case of discrimination are identical under both state and federal law. Goudeau, 793 F.3d at 474.

The elements of a prima facie case of employment discrimination are that the plaintiff: (1) is a member of a legally-protected class; (2) was qualified to hold the position; (3) suffered an adverse employment action; and (4) was treated less favorably than those outside of the protected class. Mission Consol. Independent School Dist. v. Garcia, 372 S.W.3d 629, 634 (Tex. 2012); Malcolm v. Vicksburg Warren Sch. Dist. Bd. of Trustees, 709 F. App'x 243, 247 (5th Cir. 2017). The plaintiff must meet "every element of a prima facie case." Cherry v. CCA Properties of Am. Liab. Corp., 438 F. App'x 348, 352 (5th Cir. 2011). The defendant is entitled to dismissal if the plaintiff fails to show any single element of the prima facie case. McCoy v. Texas Instruments, Inc., 183 S.W.3d 548, 555 (Tex. App. 2006).

"After the plaintiff establishes a prima facie case, the burden shifts to the employer to show a legitimate, nonretaliatory reason for the adverse employment action." Black v. Pan Am. Labs., L.L.C., 646 F.3d 254, 259 (5th Cir. 2011). The Court does not reach this step unless the plaintiff has first demonstrated every element of a prima facie case. Byers v. Dallas Morning News, Inc., 209 F.3d 419, 429 (5th Cir. 2000).

If the defendant meets its burden at the second step, then "the presumption of discrimination created by the plaintiff's prima facie case disappears and the plaintiff must meet its ultimate burden of persuasion on the issue of intentional discrimination." Machinchick v. PB Power, Inc., 398 F.3d 345, 350 (5th Cir. 2005). "A plaintiff may meet this burden by producing evidence tending to show that the reason offered by the defendant is pretext for discrimination." Id.

## III. Analysis

In the operative complaint, Vorrey has asserted five separate claims. The first four claims are based on four distinct actions of employment discrimination: (1) not hiring him as the airport director; (2) falsely accusing him of forging Walker's signature; (3) refusing to complete the LCA form; and (4) terminating his employment. As to the first claim, it was not timely filed under federal or state law, depriving the Court of subject matter jurisdiction under state law and failing to state a claim to relief under federal law. As to the second, third, and fourth claims, each claim fails to establish a prima facie case under McDonnell-Douglas, albeit for a different reason on each claim.

The fifth claim made by Vorrey is that the City did not reimburse him for the fees and costs associated with his unsuccessful H-1B visa application, as required by federal law. The Court lacks subject matter jurisdiction over this claim.

**\*6**  With this summary in mind, the Court turns to the examination of each claim.

### A. Employment Discrimination

### 1. Failure to Promote

Vorrey asserts that the City discriminated against him when it failed to promote him to the position of airport director. This claim is untimely filed.

In April 2016, the City hired Bryant Walker for the position of airport director. Dkt. No. 16, pp. 4-5. It wasn't until April 27, 2017, that Vorrey filed a claim with the EEOC, claiming employment discrimination. Dkt. No. 16, p. 10.

Whether considered under state or federal law, Vorrey's claim was not timely filed. Under state law, "[a]n aggrieved employee must file his formal complaint with the EEOC or [Texas Commission on Human Rights] no later than 180 days after the date

203 WL 6 12534©W

of the alleged unlawful employment practice." Harris v. BASF Corp., 81 F. App'x 495, 496 (5th Cir. 2003). Even if the Court assumes that Walker was hired on April 30, 2016, then the complaint had to be filed no later than October 27, 2016, which is 180 days later. Under state law, the failure to timely file a complaint is jurisdictional. Manuel v. Sanderson Farms Inc., Processing Div., 90 F. App'x 714, 717 (5th Cir. 2004) (citing Jones v. Grinnell Corp., 235 F.3d 972, 974 (5th Cir. 2001) ). Thus, the Court lacks jurisdiction as to this claim under state law.

Under federal law, Vorrey had 300 days from the date that Walker was hired to file a claim with the EEOC. 42 U.S.C. § 2000e-5(e); Tillison v. Trinity Valley Elec. Co-op. Inc., 204 F. App'x 346, 348 (5th Cir. 2006) ("a claimant must file a charge of discrimination within 300 days of the alleged discriminatory action."). Thus, if Walker was hired on April 30, 2016, then Vorrey had until February 24, 2017, to timely file his claim with the EEOC. Again, Vorrey did not file his complaint until April 27, 2017, which makes it untimely filed.

Unlike state law, where the failure to timely file is jurisdictional, Manuel, 90 F. App'x at 717, under federal law, the failure to timely exhaust is not jurisdictional, but, instead constitutes an affirmative defense. Davis v. Fort Bend Cty., 893 F.3d 300, 307 (5th Cir. 2018). Such claims are subject to equitable tolling. "Under the equitable-tolling doctrine, failure to [timely file] may be excused, particularly (although not exclusively) in three circumstances: (1) a pending action between the parties in the incorrect forum; (2) the claimant's unawareness of facts supporting her claim because the defendant intentionally concealed them; and (3) the claimant's being misled by the EEOC about her rights." Tillison, 204 F. App'x at 348. The plaintiff has the burden to establish that equitable tolling is appropriate. Id. In any event, such tolling should be applied "sparingly." Id.

At the time of filing, the limitations period had already passed. Vorrey has pled no facts showing that equitable tolling is appropriate and none are evident from the record, even if the Court goes beyond the instances expressly listed in Tillison. This claim should be dismissed for failure to state a claim upon which relief can be granted.

## 2. False Accusation & Investigation

 **\*7** Vorrey alleges that the City discriminated against him when it investigated him for allegedly forging Walker's signature on the LCA paperwork. Despite the allegation, Vorrey does not state a prima facie case of employment discrimination.

One of the prongs of a prima facie case of discrimination, under both state and federal law, is that Vorrey must have suffered an adverse employment action. Mission Consol. Independent School Dist., 372 S.W.3d at 634; Malcolm, 709 F. App'x at 247. The allegation of forging Walker's signature – regardless of the truth of the claim – and the ensuing investigation, do not constitute an adverse employment action.

The Fifth Circuit "has analyzed the 'adverse employment action' element in a stricter sense than some other circuits." Burger v. Cent. Apartment Mgmt., Inc., 168 F.3d 875, 878 (5th Cir. 1999). Under Fifth Circuit precedent, only "ultimate" employment decisions – "such as hiring, granting leave, discharging, promoting, and compensating" – are considered adverse employment actions. Id.

The Fifth Circuit has consistently held that interlocutory decisions – even if they lead to an eventual termination – are not adverse employment actions. Wakefield v. State Farm Ins., 229 F.3d 1148 (5th Cir. 2000). This is because the intermediate decision did not have the immediate effect of altering the terms and conditions of employment. Wakefield, 229 F.3d at 1148 (failure to be recommended for a promotion not sufficiently adverse); Clayton v. Rumsfeld, 106 F. App'x 268, 270 (5th Cir. 2004) ("possible spying, a non-promotable rating, scrutinization, a letter of warning, rejection of [plaintiff's] request to have a third person of her choosing present at weekly meetings with her supervisors" not adverse); Cothran v. Potter, No. 3:08-CV-0785-O, 2010 WL 1062564, at \*3 (N.D. Tex. Mar. 22, 2010), aff'd, 398 F. App'x 71 (5th Cir. 2010) (increased supervision of employee not adverse); Julian v. City of Houston, No. 4:12-CV-2973, 2014 WL 3795580, at \*23 (S.D. Tex. July 31, 2014), aff'd, 618 F. App'x 211 (5th Cir. 2015) ("unfavorable performance ratings" not adverse); Garcia v. Potter, No. SA-09-CV-973-

XR, 2010 WL 2025068, at *4 (W.D. Tex. May 18, 2010) ("letters of warning" in personnel file not adverse). Thus, in each case, a decision was made that did not necessarily have to result in the eventual termination or demotion of the employee and that decision was not an adverse employment action.

In short, an investigation that does not result in a change in pay, benefits, responsibility, or prospects for promotion is not an adverse employment action. Mora v. Ashcroft, 142 F. App'x 206, 207 n. 2 (5th Cir. 2005) (unpubl.); see Hockman v. Westward Commc'ns, LLC, 407 F.3d 317, 331 (5th Cir. 2004) (holding that a claim that the employer instituted a "baseless racial harassment investigation" against the employee was not an adverse employment action).

Thus, the decision to investigate Vorrey and the apparent forgery of Walker's signature on the LCA form was not an adverse employment action. The failure to plead facts as to any single prong of the prima facie case is fatal to Vorrey's claim. Cherry, 438 F. App'x at 352. Given this failure, this claim should be denied for failure to state a claim upon which relief can be granted.

### 3. Failure to Complete the LCA Form

 **\*8**  Vorrey alleges that the City discriminated against him when it chose not to return the LCA Form, constructively denying him his H-1B visa. Again, Vorrey's complaint fails to state a claim upon which relief can be granted.

As previously noted, the four elements of an employment discrimination claim are that the plaintiff: (1) is a member of a legally-protected class; (2) was qualified to hold the position; (3) suffered an adverse employment action; and (4) was treated less favorably than similarly situated employees, who are not members of the protected class. Malcolm, 709 F. App'x at 247. Vorrey has pled that he is a member of a legally protected class. Furthermore, at the time that the LCA form was due, Vorrey still had a legally valid H-1B visa and has pled that he was qualified to remain in his position. Thus, at the time that Walker chose not to return the LCA form, the first two elements of the prima facie case were satisfied. Accordingly, the Court will assume these well-pled facts to be true and construe them in Vorrey's favor. Villarreal v. Wells Fargo Bank, N.A., 814 F.3d 763, 766 (5th Cir. 2016). Given this conclusion, the Court will focus upon the third and fourth elements.

When analyzing whether the failure to file the LCA form was an adverse employment action, "[a] determining factor in the analysis is whether [the Plaintiff's] employment status [was] significantly altered" by the employer's decision. McFall v. Gonzales, 143 F. App'x 604, 608 (5th Cir. 2005). "For example, a decision made by an employer that only limits an employee's opportunities for promotion or lateral transfer does not qualify as an adverse employment action." Banks v. E. Baton Rouge Par. Sch. Bd., 320 F.3d 570, 575 (5th Cir. 2003).

As previously discussed, an employer's action, that does not immediately alter the terms or conditions of employment, is not an adverse employment action. Wakefield, 229 F.3d 1148. But this claim differs in one key respect from the cases where an employer instituted an investigation or put an employee under increased supervision or issued a negative performance review. Unlike those cases, the decision not to complete the LCA resulted in Vorrey losing his authorization to work for the City as a matter of law. See 20 C.F.R. § 655.730(b) ("Incomplete or obviously inaccurate LCAs will not be certified by [DOL]"). The failure to complete the LCA had the practical effect of terminating Vorrey's employment with the City, which Walker knew when he refused to complete the form. Dkt. No. 16-3, p. 1. This decision terminated Vorrey's legal authorization to work for the City at the expiration of his visa. Indeed, it was a discharge in all but name. As such, it constituted an ultimate employment decision and was an adverse employment action. That finding, however, does not end the analysis. As noted earlier, each element must be present to state a claim. Here the failure lies as to the last element.

As to the fourth element, Vorrey has failed to plead facts showing that he was treated less favorably than similarly situated employees who are not members of the protected class. "There must be 'nearly identical' circumstances for employees to be considered similarly situated." Maestas v. Apple, Inc., 546 F. App'x 422, 427 (5th Cir. 2013). Vorrey, then, must be compared to other H-1B visa holders working for the City. Vorrey has pled no facts showing that the City completed LCA applications

for workers who were not Indian, or who were younger than he was. In fact, Vorrey has not pled any facts as to any other City workers who held H-1B visas. Given this failure, Vorrey has failed to plead a <u>prima facie</u> case of discrimination as to this claim and it should be dismissed.

### 4. Termination

**\*9**  Vorrey asserts that he was discriminated against when the City formally terminated his employment. Once again, he has failed to state a claim upon which relief can be granted.

One of the prongs of a <u>prima facie</u> case is that the employee was qualified for the position. It is undisputed that Vorrey is an Indian national. For aliens, "being 'qualified' for the position is not determined by the applicant's capacity to perform the job-rather, it is determined by whether the applicant was an alien authorized for employment in the United States at the time in question." <u>Egbuna v. Time-Life Libraries, Inc.</u>, 153 F.3d 184, 187 (4th Cir. 1998) (en banc). Vorrey's work authorization expired on January 31, 2017. Dkt. No. 16, p. 7. Vorrey's employment was terminated on February 10, 2017. Dkt. No. 16-4. Thus, at the time of termination, Vorrey was no longer authorized to work for the City. In short, he was no longer qualified for the position. Thus, Vorrey has failed to pled facts showing a <u>prima facie</u> case of discrimination and this claim should be dismissed.

### B. Fees

Vorrey claims that the City was required to reimburse him for his fees and costs in connection with his H-1B visa. The Court lacks jurisdiction over this claim.

Under federal regulations, an employer may not "recoup a business expense(s) of the employer (including attorney fees and other costs connected to the performance of H-1B program functions which are required to be performed by the employer, e.g., preparation and filing of LCA and H-1B petition)." 20 C.F.R. § 655.731(b)(9)(ii). If an employer does recoup these expenses, the Department of Labor "will consider the amount to be an unauthorized deduction from wages even if the matter is not shown in the employer's payroll records as a deduction." 20 C.F.R. § 655.731(b)(12).

The proper remedy, in the event that an employer unlawfully deducts H-1B fees and costs, is to file a complaint with the Administrator of the Wage and Hour Division, Employment Standards Administration in the Department of Labor ("the Administrator"). 20 C.F.R. § 655.731(d). If the Administrator finds that a violation has occurred, the Administrator will seek a prevailing wage determination from the Employment and Training Administration ("ETA"), asking the ETA to determine any violations and to compute any necessary back wages from the unauthorized deduction. <u>Id</u>.

Any appeals from a determination by the ETA go to an administrative law judge, and then to the Department of Labor's Administrative Review Board ("ARB"). <u>Kutty v. U.S. Dep't of Labor</u>, 764 F.3d 540, 543 (6th Cir. 2014). A party may appeal the ARB's decision as a final agency action under the Administrative Procedures Act. <u>Dongsheng Huang v. Admin. Review Bd., U.S. Dep't of Labor</u>, 579 F. App'x 228, 231 (5th Cir. 2014).

Vorrey has alleged that the City "unlawfully required him to pay the application fees for his H-1B visa." Dkt. No. 16, p. 13. There is, however, "no private right of action" to recover the costs of filing an H-1B visa. <u>Watson v. Bank of Am.</u>, 196 F. App'x 306, 307 (5th Cir. 2006)

There is no evidence in the record that Vorrey ever filed a claim with the Department of Labor making these allegations. Absent making such a claim – and following the administrative process to completion – the Court lacks jurisdiction over the claim. <u>Shah v. Wilco Sys., Inc.</u>, 126 F. Supp. 2d 641, 648 (S.D.N.Y. 2000) (noting that judicial review can only happen "once the administrative procedure has been exhausted.").

*10  The absence of any administrative process deprives the Court of jurisdiction over this claim. Shah, 126 F. Supp. 2d at 647-48. Accordingly, this claim should be dismissed for lack of jurisdiction.

**IV. Recommendation**

It is recommended that the motion to dismiss filed by the City of Brownsville be granted. Dkt. No. 18. [5]

It is further recommended that:

– Any claim of employment discrimination under the Texas Commission on Human Rights Act, relating to the failure to promote Vorrey to airport director, be dismissed without prejudice for lack of jurisdiction.

– Any remaining claims of employment discrimination under the Texas Commission on Human Rights Act, be dismissed with prejudice for failure to state a claim upon which relief can be granted.

– All claims of employment discrimination under either Title VII or the Age Discrimination in Employment Act, be dismissed with prejudice for failure to state a claim upon which relief can be granted.

– Any claims for unreimbursed fees and costs relating to the H-1B visa process be dismissed without prejudice for lack of jurisdiction.

The parties have fourteen (14) days from the date of being served with a copy of this Report and Recommendation within which to file written objections, if any, with the Honorable Fernando Rodriguez, Jr., United States District Judge. 28 U.S.C. § 636(b)(1) (eff. Dec. 1, 2009). Failure to file timely objections shall bar the parties from a de novo determination by the District Judge of an issue covered in the report and shall bar the parties from attacking on appeal factual findings accepted or adopted by the district court except upon grounds of plain error or manifest injustice. See § 636(b)(1); Thomas v Arn, 474 U.S. 140, 149 (1985); Douglass v. United Servs. Auto. Ass'n, 79 F.3d 1415, 1428-29 (5th Cir. 1996) superseded by statute on other grounds, 28 U.S.C. § 636(b)(1) (extending the time to file objections from ten to fourteen days).

DONE at Brownsville, Texas, on October 5, 2018.

**All Citations**

Not Reported in Fed. Supp., 2018 WL 7291458

**Footnotes**

1    As discussed later, the Court recommends that the motion to strike the exhibits, attached to Vorrey's response, be dismissed as moot.

2    The 30th day for service was on October 22, 2017, which was a Sunday. Pursuant to FED. R. CIV. P. 6(a)(1)(C), the following day, October 23, 2017, became the deadline to timely remove the case.

3    The Court is typically not permitted to consider matters outside of the pleadings when deciding a motion to dismiss. LeBeouf v. Manning, 575 F. App'x 374, 375 (5th Cir. 2014) (citing Leal v. McHugh, 731 F.3d 405, 410 (5th Cir. 2013)

203 WL 6 12534©W

). Even if the Court considers the exhibits provided by Vorrey, it does not alter the Court's analysis and the outcome remains the same. Accordingly, the motion to strike the exhibits should be denied as moot.

4    McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973).

5    Vorrey has sought the opportunity to amend and replead his complaint in the event that the Court is inclined to grant the motion to dismiss. Dkt. No. 27, p. 9. The Court should not permit another amendment. Vorrey has already amended his complaint twice, giving him ample opportunity to put forward his best-pled complaint. "[P]laintiffs cannot be allowed to continue to amend or supplement their pleadings until they stumble upon a formula that carries them over the threshold.". Jacquez v. Procunier, 801 F.2d 789, 792 (5th Cir. 1986).

---

**End of Document**                                   © 2023 Thomson Reuters. No claim to original U.S. Government Works.

# EXHIBIT 32

dictment, before competent court, and jury duly empaneled, sworn and charged with the case.

---

Horace R. Goff, State Public Defender, Carson City, for appellant.

Robert List, Atty. Gen., Herbert F. Ahlswede, Chief Deputy Atty. Gen., Michael E. Fondi, Dist. Atty., Carson City, for respondent.

## OPINION

PER CURIAM:

In this appeal from an order denying a pretrial petition for habeas corpus we are asked to reverse because, (1) there was insufficient evidence to establish probable cause to hold appellant for trial for murder (NRS 200.010, NRS 200.030(1)(b)); and (2) the charge is proscribed because the prison disciplinary committee has already assessed appellant 29 days punishment "in the hole" for his involvement in the event. We reject both contentions.

[1] 1. The challenge to the sufficiency of the evidence is directed to several statements made by the deceased and admitted in evidence as dying declarations under NRS 51.335. Appellant argues the statements were not properly qualified as "dying declarations" because when they were made the deceased did not specifically say that he knew he was going to die.

Even if we assume, *arguendo*, the challenged statements were improperly admitted in evidence, other evidence in the record, which is not challenged, is sufficient to meet the requirement of NRS 171.-206, that the charged offense was committed by appellant.

[2,3] 2. The trial and conviction of an inmate who has previously been disciplined by prison authorities for the same offense does not constitute double jeopardy. State v. Williams, 208 Kan. 480, 493 P.2d 258 (1972); State v. Bowling, 1 Or. App. 103, 459 P.2d 454 (1969); United States v. Williamson, 469 F.2d 88 (5th

Cir. 1972); United States v. Hedges, 458 F.2d 188 (10th Cir. 1972); United States v. Apker, 419 F.2d 388 (9th Cir. 1969); Patterson v. United States, 183 F.2d 327 (4th Cir. 1950), cert. denied. 340 U.S. 893, 71 S.Ct. 200, 95 L.Ed. 647 (1950).

Jeopardy does not attach until "the accused has been placed upon trial, upon a valid indictment, before a competent court, and a jury duly impaneled, sworn, and charged with the case, . . . " Ex Parte Maxwell, 11 Nev. 428, 434 (1876).

The order of the trial court is affirmed.



---

**WESTERN CAB COMPANY a Nevada corporation and Johnnie Crockett, Appellants and Cross-Respondents,**

v.

**Charles L. KELLAR and Cornelia Kellar, Respondents and Cross-Appellants.**

No. 7295.

Supreme Court of Nevada.

June 28, 1974.

Rehearing Denied July 26, 1974.

A husband and wife brought an action against a corporation and one of its shareholders in which the wife alleged that she was sole owner of the corporation by virtue of a transfer of its stock to her by her husband and the husband alleged that he was entitled under an oral agreement to enforce certain promises made to him in exchange for his testifying on behalf of the corporation's application for operating authority as a taxicab company. The Eighth Judicial District Court, Clark County, James D. Santini, J., found insufficient credible evidence to support a claim of ownership on behalf of the wife, but awarded recovery to the husband, and cross appeals were filed by the parties. The Supreme Court, Zenoff, J., held that the evidence refuted the wife's assertion

Case 1:23-cv-00418-MAC   Document 6-1   Filed 02/20/24   Page 362 of 394 PageID #:  408

that she had acquired ownership of the corporation's stock; that the husband was estopped by his actions from denying the validity of a prior transaction in which he was alleged to have sold the company's stock to the individual defendant; and that the alleged oral agreement, under which the husband was to receive money and stock in exchange for supporting the company's application for operating authority and for forebearing from asserting any claim of ownership in the company, was unenforceable as being against public policy.

Affirmed in part and reversed in part.

Breen, J., dissented and filed opinion.

### 1. Evidence ⬅583
#### Husband and Wife ⬅45

Wife's assertion that she acquired sole ownership of stock in corporation from husband was refuted by evidence that husband executed agreement, notarized by wife, stating that husband was sole owner of corporation and purporting to convey all of his interest to third party; by husband's sworn testimony to same effect during hearings on corporation's application for operating authority as taxicab company; and by fact that original date of endorsement had been erased and changed in certificate for company's stock endorsed to wife.

### 2. Estoppel ⬅70(1)

Stockholder was estopped to deny validity of transfer of his shares to another on grounds that stock certificate was not delivered to transferee where he first purported in written agreement for transfer of stock to convey all ownership in corporation to transferee and then subsequently testified under oath that he had done so and where neither he nor his wife, who claimed to have acquired same shares from him, asserted ownership rights in corporation while company was being operated by transferee for some two years after transfer.

### 3. Contracts ⬅129(2)

Contract to pay witness for testifying, coupled with condition that right of witness to compensation depends upon result of suit in which testimony is to be used, is contrary to public policy and void for reason that such contract tends to lead to perjury and perversion of justice.

### 4. Contracts ⬅129(2)

Contract was unenforceable as being against public policy which provided that, in exchange for certain payments in money and transfer of corporate stock, person formerly interested in taxicab company would testify in support of company's pending application for operating authority and would forebear asserting any claim of ownership in company, payment to be contingent on granting of company's pending application.

### 5. Contracts ⬅108(1)

All contracts the purpose of which is to create situation which tends to operate to detriment of public interest are against public policy and void, whether in a particular case the purpose of the contract is effectuated.

---

Boyd, Leavitt & Freedman, Las Vegas, for appellants.

Charles L. Kellar, Kermitt L. Waters, Las Vegas, for respondents.

## OPINION

ZENOFF, Justice:

The genesis of the appellant corporation occurred in the early 1950's when Western Enterprises, Inc. was organized to operate the franchise of Western Cab Company. During a subsequent reorganization of Western Enterprises following various financial difficulties, respondent and cross-appellant Charles Kellar obtained an ownership interest in the corporation and assumed responsibility as a corporate officer. Further financial difficulties led to the transfer of all of the corporation's right, title and interest in the franchise to oper-

ate the cab company to Kellar. This occurred in July of 1964. In 1966, the corporation's charter was revoked by the state.

Thereafter, appellant Crockett, one of the founders of the business, sought to reactivate the then defunct corporation. In consideration of Crockett's payment of $500.00 and assumption of outstanding obligations of Western Enterprises, Charles Kellar executed an instrument dated May 16, 1968 purporting to convey all of his interest in the business. The agreement, which recited that Kellar was the sole owner of Western Enterprises, was notarized by respondent and cross-appellant, Cornelia Kellar.

Crockett then proceeded to reactivate the company. The corporation's charter was reinstated with the Secretary of State in June of 1968 at which time the corporation's name was changed to Western Cab Company. With the assistance of a substantial cash investment by Herbert Tobman, one of the defendants in the lower court, business was resumed. From June of 1968 through July of 1970, Crockett, Tobman and Myron Leavitt, also a defendant in the lower court action, engaged in the exclusive ownership and management of the cab company. At no time during this interval was any ownership interest asserted for or on behalf of either Charles or Cornelia Kellar.

Respondents first put forth a claim of ownership in June of 1970 when the defendants filed an application with the Taxicab Authority to change the name listed on the certificates of public convenience and necessity to conform with the new name of the corporation and for authority to issue stock. Charles Kellar appeared at a hearing on the application with the apparent intention of contesting the defendants' ownership of the corporation. That same day, during a luncheon meeting with Tobman, Crockett and Leavitt, it was agreed on behalf of the corporation to pay Kellar $6,000.00 cash and to reimburse him for monies expended on behalf of the corporation between May 16, 1968 and July

16, 1970. In addition, appellant Crockett promised to transfer five hundred of his shares in the corporation to Kellar. In consideration of these promises, Charles Kellar agreed to support the application then pending before the Taxicab Authority and to forbear asserting any claim of ownership in the cab company. In furtherance of this agreement, Kellar appeared before the Authority and gave sworn testimony acknowledging the agreement of May 16, 1968 and receipt of Crockett's $500.00 payment. At that time he represented that on the date of sale he was the sole owner of Western Enterprises, Inc.

Upon failure of the corporation's officers to execute a written memorandum of the luncheon agreement or to pay the agreed consideration, an action was filed on September 24, 1970, on behalf of Cornelia Kellar alleging that by virtue of a transfer from her husband of all stock in Western Enterprises, Inc. in 1964, she was the sole owner of the corporation. Following protracted litigation, the lower court found insufficient credible evidence to support a claim of ownership on behalf of Cornelia Kellar but awarded recovery to her husband Charles on the basis of the agreement relative to his testimony before the Taxicab Authority.

[1] 1. There is abundant evidence in the record to refute respondent and cross-appellant Cornelia Kellar's assertion that she acquired the sole ownership of the stock in Western Enterprises, Inc. on December 1, 1964. This evidence includes: (1) an agreement executed by Charles Kellar on May 16, 1968, and notarized by his wife, which states that Charles Kellar is "the sole owner of all rights, interests of Western Enterprises, Inc. . . . ," (2) Charles Kellar's sworn testimony before the Taxicab Authority of the State of Nevada to the same effect, and (3) a stock certificate representing 200 shares of stock in Western Enterprises, Inc. endorsed to Cornelia Kellar wherein it appears that the original date of the endorsement has been erased and changed. The trial court's

finding, supported by substantial evidence in the record, will not be disturbed on appeal. Briggs v. Zamalloa, 83 Nev. 400, 432 P.2d 672 (1967).

[2] 2. Respondent Kellar asserts as error the lower court's conclusion that the agreement of May 16, 1968 effectively conveyed his interest in the corporation to Crockett for the reason that a stock certificate representing 200 shares in Western Enterprises was not delivered to Crockett. We hold that Kellar is estopped to deny the validity of the transfer by reason of his conduct. On two occasions, in 1966 when the agreement of sale was executed and in 1970 before the Taxicab Authority, Kellar first purported to convey all ownership in Western Enterprises and then testified under oath that he had done so. From June of 1968 to July of 1970, when the cab company was being operated by Crockett, Tobman and Leavitt, the Kellars asserted no ownership rights in the corporation. By virtue of the 1968 agreement, both Charles and Cornelia Kellar had knowledge of the transfer. To entertain a defense of nondelivery at this late stage would be manifestly unjust and tantamount to permitting the perpetration of fraud upon the defendant parties.

3. The trial court erred however in allowing Kellar to recover on the basis of the July 1970 agreement. In consideration of this agreement the lower court found that Charles Kellar's obligations were twofold: (1) to support the application then pending before the Taxicab Authority and (2) to forbear asserting any claim of ownership in Western Cab Company. According to Charles Kellar's own memorandum of the agreement, payment was contingent on the successful outcome of the defendants' application then pending before the Taxicab Authority. Kellar testified in open court that in advance of his testimony before the Authority, he had agreed to testify precisely in the manner suggested by the defendants.

[3, 4] A contract to pay a witness for testifying coupled with the condition that

the right of the witness to compensation depends upon the result of the suit in which his testimony is to be used, is contrary to public policy and void for the reason that it is the tendency of such a contract to lead to perjury and the perversion of justice. Burchell v. Ledford, 226 Ky. 155, 10 S.W.2d 622 (1928); see also Apter v. Joffo, 32 Mich.App. 411, 189 N.W.2d 7 (1971); Goodyear Tire & Rubber Co. v. Overman Cushion Tire Co., 95 F.2d 978 (6th Cir. 1937). We do not hesitate to apply this rule when, as in the present case, the witness's only interest in the outcome of the litigation is that created by contract. See M. Farbman and Sons, Inc. v. Continental Casualty Co., 62 Misc.2d 236, 308 N.Y.S.2d 493, aff'd 66 Misc.2d 146, 319 N.Y.S.2d 775 (1971). Whatever initial interest Kellar may have had in the outcome of the application before the Taxicab Authority, it was superseded by the July 16 agreement promising payment in the event of approval.

[5] All contracts the purpose of which is to create a situation which tends to operate to the detriment of the public interest are against public policy and void whether in a particular case the purpose of the contract is effectuated. King v. Randall, 44 Nev. 118, 190 P. 979 (1920). For this reason we reverse that part of the decision in the lower court granting recovery to Charles Kellar and affirm in all other respects.

THOMPSON, C. J., and MOWBRAY and BATJER, JJ., concur.

BREEN, District Judge.

I dissent.

I disagree with that part of the majority opinion which reverses the lower court. I agree with the proposition that a contract made by a witness who testified for a consideration which is contingent upon the outcome of litigation is void as against public policy. However, where that witness is otherwise interested in the result of the litigation; where the witness has a le-

gitimate and otherwise potentially valid claim pertaining to the subject matter of the litigation which he also gives up, there is sufficient consideration to support an enforceable contract.

It is true that Mr. Kellar's testimony was given for a consideration which was, in part, contingent on the outcome of the taxicab proceedings. In addition to that, Mr. Kellar agreed to forebear asserting a claim of right. I do not believe this contract is against public policy because the policy considerations are absent in such a case.

I do not think perjury is promoted any more in this case than testimony which is the result of a compromise of a divorce case or any other compromise litigation between the parties.

When one testifies for a consideration, at least three possibilities arise with respect to that person's status toward the litigation.

If the person has no independent interest in the subject matter, nor the outcome of the proceedings, he is a stranger to the litigation and perhaps the general rule would apply. But one may be an adverse party to the proceedings or one may stand to gain or lose rights as a result of the proceedings and thus be an "interested witness". In these cases, the fact that part of the consideration itself may have illegal aspects won't defeat the agreement. There is ample authority for this proposition of law. Johnson v. Country Life Insurance Co., 12 Ill.App.3d 158, 300 N.E.2d 11 (1973); Schara v. Thiede, 58 Wis.2d 489, 206 N.W.2d 129 (1973); Ingle v. Perkins, 95 Idaho 416, 510 P.2d 480 (1973); Wilson v. Maryland Cas. Co., La.App., 269 So.2d 562 (1972); Seufert v. Greenfield, Or., 496 P.2d 197 (1972); River Garden Farms v. Superior Court, 26 Cal.App.3d 986, 103 Cal.Rptr. 498 (1972); Willcher v. Willcher, D.C.App., 294 A.2d 486 (1972); Ferro v. Bologna, 31 N.Y.2d 30, 334 N.Y.S.2d 856, 286 N.E.2d 244 (1972); Sealy Mat-

tress Co. v. Sealy, Inc., D.C., 346 F,Supp. 353 (1972); Cox v. Hope, Tex.Civ.App., 498 S.W.2d 436 (1973); Thatcher v. Darr, 27 Wyo. 452, 199 P. 938; Dodge v. Stiles, 26 Conn. 463 (1857).

I believe there was substantial evidence to conclude that part of the consideration for the July 16, 1970 contract was good faith forebearance to assert a prior existing disputed claim. If this were the case, the agreement would be valid and enforceable. For example, at the time of the agreement in Western Cab Company in question, Kellar or his wife were stockholders of record and had been notified of the proceedings before the Taxicab Authority.

The majority's view that Kellar's only interest was created by the contract itself amounts to a substitution of its view of the evidence for that of the trial court. This violates the proposition, used by the majority opinion, that a trial court's finding, if supported by substantial evidence in the record, will not be disturbed on appeal. Briggs v. Zamalloa, 83 Nev. 400, 432 P.2d 672 (1967).

The majority opinion concludes that Kellar's only interest in the outcome of the litigation was created by the July 16 contract, which they say is illegal. Yet they also say that "whatever prior interest Kellar may have had in the outcome of the application before the taxicab authority, it was superseded by the July 16 agreement promising payment in the event of approval." This is confusing to me because it appears to make the agreement both valid and invalid in order to support the conclusion reached. If the July 16 agreement superseded any prior interest, and I agree it did, it must have been supported by good and sufficient consideration otherwise it would not be enforceable.

I would affirm the lower court because its conclusion is supported by substantial evidence in the record and sound legal theory.

# EXHIBIT 33

2019 WL 7824787
Only the Westlaw citation is currently available.
United States District Court, W.D. Texas, Midland-Odessa Division.

Donna WHITE, Plaintiff,

v.

HEALTH CAROUSEL, LLC, Defendant.

MO:19-CV-00066-DC
|
Signed 10/18/2019

**Attorneys and Law Firms**

Ben C. Martin, Thomas Wm. Arbon, Law Offices of Ben C. Martin, LLP, Kristi Elizabeth Wood, Martin Baughman, Dallas, TX, for Plaintiff.

**ORDER GRANTING DEFENDANT'S MOTION TO TRANSFER**

DAVID COUNTS, UNITED STATES DISTRICT JUDGE

**\*1** BEFORE THE COURT is Defendant Health Carousel, LLC's Motion to Transfer Venue filed on May 8, 2019. (Doc. 8). Plaintiff Donna White filed a timely Response on June 6, 2019. [1] (Doc. 18). Defendant filed a Reply in support of the Motion on June 12, 2019. (Doc. 25). After due consideration of the parties' filings, [2] the record, and the applicable law, the Court **GRANTS** Defendant's Motion to Transfer Venue. (Doc. 8).

## I. BACKGROUND

This case stems from the parties' employer-employee relationship. (Doc. 1). Defendant, a staffing company, employed Plaintiff from roughly November 23, 2015 to August 21, 2017, as a traveling registered nurse. *Id.* at 3. Plaintiff was assigned to work at Ector County Hospital District d/b/a Medical Center Hospital and Medical Center Health System (the Hospital) in Odessa, Texas, on June 6, 2016. (Doc. 13 at 2). Plaintiff worked as a registered nurse at the Hospital until August 21, 2017, the day she was terminated. *Id.* at 4.

On March 8, 2019, Plaintiff filed the instant lawsuit against Defendant Health Carousel, LLC, and the Hospital. (Docs. 1, 13). Plaintiff raised the following causes of action, (1) violation of Title VII and the Texas Commission on Human Rights Act (TCHRA), (2) violation under 42 U.S.C. § 1981, *et seq.*, (3) Family and Medical Leave Act (FMLA) discrimination and retaliation, and (4) discrimination under the Americans with Disabilities Act (ADA) and the TCHRA. *Id.* at 7–13.

Defendant filed the instant Motion on May 8, 2019, arguing that the parties executed an Employment Agreement (the Agreement) that contains a forum-selection clause (FSC) and that the FSC controls for venue purposes. (Doc. 8 at 2). Thus, Defendant contends that per the FSC, the case should be transferred to the United States District Court for the Southern District of Ohio, Western Division. *Id.* Plaintiff filed a Response opposing the Motion on June 6, 2019. (Doc. 18). Likewise, the Hospital filed a Response opposing a transfer of venue to Ohio. (Docs. 17, 29). Defendant filed a Reply to each response on June 12, 2019. (Doc. 25, 26). Finally, the Hospital filed a Sur-reply, with leave of court, on June 28, 2019. (Doc. 29).

On October 10, 2019, Plaintiff and the Hospital filed a joint stipulation of dismissal with prejudice. (Doc. 33). The Court issued a final order of dismissal with prejudice as to the Hospital on October 11, 2019. (Doc. 34). Consequently, the dispute before the Court regarding venue is solely between Plaintiff and Defendant Health Carousel, LLC.

## II. LEGAL STANDARD

**\*2** An FSC may be enforced through a motion to transfer under 28 U.S.C. § 1404(a), which provides that "for the convenience of parties and witnesses, in the interest of justice, a district court may transfer any civil action to any other district or division where it might have been brought." 28 U.S.C. § 1404(a). A district court has "broad discretion in deciding whether to order a transfer." *Balawajder v. Scott*, 160 F.3d 1066, 1067 (5th Cir. 1998) (quoting *Caldwell v. Palmetto State Sav. Bank*, 811 F.2d 916, 919 (5th Cir. 1987)). "But this discretion has limitations imposed by the text of § 1404(a) and by the precedents of the Supreme Court and [the Fifth Circuit] that interpret and apply the text of § 1404(a)." *In re Volkswagen of America, Inc.*, 545 F.3d 304, 311 (5th Cir. 2008) [hereinafter *In re Volkswagen II*]. In the typical § 1404(a) analysis, district courts consider (1) whether the proposed transfer venue is a forum in which the suit could originally have been brought, (2) party and witness convenience, and (3) the interests of justice. *Broussard v. State Farm Fire and Cas. Co.*, 523 F.3d 618 (5th Cir. 2008). Further, the Fifth Circuit has adopted the private and public interest factors first enunciated in *Gulf Oil Corp. v. Gilbert*, 330 U.S. 501 (1947), a *forum non conveniens* case, as appropriate for the determination of whether a § 1404(a) venue transfer is for the convenience of parties and witnesses and in the interest of justice. *See Humble Oil & Refining Co. v. Bell Marine Serv., Inc.*, 321 F.2d 53, 56 (5th Cir. 1963).

However, "[t]he existence of a mandatory, enforceable FSC dramatically alters this analysis." *Weber v. PACT XPP Techs., AG*, 811 F.3d 758, 767 (5th Cir. 2016). The legal framework for enforcing FSCs is outlined in *Atl. Marine Constr. Co. v. U.S. Dist. Court for W. Dist. of Texas*, 571 U.S. 49 (2013). *Id.* Under *Atlantic Marine*, "the plaintiff's choice of forum 'merits no weight'; instead[, plaintiff] has the burden of establishing that § 1404(a) transfer or [*forum non conveniens*] dismissal is unwarranted." *Id.* (citation omitted). Moreover, district courts should not consider the private-interest factors. *Id.* This is primarily because the parties contracted for a specific forum; thus, "they 'waive the right to challenge their preselected forum as inconvenient....' " *Id.* (citation omitted). Courts should, however, consider the public-interest factors. *Id.* The public interest factors are: "(1) the administrative difficulties flowing from court congestion; (2) the local interest in having localized interests decided at home; (3) the familiarity of the forum with the law that will govern the case; and (4) the avoidance of unnecessary problems of conflict of laws [or in] the application of foreign law." *In re Volkswagen AG*, 371 F.3d 201, 203 (5th Cir. 2004) [hereinafter *In re Volkswagen I*] (citing *Piper Aircraft Co. v. Reyno*, 454 U.S. 235, 241 (1981)).

Finally, "when a party bound by a forum-selection clause flouts its contractual obligation and files suit in a different forum, a § 1404(a) transfer of venue will not carry with it the original venue's choice-of-law rules—a factor that in some circumstances may affect public-interest considerations." *Atl. Marine*, 571 U.S. at 64. Instead, the court in the contractually selected venue should apply its own law. *Id.* at 65.

## III. DISCUSSION

Plaintiff claims that "mandatory venue laws require that the case be adjudicated in the Midland-Odessa Division of the Western District of Texas." (Doc. 18 at 1–2). Moreover, Plaintiff argues that the FSC in the Agreement executed by the parties "should not be applied because it is overreaching, hinders Plaintiff's day in court, and [because it is] against the public interest." *Id.* at 2. Plaintiff bears the burden of establishing that transfer to the forum for which the parties bargained is unwarranted. *Atl. Marine*, 571 U.S. at 63.

### A. Mandatory Venue Laws

203WL  6 1524151

Plaintiff first argues that Texas venue law mandates the Court retain jurisdiction over her claims despite Defendant's instant Motion to Transfer Venue. (Doc. 18). However, "venue in the federal courts is a matter governed by federal law." *Taylor v. Titan Midwest Constr. Corp.*, 474 F. Supp. 145, 147 (N.D. Tex. 1979). Thus, the Texas Civil Practice and Remedies Code (TCPRC) mandatory venue statute on which Plaintiff relies is irrelevant to deciding proper venue. *Id.*

**\*3** Even if state law applied, § 15.0151 of the TCPRC, on which Plaintiff's argument regarding political subdivision is premised, is not applicable. Specifically, Plaintiff argues that under § 15.0151, which provides that an action against a political subdivision "shall be brought in the county in which the political subdivision is located," Plaintiff properly filed the case in Ector County because that is where the Hospital is located. Tex. Civ. Prac. & Rem. Code § 15.0151. As previously noted, however, the Hospital and Plaintiff settled. Accordingly, the TCPRC mandatory venue statute is not relevant.

For these reasons, the Court finds Plaintiff's argument unpersuasive.

### B. Enforceability of the FSC [3]

Plaintiff next argues that the inclusion of the FSC in the Agreement was a product of overreaching, that Plaintiff would be deprived of her day in Court if the FSC is enforced, and that the public-interest factors weigh against transferring the case to Ohio. (Doc. 18 at 4–7).

"When analyzing the enforceability of [FSCs] 'federal law applies ... in both diversity and federal question cases.' " *Liverpool FC Am. Mktg. Grp., Inc. v. Red Slopes Soccer Found.*, No. 4:17-CV-00756, 2018 WL 2298388, at \*5 (E.D. Tex. May 21, 2018) (quoting *Braspetro Oil Servs. Co. v. Modec (USA) Inc.*, 240 F. App'x 612, 615 (5th Cir. 2007)). The FSC is presumed enforceable unless there is a clear showing that the clause is " 'unreasonable' under the circumstances." *M/S Bremen v. Zapata Off-Shore Co.*, 407 U.S. 1, 10 (1972). As noted by Plaintiff, an FSC is considered unreasonable "where (1) the incorporation of the forum selection clause into the agreement was the product of fraud or overreaching; (2) the party seeking to escape enforcement 'will for all practical purposes be deprived of his day in court' because of the grave inconvenience or unfairness of the selected forum; (3) the fundamental unfairness of the chosen law will deprive the plaintiff of a remedy; or (4) enforcement of the forum selection clause would contravene a strong public policy of the forum state." *Haynsworth v. The Corp.*, 121 F.3d 956, 963 (5th Cir. 1997). The party resisting the FSC bears "a heavy burden of proof." *Carnival Cruise Lines, Inc. v. Shute*, 499 U.S. 585, 595 (1991).

#### 1. *Overreaching*

Plaintiff claims that the FSC in the Agreement was a product of overreaching and the result of disparity of bargaining power. (Doc. 18 at 4). Plaintiff contends that because Plaintiff was an employee "from a different country," she had no bargaining power with Defendant. *Id.* at 5. For comparison, Plaintiff points to a contract executed by Defendant and the Hospital in which Defendant "agreed to litigate cases in Texas," arguing that in that scenario both Defendant and the Hospital had "the same bargaining power." *Id.* Based on those facts, Plaintiff asks the Court to find that Defendant forced a forum "that is completely overreaching and unfair to an employee" when the facts of the case do not relate to the selected forum. *Id.*

"Fraud and overreaching must be specific to a forum selection clause in order to invalidate it." *Haynsworth*, 121 F.3d at 963. That is, the FSC in the Agreement is not enforceable only "if the *inclusion of that clause in the contract* was the product of fraud or coercion." *Scherk v. Alberto-Culver Co.*, 417 U.S. 506, 519 n.14 (1974) (emphasis in original) (citing *Prima Paint Corp. v. Flood & Conklin Mfg. Co.*, 388 U.S. 395 (1967)). Accordingly, allegations that do not concern the FSC are not sufficient. *Id.*

**\*4** Plaintiff's allegations regarding the contract between Defendant and the Hospital do not concern the FSC in the Agreement. Thus, Plaintiff's contention is insufficient to invalidate the FSC. *Id.* Moreover, Plaintiff's argument regarding the parties' bargaining power is an attack on the contract generally, not the FSC itself. *See Rojas v. TK Commc'ns, Inc.*, 87 F.3d 745, 749 n.3 (5th Cir. 1996) (finding an employee's claims based upon inequality of bargaining power "support [the court's] conclusion that

her attack is directed at the entire agreement"). In fact, in *Carnival Cruise Lines, Inc. v. Shute*, the Supreme Court "enforced a forum selection clause against an unsophisticated cruise ship passenger, notwithstanding the disparity in the parties' bargaining power and the fact that the contract had not been subject to negotiation." *Haynsworth*, 121 F.3d at 965 (citing *Carnival Cruise Lines*, 499 U.S. at 593–95) (explaining the holding in *Carnival Cruise Lines*).

In summary, the Court finds that Plaintiff's contention that the FSC is unenforceable because it was a product of overreaching is without merit.

## 2. *Deprivation of Day in Court*

Plaintiff argues that she would be deprived of her day in court if the Court grants Defendant's Motion. (Doc. 18 at 5–6). Plaintiff then points to the private-interest factors—the relative ease of access to sources of proof; the availability of compulsory process to secure the attendance of witnesses; the cost of attendance for willing witnesses; and all other practical problems that make trial of a case easy, expeditious and inexpensive—and argues that they do not support transfer to Ohio. (Doc. 18 at 5–6).

The court first notes that other courts have rejected the claim that an FSC should not be enforced because litigation in a particular forum would be so "gravely difficult and inconvenient as to deprive [the party] of their day in court." *Haynsworth*, 121 F.3d at 960 (citing *Hugel v. Corp. of Lloyd's*, 999 F.2d 206, 210–11 (7th Cir. 1993)). Moreover, as noted previously in this Order, the existence of a mandatory FSC changes the § 1404(a) analysis. *See Weber*, 811 F.3d at 767. Specifically, the Court cannot consider the private-interest factors. *See id.* Consequently, Plaintiff's argument that she would be deprived of her day in Court is unsupported, and thus fails.

\* \* \*

The Court finds that Plaintiff failed to meet her "heavy burden" to show that the FSC is unenforceable. Because the FSC in the Agreement is mandatory and enforceable, the private-interest factors strongly favor transfer. *Weber*, 811 F.3d at 775. The Court next determines "whether this is one of the rare cases in which the public-interest [*forum non conveniens*] factors favor keeping a case despite the existence of a valid and enforceable FSC." *Id.*

## C. Public-Interest Factors

Finally, Plaintiff contends that the public-interest factors weigh against transferring the case to the Southern District of Ohio, Western Division. (Doc. 18 at 6–7). The public interest factors are: "(1) the administrative difficulties flowing from court congestion; (2) the local interest in having localized interests decided at home; (3) the familiarity of the forum with the law that will govern the case; and (4) the avoidance of unnecessary problems of conflict of laws [or in] the application of foreign law." *In re Volkswagen I*, 371 F.3d at 203 (citing *Piper Aircraft*, 454 U.S. at 241). These factors "will rarely defeat a transfer motion, the practical result is that [FSCs] should control except in unusual cases." *Atl. Marine*, 571 U.S. at 64. This suggests "a high burden of persuasion on the party seeking to avoid enforcement of the FSC." *Weber*, 811 F.3d at 776.

Plaintiff only addresses two factors: the local interest in having localized interests decided at home and the familiarity of the forum with the law that will govern the case. (Doc. 18 at 6–7). Specifically, Plaintiff argues that Texas is the "more convenient forum" and that Texas has a local interest in having localized interests decided at home because the events giving rise to the lawsuit took place in Texas. *Id.* In a regular § 1404(a) analysis, when the events take place in one location, the second public interest factor weighs in favor of transfer to the forum in which the events took place. *See Cortez v. Brad Drake Constr.*, LLC, No. EP-15-CV-346-KC, 2016 WL 1312636, at \*3 (W.D. Tex. Apr. 4, 2016) (finding the second factor weighed in favor of transfer because the allegedly discriminatory acts occurred in the transferee forum). However, the Fifth Circuit has explained that where an FSC is involved, although a forum may have a particular interest in protecting its citizens, that is not the sort of "exceptional circumstance that justifies disregarding the parties' agreement on public-interest factor grounds." *Weber*, 811

White v. Heath Carousel, LLC, Slip Copy (2019)
203 WL 6 1524151

F.3d at 776. Thus, the Court similarly finds that although Texas has a particular interest in having localized interests decided at home, that is not so exceptional as to allow the Court to disregard the parties' agreement.

**\*5** Plaintiff also contends that Texas law will apply to this case and thus the familiarity of the forum with the law that will govern in the case weighs in favor of maintaining the case in the Western District of Texas as opposed to the Southern District of Ohio. (Doc. 18 at 7). The Court notes that the FSC in the Agreement provides that the Agreement's validity, interpretation, performance, and enforcement will be governed by the laws of the State of Ohio. (Doc. 8-1 at 5). Moreover, "a plaintiff who files suit in violation of a [FSC] enjoys no [venue] 'privilege' with respect to its choice of forum, and therefore it is entitled to no concomitant 'state-law advantages.' " *Atl. Marine*, 571 U.S. at 65. This is so because it would be inequitable and encourage gamesmanship "to allow the plaintiff to fasten its choice of substantive law to the venue transfer." *Id.* Consequently, the contractually selected court "should not apply the law of the transferor venue to which the parties waived their right." *Id.* For this reason, the federal court sitting in Ohio would be more familiar with the law that will govern the case, and thus this factor weighs in favor of transferring the case to the Southern District of Ohio.

Finally, even if Ohio choice-of-law rules point to Texas discrimination law,[4] that alone is insufficient to retain the case in this Court because the Ohio court will not be required to apply Texas choice-of-law rules for the reasons stated above. *Atl. Marine*, 571 U.S. at 67. This "reduces whatever weight the [d]istrict [c]ourt might have given to the public-interest factor that looks to the familiarity of the transferee court with the applicable law." *Id.* Moreover, "federal judges routinely apply the law of the State other than the State in which they sit" and Plaintiff does not point to any "exceptionally arcane features" of Texas discrimination law "that are likely to defy comprehension by a federal judge sitting in [Ohio]." *Id.* at 67–68.

The Court thus concludes that the public-interest factors do not justify retaining the case in the Western District of Texas.

## IV. CONCLUSION

Based on the foregoing, the Court **GRANTS** Defendant's Motion to Transfer Venue. (Doc. 8).

The Court **ORDERS** that the case be **TRANSFERRED** to the United States District Court for the Southern District of Ohio, Western Division.

Finally, the Court **ORDERS** that all pending motions be **DENIED WITHOUT PREJUDICE TO REFILING** if proper in the new venue.

It is so **ORDERED**.

**All Citations**

Slip Copy, 2019 WL 7824787

## Footnotes

1       On May 20, 2019, the Court granted Plaintiff's Motion for Extension of Time to File Answer to Motion to Transfer Venue. (Text Order Only Entry, May 20, 2019). The Court allowed Plaintiff to file a response on or before June 7, 2019. *Id.* Consequently, Plaintiff's Response was filed in a timely manner.

203WL 6 1524151

2      Now terminated Defendant Ector County Hospital District (the Hospital) also filed a Response and a Sur-reply to the instant Motion. (Docs. 17, 29). Additionally, Defendant Health Carousel, LLC, filed a Reply to the Hospital's filings. (Doc. 26). However, the Hospital is no longer a party in this lawsuit. (Docs. 33, 34). Accordingly, said filings are not relevant to the Court's ruling on the pending Motion to Transfer Venue.

3      The Court notes that neither party disputes that the FSC in the Agreement is mandatory.

4      Plaintiff raises two claims under the TCHRA. (Docs. 1, 13).

---

**End of Document**                                         © 2023 Thomson Reuters. No claim to original U.S. Government Works.

# EXHIBIT 34

---

Code of Federal Regulations
   Title 20. Employees' Benefits
      Chapter V. Employment and Training Administration, Department of Labor
         Part 656. Labor Certification Process for Permanent Employment of Aliens in the United States (Refs & Annos)
            Subpart C. Labor Certification Process

20 C.F.R. § 656.12

§ 656.12 Improper commerce and payment.

Effective: July 16, 2007

Currentness

The following provision applies to applications filed under both this part and 20 CFR part 656 in effect prior to March 28, 2005, and to any certification resulting from those applications:

(a) Applications for permanent labor certification and approved labor certifications are not articles of commerce. They shall not be offered for sale, barter or purchase by individuals or entities. Any evidence that an application for permanent labor certification or an approved labor certification has been sold, bartered, or purchased shall be grounds for investigation under this part and may be grounds for denial under § 656.24, revocation under § 656.32, debarment under § 656.31(f), or any combination thereof.

(b) An employer must not seek or receive payment of any kind for any activity related to obtaining permanent labor certification, including payment of the employer's attorneys' fees, whether as an incentive or inducement to filing, or as a reimbursement for costs incurred in preparing or filing a permanent labor certification application, except when work to be performed by the alien in connection with the job opportunity would benefit or accrue to the person or entity making the payment, based on that person's or entity's established business relationship with the employer. An alien may pay his or her own costs in connection with a labor certification, including attorneys' fees for representation of the alien, except that where the same attorney represents both the alien and the employer, such costs shall be borne by the employer. For purposes of this paragraph (b), payment includes, but is not limited to, monetary payments; wage concessions, including deductions from wages, salary, or benefits; kickbacks, bribes, or tributes; in kind payments; and free labor.

(c) Evidence that an employer has sought or received payment from any source in connection with an application for permanent labor certification or an approved labor certification, except for a third party to whose benefit work to be performed in connection with the job opportunity would accrue, based on that person's or entity's established business relationship with the employer, shall be grounds for investigation under this part or any appropriate Government agency's procedures, and may be grounds for denial under § 656.32, revocation under § 656.32, debarment under § 656.31(f), or any combination thereof.

**Credits**

[72 FR 27945, May 17, 2007]

SOURCE: 69 FR 77386, Dec. 27, 2004; 72 FR 27944, May 17, 2007; 73 FR 78068, Dec. 19, 2008; 85 FR 63915, Oct. 8, 2020; 86 FR 3608, 3672, Jan. 14, 2021; 86 FR 13995, March 12, 2021; 86 FR 26164, 26177, May 13, 2021; 86 FR 70731, Dec. 13, 2021, unless otherwise noted.

---

AUTHORITY: 8 U.S.C. 1182(a)(5)(A), 1182(p)(1); sec.122, Public Law 101–649, 109 Stat. 4978; and Title IV, Public Law 105–277, 112 Stat. 2681.

Current through Sept. 8, 2023, 88 FR 61985. Some sections may be more current. See credits for details.

**End of Document**                                     © 2023 Thomson Reuters. No claim to original U.S. Government Works.

# EXHIBIT 35

§ 655.731 What is the first LCA requirement, regarding wages?, 20 C.F.R. § 655.731

---

Code of Federal Regulations
  Title 20. Employees' Benefits
    Chapter V. Employment and Training Administration, Department of Labor
      Part 655. Temporary Employment of Foreign Workers in the United States (Refs & Annos)
        Subpart H. Labor Condition Applications and Requirements for Employers Seeking to Employ Nonimmigrants
        on H–1b Visas in Specialty Occupations and as Fashion Models, and Requirements for Employers Seeking to
        Employ Nonimmigrants on H–1b1 and E–3 Visas in Specialty Occupations (Refs & Annos)

20 C.F.R. § 655.731

§ 655.731 What is the first LCA requirement, regarding wages?

Effective: December 13, 2021

Currentness

An employer seeking to employ H–1B nonimmigrants in a specialty occupation or as a fashion model of distinguished merit and ability shall state on Form ETA 9035 or 9035E that it will pay the H–1B nonimmigrant the required wage rate. For the purposes of this section, "H–1B" includes "E–3 and H–1B1" as well.

(a) Establishing the wage requirement. The first LCA requirement shall be satisfied when the employer signs Form ETA 9035 or 9035E attesting that, for the entire period of authorized employment, the required wage rate will be paid to the H–1B nonimmigrant(s); that is, that the wage shall be the greater of the actual wage rate (as specified in paragraph (a)(1) of this section) or the prevailing wage (as specified in paragraph (a)(2) of this section). The wage requirement includes the employer's obligation to offer benefits and eligibility for benefits provided as compensation for services to H–1B nonimmigrants on the same basis, and in accordance with the same criteria, as the employer offers to U.S. workers.

(1) The actual wage is the wage rate paid by the employer to all other individuals with similar experience and qualifications for the specific employment in question. In determining such wage level, the following factors may be considered: Experience, qualifications, education, job responsibility and function, specialized knowledge, and other legitimate business factors. "Legitimate business factors," for purposes of this section, means those that it is reasonable to conclude are necessary because they conform to recognized principles or can be demonstrated by accepted rules and standards. Where there are other employees with substantially similar experience and qualifications in the specific employment in question —i.e., they have substantially the same duties and responsibilities as the H–1B nonimmigrant—the actual wage shall be the amount paid to these other employees. Where no such other employees exist at the place of employment, the actual wage shall be the wage paid to the H–1B nonimmigrant by the employer. Where the employer's pay system or scale provides for adjustments during the period of the LCA—e.g., cost of living increases or other periodic adjustments, or the employee moves to a more advanced level in the same occupation—such adjustments shall be provided to similarly employed H–1B nonimmigrants (unless the prevailing wage is higher than the actual wage).

(2) The prevailing wage for the occupational classification in the area of intended employment must be determined as of the time of filing the application. The employer shall base the prevailing wage on the best information available as of the time of filing the application. Except as provided in this section, the employer is not required to use any specific methodology to determine the prevailing wage and may utilize a wage obtained from an OFLC NPC (OES), an independent authoritative source, or other legitimate sources of wage data. One of the following sources shall be used to establish the prevailing wage:

(i) A collective bargaining agreement which was negotiated at arms-length between a union and the employer which contains a wage rate applicable to the occupation;

(ii) If the job opportunity is in an occupation which is not covered by paragraph (a)(2)(i) of this section, the prevailing wage shall be the arithmetic mean of the wages of workers similarly employed, except that the prevailing wage shall be the median when provided by paragraphs (a)(2)(ii)(A), (b)(3)(iii)(B)(2), and (b)(3)(iii)(C)(2) of this section. The prevailing wage rate shall be based on the best information available. The following prevailing wage sources may be used:

(A) OFLC National Processing Center (NPC) determination. Prior to January 1, 2010, the SWA having jurisdiction over the area of intended employment shall continue to receive and process prevailing wage determination requests, but shall do so in accordance with these regulatory provisions and Department guidance. On or after January 1, 2010, the NPC shall receive and process prevailing wage determination requests in accordance with these regulations and with Department guidance. Upon receipt of a written request for a PWD on or after January 1, 2010, the NPC will determine whether the occupation is covered by a collective bargaining agreement which was negotiated at arm's length, and, if not, determine the arithmetic mean of wages of workers similarly employed in the area of intended employment. The wage component of the Bureau of Labor Statistics Occupational Employment Statistics survey shall be used to determine the arithmetic mean, unless the employer provides an acceptable survey. The NPC shall determine the wage in accordance with secs. 212(n) and 212(t) of the INA. If an acceptable employer-provided wage survey provides a median and does not provide an arithmetic mean, the median shall be the prevailing wage applicable to the employer's job opportunity. In making a PWD, the Chicago NPC will follow 20 CFR 656.40 and other administrative guidelines or regulations issued by ETA. The Chicago NPC shall specify the validity period of the PWD, which in no event shall be for less than 90 days or more than 1 year from the date of the determination.

(1) An employer who chooses to utilize an NPC PWD shall file the labor condition application within the validity period of the prevailing wage as specified in the PWD. Any employer desiring review of an NPC PWD, including judicial review, shall follow the appeal procedures at 20 CFR 656.41. Employers which challenge an NPC PWD under 20 CFR 656.41 must obtain a ruling prior to filing an LCA. In any challenge, the Department and the NPC shall not divulge any employer wage data collected under the promise of confidentiality. Once an employer obtains a PWD from the NPC and files an LCA supported by that PWD, the employer is deemed to have accepted the PWD (as to the amount of the wage) and thereafter may not contest the legitimacy of the PWD by filing an appeal with the CO (see 20 CFR 656.41) or in an investigation or enforcement action.

(2) If the employer is unable to wait for the NPC to produce the requested prevailing wage for the occupation in question, or for the CO and/or the BALCA to issue a decision, the employer may rely on other legitimate sources of available wage information as set forth in paragraphs (a)(2)(ii)(B) and (C) of this section. If the employer later discovers, upon receipt of the PWD from the NPC, that the information relied upon produced a wage below the final PWD and the employer was paying the NPC–determined wage, no wage violation will be found if the employer retroactively compensates the H–2B nonimmigrant(s) for the difference between the wage paid and the prevailing wage, within 30 days of the employer's receipt of the PWD.

(3) In all situations where the employer obtains the PWD from the NPC, the Department will deem that PWD as correct as to the amount of the wage. Nevertheless, the employer must maintain a copy of the NPC PWD. A complaint alleging inaccuracy of an NPC PWD, in such cases, will not be investigated.

(B) An independent authoritative source. The employer may use an independent authoritative wage source in lieu of an NPC PWD. The independent authoritative source survey must meet all the criteria set forth in paragraph (b)(3)(iii)(B) of this section.

(C) Another legitimate source of wage information. The employer may rely on other legitimate sources of wage data to obtain the prevailing wage. The other legitimate source survey must meet all the criteria set forth in paragraph (b)(3)(iii)(C) of this section. The employer will be required to demonstrate the legitimacy of the wage in the event of an investigation.

(iii) For purposes of this section, "similarly employed" means "having substantially comparable jobs in the occupational classification in the area of intended employment," except that if a representative sample of workers in the occupational category can not be obtained in the area of intended employment, "similarly employed" means:

(A) Having jobs requiring a substantially similar level of skills within the area of intended employment; or

(B) If there are no substantially comparable jobs in the area of intended employment, having substantially comparable jobs with employers outside of the area of intended employment.

(iv) A prevailing wage determination for LCA purposes made pursuant to this section shall not permit an employer to pay a wage lower than required under any other applicable Federal, state or local law.

(v) Where a range of wages is paid by the employer to individuals in an occupational classification or among individuals with similar experience and qualifications for the specific employment in question, a range is considered to meet the prevailing wage requirement so long as the bottom of the wage range is at least the prevailing wage rate.

(vi) The employer shall enter the prevailing wage on the LCA in the form in which the employer will pay the wage (e.g., an annual salary or an hourly rate), except that in all cases the prevailing wage must be expressed as an hourly wage if the H–1B nonimmigrant will be employed part-time. Where an employer obtains a prevailing wage determination (from any of the sources identified in paragraphs (a)(2)(i) and (ii) of this section) that is expressed as an hourly rate, the employer may convert this determination to a yearly salary by multiplying the hourly rate by 2080. Conversely, where an employer obtains a prevailing wage (from any of these sources) that is expressed as a yearly salary, the employer may convert this determination to an hourly rate by dividing the salary by 2080.

(vii) In computing the prevailing wage for a job opportunity in an occupational classification in an area of intended employment in the case of an employee of an institution of higher education or an affiliated or related nonprofit entity, a nonprofit research organization, or a Governmental research organization as these terms are defined in 20 CFR 656.40(e), the prevailing wage level shall only take into account employees at such institutions and organizations in the area of intended employment.

(viii) An employer may file more than one LCA for the same occupational classification in the same area of employment and, in such circumstances, the employer could have H–1B employees in the same occupational classification in the same area of employment, brought into the U.S. (or accorded H–1B status) based on petitions approved pursuant to different

LCAs (filed at different times) with different prevailing wage determinations. Employers are advised that the prevailing wage rate as to any particular H–1B nonimmigrant is prescribed by the LCA which supports that nonimmigrant's H–1B petition. The employer is required to obtain the prevailing wage at the time that the LCA is filed (see paragraph (a)(2) of this section). The LCA is valid for the period certified by ETA, and the employer must satisfy all the LCA's requirements (including the required wage which encompasses both prevailing and actual wage rates) for as long as any H–1B nonimmigrants are employed pursuant to that LCA (§ 655.750). Where new nonimmigrants are employed pursuant to a new LCA, that new LCA prescribes the employer's obligations as to those new nonimmigrants. The prevailing wage determination on the later/subsequent LCA does not "relate back" to operate as an "update" of the prevailing wage for the previously-filed LCA for the same occupational classification in the same area of employment. However, employers are cautioned that the actual wage component to the required wage may, as a practical matter, eliminate any wage-payment differentiation among H–1B employees based on different prevailing wage rates stated in applicable LCAs. Every H–1B nonimmigrant is to be paid in accordance with the employer's actual wage system, and thus is to receive any pay increases which that system provides.

(3) Once the prevailing wage rate is established, the H–1B employer then shall compare this wage with the actual wage rate for the specific employment in question at the place of employment and must pay the H–1B nonimmigrant at least the higher of the two wages.

(b) Documentation of the wage statement.

(1) The employer shall develop and maintain documentation sufficient to meet its burden of proving the validity of the wage statement required in paragraph (a) of this section and attested to on Form ETA 9035 or 9035E. The documentation shall be made available to DOL upon request. Documentation shall also be made available for public examination to the extent required by § 655.760. The employer shall also document that the wage rate(s) paid to H–1B nonimmigrant(s) is(are) no less than the required wage rate(s). The documentation shall include information about the employer's wage rate(s) for all other employees for the specific employment in question at the place of employment, beginning with the date the labor condition application was submitted and continuing throughout the period of employment. The records shall be retained for the period of time specified in § 655.760. The payroll records for each such employee shall include:

(i) Employee's full name;

(ii) Employee's home address;

(iii) Employee's occupation;

(iv) Employee's rate of pay;

(v) Hours worked each day and each week by the employee if:

(A) The employee is paid on other than a salary basis (e.g., hourly, piece-rate; commission); or

(B) With respect only to H–1B nonimmigrants, the worker is a part-time employee (whether paid a salary or an hourly rate).

(vi) Total additions to or deductions from pay each pay period, by employee; and

(vii) Total wages paid each pay period, date of pay and pay period covered by the payment, by employee.

(viii) Documentation of offer of benefits and eligibility for benefits provided as compensation for services on the same basis, and in accordance with the same criteria, as the employer offers to U.S. workers (see paragraph (c)(3) of this section):

(A) A copy of any document(s) provided to employees describing the benefits that are offered to employees, the eligibility and participation rules, how costs are shared, etc. (e.g., summary plan descriptions, employee handbooks, any special or employee-specific notices that might be sent);

(B) A copy of all benefit plans or other documentation describing benefit plans and any rules the employer may have for differentiating benefits among groups of workers;

(C) Evidence as to what benefits are actually provided to U.S. workers and H–1B nonimmigrants, including evidence of the benefits selected or declined by employees where employees are given a choice of benefits;

(D) For multinational employers who choose to provide H–1B nonimmigrants with "home country" benefits, evidence of the benefits provided to the nonimmigrant before and after he/she went to the United States. See paragraph (c)(3)(iii)(C) of this section.

(2) Actual wage. In addition to payroll data required by paragraph (b)(1) of this section (and also by the Fair Labor Standards Act), the employer shall retain documentation specifying the basis it used to establish the actual wage. The employer shall show how the wage set for the H–1B nonimmigrant relates to the wages paid by the employer to all other individuals with similar experience and qualifications for the specific employment in question at the place of employment. Where adjustments are made in the employer's pay system or scale during the validity period of the LCA, the employer shall retain documentation explaining the change and clearly showing that, after such adjustments, the wages paid to the H–1B nonimmigrant are at least the greater of the adjusted actual wage or the prevailing wage for the occupation and area of intended employment.

(3) Prevailing wage. The employer also shall retain documentation regarding its determination of the prevailing wage. This source documentation shall not be submitted to ETA with the labor condition application, but shall be retained at the employer's place of business for the length of time required in § 655.760(c). Such documentation shall consist of the documentation described in paragraph (b)(3)(i), (ii), or (iii) of this section and the documentation described in paragraph (b)(1) of this section.

(i) If the employer used a wage determination issued pursuant to the provisions of the Davis–Bacon Act, 40 U.S.C. 276a et seq. (see 29 CFR part 1), or the McNamara–O'Hara Service Contract Act, 41 U.S.C. 351 et seq. (see 29 CFR part 4), the

documentation shall include a copy of the determination showing the wage rate for the occupation in the area of intended employment.

(ii) If the employer used an applicable wage rate from a union contract which was negotiated at arms-length between a union and the employer, the documentation shall include an excerpt from the union contract showing the wage rate(s) for the occupation.

(iii) If the employer did not use a wage covered by the provisions of paragraph (b)(3)(i) or (b)(3)(ii) of this section, the employer's documentation shall consist of:

(A) A copy of the prevailing wage finding from the NPC for the occupation within the area of intended employment.

(B) A copy of the prevailing wage survey for the occupation within the area of intended employment published by an independent authoritative source. For purposes of this paragraph (b)(3)(iii)(B), a prevailing wage survey for the occupation in the area of intended employment published by an independent authoritative source shall mean a survey of wages published in a book, newspaper, periodical, loose-leaf service, newsletter, or other similar medium, within the 24–month period immediately preceding the filing of the employer's application. Such survey shall:

(1) Reflect the weighted average wage paid to workers similarly employed in the area of intended employment;

(2) Reflect the median wage of workers similarly employed in the area of intended employment if the survey provides such a median and does not provide a weighted average wage of workers similarly employed in the area of intended employment;

(3) Be based upon recently collected data—e.g., within the 24–month period immediately preceding the date of publication of the survey; and

(4) Represent the latest published prevailing wage finding by the independent authoritative source for the occupation in the area of intended employment; or

(C) A copy of the prevailing wage survey or other source data acquired from another legitimate source of wage information that was used to make the prevailing wage determination. For purposes of this paragraph (b)(3)(iii)(C), a prevailing wage provided by another legitimate source of such wage information shall be one which:

(1) Reflects the weighted average wage paid to workers similarly employed in the area of intended employment;

(2) Reflect the median wage of workers similarly employed in the area of intended employment if the survey provides such a median and does not provide a weighted average wage of workers similarly employed in the area of intended employment;

(3) Is based on the most recent and accurate information available; and

(4) Is reasonable and consistent with recognized standards and principles in producing a prevailing wage.

(c) Satisfaction of required wage obligation.

(1) The required wage must be paid to the employee, cash in hand, free and clear, when due, except that deductions made in accordance with paragraph (c)(9) of this section may reduce the cash wage below the level of the required wage. Benefits and eligibility for benefits provided as compensation for services must be offered in accordance with paragraph (c)(3) of this section.

(2) "Cash wages paid," for purposes of satisfying the H–1B required wage, shall consist only of those payments that meet all the following criteria:

(i) Payments shown in the employer's payroll records as earnings for the employee, and disbursed to the employee, cash in hand, free and clear, when due, except for deductions authorized by paragraph (c)(9) of this section;

(ii) Payments reported to the Internal Revenue Service (IRS) as the employee's earnings, with appropriate withholding for the employee's tax paid to the IRS (in accordance with the Internal Revenue Code of 1986, 26 U.S.C. 1, et seq.);

(iii) Payments of the tax reported and paid to the IRS as required by the Federal Insurance Contributions Act, 26 U.S.C. 3101, et seq. (FICA). The employer must be able to document that the payments have been so reported to the IRS and that both the employer's and employee's taxes have been paid except that when the H–1B nonimmigrant is a citizen of a foreign country with which the President of the United States has entered into an agreement as authorized by section 233 of the Social Security Act, 42 U.S.C. 433 (i.e., an agreement establishing a totalization arrangement between the social security system of the United States and that of the foreign country), the employer's documentation shall show that all appropriate reports have been filed and taxes have been paid in the employee's home country.

(iv) Payments reported, and so documented by the employer, as the employee's earnings, with appropriate employer and employee taxes paid to all other appropriate Federal, State, and local governments in accordance with any other applicable law.

(v) Future bonuses and similar compensation (i.e., unpaid but to-be-paid) may be credited toward satisfaction of the required wage obligation if their payment is assured (i.e., they are not conditional or contingent on some event such as the employer's annual profits). Once the bonuses or similar compensation are paid to the employee, they must meet the requirements of paragraphs (c)(2)(i) through (iv) of this section (i.e., recorded and reported as "earnings" with appropriate taxes and FICA contributions withheld and paid).

(3) Benefits and eligibility for benefits provided as compensation for services (e.g., cash bonuses; stock options; paid vacations and holidays; health, life, disability and other insurance plans; retirement and savings plans) shall be offered to the H–1B nonimmigrant(s) on the same basis, and in accordance with the same criteria, as the employer offers to U.S. workers.

(i) For purposes of this section, the offer of benefits "on the same basis, and in accordance with the same criteria" means that the employer shall offer H–1B nonimmigrants the same benefit package as it offers to U.S. workers, and may not provide more strict eligibility or participation requirements for the H–1B nonimmigrant(s) than for similarly employed U.S. workers(s) (e.g., full-time workers compared to full-time workers; professional staff compared to professional staff). H–1B nonimmigrants are not to be denied benefits on the basis that they are "temporary employees" by virtue of their nonimmigrant status. An employer may offer greater or additional benefits to the H–1B nonimmigrant(s) than are offered to similarly employed U.S. worker(s), provided that such differing treatment is consistent with the requirements of all applicable nondiscrimination laws (e.g., Title VII of the 1964 Civil Rights Act, 42 U.S.C. 2000e–2000e17). Offers of benefits by employers shall be made in good faith and shall result in the H–1B nonimmigrant(s)'s actual receipt of the benefits that are offered by the employer and elected by the H–1B nonimmigrant(s).

(ii) The benefits received by the H–1B nonimmigrant(s) need not be identical to the benefits received by similarly employed U.S. workers(s), provided that the H–1B nonimmigrant is offered the same benefits package as those workers but voluntarily chooses to receive different benefits (e.g., elects to receive cash payment rather than stock option, elects not to receive health insurance because of required employee contributions, or elects to receive different benefits among an array of benefits) or, in those instances where the employer is part of a multinational corporate operation, the benefits received by the H–1B nonimmigrant are provided in accordance with an employer's practice that satisfies the requirements of paragraph (c)(3)(iii)(B) or (C) of this section. In all cases, however, an employer's practice must comply with the requirements of any applicable nondiscrimination laws (e.g., Title VII of the 1964 Civil Rights Act, 42 U.S.C. 2000e–2000e17).

(iii) If the employer is part of a multinational corporate operation (i.e., operates in affiliation with business entities in other countries, whether as subsidiaries or in some other arrangement), the following three options (i.e., (A), (B) or (C)) are available to the employer with respect to H–1B nonimmigrants who remain on the "home country" payroll.

(A) The employer may offer the H–1B nonimmigrant(s) benefits in accordance with paragraphs (c)(3)(i) and (ii) of this section.

(B) Where an H–1B nonimmigrant is in the U.S. for no more than 90 consecutive calendar days, the employer during that period may maintain the H–1B nonimmigrant on the benefits provided to the nonimmigrant in his/her permanent work station (ordinarily the home country), and not offer the nonimmigrant the benefits that are offered to similarly employed U.S. workers, provided that the employer affords reciprocal benefits treatment for any U.S. workers (i.e., allows its U.S. employees, while working out of the country on a temporary basis away from their permanent work stations in the United States, or while working in the United States on a temporary basis away from their permanent work stations in another country, to continue to receive the benefits provided them at their permanent work stations). Employers are cautioned that this provision is available only if the employer's practices do not constitute an evasion of the benefit requirements, such as where the H–1B nonimmigrant remains in the United States for most of the year, but briefly returns to the "home country" before any 90–day period would expire.

(C) Where an H–1B nonimmigrant is in the U.S. for more than 90 consecutive calendar days (or from the point where the worker is transferred to the U.S. or it is anticipated that the worker will likely remain in the U.S. more than 90 consecutive days), the employer may maintain the H–1B nonimmigrant on the benefits provided in his/her home country (i.e., "home country benefits") (and not offer the nonimmigrant the benefits that are offered to similarly employed U.S. workers) provided that all of the following criteria are satisfied:

(1) The H–1B nonimmigrant continues to be employed in his/her home country (either with the H–1B employer or with a corporate affiliate of the employer);

(2) The H–1B nonimmigrant is enrolled in benefits in his/her home country (in accordance with any applicable eligibility standards for such benefits);

(3) The benefits provided in his/her home country are equivalent to, or equitably comparable to, the benefits offered to similarly employed U.S. workers (i.e., are no less advantageous to the nonimmigrant);

(4) The employer affords reciprocal benefits treatment for any U.S. workers while they are working out of the country, away from their permanent work stations (whether in the United States or abroad), on a temporary basis (i.e., maintains such U.S. workers on the benefits they received at their permanent work stations);

(5) If the employer offers health benefits to its U.S. workers, the employer offers the same plan on the same basis to its H–1B nonimmigrants in the United States where the employer does not provide the H–1B nonimmigrant with health benefits in the home country, or the employer's home-country health plan does not provide full coverage (i.e., coverage comparable to what he/she would receive at the home work station) for medical treatment in the United States; and

(6) The employer offers H–1B nonimmigrants who are in the United States more than 90 continuous days those U.S. benefits which are paid directly to the worker (e.g., paid vacation, paid holidays, and bonuses).

(iv) Benefits provided as compensation for services may be credited toward the satisfaction of the employer's required wage obligation only if the requirements of paragraph (c)(2) of this section are met (e.g., recorded and reported as "earnings" with appropriate taxes and FICA contributions withheld and paid).

(4) For salaried employees, wages will be due in prorated installments (e.g., annual salary divided into 26 bi-weekly pay periods, where employer pays bi-weekly) paid no less often than monthly except that, in the event that the employer intends to use some other form of nondiscretionary payment to supplement the employee's regular/pro-rata pay in order to meet the required wage obligation (e.g., a quarterly production bonus), the employer's documentation of wage payments (including such supplemental payments) must show the employer's commitment to make such payment and the method of determining the amount thereof, and must show unequivocally that the required wage obligation was met for prior pay periods and, upon payment and distribution of such other payments that are pending, will be met for each current or future pay period. An employer that is a school or other educational institution may apply an established salary practice under which the employer pays to H–1B nonimmigrants and U.S. workers in the same occupational classification an annual salary in disbursements over fewer than 12 months, provided that the nonimmigrant agrees to the compressed annual salary payments prior to the commencement of the employment and the application of the salary practice to the nonimmigrant does not otherwise cause him/her to violate any condition of his/her authorization under the INA to remain in the U.S.

(5) For hourly-wage employees, the required wages will be due for all hours worked and/or for any nonproductive time (as specified in paragraph (c)(7) of this section) at the end of the employee's ordinary pay period (e.g., weekly) but in no event less frequently than monthly.

(6) Subject to the standards specified in paragraph (c)(7) of this section (regarding nonproductive status), an H–1B nonimmigrant shall receive the required pay beginning on the date when the nonimmigrant "enters into employment" with the employer.

(i) For purposes of this paragraph (c)(6), the H–1B nonimmigrant is considered to "enter into employment" when he/she first makes him/herself available for work or otherwise comes under the control of the employer, such as by waiting for an assignment, reporting for orientation or training, going to an interview or meeting with a customer, or studying for a licensing examination, and includes all activities thereafter.

(ii) Even if the H–1B nonimmigrant has not yet "entered into employment" with the employer (as described in paragraph (c)(6)(i) of this section), the employer that has had an LCA certified and an H–1B petition approved for the H–1B nonimmigrant shall pay the nonimmigrant the required wage beginning 30 days after the date the nonimmigrant first is admitted into the U.S. pursuant to the petition, or, if the nonimmigrant is present in the United States on the date of the approval of the petition, beginning 60 days after the date the nonimmigrant becomes eligible to work for the employer. For purposes of this latter requirement, the H–1B nonimmigrant is considered to be eligible to work for the employer upon the date of need set forth on the approved H–1B petition filed by the employer, or the date of adjustment of the nonimmigrant's status by DHS, whichever is later. Matters such as the worker's obtaining a State license would not be relevant to this determination.

(7) Wage obligation(s) for H–1B nonimmigrant in nonproductive status—

(i) Circumstances where wages must be paid. If the H–1B nonimmigrant is not performing work and is in a nonproductive status due to a decision by the employer (e.g., because of lack of assigned work), lack of a permit or license, or any other reason except as specified in paragraph (c)(7)(ii) of this section, the employer is required to pay the salaried employee the full pro-rata amount due, or to pay the hourly-wage employee for a full-time week (40 hours or such other number of hours as the employer can demonstrate to be full-time employment for hourly employees, or the full amount of the weekly salary for salaried employees) at the required wage for the occupation listed on the LCA. If the employer's LCA carries a designation of "part-time employment," the employer is required to pay the nonproductive employee for at least the number of hours indicated on the I–129 petition filed by the employer with the DHS and incorporated by reference on the LCA. If the I–129 indicates a range of hours for part-time employment, the employer is required to pay the nonproductive employee for at least the average number of hours normally worked by the H–1B nonimmigrant, provided that such average is within the range indicated; in no event shall the employee be paid for fewer than the minimum number of hours indicated for the range of part-time employment. In all cases the H–1B nonimmigrant must be paid the required wage for all hours performing work within the meaning of the Fair Labor Standards Act, 29 U.S.C. 201 et seq.

(ii) Circumstances where wages need not be paid. If an H–1B nonimmigrant experiences a period of nonproductive status due to conditions unrelated to employment which take the nonimmigrant away from his/her duties at his/her voluntary request and convenience (e.g., touring the U.S., caring for ill relative) or render the nonimmigrant unable to work (e.g., maternity leave, automobile accident which temporarily incapacitates the nonimmigrant), then the employer shall not be obligated to pay the required wage rate during that period, provided that such period is not subject to payment under the employer's benefit plan or other statutes such as the Family and Medical Leave Act (29 U.S.C. 2601 et seq.) or the Americans with Disabilities Act (42 U.S.C. 12101 et seq.). Payment need not be made if there has been a bona fide termination of the employment relationship. DHS regulations require the employer to notify the DHS that the employment relationship has been terminated so that the petition is canceled (8 CFR 214.2(h)(11)), and require the employer to provide the employee with payment for transportation home under certain circumstances (8 CFR 214.2(h)(4)(iii)(E)).

(8) If the employee works in an occupation other than that identified on the employer's LCA, the employer's required wage obligation is based on the occupation identified on the LCA, and not on whatever wage standards may be applicable in the occupation in which the employee may be working.

(9) "Authorized deductions," for purposes of the employer's satisfaction of the H–1B required wage obligation, means a deduction from wages in complete compliance with one of the following three sets of criteria (i.e., paragraph (c)(9)(i), (ii), or (iii))—

(i) Deduction which is required by law (e.g., income tax; FICA); or

(ii) Deduction which is authorized by a collective bargaining agreement, or is reasonable and customary in the occupation and/or area of employment (e.g., union dues; contribution to premium for health insurance policy covering all employees; savings or retirement fund contribution for plan(s) in compliance with the Employee Retirement Income Security Act, 29 U.S.C. 1001, et seq.), except that the deduction may not recoup a business expense(s) of the employer (including attorney fees and other costs connected to the performance of H–1B program functions which are required to be performed by the employer, e.g., preparation and filing of LCA and H–1B petition); the deduction must have been revealed to the worker prior to the commencement of employment and, if the deduction was a condition of employment, had been clearly identified as such; and the deduction must be made against wages of U.S. workers as well as H–1B nonimmigrants (where there are U.S. workers); or

(iii) Deduction which meets the following requirements:

(A) Is made in accordance with a voluntary, written authorization by the employee (Note to paragraph (c)(9)(iii)(A): an employee's mere acceptance of a job which carries a deduction as a condition of employment does not constitute voluntary authorization, even if such condition were stated in writing);

(B) Is for a matter principally for the benefit of the employee (Note to paragraph (c)(9)(iii)(B): housing and food allowances would be considered to meet this "benefit of employee" standard, unless the employee is in travel status, or unless the circumstances indicate that the arrangements for the employee's housing or food are principally for the convenience or benefit of the employer (e.g., employee living at worksite in "on call" status));

(C) Is not a recoupment of the employer's business expense (e.g., tools and equipment; transportation costs where such transportation is an incident of, and necessary to, the employment; living expenses when the employee is traveling on the employer's business; attorney fees and other costs connected to the performance of H–1B program functions which are required to be performed by the employer (e.g., preparation and filing of LCA and H–1B petition)). (For purposes of this section, initial transportation from, and end-of-employment travel, to the worker's home country shall not be considered a business expense.);

(D) Is an amount that does not exceed the fair market value or the actual cost (whichever is lower) of the matter covered (Note to paragraph (c)(9)(iii)(D): The employer must document the cost and value); and

(E) Is an amount that does not exceed the limits set for garnishment of wages in the Consumer Credit Protection Act, 15 U.S.C. 1673, and the regulations of the Secretary pursuant to that Act, 29 CFR part 870, under which garnishment(s) may not exceed 25 percent of an employee's disposable earnings for a workweek.

(10) A deduction from or reduction in the payment of the required wage is not authorized (and is therefore prohibited) for the following purposes (i.e., paragraphs (c)(10)(i) and (ii)):

(i) A penalty paid by the H–1B nonimmigrant for ceasing employment with the employer prior to a date agreed to by the nonimmigrant and the employer.

(A) The employer is not permitted to require (directly or indirectly) that the nonimmigrant pay a penalty for ceasing employment with the employer prior to an agreed date. Therefore, the employer shall not make any deduction from or reduction in the payment of the required wage to collect such a penalty.

(B) The employer is permitted to receive bona fide liquidated damages from the H–1B nonimmigrant who ceases employment with the employer prior to an agreed date. However, the requirements of paragraph (c)(9)(iii) of this section must be fully satisfied, if such damages are to be received by the employer via deduction from or reduction in the payment of the required wage.

(C) The distinction between liquidated damages (which are permissible) and a penalty (which is prohibited) is to be made on the basis of the applicable State law. In general, the laws of the various States recognize that liquidated damages are amounts which are fixed or stipulated by the parties at the inception of the contract, and which are reasonable approximations or estimates of the anticipated or actual damage caused to one party by the other party's breach of the contract. On the other hand, the laws of the various States, in general, consider that penalties are amounts which (although fixed or stipulated in the contract by the parties) are not reasonable approximations or estimates of such damage. The laws of the various States, in general, require that the relation or circumstances of the parties, and the purpose(s) of the agreement, are to be taken into account, so that, for example, an agreement to a payment would be considered to be a prohibited penalty where it is the result of fraud or where it cloaks oppression. Furthermore, as a general matter, the sum stipulated must take into account whether the contract breach is total or partial (i.e., the percentage of the employment contract completed). (See, e.g., Vanderbilt University v. DiNardo, 174 F.3d 751 (6th Cir. 1999) (applying Tennessee law); Overholt Crop Insurance Service Co. v. Travis, 941 F.2d 1361 (8th Cir. 1991) (applying Minnesota and South Dakota law); BDO Seidman v. Hirshberg, 712 N.E.2d 1220 (N.Y. 1999); Guiliano v. Cleo, Inc., 995 S.W.2d 88 (Tenn. 1999); Wojtowicz v. Greeley Anesthesia Services, P.C., 961 P.2d 520 (Colo.Ct.App. 1998); see generally, Restatement (Second) Contracts § 356 (comment b); 22 Am.Jur.2d Damages §§ 683, 686, 690, 693, 703). In an enforcement proceeding under subpart I of this part, the Administrator shall determine, applying relevant State law (including consideration where appropriate to actions by the employer, if any, contributing to the early cessation, such as the employer's constructive discharge of the nonimmigrant or non-compliance with its obligations under the INA and its regulations) whether the payment in question constitutes liquidated damages or a penalty. (Note to paragraph (c)(10)(i)(C): The $500/$1,000 filing fee, if any, under section 214(c) of the INA can never be included in any liquidated damages received by the employer. See paragraph (c)(10)(ii), which follows.)

(ii) A rebate of the $500/$1,000 filing fee paid by the employer, if any, under section 214(c) of the INA. The employer may not receive, and the H–1B nonimmigrant may not pay, any part of the $500 additional filing fee (for a petition filed prior to December 18, 2000) or $1,000 additional filing fee (for a petition filed on or subsequent to December 18, 2000), whether

directly or indirectly, voluntarily or involuntarily. Thus, no deduction from or reduction in wages for purposes of a rebate of any part of this fee is permitted. Further, if liquidated damages are received by the employer from the H–1B nonimmigrant upon the nonimmigrant's ceasing employment with the employer prior to a date agreed to by the nonimmigrant and the employer, such liquidated damages shall not include any part of the $500/$1,000 filing fee (see paragraph (c)(10)(i) of this section). If the filing fee is paid by a third party and the H–1B nonimmigrant reimburses all or part of the fee to such third party, the employer shall be considered to be in violation of this prohibition since the employer would in such circumstances have been spared the expense of the fee which the H–1B nonimmigrant paid.

(11) Any unauthorized deduction taken from wages is considered by the Department to be non-payment of that amount of wages, and in the event of an investigation, will result in back wage assessment (plus civil money penalties and/or disqualification from H–1B and other immigration programs, if willful).

(12) Where the employer depresses the employee's wages below the required wage by imposing on the employee any of the employer's business expenses(s), the Department will consider the amount to be an unauthorized deduction from wages even if the matter is not shown in the employer's payroll records as a deduction.

(13) Where the employer makes deduction(s) for repayment of loan(s) or wage advance(s) made to the employee, the Department, in the event of an investigation, will require the employer to establish the legitimacy and purpose(s) of the loan(s) or wage advance(s), with reference to the standards set out in paragraph (c)(9)(iii) of this section.

(d) Enforcement actions.

(1) In the event that a complaint is filed pursuant to subpart I of this part, alleging a failure to meet the "prevailing wage" condition or a material misrepresentation by the employer regarding the payment of the required wage, or pursuant to such other basis for investigation as the Administrator may find, the Administrator shall determine whether the employer has the documentation required in paragraph (b)(3)of this section, and whether the documentation supports the employer's wage attestation. Where the documentation is either nonexistent or is insufficient to determine the prevailing wage (e.g., does not meet the criteria specified in this section, in which case the Administrator may find a violation of paragraph (b)(1), (2), or (3), of this section); or where, based on significant evidence regarding wages paid for the occupation in the area of intended employment, the Administrator has reason to believe that the prevailing wage finding obtained from an independent authoritative source or another legitimate source varies substantially from the wage prevailing for the occupation in the area of intended employment; or where the employer has been unable to demonstrate that the prevailing wage determined by another legitimate source is in accordance with the regulatory criteria, the Administrator may contact ETA, which shall provide the Administrator with a prevailing wage determination, which the Administrator shall use as the basis for determining violations and for computing back wages, if such wages are found to be owed. The 30–day investigatory period shall be suspended while ETA makes the prevailing wage determination and, in the event that the employer timely challenges the determination (see § 655.731(d)(2)), shall be suspended until the challenge process is completed and the Administrator's investigation can be resumed.

(2) In the event the Administrator obtains a prevailing wage from ETA pursuant to paragraph (d)(1) of this section, and the employer desires review, including judicial review, the employer shall challenge the ETA prevailing wage only by filing a request for review under § 656.41 of this chapter within 30 days of the employer's receipt of the PWD from the Administrator. If the request is timely filed, the decision of OFLC is suspended until the Center Director issues a determination on the employer's appeal. If the employer desires review, including judicial review, of the decision of the NPC Center Director, the employer shall make a request for review of the determination by the Board of Alien Labor

Certification Appeals (BALCA) under § 656.41(e) of this chapter within 30 days of the receipt of the decision of the Center Director. If a request for review is timely filed with the BALCA, the determination by the Center Director is suspended until the BALCA issues a determination on the employer's appeal. In any challenge to the wage determination, neither ETA nor the NPC shall divulge any employer wage data collected under the promise of confidentiality.

(i) Where an employer timely challenges an OFLC PWD obtained by the Administrator, the 30–day investigative period shall be suspended until the employer obtains a final ruling. Upon such a final ruling, the investigation and any subsequent enforcement proceeding shall continue, with the PWD as determined by the BALCA serving as the conclusive determination for all purposes.

(ii) [Reserved]

(3) For purposes of this paragraph (d), OFLC may consult with the NPC to ascertain the prevailing wage applicable under the circumstances of the particular complaint.

**Credits**

[65 FR 80214, Dec. 20, 2000; 66 FR 10814, Feb. 20, 2001; 66 FR 63302, Dec. 5, 2001; 69 FR 68228, Nov. 23, 2004; 69 FR 77384, Dec. 27, 2004; 71 FR 35521, June 21, 2006; 71 FR 37804, June 30, 2006; 73 FR 19949, April 11, 2008; 73 FR 78067, Dec. 19, 2008; 74 FR 45561, Sept. 3, 2009; 85 FR 63914, Oct. 8, 2020; 86 FR 3608, 3672, Jan. 14, 2021; 86 FR 13995, March 12, 2021; 86 FR 26164, May 13, 2021; 86 FR 70730, Dec. 13, 2021]

SOURCE: 42 FR 45899, Sept. 13, 1977; 51 FR 24141, July 2, 1986; 51 FR 30351, Aug. 26, 1986; 52 FR 20507, June 1, 1987; 54 FR 28046, July 5, 1989; 55 FR 29358, July 19, 1990; 55 FR 50510, Dec. 6, 1990; 56 FR 24666, May 30, 1991; 56 FR 54738, Oct. 22, 1991; 56 FR 56875, Nov. 6, 1991; 57 FR 1337, Jan. 13, 1992; 57 FR 40989, Sept. 8, 1992; 59 FR 897, Jan. 6, 1994.; 59 FR 5484, Feb. 4, 1994; 59 FR 65659, Dec. 20, 1994; 59 FR 65676, Dec. 20, 1994; 60 FR 3976, Jan. 19, 1995; 65 FR 43542, July 13, 2000; 65 FR 51149, Aug. 22, 2000; 65 FR 80208, Dec. 20, 2000; 65 FR 80209, Dec. 20, 2000; 67 FR 59779, Sept. 24, 2002; 69 FR 68226, Nov. 23, 2004; 71 FR 37804, June 30, 2006; 73 FR 19947, April 11, 2008; 73 FR 77207, Dec. 18, 2008; 73 FR 78052, Dec. 19, 2008; 74 FR 25985, May 29, 2009; 75 FR 6959, Feb. 12, 2010; 75 FR 10403, March 5, 2010; 78 FR 24061, April 24, 2013; 80 FR 24108, April 29, 2015; 80 FR 63066, Oct. 16, 2015; 81 FR 43448, July 1, 2016; 81 FR 48700, July 26, 2016; 84 FR 12431, April 1, 2019; 85 FR 63914, Oct. 8, 2020; 86 FR 3608, 3672, Jan. 14, 2021; 86 FR 13995, March 12, 2021; 86 FR 26164, May 13, 2021; 86 FR 70730, Dec. 13, 2021, unless otherwise noted.

AUTHORITY: Section 655.0 issued under 8 U.S.C. 1101(a)(15)(E)(iii), 1101(a)(15)(H)(i) and (ii), 8 U.S.C. 1103(a)(6), 1182(m), (n), and (t), 1184(c), (g), and (j), 1188, and 1288(c) and (d); sec. 3(c)(1), Pub.L. 101–238, 103 Stat. 2099, 2102 (8 U.S.C. 1182 note); sec. 221(a), Pub.L. 101–649, 104 Stat. 4978, 5027 (8 U.S.C. 1184 note); sec. 303(a)(8), Pub.L. 102–232, 105 Stat. 1733, 1748 (8 U.S.C. 1101 note); sec. 323(c), Pub.L. 103–206, 107 Stat. 2428; sec. 412(e), Pub.L. 105–277, 112 Stat. 2681 (8 U.S.C. 1182 note); sec. 2(d), Pub.L. 106–95, 113 Stat. 1312, 1316 (8 U.S.C. 1182 note); 29 U.S.C. 49k; Pub.L. 107–296, 116 Stat. 2135, as amended; Pub.L. 109–423, 120 Stat. 2900; 8 CFR 214.2(h)(4)(i); 8 CFR 214.2(h)(6)(iii); and sec. 6, Pub.L. 115–218, 132 Stat. 1547 (48 U.S.C. 1806).; Subpart A issued under 8 CFR 214.2(h).; Subpart B issued under 8 U.S.C. 1101(a)(15)(H)(ii)(a), 1184(c), and 1188; and 8 CFR 214.2(h).; Subpart E issued under 48 U.S.C. 1806.; Subparts F and G issued under 8 U.S.C. 1288(c) and (d); sec. 323(c), Pub.L. 103–206, 107 Stat. 2428; and 28 U.S.C. 2461 note, Pub.L. 114–74 at section 701.; Subparts H and I issued under 8 U.S.C. 1101(a)(15)(H)(i)(b) and (b)(1), 1182(n), and (t), and 1184(g) and (j); sec. 303(a)(8), Pub.L. 102–232, 105 Stat. 1733, 1748 (8 U.S.C. 1101 note); sec. 412(e), Pub.L. 105–277, 112 Stat. 2681; 8 CFR 214.2(h); and 28 U.S.C. 2461 note, Pub.L. 114–75 at section 701.; Subparts L and M issued under 8 U.S.C. 1101(a)(15)(H)(i)(c) and 1182(m); sec. 2(d), Pub.L. 106–95, 113 Stat. 1312, 1316 (8 U.S.C. 1182 note); Pub.L. 109–423, 120 Stat. 2900; and 8 CFR 214.2(h).

Notes of Decisions (4)

Current through Sept. 8, 2023, 88 FR 61985. Some sections may be more current. See credits for details.

---

**End of Document**

© 2023 Thomson Reuters. No claim to original U.S. Government Works.

# EXHIBIT 36

West's Nevada Revised Statutes Annotated
  Title 15. Crimes and Punishments (Chapters 193-207)
    Chapter 200. Crimes Against the Person (Refs & Annos)
      Involuntary Servitude; Purchase or Sale of Person

N.R.S. 200.463

200.463. Involuntary servitude; penalties

Effective: July 1, 2023
Currentness

<2023 legislation subject to revision and classification by the Legislative Counsel Bureau.>

1. A person who knowingly subjects, or attempts to subject, another person to forced labor or services by:

(a) Causing or threatening to cause physical harm to any person;

(b) Physically restraining or threatening to physically restrain any person;

(c) Abusing or threatening to abuse the law or legal process;

(d) Knowingly destroying, concealing, removing, confiscating or possessing any actual or purported passport or other immigration document, or any other actual or purported government identification document, of the person;

(e) Extortion;

(f) Causing or threatening to cause financial harm to any person;

(g) Debt bondage;

(h) Peonage; or

(i) Using a scheme, plan or pattern intended to cause the person to believe that the failure to perform an act would result in serious harm or physical restraint against any person,

is guilty of holding a person in involuntary servitude.

2. Unless a greater penalty is provided in NRS 200.4631, a person who is found guilty of holding a person in involuntary servitude is guilty of a category B felony and shall be punished:

(a) Where the victim suffers substantial bodily harm while held in involuntary servitude or in attempted escape or escape therefrom, by imprisonment in the state prison for a minimum term of not less than 7 years and a maximum term of not more than 20 years, and may be further punished by a fine of not more than $50,000.

(b) Where the victim suffers no substantial bodily harm as a result of being held in involuntary servitude, by imprisonment in the state prison for a minimum term of not less than 5 years and a maximum term of not more than 20 years, and may be further punished by a fine of not more than $50,000.

3. As used in this section:

(a) "Debt bondage" has the meaning ascribed to it in 22 U.S.C. § 7102.

(b) "Peonage" means a status or condition of compulsory service based upon real or alleged indebtedness.

**Credits**
Added by Laws 2005, c. 44, § 3. Amended by Laws 2013, c. 354, § 3; Laws 2023, c. 46, § 10, eff. July 1, 2023.

N. R. S. 200.463, NV ST 200.463
Current through legislation of the 82nd Regular Session (2023) effective through October 1, 2023, excluding chapters 280 and 505. Text subject to revision and classification by the Legislative Counsel Bureau.

**End of Document**
© 2023 Thomson Reuters. No claim to original U.S. Government Works.